**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REPSOL YPF, S.A. and TEXAS YALE
CAPITAL CORP., Individually and On Behalf
of All Others Similarly Situated,

     Plaintiffs,

  - against -

REPUBLIC OF ARGENTINA,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. _____

**CLASS ACTION**
**COMPLAINT**

*JUDGE GRIESA*

12 CV 3877

RECEIVED
MAY 16 2012
U.S.D.C. S.D. N.Y.
CASHIERS

   Plaintiffs Repsol YPF, S.A. ("Repsol") and Texas Yale Capital Corp. ("Yale

Capital"), by their attorneys Davis Polk & Wardwell LLP, allege as follows for their

complaint herein:

## NATURE OF THE ACTION

   1.  This class action arises from an effort by the Republic of Argentina

("Argentina") to walk away from the contractual obligations that it undertook when it

chose to enter the United States to raise capital through the initial public offering of its

formerly state-owned oil company, YPF, S.A. ("YPF" or the "Company"). To induce

investors to purchase shares in that former state enterprise, Argentina undertook the

contractual obligation to launch a tender offer to all holders of Class D shares of YPF if it

should ever in the future seek to retake control of the Company. But now, culminating a

wide-ranging offensive against YPF that has nearly halved the stock market value of the

Company in a matter of months, Argentina has seized control of YPF's operations,

appointed an "intervenor" conferred with all the powers of the Company's board and

president, and enacted legislation seizing by fiat a majority of YPF's shares, all without launching any tender offer.

2.      Argentina's tender offer obligation was set forth, *inter alia*, in new provisions of the Company's by-laws that Argentina adopted when, as sole and controlling shareholder, it sought to privatize YPF and to monetize a portion of its interest by publicly offering its shares.  The lion's share of that privatization was accomplished through an SEC-registered initial public offering of American Depositary Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE"), which alone delivered proceeds of more than *$1.1 billion* directly to Argentina as selling shareholder – nearly half of the funds raised through the privatization as a whole, and almost twice the proceeds raised within Argentina.  In order to induce U.S. and other investors to purchase shares in the formerly state-owned enterprise, Argentina committed to shareholders that it would not retake control of the Company without offering all investors a compensated exit.  Indeed, the new provisions prohibited Argentina from ever again exercising control over YPF, even if it had sufficient shares to do so, unless it launched a tender offer for all Class D shares – the shares it was taking public – at a price determined according to those provisions.  These promises have been repeated in numerous prospectuses and periodic reports filed with the SEC in the years since the IPO, each of which Argentina approved and ratified in its commercial capacities as a shareholder of YPF and through its designated board representative.

3.      Notwithstanding these clear contractual commitments, and without any tender offer being launched, Argentina has now seized control of YPF's facilities and operations, appointed an intervenor with total control over the Company, and enacted

legislation seizing by fiat a majority of the Company's shares. Argentina's failure to launch a tender offer despite having retaken control over YPF constitutes a breach of its contractual obligations to other shareholders. Its unequivocally expressed intention to acquire a majority of the Company's shares without any such tender offer moreover constitutes a repudiation of its contractual obligations and presents an actual, justiciable controversy concerning the parties' rights and obligations under their contract.

4.      Plaintiffs accordingly seek compensatory damages in respect of Argentina's breach of contract, a declaration from this Court upholding Plaintiffs' legal rights under the contract, and other relief as set forth herein. Plaintiffs' claims do not require any ruling on the sovereign powers of Argentina. Rather, it is the contractual consequences of Argentina's actions, actions constituting the commercial conduct of Argentina in its capacities as selling and continuing shareholder of YPF, and relating to commercial acts due to have been performed in this District – that are at issue. These issues are commercial matters within the jurisdiction of this Court and are specifically governed by an enforceable contract among the parties.

## PARTIES

5.      Plaintiff Repsol is a publicly-held limited liability company (*sociedad anónima*) organized under the laws of the Kingdom of Spain with its headquarters in Madrid, Spain. Plaintiff Repsol is a holder of YPF Class D shares directly and through its ownership of ADRs administered by the Bank of New York as depositary agent. Through a series of transactions in 1999, including a direct purchase from Argentina consummated in New York City and a public tender offer for Class D shares, Repsol acquired a controlling stake in YPF and remains one of YPF's largest shareholders. It is from Repsol that Argentina has subjected to expropriation 51% of YPF's Class D shares.

3

In this action Repsol is suing solely on the basis of its continued holding of that portion of its shares that is not subject to the expropriation process.

