UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

REPSOL YPF, S.A.[1] and TEXAS YALE CAPITAL
CORP., Individually and On Behalf of All Others Similarly
Situated,

               Plaintiffs,

     -against-

REPUBLIC OF ARGENTINA,

               Defendant.

12 Civ. 3877 (TPG) (FM)

**ORAL ARGUMENT
REQUESTED**

---

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


LATHAM & WATKINS LLP
Miles N. Ruthberg
James E. Brandt
Christopher R. Harris
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Plaintiffs*

---

[1] Now known as Repsol, S.A.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................3

I.      THE COURT HAS SUBJECT MATTER JURISDICTION UNDER THE
FSIA ..........................................................................................................3

        A.     Defendant's Failure To Make A Tender Offer Constitutes
"Commercial Activity Carried On In The United States" ..........................4

            1.     Defendant's Conduct Is Commercial In Nature............................4

                a.     The Course Of Conduct Was Commercial .........................5

                b.     The Particular Omission At Issue Was Also
Commercial........................................................................6

                c.     The Conduct At Issue Was Not Sovereign .........................7

            2.     A "Significant Nexus" Exists Between The Commercial
Activity In The United States And The Cause Of Action ..............8

        B.     Defendant's Conduct Is Also Commercial Activity Abroad
Causing A "Direct Effect" In The United States ......................................12

II.     THE ACT OF STATE DOCTRINE IS IRRELEVANT ......................................15

III.    VENUE IS PROPER ..................................................................................17

IV.    DEFENDANT FAILS TO SHOW THIS ACTION SHOULD BE
DISMISSED FOR *FORUM NON CONVENIENS* ................................................18

        A.     Plaintiffs' Chosen Forum Is Entitled To Substantial Deference...............19

        B.     Argentina Is Not An Adequate Alternative Forum For Litigation
Against Defendant Regarding YPF ........................................................20

        C.     Regardless, Defendant Fails To Carry Its Burden To Demonstrate
That The Balance Of Public And Private Factors Requires
Dismissal...........................................................................................25

            1.     Defendant Fails To Show That "Private" Factors Require
Dismissal...........................................................................25

            2.     Defendant Fails To Show That "Public" Factors Require
Dismissal...........................................................................27

V.     THE COMPLAINT ADEQUATELY STATES ITS CLAIMS FOR
RELIEF....................................................................................................28

        A.     The Complaint States A Claim For Breach Of Contract ..........................28

1.    Defendant Admittedly Took Control Of The YPF Shares And Thus Triggered The Tender Offer Requirements ..................29

    a.    Under The Bylaws, A Change In Control Constitutes An "Acquisition," Without The Need For Transfer Of Ownership...............................................29

    b.    Control Also Suffices To Establish An "Acquisition" Under Argentine Law ...............................30

    c.    Defendant Admits It Has Control .....................................31

2.    An "Acquisition" Need Not Be "Permanent" Under The Bylaws.........................................................................................32

B.    The Complaint States A Claim For Anticipatory Repudiation.................33

C.    The Complaint States A Claim For Promissory Estoppel ........................33

D.    The Complaint States A Claim For Breach Of The Implied Covenants Of Good Faith And Fair Dealing .............................................34

E.    Plaintiff Texas Yale States A Claim For Breach Of Contract ..................35

CONCLUSION.........................................................................................................35

# TABLE OF AUTHORITIES

**PAGE(S)**

*Abaclat v. Argentine Republic,*
Case No. ARB/07/5 (ICSID Aug. 4, 2011) ............................................................................ 22

*Abdullahi v. Pfizer, Inc.,*
562 F.3d 163 (2d Cir. 2009) .................................................................................................. 21

*Adler v. Federal Republic of Nigeria,*
107 F.3d 720 (9th Cir. 1997) ........................................................................................... 13, 14

*Aguas Lenders Recovery Grp., LLC v. Suez S.A.,*
No. 06 Civ. 7873, 2008 WL 612669 (S.D.N.Y. Mar. 3, 2008), *rev'd on other grounds,*
585 F.3d 696 (2d Cir. 2009) .................................................................................................. 21

*American Construction Machinery& Equip. Corp. v. Mechanised Construction of Pakistan Ltd.,*
No. 85 Civ. 376, 1986 WL 2973 (S.D.N.Y. Mar. 5, 1986) ............................................. 17, 18

*Arango v. Guzman Travel Advisors Corp.,*
621 F.2d 1371 (5th Cir. 1980) ................................................................................................. 6

*Bank of Credit & Commerce International (Overseas) Ltd. v. State Bank of Pakistan,*
273 F.3d 241 (2d Cir. 2001) ................................................................................. 18, 19, 20, 24

*Bigio v. Coca-Cola Co.,*
448 F.3d 176 (2d Cir. 2006) ............................................................................................. 19, 27

*Commercial Bank of Kuwait v. Rafidain Bank,*
15 F.3d 238 (2d Cir. 1994) .................................................................................................... 13

*Concesionaria DHM, S.A. v. International Finance Corp.,*
307 F. Supp. 2d 553 (S.D.N.Y. 2004) ................................................................................... 17

*Daventree Ltd. v. Republic of Azerbaijan,*
349 F. Supp. 2d 736 (S.D.N.Y. 2004) ............................................................................ 4, 5, 15

*EM Ltd. v. Republic of Argentina,*
865 F. Supp. 2d 415 (S.D.N.Y. 2012) ................................................................................... 23

*EM Ltd. v. Republic of Argentina,*
No. 08 Civ. 7974 (TPG), 2009 U.S. Dist. LEXIS 91652 (S.D.N.Y. Sept. 30, 2009), *affd, sub nom. NML Capital, Ltd.v. Republic of Argentina,* 680 F.3d 254 (2d Cir. 2012).........................20

*Embassy of the Arab Republic of Egypt v. Lasheen,*
603 F.3d 1166 (9th Cir. 2010) ............................................................................................... 13

iii

*Garb v. Republic of Poland,*
  440 F.3d 579 (2d Cir. 2006) ............................................................................ 6

*Gibbons v. Udaras na Gaeltachta,*
  549 F. Supp. 1094 (S.D.N.Y. 1982) .......................................................... 6, 7, 9, 15

*Global Crossing Bandwidth, Inc. v. PNG Telecommunications, Inc.,*
  No. 06-CV-6415T, 2007 WL 174094 (W.D.N.Y. Jan. 22, 2007) ............................................. 34

*Gross v. British Broadcasting Corp.,*
  386 F.3d 224 (2d Cir. 2004) ............................................................................ 27

*Guirlando v. T.C. Ziraat Bankasi A.S.,*
  602 F.3d 69 (2d Cir. 2010) ........................................................................ 11, 15

*Gulf Oil Corp. v. Gilbert,*
  330 U.S. 501 (1947) .................................................................................. 19

*Hanil Bank v. PT. Bank Negara Indonesia (Persero),*
  148 F.3d 127 (2d Cir. 1998) ........................................................................ 13, 15

*Hard Rock Cafe International, (USA), Inc. v. Hard Rock Hotel Holdings, LLC,*
  808 F. Supp. 2d 552 (S.D.N.Y. 2011) ................................................................... 34

*In re Randall's Island Family Golf Centers, Inc.,*
  272 B.R. 521 (S.D.N.Y. 2002) ......................................................................... 33

*Ingram Micro, Inc. v. Airoute Cargo Express, Inc.,*
  No. 99 Civ. 12480(SAS), 2001 U.S. Dist. LEXIS 2912 (S.D.N.Y. 2001) ................................... 25

*Iragorri v. United Technologies Corp.,*
  274 F.3d 65 (2d Cir. 2001) .................................................................. 18, 19, 20, 25

*Kapsis v. American Home Mortgage Servicing Inc.,*
  No. 11–cv–4936, 2013 WL 544010 (E.D.N.Y. Feb. 14, 2013) .............................................. 33

*Keller v. Central Bank of Nigeria,*
  277 F.3d 811 (6th Cir. 2002) .......................................................................... 13

*Kensington Int'l Ltd. v. Itoua,*
  505 F.3d 147 (2d Cir. 2007) ........................................................................... 15

*Lafarge Canada, Inc. v. Bank of China,*
  No. 00 CIV. 0261, 2000 WL 1457012 (S.D.N.Y. Sept. 29, 2000) .......................................... 27

*Lerro v. Quaker Oats Co.,*
  84 F.3d 239 (7th Cir. 1996) ......................................................................... 9, 14

*Lightwater Corp. v. Republic of Argentina,*
  No. 02 Civ. 3804(TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) .................................. 16

*Lyondell-CITGO Refining, LP v. Petroleos,* de Venez., S.A.,
  No. 02 Civ. 0795, 2003 U.S. Dist. LEXIS 13809 (S.D.N.Y. Aug. 6, 2003) ...................... 15, 17

*MasterCard Int'l, Inc. v. Argencard Sociedad Anonima,*
  No. 01 Civ. 2027, 2002 WL 432379 (S.D.N.Y. Mar. 20, 2002) .............................................. 21

*McKesson Corp. v. Islamic Republic of Iran,*
  185 F.R.D. 70 (D. D.C. 1999) .............................................................................................. 24

*Ministry of Supply, Cairo v. Universe Tankships, Inc.,*
  708 F.2d 80 (2d Circ. 1983) .................................................................................................. 8

*Morpheus Capital Advisors LLC v. UBS AG,*
  105 A.D.3d 145, 962 N.Y.S.2d 82 (1st Dep't 2013) ............................................................ 7

*Mortimer Offshore Services, Ltd. v. Federal Republic of Germany,*
  615 F.3d 97 (2d Cir. 2010) .................................................................................................... 12

*NML Capital, Ltd. v. Republic of Argentina,*
  699 F.3d 246 (2d Cir. 2012) .................................................................................................. 23

*NML Capital, Ltd. v. Republic of Argentina,*
  680 F.3d 254 (2d Cir. 2012) .................................................................................................. 20

*Perry v. Erie Transfer Co.,*
  19 N.Y.S. 239 (N.Y.C. C.P. N.Y. County 1892), *aff'd,* 4 Misc. 598, 23 N.Y.S. 878 (N.Y.C.
  C.P. Gen. T. N.Y. County 1893) .......................................................................................... 10

*R. Maganlal & Co. v. M.G. Chemical Co.,*
  942 F.2d 164 (2d Cir. 1991) ........................................................................................... 19, 25

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales,*
  235 F.3d 738 (2d Cir. 2000) ............................................................................................. 4, 8

*Republic of Argentina v. Weltover, Inc.,*
  504 U.S. 607 (1992) ...................................................................................................... *passim*