6.      Plaintiff Texas Yale Capital Corp. is a financial investment advisory firm registered with the SEC and organized under the laws of the State of Texas with its headquarters located in Spicewood, Texas. Yale Capital holds shares in YPF through its ownership of ADRs administered by the Bank of New York as depositary agent.

7.      Defendant the Republic of Argentina is also a shareholder of YPF. Prior to the 1993 IPO of YPF, Argentina was the sole owner of YPF, and it participated in that offering, including the SEC-registered offering of ADRs, as the Company's sole and selling shareholder. Subsequent to the IPO, Argentina has remained a shareholder of the Company, specifically as the exclusive holder of Class A "golden" shares, and has continued to participate in its management through a designated representative on the Company's board of directors. Argentina has now also acquired control of a majority of the Company's Class D shares through the intervention in YPF and the expropriation of 51% of YPF's Class D shares. Argentina is organized as a federation of twenty-three provinces and an independent federal city (Buenos Aires).

8.      Non-party YPF is a publicly-held limited liability stock company (*sociedad anónima*) organized under the laws of Argentina. The address of its principal executive offices is Macacha Güemes 515, 1106, Buenos Aires, Argentina. Prior to 1993, it was an exclusively state-owned, monopolist oil and gas company. In the early 1990s, YPF was privatized and Argentina took it public in 1993. YPF's shares trade on the NYSE, in the form of ADRs, under the symbol "YPF." YPF's Class D shares comprise almost 100% of the Company's outstanding capital stock. ADRs represent

4

approximately 60% of YPF's outstanding Class D shares, and thus approximately 60% of YPF's capital stock.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1330 because this is a non-jury civil action against a foreign state, as defined in 28 U.S.C. § 1603(a), involving claims for relief *in personam* with respect to which the foreign state is not entitled to immunity under 28 U.S.C. § 1605(a), or under any applicable international agreement.  In particular, Defendant Argentina is not entitled to immunity under 28 U.S.C. § 1605(a)(2) because this action is based upon Argentina's commercial activity and its acts in connection therewith, which have been carried on and performed and have caused direct effects in the United States.

10.     Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District.

## FACTUAL ALLEGATIONS

### Privatization of YPF and Adoption of the Tender Offer Requirements

11.     From the 1920s through the 1980s, Argentina maintained a monopoly in the oil and gas industry through state agencies and YPF's predecessor entity, Yacimientos Petrolíferos Fiscales.  YPF was an entirely state-owned and state-run enterprise, dominated and controlled by Argentina as its sole shareholder.  Argentina actively participated in and exercised control over YPF's operations.  As disclosed in YPF's Prospectus dated June 28, 1993 (the "U.S. IPO Prospectus"), Argentina operated YPF in accordance with the national hydrocarbon policy and other governmental policies. These policies "generally reflected broader Argentine political and social objectives

rather than business strategies designed to maximize [YPF's] profitability." As an instrument of Argentina, YPF functioned as its agent and representative.

12.     However, in the early 1990s, Argentina made a decision to privatize YPF, representing to potential investors that the Company would be "transform[ed]" from an inefficient government monopoly "into an efficient and competitive enterprise." Acting in a commercial capacity and no different than any private controlling shareholder, Argentina sought to monetize a portion of its interest in YPF by publicly offering shares.

13.     In the context of this privatization and with an eye to an eventual public offering of YPF, Argentina in its commercial capacity as sole and controlling shareholder adopted certain provisions in YPF's by-laws designed to induce investors to purchase the Company's shares by committing to investors that they would be provided a compensated exit in the event Argentina were to have a change of heart and choose to retake control of YPF. Argentina enacted those provisions itself by National Executive Decree No. 1,106, dated May 31, 1993.

14.     In its commercial capacity as shareholder of YPF, Argentina caused those new provisions to be codified in the Company's by-laws. Section 7 of those by-laws required persons intending to consummate a control acquisition to first make a public tender offer for YPF's outstanding shares. And, critically, Section 28 of the by-laws expressly provided that the tender offer requirement of Section 7 applied to any subsequent acquisition of control by Argentina. This was because the purpose of the new tender offer provisions was to address investors' concern that if Argentina should change its mind about privatizing the formerly state-owned oil Company, investors could wind up holding equity in a government-dominated YPF, operated not for their benefit as

6

shareholders, but as an instrumentality of the Argentine government. That is precisely what has now happened, but Argentina has not honored its tender offer obligations and, to the contrary, has made clear that it does not intend to do so.