*Rogers v. Petroleo Brasileiro, S.A.,*
  673 F.3d 131 (2d Cir. 2012) ...................................................................................... 11, 12, 15

*Romea v. Heiberger & Associates,*
  163 F.3d 111 (2d Cir. 1998) .................................................................................................. 11

*Satz v. McDonnell Douglas Corp.,*
  244 F.3d 1279 (11th Cir. 2001) ............................................................................................ 21

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993) ........................................................................................ 4

*Shapiro v. Republic of Bolivia,*
  930 F.2d 1013 (2d Cir. 1991) ...................................................................... 5, 15

*Shapsis v. Kogan,*
  No. 38418/07, 2011 WL 61727 (Sup. Ct. Kings County Jan. 7, 2011)..................................... 34

*Skanga Energy & Marine Ltd. v. Arevenca S.A.,*
  875 F. Supp. 2d 264 (S.D.N.Y. 2012) .......................................................... 19, 20

*Société Nationale Industrielle Aérospatiale v. Unites States District Court,*
  482 U.S. 522 (1987).......................................................................................... 24

*Thomas v. Scully,*
  943 F.2d 259, 260 (2d Cir. 1991) ...................................................................... 15

*Tonoga, Ltd. v. Ministry of Public Works & Housing of the Kingdom of Saudi Arabia,*
  135 F. Supp. 2d 350 (N.D.N.Y. 2001) .............................................................*pasim*

*United States v. Giffen,*
  326 F. Supp. 2d 497 (S.D.N.Y. 2004) ................................................................ 17

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.,*
  82 A.D. 3d 604, 919 N.Y.S.2d 151 (1st Dep't 2011)................................................... 33

*Warter v. Boston Securities, S.A.,*
  380 F. Supp. 2d 1299 (S.D. Fla. 2004)............................................................... 21

*Weltover, Inc. v. Republic of Argentina,*
  753 F. Supp. 1201 (S.D.N.Y. 1991) ............................................................. 26, 28

*Wolf v. Banco Nacional de Mexico, S.A.,*
  739 F.2d 1458 (9th Cir. 1984) ...................................................................... 5, 15

*W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International,*
  493 U.S. 400 (1990) ................................................................................. 16, 17

*Zitman v. Tucker,*
  No. 94 CIV. 6658, 1994 WL 713693 (S.D.N.Y. Dec. 21, 1994) ........................................... 10

## RULES AND STATUTES

17 C.F.R. § 229.1016(a)(1) ..........................................................................................10

17 C.F.R. § 240.13d-101 ............................................................................................. 10

17 C.F.R. § 240.14d-2 ................................................................................................... 9

17 C.F.R. § 240.14d-100 .............................................................................................10

28 U.S.C. § 1391(f)(1) ......................................................................... 11, 12, 17, 18

28 U.S.C. § 1603(d) ........................................................................................... *passim*

28 U.S.C. § 1603(e) .................................................................................................... 8

28 U.S.C. § 1605(a)(2) ......................................................................... 4, 11, 12, 13

77 Fed. R. 18,899 (Mar. 29, 2012) ............................................................................ 23

Fed. R. Civ. P. 8(a) ..................................................................................................... 3

Fed. R. Civ. P. 23 ...................................................................................................... 22

## INTRODUCTION

Plaintiffs in this action are shareholders of YPF, S.A. ("YPF" or the "Company"), who bought shares in an independent public company, only to have those shares drop drastically in value when Defendant the Republic of Argentina seized a controlling stake of YPF.  In doing so, Defendant violated the by-laws of the Company (the "Bylaws"),[2] which required it to make a tender offer at a premium price for all outstanding shares.  This requirement was adopted to protect against exactly what has happened here: the nationalization of the Company without offering a compensated exit for its shareholders.  Indeed, as Defendant itself admits:  (i) the Bylaws are a contract with shareholders; (ii) the Bylaws require Defendant to make a tender offer in the event of an acquisition of a controlling stake of YPF's stock; and (iii) Defendant now "control[s]" more than 51% of those shares.  Thus, there should be no question that Defendant breached by failing to make a tender offer for the shares.  Nevertheless, Defendant here attempts to escape its tender offer obligations, arguing on various grounds that it is beyond the reach of this Court.  As a fallback, Defendant argues that the shares it now admittedly controls are in legal limbo, and thus that the tender offer requirement has not yet been triggered.  Because neither of these strategies succeeds, Defendant's motion to dismiss must be rejected.

*First*, as it has done elsewhere, Defendant argues it is above the law.  According to Defendant, any decision it made following its May 2012 seizure of a controlling share of YPF is sovereign, and thus beyond review by U.S. courts.  By this logic, any decision about a commercial transaction relating in any way to YPF, such as to contractually guarantee YPF's performance, is "sovereign" simply because Defendant made the decision.  This tautology is not

---

[2] *See* Ex. A, By-Laws (Estatutos) of YPF S.A. as Amended (English Version), Exhibit 1.2 to 2009 YPF Form 20-F, filed 6/29/10 (incorporated by reference in 2012 YPF 20-F, filed 4/26/13).  Citations to "Ex." refer to exhibits to the Declaration of Christopher R. Harris filed contemporaneously herewith.

the law.  Instead, the Foreign Sovereign Immunities Act ("FSIA") provides for jurisdiction here because the complained-of conduct is a breach of contract—a paradigmatic example of commercial activity, and a routine basis for FSIA jurisdiction.  As a result, Defendant's related arguments regarding venue and the Act of State doctrine fail as well.

*Second*, Defendant seeks dismissal on the basis of *forum non conveniens*.  However, Defendant fails to carry its burden to overcome the strong preference in favor of Plaintiffs' selection of New York, given the many legitimate reasons for bringing the action in this District: it is where the American Depositary Shares ("ADSs") were initially offered on the New York Stock Exchange ("NYSE"), where Plaintiffs' ADSs continue to trade, and where the tender offer required by the Bylaws was to be performed.  Indeed, because New York is the financial capital of the United States, this venue has a paramount interest in enforcing the integrity of the U.S. securities markets.  Defendant likewise fails to prove that Argentina offers an adequate alternative forum.  As evidenced in the Affidavit of Dr. Gustavo Naveira,[3] Plaintiffs' expert and a former judge in Argentina:  (i) chronic delays and procedural irregularities afflict litigation against the Argentine government in Argentina; (ii) Plaintiffs would also face severe limitations on pre-trial discovery in Argentine court; and (iii) the Argentine court would likely determine that simply to bring the case in the first instance Plaintiffs must outlay over a hundred million dollars in court fees, and if Plaintiffs lost, they could be charged over a *billion* dollars in attorneys' fees.  But regardless, even if Argentina provided an acceptable alternative, Defendant would *still* fail to demonstrate the need for dismissal.  Given the nexus with New York, the interest of U.S. courts in enforcing contractual rights of U.S. residents, and Defendant's

---

[3] The Affidavit of Dr. Gustavo Naveira, dated July 26, 2013 ("Naveira Aff."), is submitted concurrently herewith in support of Plaintiffs' Opposition to Defendant's Motion to Dismiss.

familiarity with litigation in this District, Defendant cannot come close to showing any factors that weigh "heavily" in favor of an alternative forum—as required to carry its burden.

*Third*, Defendant makes a token argument that even if this Court can hear this action, no contractual duties have yet arisen, because it does not yet *own* the expropriated shares.  But the Bylaws' tender offer requirement is triggered either by becoming "the owner" of, or "*exercise[ing] the control of*," the shares.  And even if the Bylaws did not explicitly include control, Dr. Naveira explains that the normal meaning of "acquire" under Argentine law includes ownership *or* control.  Indeed, either simple possession or obtaining rights in property—both of which Defendant concedes it enjoys—establishes an acquisition.

Finally, Plaintiffs easily satisfy the pleading standard under Rule 8(a) of the Federal Rules of Civil Procedure for each claim.

## ARGUMENT

## I.    THE COURT HAS SUBJECT MATTER JURISDICTION UNDER THE FSIA

Argentina disputes this Court's jurisdiction on the basis of the FSIA, arguing that Plaintiffs seek to interfere with its sovereign activity in expropriating a controlling share of YPF. However, Plaintiffs do not challenge the expropriation process in this action,[4] only Defendant's separate failure to fulfill the contractual obligations triggered in seizing control of the Company.

The FSIA creates jurisdiction  based on "commercial activity" by a sovereign entity if the basis for the lawsuit satisfies any of the three statutory clauses:  (1) "commercial activity carried on" in the United States; (2) an "act performed in" the United States in connection with commercial activity elsewhere; or (3) an "act outside" the United States in connection with

---

[4] Plaintiff Repsol, S.A. ("Repsol") reserves the right to pursue reparation for the expropriation in other venues.

foreign commercial activity that causes a "direct effect" in the United States.  28 U.S.C. § 1605(a)(2).[5]  Here, the Court has jurisdiction under at least the first and third clauses.

### A.     Defendant's Failure To Make A Tender Offer Constitutes "Commercial Activity Carried On In The United States"

To satisfy the test for jurisdiction under the first clause, (i) an action must be "based upon some commercial activity by [a defendant] that had substantial contact with the United States," and (ii) there must be a "significant nexus" between the commercial activity in this country and the cause of action.  *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 747 (2d Cir. 2000) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993)) (internal quotation marks omitted).   Under the FSIA, "[c]ommercial activity" within the meaning of clause one may be "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).

### 1.     Defendant's Conduct Is Commercial In Nature

"[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's acts are 'commercial' within the meaning of the FSIA."  *Daventree Ltd. v. Republic of Azerbaijan,* 349 F. Supp.2d 736 (S.D.N.Y. 2004) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992)).  In deciding whether challenged conduct is "commercial" or not, it is the "nature of the course of conduct" at issue, rather than its "purpose," that governs the determination.  28 U.S.C. § 1603(d).

---

[5] Section 1605 reads, in relevant part, as follows:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case-- . . . .

   (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. §§ 1605(a)(2).

**a.      The Course Of Conduct Was Commercial**

Defendant's entire "course of conduct" at issue falls squarely within two paradigmatic types of commercial activity recognized in case law.  First, courts have held that it is "self-evident" that raising capital through securities markets is a commercial activity.  *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991) (issuing sovereign debt); *see also Wolf v. Banco Nacional de Mexico, S.A.*, 739 F.2d 1458, 1460 (9th Cir. 1984) (sale of certificate of deposit was commercial activity).  Here, Argentina privatized YPF in 1993 and raised $1.1 billion from the U.S. offering alone (by making the very promise it then breached here).  *See* Compl. ¶ 21.[6]  In this way, Argentina "navigated the world of private commerce to achieve [its] financial goals."  *Daventree,* 349 F. Supp. 2d at 754. It thus does not matter that, as Defendant stresses, the "purpose" of privatizing, then re-nationalizing YPF may have been sovereign.  *See* Memorandum of Law In Support Of Defendant's Motion To Dismiss The Complaint ("Def.'s Mot.") at 8 (Defendant sought "to develop its natural resources and to achieve and ensure its energy independence").  The "nature" of Defendant's activity in raising capital "was private and commercial."  *Daventree*, 349 F. Supp. 2d at 750.