15.     Sections 7 and 28 of the by-laws remain in effect to date and have been in effect continuously since 1993. Indeed, Section 7 was triggered and honored in the case of two prior acquisitions. Under Section 7, unless a tender offer is launched for all outstanding shares of all classes, it is forbidden for anyone to acquire shares or securities of YPF, whether directly or indirectly, by any means or instrument if, as a result, the acquirer will hold or exercise control over 20% or more of YPF's Class D shares or Class D shares representing 15% or more of YPF's capital stock.

16.     Far from exempting Argentina from those tender offer requirements, another new provision, Section 28, was added to avoid any doubt that Argentina itself was undertaking a tender offer obligation. Indeed, Section 28 was addressed specifically to control transactions by Argentina, setting forth "*Normas especiales*" – "Special provisions" – that made such transactions subject to Section 7 and required Argentina to make a tender offer for all outstanding Class D shares as a condition of acquiring directly or indirectly, by any means or instrument, YPF's shares or securities if, as a result, Argentina were to own or exercise control over (i) at least 49% of YPF's capital stock; (ii) Class D shares representing 15% or more of YPF's capital stock; or (iii) 20% or more of YPF's Class D shares.

17.     Underscoring Argentina's self-imposed prohibition on a reacquisition of control without a tender offer, Section 28 expressly prohibits Argentina from exercising control over the Company – even if it had sufficient shares to do so – unless and until a

7

tender offer had been made. Absent a tender offer, any shares of stock or securities acquired by Argentina in violation of its contractual tender offer obligation are automatically stripped of any right to vote, to collect dividends or other distributions, or even to be counted towards a quorum of shareholders.

18.    The by-laws not only mandate that Argentina make a tender offer, but also specify the procedures that the tender offer must follow and the price at which the offer must be made. That price is the highest of: (i) the highest price Argentina paid for Class D shares in the preceding two-year period; (ii) the highest closing price, at the seller's rate, for a Class D share of stock, as quoted on the Buenos Aires Stock Exchange, for the preceding thirty-day period; (iii) the product of the highest closing price on the Buenos Aires Stock Exchange in the preceding thirty-day period and the ratio of the highest price Argentina paid for a Class D share in the preceding two-year period against the market price of a Class D share on the day immediately prior to the first day of that two-year period; or (iv) the product of YPF's net income per Class D share during the immediately preceding four complete fiscal quarters and the higher of either the price/income ratio for those four quarters or the highest price/income ratio over the preceding two-year period.

19.    The by-law provisions adopted by Argentina also mandated that the required tender offer be made in the United States – specifically, in New York City. Under Section 7, the tender offeror must publish a notice of the offer at least once a week for the duration of the offer in the business section of the major newspapers of New York. The notice must set forth, *inter alia*, the identification of the bidder, the tender offer price, and a statement that the offer is open to all of YPF's shareholders.

8

20.     Section 7 also requires that the tender offer must comply with applicable regulations in the jurisdictions where the tender offer takes place and the provisions of the stock exchanges where YPF's shares are listed.  The tender offer mandated by Section 7 therefore must comply with the applicable rules and regulations of the SEC and the New York Stock Exchange.  Those rules and regulations, incorporated by reference into the tender offer provisions, in turn require Argentina to file a tender offer statement in the United States with the SEC, for the benefit of U.S. investors, provide notice to investors and to the New York Stock Exchange, and establish a depository or forwarding agent in New York.

### Initial Public Offering of YPF

21.     On June 29, 1993, acting in its commercial capacity as sole and selling shareholder, Argentina launched an initial public offering of YPF's Class D shares.  These shares were offered on the Buenos Aires Stock Exchange and were offered on the New York Stock Exchange and on other exchanges outside the United States and Argentina in the form of ADRs.  But the single largest portion of the public offering was Argentina's sale of shares into the United States, which represented 65,000,000 of the total 140,000,000 Class D shares offered in the privatization.  Indeed, the U.S. offering raised nearly twice as much capital as the Argentine offering, and constituted nearly half of the privatization.  The proceeds to Argentina, as selling shareholder, from the U.S. offering alone were over *$1.1 billion*.  That offering was registered through a Registration Statement on Form F-1 filed with the SEC in accordance with the Securities Act of 1933 and was effectuated by means of the U.S. IPO Prospectus.