Second, entering into a contract is a paradigmatic example of commercial activity.  *See Weltover*, 504 U.S. at 614-15 ("[P]rivate companies can similarly use sales contracts to acquire goods . . . .").  Here, Defendant made a contractual commitment to shareholders embodied in the Bylaws, which Defendant never denies.  *See* Compl. ¶¶ 16-20.   Defendant also described its contractual obligations by describing them in English to U.S. investors in the U.S. IPO Prospectus.  *See id.* ¶¶ 21-22.  As a continuing shareholder of YPF (and having at least one director on YPF's Board at all times as the owner of a "golden" share), Defendant then repeated

---

[6] Ex. B, *Repsol YPF, S.A. v. Republic of Argentina,* 12 Civ. 3877 (TPG) (May 15, 2012) [ECF No. 1].

and reaffirmed its contractual commitments annually in YPF's U.S. SEC filings.  *See id.* ¶¶ 25-
26.  These commitments easily qualify as commercial activity.  *See Arango v. Guzman Travel
Advisors Corp.*, 621 F.2d 1371, 1379-80 (5th Cir. 1980) (clause 1 jurisdiction proper where the
action "arose directly from . . . the marketing and execution of contracts" in the United States).[7]

### b.      The Particular Omission At Issue Was Also Commercial

The "particular . . . act" at issue was also commercial.  28 U.S.C. § 1603(d).  In
identifying the particular act or omission in dispute, courts look to the specific conduct that
"serves as the *basis for* [the] plaintiffs' claims."  Def.'s Mot. at 7 (quoting *Garb v. Republic of
Poland*, 440 F.3d 579, 586 (2d Cir. 2006) (emphasis added)).  Here, the "basis" for the claim is
Defendant's failure to make a tender offer, in breach of its contractual obligations in the Bylaws.
As courts have repeatedly recognized, a breach of contract claim is "based upon" the underlying
commercial activity of entering the contract.  *See Tonoga, Ltd. v. Ministry of Public Works &
Housing of the Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 356 (N.D.N.Y. 2001) (finding
jurisdiction under clause 1 where plaintiff's claim for breach of guarantee agreements was
"based upon" sovereign defendant's commercial activity in entering into the transactions);
*Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094, 1109-10 (S.D.N.Y. 1982) (sovereign
defendant's failure to perform contractual obligations was "'based upon' acts that were
performed 'in connection with'" the commercial activity of participating in a joint venture
agreement).  Thus, the basis for the claims in this case was commercial activity.

---

[7] It is worth noting that, under Defendant's control, YPF continues to operate as a commercial enterprise.  Argentine
Law 26,741 states in that YPF will continue its operations as a corporation, according to the Argentine Companies
Law, and that the laws and regulations governing the management of state-run entities will not apply.  *See* Ex. C,
Law 26,741, Argentina's Sovereign Power Over Hydrocarbons, May 4, 2012, at 4 (attachment to YPF Form 6-K,
filed 5/9/12).

The "basis" is not, as Defendant suggests, its decision to "take control of YPF . . . as a sovereign nation seeking to develop its natural resources and ensure its energy independence." Def.'s Mot. at 8.  Defendant's state of mind and decision-making process is not an element of this claim, nor does this lawsuit seek to prevent Defendant from controlling YPF.  *Cf. Morpheus Capital Advisors LLC v. UBS AG*, 105 A.D.3d 145, 150, 962 N.Y.S. 2d 82, 86 (1st Dep't 2013) (explaining that the elements of a breach of contract claim are plaintiff's performance, defendant's breach, and damages).

### c.      The Conduct At Issue Was Not Sovereign

Defendant argues this case is necessarily based on sovereign activity because only a sovereign can expropriate property.  However, as the Complaint makes clear, Plaintiffs do not here challenge or seek to reverse the expropriation process.  Indeed, Plaintiffs do not seek compensation for the expropriated shares, and the proposed class by definition excludes those shares.  *See* Compl. ¶ 44.  Thus, the expropriation could be held to be valid by the competent tribunal abroad and it would not affect Plaintiffs' rights at all.  Likewise, Plaintiffs could succeed in this action without any effect on the completion or validity of the expropriation.

Instead, Plaintiffs challenge Defendant's separate failure to obey its contractual obligations under the Bylaws that arose in taking control of YPF.  Such obligations are inherently "commercial" in nature.  *See, e.g.*, *Gibbons*, 549 F. Supp. at 1109-10 (participating in a contract "constituted commercial activity").  Thus, it does not matter *how* Defendant acquired control, *i.e.*, whether through a "sovereign" mechanism like expropriation, or a market mechanism like open-market purchases of YPF shares.  Indeed, Argentina recognized the commercial nature of its obligations in drafting the Bylaws: the tender offer requirement is triggered by "all acquisitions made by the National Government, *whether directly or indirectly,*

*by any means or instrument*."   Bylaws Section 28 (emphasis added).   As a result, regardless of the mechanism by which Defendant took control of YPF, it must now meet the commercial obligations in the Bylaws—just as any "private player" initiating a takeover of YPF would have to.  *Weltover*, 504 U.S. at 614-15.

Nor is Defendant correct that any "decisions" with respect to YPF are sovereign solely because Defendant made the decisions following the takeover.   If this were true, Defendant would be immune from suit for many obviously commercial acts.   For example, Defendant could act as guarantor for loans taken out by YPF, then "decide" to ignore its contractual obligations, with no repercussions.   That is not the law.   *See, e.g., Tonoga*, 135 F. Supp. 2d at 356 (accepting jurisdiction over breach of contract claim against sovereign entity that decided not to honor its guarantee agreements).   Defendant's tautology cannot alter the commercial nature of its breach.

### 2.   A "Significant Nexus" Exists Between The Commercial Activity In The United States And The Cause Of Action

Commercial activity is carried on in the United States when it "has substantial contact" with this country.   28 U.S.C. § 1603(e).   For this to be true, a "significant nexus" must exist between the commercial activity alleged to occur in the United States and the cause of action. *Reiss*, 235 F.3d at 747.

Here, the Complaint alleges more than a substantial "nexus" between Defendant's "regular course of commercial conduct" in the United States and Plaintiffs' claims.  *See Ministry of Supply, Cairo v. Universe Tankships, Inc.,* 708 F.2d 80, 84 (2d Cir. 1983); 28 U.S.C. §1603(d).   In YPF's initial public offering ("IPO"), Defendant caused Class D shares of YPF to be registered with the SEC and offered to U.S. investors in the form of ADSs.  *See* Compl. ¶ 21. In fact, Defendant raised more than $1 billion in capital from the United States, the majority of the offering.  *See id.*   To do so, Defendant made contractual commitments to U.S. shareholders,

codified in the Bylaws, that they would receive a tender offer in the event of a re-nationalization. *See id.* ¶¶ 22-23.   Defendant then repeatedly confirmed those obligations directly to U.S. shareholders, through SEC filings including translations of the Bylaws.  *See id.* ¶ 26.  Plaintiffs seek redress for Defendant's ultimate breach of these duties.  *See id.* ¶¶ 37, 40-41.  Because Plaintiffs' cause of action thus arises from the "formation of a contract . . . substantial aspects [of which] were to be performed here," it has the requisite "nexus" with commercial activity in the United States.  *See Tonoga*, 135 F. Supp. 2d at 356-57 (quoting *Gibbons*, 549 F. Supp. at 1113).

A "significant nexus" also exists between the United States and the particular omissions at issue:  Defendant's failures (i) to make a tender offer, and (ii) to pay those shareholders who accepted the offer.  First, the offer itself should have taken place in the United States.  Legally, a tender offer is the "definitive announcement" by an offeror to buy securities (not the payment of compensation, which occurs only if the offer is later accepted).  *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 245 (7th Cir. 1996); *see* 17 C.F.R. § 240.14d-2 (tender offer commences on the date "when the bidder has first published, sent or given the means to tender to security holders").  Thus, the offer would have occurred in the locations where it was announced, *i.e.* for the shareholders in this class, in the United States.  Indeed, the Bylaws expressly recognize that the tender offer occurs *outside* Argentina, because the offer must follow "regulations ***in the jurisdictions*** [plural] ***where the takeover bid takes place***."  Bylaws § 7(f) (emphasis added).[8]

In particular, the Bylaws require numerous actions in the United States:

- The offeror must publish notice of the proposed transaction in major newspapers in New York.  *See* Bylaws § 7(f)(iv).

---

[8] Similarly, the offer also must follow "the provisions of the stock exchanges where the Corporation's shares and securities are listed," to the extent they impose additional requirements, implying that the offer will take place in those jurisdictions as well.  *Id.*

- The offeror must comply with the NYSE rules, incorporated by reference into Section 7, that "offering material should be delivered *to the Exchange* no later than the distribution date to shareholders." *See* New York Stock Exchange Rule 311.03 – Tender Offers (emphasis added).[9]

- The offeror must similarly comply with SEC rules, also incorporated into the Bylaws, requiring the acquirer to file with the SEC in the United States a Schedule 13D and Schedule TO explaining the terms of the tender offer, *see* 17 C.F.R. § 240.13d-101; *id.* § 240.14d-100, and also to file a copy of the tender offer materials themselves, *see id.* § 229.1016(a)(1).

- The offeror must transmit the offer to YPF, which then in turn must transmit it to record owners. *See* Bylaws § 7(f)(iii). In the case of ADSs, that would be the depositary bank in New York. *See* Compl. ¶ 6.

These four requirements are the only means of making the offer under the Bylaws. *See* Bylaws § 7. Accordingly, Defendant failed to make the tender offer in the United States for any shareholders either located in the United States or holding ADSs.