22.     The offering was pitched to investors as part and parcel with YPF's "transformation from a ***politically managed, government-owned monopoly*** to an

9

*efficient and competitive integrated oil company*." Now with its intervenor and expropriation law, Argentina is transforming the Company right back to a politically managed, government-controlled company. In marketing its Company to U.S. investors, Argentina distinguished in its U.S. IPO Prospectus the past management of YPF, in which government policies "dictated the management and operation of [YPF]" based on "broader Argentine political and social objectives rather than business strategies designed to maximize [YPF's] profitability." And Argentina painted a cautionary picture of YPF under its past political management: "[YPF's] *operations were inefficient,* and generally *lacked continuity in planning and effective internal controls. Stringent financial criteria were not applied* in making investment decisions, and [YPF]'s opportunities to reinvest internally generated funds were subject to government budgetary constraints." It is thus small wonder, in such circumstances, that investors insisted on a compensated exit should Argentina once again obtain control of YPF, and again run YPF according to its own policies, rather than shareholder interest.

23.     For that reason, Argentina repeated in the U.S. IPO Prospectus its commitment not to reacquire or even exercise control over YPF in the future without launching a tender offer for all of the Class D shares it was taking public. Argentina told potential investors that "*[u]nder the Company's By-laws, in order to acquire a majority of the Company's capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on terms and conditions specified in the By-laws*." Argentina also committed in that Prospectus that "*[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with th[at] procedure . . . will result in the*

*suspension of the voting, dividend and other distribution rights of the shares so acquired*." The value of Argentina's promise that it would not retake control of YPF without offering all Class D shareholders a compensated exit was priced into the value of Class D shares when they were offered in 1993 and at all times thereafter.

### Argentina's Continued Role as Shareholder of YPF and Repetitions of Its Tender Offer Obligations

24.     The privatization and public offering of YPF did not end Argentina's role as YPF shareholder. To the contrary, the privatization transaction left Argentina with important privileges and a significant continuing role in YPF.

25.     Argentina remained the exclusive holder of YPF's Class A "golden" shares, holding 3,764 such shares as of December 31, 2011. Pursuant to the by-laws, as the holder of Class A shares, Argentina voted separately with respect to the election of YPF's board of directors and, as long as it held a single Class A share, Argentina was entitled to appoint one director and one alternate director. In addition, Argentina enjoyed veto rights with respect to specific categories of corporate activities, including acquisition by a third party of shares representing more than 50% of YPF's capital stock.

26.     Argentina's commitment, in its capacity as a shareholder of YPF, not to retake control of the Company without launching a tender offer has been repeatedly reiterated and reaffirmed to investors in the United States through various means. In addition to their inclusion in the U.S. IPO Prospectus, English versions of the by-laws have been regularly filed with or incorporated by reference in the Form 20-F that YPF files with the SEC on an annual basis. Indeed, so fundamental are the tender offer provisions to which Argentina is subject that they have been described in each of YPF's annual Form 20-Fs filed with the SEC since the 1993 IPO. As the holder of YPF's Class

A "golden" shares and through its representative on the Company's board of directors, Argentina made and approved each and every one of those continuing promises and continuously ratified its tender offer obligations under YPF's by-laws.

### Argentina's Campaign to Depress the Company's Stock Price

27.     Through the end of 2011, the Argentine government seemed wholly supportive of YPF.  Indeed, the government publicly praised YPF, thanking it for its commitment to Argentina and "continuing its investments in the country and being its first taxpayer."[1]  In 2010, President Kirchner praised YPF's strategic plan for 2010 through 2014 as "reaffirm[ing] above all things optimism and hopes in the present and the future."  As recently as November 2011, the government's board representative stated that "Argentina is in total accord with the activities that the company has been conducting."  Indeed, investment banking analysts attending presentations in Argentina in November and December 2011 involving YPF management and high-ranking government officials reported to their clients that the Company's relationship with the government seemed positive, and that the Company was engaged in ongoing discussions with the government to raise domestic gas prices, which the government recognized would be important in order to create a more attractive investment environment.

28.     But beginning no later than January 2012 and through mid-April 2012, Argentina changed course and launched an aggressive and wide-ranging offensive against YPF and its shareholders.  As a direct and intended consequence of this government campaign, the stock market value of the Company and the price of its shares were cut nearly in half in a matter of months, in advance of Argentina's seizure of control of YPF

---

[1] All quotations in Paragraphs 27 through 38 are translated from the original Spanish.

12

and announcement of the expropriation legislation on April 16, 2012.  Indeed, public officials acknowledged this objective and celebrated the alleged benefits to Argentina, at the expense of the Company's other shareholders.  For example, on March 14, 2012, Chubut Province Governor Martín Buzzi, speaking on Argentine television, ardently vowed that the decline in YPF's stock price would continue: "You have seen more than once in recent days that the newspapers report how YPF's stock price has been falling. Well, those shares are going to keep dropping on the Buenos Aires stock exchange, the Madrid stock exchange and the New York Stock Exchange.  But that is because our shares are going up.  The shares of the Patagonian people are going up.  The shares of the people of Chubut and Santa Cruz are going up, and those are the shares that are important to us."