Second, even if the breach here were the failure to *pay* rather than the failure to *offer*, the consummation of the offer for all accepting U.S. ADS holders would have taken place in the United States. In general, the breach of an obligation to pay occurs where the payee resides. *See Zitman v. Tucker*, No. 94 CIV. 6658, 1994 WL 713693, at *2 (S.D.N.Y. Dec. 21, 1994) (breach took place in New York where contract required payments to plaintiff in New York); *see also Perry v. Erie Transfer Co.*, 19 N.Y.S. 239 (N.Y.C. C.P. N.Y. County 1892) (defendants had "contractually assumed the obligation to pay" in New Jersey where plaintiff was a New Jersey resident), *aff'd*, 4 Misc. 598, 23 N.Y.S. 878 (N.Y.C. C.P. Gen. T. 1893). In this case, Plaintiffs allege that Texas Yale is headquartered in the United States and holds YPF ADSs, *see* Compl. ¶ 6. Moreover, the Complaint alleges that approximately 60% of YPF's Class D shares trade as ADSs, *see id.* ¶ 8, a substantial portion of which is likely to be held by U.S. investors. Plaintiffs

---

[9] *Available at* http://nysemanual.nyse.com/lcm/Help/mapContent.asp?sec=lcm-sections&title=sx-ruling-nyse-policymanual_311.03&id=chp_1_4_11_3.

thus allege numerous class members who failed to receive compensation in the United States.[10] This too would establish that "substantial aspects" of performance should have occurred in the United States, which creates the requisite nexus.  *Tonoga*, 135 F. Supp. 2d at 356-57.

Defendant argues that *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 138 (2d Cir. 2012) and *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 76 (2d Cir. 2010) indicate that Defendant's "decision" not to launch a tender offer occurred in Argentina, not the United States. These cases are not relevant here.  They do not address the first clause of § 1605(a)(2), only the second and third clauses.  *See Rogers*, 673 F.3d at 135 n.6.  Indeed, they interpret the narrower term "act" in those clauses, not the broader term "activity" in the first clause.  *See id.* at 138 n.7. "[A]ctivity" broadly includes "*either* a regular course of commercial conduct *or* a particular commercial *transaction or act*," 28 U.S.C. § 1603(d) (emphasis added).  Thus, any limitations placed on the meaning of "act" by *Rogers* or *Guirlando* cannot remove the nexus between Plaintiffs' claims and the United States in this case for purposes of the first clause.

Moreover, even if a foreign sovereign's "decision" not to act occurs overseas for purposes of clauses two and three, that cannot be true for clause one, or the FSIA's venue provision would become meaningless.  In suits against foreign sovereigns, venue is proper "in any judicial district in which a substantial part of the events *or omissions* giving rise to the claim occurred."  28 U.S.C. § 1391(f)(1) (emphasis added).  For the phrase "or omissions" to have meaning, there must be valid claims under the FSIA based solely on an "omission" in the United States.  If for clauses two and three a sovereign's decision not to act always occurs overseas, those clauses can never permit jurisdiction based solely on an omission in the United States.  *See*

---

[10] To the extent Defendant disputes the existence or amount of U.S. shareholders, such an argument is improper for a motion to dismiss, pursuant to which the Court must presume the truth of the factual allegations.  *See Romea v. Heiberger & Assocs.*, 163 F.3d 111, 114 (2d Cir. 1998) (a court evaluating a motion to dismiss for failure to state a claim is required to accept all factual allegations in the complaint as true).

*Rogers*, 673 F.3d at 138.  Therefore the broader clause one *must* allow jurisdiction for omissions in the United States, or else there could never be a situation where the phrase "or omission" in § 1391(f) has meaning.  *See also Tonoga*, 135 F. Supp. 2d at 355-57 (failure to perform on guarantee satisfied clause 1).

###### B.   Defendant's Conduct Is Also Commercial Activity Abroad Causing A "Direct Effect" In The United States

Jurisdiction also arises in this case under the third clause of § 1605(a)(2).  This clause extends to cases in which the "'lawsuit is (1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and (3) that 'cause[d] a direct effect in the United States.'"  *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Ger.,*  615 F.3d 97, 105-06 (2d Cir. 2010) (quoting *Weltover*, 504 U.S. at 611 and 28 U.S.C. § 1605(a)(2)).

Here, Plaintiffs' claims satisfy the first element because they are admittedly "based upon" an "act outside" the United States.  28 U.S.C. § 1605(a)(2).  According to Defendant, "the decision not to launch a tender offer" took place in Argentina.  Def.'s Mot. at 11.  Defendant also identifies other activities related to the required tender offer that it failed to perform in Argentina, such as sending its offer to YPF.  *See* Def.'s Mot. at 13-14 n.11.

Plaintiffs also satisfy the second element for clause three because they allege "commercial activity . . . outside this country."  *Mortimer*, 615 F.3d at 105-06.  In addition to the NYSE portion of YPF's IPO, Defendant caused YPF's Class D shares to be offered on the Buenos Aires stock exchange.  *See* Compl. ¶ 21.  And Defendant's enactment of the contractual obligations in the Bylaws, its "decision not to launch the tender offer" in Argentina, and its failure to perform required acts in Argentina related to the tender offer, were all commercial acts: "[E]ntering into [an] [a]greement and allegedly breaching that [a]greement constitute

commercial activity." *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 (9th Cir. 2010) (finding jurisdiction under clause 3 of § 1605(a)(2)).

Plaintiffs satisfy the third element for clause three as well, because Defendant's failure to make a tender offer had a "direct effect" in the United States. The Supreme Court has held that where a sovereign fails to perform an act required to take place in the United States, that "necessarily ha[s] a 'direct effect' in the United States." *Weltover*, 504 U.S. at 619. Lower courts have uniformly followed this reasoning. *See, e.g., Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994) (failure to make contractually-obligated payment in the United States caused direct effect); *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002) (same); *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 132 (2d Cir. 1998) (failure to make required payment on a letter of credit in the United States caused direct effect); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997) (failure to perform contract in the United States caused direct effect).

In this case, the failure to make a tender offer had two direct effects: it eliminated the various U.S.-based mechanisms of the offer, and thus the offer itself, from the United States; and it eliminated the payments of funds into the United States that acceptance of the offer would have caused. First, Defendant ignored numerous contractual requirements that must be performed in the United States, including: (i) publication of the offer in major newspapers in New York; (ii) filing the offer with the NYSE; (iii) filing the offer with the SEC; and (iv) making other SEC disclosures describing the offer and Defendant's intentions with respect to the takeover. *See supra* I.A.2; Bylaws § 7. The offeror must also abide by the applicable regulations in the jurisdictions where the takeover bid takes place and the provisions of the stock exchanges where the YPF shares and securities (including ADS) are traded, here the NYSE. *See*

13

Bylaws § 7(f).  By labeling these actions "trivial" and "incidental," Def.'s Mot. at 14, Defendant

ignores the fact that a tender offer is the "definitive announcement" itself.  *Lerro*, 84 F.3d at 245.

Indeed, without publication, shareholders would have had no way to evaluate the required offer

or make an informed decision as to whether to accept or reject it.  Defendant's failure to obey

these terms thus deprived U.S. shareholders of timely critical information, and of the offer itself.

In this way, the "failure to satisfy [the] obligation" to publish and file the offer in the United

States "necessarily had a direct effect in the United States."  *Adler*, 107 F.3d at 727.

      Second, Defendant's failure to pay for any shares tendered would also cause a direct

effect in the United States.  As explained above, the Complaint alleges both a named Plaintiff,

and a significant number of class members, located in the United States.  *See* Compl. ¶¶ 6, 8, *see*

*also id.* ¶¶ 7, 21 (Class D Shares trade as ADSs on the NYSE); ¶ 40 (tender offer extends to "all

Class D shares").  All such U.S. shareholders suffered the direct effect of failing to receive the

proceeds of the tender offer if accepted—the very "financial injury" that Defendant concedes to

be alleged in the Complaint.  Def.'s Mot. at 13.

      Regardless, Defendant is simply wrong that under *Weltover* a direct effect occurs "*only*

where a contract (i) requires payment to be made in the United States, or (ii) gives the obligee

the right to designate the United States as the place for payment and the obligee thereafter so

designates."  *Id.* at 12 (emphasis added).  Instead, as the Second Circuit has explained:

> *Weltover* does not insist the 'place of performance' be in the United States in
> order for a financial transaction to cause a direct effect in this country.  Rather, it
> only requires an effect in the United States that follows as an immediate
> consequence of the defendant's actions overseas.  Further, it need not be the
> location where the *most* direct effect is felt, simply *a* direct effect.  [Here], [s]uch
> a direct effect was felt in the United States as a result of defendant's breach. The
> failure of money to reach plaintiff's New York bank account was an immediate
> consequence of defendant['s] actions in Indonesia.

*Hanil Bank,* 148 F.3d 127 at 133 (emphasis in original).[11]  In this case, the failure to make the offer in the United States, and the "failure of money to reach" Plaintiffs, including Texas Yale and all other class members who hold ADSs, in the United States, followed as an "immediate consequence" of Defendant's failure to make a tender offer and then consummate it for all accepting parties.  *See id.*  That failure thus caused a "direct effect" in the United States.  Indeed, Defendant concedes that under *Guirlando*, transfers of money involving U.S. banks have a "direct effect."  *See* Def.'s Mot. at 13 (*citing Guirlando*, 602 F.3d at 80).

For each of these reasons, the FSIA provides for jurisdiction over this action.

## II.    THE ACT OF STATE DOCTRINE IS IRRELEVANT

The Act of State defense is not relevant here for four reasons. *First*, because Defendant bears the burden to show that the Act of State defense precludes liability, courts generally decline to consider it on a motion to dismiss.  *See Daventree*, 349 F. Supp. 2d at 755; *Lyondell-CITGO Ref., LP v. Petroleos de Venez., S.A.*, No. 02 Civ. 0795, 2003 U.S. Dist. LEXIS 13809, at *26 (S.D.N.Y. Aug. 6, 2003).[12]

---

[11] *Weltover* and the other cases Defendant cites concerned only agreements where the only relevant contractual clause involved a payment.  *See Weltover*, 504 U.S. at 619 ("Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."); *Rogers*, 673 F.3d at 140 (arising from action to redeem or convert bearer bonds and finding direct effect lacking where "there [was] nothing in the language of the Bonds that suggest[ed] a reasonable understanding that the United States could be a possible place of performance"); *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 158 (2d Cir. 2007) (concerning payments on loan agreements and noting that "[t]he record does not indicate that the prepayment agreements required performance in the United States").  Nothing in these cases limits the direct effect test to such clauses; rather, the cases stand for a more general proposition, which Defendant itself concedes.  *See* Def's. Mot. at 12 ("In the context of claims for breach of contract due to nonperformance there is 'direct effect in the United States' if the foreign state does not satisfy a contractual obligation to perform in the [United States].").  *See also Tonoga*, 135 F. Supp. 2d at 356-57 ("Regardless of whether substantial portions of the alleged guarantees were negotiated in this country or called for payments here, when 'the commercial activity in question centers on the formation of a contract, the United States will be found to have had a substantial contact with that activity if . . . substantial aspects of the contract were to be performed here.'") (quoting *Gibbons*, 549 F. Supp. at 1113); *cf. Shapiro*, 930 F.2d at 1018-19 (finding commercial activity under clause 1 on the basis of entering a contract to raise capital from U.S. residents without any specific contractual clause requiring payment in the United Sates); *Wolf*, 739 F.2d at 1460 (same).