29.     Argentina's campaign against YPF was characterized by, among other things, repeated government leaks to the Argentine press.  Again and again, a steady stream of unattributed government leaks led to rampant rumors that nationalization and any manner of other hostile government action were imminent.  The effect on YPF's stock of these leaks and the resulting uncertainty was disastrous.

30.     In late January 2012, the Argentine newspaper *Página/12*, which is widely regarded to be a mouthpiece for the Kirchner administration, began reporting that Argentina was considering nationalizing YPF.  In just the first month after it was leaked that the government was considering nationalizing YPF, the price of YPF's ADRs dropped over 20%.  By the end of February, it was reported that the Argentine legislature had prepared a plan to nationalize YPF and that the plan had been presented to President Kirchner.  YPF's ADR price dropped over 14% on the news.  The Argentine, U.S., and

Spanish press anticipated that a formal announcement of nationalization would come during the opening of the legislative session on March 1, 2012, but no such announcement was made. In mid-March, *Página/12* reported, once again attributing its story to unnamed government sources, that Argentina intended to nationalize YPF before winter began in the southern hemisphere. Chief Cabinet Minister Juan Manuel Abal Medina stated only that the government had not ruled out nationalization. Moody's subsequently downgraded YPF and other Argentine oil companies on the news. By the end of March, *Página/12* reported that President Kirchner had decided to nationalize YPF, and was merely determining which way to proceed. From that time until April 16, when the nationalization legislation was formally announced, YPF's ADRs fell another 23%. The steep decline in YPF's share price over the early part of 2012 as a result of the government's campaign against the Company occurred despite positive news from the Company during the same period, including its discovery of vast new oil reserves in Argentina.

31.   The government's campaign was not limited to press leaks. On February 23, 2012, Argentina's representative on YPF's board of directors sought to have several high-ranking government officials participate in a YPF board meeting. When those officials were not allowed to enter the meeting, the government's director refused to participate, and Argentina's *Comisión Nacional de Valores* (the Argentine securities regulator) subsequently voided the meeting entirely. And, upon information and belief, under pressure from Argentina, various provinces revoked and/or initiated revocation proceedings for more than a dozen of YPF's oil and gas concessions, including concessions for some of YPF's most productive fields. Upon information and belief,

14

under similar pressure, the *Comisión Nacional de Valores* and Argentine antitrust and tax
authorities also took action with respect to YPF.

**Argentina's Retaking of Control over YPF and
Repudiation of Its Tender Offer Obligations**

32.     Culminating this broad offensive against YPF, on April 16, 2012,
Argentina seized control of YPF's operations, appointed an intervenor vested with all the
powers of the Company's board and president, and announced legislation that would
expropriate 51% of the Company's Class D shares.  The expropriation legislation was
signed into law by President Kirchner on May 4, 2012, and went into effect on May 7,
2012.

33.     On April 16, 2012, by Emergency Decree No. 530, Argentina declared
through its executive branch that it was taking complete control of YPF, effective
immediately, by appointing the Minister of Planning, Julio De Vido, as "Intervenor" and
vesting De Vido with all the powers of the Company's board of directors as well as those
of its president.  The control that Argentina gained over YPF through its Intervenor not
only exceeded the thresholds that would trigger a mandatory tender offer, it was
effectively total.  It is now only Argentina, not the shareholders, who has the ability,
among other things, to appoint management and establish dividend policy.

34.     That same day, government officials entered YPF's headquarters in
Buenos Aires, seized control of the Company's facilities and otherwise began exercising
control of the Company's operations.  Argentina immediately replaced the Company's
top management with government officials.  Indeed, the Argentine press reported that
even before President Kirchner had finished announcing the seizure and expropriation
legislation, Argentina's board representative arrived at YPF's headquarters with a list of

15

executives, including the Company's CEO, who were given fifteen minutes to pack up their belongings and leave the premises.  Within hours, Argentina's Intervenor, De Vido, assumed control of the seizure operation and appointed government officials to run each of the Company's key areas.

35.    Also on April 16, 2012, Argentina announced and delivered proposed legislation by which Argentina would expropriate 51% of YPF's Class D shares, without making the tender offer for the Company's outstanding Class D shares required under the by-laws.