[12] Here, Defendant relies on facts not alleged in the Complaint, which confirms why this is not appropriate for a motion to dismiss.  *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (reversing dismissal pursuant to Rule

*(footnote cont'd)*

*Second*, as this Court has recognized, the Act of State defense "applies only to actions of a nation within its territory."   *Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003).   While Defendant's course of conduct may have occurred partially in Argentina, the breach—the failure to make a tender offer—occurred in the United States and elsewhere, as the Bylaws explicitly recognize.   *See* Bylaws § 7(f) (requiring compliance with applicable laws in "the ***jurisdictions*** where the takeover bid takes place") (emphasis added).

*Third*, this lawsuit does not challenge the validity of any "sovereign" act.   "Act of state issues only arise when a court must decide—that is, when the *outcome of the case turns upon*— the effect of official action by a foreign sovereign.   When that question is not in the case, neither is the act of state doctrine."   *W. S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (emphasis added).   Here, Plaintiffs do not challenge in this action the expropriation or Defendant's rationale for taking control of YPF.   Instead, Plaintiffs only seek relief based on Defendant's failure to make a tender offer for non-expropriated shares.   Thus, a judgment for Plaintiffs would not "declare invalid" any "official act" by Defendant, *i.e.*, the expropriation.   *Id.* at 405.   Even a victory by Plaintiffs in this action will not prevent the expropriation.   Indeed, because the "outcome of the case" does not "turn[] upon" holding the expropriation to be proper or improper, Act of State issues are "not in the case."   *Id.* at 406.   For

---

12(b)(6) where "[t]he district court's rationale . . . went beyond the face of the complaint and addressed the merits of the case").   As a reason to invoke the Act of State doctrine, Defendant argues "[t]he acts underlying the alleged breach of YPF's by-laws are core aspects of the government's decision to ensure an independent supply of oil and gas."   Def.'s Mot. at 16. As explained above, Defendant's motivations are irrelevant, but even if its decisions to ensure energy supply could somehow justify breaching contractual obligations, Defendant would bear the burden to prove how and why a judgment for Plaintiffs would improperly interfere with sovereign energy policy, including proving the likelihood of each causal step between making a tender offer and Argentina losing energy independence.

this reason, Defendant's complaints about Plaintiffs' requested remedies are also misplaced, given that none would "declare invalid" the expropriation.[13]  *Id.* at 405.

*Fourth*, the Act of State doctrine, like the FSIA, also includes a commercial activity exception.  Actions which are "commercial" rather than "governmental" are not protected by the Act of State defense.  *See United States v. Giffen*, 326 F. Supp. 2d 497, 503 (S.D.N.Y. 2004) (holding that actions which are "commercial—not governmental" are not immune under the Act of State doctrine).  Therefore, Defendant's Act of State defense also fails because, as explained above, the acts at issue were commercial in nature.

## III.   VENUE IS PROPER

Defendant's venue argument fares no better.  Venue in an action against a foreign sovereign is proper: "(1) in any judicial district in which a substantial part of the events *or omissions* giving rise to the claim occurred . . . ."  28 U.S.C. § 1391(f)(1) (emphasis added).  "Substantial" does not mean all or even most.  Indeed, venue may be appropriate in a district "even if a greater portion of events occurred elsewhere."  *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 559 (S.D.N.Y. 2004).  Accordingly, where events in a district support the commercial activity exception to the FSIA, the test for venue is easily satisfied.  *See Am. Constr. Mach.& Equip. Corp. v. Mechanised Constr. of Pakistan Ltd.*, No. 85 Civ. 3765, 1986 WL 2973, at *5 (S.D.N.Y. Mar. 5, 1986).

Here, more than a "substantial" portion of the events giving rise to Plaintiffs' claim occurred in the Southern District of New York.  When Defendant took YPF public, it chose to

---

[13] At best, the question of whether any remedies would implicate Act of State issues raises a premature factual issue not appropriately considered on a motion to dismiss.  *Cf. Lyondell-CITGO Refining, LP*, 2003 U.S. Dist. LEXIS 13809, at *26 (noting that Act of State issues are generally more appropriate for summary judgment).  Indeed, if and when Plaintiffs prevail, the question of remedies will be up to the Court or a jury.  At that time, if the Court has concerns under the Act of State doctrine regarding any of Plaintiffs' requested remedies, it may impose alternatives.  None of Defendant's fears about the eventual impact of particular remedies prevents this case from going forward.

list and offer YPF ADSs on the NYSE.  *See* Compl. ¶ 21.  Defendant therefore offered and marketed NYSE-traded securities in this district, raising more than $1 billion of capital in the process.  *Id.*  The Bank of New York serves as the depositary agent for the ADSs.  *See id.* ¶ 6.

Moreover, more than a "substantial" part of the "omissions" at issue occurred in this District.  28 U.S.C. § 1391(f)(1).  Defendant's breach of contract caused (i) the failure to make the offer by publishing it in newspapers in **New York**, *see* Compl. ¶ 19; (ii) the failure to distribute the offer **to the NYSE**, *see id.* ¶ 20; and (iii) the failure to pay the compensation required by the Bylaws to holders of ADSs in New York, *see id.* ¶ 42.  These omissions amply justify venue in this District.  *See Tonoga*, 135 F. Supp. 2d at 359 (venue proper where "a substantial portion of the alleged guarantee was to be performed in this district"); *Am. Const. Mach. & Equip. Corp.*, 1986 WL 2973, at *5 (venue proper in part based on the place of performance of an unfulfilled contractual obligation).

## IV.  DEFENDANT FAILS TO SHOW THIS ACTION SHOULD BE DISMISSED FOR *FORUM NON CONVENIENS*

"The defendant bears the burden of proof on all elements" of a motion to dismiss for *forum non conveniens*, and "great weight is given to the plaintiff's choice of forum."  *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001) ("*Bank of Credit*") (internal citations omitted).  Accordingly, an action should not be dismissed unless the chosen forum is "genuinely inconvenient" and the alternative is "significantly preferable."  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 74-75 (2d Cir. 2001) (en banc).  To assess this, a court will first consider the "[d]egree of [d]eference" due to a plaintiff's choice.  *Iragorri*, 274 F.3d at 70-71.  Next, it assesses "whether an adequate alternative forum exists." *Id.* at 73.  Then, only if the alternative forum is found to be adequate, will the court then consider whether the "balance" of the "private interest factors" and "public

interest factors" requires denying plaintiff's chosen forum.  *Id.* at 73-74; *see Bank of Credit*, 273 F.3d at 246.  Here, Defendant fails to carry its burden on any of these elements.

### A.    Plaintiffs' Chosen Forum Is Entitled To Substantial Deference

"'[T]he plaintiff's choice of forum should rarely be disturbed.'"  *Iragorri*, 274 F.3d at 71 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Although a plaintiff proceeding in its own forum deserves more deference than one proceeding in a foreign forum, *see id.*, "the more that a . . . foreign plaintiff, chooses to sue in a United States court for *'legitimate reasons,'* the more deference must be given to that choice."  *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 179 (2d Cir. 2006) (quoting *Iragorri*, 274 F.3d at 73) (emphasis added); *see also R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167-68 (2d Cir. 1991) (foreign plaintiff's selection of U.S. forum must receive some deference).

In this case, the Court should grant considerable deference to the preferences of both named Plaintiffs.  With respect to Repsol, although headquartered in Spain, Repsol has "legitimate reasons" for bringing this action in New York.  *Bigio*, 448 F.3d at 179.  Specifically, Plaintiffs' causes of action arise from a nexus of facts in New York: (i) Defendant initially offered YPF shares for sale on the NYSE in this district, *see* Compl. ¶ 21; (ii) YPF's ADSs continue to trade on the NYSE, *see id.* ¶ 8; and (iii) the tender offer at issue was supposed to occur in New York by virtue of publication in New York news sources and notification to the NYSE, *see id.* ¶¶ 19-20.  Indeed, Repsol continues to hold YPF Class D shares through ADSs, so New York is also the venue in which Repsol's own shares are currently listed on the NYSE.  *See* Compl. ¶ 5.  Because there is a "bona fide connection between the subject matter of [this] lawsuit and the chosen forum" Repsol's choice of forum is "*entitled to considerable deference*."  *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 273 (S.D.N.Y. 2012) (denying motion to dismiss action brought by foreign plaintiff on *forum non conveniens* grounds).

Nor does this case raise reasons to question the "legitima[cy]" of Repsol's motives. *See Iragorri*, 274 F.3d at 75 (considering "forum-shopping reasons" in determining degree of deference). Plaintiffs filed this action one month after Defendant announced the expropriation on April 16, 2012, removing the possibility that they chose New York to take advantage of a more permissive statute of limitations. Plaintiffs' choice of New York is also not designed to haul Defendant into a hostile or unfamiliar forum; Defendant is a repeat player in this District, and more than capable of mounting a defense here.[14]

With respect to Texas Yale, Defendant's suggestion that Texas Yale "must demonstrate why this District is the most convenient forum" turns the law on its head. Def.'s Mot. at 21. Defendant "bears the burden of proof on *all elements* of the motion." *Bank of Credit*, 273 F.3d at 246 (emphasis added). Regardless, this District *is* a convenient forum for Texas Yale. Though headquartered in Texas, as a financial advisory firm Texas Yale trades in numerous stocks listed on New-York based exchanges. *See* Compl. ¶ 6.[15] Nor can Texas Yale be faulted for not choosing its home forum, in light of the greater factual nexus with New York described above. There is thus no reason to give anything less than "considerable deference" to Texas Yale's choice as well. *Skanga Energy*, 875 F. Supp. 2d at 273.

### B.   Argentina Is Not An Adequate Alternative Forum For Litigation Against Defendant Regarding YPF

To determine the "adequacy" of a proposed alternative forum, the inquiry focuses on the particular claim at issue. *See, e.g.*, *Bank of Credit*, 273 F.3d at 247-48 (remanding for consideration of Pakistani statute that would govern plaintiff's claim). It is thus irrelevant that,

---

[14] *See, e.g., EM Ltd. v. Republic of Argentina*, No. 08 Civ. 7974 (TPG), 2009 U.S. Dist. LEXIS 91652 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom., NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 258 (2d Cir. 2012).