36.    Due to Argentina's April 16 seizure of control and announcement of the expropriation legislation, the NYSE suspended trading of YPF's ADRs.  Since the NYSE allowed trading to resume on April 18, the price of YPF's ADRs has plummeted by another 26% as of market close on May 14, 2012.

37.    On April 17, 2012, Deputy Economy Minister Axel Kicillof, who was appointed Vice-Intervenor in YPF by Decree No. 532, delivered a speech before the Argentine Senate regarding Argentina's takeover of YPF, further underscoring Argentina's breach and repudiation of its tender offer obligation.  Kicillof in fact acknowledged the contractual tender offer obligation and its applicability to Argentina.  But Kicillof rejected the provision – which had been adopted into the by-laws by Argentina itself – as a "bear trap" and a matter of YPF's "unfair" and internal by-laws.[2] And Kicillof mocked the notion that Argentina should have to honor its legal obligations,

---

[2] Kicillof stated: "In that unfair by-law, they said that if anyone dared to step foot, like the State itself – because, believe me, that if anyone wanted to buy shares to enter into the company, and passed 15%, he stepped in the bear trap and had to buy 100% of the company at a value equivalent to $19 billion. Because the fools are those who think that the State has to be stupid and buy everyone according to YPF's own law, respecting its by-law."

stating that only "fools" would expect Argentina to comply with its by-laws obligations, and declaring that "'[l]egal certainty' and 'investment climate' are two horrible words."

38.     On May 4, 2012, the expropriation legislation was signed into law as Law 26,741 (the "Expropriation Law"), which became effective on May 7, 2012.  Title III of the Expropriation Law, labeled "Of the Recovery of Control of YPF," provides for the expropriation by Argentina of 51% of the Class D shares of YPF.  Pursuant to the Expropriation Law, the expropriation process will be governed by Law 21,499, Argentina's 1977 law concerning expropriations.

39.     The Expropriation Law gives Argentina total and unequivocal control over YPF.  As soon as it became effective, the Expropriation Law granted Argentina the power to exercise voting rights on all 51% of the Class D shares subject to expropriation. The Expropriation Law also provides that while the expropriated shares are to be divided between the federal executive (51%) and certain provinces (49%), all of the expropriated shares must be voted as a block for a minimum term of fifty years.  The Law dictates that the block must pursue a slate of candidates for the board of directors who will proportionally represent the new holders of the expropriated shares – *i.e.*, the federal executive and the provinces – and a director to represent the Company's workers, rather than the shareholders.

40.     Argentina's failure to launch a tender offer for all YPF Class D shares despite having acquired control over a majority of YPF's stock constitutes a breach of its tender offer obligations.  Through the Expropriation Law, Argentina acquired, among other rights, the power to vote 51% of YPF's Class D shares.  Section 28 of the by-laws provides that any direct or indirect acquisition by Argentina that results in its exercising

17

control over at least 49% of the Company's stock mandates a tender offer for all Class D shares.  Argentina's failure to launch such a tender offer is therefore in direct breach of its contractual obligations under the by-laws.

41.      Argentina's announcement and enactment of the Expropriation Law and related statements also have clearly demonstrated its intent to retake control of YPF without any tender offer and to manage the Company for its own benefit, rather than that of shareholders, in direct repudiation of the promises it made as selling shareholder of YPF and has continuously repeated and ratified at all times since.  On April 23, 2012, underscoring Argentina's disenfranchisement of YPF's shareholders, Argentina's Intervenor cancelled the Company's annual general shareholders' meeting, which had been scheduled for April 25 and at which it had been intended that the Company's annual financial statements would be approved.  Argentina did not reschedule that meeting in time to comply with requirements that financial statements be issued no later than April 30, 2012, and although the *Comisión Nacional de Valores* has scheduled an annual meeting for June 4, 2012, approval of financial statements is not included on the agenda for that meeting.

42.      As a result of Argentina's breaches and repudiation of its obligations, Plaintiffs have suffered precisely the fate that Argentina had committed would not occur: the transformation of YPF back into a government enterprise, without their being offered the opportunity to exit on the terms set by the by-laws.  Plaintiffs have accordingly sustained significant damages.  They seek compensation for those damages, as well as declaratory and injunctive relief as set forth below.

43.     Plaintiffs Repsol and Yale Capital and all other members of the plaintiff class expressly reserve the right to bring other claims not asserted herein that may relate to Argentina's takeover of YPF, including without limitation such claims as may be necessary to prevent any improper interference or unfair competition by third parties seeking to take advantage of the current circumstances to profit at the expense and in violation of the rights of YPF's now disenfranchised shareholders.  Repsol specifically reserves its rights and remedies under: (a) Argentine law and any other applicable legal order; and (b) the Agreement for the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Argentine Republic signed on 3 October 1991 (and which entered into force on 28 September 1992) duly notified to the Argentine Republic by letter dated May 10, 2012, which rights and remedies are not pursued in the present action.

## CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all record or beneficial holders of Class D shares of YPF stock, either directly or through ADRs, who held at the time of Argentina's breach and repudiation of its tender offer obligations, and who were damaged thereby (the "Class").  The Class definition excludes the Class D shares held by Repsol subject to the expropriation process.  The Class also excludes Argentina and any of its instrumentalities, agencies, provinces, departments, or state-run or state-controlled enterprises or funds who may hold Class D shares.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this

time and can only be ascertained through appropriate discovery, Plaintiffs believe that the Class members number at least in the thousands. Plaintiffs also believe that members of the Class are geographically dispersed.

46.     Plaintiffs' claims are typical of the claims of the Class members because Plaintiffs and all Class members are holders of YPF Class D shares, either directly or through ADRs. YPF's by-laws constitute an enforceable contract among YPF's shareholders, including Defendant Argentina and each member of the plaintiff Class. Argentina has commonly breached its contract with Plaintiffs and all Class members, including by retaking control of the Company without honoring its tender offer obligations, and by repudiating its tender offer obligations.

47.     Plaintiffs will fairly and adequately protect the interests of the Class as the interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel competent and experienced in complex commercial and securities litigation.

48.     Argentina has acted and refused to act in a manner generally applicable to the Class, thereby making final injunctive or declaratory relief appropriate with respect to the Class as a whole.

49.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Among those questions of law and fact common to the Class are the nature of Argentina's obligations under the tender offer provisions, Argentina's breaches and repudiation of those obligations, and the price at which a tender offer should have been made pursuant to the by-laws.

50.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.  Upon information and belief, the Class is readily ascertainable from the Defendant's records and the records of the depositary agent.

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

51.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 50 above.

52.    Argentina enacted provisions in the by-laws assuring YPF's investors that if it ever acquired a controlling stake in YPF, it would make a public tender offer for all of YPF's outstanding Class D shares.

53.    YPF's by-laws constitute an enforceable contract.  Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract. Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek to retake control of YPF.

21

54.     Pursuant to the terms of the by-laws, Argentina is prohibited from exercising control over YPF without launching a tender offer for all Class D shares in accordance with Sections 7 and 28 of the by-laws.

55.     Argentina breached that contract by failing to make a tender offer as required by the by-laws as a condition of its exercising control over YPF as of April 16, 2012, and as a result of its acquiring control over a majority of YPF's shares as of May 4, 2012.

56.     The plaintiff Class has been damaged by Argentina's breach in an amount to be determined according to proof.

## SECOND CAUSE OF ACTION:
## ANTICIPATORY REPUDIATION

57.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 56 above.

58.     Argentina enacted provisions in the by-laws assuring YPF's investors that if it ever acquired a controlling stake in YPF, it would make a public tender offer for all of YPF's outstanding Class D shares.

59.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract. Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek

to retake control of YPF.  Plaintiffs remain ready, willing, and able to perform their

obligations under the Company's by-laws as holders of YPF Class D shares.

60.     Pursuant to the terms of the by-laws, Argentina is prohibited from

exercising control over YPF without launching a tender offer for all Class D shares in

accordance with Sections 7 and 28 of the by-laws.

61.     Argentina has repudiated its contractual tender offer obligations by

unequivocally expressing its intention to acquire ownership or control of a majority of the

Company's shares without making any such tender offer, in material breach of its

obligations under the tender offer provisions, a breach that would give rise to a claim for

damages for breach of contract, and by taking voluntary affirmative actions that render it

unable or apparently unable to perform without such breach.  The plaintiff Class has been

damaged as a result of Argentina's repudiation of its tender offer obligations in an

amount to be determined according to proof.

### THIRD CAUSE OF ACTION:
### PROMISSORY ESTOPPEL

62.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 61 above.

63.     In connection with the privatization and public offering of YPF and

continuously at all times thereafter, Argentina promised to U.S. and other investors that it

would not retake control of YPF without making a tender offer to all Class D

shareholders as provided in the by-laws.  Those promises were communicated to

investors by means including the by-laws and the U.S. IPO Prospectus.  Argentina

repeated these promises on a regular basis to the U.S. market, including every time the

Company's by-laws were publicly filed with the SEC in connection with YPF's periodic reporting requirements under U.S. securities laws.