[15] *See, e.g.*, http://www.nasdaq.com/quotes/institutional-portfolio/texas-yale-capital-corp-681670 (listing investments by Texas Yale in securities that trade on the NASDAQ exchange based on SEC filings).

as Defendant notes, Argentina may offer an adequate forum for claims against other defendants.[16]  In fact, any attempt to bring such an action in Argentina against Argentina would be all but futile because of the following problems, outlined in Dr. Naveira's affidavit:

**Extraordinary Delay and Procedural Irregularities:** Even if a forum both permits service of process on the defendant and imposes no legal bar to the claim, "[s]uch a forum may nevertheless be inadequate if it does not permit the reasonably prompt adjudication of a dispute." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009).  That is precisely what Plaintiffs would face in Argentina.  *See* Naveira Aff. ¶¶ 5-9.  In general, the average time for ordinary proceedings against the Argentine government to reach a final judgment on the merits in an Argentine court of first instance is more than six years.  *See* Horacio D. Rosatti, *Los Tratados Bilaterales De Inversión, El Arbitraje Internacional Obligatorio Y El Sistema Constitucional Argentino*, LA LEY, Jan. 1, 2008, n.28.[17]  As for litigation regarding YPF specifically, Defendant cites Repsol's actions arising out of the expropriation that are already proceeding in Argentine courts as evidence of adequacy.  Def.'s Mot. at 22.  But in fact, these proceedings, as well as the other proceedings identified in Dr. Naveira's affidavit, demonstrate the opposite.  These court proceedings have shown: (i) an unreasonable number of jurisdictional questions raised by the Argentine courts; (ii) reluctance by the courts to consider the merits of the questions submitted, even within the limited framework of a preliminary request for injunctive relief; (iii) delays in

---

[16] *See* Def.'s Mot. at 22 & n.17 (citing *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001) (action for wrongful death based on an airplane crash); *Warter v. Boston Sec., S.A.*, 380 F. Supp. 2d 1299 (S.D. Fla. 2004) (action for alleged embezzlement of funds invested with an Argentine securities brokerage); *MasterCard Int'l, Inc. v. Argencard Sociedad Anonima*, No. 01 Civ. 2027, 2002 WL 432379 (S.D.N.Y. Mar. 20, 2002) (action for termination of Argentine corporation's membership in credit card licensing program and exclusivity provisions in the license agreement through injunctive relief); *Aguas Lenders Recovery Grp., LLC v. Suez S.A.*, No. 06 Civ. 7873, 2008 WL 612669 (S.D.N.Y. Mar. 3, 2008), *rev'd on other grounds*, 585 F.3d 696 (2d Cir. 2009) (action regarding dispute over a concession agreement involving the operation of the water and sewer system in Buenos Aires and its suburbs)).

[17] Ex. D.

proceedings severe enough to be considered a "denial of justice"; (iv) an unusual number of inexplicable errors to the detriment of the petitioners against Argentina; and (v) undue delays in handling the cases in general, as a result of the foregoing problems.  *See* Naveira Aff. ¶¶ 10-16.

**No Rule 23 Equivalent**: Argentina lacks any procedural rule at the federal level analogous to Federal Rule of Civil Procedure 23.  *See* Naveira Aff. ¶ 17.  It is thus highly unlikely that any Argentine court would permit the aggregation of the claims of all record or beneficial holders of Class D shares of YPF stock (other than Repsol with respect to the expropriated shares), who held at the time of Argentina's breach, which would be the most efficient way to enforce the Bylaws.  *See id.* ¶¶ 17-25; *see also Abaclat v. Argentine Republic*, Case No. ARB/07/5 ¶ 471(ii) (ICSID Aug. 4, 2011)[18] (noting Argentine government's position that "collective claims" by bondholders have not been recognized in Argentina); *id.* ¶ 587.

**Prohibitive Court Fees:** To bring a case in the first instance, a plaintiff must pay a court tax of 3% of the amount in controversy.  *See* Naveira Aff. ¶ 26.  If Plaintiffs brought a lawsuit before Argentine Federal Courts similar to that brought here, it is likely that the Argentine court would impose such a tax and that the amount of the controversy would be determined based on the potential amount of the tender offer (which would be billions of dollars).  *See id.* ¶¶ 31-32.  Thus, Plaintiffs would likely be charged over a hundred million dollars just to have the case heard.[19]  *See id.* ¶ 32.  Because the court tax is triggered by merely filing a complaint, and since subsequent abandonment of an action does not eliminate a plaintiff's liability for the tax, Repsol would be required to file its complaint without any means to ascertain in advance what amount

---

[18] Ex. E.

[19] Even devalued after the expropriation announcement, YPF's shares have a total market capitalization of more than $6.3 billion as of July 26, 2013. *See* http://finance.yahoo.com/q?s=YPF (last checked July 26, 2013).  The Bylaws formula, of course, would call for payment to shareholders based on a much higher price.  *See* Compl. ¶ 18.

of tax a court would ultimately fix.  *See id.* ¶ 33.  Worse, if Plaintiffs were to lose the action, the court might require them to pay Defendants' attorneys' fees, calculated at *up to twenty-eight percent* of the amount in controversy.  *See id.* ¶¶ 34-36.  In other words, if an Argentine court ruled in favor of the Argentine government, Plaintiffs could face a fee award of over a *billion* dollars for attempting to enforce their contractual rights.

**Bias in Favor of Defendant**:  Courts in New York and even the President of the United States repeatedly have observed that the Argentine courts are predisposed to find in Argentina's favor and, when Argentina has been found liable in foreign proceedings pursuant to lawful legal process, Argentina and its courts nevertheless have refused to enforce or abide by adverse judgments.  *See NML Capital, Ltd. v. Republic of Arg.*, 699 F.3d 246, 253 & n.5 (2d Cir. 2012) ("[P]laintiffs hold judgments against Argentina that, as we have seen, *its courts have refused to honor.*") (emphasis added); *EM Ltd. v. Republic of Arg.*, 865 F. Supp. 2d 415, 417 (S.D.N.Y. 2012) ("This is yet another situation growing out of the Republic's continued intransigence in failing to honor its lawful judgment debts."); Presidential Proclamation 8788 of March 26, 2012, 77 Fed. Reg. 18,899, 18,899 (Mar. 29, 2012) ("I have determined … that it is appropriate to suspend Argentina's designation as a GSP beneficiary … because *it has not acted in good faith in enforcing arbitral awards* in favor of [U.S. citizens and companies].") (emphasis added).

**New Threats to Judicial Independence**:  Recent legislation in Argentina has restructured the court system in ways that make it more difficult to litigate against the federal government.  *See* Naveira Aff. ¶¶ 43-45.  These measures have exacerbated a "crisis of independence" for the judiciary, *id.* ¶ 51; *see also id.* ¶¶ 46-54, and would make it even more difficult for Plaintiffs to obtain an impartial hearing against the Argentine government in Argentine courts, *see id.* ¶ 55.

**Limited Discovery**: Any action in Argentina would permit only extremely limited discovery. Plaintiffs could not obtain pre-trial document discovery, other than particular documents known to be in Defendant's possession; it is not possible to request production of categories of documents. *See* Naveira Aff. ¶¶ 66, 69. The procedures surrounding witness testimony—particularly where the witness is a representative of the Argentine state—are also extremely limited. *See id.* ¶¶ 73-78. Worse, if a representative of Defendant gave testimony, the representative would not be subject to prosecution for perjury if the representative did not tell the truth. *See id.* ¶ 77. In contrast, in this matter, Plaintiffs could use the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention") to request that an Argentine court authorize the taking of witness evidence according to the procedures of U.S. litigation. *See id.* ¶¶ 80-81. Moreover, Plaintiffs may also have grounds to request that this Court compel witnesses to testify in the United States under the Federal Rules of Civil Procedure.[20]

Taken together, the problems that would plague any attempt to bring this action in Argentina make the probability of obtaining adequate relief vanishingly small. Because Defendant's proposed alternative forum is thus inadequate, the Court may reject Defendant's motion without any further analysis. *Cf. Bank of Credit*, 273 F.3d at 246 (public and private factors must be balanced only after determining adequate alternative forum exists).

---

[20] *See Société Nationale Industrielle Aérospatiale v. United States Dist. Ct.*, 482 U.S. 522, 540-41 (1987) (noting that the court may elect to allow evidence through Hague Convention or alternatively "order discovery under the Federal Rules of Civil Procedure"); *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 80-81 (D. D.C. 1999) (compelling testimony from an Iranian government official in Washington, D.C. under the Federal Rules).

**C.**   **Regardless, Defendant Fails To Carry Its Burden To Demonstrate That The Balance Of Public And Private Factors Requires Dismissal**

Even if there were an adequate alternative forum (which there is not), Defendant would still fail to justify dismissal.  "Because there is ordinarily a strong presumption in favor of plaintiff's choice of forum, that choice will not be overcome unless the relevant private and public interest factors weigh heavily in favor of trial in the [adequate] alternative forum." *R. Maganlal & Co.,* 942 F.2d at 167.  Here, these factors cannot overcome Plaintiffs' selection.

**1.**   **Defendant Fails To Show That "Private" Factors Require Dismissal**

The "private" factors relevant to whether the plaintiff's chosen forum is so inconvenient as to warrant dismissal relate to "the convenience of the litigants."  *Iragorri*, 274 F.3d at 73.  In this instance, Defendant fails to show Argentina would be more convenient.

On one hand, Defendant cannot credibly claim that litigation in New York creates inconvenience.  Defendant appears frequently in courts in this District.  *See supra* n.14.  More importantly, Defendant chose to register YPF in the United States, and continues to solicit U.S. investors, including through a recent "road show" in New York City.[21]  Defendant cannot now complain about being sued in the very forum where it solicited investment, regarding the very investments it solicited.  Nor can Defendant identify any other legitimate bases to object to this District.  Although it cites U.S. litigation costs and the costs of translating testimony and documents, these could be a miniscule fraction of the costs of court fees alone to bring the action in Argentina, which will also likely cause costly and substantial delays.  *See supra* IV.B; Naveira Aff. ¶¶ 5-16, 26-42.  *See Ingram Micro, Inc. v. Airoute Cargo Express, Inc.*, No. 99 Civ. 12480, 2001 U.S. Dist. LEXIS 2912, at *14 (S.D.N.Y. 2001) (need for translation "is not a hardship of

---

[21] *See* Ex. F, Victoria Ginzberg, *"We will take the necessary measures,"* PÁGINA 12, June 16, 2012 ("Regarding [YPF], [President Kirchner] announced a road show to 'make an offering of business, production, exploitation and services models.'")

sufficient magnitude to justify dismissal"). Defendant also argues that translating key documents such as the Bylaws "could seriously complicate the process of interpreting key provisions of the By-laws." Def.'s Mot. at 19. However, Defendant—the controlling shareholder of YPF—has already caused the English version of the Bylaws to be posted on the website of YPF,[22] and has never disputed any translation in its 20 prior years as a YPF shareholder.