64.     Argentina made these promises with the intention to induce reliance and specifically with the intention to induce Class members to purchase shares in YPF, and the value of Argentina's promises was priced into the value of Class D shares at all times. It was therefore reasonable and foreseeable that Class members would rely on Argentina's promise in purchasing their Class D shares of YPF.

65.     The plaintiff Class relied on Argentina's promises to their detriment, including because, among other things, they have been denied the promised tender offer and instead hold devalued YPF Class D shares without the benefit of the compensated exit they were promised.

### FOURTH CAUSE OF ACTION:
### DECLARATORY JUDGMENT

66.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 65 above.

67.     An actual and justiciable controversy has arisen and now exists between the plaintiff Class and Argentina, as Argentina has reacquired control of YPF and has unequivocally expressed its intention not to launch a tender offer for all outstanding Class D shares in contravention of YPF's by-laws.

68.     As shareholders of YPF who have been adversely impacted by Argentina's failure to make a tender offer as promised, Plaintiffs have standing to bring this action.

69.     Plaintiffs seek a declaration (a) that as a contractual consequence of its having seized control of YPF, Argentina is obligated to launch a tender offer for all Class

D shares on the terms set forth in Sections 7 and 28 of the Company's by-laws; (b) that as

a contractual consequence of its having acquired a 51% interest in the Class D shares of

YPF, Argentina is obligated to launch a tender offer for all Class D shares on the terms

set forth in Sections 7 and 28 of the Company's by-laws; and (c) that unless and until

such tender offer has been made, the shares acquired by Argentina in violation of the

tender offer provisions shall have no right to vote, receive dividends or be counted

towards a quorum.

70.     Due to Argentina's efforts to drive down the value of YPF's shares,

Plaintiffs further seek a declaration of the relevant date for calculating the tender offer

price pursuant to the by-laws, to be determined by this Court.

## FIFTH CAUSE OF ACTION:
## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

71.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 70 above.

72.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina

and each member of the plaintiff Class are YPF shareholders, parties to that contract.

Members of the plaintiff Class are alternatively entitled to enforce the by-laws because

they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to

benefit all record or beneficial holders of Class D shares and the benefit of those

provisions to the plaintiff Class is immediate, not merely incidental, as they directly

assure Class members that Argentina must offer them a compensated exit should it seek

to retake control of YPF.

73.     A duty of good faith and fair dealing is implied in the by-laws and binds

the parties thereto.  This duty implies obligations consistent with the other terms of the

contract, including the obligation that Argentina would not take actions to cause Class members' rights under the contract to be devalued.

74.    Argentina breached this implied duty of good faith and fair dealing by, among other things, conducting a wide-ranging campaign against YPF beginning in January 2012 that caused the price of YPF's shares to drop precipitously. Argentina engaged in this conduct with the intent and effect to depress the price at which it could be obligated to make a tender offer under the terms of its contract with the plaintiff Class.

75.    Argentina's actions have had the effect of depriving Class members of the full benefit of their bargain, specifically their right under the tender offer price provisions of the by-laws to be offered fair consideration for their shares, free from manipulation, in the event Argentina retook control of YPF. The plaintiff Class has been damaged by Argentina's breach of the implied duty of good faith and fair dealing in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

    A.    Compensatory damages according to proof;

    B.    A declaration that Argentina is required to make a tender offer pursuant to the terms of the by-laws;

    C.    A declaration that the price for such tender offer is to be determined on the basis set forth in the by-laws, as of a date to be determined according to proof;

D.    A declaration that, unless and until Argentina has launched a

tender offer in accordance with the by-laws, all shares acquired by Argentina in

contravention of those by-laws are stripped of any right to vote, collect dividends or other

distributions, and shall not be counted towards a quorum of shareholders;

E.    An injunction preventing Argentina from exercising voting rights

or rights to dividends or other distributions or other rights pertaining to the shares

acquired by Argentina in violation of YPF's by-laws unless and until a tender offer has

been launched in accordance with the by-laws; and

F.    Such other and further relief as the Court may deem just and

proper.


Dated:   New York, New York
         May 15, 2012

                              DAVIS POLK & WARDWELL LLP

                              By:
                                 _____
                                 Michael P. Carroll
                                 Antonio J. Perez-Marques

                                 450 Lexington Avenue
                                 New York, New York 10017
                                 (212) 450-4000
                                 michael.carroll@davispolk.com
                                 antonio.perez@davispolk.com

                                 *Attorneys for Plaintiffs Repsol YPF, S.A. and
                                 Texas Yale Capital Corp.*