On the other hand, Defendant fails to identify any legitimate evidentiary advantages to Argentina as a forum. Defendant first argues that most fact witnesses are located in Argentina, and may not be available pursuant to this court's jurisdiction either in Argentina or New York.[23] *See* Def.'s Mot. at 23-24. However, Defendant fails to provide "a list of witnesses [it] would call at trial and their residence, which has been held to be a prerequisite for *forum non conveniens* dismissal." *Weltover, Inc. v. Republic of Arg.*, 753 F. Supp. 1201, 1209 (S.D.N.Y. 1991) ("*Weltover Dist. Ct.*"). Defendant also ignores the many potential witnesses *not* located in Argentina. These include former YPF directors who now reside in Spain and elsewhere, as well as officers of the depositary for ADSs in New York. Defendant next argues that the "decision" not to launch a tender offer occurred in Argentina, but this case does not turn on Defendant's motives or rationale. Instead, it turns on Defendant's failure to publish the tender offer and to consummate it by paying accepting shareholders, in the United States and elsewhere. Indeed, given the factual nexus with New York described above, a significant amount of evidence will be more conveniently accessed in this District, including access to experts to testify on how to calculate the tender offer price under the Bylaws.

---

[22] *See* Corporate Governance, By-Laws of YPF Sociedad Anónima, *available at* http://www.ypf.com/enu/InversoresAccionistas/GobiernoCorporativo/Paginas/Estatutos.aspx.

[23] This point is also a red herring, given that Defendant neither identifies these witnesses nor offers to make any witnesses available should the case be transferred to Argentina. Defendant cannot rely on its own plan to disregard U.S. law and discovery obligations as a reason to avoid a U.S. lawsuit.

### 2. Defendant Fails To Show That "Public" Factors Require Dismissal

The "public" interest factors also weigh strongly in favor of litigating this dispute in New York. These focus on the respective interests of, and burden on, the judicial systems in the different forums in the legal and factual issues in the case. *See Gross v. British Broad. Corp.*, 386 F.3d 224, 233 (2d Cir. 2004) (describing factors, including "the local interest in having localized controversies decided at home" and the "unfairness of burdening citizens in an unrelated forum with jury duty"). In this case, Argentina's breach of its tender offer obligations to U.S. shareholders of U.S.-registered securities strikes at the heart of the integrity of U.S. financial markets. Indeed, as a "financial capital," New York "has a great interest in the outcome of [] financial dispute[s]." *Lafarge Canada, Inc. v. Bank of China*, No. 00 CIV. 0261, 2000 WL 1457012, at *4 (S.D.N.Y. Sept. 29, 2000). Thus, Defendant's breach of contractual terms directed at investors in securities traded in New York, and its failure to make a tender offer in New York or file the offer with the NYSE, create a "localized controversy" in this district as much as any other. *See Gross*, 386 F.3d at 233.

Defendant resists this conclusion with three arguments. First, it repeats the suggestion that this action "implicates Argentina's sovereign responsibility for the country's energy resources and its national interest in the proper application of its expropriation laws." Def.'s Mot. at 24. For the reasons explained above, this action implicates none of these issues, only whether Defendant performed its contractual obligations and, if not, what damages Plaintiffs should receive. Defendant will continue to exercise control over YPF and its energy resources, regardless of the outcome of this lawsuit.

Second, Defendant claims that "key issues are governed by Argentine law." *Id.* U.S. courts, however, "are regularly called upon to interpret foreign law." *Bigio*, 448 F.3d at 179; *see*

*also Weltover Dist. Ct.*, 753 F. Supp. at 1209 (need to apply Argentine law did not justify dismissal). This Court is more than capable of dealing with the limited Argentine law issues arising from interpreting the Bylaws. Indeed, Defendant's own brief devotes only two paragraphs to the meaning of "acquisition" under Argentine law, and makes no other Argentine law arguments on the merits. *See* Def.'s Mot. at 26-27.

Third, Defendant claims that the relief requested by Plaintiffs "depends on an answer to the same question that will be decided by the National Court of Appraisal"[24] in Argentina, which will determine the compensation due to Repsol for the expropriated shares. Def.'s Mot. at 24-25. However, this action only requires determining the consideration due to holders of *non-expropriated* YPF shares, *see* Compl. ¶ 44—which are not at issue in any Argentine proceeding instituted by Repsol. *See* Naveira Aff. ¶¶ 56-59. Indeed, the question in this case is not how much the non-expropriated shares are worth in a vacuum, but how to apply the formula for the tender offer price in Section 7 of the Bylaws. *See* Compl. ¶ 18.

## V.      THE COMPLAINT ADEQUATELY STATES ITS CLAIMS FOR RELIEF

### A.      The Complaint States A Claim For Breach Of Contract

In a halfhearted attempt to argue that Plaintiffs fail to state a claim for breach of contract, Defendant resorts to sleight of hand based on the legal measures used in the takeover of YPF. The premise of this argument is that the seized YPF shares exist in a legal netherworld. Specifically, Defendant asserts that it has not yet taken "title to the shares," and the occupation of YPF is "temporary." Def.'s Mot. at 26. Thus, although it admittedly has "control" of the shares, Defendant says the shares have not yet been "acquired," and contends that the tender offer requirements therefore do not apply. The Bylaws and applicable law forbid this argument.

---

[24] The National Court of Appraisal is an administrative body within the federal government of Argentina. *See* Naveira Aff. ¶ 61.

1.      **Defendant Admittedly Took Control Of The YPF Shares And Thus Triggered The Tender Offer Requirements**

   a.      **Under The Bylaws, A Change In Control Constitutes An "Acquisition," Without The Need For Transfer Of Ownership**

Section 28 of the Bylaws defines the transactions that trigger Defendant's tender offer obligations to include control of the shares:

> The provisions of subsections e) and f) of Section 7 [setting forth tender offer requirements]. . . shall apply to all acquisitions made by the National Government, *whether directly or indirectly, by any means or instrument*, of shares or securities of the Corporation, 1) if, as a consequence of such acquisition, the National Government *becomes the owner, or exercises the control of*, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock . . . .[25]

Bylaws § 28(A) (emphasis added).  First, Section 28 captures "indirect acquisitions," *i.e.*, transactions by which Defendant "*indirectly*" acquires Class D shares.  Section 7—which is incorporated by reference into Section 28—makes clear that "indirectly" means a transaction where shares come under Argentina's "control."  Bylaws § 7(h)(i).  The remedies for a violation of Section 7 similarly recognize that obtaining control, rather than ownership, is enough for an "indirect" acquisition.  In the case of a "direct" takeover, the voting prohibitions in Section 7(h) lifts when the acquired "shares of stock are sold;" in the case of an "indirect" takeover, this penalty lifts when the purchaser "loses the control" of the shares.  Bylaws § 7(h).

Second, Section 28(A)(1) further rejects any need for transfer of ownership.  It is triggered "if, as a consequence of such acquisition," of YPF shares, Defendant "becomes the

---

[25] Section 28 goes on to state that, in the alternative, the tender offer requirements apply if Defendant "acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5%" of the total common stock, but that if Class A shares represent a lower percentage, instead "the general criteria set forth in subsection d) of Section 7 shall apply."  Bylaws § 28(A)(2).  Section 7(d) sets the tender offer threshold at either (i) 15% of all capital stock, or only (ii) 20% of Class D stock if the 20% of Class D shares represent less than 15% of all stock.  Since Defendant admits it controls more than 15% of all capital stock by controlling 51% of Class D shares, it triggered the tender offer requirements under the alternative test of Section 28(A)(2) as well.

owner, or *exercises the control of* the shares . . . ."  Bylaws  § 28(A)(1) (emphasis added).  Thus, by definition, an "acquisition" under the Bylaws must be broader than becoming an owner, or the phrase "becomes the owner" would be redundant, and the phrase "or exercises the control of" would be meaningless.[26]  *See* Naveira Aff. ¶ 88.  The Bylaws thus *explicitly* require a tender offer upon a change in control.[27]

### b.    Control Also Suffices To Establish An "Acquisition" Under Argentine Law

Even if the Bylaws were silent as to whether "acquisition" requires change of ownership, the normal meaning of the term "acquisition" in Argentine law imposes no such requirement. First, under Argentine law, including the Argentine Civil Code and Antitrust Law No. 25,156, "acquisition" includes not only ownership, but also: (i) taking control; (ii) taking possession; or (iii) merely having "tenancy" of an item.  *See* Naveira Aff. ¶¶ 91-92, 98.  Defendant concedes it has control of the shares, *see* Def.'s Mot. at 4, and Dr. Arecha concedes that Defendant has possession of the shares as well.  Arecha Decl. ¶ 6.  Second, even the dictionary cited by Dr. Arecha acknowledges that an acquisition includes "obtaining a thing *or right* in order to reap such monetary benefits as may be relevant."  *See* Naveira Aff. ¶ 99 (quoting Enciclopedia Juridica Omeba, Editorial Bibliografica Argentina); *see* Arecha Decl. ¶ 13 (citing the same source).  Dr. Arecha also concedes that Defendant has taken the rights associated with the shares. *See* Arecha Decl. ¶ 12; Naveira Aff. ¶ 100.  The takeover thus satisfies several common meanings of the term "acquisition."

---

[26] Defendant's declaration from Martín Arecha relies on the fact that some expropriated shares are registered in Repsol's name.  *See* Declaration of Martín Arecha, Apr. 30, 2013, submitted in support of Def.'s Mot. ("Arecha Decl.") ¶ 19.  This is irrelevant under the Bylaws, which expressly recognize that acquisitions may occur (i) through beneficial ownership of ADSs, which of course are registered not in the name of the beneficial owner but of the Depositary, or (ii) through other similar mechanisms.  *See* Bylaws § 7(i).

[27] The same result applies under Sections 28(A)(2) and 7(d), because Defendant "exercises the control" of more than 15% of all capital stock by controlling 51% of Class D shares.  *See* Bylaws §§ 7(d), 28(A)(2); Naveira Aff. ¶ 90.

It also makes sense that seizing control would trigger the tender offer requirement.  Its purpose is to provide a withdrawal right for investors if Argentina seeks to seize control, as YPF will no longer be managed to benefit investors.  Indeed, as demonstrated here, the price of YPF's shares plummeted as soon as Defendant took control, causing exactly the injury to Plaintiffs that the Bylaws were drafted to prevent.[28]  The injury occurred upon transfer of control, not some future transfer of title.

### c.        Defendant Admits It Has Control

Here, Defendant admittedly took control of 51% of YPF's stock.  Defendant concedes that (i) it has taken "control of YPF" and is engaged in a "temporary *occupation* of the shares until the Expropriation Process is completed," Def.'s Mot. at 4 (emphasis added); (ii) it has the "***right*** to vote, in Argentina, the shares" of YPF, *id.* at 17; *see also* Arecha Decl. ¶ 12, thus demonstrating that and (iii) its actions have resulted in the "dispossession" of Repsol's shares, so that Defendant may "use and enjoy" them, Arecha Decl. ¶ 6.   As a result, through the "mechanism" of Law 26,741, Defendant has made an acquisition within the meaning of Sections 7 and 28 of the Bylaws.  *See supra* V.A.1.a; Naveira Aff. ¶ 99 (acquisition means "obtaining a thing ***or right***").   It would be strange, to say the least, if Defendant could vote the shares to purportedly elect a new board (as it did), and otherwise direct YPF, without controlling its shares.  *See e.g.,* Def.'s Mot. at 4 (Defendant concluded that "taking control of YPF was

---

[28] Defendant's declarant Dr. Arecha argues that because no price has been set for the shares, the "obligation" to make a tender offer does "not exist." Arecha Decl. ¶ 23.  This argument fails for two reasons.  First, it is wholly circular.  Dr. Arecha effectively reasons that because Defendant has not complied with the obligation in the Bylaws to calculate the price of the required offer, it need not make the offer at all.  But the Bylaws expressly contemplate that Defendant might make an acquisition without a tender offer, and impose penalties for such a violation.  *See* Bylaws §7(h).  It would make no sense to allow Defendant to escape its obligations simply by refusing to calculate a price.  Second, Dr. Arecha's argument also ignores the rules for setting the price in the Bylaws.  The price must be calculated as the highest of four alternatives, only two of which would be keyed to an earlier acquisition price within the prior two years: Sections 7(f)(v)(A) and (C), but not (B) and (D).  Indeed, Defendant realizes the fallacy of Dr. Arecha's logic, as it does not even mention this point in its brief.  In addition, Dr. Arecha fails to explain why he is so sure that the Argentine government has not acquired any other YPF shares during the previous two years.

necessary to reverse the Company's declining levels of production and exploration."); *id.* at 8 (conceding that Defendant took control of YPF in order to "develop its natural resources and to achieve and ensure its energy independence").[29]   In addition to voting the shares, Defendant has collected a dividend of approximately $30 million paid by YPF on earnings accrued prior to the expropriation.  *See* Naveira Aff. at 25 n.101.

### 2.   An "Acquisition" Need Not Be "Permanent" Under The Bylaws

Defendant's argument that it is excused from making a tender offer because it has not taken permanent control of the YPF shares fails for three reasons.  First, Section 7 of the Bylaws recognizes that even temporary acquisitions trigger tender offer requirements.  It provides that the penalties for ignoring these provisions lift when a purchaser "loses control" of the shares. Bylaws § 7(h).  Moreover, Section 28 of the Bylaws does not in any way exclude acquisitions of a temporary nature from the tender offer rules.  *See* Naveira Aff. ¶¶ 103-104.  Second, the normal meaning of the term "acquisition" under Argentine law also does not require that the acquisition be permanent.  Instead, an "acquisition" can be temporary under Argentine law.  *See id.* ¶¶ 105-106.  Third, even if the Bylaws or Argentine law required that an "acquisition" must be permanent (which neither does), Defendant would *still* have acquired the YPF shares.  Here, Defendant has taken permanent control of YPF, even though the "means or instrument" of its control will change from occupation to ownership when it finally owns the shares.  Bylaws § 28(A).   Defendant admits it will maintain control when the "Expropriation Process is completed," Def.'s Mot. at 4, at which point ownership will pass to Defendant, *see id.* at 26.

---

[29] Defendant's statements following the expropriation also demonstrate its understanding that it had acquired the shares.  For example, Defendant publicly boasted about acquiring YPF.  President Fernández de Kircher stated, "We have recovered one of the most emblematic companies in Argentina."  Ex. G, Jonathan Gilbert & Whitney Eulich, *Argentina's Renationalization of YPF: A Push to Manage Oil on Its Own Terms*, CHRISTIAN SCIENCE MONITOR, May 12, 2012.  She similarly stated, "YPF belongs to everyone, I want us to be very clear about that."  Ex. H, *Repsol will claim damages from Argentina for US $10,500 million*, PORTAFOLIO, Apr. 16, 2012.

### B.     The Complaint States A Claim For Anticipatory Repudiation

Defendant challenges Plaintiffs' anticipatory repudiation claim by arguing that "there has been no acquisition of shares," and that an acquisition "will not happen until the Expropriation Process is completed."  Def.'s Mot. at 27.  This argument fails because, as explained above, Defendant has "acquired" the shares because it has acquired the rights attached to those shares and controls them.  But even if it had not, the Complaint and Defendant's own pleading would still support a claim for repudiation because they identify "unequivocal statement[s] . . . making clear that it did not intend to perform."  *Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*, 82 A.D.3d 606, 604, 919 N.Y.S.2d 151, 151 (1st Dep't 2011); *see also In re Randall's Island Family Golf Centers, Inc.*, 272 B.R. 521, 523 (S.D.N.Y. 2002) (finding anticipatory breach where party's "words and deeds about his intention to repudiate the contract were 'unequivocal'") (internal citation omitted).  Specifically, Defendant's officials rejected the contractual obligations in the Bylaws, *see* Compl. ¶ 37,[30] and Defendant does not dispute that it will not launch a tender offer. *See* Def.'s Mot. at 27 (asserting that no tender offer has been triggered and indicating that Defendant will proceed to complete the expropriation).

### C.     The Complaint States A Claim For Promissory Estoppel

Defendant criticizes the promissory estoppel claim on the ground that the Complaint identifies no promises other than the ones in the Bylaws.  *See* Def.'s Mot. at 27.  However, the Complaint expressly alleges that the prospectus for the 1993 IPO contained the "clear and unambiguous" promise required for a promissory estoppel claim.  *Kapsis v. Am. Home Mortg.*

---

[30] Defendant has publicly mocked the notion that it would respect the Bylaws and pay Repsol's demand for the expropriated shares.  *See* Ex. I, Gabriel Sued, *Kicillof: "We are not going to pay them what they are saying"*," LA NACIÓN, Apr. 18, 2012 (noting that Deputy Minister for the Economy, Axel Kicillof, explicitly stated "[w]e are not going to pay [Repsol] what they are saying," and  "[t]he morons are those who think that the State has to be stupid and buy everything in accordance with YPF's statute").

*Servicing Inc.*, No. 11–cv–4936, 2013 WL 544010, at *21 (E.D.N.Y. Feb. 14, 2013) (denying motion to dismiss promissory estoppel claim).  In the prospectus, Defendant promised that to acquire a majority of YPF's stock, "the Argentine Government first would be required to make a cash tender offer" to all outstanding shareholders, and that a failure to do so "will result in the suspension of the voting, dividend and other distribution rights" in the acquired shares.  Compl. ¶ 23.  Even if these promises relate to the same subject matter as those in the Bylaws, Plaintiffs may pursue the estoppel claim as an alternative.  *Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.*, No. 06-CV-6415T, 2007 WL 174094, at *3 (W.D.N.Y. Jan. 22, 2007) (permitting contract and estoppel to be pled in the alternative).

### D.   The Complaint States A Claim For Breach Of The Implied Covenants Of Good Faith And Fair Dealing

Contrary to Defendant's argument, Plaintiffs' claim for breach of the implied covenants of good faith and fair dealing is not duplicative of their breach of contract claim.  Here, to the extent the Bylaws did not "expressly forbid[]" Defendant's alleged actions because no "acquisition" has occurred, Defendant's conduct certainly "deprive[d] [Plaintiffs] of the right to receive the benefits" under the Bylaws.  *Shapsis v. Kogan*, 30 Misc. 3d 1208(A), No. 38418/07, 2011 WL 61727, at *9 (Sup. Ct. Kings County Jan. 7, 2011) (internal citations and quotation marks omitted).  Specifically, if Defendant were to prevail on its contract argument (which as noted above it should not), that would mean that Defendant engaged in a scheme to avoid its bylaw requirements by launching a "temporary occupation" rather than obtaining ownership, to evade the clear goal of the Bylaws to protect investors in the event of a planned government takeover.  As a result, to the extent the meaning of "acquisition" is in any doubt (which it is not), Plaintiffs may plead their covenant claim in the alternative.  *See Hard Rock Cafe Int'l., (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) ("[W]here

the existence *or meaning* of a contract is in doubt, a party may plead a claim for breach of the covenant of good faith and fair dealing in the alternative.") (emphasis added).[31]

### E.     Plaintiff Texas Yale States A Claim For Breach Of Contract

Even if it were proper to consider Texas Yale's current holdings in YPF—nowhere alleged in the Complaint—for purposes of Defendant's motion, Defendant is mistaken that Texas Yale's claims must be dismissed.  Plaintiffs' claims arise from Defendant's failure to make a tender offer in 2012.  *See* Compl. ¶ 17.   Defendant immediately injured all Plaintiffs by withholding the compensated exit guaranteed in the Bylaws and leaving them with devalued shares.  That Texas Yale may have since sold its holdings for dramatically less than the tender offer price set forth in the Bylaws only confirms its damages.

### CONCLUSION

Plaintiffs respectfully requests that the Court deny Defendant's Motion to Dismiss.


Dated:  July 26, 2013
New York, NY

                                    Respectfully submitted,

                                    LATHAM & WATKINS LLP

                                    By: /s/ Christopher R. Harris
                                        Miles N. Ruthberg
                                        James E. Brandt
                                        Christopher R. Harris
                                        885 Third Avenue
                                        New York, New York 10022
                                        Telephone: (212) 906-1200
                                        Facsimile: (212) 751-4864

                                        *Attorneys for Plaintiffs*

---

[31] Regardless, the Complaint contains ample factual allegations supporting bad faith.  *See, e.g.*, Compl. ¶¶ 27-31 (describing Defendant's campaign to depress the value of the shares); *id.* ¶ 34 (describing seizure of YPF's facilities); *id.* ¶¶ 38-39 (describing the legal strategy in taking immediate control of the shares subject to expropriation); *id.* ¶¶ 40-41 (describing the failure to pay any compensation to outstanding shareholders).