UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| REPSOL YPF, S.A.[i] and TEXAS YALE CAPITAL CORP., Individually and On Behalf of All Others Similarly Situated,<br><br>                   Plaintiffs,<br><br>      -against-<br><br>REPUBLIC OF ARGENTINA,<br><br>                   Defendant. | 12 Civ. 3877 (TPG) (FM)<br><br><br>**DECLARATION OF CHRISTOPHER R. HARRIS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT** |

I, Christopher R. Harris, do hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a member of the Bar of this court and a partner at the firm of Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, counsel for Plaintiff Repsol YPF, S.A., now known as Repsol, S.A, and Plaintiff Texas Yale Capital Corp.  I respectfully submit this declaration in opposition to Defendant's Motion to Dismiss the Complaint in the above-captioned proceedings.

2.      Attached hereto as Exhibit A is a true and correct copy of the By-Laws (Estatutos) of YPF S.A. as Amended (English Version), Exhibit 1.2 to 2009 YPF Form 20-F, filed 6/29/10 (incorporated by reference in 2012 YPF 20-F, filed 4/26/13).

---

[i] Now known as Repsol, S.A.

3.      Attached hereto as Exhibit B is a true and correct copy of the Complaint filed on

May 15, 2012 in the above-captioned proceedings, *Repsol YPF, S.A. v. Republic of Argentina,* 12

Civ. 3877 (TPG) (May 15, 2012) [ECF No. 1].

4.      Attached hereto as Exhibit C is a true and correct copy of Law 26,741,

Argentina's Sovereign Power Over Hydrocarbons, May 4, 2012 (attachment to YPF Form 6-K,

filed 5/9/12).

5.      Attached hereto as Exhibit D is a true and correct copy of the article, Horacio D.

Rosatti, *Los Tratados Bilatrales De Inversion, El Arbitraje Intenacional Obligatorio Y El*

*Sistema Constitucional Argentino,* LA LEY, Jan. 1, 2008, with an attached English translation and

certification of translation.

6.      Attached hereto as Exhibit E is a true and correct copy of the decision and

dissenting opinion in *Abaclat v. Argentine Republic*, Case No. ARB/07/5 (ICSID Aug. 4, 2011).

7.      Attached hereto as Exhibit F is a true and correct copy of the article, Victoria

Ginzberg, *"We will take the necessary measures,"* PÁGINA 12, June 16, 2012, *available at*

http://www.pagina12.com.ar/diario/elpais/1-196541-2012-06-16.html, with an attached English

translation and certification of translation.

8.      Attached hereto as Exhibit G is a true and correct copy of the article, Jonathan

Gilbert & Whitney Eulich, *Argentina's Renationalization of YPF:  A Push to Manage Oil on Its*

*Own Terms,* CHRISTIAN SCIENCE MONITOR, May 12, 2012.

9.      Attached hereto as Exhibit H is a true and correct copy of article *Repsol will claim*

*damages from Argentina for US $10,500 million*, PORTAFOLIO, Apr. 17, 2012, with an attached

English translation and certification of translation.

10.     Attached hereto as Exhibit I is a true and correct copy of the article, Gabriel

Sued, *Kicillof: "We are not going to pay them what they are saying,"* La Nación, Apr. 18, 2012,

with an attached English translation and certification of translation.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:  July 26, 2013
        New York, New York


                                    By: /s/ Christopher R. Harris
                                        Christopher R. Harris

# Exhibit A

# YPF SOCIEDAD ANONIMA (YPF)

AVENIDA PTE R SAENZ 777–8 PISO
BUENOS AIRES 1364 AR, C1
541. 326.7265

# EX–1.2

**BY–LAWS (ESTATUTOS) OF YPF S.A. AS AMENDED (ENGLISH VERSION)**
**20–F Filed on 06/29/2010 – Period: 12/31/2009**
File Number 001–12102



LIVEDGAR® Information Provided by Thomson Reuters Accelus, ©2011. All Rights Reserved.
800.669.1154
www.gsionline.com

Exhibit 1.2

BY–LAWS OF Y.P.F. SOCIEDAD ANÓNIMA

**ARTICLE I**

**NAME, OFFICES AND DURATION**

**Section 1 – Name**

The Corporation name is YPF SOCIEDAD ANÓNIMA. In the performance of the activities incidental to its corporate purpose and in all legal acts carried out thereby, it shall indistinctly use either its full name or the short form YPF S.A.

**Section 2 – Office**

The legal domicile of the Corporation shall be located at the City of Buenos Aires, Argentine Republic, notwithstanding which, it may establish regional administrations, delegations, branches, agencies or any other kind of representation within the country or abroad.

**Section 3 – Duration**

The term of duration of the Corporation shall be of one hundred (100) years as from the registration of these By–laws with the Public Registry of Commerce (*Registro Público de Comercio*).

**ARTICLE II**

**PURPOSE**

**Section 4 – Purpose**

The Corporation's purpose shall be to perform, on its own, through third parties or in association with third parties, the survey, exploration and exploitation of liquid and/or gaseous hydrocarbon fields and other minerals, as well as the industrialization, transportation and commercialization of these products and their direct or indirect by–products, including petrochemical products, chemical products, whether derived from hydrocarbons or not, and non–fossil fuels, biofuels and their components, as well as the generation of electrical energy through the use of hydrocarbons, to which effect it may manufacture, use, purchase, sell, exchange, import or export them. It shall also be the Corporation's purpose the rendering, on its own, through a controlled company or in association with third parties, of telecommunications services in all forms and modalities authorized by

1

the legislation in force after applying for the relevant licenses as required by the regulatory framework, as well as the production, industrialization, processing, commercialization, conditioning, transportation and stockpiling of grains and products derived from grains, as well as any other activity complementary to its industrial and commercial business or any activity which may be necessary to attain its object. To better achieve these purposes, it may set up, become associated with or have an interest in any public or private entity domiciled in the country or abroad, within the limits set forth in these By–laws.

**Section 5 – Actions for the achievement of the corporate purpose**

a)      To accomplish its purpose, the Corporation may carry out any kind of legal act or transaction, including those of a financial nature but excluding intermediation, which are incidental to its corporate purpose, or related thereto, since for the purpose of fulfilling its purpose, the Corporation has full legal capacity to acquire rights, undertake obligations, and exercise any act not prohibited by the laws or these By–laws.

b)      In particular, the Corporation may:

    (i)      Purchase or otherwise acquire real estate, personal property, livestock, facilities and any other class of rights, titles, shares or securities, sell, exchange, assign or dispose of them under any instrument, give them as security and encumber them, including pledges, mortgages or any other real–property interests and constitute ease of ways thereon, become associated with individuals or legal persons, enter into joint ventures and business collaboration agreements.

    (ii)     Enter into any kind of agreement and undertake obligations, even loans or other liabilities, with official or private banks, whether national or foreign, international credit institutions and/or organizations of any other nature, accept and grant consignments, commissions and/or agency agreements and grant commercial credits related to its business activities.

    (iii)    Issue, in the country or abroad, debentures, corporate bonds, and other debt securities in any currency with or without a security interest, whether special or floating, convertible or not.

2

**ARTICLE III**

**CAPITAL. SHARES OF STOCK**

**Section 6 – Principal**

a)    Amount of capital stock: The capital stock is fixed in the amount of THREE THOUSAND NINE HUNDRED THIRTY–THREE MILLION ONE HUNDRED AND TWENTY–SEVEN THOUSAND NINE HUNDRED AND THIRTY ($ 3,933,127,930) fully subscribed and paid in, represented by THREE HUNDRED NINTY–THREE MILLION THREE HUNDRED AND TWELVE THOUSAND SEVEN HUNDRED NINETY–THREE (393,312,793) book–entry shares of common stock, of TEN PESOS ($10.00) nominal value each, entitled to one vote per share.

b)    Classes of shares of common stock: The capital stock is divided into four classes of shares of common stock as per the following detail:

(i)    Class A shares of stock, only the National Government shall be the holder of class A shares of stock;

(ii)    Class B shares of stock, originally destined to be acquired by holders of Consolidation Bonds of Gas and Oil Royalties or creditors of the Nation on account of gas and oil royalties. Class B shares of stock acquired by a holder of such Bonds other than a Province or the National Government shall become Class D shares of stock;

(iii)    Class C shares of stock, originally destined by the National Government to the Corporation's employees under the Shared Ownership Program set forth in Act 23,696. Class C shares of stock not purchased by the Corporation's employees under the Shared Ownership Program shall become class A shares of stock; and

(iv)    Class D shares of stock, thus converted due to the transfer of class A, B or C shares of stock to any person in accordance with the following rules:

•    Class A shares of stock transferred by the National Government to any person shall become class D shares of stock, except for transfers to the Provinces, if previously authorized by law, in which case they shall not change their class.

•    Class B shares of stock that the Provinces transfer to any person other than a Province shall become class D shares of stock.

3

- Class C shares of stock that are transferred to third parties beyond the Shared Ownership Program shall become class D shares of stock.
- Class D shares of stock shall not change to other classes by virtue of the subscription or acquisition thereof by the National Government, the Provinces, other public legal entity or by the personnel participating in the Shared Ownership Program.

c)    Class A special rights: The affirmative vote of class A shares of stock, whatever the percentage of capital stock that such class of shares represents, shall be required so that the Corporation validly resolves to:

(i)    Determine the merger with another or other companies;

(ii)    Accept that the Corporation, through the acquisition of its shares by third parties, shall become subject to a takeover, whether consented or hostile, representing the holding of more than fifty percent (50 %) of the capital stock of the Corporation;

(iii)    Transfer to third parties all of the exploitation rights granted within the framework of Act 17,319, its supplementary and regulatory rules, and Act 24,145, for it to determine the full suspension of the exploration and exploitation activities of the Corporation;

(iv)    Determine the voluntary dissolution of the Corporation;

(v)    Transfer the corporate or fiscal domicile of the Corporation outside the Argentine Republic.

Besides, the prior enactment of a national law will be required to resolve favorably on paragraphs (iii) and (iv) above.

d)    Preferred shares of stock: The Corporation may issue preferred shares with or without voting right, which shall be divided into classes A, B, C, and D. The same rules on ownership and conversion set forth in subsection b) above for the same class of shares of common stock shall be applied to each class of preferred stock. When preferred shares of stock exercise their voting right (whether temporarily or permanently), they shall do so as members, to such effect, of the class they belong to.

e)    Capital Increases: The capital may be increased up to five times its original amount by resolution passed at the regular shareholders' meeting, in accordance with the provisions of section 188 of Act 19,550, such limit being

4

ruled out if the Corporation is authorized to make a public offering of its shares of stock. The regular shareholders' meeting shall establish the nature of the shares to be issued on account of the capital increase, pursuant to the conditions set forth in these By–laws, it being able to delegate to the Board of Directors the power to set the time of issuance, as well as the determination of the payment terms and conditions of the shares, being also empowered to carry out any other delegation authorized by law. The issuance of shares of preferred or common stock shall be carried out per classes, respecting the proportion existing among the different classes as of the date of issuance, without prejudice to the modifications that may subsequently be derived from the exercise of the preemptive and accretion rights, as provided for in section 8 hereof.

**Section 7 – Transfer of stock**

a)   Book–entry stocks: Shares shall not be represented by certificates. Instead, they shall be book–entry shares and shall be recorded in accounts kept under their holder's names in the Corporation, commercial banks, investment banks or securities clearing houses as authorized by the Board of Directors. Shares of stock shall be indivisible. Should there be co–ownership, the representation to exercise the rights or the fulfillment of obligations shall be unified.

b)   Transfer of class A or C shares: Any transfer of class A shares carried out in breach of the provisions of the last paragraph of section 8 of Act 24,145, or of class C shares carried out in breach of the rules of the Shared Ownership Program or the relevant General Transfer Agreement notified by effective means to the Corporation, shall be null and void and shall not be acknowledged by the Corporation.

c)   Information duty: Any person who shall, directly or indirectly, acquire by any means or instrument, class D shares, or which upon transfer shall be converted into class D, or securities of the Corporation of any type that may be convertible into class D shares (including, within the meaning of the term "securities", but without limitation, debentures, corporate bonds, and stock coupons), which shall grant control over more than three per cent (3%) of the class D shares, shall notify the Corporation within five (5) days as from the acquisition that caused such excess, and report such circumstance to the Corporation, notwithstanding

5

the compliance of the additional measures imposed by the applicable regulations on capital markets for this kind of event. The information referred to above shall also include the transaction date, the price, the number of shares purchased and the intent of the purchaser to acquire a larger stake or to take over control of the corporate will. If the purchaser is made up of a group of individuals, it shall be bound to identify the members composing the group. The information herein provided for shall be furnished in relation to acquisitions carried out after the one informed first, when the limit on the amounts of class D shares indicated in the latest information shall be exceeded again in accordance with the provisions hereunder.

d)      Takeover: If the terms of subsections e) and f) of this section are not complied with, it shall be forbidden to acquire shares or securities of the Corporation, whether directly or indirectly, by any means or instrument (including within the meaning of the term "securities", without limitation, debentures, corporate bonds and stock coupons) convertible into shares if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of the Corporation which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.

Notwithstanding the foregoing: (i) acquisitions by the person already holding, or the person already exercising control of, shares representing more than FIFTY PERCENT (50%) of the capital stock shall be excluded from the provisions of subsections e) and f) of this section; and (ii) any subsequent acquisitions by any person already holding, or any person already exercising the control of, shares representing FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of outstanding Class D shares, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock, provided the shares the purchaser already holds or becomes a holder of (including the shares it held prior to the acquisition and those it acquired by virtue thereof) do

6

not exceed FIFTY PERCENT (50%) of the capital stock, shall be excluded from the provisions of subsection e) paragraph (ii) and subsection f) of this section.

Acquisitions referred to in this subsection d) are called "Takeovers".

e)      Requirements: The person wishing to a Takeover (hereinafter called "the Bidder") shall:

          (i)      Obtain the prior consent of the special shareholders' meeting of class A shareholders; and

          (ii)     Arrange a takeover bid for the acquisition of all the shares of all classes of the Corporation and all securities convertible into shares.

          Any decision passed at special shareholders' meeting of Class A shares regarding the matters provided for in this subsection e) shall be final and shall not entitle any of the parties to claim any kind of compensation.

f)      Takeover Bid: Each takeover bid shall be conducted in accordance with the procedure herein stipulated and, to the extent that applicable regulations in the jurisdictions where the takeover bid takes place and the provisions of the stock exchanges where the Corporation's shares and securities are listed impose additional or stricter requirements than the ones provided hereunder, such additional or stricter requirements shall be complied with in the stock exchanges or markets where they are applicable.

          (i)      The Bidder shall notify the Corporation in writing about the takeover bid at least fifteen business days in advance to the starting date thereof. The Corporation shall be notified about all terms and conditions of any agreement or memorandum of understanding that the Bidder might have entered into or might intend to enter into with a holder of shares of the Corporation whereby, if such agreement or memorandum of understanding were executed, the Bidder would be in the situation described in the first paragraph of subsection d) of this Section (hereinafter called "Prior Agreement"). Such notice shall include the following minimum information:

               (A)     The Bidder's identification, nationality, domicile, and telephone number;

               (B)     If the Bidder is made up by a group of persons, the identification and domicile of each Bidder of the group and of the managing officer of each person or entity making up the group;

7

      (C)    The consideration offered for the shares of stock and/or securities. If the takeover bid is subject to the condition that a certain number of shares be acquired, such minimum number shall be indicated;

      (D)    The scheduled expiration date of the takeover bid period, whether it can be extended, and if so, the procedure therefor;

      (E)    A statement by the Bidder indicating the exact dates before and after which the shareholders and security holders, who subjected them for sale subject to the takeover bid regime, shall be entitled to withdraw them, how the shares and securities thus subjected to sale shall be accepted, and in accordance to which the withdrawal of the shares and securities from sale under the takeover bid regime shall be carried out;

      (F)    A statement indicating that the takeover bid shall be open to all shareholders and holders of securities convertible into shares of stock;

      (G)    Any additional information, including the Bidder's accounting statements, as the Corporation may reasonably request or which may be necessary so as to avoid the above–mentioned notice from leading to wrong conclusions or when the information submitted is incomplete or insufficient.

(ii)    The Board of Directors shall call special meeting of class A shares of stock, by any effective means, to be held ten business days following the receipt by the Corporation of the notice indicated under paragraph (*i*), for the purpose of considering the approval of the takeover bid, and it shall submit to such meeting its recommendation in that regard. If the meeting is not held despite the call, or if it is held but the takeover bid is rejected, the latter shall not be carried out, nor shall the Prior Agreement, if any, be executed.

(iii)    The Corporation shall send by mail to each shareholder or holder of securities convertible into stock, at the Bidder's cost and expense, and with reasonable due diligence, a copy of the notice delivered to the Corporation in accordance with the provisions of paragraph (i). The Bidder shall make an advance payment to Corporation of the funds required for such purpose.

(iv)    The Bidder shall send by mail or otherwise deliver, with reasonable due diligence, to each shareholder or holder of securities convertible into stock who shall so request, a copy of the notice delivered to the Corporation and

8

shall publish a notice containing substantially the information stated in paragraph (i), at least once a week, starting on the date such notice is served on the Corporation pursuant to paragraph (i) and ending upon the expiration date of the takeover bid. Subject to the applicable legal provisions, this information shall be published in the business section of the major newspapers of the Argentine Republic, in the City of New York, U.S.A. and any other city where the shares shall be listed.

(v)    The consideration for each share of stock or security convertible into stock payable to each shareholder or security holder shall be the same, in cash, and shall not be lower than the highest of the following prices of each class D share of stock or security convertible into a class D share:

    (A)    the highest price per share or security paid by the Bidder, or on behalf thereof, in relation to any acquisition of class D shares of stock or securities convertible into class D shares of stock within the two–year period immediately preceding the notice of Takeover, adjusted as a consequence of any division of shares, stock dividend, subdivision or reclassification affecting or related to class D shares of stock; or

    (B)    The highest closing price, at the seller's rate, during the thirty–day period immediately preceding such notice, of a class D share of stock as quoted by the Buenos Aires Stock Exchange, in each case as adjusted as a consequence of any division of shares, stock dividend, subdivision or reclassification affecting or related to class D shares of stock; or

    (C)    A price per share equal to the market price per class D share of stock determined as stated in paragraph (B) herein multiplied by the ratio between: (a) the highest price per share paid by the Bidder, or on his behalf, for any class D share of stock, in any share acquisition of this class within the two–year term immediately preceding the notice date indicated in paragraph (i), and (b) the market price for class D share of stock on the day immediately preceding the first day of the two–year period in which the Bidder acquired any type of interest or right in a class D share of stock. In each case the price shall be adjusted taking into account the subsequent division of shares, stock dividend, subdivision or reclassification affecting or related to class D; or

9

(D)     The Corporation's net income per class D share during the last four complete fiscal quarters immediately preceding the notice date indicated in paragraph (i), multiplied by the higher of the following ratios: the price/income ratio for that period for class D shares of stock (if any) or the highest price/income ratio for the Corporation during the two–year period immediately preceding the notice date indicated in paragraph (i). Such multiples shall be determined by applying the regular method used by the financial community for computing and reporting purposes.

(vi)     The shareholders or security holders that have subjected them to the takeover bid may withdraw them from the bid before the date established for the expiration of such bid.

(vii)     The takeover bid shall be open for a minimum term of TWENTY (20) days and a maximum term of THIRTY (30) days as from the date the bid was authorized by Comisión Nacional de Valores de Argentina (Argentine Securities Exchange Commission).

(vii)     The Bidder shall acquire all shares and/or securities convertible into stock that before the expiration date of the takeover bid are set on sale in accordance with the regime ruling takeover bids. If the number of such shares or securities is lower than the minimum number to which the Bidder conditioned the takeover bid, the Bidder may withdraw it.

(ix)     If the Bidder has not set a minimum number as a condition to the takeover bid as stated in paragraph (i) (C) of this subsection, once this procedure has finished, the Bidder may execute the Prior Agreement, if any, whatever the number of shares of stock and/or securities purchased thereby under the regime regulating takeover bids. If he has set that minimum number, the Bidder shall execute the Prior Agreement only if the minimum number required under the regime ruling takeover bids has been exceeded. The prior agreement shall be executed within thirty days as from the closing of the takeover bid, otherwise, it shall be necessary to repeat the procedure provided for in this section to execute it.

If there existed no Prior Agreement, the Bidder, in the afore–mentioned cases and opportunities where such Prior Agreement could be executed, may purchase freely the number of shares of stock and/or securities that he

10

reported to the Corporation through the communication set forth in paragraph (i) of this subsection, provided the Bidder has not purchased such number of shares of stock and/or securities under the takeover bid regime.

g)    Related transactions: Any merger, consolidation or any other combination leading to substantially the same effects (hereinafter called "the Related Transaction") comprising the Corporation or any other person (hereinafter "the Interested Shareholder") that has previously carried out a Takeover, or having for the Interested Shareholder the effects, regarding the holding of class D shares of stock, of a Takeover, shall only be performed if the consideration to be received by each shareholder from the Corporation in such Related Transaction is equal for all shareholders and not lower than:

      (i)    The highest price per share of stock paid by or on account of such Interested Shareholder in relation to the acquisition of:

            (A)    Shares of the class to be transferred by the shareholders in such Related Transaction (hereinafter called "the Class"), within the two–year period immediately preceding the first public announcement of the Related Transaction (hereinafter called "the Announcement Date"), or

            (B)    Shares of the Class purchased by said Interested Shareholder in any Takeover.

      In both cases as adjusted by virtue of any stock division, share dividend, subdivision or reclassification affecting or related to the class.

      (ii)    The highest closing price, at the seller's rate, during the thirty–day period immediately preceding the announcement date or the date of purchase of the shares of the Class by the Interested Shareholder in any Takeover, of a share of the Class as quoted at the Buenos Aires Stock Exchange, adjusted by any division of shares, stock dividend, subdivision or reclassification affecting or related to the Class.

      (iii)    A price per share equal to the market price of a share of the Class determined as established in subsection (ii) of this section multiplied by the ratio between: (a) the highest price per share paid by the Interested Shareholder or on his behalf, for any share of the Class, in any acquisition

11

of shares of the Class within the two–year period immediately preceding the Announcement Date, and (b) the market price per share of the Class on the day immediately preceding the first day of the two–year period in which the Interested Shareholder acquired any type of interest or right in a share of the Class. In each case the price shall be adjusted taking into account the subsequent division of shares, stock dividend, subdivision or reclassification affecting or related to the Class.

(iv)    The net income of the Corporation per each share of the Class during the last four complete fiscal quarters immediately preceding the Announcement Date, multiplied by the higher of the following ratios: the price / income ratio for that period for the shares of stock of the Class (if any) or the highest price / income for the Corporation in the two–year period immediately preceding the Announcement Date. Such multiples shall be determined using the regular method used by the financial community for their computation and reporting.

h)    Breach of Requirements: Shares of stock and securities acquired in breach of the provisions of subsections 7 c) through 7 g), both included, of this section, shall not grant any right to vote or collect dividends or other distributions that the Corporation may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of the Corporation, until such shares of stock are sold, in the case the purchaser has obtained the direct control of YPF, or until the purchaser loses the control of the YPF's parent company, if the takeover has been indirect.

i)    Construction: For the purposes of section 7, the term "indirectly" shall include the purchaser's parent companies, the companies controlled by it or that would end up under the control thereof as a consequence of the Takeover, Takeover Bid, Prior Agreement, or Related Transaction, as the case may be, that would grant at the same time the control of the Corporation, the companies submitted to the common control of the purchaser and other persons acting jointly with the purchaser; likewise, the holdings a person has through trusts, American Depositary Receipts ("ADR") or other similar mechanisms shall be included.

<div align="center">12</div>

The Corporation is not adhered to the Optional Statutory Regime for the Mandatory Acquisition of Shares in a Takeover Bid (*Régimen Estatutario Optativo de Oferta Pública de Adquisición Obligatoria*) under the regulations of section 24 of Decree 677/01.

**Section 8 – Preemptive right**

a)   General rules: The holders of each class of common or preferred stock shall be entitled to a preemptive right in the subscription of the shares of stock of the same class to be issued, pro rata their holdings. This right shall be exercised under the conditions and terms established in the applicable Law and regulations. The conditions of issuance, subscription and payment of class C shares of stock may be more advantageous for their purchasers than the ones provided for the rest of the shares; however, under no circumstances shall they be more onerous. Any preemptive right holder, whatever the class of stock originating it, may assign it to any third party, in which case the share of stock entitled to such preemptive right shall become or consist of a class D share of stock.

b)   Accretion Right: The accretion right shall be exercised within the same period fixed for the preemptive right, and with respect to all classes of shares that have not been initially subscribed. To such purposes:

   (i)   Class A shares that have not been subscribed in exercise of the preemptive right of by the National Government shall be converted into class D shares and shall be offered to the shareholders of such Class that have expressed their intention to exercise their accretion right with respect to non–subscribed class A shares;

   (ii)   Class B shares that have not been subscribed by the Provinces in exercise of their original preemptive rights, for failure to exercise such right or due to the assignment thereof, shall be allocated to the Provinces having subscribed class B shares and having expressed their intention to exercise their accretion right, and the balance shall be converted into class D shares to be offered to class D shareholders who have expressed their intention to exercise their accretion right with respect to non–subscribed class B shares;

   (iii)   Class C shares that have been subscribed by the persons comprised in the Shared Ownership Program in exercise of their original preemptive rights,

13

due to failure to do so or to assignment thereof, shall be assigned to those persons comprised in such regime that have subscribed class C shares and have stated their intention to exercise their accretion right, and the balance shall be converted into class D shares to be offered to shareholders of that class who have stated their intention to exercise their accretion right with respect to non–subscribed class C shares;

(iv)     Class D shares not subscribed in exercise of the preemptive rights incidental to that class of shares shall be assigned to the subscribers of that class who have stated their intention to exercise their accretion right;

(v)     The remaining class D shares shall be assigned to shareholders of other classes who have stated their intention to exercise their accretion right.

c)     Limits: The preemptive and accretion rights set forth in the preceding paragraphs shall only exist provided they are required by the corporate legislation in force at the time or that they are necessary to comply with the applicable provisions of Acts 23,696 and 24,145.

**Section 9 – Public and private offering. Revoked**

**ARTICLE IV**

**CORPORATE BONDS, PROFIT SHARING STOCK ("BONOS DE PARTICIPACIÓN") AND OTHER SECURITIES**

**Section 10 – Securities the Corporation may Issue**

a)     Corporate bonds: The Corporation may issue corporate bonds, whether convertible or not. When it is required by law that the issuance of corporate bonds be decided by the shareholders' meeting, said meeting may delegate all or some of the issuance conditions to the Board of Directors.

b)     Other securities: The Corporation may issue preferential right securities ("*bonos de preferencia*") and other securities authorized by the applicable law. The preferential right securities shall grant their holders the preemptive subscription right in the event of capital increases decided in the future and up to the amount that such securities shall allow. In the subscription of such securities and other convertible securities, the shareholders shall have the preemptive right under the terms and in the cases established in section 8 of these By–laws.

c)      Conversion into class D: Any convertible security issued by the Corporation shall grant the conversion right only into class D shares of stock. Its issuance shall be authorized at a special meeting of class D shareholders.

**ARTICLE V**

**ADMINISTRATION AND MANAGEMENT**

**Section 11 – Board of Directors**

a)      Number: The administration and management of the Corporation shall be in the hands of a Board of Directors composed of at least eleven (11) and not more than twenty–one (21) regular Directors, as may be decided at the Shareholders' Meeting, who shall be appointed to serve for a term of 1 to 3 fiscal years, as may be decided at the Shareholders Meeting in each case, and may be reelected indefinitely, notwithstanding the provisions of subsection e) of this section.

b)      Alternate directors: Each class of shares shall appoint an equal or lower number of alternate directors than the number of regular directors it is authorized to appoint. Alternate directors shall fill the vacancies within their respective class in the order of their appointment upon the occurrence of such vacancy, whether by absence, resignation, license, incapacity, disability or death, prior acceptance by the Board of the grounds for substitution, should it be temporary.

c)      Appointment: Directors shall be appointed by the majority vote within each of the classes of ordinary shares of stock, as indicated below:

      (i)      class A shall appoint a regular and an alternate director provided there exists at least one class A share;

      (ii)     The appointment of the other regular and alternate directors (which shall in no case be lower than six regular directors and an equal or lower number of alternate directors) shall correspond to class D. Classes B and C shall cast their votes together with class D shares at the special meeting of shareholders of such class called for the appointment of Directors;

      (iii)    at Class D special meetings of shareholders called for the appointment of directors, directors may be elected by cumulative voting in compliance with provisions of section 263 of Act 19,550, even when such meeting is attended by holders of shares A, B or C as afore–mentioned.

15

d)      Absence of a class: If no shares of a given class entitled to vote in the election of directors of a class of shares are present at a meeting held on second call for the appointment of directors, then the directors of such class shall be elected by the shareholders of the remaining classes voting jointly as if they belonged to a single class, except when the absence of shareholders shall occur at meetings of Class A, B or C shareholders, in which case the statutory auditor elected by class A shares or jointly by classes A, B and C, as appropriate pursuant to the provisions of section 21, subsection b), shall appoint the regular and alternate directors of those classes that are absent.

e)      Staggered Appointment: Directors shall be appointed for the term decided at the meeting as provided for in section 11, subsection a), except when directors are appointed to complete the term of office of the directors being replaced.

f)      Candidate nomination: Each meeting at which directors for class D shares are to be elected, any class D shareholder or group of shareholders holding more than three per cent (3%) of the capital represented by class D shares, may request that all shareholders of such class be sent a list of the candidates to be proposed by such shareholder or group of shareholders at the meeting of such class for the election thereof. In the case of depositary banks having shares registered in their name, these provisions shall apply with respect to the beneficiaries. Likewise, the board of directors may propose candidates for the office of directors to be elected at the shareholders' meetings of the respective classes, whose names shall be notified to all shareholders together with the lists proposed by the shareholders first above–mentioned. The preceding provisions shall not prevent any shareholder present at the meeting from proposing candidates not included in the nominations notified by the Board. No proposal for the election of directors for any of the classes may be made, prior to the meeting or during the course thereof, unless the written acceptance of the offices by the nominated candidates is presented to the Corporation.

g)      Manner of election: Notwithstanding the provisions related to cumulative voting set forth in paragraph (vi), subsection c) of this Section, class D Directors shall be elected by voting a whole list provided no shareholder shall object thereto; otherwise, it shall be carried out individually. The list or person, as the case may be, shall be considered elected when it has obtained the absolute majority vote

16

of class D shares of stock present at the meeting. Should no list obtain a majority vote, a new voting shall take place in which the two lists or persons receiving the higher number of votes shall participate, and the list or person obtaining the higher number of votes shall be deemed elected.

h)      Removal: Subject to the requirements of applicable quorums, each class, by a majority vote of the shares of the class present at the meeting, may remove the directors elected thereby, provided the removal has been included in the agenda.

## Section 12 – Performance Bond

Each Regular Director shall furnish a bond for the amount of at least ten thousand Pesos ($ 10,000) or its equivalent, which may consist of securities, sovereign bonds or amounts of money in domestic or foreign currencies deposited with financial institutions or securities clearing houses, to the order of the Corporation, or sureties or bank guaranties, or surety bonds or third party insurance to the name of the Corporation, which cost shall be borne by each Director; no bond shall be furnished by depositing funds in the corporate safe deposit box. When the bond is furnished by depositing securities, sovereign bonds or sums of money in domestic or foreign currencies, the conditions under which such deposits are made shall ensure their unavailability during the course of any liability claims against him. Alternate Directors shall only furnish the mentioned bond in the event of taking office in replacement of a regular Director to complete the relevant term or terms of office.

## Section 13 – Vacancies

Statutory auditors may appoint directors in the event vacancies, who shall hold office until the election of new Directors at the shareholders meeting. The statutory auditor appointed by Class A shares shall appoint one Director for Class A shareholder, following consultation with Class A shareholder, and the statutory auditors appointed by Class D shares shall appoint Directors for such class.

## Section 14 – Remuneration

a)      Non–executive members: The duties of non–executive Board members shall be compensated pursuant to the resolution passed annually at the regular meeting in global terms and shall be distributed in equal parts among them, whereas among alternate directors, such distribution shall be made pro rata

17

the term during which they replaced such regular members. The meeting shall authorize the amounts that may be paid on account of such fees during the current fiscal year, subject to the approval at the meeting at which such fiscal year shall be considered.

b)     Executive members: The Corporation directors performing executive, technical and administrative functions or special assignments shall receive a remuneration for such duties or assignments which shall be in line with those prevailing in the market, and which shall be fixed by the Board, with abstention of the above–mentioned. Such remunerations, together with those of the whole Board, shall be subject to the approval of the shareholders' meeting, pursuant to the system provided for by section 261 of Act. 19,550.

c)     General rule: Directors' remunerations set forth in the foregoing subsections a) and b) shall comply with the limits provided for by section 261 of Act 19,550, except for the case provided for in the last paragraph of such section.

### Section 15 – Meetings

The Board shall meet at least once a quarter, and may be called by the Chairman of the Board of Directors, or his replacement, whenever he shall deem it convenient. Likewise, the Chairman of the Board, or his replacement, shall call a meeting of the Board at any of the director's request. In this case, the meeting shall be called by Chairman of the Board, and the meeting shall be held within a term of five days as from the request receipt; otherwise, the meeting may be called by any of the directors. The Meetings of the Board of Directors shall be called by written notice and shall include the agenda. However, items not included in the agenda may be considered in the event of urgent matters occurring after the call.

### Section 16 – Quorum and majorities

At the meetings, the Board may transact business with the members present thereat, or communicated with one another by other means of simultaneous transmission of sound, images or words. The Board shall be presided over by the Chairman of the Board of Directors, or his replacement, and the signing of the minutes may be delegated by those who attend the meeting from another place to the members present at the meeting. The absolute majority of the board members shall constitute a quorum for the transaction of business, considering the attendance of participating and present members as well as those communicated

with one another from another place. The attendance and participation of the members present and of the members attending the meeting from another place shall be entered in the minutes. If at a regularly called meeting, after one hour of the time fixed in the meeting notice the quorum shall not be present, the Chairman of the Board, or his replacement, may invite the alternate directors of the classes corresponding to those absent at the meeting to join the meeting until the minimum quorum shall be present or may call the meeting to another date. Notwithstanding the above, in the event the absences shall not affect the quorum, the board may invite the alternate directors of the corresponding classes to join the meeting. The Board shall adopt resolutions by the majority vote of the members present at the meeting and of those participating thereat from another place. The Statutory Committee shall register in the Board Minutes the adoption of resolutions according to the appropriate procedure. The Chairman of the Board, or his replacement, shall, in all cases, be entitled to vote and double vote should the ballots result in a tie. Absent directors may authorize another director to vote on their behalf, provided the quorum shall be present, in which case no alternate directors shall join the meeting in replacement of the directors granting such authorization. Minutes shall be prepared and signed within FIVE (5) business days from the date on which the meeting was held by the present members of the Board and by the representative of the Statutory Committee.

**Section 17 – Powers of the Board of Directors**

The Board of Directors shall have wide powers to organize, conduct and manage the affairs of the Corporation, including those powers which require the granting of special powers of attorney as provided for in Section 1881 of the Civil Code and Section 9 of Decree Law 5965/63. It may specifically operate with all kind of banks, financial companies or public and private credit institutions; grant or revoke special, general, judicial, administrative or other kind of powers of attorney, with or without power of substitution; bring in, prosecute, answer or waive claims or criminal actions, and carry out any other proceedings or legal acts by which the Corporation shall acquire rights or assume obligations, with no further restriction than those arising from the applicable laws, these By–laws or the decisions adopted at the meetings, being empowered to:

19

(i)    Grant general and special powers of attorney – including those having the purpose set forth in section 1881 of the Civil Code – as well as those authorizing to lodge criminal actions, and to revoke them. For the purposes of filing and answering interrogatories, acknowledge documents in court proceedings, make statements answering charges at the preliminary investigation proceedings or declare at administrative proceedings, the Board shall be allowed to grant powers so that the Corporation be represented by a duly appointed director, manager, or attorney–in–fact.

(ii)   Purchase, sell, assign, grant, exchange and give and accept in gratuitous bailment all kinds of real and personal property, business and industrial facilities, vessels, shipping equipment and aircraft, rights, including trade–marks and letters patent and industrial and intellectual property rights; enter into easement agreements, either as grantor or grantee, mortgages, ship mortgages, pledges or any other security interest and, in general, carry out any and all acts and enter into all the contracts deemed convenient with respect to the Corporate purpose, whether within the country or abroad, including leases for the maximum term established by law.

(iii)  Become associated with individuals or legal persons, in compliance with the legislation in force and these By–laws and enter into joint ventures or business collaboration agreements.

(iv)   Take all the necessary steps before national or foreign authorities for the fulfillment of the Corporation's purpose.

(v)    Approve staff appointments, appoint general or special managers, fix the compensation levels and working conditions thereof, and any other action related to staff policy, decide promotions, transfers and removals, and apply the penalties that might be applicable.

(vi)   Issue, within the country or abroad, in national or foreign currency, debentures, corporate bonds or bonds guaranteed by a security interest, or by a special or floating guarantee or unsecured, whether convertible or not, pursuant to the legal applicable provisions and with the prior consent of the pertinent shareholders meeting when legally required.

(vii)  Make court or out–of–court settlements in all kind of matters, submit to arbitration proceedings, file and answer all kinds of legal and administrative

20

complaints and assume the capacity as accuser in the competent criminal or correctional jurisdiction, grant all kinds of bonds and extend jurisdictions within the country or abroad, waive the right to appeal and any applicable statutes of limitation, file or answer interrogatories in court, make novations, grant debt reductions or grace periods and, in general, perform all acts for which the law requires a special power of attorney.

(viii)    Carry out all kinds of transactions with banks and financial institutions, including Banco de la Nación Argentina, Banco de la Provincia de Buenos Aires, and other official banking and financial institutions, whether private, semi–private existing within the country or abroad. Perform transactions and take out loans and other liabilities with official or private banks, including those mentioned in the preceding phrase, international credit institutions or agencies or of any other nature, individuals or legal persons domiciled in the country or abroad.

(ix)    Create, maintain, close, restructure or transfer the offices and divisions of the Corporation and create new regional administrations, agencies or branches within the country or abroad; set up and accept representations.

(x)    Approve and submit the Annual Report, Inventory, General Balance Sheet and Statement of Income of the Corporation at the shareholders' meeting for the consideration thereof, proposing, on an annual basis, the allocation of the Fiscal Year profits.

(xi)    Approve the contracting system of the Corporation, which shall ensure the participation of bidders as well as the transparency and publicity of the bidding process.

(xii)    Decide, if he shall deem it convenient and necessary, the creation of an executive committee and other committees of the Board, determine the functions and performance restrictions thereof within the powers granted by these By–laws and issue the internal rules of procedure thereof.

(xiii)    Approve, if applicable, the appointment of the General Manager and Assistant General Manager, as provided for in section 18 (c).

(xiv)    Resolve all doubts or issues derived from the application of these By–laws, for which purpose the Board of Directors shall be vested with ample

powers, all of which shall be reported in due time at the shareholders' meeting.

(xv)     Issue its own internal rules of procedure.

(xvi)    Request and maintain the quotation, on the domestic and foreign stock and security markets, of its shares of stock and other securities when deemed necessary.

(xvii)   Approve the annual budget, expenditure and investment estimates, the necessary borrowing levels and the annual action plan of the Corporation.

(xviii)  Exercise the other powers granted by these By–laws.

The above list of powers is merely illustrative and not restrictive, and therefore, the Board is vested with all the powers to manage and dispose of the assets of the Corporation and to perform all the acts for the best fulfillment of the corporate purpose, save as otherwise provided for in these By–laws. Such powers may be exercised by attorneys–in–fact specifically appointed to such end, for the purposes and to the extent determined in each particular case.

**Section 18 – Chairman and Vice Chairman of the Board of Directors – General Manager – Assistant General Manager**

a)       Appointment: The Board shall appoint a Chairman from among the members elected by Class D shares, and it may appoint, as applicable, Vice Chairmen of the Board. In the event of a tie, it shall be decided by the votes cast by the Directors elected by Class D. The Chairman and Vice Chairmen of the Board shall hold office for two (2) fiscal years, provided such term shall not exceed their respective terms of office, and may be indefinitely reelected under such conditions should they be elected or reelected as Directors by Class D. The Chairman of the Board shall also serve as General Manager. He shall be the Corporations' chief executive officer and shall be responsible for the executive management functions. Should the Chairman of the Board state upon his election, or subsequently thereto, that he does not wish to serve as General Manager, he shall propose the person (who may be a Director or not, but in the first case he shall have been elected by Class D shareholders) who shall hold such office, subject to the Board's consent. The Chairman of the Board may resume at any time the position as General Manager. The Chairman or the General Manager may propose two persons to the Board (who may be

22

Directors or not, but in the first case they shall have been elected by Class D) who, subject to the Board's approval, shall serve as Assistant General Managers. The Assistant General Managers shall report directly to the General Manager and shall assist him in the management of the corporate affairs as well as in other executive functions assigned or delegated thereto by the General Manager, whom he shall replace in case of absence or other interim impediment. One Assistant General Manager shall serve as General Operations Director and the other as Assistant Director to the Executive Vice Chairman, if any.

b)    Vice Chairmen of the Board: The Executive Vice Chairman of the Board shall replace the Chairman of the Board in case of resignation, death, incapacity, disability, removal or temporary or definite absence of the latter. In all these cases, save in the case of temporary absence, the Board shall appoint a new Chairman of the Board within sixty days as from the date in which the vacancy occurred and in compliance with the provisions of subsection a) of this section. Should there be more than one Vice Chairman, the Chairman's vacancy shall be filled by the Vice Chairman who has been discharging the functions of the Executive Vice President, and in second place by the eldest Vice Chairman.

c)    When one of the Vice Chairmen is appointed as General Manager or as Assistant General Manager, he shall be called "Executive Vice Chairman". When the Chairman of the Board serves as General Manager, if the Vice Chairman of the Board does not serve as Executive Vice Chairman, the latter shall only replace the former in the position as Chairman of the Board.

d)    In case of a tie vote in the approval of the General Manager's or the Assistant General Managers' designation, it shall be decided by the votes cast by the Directors elected by Class D.

e)    For the purposes of his activities abroad and with respect to the international capital markets, the General Manager shall be appointed as "Chief Executive Officer" and the General Operations Director shall be designated as "Chief Operating Officer". The General Manager and the Assistant General Managers shall be authorized to sign all contracts, commercial papers, public deeds and other public and private documents binding and/or granting rights to the Corporation within the scope of the powers granted by the Board, without

23

detriment to the legal representation corresponding to the Chairman of the Board and the Executive Vice Chairman of the Board, as the case may be, and notwithstanding the other powers and delegations of executing authority as the Board shall decide.

**Section 19 – Powers of the Chairman of the Board**

The Chairman of the Board, or the Executive Vice Chairman of the Board, in absence of the former, shall have the following rights and duties, in addition to those established in section 18 of these Bylaws:

(i)     To exercise the legal representation of the Corporation in compliance with the provisions of section 268 of Act 19,550 and to comply with and verify the compliance of the laws, decrees, these By–laws and the resolutions adopted by the shareholders' meeting, the Board and the Executive Committee.

(ii)    To call and preside over all meetings of the Board of Directors, being entitled to vote in all cases and to cast two votes in case of a tie.

(iii)   To serve, if appropriate, as General Manager.

(iv)    To execute public and private documents in the name and on behalf of the Corporation, without detriment to the delegation of executing authority or powers granted by the Board thereto and to the powers which, as the case may be, are vested in the General Manager and Assistant General Manager.

(v)     To perform or order the performance of Board resolutions, without detriment to the powers vested, as the case may be, on the General Manager and Assistant General Manager, and notwithstanding the fact that the Board may decide to undertake on its own behalf the performance of a resolution or functions or powers of a particular nature.

(vi)    To preside over the shareholders' meetings of the Corporation.

**ARTICLE VI**

**SUPERVISION**

**Section 20 – Statutory Audit Committee**

a)     Number of members: The supervision of the Corporation shall be in the hands of a statutory audit committee composed of three (3) to five (five) regular statutory auditors and three (3) to five (5) alternate statutory auditors, as shall be decided by the shareholders meeting.

b)      Appointment: Class A shares shall appoint one regular and one alternate statutory auditors, provided at last one share of such class shall exist; the remaining regular and alternate statutory auditors shall be appointed by Class D shares. Statutory auditors shall serve for one (1) fiscal year and shall have the powers established in Act No. 19,550 and in the legal regulations in force. Meetings of the Statutory Audit Committee may be called by any of the statutory auditors. The presence of all its members shall be necessary at such meetings and resolutions shall be adopted by a majority vote. The dissident statutory auditor shall have the rights, powers and duties established in Act No. 19,550.

c)      Compensation: Statutory auditors' compensation shall be fixed at shareholders' regular meeting within the limits provided for by the legislation in force.

**ARTICLE VII**

**REGULAR MEETINGS OF SHAREHOLDERS**

**Section 21 – Notice**

Shareholders' regular or special meetings, as the case may be, shall be called for the purpose of considering the matters established in sections 234 and 235 of Act 19,550. Notices of meetings shall be given pursuant to the legal provisions in force.

**Section 22 – Publicity**

a)      Public notice: Notice of shareholders' meetings, whether regular or special, shall be published in the Official Gazette ("Boletín Oficial"), in one of the major newspapers in the Argentine Republic and in the reports of the stock and securities exchange markets of the country where the shares of the company shall be listed. Such notice shall be published during the term with the anticipation provided for by legal provisions in force. The Board shall order the publications to be made abroad in order to comply with the rules and practices in force in the jurisdictions corresponding to the stock and exchange markets where the said shares shall be listed.

b)      Other media: The Board may hire the services of companies specialized in the communication with shareholders, and may resort to other media in order to inform them about their points of view regarding the items of the agenda to be

25

submitted for consideration at the shareholders' meetings being called. The cost of such services and publicity shall be borne by the Corporation.

**Section 23 – Proxies**

Shareholders may be represented at any meeting by a written proxy granted by private instrument with the shareholder's signature certified either in court, by a notary public or a bank. The Chairman of the Board of Directors, shall preside over the shareholders' meetings, or in his absence, they shall be presided over by the person appointed at the meeting.

**Section 24 – Decision–making**

a)    Quorum and majorities: The applicable quorum and majorities are those provided for in sections 243 and 244 of Act 19,550 according to the nature of the meeting, notice and matters to be considered, except for:

    (i)    quorum at special meeting at second call, which shall be deemed validly held whatever the number of shares entitled to vote present thereat;

    (ii)    decisions regarding the matters listed in subsection (c) of Section 6, which shall require the affirmative vote of class A shares of stock cast at a Special Meeting;

    (iii)    decisions related to the issues listed in subsection (b) below, which shall require, both at meetings on first and second call, a majority equivalent to 75% (seventy–five percent) of the shares entitled to vote;

    (iv)    decisions regarding the issues listed in subsection (c) below, which shall require both at first and second call a majority equivalent to 66% (sixty–six percent) of the shares entitled to vote;

    (v)    decisions modifying the rights of a class of shares, which shall require the consent of such class given at special meeting;

    (vi)    decisions related to the amendment of any provision of these By–laws requiring a special majority, which shall require to such end a special majority; and

    (vii)    other cases in which these By–laws require the voting per class or the consent of each of the classes.

b)    The decisions requiring the special majority provided for in paragraph (iii) of the preceding subsection, notwithstanding the consent given by at the Special Meeting of the class which rights are being modified, are the following: (i) the

26

transfer of the corporate office to a foreign country; (ii) a substantial change of the corporate purpose whereby the activity defined in section 4 of these By–laws shall cease to be the main or principal activity of the corporation, (iii) the approval to cancel the listing of shares in the Buenos Aires and New York Stock Exchanges (iv) the Corporation splitting–up into various companies, if as a result thereof at least 25% of the assets of the Corporation are transferred to the resulting companies, even when such percentage shall be reached by successive splitting–ups operated in a one–year term.

c)   The decisions that shall require the special majority provided for in paragraph (iv) of the preceding subsection, notwithstanding the consent given at the Special Meeting of Shareholders by the class of shares the rights of which are being affected, are the following: (i) the amendment of these By–laws when it shall imply (A) modifying the percentages set forth in paragraphs 7 (c) or 7 (d) or (B) or eliminating the requirements set forth in paragraphs 7(e) (ii) 7 (f) (i) (F) and 7 (f) (v) of section 7 in the sense that the public offering shall reach 100% of the shares of stock and convertible securities, shall be payable in cash and shall not be lower than the price resulting form the mechanisms provided therein; (ii) the granting of guarantees in favor of the shareholders of the Corporation, except when the guarantee and the guaranteed obligation shall have been assumed in furtherance of the corporate purpose; (iii) the complete suspension of all refining, commercialization and distribution activities; and (iv) the amendment of the provisions related to the number, nomination, election and structure of the Board of Directors.

d)   Special shareholders' meetings: Special meetings of classes of shares shall follow the quorum rules provided for regular shareholders' meetings applied to the total number of outstanding shares of such class. Should the general quorum of all classes of shares be present, any number of shares of the classes A, B and C shall constitute quorum at first and subsequent calls for special meetings of the said classes. Should the holder of all class A shares be the National Government, the special meeting of such class may be replaced by a notice signed by the public officer authorized to vote such shares.

**ARTICLE VIII**
**BALANCE SHEETS AND ACCOUNTS**

27

**Section 25 – Fiscal year of the Corporation**

a)    Date: the fiscal year of the Corporation shall commence on January 1 of each year and shall close on December 31 of like year. The Inventory, General Balance Sheet and Statement of Income shall be drawn up as of that date according to the pertinent legal regulations and technical accounting standards.

b)    Modification: The fiscal year closing date may be modified by decision passed at the shareholders' meeting, which shall be registered with the Public Registry of Commerce and notified to the supervisory authorities.

c)    Allocation of profits: The liquid and realized profits shall be allocated as follows:

      (i)    Five percent (5%) up to the twenty percent of the capital stock, to the Legal Reserve Fund;

      (ii)    To fees payable to the Board of Directors and statutory auditors, as the case may be;

      (iii)    To payment of fixed dividends on preferred shares of stock, if any with such preference, and otherwise the unpaid cumulative dividends;

      (iv)    The balance, in whole or in part, to dividends in cash to holders of shares of common stock or to contingency Reserve Funds or carried forward to the next fiscal year or to the purpose that the shareholder's meeting shall determine.

d)    Dividend payment: Dividends shall be paid pro rata the respective holdings, within ninety (90) days as from the approval thereof and the collection right shall revert to the Company upon the expiration of a three (3) year term as from the date they were made available to the shareholders. The shareholders' meeting, or the Board of Directors, as the case may be, may authorize the payment of dividends on a quarterly basis, provided the applicable provisions are not be infringed.

**ARTICLE IX**

**LIQUIDATION**

**Section 26 – Applicable rules**

Upon the dissolution, liquidation or winding up of the affairs of the Corporation for any cause whatsoever, the pertinent procedures shall be carried out in accordance with the provisions of Chapter I, Article XIII of Act Number 19,550.

**ARTICLE X**

*OTHER PROVISIONS*

**Section 27**

All references made in these By–laws to the "date of these By–laws" shall mean the date on which the By–laws amendment passed by Decree Number 1106/93 is registered with the Public Registry of Commerce.

**Section 28 – Provisions applicable to acquisitions by the National Government**

(A)     The provisions of subsections e) and f) of Section 7 (with the sole exception of the provisions of paragraph B of the said Section) shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or 2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock provided for in subsection (a) of section 6 of these By–laws upon registration thereof with the Public Registry of Commerce. Should class A shares represent a lower percentage than the one previously mentioned, the provisions set forth in point 2) of this Section shall not be applicable. Instead, the general criteria set forth in subsection d) of Section 7 shall apply.

(B)     The purchase offer provided for in the cases contemplated in the preceding points (1) and (2) in A) above shall be limited to the aggregate amount of class D shares of stock.

(C)     The penalties provided for in subsection (h) of Section 7 shall be limited, in the case of the National Government, to the loss of the right to vote, provided the acquisition in breach of the provisions of Section 7 and this section has occurred gratuitously or due to a question of fact or a question of law in which the National Government has acted with the intention and purpose of acquiring shares exceeding the established limits, except if, as a consequence of such acquisition, the National Government becomes the owner of, or exercises the control over at least 49% of the capital stock, or over at least 50% of class D

29

shares of stock. In all other cases, the penalties provided for in subsection h) of Section 7 shall be applied with no kind of limitation whatsoever.

(D)    For the purposes provided for in this section and in subsections e) and f) of section 7, the term "companies" contemplated in paragraph (i) of section 7, in its relevant parts, comprises any kind of entity or organization having a relationship with the National Government of the nature described in the mentioned subsection. The term "securities" as used in this section shall have the scope provided for in subsection d) of section 7. The term "Takeover" used in section 7 is applied to the acquisitions provided for in paragraph (A) of this section 28.

**Section 29 – Revoked**

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REPSOL YPF, S.A. and TEXAS YALE
CAPITAL CORP., Individually and On Behalf
of All Others Similarly Situated,

      Plaintiffs,

  - against -

REPUBLIC OF ARGENTINA,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUDGE GRIESA

12 CV 3877

Civil Action No.

CLASS ACTION
COMPLAINT

RECEIVED
MAY 16 2012
U.S.D.C. S.D. N.Y.
CASHIERS

   Plaintiffs Repsol YPF, S.A. ("Repsol") and Texas Yale Capital Corp. ("Yale

Capital"), by their attorneys Davis Polk & Wardwell LLP, allege as follows for their

complaint herein:

### NATURE OF THE ACTION

  1.  This class action arises from an effort by the Republic of Argentina

("Argentina") to walk away from the contractual obligations that it undertook when it

chose to enter the United States to raise capital through the initial public offering of its

formerly state-owned oil company, YPF, S.A. ("YPF" or the "Company"). To induce

investors to purchase shares in that former state enterprise, Argentina undertook the

contractual obligation to launch a tender offer to all holders of Class D shares of YPF if it

should ever in the future seek to retake control of the Company. But now, culminating a

wide-ranging offensive against YPF that has nearly halved the stock market value of the

Company in a matter of months, Argentina has seized control of YPF's operations,

appointed an "intervenor" conferred with all the powers of the Company's board and

president, and enacted legislation seizing by fiat a majority of YPF's shares, all without launching any tender offer.

2.    Argentina's tender offer obligation was set forth, *inter alia*, in new provisions of the Company's by-laws that Argentina adopted when, as sole and controlling shareholder, it sought to privatize YPF and to monetize a portion of its interest by publicly offering its shares.  The lion's share of that privatization was accomplished through an SEC-registered initial public offering of American Depositary Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE"), which alone delivered proceeds of more than *$1.1 billion* directly to Argentina as selling shareholder – nearly half of the funds raised through the privatization as a whole, and almost twice the proceeds raised within Argentina.  In order to induce U.S. and other investors to purchase shares in the formerly state-owned enterprise, Argentina committed to shareholders that it would not retake control of the Company without offering all investors a compensated exit.  Indeed, the new provisions prohibited Argentina from ever again exercising control over YPF, even if it had sufficient shares to do so, unless it launched a tender offer for all Class D shares – the shares it was taking public – at a price determined according to those provisions.  These promises have been repeated in numerous prospectuses and periodic reports filed with the SEC in the years since the IPO, each of which Argentina approved and ratified in its commercial capacities as a shareholder of YPF and through its designated board representative.

3.    Notwithstanding these clear contractual commitments, and without any tender offer being launched, Argentina has now seized control of YPF's facilities and operations, appointed an intervenor with total control over the Company, and enacted

2

legislation seizing by fiat a majority of the Company's shares. Argentina's failure to launch a tender offer despite having retaken control over YPF constitutes a breach of its contractual obligations to other shareholders. Its unequivocally expressed intention to acquire a majority of the Company's shares without any such tender offer moreover constitutes a repudiation of its contractual obligations and presents an actual, justiciable controversy concerning the parties' rights and obligations under their contract.

4.      Plaintiffs accordingly seek compensatory damages in respect of Argentina's breach of contract, a declaration from this Court upholding Plaintiffs' legal rights under the contract, and other relief as set forth herein. Plaintiffs' claims do not require any ruling on the sovereign powers of Argentina. Rather, it is the contractual consequences of Argentina's actions, actions constituting the commercial conduct of Argentina in its capacities as selling and continuing shareholder of YPF, and relating to commercial acts due to have been performed in this District – that are at issue. These issues are commercial matters within the jurisdiction of this Court and are specifically governed by an enforceable contract among the parties.

## PARTIES

5.      Plaintiff Repsol is a publicly-held limited liability company (*sociedad anónima*) organized under the laws of the Kingdom of Spain with its headquarters in Madrid, Spain. Plaintiff Repsol is a holder of YPF Class D shares directly and through its ownership of ADRs administered by the Bank of New York as depositary agent. Through a series of transactions in 1999, including a direct purchase from Argentina consummated in New York City and a public tender offer for Class D shares, Repsol acquired a controlling stake in YPF and remains one of YPF's largest shareholders. It is from Repsol that Argentina has subjected to expropriation 51% of YPF's Class D shares.

3

In this action Repsol is suing solely on the basis of its continued holding of that portion of its shares that is not subject to the expropriation process.

6.      Plaintiff Texas Yale Capital Corp. is a financial investment advisory firm registered with the SEC and organized under the laws of the State of Texas with its headquarters located in Spicewood, Texas.  Yale Capital holds shares in YPF through its ownership of ADRs administered by the Bank of New York as depositary agent.

7.      Defendant the Republic of Argentina is also a shareholder of YPF.  Prior to the 1993 IPO of YPF, Argentina was the sole owner of YPF, and it participated in that offering, including the SEC-registered offering of ADRs, as the Company's sole and selling shareholder.  Subsequent to the IPO, Argentina has remained a shareholder of the Company, specifically as the exclusive holder of Class A "golden" shares, and has continued to participate in its management through a designated representative on the Company's board of directors.  Argentina has now also acquired control of a majority of the Company's Class D shares through the intervention in YPF and the expropriation of 51% of YPF's Class D shares.  Argentina is organized as a federation of twenty-three provinces and an independent federal city (Buenos Aires).

8.      Non-party YPF is a publicly-held limited liability stock company (*sociedad anónima*) organized under the laws of Argentina.  The address of its principal executive offices is Macacha Güemes 515, 1106, Buenos Aires, Argentina.  Prior to 1993, it was an exclusively state-owned, monopolist oil and gas company.  In the early 1990s, YPF was privatized and Argentina took it public in 1993.  YPF's shares trade on the NYSE, in the form of ADRs, under the symbol "YPF."  YPF's Class D shares comprise almost 100% of the Company's outstanding capital stock.  ADRs represent

4

approximately 60% of YPF's outstanding Class D shares, and thus approximately 60% of YPF's capital stock.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1330 because this is a non-jury civil action against a foreign state, as defined in 28 U.S.C. § 1603(a), involving claims for relief *in personam* with respect to which the foreign state is not entitled to immunity under 28 U.S.C. § 1605(a), or under any applicable international agreement.  In particular, Defendant Argentina is not entitled to immunity under 28 U.S.C. § 1605(a)(2) because this action is based upon Argentina's commercial activity and its acts in connection therewith, which have been carried on and performed and have caused direct effects in the United States.

10.     Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims alleged occurred in this District.

## FACTUAL ALLEGATIONS

### Privatization of YPF and Adoption of the Tender Offer Requirements

11.     From the 1920s through the 1980s, Argentina maintained a monopoly in the oil and gas industry through state agencies and YPF's predecessor entity, Yacimientos Petrolíferos Fiscales.  YPF was an entirely state-owned and state-run enterprise, dominated and controlled by Argentina as its sole shareholder.  Argentina actively participated in and exercised control over YPF's operations.  As disclosed in YPF's Prospectus dated June 28, 1993 (the "U.S. IPO Prospectus"), Argentina operated YPF in accordance with the national hydrocarbon policy and other governmental policies. These policies "generally reflected broader Argentine political and social objectives

5

rather than business strategies designed to maximize [YPF's] profitability." As an instrument of Argentina, YPF functioned as its agent and representative.

12.     However, in the early 1990s, Argentina made a decision to privatize YPF, representing to potential investors that the Company would be "transform[ed]" from an inefficient government monopoly "into an efficient and competitive enterprise." Acting in a commercial capacity and no different than any private controlling shareholder, Argentina sought to monetize a portion of its interest in YPF by publicly offering shares.

13.     In the context of this privatization and with an eye to an eventual public offering of YPF, Argentina in its commercial capacity as sole and controlling shareholder adopted certain provisions in YPF's by-laws designed to induce investors to purchase the Company's shares by committing to investors that they would be provided a compensated exit in the event Argentina were to have a change of heart and choose to retake control of YPF. Argentina enacted those provisions itself by National Executive Decree No. 1,106, dated May 31, 1993.

14.     In its commercial capacity as shareholder of YPF, Argentina caused those new provisions to be codified in the Company's by-laws. Section 7 of those by-laws required persons intending to consummate a control acquisition to first make a public tender offer for YPF's outstanding shares. And, critically, Section 28 of the by-laws expressly provided that the tender offer requirement of Section 7 applied to any subsequent acquisition of control by Argentina. This was because the purpose of the new tender offer provisions was to address investors' concern that if Argentina should change its mind about privatizing the formerly state-owned oil Company, investors could wind up holding equity in a government-dominated YPF, operated not for their benefit as

shareholders, but as an instrumentality of the Argentine government. That is precisely
what has now happened, but Argentina has not honored its tender offer obligations and,
to the contrary, has made clear that it does not intend to do so.

15.     Sections 7 and 28 of the by-laws remain in effect to date and have been in
effect continuously since 1993. Indeed, Section 7 was triggered and honored in the case
of two prior acquisitions. Under Section 7, unless a tender offer is launched for all
outstanding shares of all classes, it is forbidden for anyone to acquire shares or securities
of YPF, whether directly or indirectly, by any means or instrument if, as a result, the
acquirer will hold or exercise control over 20% or more of YPF's Class D shares or Class
D shares representing 15% or more of YPF's capital stock.

16.     Far from exempting Argentina from those tender offer requirements,
another new provision, Section 28, was added to avoid any doubt that Argentina itself
was undertaking a tender offer obligation. Indeed, Section 28 was addressed specifically
to control transactions by Argentina, setting forth *"Normas especiales"* – "Special
provisions" – that made such transactions subject to Section 7 and required Argentina to
make a tender offer for all outstanding Class D shares as a condition of acquiring directly
or indirectly, by any means or instrument, YPF's shares or securities if, as a result,
Argentina were to own or exercise control over (i) at least 49% of YPF's capital stock;
(ii) Class D shares representing 15% or more of YPF's capital stock; or (iii) 20% or more
of YPF's Class D shares.

17.     Underscoring Argentina's self-imposed prohibition on a reacquisition of
control without a tender offer, Section 28 expressly prohibits Argentina from exercising
control over the Company – even if it had sufficient shares to do so – unless and until a

tender offer had been made.  Absent a tender offer, any shares of stock or securities
acquired by Argentina in violation of its contractual tender offer obligation are
automatically stripped of any right to vote, to collect dividends or other distributions, or
even to be counted towards a quorum of shareholders.

18.     The by-laws not only mandate that Argentina make a tender offer, but also
specify the procedures that the tender offer must follow and the price at which the offer
must be made.  That price is the <u>highest</u> of: (i) the highest price Argentina paid for Class
D shares in the preceding two-year period; (ii) the highest closing price, at the seller's
rate, for a Class D share of stock, as quoted on the Buenos Aires Stock Exchange, for the
preceding thirty-day period; (iii) the product of the highest closing price on the Buenos
Aires Stock Exchange in the preceding thirty-day period and the ratio of the highest price
Argentina paid for a Class D share in the preceding two-year period against the market
price of a Class D share on the day immediately prior to the first day of that two-year
period; or (iv) the product of YPF's net income per Class D share during the immediately
preceding four complete fiscal quarters and the higher of either the price/income ratio for
those four quarters or the highest price/income ratio over the preceding two-year period.

19.     The by-law provisions adopted by Argentina also mandated that the
required tender offer be made in the United States – specifically, in New York City.
Under Section 7, the tender offeror must publish a notice of the offer at least once a week
for the duration of the offer in the business section of the major newspapers of New
York.  The notice must set forth, *inter alia*, the identification of the bidder, the tender
offer price, and a statement that the offer is open to all of YPF's shareholders.

20.      Section 7 also requires that the tender offer must comply with applicable regulations in the jurisdictions where the tender offer takes place and the provisions of the stock exchanges where YPF's shares are listed.  The tender offer mandated by Section 7 therefore must comply with the applicable rules and regulations of the SEC and the New York Stock Exchange.  Those rules and regulations, incorporated by reference into the tender offer provisions, in turn require Argentina to file a tender offer statement in the United States with the SEC, for the benefit of U.S. investors, provide notice to investors and to the New York Stock Exchange, and establish a depository or forwarding agent in New York.

### Initial Public Offering of YPF

21.      On June 29, 1993, acting in its commercial capacity as sole and selling shareholder, Argentina launched an initial public offering of YPF's Class D shares. These shares were offered on the Buenos Aires Stock Exchange and were offered on the New York Stock Exchange and on other exchanges outside the United States and Argentina in the form of ADRs.  But the single largest portion of the public offering was Argentina's sale of shares into the United States, which represented 65,000,000 of the total 140,000,000 Class D shares offered in the privatization.  Indeed, the U.S. offering raised nearly twice as much capital as the Argentine offering, and constituted nearly half of the privatization.  The proceeds to Argentina, as selling shareholder, from the U.S. offering alone were over *$1.1 billion*.  That offering was registered through a Registration Statement on Form F-1 filed with the SEC in accordance with the Securities Act of 1933 and was effectuated by means of the U.S. IPO Prospectus.

22.      The offering was pitched to investors as part and parcel with YPF's "transformation from a *politically managed, government-owned monopoly* to an

9

*efficient and competitive integrated oil company.*" Now with its intervenor and expropriation law, Argentina is transforming the Company right back to a politically managed, government-controlled company. In marketing its Company to U.S. investors, Argentina distinguished in its U.S. IPO Prospectus the past management of YPF, in which government policies "dictated the management and operation of [YPF]" based on "broader Argentine political and social objectives rather than business strategies designed to maximize [YPF's] profitability." And Argentina painted a cautionary picture of YPF under its past political management: "[YPF's] *operations were inefficient*, and generally *lacked continuity in planning and effective internal controls. Stringent financial criteria were not applied* in making investment decisions, and [YPF]'s opportunities to reinvest internally generated funds were subject to government budgetary constraints." It is thus small wonder, in such circumstances, that investors insisted on a compensated exit should Argentina once again obtain control of YPF, and again run YPF according to its own policies, rather than shareholder interest.

23.    For that reason, Argentina repeated in the U.S. IPO Prospectus its commitment not to reacquire or even exercise control over YPF in the future without launching a tender offer for all of the Class D shares it was taking public. Argentina told potential investors that "*[u]nder the Company's By-laws, in order to acquire a majority of the Company's capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on terms and conditions specified in the By-laws.*" Argentina also committed in that Prospectus that "*[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with th[at] procedure . . . will result in the*

*suspension of the voting, dividend and other distribution rights of the shares so*

*acquired.*" The value of Argentina's promise that it would not retake control of YPF

without offering all Class D shareholders a compensated exit was priced into the value of

Class D shares when they were offered in 1993 and at all times thereafter.

<u>Argentina's Continued Role as Shareholder of YPF and<br>Repetitions of Its Tender Offer Obligations</u>

24.     The privatization and public offering of YPF did not end Argentina's role

as YPF shareholder.  To the contrary, the privatization transaction left Argentina with

important privileges and a significant continuing role in YPF.

25.     Argentina remained the exclusive holder of YPF's Class A "golden"

shares, holding 3,764 such shares as of December 31, 2011.  Pursuant to the by-laws, as

the holder of Class A shares, Argentina voted separately with respect to the election of

YPF's board of directors and, as long as it held a single Class A share, Argentina was

entitled to appoint one director and one alternate director.  In addition, Argentina enjoyed

veto rights with respect to specific categories of corporate activities, including acquisition

by a third party of shares representing more than 50% of YPF's capital stock.

26.     Argentina's commitment, in its capacity as a shareholder of YPF, not to

retake control of the Company without launching a tender offer has been repeatedly

reiterated and reaffirmed to investors in the United States through various means.  In

addition to their inclusion in the U.S. IPO Prospectus, English versions of the by-laws

have been regularly filed with or incorporated by reference in the Form 20-F that YPF

files with the SEC on an annual basis.  Indeed, so fundamental are the tender offer

provisions to which Argentina is subject that they have been described in each of YPF's

annual Form 20-Fs filed with the SEC since the 1993 IPO.  As the holder of YPF's Class

A "golden" shares and through its representative on the Company's board of directors,
Argentina made and approved each and every one of those continuing promises and
continuously ratified its tender offer obligations under YPF's by-laws.

### Argentina's Campaign to Depress the Company's Stock Price

27.    Through the end of 2011, the Argentine government seemed wholly
supportive of YPF.  Indeed, the government publicly praised YPF, thanking it for its
commitment to Argentina and "continuing its investments in the country and being its
first taxpayer."[1]  In 2010, President Kirchner praised YPF's strategic plan for 2010
through 2014 as "reaffirm[ing] above all things optimism and hopes in the present and
the future."  As recently as November 2011, the government's board representative stated
that "Argentina is in total accord with the activities that the company has been
conducting."  Indeed, investment banking analysts attending presentations in Argentina in
November and December 2011 involving YPF management and high-ranking
government officials reported to their clients that the Company's relationship with the
government seemed positive, and that the Company was engaged in ongoing discussions
with the government to raise domestic gas prices, which the government recognized
would be important in order to create a more attractive investment environment.

28.    But beginning no later than January 2012 and through mid-April 2012,
Argentina changed course and launched an aggressive and wide-ranging offensive against
YPF and its shareholders.  As a direct and intended consequence of this government
campaign, the stock market value of the Company and the price of its shares were cut
nearly in half in a matter of months, in advance of Argentina's seizure of control of YPF

---

[1] All quotations in Paragraphs 27 through 38 are translated from the original Spanish.

12

and announcement of the expropriation legislation on April 16, 2012.  Indeed, public officials acknowledged this objective and celebrated the alleged benefits to Argentina, at the expense of the Company's other shareholders.  For example, on March 14, 2012, Chubut Province Governor Martín Buzzi, speaking on Argentine television, ardently vowed that the decline in YPF's stock price would continue:  "You have seen more than once in recent days that the newspapers report how YPF's stock price has been falling. Well, those shares are going to keep dropping on the Buenos Aires stock exchange, the Madrid stock exchange and the New York Stock Exchange.  But that is because our shares are going up.  The shares of the Patagonian people are going up.  The shares of the people of Chubut and Santa Cruz are going up, and those are the shares that are important to us."

29.     Argentina's campaign against YPF was characterized by, among other things, repeated government leaks to the Argentine press.  Again and again, a steady stream of unattributed government leaks led to rampant rumors that nationalization and any manner of other hostile government action were imminent.  The effect on YPF's stock of these leaks and the resulting uncertainty was disastrous.

30.     In late January 2012, the Argentine newspaper *Página/12*, which is widely regarded to be a mouthpiece for the Kirchner administration, began reporting that Argentina was considering nationalizing YPF.  In just the first month after it was leaked that the government was considering nationalizing YPF, the price of YPF's ADRs dropped over 20%.  By the end of February, it was reported that the Argentine legislature had prepared a plan to nationalize YPF and that the plan had been presented to President Kirchner.  YPF's ADR price dropped over 14% on the news.  The Argentine, U.S., and

Spanish press anticipated that a formal announcement of nationalization would come during the opening of the legislative session on March 1, 2012, but no such announcement was made. In mid-March, *Página/12* reported, once again attributing its story to unnamed government sources, that Argentina intended to nationalize YPF before winter began in the southern hemisphere. Chief Cabinet Minister Juan Manuel Abal Medina stated only that the government had not ruled out nationalization. Moody's subsequently downgraded YPF and other Argentine oil companies on the news. By the end of March, *Página/12* reported that President Kirchner had decided to nationalize YPF, and was merely determining which way to proceed. From that time until April 16, when the nationalization legislation was formally announced, YPF's ADRs fell another 23%. The steep decline in YPF's share price over the early part of 2012 as a result of the government's campaign against the Company occurred despite positive news from the Company during the same period, including its discovery of vast new oil reserves in Argentina.

31. The government's campaign was not limited to press leaks. On February 23, 2012, Argentina's representative on YPF's board of directors sought to have several high-ranking government officials participate in a YPF board meeting. When those officials were not allowed to enter the meeting, the government's director refused to participate, and Argentina's *Comisión Nacional de Valores* (the Argentine securities regulator) subsequently voided the meeting entirely. And, upon information and belief, under pressure from Argentina, various provinces revoked and/or initiated revocation proceedings for more than a dozen of YPF's oil and gas concessions, including concessions for some of YPF's most productive fields. Upon information and belief,

14

under similar pressure, the *Comisión Nacional de Valores* and Argentine antitrust and tax

authorities also took action with respect to YPF.

<u>**Argentina's Retaking of Control over YPF and**</u>
<u>**Repudiation of Its Tender Offer Obligations**</u>

32.     Culminating this broad offensive against YPF, on April 16, 2012,

Argentina seized control of YPF's operations, appointed an intervenor vested with all the

powers of the Company's board and president, and announced legislation that would

expropriate 51% of the Company's Class D shares.  The expropriation legislation was

signed into law by President Kirchner on May 4, 2012, and went into effect on May 7,

2012.

33.     On April 16, 2012, by Emergency Decree No. 530, Argentina declared

through its executive branch that it was taking complete control of YPF, effective

immediately, by appointing the Minister of Planning, Julio De Vido, as "Intervenor" and

vesting De Vido with all the powers of the Company's board of directors as well as those

of its president.  The control that Argentina gained over YPF through its Intervenor not

only exceeded the thresholds that would trigger a mandatory tender offer, it was

effectively total.  It is now only Argentina, not the shareholders, who has the ability,

among other things, to appoint management and establish dividend policy.

34.     That same day, government officials entered YPF's headquarters in

Buenos Aires, seized control of the Company's facilities and otherwise began exercising

control of the Company's operations.  Argentina immediately replaced the Company's

top management with government officials.  Indeed, the Argentine press reported that

even before President Kirchner had finished announcing the seizure and expropriation

legislation, Argentina's board representative arrived at YPF's headquarters with a list of

executives, including the Company's CEO, who were given fifteen minutes to pack up
their belongings and leave the premises.  Within hours, Argentina's Intervenor, De Vido,
assumed control of the seizure operation and appointed government officials to run each
of the Company's key areas.

35.     Also on April 16, 2012, Argentina announced and delivered proposed
legislation by which Argentina would expropriate 51% of YPF's Class D shares, without
making the tender offer for the Company's outstanding Class D shares required under the
by-laws.

36.     Due to Argentina's April 16 seizure of control and announcement of the
expropriation legislation, the NYSE suspended trading of YPF's ADRs.  Since the NYSE
allowed trading to resume on April 18, the price of YPF's ADRs has plummeted by
another 26% as of market close on May 14, 2012.

37.     On April 17, 2012, Deputy Economy Minister Axel Kicillof, who was
appointed Vice-Intervenor in YPF by Decree No. 532, delivered a speech before the
Argentine Senate regarding Argentina's takeover of YPF, further underscoring
Argentina's breach and repudiation of its tender offer obligation.  Kicillof in fact
acknowledged the contractual tender offer obligation and its applicability to Argentina.
But Kicillof rejected the provision – which had been adopted into the by-laws by
Argentina itself – as a "bear trap" and a matter of YPF's "unfair" and internal by-laws.[2]
And Kicillof mocked the notion that Argentina should have to honor its legal obligations,

---

[2] Kicillof stated: "In that unfair by-law, they said that if anyone dared to step foot, like the State
itself – because, believe me, that if anyone wanted to buy shares to enter into the company, and passed
15%, he stepped in the bear trap and had to buy 100% of the company at a value equivalent to $19 billion.
Because the fools are those who think that the State has to be stupid and buy everyone according to YPF's
own law, respecting its by-law."

stating that only "fools" would expect Argentina to comply with its by-laws obligations, and declaring that "'[l]egal certainty' and 'investment climate' are two horrible words."

38.     On May 4, 2012, the expropriation legislation was signed into law as Law 26,741 (the "Expropriation Law"), which became effective on May 7, 2012. Title III of the Expropriation Law, labeled "Of the Recovery of Control of YPF," provides for the expropriation by Argentina of 51% of the Class D shares of YPF. Pursuant to the Expropriation Law, the expropriation process will be governed by Law 21,499, Argentina's 1977 law concerning expropriations.

39.     The Expropriation Law gives Argentina total and unequivocal control over YPF. As soon as it became effective, the Expropriation Law granted Argentina the power to exercise voting rights on all 51% of the Class D shares subject to expropriation. The Expropriation Law also provides that while the expropriated shares are to be divided between the federal executive (51%) and certain provinces (49%), all of the expropriated shares must be voted as a block for a minimum term of fifty years. The Law dictates that the block must pursue a slate of candidates for the board of directors who will proportionally represent the new holders of the expropriated shares – *i.e.*, the federal executive and the provinces – and a director to represent the Company's workers, rather than the shareholders.

40.     Argentina's failure to launch a tender offer for all YPF Class D shares despite having acquired control over a majority of YPF's stock constitutes a breach of its tender offer obligations. Through the Expropriation Law, Argentina acquired, among other rights, the power to vote 51% of YPF's Class D shares. Section 28 of the by-laws provides that any direct or indirect acquisition by Argentina that results in its exercising

17

control over at least 49% of the Company's stock mandates a tender offer for all Class D shares. Argentina's failure to launch such a tender offer is therefore in direct breach of its contractual obligations under the by-laws.

41.     Argentina's announcement and enactment of the Expropriation Law and related statements also have clearly demonstrated its intent to retake control of YPF without any tender offer and to manage the Company for its own benefit, rather than that of shareholders, in direct repudiation of the promises it made as selling shareholder of YPF and has continuously repeated and ratified at all times since. On April 23, 2012, underscoring Argentina's disenfranchisement of YPF's shareholders, Argentina's Intervenor cancelled the Company's annual general shareholders' meeting, which had been scheduled for April 25 and at which it had been intended that the Company's annual financial statements would be approved. Argentina did not reschedule that meeting in time to comply with requirements that financial statements be issued no later than April 30, 2012, and although the *Comisión Nacional de Valores* has scheduled an annual meeting for June 4, 2012, approval of financial statements is not included on the agenda for that meeting.

42.     As a result of Argentina's breaches and repudiation of its obligations, Plaintiffs have suffered precisely the fate that Argentina had committed would not occur: the transformation of YPF back into a government enterprise, without their being offered the opportunity to exit on the terms set by the by-laws. Plaintiffs have accordingly sustained significant damages. They seek compensation for those damages, as well as declaratory and injunctive relief as set forth below.

43.     Plaintiffs Repsol and Yale Capital and all other members of the plaintiff

class expressly reserve the right to bring other claims not asserted herein that may relate

to Argentina's takeover of YPF, including without limitation such claims as may be

necessary to prevent any improper interference or unfair competition by third parties

seeking to take advantage of the current circumstances to profit at the expense and in

violation of the rights of YPF's now disenfranchised shareholders.  Repsol specifically

reserves its rights and remedies under: (a) Argentine law and any other applicable legal

order; and (b) the Agreement for the Reciprocal Promotion and Protection of Investments

between the Kingdom of Spain and the Argentine Republic signed on 3 October 1991

(and which entered into force on 28 September 1992) duly notified to the Argentine

Republic by letter dated May 10, 2012, which rights and remedies are not pursued in the

present action.

## CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2),

and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all

record or beneficial holders of Class D shares of YPF stock, either directly or through

ADRs, who held at the time of Argentina's breach and repudiation of its tender offer

obligations, and who were damaged thereby (the "Class").  The Class definition excludes

the Class D shares held by Repsol subject to the expropriation process.  The Class also

excludes Argentina and any of its instrumentalities, agencies, provinces, departments, or

state-run or state-controlled enterprises or funds who may hold Class D shares.

45.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiffs at this

19

time and can only be ascertained through appropriate discovery, Plaintiffs believe that the
Class members number at least in the thousands.  Plaintiffs also believe that members of
the Class are geographically dispersed.

46.     Plaintiffs' claims are typical of the claims of the Class members because
Plaintiffs and all Class members are holders of YPF Class D shares, either directly or
through ADRs.  YPF's by-laws constitute an enforceable contract among YPF's
shareholders, including Defendant Argentina and each member of the plaintiff Class.
Argentina has commonly breached its contract with Plaintiffs and all Class members,
including by retaking control of the Company without honoring its tender offer
obligations, and by repudiating its tender offer obligations.

47.     Plaintiffs will fairly and adequately protect the interests of the Class as the
interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.  In
addition, Plaintiffs are represented by counsel competent and experienced in complex
commercial and securities litigation.

48.     Argentina has acted and refused to act in a manner generally applicable to
the Class, thereby making final injunctive or declaratory relief appropriate with respect to
the Class as a whole.

49.     Questions of law and fact common to the members of the Class
predominate over questions that may affect only individual members.  Among those
questions of law and fact common to the Class are the nature of Argentina's obligations
under the tender offer provisions, Argentina's breaches and repudiation of those
obligations, and the price at which a tender offer should have been made pursuant to the
by-laws.

50.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.  Upon information and belief, the Class is readily ascertainable from the Defendant's records and the records of the depositary agent.

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

51.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 50 above.

52.     Argentina enacted provisions in the by-laws assuring YPF's investors that if it ever acquired a controlling stake in YPF, it would make a public tender offer for all of YPF's outstanding Class D shares.

53.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract.  Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek to retake control of YPF.

21

54.     Pursuant to the terms of the by-laws, Argentina is prohibited from exercising control over YPF without launching a tender offer for all Class D shares in accordance with Sections 7 and 28 of the by-laws.

55.     Argentina breached that contract by failing to make a tender offer as required by the by-laws as a condition of its exercising control over YPF as of April 16, 2012, and as a result of its acquiring control over a majority of YPF's shares as of May 4, 2012.

56.     The plaintiff Class has been damaged by Argentina's breach in an amount to be determined according to proof.

### SECOND CAUSE OF ACTION:
### ANTICIPATORY REPUDIATION

57.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 56 above.

58.     Argentina enacted provisions in the by-laws assuring YPF's investors that if it ever acquired a controlling stake in YPF, it would make a public tender offer for all of YPF's outstanding Class D shares.

59.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract. Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek

to retake control of YPF. Plaintiffs remain ready, willing, and able to perform their obligations under the Company's by-laws as holders of YPF Class D shares.

60.     Pursuant to the terms of the by-laws, Argentina is prohibited from exercising control over YPF without launching a tender offer for all Class D shares in accordance with Sections 7 and 28 of the by-laws.

61.     Argentina has repudiated its contractual tender offer obligations by unequivocally expressing its intention to acquire ownership or control of a majority of the Company's shares without making any such tender offer, in material breach of its obligations under the tender offer provisions, a breach that would give rise to a claim for damages for breach of contract, and by taking voluntary affirmative actions that render it unable or apparently unable to perform without such breach. The plaintiff Class has been damaged as a result of Argentina's repudiation of its tender offer obligations in an amount to be determined according to proof.

### THIRD CAUSE OF ACTION:
### PROMISSORY ESTOPPEL

62.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 61 above.

63.     In connection with the privatization and public offering of YPF and continuously at all times thereafter, Argentina promised to U.S. and other investors that it would not retake control of YPF without making a tender offer to all Class D shareholders as provided in the by-laws. Those promises were communicated to investors by means including the by-laws and the U.S. IPO Prospectus. Argentina repeated these promises on a regular basis to the U.S. market, including every time the

23

Company's by-laws were publicly filed with the SEC in connection with YPF's periodic reporting requirements under U.S. securities laws.

64.     Argentina made these promises with the intention to induce reliance and specifically with the intention to induce Class members to purchase shares in YPF, and the value of Argentina's promises was priced into the value of Class D shares at all times. It was therefore reasonable and foreseeable that Class members would rely on Argentina's promise in purchasing their Class D shares of YPF.

65.     The plaintiff Class relied on Argentina's promises to their detriment, including because, among other things, they have been denied the promised tender offer and instead hold devalued YPF Class D shares without the benefit of the compensated exit they were promised.

## FOURTH CAUSE OF ACTION:
## DECLARATORY JUDGMENT

66.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 65 above.

67.     An actual and justiciable controversy has arisen and now exists between the plaintiff Class and Argentina, as Argentina has reacquired control of YPF and has unequivocally expressed its intention not to launch a tender offer for all outstanding Class D shares in contravention of YPF's by-laws.

68.     As shareholders of YPF who have been adversely impacted by Argentina's failure to make a tender offer as promised, Plaintiffs have standing to bring this action.

69.     Plaintiffs seek a declaration (a) that as a contractual consequence of its having seized control of YPF, Argentina is obligated to launch a tender offer for all Class

D shares on the terms set forth in Sections 7 and 28 of the Company's by-laws; (b) that as a contractual consequence of its having acquired a 51% interest in the Class D shares of YPF, Argentina is obligated to launch a tender offer for all Class D shares on the terms set forth in Sections 7 and 28 of the Company's by-laws; and (c) that unless and until such tender offer has been made, the shares acquired by Argentina in violation of the tender offer provisions shall have no right to vote, receive dividends or be counted towards a quorum.

70.     Due to Argentina's efforts to drive down the value of YPF's shares, Plaintiffs further seek a declaration of the relevant date for calculating the tender offer price pursuant to the by-laws, to be determined by this Court.

### FIFTH CAUSE OF ACTION:
### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

71.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 70 above.

72.     YPF's by-laws constitute an enforceable contract. Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract. Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract. Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek to retake control of YPF.

73.     A duty of good faith and fair dealing is implied in the by-laws and binds the parties thereto. This duty implies obligations consistent with the other terms of the

contract, including the obligation that Argentina would not take actions to cause Class members' rights under the contract to be devalued.

74.     Argentina breached this implied duty of good faith and fair dealing by, among other things, conducting a wide-ranging campaign against YPF beginning in January 2012 that caused the price of YPF's shares to drop precipitously. Argentina engaged in this conduct with the intent and effect to depress the price at which it could be obligated to make a tender offer under the terms of its contract with the plaintiff Class.

75.     Argentina's actions have had the effect of depriving Class members of the full benefit of their bargain, specifically their right under the tender offer price provisions of the by-laws to be offered fair consideration for their shares, free from manipulation, in the event Argentina retook control of YPF. The plaintiff Class has been damaged by Argentina's breach of the implied duty of good faith and fair dealing in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.     Compensatory damages according to proof;

B.     A declaration that Argentina is required to make a tender offer pursuant to the terms of the by-laws;

C.     A declaration that the price for such tender offer is to be determined on the basis set forth in the by-laws, as of a date to be determined according to proof;

26

D.      A declaration that, unless and until Argentina has launched a

tender offer in accordance with the by-laws, all shares acquired by Argentina in

contravention of those by-laws are stripped of any right to vote, collect dividends or other

distributions, and shall not be counted towards a quorum of shareholders;

E.      An injunction preventing Argentina from exercising voting rights

or rights to dividends or other distributions or other rights pertaining to the shares

acquired by Argentina in violation of YPF's by-laws unless and until a tender offer has

been launched in accordance with the by-laws; and

F.      Such other and further relief as the Court may deem just and

proper.

Dated:   New York, New York
         May 15, 2012

                              DAVIS POLK & WARDWELL LLP

                              By: _____

                              Michael P. Carroll
                              Antonio J. Perez-Marques

                              450 Lexington Avenue
                              New York, New York 10017
                              (212) 450-4000
                              michael.carroll@davispolk.com
                              antonio.perez@davispolk.com

                              *Attorneys for Plaintiffs Repsol YPF, S.A. and
                              Texas Yale Capital Corp.*

27

# Exhibit C

# FORM 6-K
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
### Report of Foreign Issuer

### Pursuant to Rule 13a-16 or 15d-16 of
### the Securities Exchange Act of 1934

For the month of May, 2012

Commission File Number: 001-12102

# YPF Sociedad Anónima

(Exact name of registrant as specified in its charter)

## Macacha Güemes 515
## C1106BKK Buenos Aires, Argentina

(Address of principal executive office)

Indicate by check mark whether the registrant files or will file
annual reports under cover of Form 20-F or Form 40-F:

Form 20-F     X     Form 40-F     _____

Indicate by check mark if the registrant is submitting the Form 6-K
in paper as permitted by Regulation S-T Rule 101(b)(1):

Yes     _____          No     X

Indicate by check mark if the registrant is submitting the Form 6-K
in paper as permitted by Regulation S-T Rule 101(b)(7):

Yes     _____          No     X

## YPF Sociedad Anónima

TABLE OF CONTENTS

| Item | |
| --- | --- |
| 1 | Translation of letter to the Buenos Aires Stock Exchange dated May 8, 2012 |
| 2 | Translation of letter to the Buenos Aires Stock Exchange dated May 8, 2012 |
| 3 | Call of Shareholder Meeting |

Item 1

**TRANSLATION**



Nota I/YPF No. 26/2012

Buenos Aires, May 8, 2012

Messrs.
**Bolsa de Comercio de Buenos Aires**
**(Buenos Aires Stock Exchange)**

<u>**Ref.**</u>: Law No. 26,741

Dear Sirs:

The purpose of this letter is to comply with the requirements of Chapter VII, Article 23 of the Regulations of the Buenos Aires Stock Exchange.

We hereby inform you that, on May 7, the approval of Law. No 26,741 was published in the Official Gazette of the Republic of Argentina, which, among other matters, provides for the expropriation of 51% of the equity of YPF S.A. represented by an identical stake of Class D Shares of said company owned by Repsol YPF S.A., its controlled or controlling entities, directly or indirectly, and states that, upon the entry into effect of this Law, the exercise of all rights attached to the expropriated shares correspond to the National State .

Please find attached a copy of the Law referred to above.

Yours faithfully,

Architect Julio M. DE VIDO
Intervenor YPF, Decree No. 530/12

---

**TRANSLATION**

LAW 26,741

THE SENATE AND HOUSE OF DELEGATES OF THE ARGENTINE
NATION, CONVENED IN LEGISLATURE, ETC.
ISSUES BY LAW:

TITLE I

SOLE CHAPTER

ARGENTINA'S HYDROCARBON SOVEREIGNTY

Article 1. - Achieving self-sufficiency in the supply of hydrocarbons as well as in the exploration, exploitation, industrialization, transportation and sale of hydrocarbons, is hereby declared a national public interest and a priority for the Republic of Argentina, with the goal of guaranteeing socially equitable economic development, the creation of jobs, the increase of the competitiveness of various economic sectors and the equitable and sustainable growth of the provinces and regions.

Article 2.- The National Executive Office, as the authority in charge of setting policy on this subject, shall introduce the measures necessary to accomplish the purpose of the present law with the participation of the provinces and public and private capital, national and international.

Article 3.- The principles of the hydrocarbon policy of the Republic of Argentina are hereby established as the following:

    a.   Promote the use of hydrocarbons and their derivatives to promote development and as a mechanism to increase the competitiveness of the various economic sectors and that of the provinces and regions;

    b.   Convert hydrocarbon resources to proved reserves and their exploitation and the restoration of reserves;

    c.   Integrate public and private capital, national and international, into strategic alliances dedicated to the exploration and exploitation of conventional and nonconventional hydrocarbons;

    d.   Maximize the investments and the resources employed for the achievement of self-sufficiency in hydrocarbons in the short, medium and long term;

    e.   Incorporate new technologies and categories of management that contribute to the improvement of hydrocarbon exploration and exploitation activities and the advancement of technological development in the Republic of Argentina in this regard;

1

---

    f.   Promote the industrialization and sale of hydrocarbons with a high added-value;

    g.   Protect the interests of consumers with respect to the price, quality and availability of hydrocarbon derivatives;

    h.   Collect outstanding balances relating to exportable hydrocarbons in order to improve the trade balance, ensuring a rational exploitation of the resources and the sustainability of its exploitation for use by future generations.

TITLE II

SOLE CHAPTER
FEDERAL COUNCIL OF HYDROCARBONS

Article 4.- A Federal Council of Hydrocarbons is hereby created which shall include the participation of the following:

    a.   The Ministry of Economy and Public Finances, the Ministry of Federal Planning, Public Investment and Services, the Ministry of Labor, Employment and Social Security and the Ministry of Industry, through their respective representatives.

    b.   The provinces and the Autonomous City of Buenos Aires, through the representatives that each may appoint.

Article 5.- The duties of the Federal Council of Hydrocarbons shall be the following:

a.   Promote the coordinated action of the National and Provincial Governments, with the purpose of ensuring the fulfillment of the objectives of the present law.

b.   Adopt decisions regarding all questions related to the accomplishment of the objectives of this law and the establishment of the hydrocarbons policy of the Republic of Argentina that the National Executive Office may submit for consideration.

Article 6.- The Council shall convene a meeting with the absolute majority of its members an shall be presided and represented by the representative of the National Government that the National Executive Office designates to such end.  It shall establish its own internal regulations.

2

---

TITLE III
RECUPERATION OF CONTROL OF YPF

CHAPTER I
EXPROPRIATION

Article 7.- For purposes of ensuring the fulfillment of the objectives of this law, fifty-one percent (51%) of the equity of YPF Sociedad Anónima, represented by an identical stake of Class D shares held by Repsol YPF S.A., its controlled or controlling entities, directly or indirectly, is hereby declared a public interest and subject to expropriation. In addition, fifty-one percent (51%) of the equity of Repsol YPF GAS S.A, represented by sixty percent (60%) of the Class A shares of such company, held by Repsol Butano S.A., its controlled or controlling entities, is hereby declared a public interest and subject to expropriation.

Article 8.- The YPF Sociedad Anónima and Repsol YPF Gas S.A. shares subject to expropriation in accordance with the preceding article shall be distributed in the following manner: fifty-one percent (51%) shall belong to the National Government and the remaining forty-nine percent (49%) shall be distributed among the provinces that compose the National Organization of Hydrocarbon Producing States.

Regulations shall take into consideration the conditions relating to the transfer, ensuring that the distribution of the shares among the provinces that accept their transfer is conducted in an equitable manner, considering each of their levels of hydrocarbon production and proved reserves.

Article 9.- To ensure compliance with the objectives of this law, the National Executive Office, by itself or through an appointed public entity, shall exercise all the political rights associated with the shares subject to expropriation until the transfer of political and economic rights is completed, in accordance with the preceding article.

The transfer of the political and economic rights of the shares subject to expropriation conducted by the National Government in favor of the provincial governments members of the National Organization of Hydrocarbon Producing States, shall provide for the exercise of shareholder rights in a unified manner for the minimum term of fifty (50) years by means of a shareholders' agreement.

The appointment of YPF S.A. Directors corresponding to the expropriated shares shall be completed proportionally considering the holdings of the National Government, Provincial Governments and one Director shall represent the employees of the company.

Article 10.- For purposes of implementing this law and the registration of the ownership rights connected to the shares subject to expropriation, it is hereby recorded that the expropriation of such shares is conducted for the public interest

3

---

and that any future transfer of the shares is prohibited without the permission of the National Congress by a two-thirds vote of its members.

Article 11.- The expropriation processes shall be governed by the provisions of Law No. 21,499 and the expropriator shall be the National Executive Office.

Article 12.- The price of the property subject to expropriation shall be determined in accordance with the provisions of Law No. 21,499, Article 10 and the corresponding provisions.  The appraisal shall be conducted by the National Court of Appraisal.

CHAPTER II

OPERATIONAL CONTINUITY

Article 13.- To ensure the continuity of the activities associated with the exploration, production, processing and refining of hydrocarbons by YPF Sociedad Anónima and Repsol YPF Gas S.A., as well as their transport, distribution and sale, and the increasing investment flows, and adequately supplying the fuel required for the function of the national economy pursuant to the provisions of this law, the National Executive Office, through the persons or organizations it appoints, shall exercise all of the rights conferred upon the shares subject to expropriation in accordance with articles 57 and 59 of such act.

The National Securities Commission, on the day of enactment of this law, shall convene a shareholders meeting in order to discuss, among other matters deemed necessary and relevant for the purposes of the foregoing, the dismissal of all the directors and alternate members, trustees and their alternates, and appoint replacements for the applicable term.

Article 14.- The National Executive Office and Intervenor designated by YPF Sociedad Anónima and Repsol YPF Gas S.A. are empowered to adopt all actions and precautions as necessary, until control of YPF Sociedad Anónima and Repsol YPF Gas S.A. is assumed, in order to ensure the operation of the company, the preservation of its assets, and the supply of hydrocarbons.

CHAPTER III

THE LEGAL CONTINUITY AND MANAGEMENT OF YPF S.A.

Article 15.-  In the execution of its activities, YPF Sociedad Anónima and Repsol YPF Gas S.A. shall continue to operate as publicly traded corporations pursuant to Chapter II, Section V of Law Nº 19,550 and its corresponding regulations, and shall not be subject to any legislation or regulation applicable to the management or control of Companies or entities owned by the National Government or provincial governments.

4

Article 16.-  The administration of shareholder rights corresponding to the shares subject to expropriation by the National Government and its provinces shall be executed pursuant to the following principles:

   a.   The strategic contribution of YPF Sociedad Anónima in compliance with the objectives set forth herein;

   b.   The administration of YPF Sociedad Anónima pursuant to the industry's best practices and corporate governance, safeguarding shareholder interest and generating value on their behalf;

   c.    The professional management of YPF S.A.

Article 17.- For purposes of complying with the present law, with respect to sources of finance, YPF Sociedad Anónima shall resort to internal and external, strategic alliances, joint ventures, transitory business unions, and all cooperation partnerships whether public, private or mixed companies, domestic and foreign.

Article 18.- This law is a public order law and shall enter into force upon its publication in the Official Gazette.

Article 19.- It shall be communicated to the National Executive Office.

GIVEN IN THE SESSIONS ROOM OF THE ARGENTINE CONGRESS, IN BUENOS AIRES, THE THIRD DAY OF MAY OF THE YEAR TWO THOUSAND AND TWELVE.

-REGISTERED UNDER NO. 26,741-

AMADO BOUDOU. – JULIAN A. DOMINGUEZ. – Juan H. Estrada. – Gervasio Bozzano.

5

Item 2

TRANSLATION



Note I/YPF No. 27/2012

Buenos Aires, May 8, 2012

To the
**Bolsa de Comercio de Buenos Aires**
**(Buenos Aires Stock Exchange)**


Dear Sirs:

      The purpose of this letter is to comply with the requirements of Chapter VII, Article 23 of the Regulations of the Buenos Aires Stock Exchange.

      We hereby inform you that Mr. Miguel Matías Galuccio, Oil Engineer, has been appointed General Manager of YPF S.A. for the period of the intervention stipulated by Decree No 530/2012.

Yours faithfully


Architect Julio M. DE VIDO
Intervenor YPF, Decree No. 530/12

---

Item 3

**Translation**

Ministry of Economy and Public Finance
National Securities Commission


YPF Sociedad Anónima

CALL NOTICE

The Shareholders are hereby informed that the National Securities Commission, in accordance with the powers assigned by article 13 of Law 26.741 of May 4, 2012, resolved to call the General Ordinary and Special Class A and Class D Shareholders' Meeting to be held on June 4, 2012, at 11:00 a.m. in first call, and at 12.00 p.m. in second call, in the Corporate Offices located at Macacha Güemes 515, Autonomous City of Buenos Aires, to consider the following:

AGENDA:

1.  Appointment of two Shareholders who shall sign the Minutes of the Meeting.

2.  Removal of one regular and one alternate member of the Supervisory Committee for Class A shares.

3.  Removal of the regular and alternate members of the Supervisory Committee for Class D shares.

4.  Fix the number of regular and alternate members of the Supervisory Committee.

5.  Appointment of one regular and one alternate member of the Supervisory Committee for Class A shares.

6.  Appointment of the regular and alternate members of the Supervisory Committee for Class D shares.

7.  Removal of the regular and the alternate member of the Board of Directors for Class A shares.

8.  Removal of the regular and the alternate members of the Board of Directors for Class D shares.

9.  Fix the number of the regular and the alternate members of the Board of Directors.

10. Appointment of one regular and one alternate member of the Board of Directors for Class A shares and fix the term of appointment.

11. Appointment of the regular and the alternate members of the Board of Directors for Class D shares and fix the term of appointment.

NOTES: 1) The Shareholders are reminded that the Register of Book-entry Shares of the Company is kept by Caja de Valores S.A., with domicile at 25 de mayo 362, Autonomous City of Buenos Aires. Therefore, under section 238 of Law No. 19,550, in

---

**Translation**

order to attend the Meeting they must obtain a certificate evidencing the account of book-entry shares issued by Caja de Valores S.A. for this purpose, and submit such certificate for its registration in the Register of Attendance to Meetings, at the National Securities Commission situated in 25 de Mayo 175, floor 7th of the Autonomous City of Buenos Aires, on any business day from May 14, 2012 to May 19, 2012 inclusive, from 11:00 a.m. to 1:00 p.m. and from 2:00 p.m. to 4:00 p.m. The Commission will provide shareholders with the receipt certificates that will enable them to attend the Meeting.

2) The Shareholders who are entities constituted abroad are reminded that, under Resolution 7/2005 of the Superintendency of Corporations (*Inspección General de Justicia*), in order to attend the Meeting they must comply with section 123 of Law No. 19,550. Likewise, under Resolution No. 465/04 of the National Securities Commission, at the time of confirming their attendance and of their actual attendance, they must prove, with respect to the holders of shares and their respective representative, the following information: name, surname and personal identification document; or corporate name and registration details, as the case may be, as well as the other information specified in such provision.

3) Except with respect to items 2, 5, 7 and 10, in considering the Agenda, Shareholders of all classes of shares must exercise their voting rights with respect to all items in block.

4) Shareholders are required to be present at the location designated for the General Meeting at least 15 minutes earlier than the time indicated above, in order to facilitate their accreditation and the registration of their attendance. No accreditations will be accepted outside the stated time.

Signed by Lic. Alejandro VANOLI, President of the National Securities Commission

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**YPF Sociedad Anónima**

Date: May 8, 2012

By:      /s/ Julio M. DE VIDO

Name:  Julio M. DE VIDO
Title:    Intervenor

# Exhibit D

**Voces:** TRATADO INTERNACIONAL ~ PROYECTO DE INVERSION ~ ARBITRAJE INTERNACIONAL ~ CONSTITUCION NACIONAL ~ CONSTITUCIONALIDAD
**Título:** Los tratados bilaterales de inversión, el arbitraje internacional obligatorio y el sistema constitucional argentino
**Autor:** Rosatti, Horacio D.
**Publicado en:** LA LEY2003-F, 1283 - Derecho Constitucional - Doctrinas Esenciales Tomo I, 01/01/2008, 771

**Sumario:** SUMARIO: I. Descripción del tema. - II. TBIs: Naturaleza jurídica y control constitucional. - III. Los casos tradicionales de admisión de jurisdicción foránea y el control local de constitucionalidad. - IV. La incidencia de cierta conjunción TBI + CIADI en materia de control de constitucionalidad. - V. Conclusiones.

## I. Descripción del tema

### A. Introducción

A partir de 1990 y hasta el año 2000 inclusive la República Argentina suscribió con distintos países diversos tratados de promoción y protección recíproca de inversiones.

El objetivo de estos tratados bilaterales de inversión (en adelante TBI o TBIs, en singular o en plural, según sea el caso) consistió genéricamente -conforme a lo que se dice en sus Preámbulos- en 'promover una mayor cooperación económica entre los países contratantes' para lograr 'el desarrollo económico de los países' y 'el incremento de la prosperidad de los pueblos' y, específicamente, en 'estimular la iniciativa económica privada' y 'el flujo de capitales privados', como así también 'mantener un marco estable para las inversiones y un trato justo y equitativo a las inversiones' [(1)]

Los TBIs, aprobados por la Argentina mediante leyes del Congreso, prevén en su articulado mecanismos de solución de controversias en materia de 'inversión' por medio de arbitrajes internacionales, ya sea a través de tribunales ad hoc o mediante tribunales constituidos bajo reglas específicas [(2)] Distintas cláusulas de los TBIs y de los tribunales de arbitraje constituidos bajo reglas específicas contienen variadas restricciones al ejercicio de la jurisdicción nacional en materia de control judicial.

Describiremos sumariamente estas cláusulas y luego, a partir del análisis de la naturaleza jurídica de los TBIs según el derecho público interno, habremos de ponderar la congruencia de tales disposiciones en el marco supra-legal nacional argentino.

### B. Las cláusulas restrictivas al ejercicio de la jurisdicción nacional en materia de inversiones extranjeras

#### a. Las cláusulas en los TBIs

El texto de los distintos TBIs celebrados por la República Argentina [(3)] responde a un patrón común, sin perjuicio de ciertas variaciones atribuibles prima facie a los avatares de la negociación previa a la concreción de los convenios y/o al peso de la costumbre jurídica del país co-contratante.

Seguidamente -a modo de muestreo representativo- describiremos los aspectos más relevantes vinculados con las cláusulas restrictivas al ejercicio de la jurisdicción nacional observables en los TBIs celebrados con el Reino de España, la República Francesa, el Reino de Gran Bretaña e Irlanda del Norte, los Estados Unidos de Norteamérica y la República Federal de Alemania, que fueran oportunamente aprobados por leyes del Congreso Nacional.

#### * TBI con el Reino de España

a) Si hay controversia y no puede ser dirimida dentro de los seis (6) meses contados desde que la misma se haya promovido será sometida a los tribunales competentes de la parte en cuyo territorio se realizó la inversión (artículo X, 2);

b) El arbitraje como método de resolución de la controversia se torna inexorable:

b1) si no hay decisión de fondo en los tribunales de la parte en cuyo territorio se realizó la inversión luego de dieciocho (18) meses contados a partir de la iniciación del proceso o cuando tal decisión exista pero la controversia subsista (art. X, 3, a); o,

b2) cuando ambas partes de la controversia así lo hayan convenido (art. X, 3, b);

c) La controversia será resuelta por el arbitraje del CIADI o de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional (en adelante CNUDMI) (art. X, 4);

d) La sentencia arbitral será obligatoria y cada parte contratante la ejecutará de acuerdo con su legislación (art. X, 6).

#### * TBI con la República Francesa

a) Si hay controversia y no puede ser dirimida dentro de los seis (6) meses contados desde el momento en que la misma ha sido planteada la cuestión será sometida, a pedido del inversor, o bien a las jurisdicciones nacionales de la Parte contratante implicada en la controversia, o bien al arbitraje internacional (art. 8,2);

b) Una vez que el inversor haya sometido la controversia a las jurisdicciones de la Parte Contratante implicada o al arbitraje internacional, la elección de uno u otro de esos procedimientos será definitiva (art. 8,2);

c) En caso de opción por el arbitraje internacional la controversia podrá ser llevada, a elección del inversor, al CIADI (cuando el Estado parte haya adherido al Convenio que lo crea) o a un tribunal de arbitraje ad hoc establecido de acuerdo con las reglas de arbitraje de CNUDMI (art. 8,3);

d) El órgano arbitral decidirá en base al TBI, al derecho de la Parte Contratante que sea parte en la controversia -incluidas las normas relativas a conflictos de leyes- y a los términos de eventuales acuerdos particulares concluidos con relación a la inversión, como así también a los principios del Derecho Internacional en la materia (art. 8,4);

e) Las sentencias arbitrales serán definitivas y obligatorias para las partes en la controversia (art. 8,5).

* TBI con el Reino de Gran Bretaña e Irlanda del Norte

a) El mecanismo de activación de la resolución de controversias no requiere de un plazo específico desde que la disputa se haya declarado (art. 8,1);

b) Se prevé la opción hacia el arbitraje por cualquiera de las partes en términos muy similares al TBI con el Reino de España (art. 8,2);

c) Las controversias pueden someterse al arbitraje CIADI o CNUDMI (art. 8,3);

d) Los criterios normativos para la resolución del conflicto y el valor del laudo arbitral son similares a los previstos en el TBI con la República de Francia.

* TBI con Estados Unidos de Norteamérica

a) El mecanismo de activación de la resolución de controversias no requiere de un plazo específico desde que la disputa se haya declarado (art. VII, 2);

b) El inversor puede optar resolver la controversia:

b1) en los tribunales judiciales o administrativos de la Parte que sea parte en la controversia (art. VII, 2, a);

b2) por medio del mecanismo de solución de controversias previamente acordado (art. VII, 2, b); o,

b3) por el arbitraje CIADI, el arbitraje CNUDMI o cualquier otro una vez transcurridos seis (6) meses desde que la controversia se declaró si no es de aplicación ni la alternativa b1) ni la b2) anteriores (art. VII, 3,a).

c) El laudo arbitral será definitivo y obligatorio para las partes de la controversia. El Estado se compromete a llevar adelante sin demora las disposiciones del laudo arbitral y se encarga de su observancia en su territorio (art. VII, 6).

* TBI con la República Federal de Alemania: los motivos que propician el arbitraje, los plazos, los procedimientos y el valor y la aplicación del laudo son prácticamente idénticos a los dispuestos en el TBI celebrado con el Reino de España (art. l0).

* Los TBIs celebrados entre la Argentina y Francia (art. 4), EE.UU. (art. II, 1 y 7), el Reino de Gran Bretaña e Irlanda del Norte (art. 3) y Alemania (art. 3) permitirían obviar el requisito del agotamiento de la vía jurisdiccional pactada en el TBI entre Argentina y el Reino de España por aplicación de la cláusula de la Nación más favorecida, en razón de la cual se dispone que "en todas las medidas regidas por el acuerdo, el tratamiento a las inversiones no será menos favorable que el otorgado por cada parte a las inversiones realizadas en su territorio por inversores de las terceras partes" (TBI Argentina-Reino de España, art. IV, 2) (4).

b. Las cláusulas de arbitraje del CIADI

El Convenio sobre arreglo de diferencias relativas a inversiones entre Estados y nacionales de otros Estados que crea el CIADI y aprueba el procedimiento de arbitraje internacional establece -en lo que refiere a nuestro tema- lo siguiente:

a) Presume juris tantum que si no ha habido declaración expresa en contrario el consentimiento de las partes al procedimiento de arbitraje según el Convenio excluye cualquier otro recurso (art. 26);

b) Presume juris tantum que si no ha habido declaración expresa en contrario puede recurrirse al arbitraje sin exigir el agotamiento previo de las vías administrativas o judiciales nacionales (art. 26);

c) El Tribunal Arbitral resuelve sobre su propia competencia (art. 41, 1) (5), pudiéndolo hacer como 'cuestión previa' o 'conjuntamente con el fondo de la cuestión' (art. 41,2);

d) El laudo tiene el valor de una sentencia firme dictada por un tribunal del Estado condenado (art. 54, 1) (6) y se ejecuta de acuerdo con las normas que -sobre ejecución de sentencias- estuvieran en vigor en los territorios en que dicha ejecución se pretenda (art. 54, 3);

e) El laudo sólo puede ser aclarado, revisado o anulado de acuerdo a los mecanismos previstos por el Convenio, que excluye la jurisdicción local (arts. 50, 51, 52 y 53).

**II. TBIs: Naturaleza jurídica y control constitucional**

A. Naturaleza jurídica de los tratados bilaterales de inversión

a. La tipificación de los tratados internacionales según la Constitución Nacional Argentina

La Constitución Nacional Argentina establece una tipificación de los tratados internacionales en base a la materia objeto de regulación. El disímil contenido prohija una jerarquización que se expresa en su articulación con la Constitución y la ley y en la facultad/dificultad con que pueden ingresar, progresar o egresar al sistema jurídico nacional.

Las categorías constitucionales, según los ejes temáticos de los tratados, son las siguientes:

a) tratados sobre derechos humanos (art. 75 inc. 22, párr. 2° y 3°);

b) tratados de integración (art. 75 inc. 24);

c) tratados no incluidos en los ítems anteriores celebrados con otras naciones o con organizaciones internacionales (art. 75 inc. 22, párr. 1°);

d) concordatos con la Santa Sede (art. 75 inc. 22, párr. 1°); y,

e) convenios celebrados por las provincias con conocimiento del Congreso Nacional (art. 124).

A los efectos de este trabajo habremos de circunscribir el análisis a las tres primeras categorías de tratados, excluyendo a los concordatos con la Santa Sede y a los tratados internacionales celebrados por las provincias [7]. Para decirlo de otro modo: circunscribiremos el análisis a los tratados internacionales celebrados por el Estado Nacional con sujetos distintos de la Santa Sede.

La jerarquía de los tratados de las tres categorías circunscriptas que se deriva de la Constitución Nacional Argentina es la siguiente:

a) tratados con jerarquía constitucional (art. 75 inc. 22, párr. 2°); y,

b) tratados con jerarquía superior a la ley; que a su vez pueden sub-clasificarse en:

b1) tratados que pueden alcanzar la jerarquía constitucional (art. 75 inc. 22, párr. 3°); y,

b2) tratados que no pueden alcanzar la jerarquía constitucional (art. 75 inc. 22, párr. 1° y art. 75 inc. 24).

Las modalidades de ingreso, progreso y egreso al sistema jurídico argentino de los tratados internacionales bajo análisis permite reconocer:

Respecto del ingreso:

a) tratados con ingreso constitucional 'directo' (los citados en el art. 75 inc. 22, párr. 2°); y,

b) tratados con ingreso constitucional 'indirecto' (por ley), que podrían sub-clasificarse en:

b1) tratados que pueden ingresar por ley con mayoría 'normal', es decir mayoría absoluta de cada una de las Cámaras computada sobre el quórum (art. 75 inc. 22, párrs. 1° y 3°); y,

b2) tratados que pueden ingresar por ley con mayoría `agravada', es decir mayoría absoluta de la totalidad de los miembros de cada Cámara (tratados de integración con otros países de Latinoamérica previstos en el art. 75 inc. 24, párr. 2°);

b3) tratados que pueden ingresar por ley luego de dos votaciones del Congreso, la primera con mayoría 'normal' y la segunda con mayoría `agravada' (tratados de integración con Estados no latinoamericanos previstos en el art. 75 inc. 24, párr. 2°).

Respecto del progreso:

a) tratados que pueden progresar desde una jerarquía superior a la ley hacia la jerarquía constitucional (art. 75 inc. 22, párr. 3°); y,

b) tratados que no pueden progresar desde la jerarquía superior a la ley hacia la jerarquía constitucional (art. 75 inc. 22, párr. 1° y art. 75, inc. 24).

Respecto del egreso:

a) tratados que pueden egresar del sistema jurídico argentino mediante una ley votada con mayoría 'normal', es decir con mayoría absoluta de los miembros de cada Cámara que forman quorum (art. 75, inc. 22, párr. 1°);

b) tratados que pueden egresar del sistema jurídico argentino mediante una ley votada con mayoría absoluta de la totalidad de los miembros de cada Cámara (art. 75 inc. 24); y.

c) tratados que pueden egresar del sistema jurídico argentino mediante una ley votada con las dos terceras partes de la totalidad de los miembros de cada Cámara (art. 75 inc. 22, párr. 2°).

b. Ubicación de los tratados de inversión dentro de la tipología constitucional argentina

A la luz de la tipología precedente, los tratados bilaterales de inversión deben ser ubicados dentro de la categoría de los tratados referidos en el art. 75 inc. 22, párr. 1° de la Constitución Nacional. Consecuentemente:

\* gozan de jerarquía superior a la ley;

\* no pueden llegar a la jerarquía constitucional; e

\* ingresan y egresan por medio de leyes votadas por la mayoría absoluta de los miembros de cada Cámara del Congreso computada sobre el quórum (regla general del art. 78, Constitución Nacional).

Su jerarquía los ubica un escalón por debajo de la Constitución y uno por arriba de la ley, integrando en esa posición la pirámide jurídica que constituye 'la ley suprema de la Nación' según la expresión del art. 31 de la Constitución Nacional.

B. El control jurídico de los TBIs según el sistema constitucional argentino

Desde el punto de vista constitucional, los tratados de inversión pueden ser objeto de control: a) en razón de su contenido, y b) por parte de los tribunales locales.

a. El contenido (art. 27, Constitución Nacional)

El control de contenido se referencia 'genéricamente' (como toda norma infra-constitucional) con el grado de congruencia de las disposiciones del tratado y el texto constitucional in totum, y 'específicamente' con la cláusula del art. 27 de la Constitución, aquella que obliga al Gobierno Federal "a afianzar sus relaciones de paz y comercio con las potencias extranjeras por medio de tratados que estén en conformidad con los principios de derecho público establecidos en esta Constitución".

¿Cuáles son los principios de derecho público a los que remite el art. 27 de la Constitución?. En nuestro criterio, la cláusula reenvía -aun desde una perspectiva minimalista- a los siguientes principios:

\* La forma representativa, republicana y federal de gobierno (art. 1 y conc., Constitución Nacional);

\* El principio de juridicidad y el de reserva (art. 19, Constitución Nacional);

\* El principio de igualdad (arts. 15, 16, 75 inc. 23 y conc., Constitución Nacional);

\* El carácter no absoluto de los derechos y la pauta de razonabilidad para su reglamentación (arts. 14, 28, 99 inc. 2 y conc., Constitución Nacional); y,

\* El debido proceso legal (art. 18 y conc., Constitución Nacional)

Joaquín V. González afirma que el art. 27 de la Constitución Argentina constituye una limitación a los poderes del Congreso, "de manera que en ningún caso puede comprometer, en forma alguna de arbitraje, el honor, la soberanía y los intereses esenciales de la Nación"; y agrega: "por consiguiente, el Congreso Argentino no puede autorizar un pacto compromisorio con otra Nación para someter a arbitraje puntos que afecten cualquiera de los principios fundamentales de la Constitución"[8].

Debe recordarse, a mayor abundamiento, que esta cláusula no sufrió mengua alguna luego de la reforma constitucional de 1994, desde el momento en que la ley de convocatoria dejó muy clara la inmutabilidad de la `parte dogmática' de nuestro texto fundamental (ley 24.309, art. 7 -Adla, LIV-A, 89-) y desde que la propia cláusula que jerarquizó los tratados internacionales ratificó que no derogaba artículo alguno de la primera parte de la Constitución (el párrafo aclaratorio alude a los convenios sobre derechos humanos, aunque consideramos que el razonamiento debe extenderse a los tratados sobre inversiones debido a su menor jerarquía normativa) [9].

b. La jurisdicción (art. 116, Constitución Nacional)

Desde el punto de vista jurisdiccional, el art. 116 de la Constitución Argentina establece la competencia de los tribunales federales para dirimir diferendos relacionados con las materias susceptibles de ser reguladas por los tratados de marras. La reforma constitucional de 1994 previó la delegación de la jurisdicción nacional a organizaciones supraestatales de modo explícito (en el inc. 24 del art. 75, dedicado a los tratados de integración) y de modo indirecto (en el inc. 22, segundo párrafo, del mismo artículo, dedicado a los tratados sobre derechos humanos, en la medida en que los convenios que cita prevean tal delegación); los constituyentes no previeron la delegación de jurisdicción en la hipótesis de los tratados del primer párrafo del inc. 22 del art. 75 de la Constitución.

La doctrina constitucional nacional no discute que los tratados del primer párrafo del inc. 22 del art. 75 deben estar sujetos a control constitucional en sede judicial local [10]. Ésta es la opinión de Bidart Campos [11], Ekmekdjian [12], Gelli [13], Quiroga Lavié [14] y Castorini de Tarquini [15].

**III. Los casos tradicionales de admisión de jurisdicción foránea y el control local de constitucionalidad**

La jurisdicción foránea ha sido aceptada por la República Argentina en casos ajenos a los TBIs; se trata de las hipótesis de la intervención de tribunales internacionales en materia de violación de derechos humanos y de tribunales extranjeros en caso de actividad estatal juri gestionis de naturaleza comercial.

Como se demostrará seguidamente, en ambos casos -a diferencia de las hipótesis de TBI + CIADI la Argentina no ha resignado la posibilidad de controlar en algún momento la constitucionalidad de la cuestión debatida.

A. Admisión de jurisdicción internacional con posibilidad de control previo de constitucionalidad

La Convención Americana sobre Derechos Humanos (en adelante 'la Convención') llamada 'Pacto de San José de Costa Rica', incorporada expresamente a la Constitución Nacional Argentina a partir de la reforma de 1994 con jerarquía constitucional, prevé la intervención de la Corte Interamericana de Derechos Humanos (en adelante 'La Corte'), órgano con competencia jurisdiccional para entender 'en cualquier caso relativo a la interpretación y aplicación de la Convención' (art. 62, 3) y -más específicamente- 'en caso de violación de un derecho o libertad protegidos' en la misma (art. 63, 2).

La intervención de la Corte sólo puede activarse una vez agotada la previa intervención de la Comisión Interamericana de Derechos Humanos (en adelante 'la Comisión') (art. 61, 2), órgano consultivo previsto por la Convención de marras; a su vez, para que la Comisión actúe es necesario -entre otros requisitos- "que se hayan interpuesto y agotado los recursos de jurisdicción interna, conforme a los principios del Derecho Internacional generalmente reconocidos" (art. 46, 1, a)). La Comisión declarará inadmisible toda petición o comunicación en la que este requisito no luzca acreditado (art. 47, a).

El principio del previo agotamiento de la jurisdicción nacional sólo se excepciona cuando "no exista en la legislación interna del Estado de que se trata el debido proceso legal para la protección del derecho o derechos que se alega han sido violados" (art. 46, 2, a)), "no se haya permitido al presunto lesionado en sus derechos el acceso a los recursos de la jurisdicción interna, o haya sido impedido de agotarlos" (art. 46, 2, b)) o "haya retardo injustificado en la decisión sobre los mencionados recursos" (art. 46, 2, c)) (16).

La conclusión que interesa a este trabajo es que la apertura de jurisdicción admitida por la República Argentina en el marco de la Convención Americana sobre Derechos Humanos no inhibe la posibilidad del control previo de constitucionalidad por parte de los tribunales nacionales.

B. Admisión de jurisdicción extranjera con posibilidad de control posterior de constitucionalidad

Cierta actividad comercial del Estado Argentino, destinada a surtir efectos en el exterior (vgr: refinanciación de deudas con Bancos extranjeros, compra de ciertos bienes registrables en el exterior, colocación de títulos de la deuda pública externa fuera del país, etc.) incorpora asiduamente la prórroga de jurisdicción hacia tribunales extranjeros.

En tales hipótesis, la prórroga de jurisdicción es convalidada en la medida en que: a) los actos que la originan expresen la actuación juri gestionis y no juri imperii del Estado, concretándose en relaciones jurídicas típicas del Derecho Internacional Privado; y b) las sentencias dictadas en el extranjero como consecuencia de un conflicto originado por actos estatales juri gestionis requieran, para su aplicación en la Argentina, del exequátur.

a. Actos juri imperii y juri gestionis

La doctrina administrativista distinguió, desde antaño, dentro de la multiplicidad de los actos estatales, a aquellos actos que el Estado realiza como persona pública de aquellos que realiza como persona privada (17); más modernamente, se discierne entre aquellos actos que el Estado decide de modo unilateral y a veces discrecional -aunque siempre en el marco del Estado de Derecho- en mira a intereses supremos y en situación de privilegio o supremacía con relación a los particulares (vgr: crear impuestos, instituir penas y aplicarlas, ejercer el poder de policía, etc.), de aquellos otros actos en los que el Estado actúa dentro de la esfera de los derechos patrimoniales, en relación de paridad con los particulares (vgr: actos comerciales en general). A los primeros se los denomina actos iuri imperii y a los segundos actos juri gestionis (18). La prórroga de jurisdicción encuentra cabida en el marco de los actos estatales juri gestionis, estando prevista expresamente por la legislación argentina en el art. 1° del Cód. Procesal Civil y Comercial de la Nación (en adelante CPCyCN) (19).

b. El exequátur

A su turno, la sentencia dictada en el extranjero en materia de controversias vinculadas a los actos estatales juri gestionis requiere, para su ejecución en la Argentina, del exequátur.

El exequátur o 'autorización para la ejecución' es lo que separa a una sentencia ejecutoria dictada en el extranjero de otra que aspira a serlo; por ello se ha afirmado que el sentido de esta institución es el de 'convertir la sentencia extranjera en título ejecutorio argentino' a través de 'un proceso de conocimiento o de re-conocimiento' (20). No se trata de reexaminar la relación jurídica juzgada en el extranjero, se trata de establecer en sede judicial local y en un proceso contradictorio si la sentencia cumple con determinados requisitos. Uno de los requisitos que deben concurrir para que opere la conversión de la sentencia extranjera en título ejecutorio dentro del país es que "no afecte los principios de orden público del derecho argentino", standard que permite conectar a la decisión judicial foránea con el art. 27 de la Constitución Nacional (21).

La conclusión que interesa a este trabajo es que la prórroga de jurisdicción admitida por la República Argentina en el marco de los actos estatales juri gestionis no inhibe la posibilidad del control a posteriori de constitucionalidad por parte de un tribunal nacional.

**IV. La incidencia de cierta conjunción TBI + CIADI en materia de control de constitucionalidad**

De acuerdo a lo dicho precedentemente, la lógica de la apertura o de la prórroga de la jurisdicción nacional hacia tribunales internacionales o extranjeros estuvo tradicionalmente ligada en la Argentina a la posibilidad de ejercer -antes o después, pero en cualquier caso en algún momento- el control judicial por parte de un (o varios)

tribunal(es) nacional(es). Esta potestad de control local no violenta principio alguno del derecho internacional; al contrario, siguiendo por caso los ejemplos citados ut-supra, el sistema americano de protección de los derechos humanos y la institución del exequátur gozan de indiscutido reconocimiento en el derecho internacional.

No obstante, la conjunción del sistema TBI + CIADI (en realidad debería decirse cierta conjunción o también cierta interpretación del sistema TBI + CIADI) no permite cumplir con el citado control. A ello contribuye la peculiar interpretación que se le asigna a la reunión de ciertos elementos típicamente privados (básicamente la inversión y las relaciones que de ella se derivan) con otros elementos típicamente públicos (los tratados bilaterales celebrados entre naciones soberanas y el sistema de juzgamiento de controversias que procede de una convención internacional).

Iniciemos la travesía intelectual partiendo de la inversión extranjera. En tanto ligada al derecho privado, a las relaciones vinculadas con la inversión extranjera se le aplican los principios de la 'autonomía de la voluntad' y la 'prórroga de jurisdicción'. El correlato de esta encuadramiento, en el marco del derecho internacional privado, sería requerir -previo a la ejecución de una sentencia dictada en el exterior- el exequátur. ¿Por qué no se les requiere el exequátur a las sentencias emergentes de disputas en materia de inversión dentro del sistema TBI + CIADI? Probablemente porque no se consideren 'sentencias extranjeras' sino 'sentencias internacionales', en tanto dictadas dentro de un marco de arbitraje al que se arriba en función de una convención internacional activada por un tratado bilateral entre Estados soberanos a los que se les aplica el principio pacta sunt servanda.

Llegamos al derecho internacional público partiendo del derecho internacional privado. Correcto, entonces, si estamos en el derecho internacional público ¿por qué no se agota la jurisdicción local antes de habilitar la jurisdicción internacional, tal como ocurre con las controversias que se dirimen en el sistema americano de derechos humanos, en las que se ponen en juego valores tales como la vida, la integridad física, la dignidad y las libertades básicas de las personas? Probablemente se responda que el agotamiento de la vía local puede ser dispensado en el marco de relaciones comerciales y patrimoniales como las derivadas de una inversión extranjera, con lo cual 'regresamos' al derecho internacional privado. Este regreso nos llevaría -a su vez- a retornar al texto a partir del párrafo anterior (el que comienza con "Iniciemos la travesía intelectual..."); pronto nos veríamos arribando hasta este mismo punto... y luego estaríamos obligados a repetir una y mil veces este circunloquio, que requiere -como condición de su coherencia- no salirse de la órbita de las normas positivas que lo han hecho posible.

En suma, los argumentos del no control local sólo se tornan consistentes en un contexto autorreferente y en tensión con principios tradicionales del derecho internacional público y privado. Un derecho internacional público que ignora al derecho público nacional; un derecho internacional privado que ignora al exequátur; se trata -en realidad- de una curiosa conjunción cuyo parentesco se afirma en el retaceo del control jurisdiccional local.

### V. Conclusiones

* La reforma constitucional de 1994 significó un importante avance en la apertura del sistema jurídico argentino hacia el sistema jurídico internacional. Tal vinculación no eliminó las fronteras del bloque normativo local ni subvirtió la jerarquía jurídica establecida en la Constitución Argentina.

* La vocación aperturista del sistema jurídico argentino hacia el sistema jurídico internacional se encaminó a privilegiar claramente la jerarquización de los derechos humanos stricto sensu (desde los contenidos) y la participación nacional en distintas variantes de integración (desde lo organizativo).

* Los tratados de comercio lato sensu celebrados por la República Argentina con Estados extranjeros fueron jerarquizados a partir de la reforma constitucional de 1994, ubicándose por arriba de la ley común y por debajo de la Constitución, aplicándose a ellos lo prescripto por el art. 27 de la Constitución Nacional.

* Si en virtud de la aplicación de un tratado internacional como la Convención de Viena sobre Derecho de los Tratados de 1969 (aprobada por nuestro país mediante ley 19.865 -Adla, XXXII-D, 6412-), que sirve de fuente interpretativa a otros tratados también vigentes (en nuestro caso los TBIs), teniendo ellos jerarquía supra-legal e infra-constitucional, pudiera evitarse el control de constitucionalidad local, quedaría consagrada la posibilidad de modificar la Constitución Nacional por medio de leyes (las que aprueban los tratados), violentándose el procedimiento de reforma constitucional previsto en el art. 30 y, a la vez, quedaría subvertida la pirámide jurídica nacional desde el momento en que el tratado supra-legal pero infra-constitucional prevalecería sobre la Constitución, violentándose el orden jerárquico establecido en el art. 31 de la Constitución Nacional con la aclaración del art. 75 inc. 22 (22).

* Como consecuencia de lo anterior, no es aceptable presumir que la República Argentina pueda ceder de modo anticipado (por medio de una ley que aprueba un TBI) y definitivamente (por medio de otra ley que aprueba un mecanismo de arbitraje internacional) su potestad de efectuar el control judicial de constitucionalidad en sus tribunales de los tratados de comercio ni de los conflictos que suscite su aplicación.

* El sistema de arbitraje al estilo CIADI, que se dispara a partir de determinados presupuestos contemplados en los TBIs y cuyas consecuencias ya no pueden ser analizadas por los tribunales nacionales, constituye un

mecanismo hermético (una vez que se ingresa en él ya no es posible salir de él) y autorreferencial (se trata de un dispositivo que se interpreta a sí mismo) que resulta incompatible con el sistema jurídico argentino, en la medida en que impide un control de contenido entre el texto, la interpretación y la aplicación del tratado con normas de jerarquía superior vigentes en el país e inhibe la intervención de los tribunales nacionales como no sea para ejecutar el laudo resuelto en extraña jurisdicción.

* La imposibilidad de control judicial local de inconstitucionalidad no es para la República Argentina una cuestión procesal sino sustancial, en la medida en que traduce una inhibitoria para ponderar la vigencia de los siguientes principios de derecho público argentino a cuya observancia condiciona la Constitución Nacional la validez de los tratados internacionales de comercio: la forma representativa, republicana y federal de gobierno (art. 1 y conc., Constitución Nacional), el principio de juridicidad y el de reserva (art. 19, Constitución Nacional), el principio de igualdad (arts. 15, 16, 75 inc. 23 y conc., Constitución Nacional), el carácter no absoluto de los derechos y la pauta de razonabilidad para su reglamentación (arts. 14, 28, 99 inc. 2 y conc. , Constitución Nacional) y el debido proceso legal (art. 18 y conc., Constitución Nacional).

* Prima facie los principios de derecho público argentino citados precedentemente pueden encontrar fuente de vulneración en la conjunción TBIs + CIADI en los siguientes supuestos: la forma representativa de gobierno en la medida en que se inhibe o acota la actividad de los poderes nacionales constituidos (el Poder Legislativo en la hipótesis de prohibición de modificar las condiciones legales iniciales de la inversión por imperio de la llamada 'cláusula de estabilización legal' (23) y el Poder Judicial en la hipótesis de imposibilidad de actuar en materia de control de constitucionalidad); la forma republicana de gobierno, en la medida en que confiscadas o retaceadas las atribuciones de los Poderes Legislativo y Judicial nacionales, se genera un des-balance hacia el Poder Ejecutivo (que es quien designa a los árbitros, encargados -en gran medida- de reemplazar a los citados poderes constituidos nacionales), desdibujándose en consecuencia el criterio de 'división de poderes' que es consustancial a la forma republicana de gobierno; el principio de juridicidad y de reserva, en la medida en que la sobrestimación del valor jurídico de los tratados de comercio introduce una modificación en la jerarquía normativa argentina prevista por el art. 31 de la Constitución Nacional por métodos diferentes a los previstos por la propia Constitución en el art. 30; el principio de igualdad, en la medida en que -bajo determinadas circunstancias y por aplicación conjunta o separada de las cláusulas de 'Nación más favorecida' y/o de 'estabilización legal' (24)- se prohíje una situación de discriminación en favor de personas jurídicas extranjeras (25) el carácter no absoluto de los derechos, en la medida en que opere la inhibitoria de modificación legislativa para ciertos derechos vinculados con el status original de la inversión por aplicación de la citada cláusula de 'estabilización legal', y el debido proceso legal, en la medida en que se impida, frustre o interrumpa el acceso a la jurisdicción nacional, se vulnere el criterio del juez natural o se retaceen vías recursivas locales idóneas.

* La incipiente jurisprudencia CIADI en relación a la interpretación de los TBIs tiende a generar una brecha cada vez más amplia entre las ópticas nacional e internacional en materia de controversias sobre inversiones y amenaza con derrumbar el ámbito de confianza pacientemente reconstruido entre países como la Argentina (seguramente hay otros) con el sistema jurídico internacional.

En el citado caso "Mafezzini, Ricardo c. Reino de España", en virtud de una peculiar aplicación del principio de laNación más favorecida, y como si lo que estuviera en juego fuese una cuestión de naturaleza meramente procesal, se ha multilateralizado la imposibilidad de ejercer un control judicial local sobre la relación de inversión extranjera. A partir de este precedente la cláusula debería llamarse del inversor más favorecido.

Y, más grave aun, a partir del laudo sobre aceptación de jurisdicción en "CMS Gas Transmission Company vs. República Argentina" se ha abierto la puerta (en realidad se trata de una tranquera) para que cualquier accionista minoritario pueda accionar contra un Estado soberano en función de una inversión sobre la que no tiene un control efectivo. Se trata de un caso que, so pretexto de resolver una cuestión procesal, ha implicado un profundo daño -aun no debidamente cuantificado- a un país soberano, en términos de multiplicación de la litigiosidad, de fomento del 'abuso del proceso' arbitral, de temeridad jurisdiccional internacional y de potencial dis-rupción de los procesos de renegociación contractual en ciernes. Este precedente revela hasta qué punto el sistema de arbitraje gira sobre sí mismo, sobre sus propios intereses, desentendiéndose de las consecuencias económicas, institucionales y sociales que genera.

* Si el arbitraje internacional en temas comerciales no se asume como un sistema, vinculándose -por un lado- con otros arbitrajes comerciales planteados contra el mismo Estado soberano y -por otro lado y 'de alguna manera'- con el orden normativo nacional, la consecuencia está a la vista: el éxito del primer inversor será inversamente proporcional al éxito de los demás, pues 'no alcanzará para todos'. Esto originará -entre otras consecuencias disvaliosas- la distorsión de uno de los objetivos básicos invocados en la celebración de los TBIs, como es el de lograr un 'marco jurídico estable' y 'mayores niveles de 'seguridad jurídica' (26) para las inversiones extranjeras.

* Remontar la escalada de creciente desconfianza supone asumir recíprocamente los errores (y los abusos) cometidos en el pasado, morigerar la mentalidad solamente comercialista con la que se suelen enfocar ciertas cuestiones (prescindiendo del contexto socioeconómico global), revisar el perfil de los árbitros, su

representatividad y su responsabilidad y -fundamentalmente- no abandonar el sentido común, que es fuente hermenéutica de la buena fe jurídica (27). A título de ejemplo: ¿expresa la realidad de las cosas una cláusula que estipula la duración de un proceso controversial en los tribunales argentinos (y de cuantos países más!), desde su planteamiento inicial hasta la obtención de una sentencia definitiva en dieciocho (18) meses? (28)

* Un nuevo default (esta vez jurisdiccional) de países receptores de inversiones puede significar un duro revés no sólo para los inversionistas y para el desarrollo sustentable y armónico de las naciones afectadas sino para el sistema jurídico internacional que, en la medida en que refleja posiciones decantadas y sensatas -antes que el triunfo a sangre y fuego de una posición dominante- permite expresar el avance de una conciencia universal que, más allá de sus heterogeneidades, está dispuesta a reconocer valores supranacionales.

Especial para La Ley. Derechos reservados (ley 11.723)

(1) Una descripción de las ventajas de los TBIs en: YMAZ VIDELA, Esteban M., "Protección de inversiones extranjeras. Tratados bilaterales. Sus efectos en las contrataciones administrativas", Ed. La Ley, Buenos Aires, 1999; TAWIL, Guido Santiago, "Los tratados de protección y promoción recíproca de inversiones. La responsabilidad del Estado y el arbitraje internacional", LA LEY, 2000-D, 1106 y LISDERO Alfredo R. y HELBERT, Darío J., "La protección de la Inversiones extranjeras en la Argentina. Los Tratados de Protección Recíproca de Inversiones y su interpretación jurisprudencial", ED, 13 de junio de 2002.

(2) A tal efecto, la República Argentina aprobó mediante ley 24.353 (B.O. 02/09/94) el Convenio sobre arreglo de diferencias relativas a inversiones entre Estados y nacionales de otros Estados (celebrado en Washington el 18 de marzo de 1965), por el cual se crea el Centro Internacional de Arreglo de Diferencias relativas a Inversiones (en adelante CIADI) y se aprueban mecanismos de solución de controversias basadas en la conciliación y en el arbitraje.

(3) Acuerdos de Promoción y Protección recíproca de Inversiones firmados por la República Argentina (se indica país co-contratante, fecha de la firma del convenio, número de ley aprobatoria y fecha de entrada en vigencia del TBI):

República Argelina Democrática Popular: Fecha de firma: 04/10/2000; ley aprobatoria: 25.538/02; Vigencia: No informada.

República de la India: Fecha de firma: 20/08/99; ley aprobatoria: 25.540/2002; Vigencia: No informada.

República de Nueva Zelandia: Fecha de firma: 27/08/99; ley aprobatoria: 25.539/2002; Vigencia: No informada.

Tailandia: Fecha de firma 18/02/2000; ley aprobatoria: 25.532/02; Vigencia: No informada.

Filipinas: Fecha de firma 20/09/99; ley aprobatoria: 25.481/01; Vigencia: No informada.

Guatemala: Fecha de firma: 21/04/98; ley aprobatoria: 25.350/00; Vigencia: No informada.

República de Sudáfrica: Fecha de firma: 23/07/98; ley aprobatoria: 25.352/00; Vigencia: No informada.

Nicaragua: Fecha de firma: 10/08/98; ley aprobatoria: 25.351/00; Vigencia: No informada.

Federación Rusa: Fecha de firma: 25/06/98; ley aprobatoria: 25.353/00; Vigencia. No informada.

Costa Rica: Fecha de firma: 21/05/97; ley aprobatoria: 25.139/99; Vigencia: No informada.

El Salvador: Fecha de firma: 09/05/96; ley aprobatoria: 25.023/98; Vigencia: 08/01/99.

República Checa: Fecha de firma: 27/09/96; ley aprobatoria: 24.983/98; Vigencia: 23/07/98

Lituania: Fecha de firma: 14/03/96; ley aprobatoria: 24.984/98; Vigencia: 01/09/98

Panamá: Fecha de firma: 10/05/96; ley aprobatoria: 24.971 /98: Vigencia: 22/06/98

México: Fecha de firma: 13/11/96; ley aprobatoria: 24.792/98; Vigencia: 22/06/98

Marruecos: Fecha de firma: 13/06/96; ley aprobatoria 24.890/97; Vigencia: No está en vigor.

Indonesia: Fecha de firma: 07/11/95; ley aprobatoria: 24.814/97; Vigencia: No esta en vigor.

Cuba: Fecha de firma: 30/11/95; ley aprobatoria: 24.770/97; Vigencia: 0l/06/97.

Vietnam.: Fecha de firma: 03/06/96; ley aprobatoria: 24.778/97; Vigencia: 01/06/97

Israel: Fecha de firma: 23/07/95; ley aprobatoria: 24.771/97; Vigencia: 10/04/97

Australia: Fecha de firma: 23/08/95; ley aprobatoria: 24.728/96; Vigencia: 11/01/97

República de Corea: Fecha de firma: 17/05/94; ley aprobatoria: 24.682/96; Vigencia: 24/09/96

Ucrania: Fecha de firma: 09/08/95; ley aprobatoria: 24.681/96; Vigencia: 06/05/97

Perú: Fecha de firma: 10/11/94; ley aprobatoria: 24.680/96; Vigencia: 24/I0/96

Malasia: Fecha de firma: 06/09/94; ley aprobatoria: 24.613/96; Vigencia: 20/03/96

Finlandia: Fecha de firma: 05/1l/93; ley aprobatoria: 24.614/96; Vigencia: 03/05/96

Portugal: Fecha de firma: 06/10/94; ley aprobatoria: 24.593/95; vigencia: 03/05/96

Croacia: Fecha de firma: 02/12/94; ley aprobatoria: 24.563/95: Vigencia: 01/06/96

Jamaica: Fecha de firma: 08/02/94; ley aprobatoria: 24.549/95; vigencia: 01/12/95

Venezuela: Fecha de firma: 16/11/93; ley aprobatoria: 24.457/95: Vigencia: 01/07/95

Ecuador: Fecha de firma: 18/02/94: ley aprobatoria: 24.459/95; Vigencia: 01/12/95

Rumania: Fecha de firma: 29/07/93; ley aprobatoria: 24.456/95; Vigencia: 0l/05/95

Bolivia: Fecha de firma: 17/03/94; ley aprobatoria: 24.458/95; Vigencia: 01/05/95

Senegal: Fecha de firma: 06/04/93; ley aprobatoria: 24.396/94; Vigencia: No está en vigor.

Bulgaria: Fecha de firma: 21/09/93; ley aprobatoria: 24.401/94; Vigencia: 11/03/97

Armenia: Fecha de firma: 06/04/93; ley aprobatoria: 24.395/94; Vigencia: 20/I2/94

Túnez: Fecha de firma: 17/06/92; ley aprobatoria: 24.394/94; Vigencia: 23/01/95

Dinamarca: Fecha de firma: 06/11/92; ley aprobatoria: 24.397/94; Vigencia: 02/02/95

Turquía: Fecha de firma: 08/05/92; ley aprobatoria: 24.340/94; Vigencia: Ol/05/95

Hungría: Fecha de firma: 05/02/93; ley aprobatoria: 24.335/94; Vigencia: 01/10/97

República Popular China: Fecha de firma: 05/11/92; ley aprobatoria: 24.324/94; Vigencia: 01/08/94

República de Austria: Fecha de firma: 07/08/92; ley aprobatoria: 24.238/94; Vigencia: 01/01/95

Egipto: Fecha de firma: 11/ 05/92; ley aprobatoria: 24.248/93; Vigencia: 03/I2/93

Países Bajos: Fecha de firma: 20/10/92; ley aprobatoria: 24.352/94: Vigencia: 01/10/94

Gran Bretaña e Irlanda del Norte: Fecha de firma: 1I/12/90; ley aprobatoria: 24.184/92; Vigencia: 19/02/93

Bélgica y Luxemburgo: Fecha de firma: 28/06/90; ley aprobatoria 24.123/ 92; Vigencia: 20/05/94

Canadá: Fecha de firma: 05/11/91; ley aprobatoria: 24.125/92; Vigencia: 29/04/93.

EE.UU: Fecha de firma: 14/11/91; ley, aprobatoria: 24.124/92; Vigencia: 20/10/94.

Acuerdo por Canje de Nota modificatoria del Tratado (AC/P/CJE N:) Vigencia: 31/03/92. Acuerdo por Canje de Nota modificatoria del Tratado: Fecha de firma: 06/11/92; ley aprobatoria: 24.356/94; Vigencia: 20/10/94.

Italia: Fecha de firma: 22/05/90; ley aprobatoria: 24.122/92; Vigencia: 14/10/93

Suecia: Fecha de firma: 22/11/91; ley aprobatoria: 24.117/92; Vigencia : 28/09/92

España: Fecha de firma: 03/10/91; ley aprobatoria: 24.118/92; Vigencia 28/09/92

Francia: Fecha de firma: 03/07/91; ley aprobatoria: 24.100/92; Vigencia: 03/03/93

Alemania: Fecha de firma: 09/04/91; ley aprobatoria: 24.098/92; Vigencia: 08/11/93

Suiza: Fecha de firma: 12/04/91; ley aprobatoria: 24.099/92; Vigencia: 06/11/92

Polonia: Fecha de firma: 31/07/91; ley aprobatoria: ley 24.101/92; Vigencia: 0l/09/92

Chile: Fecha de firma: 02/08/91; ley aprobatoria: 24.342/93; Vigencia: 01/01/95

(4) La cláusula de la Nación más favorecida en el contexto de la no utilización de los remedios jurisdiccionales locales ha sido aplicada en CIADI, caso "Maffezini, Ricardo Agustín vs. Reino de España", N°ARB/97/7, fallado el 13 de noviembre de 2000.

Sobre esto: TAWIL, Guido Santiago, "Los conflictos en materia de inversión, la jurisdicción del CIADI y el derecho aplicable: a propósito de las recientes decisiones en los casos Vivendi, Wena y Maffezini", en Revista Argentina del Régimen de la Administración Pública, Buenos Aires, octubre de 2002, año XXV, N° 289, p. 241 y siguientes.

(5) En uso de esa atribución le ha otorgado legitimación activa no ya a una Sociedad inversora extranjera sino también a un accionista minoritario de dicha sociedad.

CIADI, caso "Lanco Internacional Inc vs. República Argentina" N° ARB/97/6, fallado 8 de diciembre de 1998 y luego CIADI, caso "CMS Gas Transmission Company vs. República Argentina", N° ARB/01/8, fallado el 17 de, julio de 2003 (decisión del tribunal arbitral sobre excepción de jurisdicción).

(6) El laudo, ubicado temporalmente al final de la travesía del arbitraje, completa el mecanismo de sustitución (ahora desde una perspectiva 'retroactiva') de la regla del agotamiento de los recursos internos, previamente menguada o desconocida por el propio texto de los TBIs. Ello así no sólo por la equiparación del laudo a una sentencia de un tribunal interno "sino también porque la calificación de 'firme' aplicada a esa sentencia refleja que mediante el arbitraje del CIADI y el recurso de anulación, se entiende que dichos recursos han sido agotados. De este modo la limitación de soberanía que representa la renuncia al control del exequátur se presenta como un corolario de la limitación de la soberanía que supone la renuncia a la jurisdicción de los tribunales internos en las controversias sometidas al CIADI". VIVES CHILLIDA, Julio A., "El Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (CIADI)", Ed. McGrawHill, Madrid, 1998, p. 235.

(7) La posibilidad de que las provincias argentinas, a partir del art. 124 de la Constitución Nacional, puedan celebrar tratados internacionales de promoción y protección de inversiones se desarrolla en: NIELSEN, Federico, "Las provincias ante los Tratados de Promoción y Protección Recíproca de Inversiones y sus consecuencias", ED, Buenos Aires, 31 de diciembre de 2002, p. 1 y siguientes.

(8) GONZÁLEZ, Joaquín V., "Obras Completas", Ed. Universidad Nacional de La Plata, Buenos Aires, 1935, vol. XI, p. 210 y sigte.

(9) La vigencia inalterada del art. 27 de la Constitución Nacional Argentina y su supremacía respecto de los tratados encuadrados en el primer párrafo del inciso 22 del art. 75 de la Constitución Nacional es sostenida por: BIDART CAMPOS, Germán J., "Manual de la Constitución reformada", t. I, p. 372, Ed. Ediar, Buenos Aires, 1998, GELLI, María Angélica, "Constitución de la Nación Argentina. Comentada y concordada", p. 244, 591 y sigtes., Ed. La Ley, Buenos Aires, 2003; SAGÜÉS, Néstor P., "Elementos de Derecho Constitucional", t. II, p. 62 y sigtes., Ed. Astrea, Buenos Aires, 2001, y VANOSSI. Jorge Reinaldo y DALLA VÍA, Alberto Ricardo, "Régimen constitucional de los tratados", p. 294 y sigte., Ed. Abeledo-Perrot. Buenos Aires, 2000.

(10) La República Argentina ha sido tradicionalmente abanderada de la posición que defiende su jurisdicción nacional como escenario idóneo para dirimir las disputas que involucran a un inversor extranjero. Este principio, de larga vigencia en el Derecho Internacional Público, es conocido como doctrina Calvo, en homenaje al diplomático y tratadista argentino que sobre finales del siglo XIX repudió -en base al principio de igualdad de los Estados- la injerencia de legislación y/o tribunales extraños a los nacionales para resolver los conflictos jurídicos que involucraran a un inversor extranjero.

(11) BIDART CAMPOS sostiene que toda norma legal que inhiba el control de constitucionalidad es inconstitucional. BIDART CAMPOS, Germán J., op. cit., 1997, t. III, p. 435.

Para este autor es factible la desaplicación de un tratado de rango infraconstitucional en razón de su inconstitucionalidad declarada por un tribunal nacional, pero ello no exime a nuestro país de 'responsabilidad internacional'.

BIDART CAMPOS, G., op. cit., t. II, p. 418.

(12) EKMEKDJIAN, Miguel A., "Tratado de Derecho Constitucional", t. II, p. 769 y sigtes., Ed. Depalma, Buenos Aires. 1994.

(13) GELLI, María Angélica, op. cit., p. 808 y siguiente.

(14) QUIROGA LAVIE, Humberto, BENEDETTI, Miguel Angel y CENICACELAYA, María de las Nieves, "Derecho Constitucional Argentino", t. I, p. 541, Ed. Rubinzal-Culzoni, Buenos Aires, 2001.

Para estos autores la declaración de inconstitucionalidad de un tratado de los previstos en el art. 75 inc. 22 párr. 1°, no afecta el principio del 'pacta sunt servanda'.

(15) Para esta autora la declaración de inconstitucionalidad de un tratado de los previstos en el art. 75 inc. 22, párrafo 1°, de la Constitución Argentina "sólo tendrá efectos internos y no podrá oponerse internacionalmente", CASTORINA de TARQUINI, María Celia, "Supremacía de la Constitución", en Instituto Argentino de Estudios Constitucionales y Políticos, "Derecho Constitucional de la reforma de 1994", t. I, p. 161, Ed. Depalma, Mendoza, 1995.

(16) En el caso "Cantos" la Corte Interamericana de Derechos Humanos estimó, luego de ponderar factores tales como la complejidad del caso, la actividad procesal del interesado y la conducta de las autoridades competentes, que un 'tiempo neto' de proceso de cinco (5) años en la Corte Suprema de Justicia de la Nación no resultaba 'irrazonable' y, por tanto, no violentaba el derecho al debido proceso del actor. El 'tiempo bruto' del proceso en el máximo tribunal judicial de la Nación Argentina sumó diez (10) años.

Corte Interamericana de Derechos Humanos, caso "Cantos, José María", fallado el 28 de noviembre de 2002 (La Ley, 2003-C, 2).

(17) BIELSA, Rafael, "Derecho Administrativo", p. 9, Ed. Depalma, Buenos Aires, 1955.

(18) Sobre este tema: GUALDE, Andrea, "La actividad comercial del Estado como excepción a la procedencia de la inmunidad soberana", ED, suplemento de Derecho Constitucional, Buenos Aires, 26 de junio de 2000, p. 16 y siguientes.

La diferencia entre los actos estatales "juri imperii" y "juri gestionis" y su incidencia en la inmunidad de jurisdicción fue reconocida por la Corte Suprema de Justicia en "Vallarino, Edelmiro c. Emabajada del Japón", 4 de mayo de 2000 y en "Coronel, Oscar Antonio y otro c. estado Nacional s/accidente", 9 de noviembre de 2000.

(19) Código Procesal Civil y Comercial de la Nación (en adelante CPCyCN), art. 1°:

"La competencia atribuida a los tribunales nacionales es improrrogable.

Sin perjuicio en lo dispuesto por los tratados internacionales y por el art. 12 inciso 4° de la ley 48, exceptúase la competencia territorial en asuntos exclusivamente patrimoniales, que podrá ser prorrogada de conformidad de partes. Si estos asuntos son de índole internacional, la prórroga podrá admitirse aun a favor de jueces extranjeros o de árbitros que actúen fuera de la República, salvo en los casos en que tribunales argentinos tienen jurisdicción exclusiva o cuando la prórroga está prohibida por ley".

El art. 12 inc. 4 de la ley nacional 48 excluye la jurisdicción de los tribunales nacionales y la considera prorrogada a los juzgados de provincia en los pleitos civiles en que "un extranjero demande a una provincia, o a un ciudadano, o bien el vecino de una provincia demande al vecino de otra o ante un juez o tribunal de provincia, o cuando siendo demandados el extranjero o el vecino de otra provincia, contesten a la demanda sin oponer la excepción de declinatoria". En tales supuestos la causa sólo podrá suscitar la jurisdicción nacional por la interposición del recurso extraordinario previsto por el art. 14 de la citada ley nacional 48.

(20) FENOCHIETTO, Carlos Eduardo, "Código Procesal Civil y Comercial de la Nación", t. 2, p. 790 y sigtes., Ed. Astrea, Buenos Aires, 1999.

(21) CPCyCN, art. 517: "Las sentencias de tribunales extranjeros tendrán fuerza ejecutoria en los términos de los tratados celebrados con el país de que provengan.

Cuando no hubiese tratados, serán ejecutables si concurriesen los siguientes requisitos:

1°) Que la sentencia, con autoridad de cosa juzgada en el Estado en que se ha pronunciado, emane de tribunal competente según las normas argentinas de jurisdicción internacional y sea consecuencia del ejercicio de una acción personal o de una acción real sobre un bien mueble, si éste ha sido trasladado a la República durante o después del juicio tramitado en el extranjero.

2°) Que la parte demandada contra la que se pretende ejecutar la sentencia hubiese sido personalmente citada y se haya garantizado su defensa.

3°) Que la sentencia reúnalos requisitos necesarios para ser considerada como tal en el lugar en que hubiere sido dictada y las condiciones de autenticidad exigidas por la ley nacional.

4°) Que la sentencia no afecte los principios de orden público del derecho argentino.

5°) Que la sentencia no sea incompatible con otra pronunciada, con anterioridad o simultáneamente, por un tribunal argentino".

(22) MONCAYO, Guillermo, VINUESA, Raúl y GUTIÉRREZ POSSE, Hortensia, "Derecho Internacional Público", t. I, p. 60, Ed. Zavalía, Buenos Aires, 1987.

(23) La 'cláusula de estabilización legal' fue introducida en el derecho argentino a partir de la entrada en vigencia del TBI con la República de Panamá mediante ley 24.971 (B.O.: 25/06/98 -Adla, LVIII-C, 2852-). El texto de la cláusula sub-exámine es el siguiente: "Ninguna de las Partes Contratantes tomará directa o indirectamente medidas de expropiación o de nacionalización, ni ninguna otra medida similar, 'incluyendo modificación o derogación de leyes', que tenga el mismo efecto, contra inversiones que se encuentren en su territorio y que pertenezcan a inversores de la otra Parte Contratante, a menos que dichas medidas sean tomadas por razones de utilidad pública o de interés social, definidas en la legislación del Estado receptor, sobre una base no discriminatoria y bajo el debido proceso legal" (art. 3(1)). La comilla simple no es del original.

(24) YMAZ VIDELA, Esteban M., op. cit., p. 38. TAWIL, Guido S., "Los tratados de Protección y Promoción recíproca de inversiones...", op. cit., p. 1113.

(25) Una aguda crítica a esta consecuencia la hemos leído en: BEVILLAQUA, Norma N., "Los tratados económicos y la Constitución Argentina. Los antecedentes del ALCA", texto inédito, p. 26 y siguientes.

(26) El dramatismo de este planteo se refleja en: GUERRERO, Raúl, "Los Tratados en la Constitución de 1994", especialmente p. 125 y sigtes. y p. 180 y sigtes., Ed. Ciudad Argentina, Buenos Aires, 2001.

En el mismo sentido: SAGÜÉS, Néstor P., "Elementos de Derecho Constitucional", t. I, p. 153, Ed. Astrea, Buenos Aires, 2001.

(27) ¿Obran de buena fe los co-contratantes que celebran un pacto de inversión desconociendo normas de importancia fundamental del derecho interno del Estado receptor de la inversión, como aquella que establece la necesaria congruencia de los tratados con los principios de su derecho público, tales como la conformación de la estructura jerárquica de su orden jurídico y la competencia de sus órganos constitucionales?

Debe recordarse que dentro de la tradición jurídica argentina conforman los principios del derecho público nacional "standards" tales como el amplio funcionamiento de nuestras instituciones o el ejercicio de la jurisdicción del Estado sus poderes de gobierno.

Ello ha hecho decir a Saavedra Lamas que la justicia del país debe quedar exhausta antes de iniciar cualquier vía internacional y que, para el caso de recurrirse a la solución de diferencias por medios no convencionales, es el arbitraje el que debe adaptarse a la Constitución y no a la inversa.

VANOSSI, Jorge y DALLA VÍA, Alberto, op. cit., p. 35 y sigtes.

(28) Un muestreo realizado por la Dirección Nacional de Auditoría de la Procuración del Tesoro de la Nación, sobre un universo de mil seiscientos (1600) juicios de relevante significación económica que tuvieran al Estado Nacional como demandado, presentados entre los años 1985 y 2000 y acotado a procesos de conocimiento con controversias requeridas de prueba (vgr: daños y perjuicios, incumplimientos contractuales), es decir de naturaleza similar a la propia de un conflicto generado por incumplimiento de un TBI, reveló que la 'duración promedio' del proceso judicial -computando desde la presentación de la demanda hasta la obtención de sentencia de primera instancia- es de seis (6) años y un (1) mes.

La muestra, tomada a partir de la "performance" de los tribunales contencioso-administrativos de la Capital Federal, ante los cuales deberían radicarse los juicios que pudieran promover inversores extranjeros, reveló también que ningún caso de los asimilables a un juicio por incumplimiento de un TBI pudo resolverse en dieciocho (18) meses.

No se trata de una anomalía imputable a los juzgados intervinientes; otras muestras realizadas en otros fueros respecto de procesos de conocimiento con controversias requeridas de prueba arroja una 'duración promedio' similar.

**Headings:**  INTERNATIONAL TREATY ~ INVESTMENT PROJECT ~ INTERNATIONAL ARBITRATION ~ NATIONAL CONSTITUTION ~ CONSTITUTIONALITY
**Title:**  Bilateral Investment Treaties, Mandatory International Arbitration and the Argentine Constitutional System
**Author:**  Rosatti, Horacio D.
**Published in:**  THE LAW 2003-F, 1283 - Constitutional Law - Essential Doctrines Volume I, 01/01/2008, 771

**Summary:**  SUMMARY:  I.  Description of the subject. - II.  BITs:  Legal status and constitutional control. - III.  Traditional cases of submission to foreign jurisdiction and local judicial review of constitutionality. - IV.  The incidence of the particular BIT + ICSID conjunction with respect to judicial review of constitutionality. - V.  Conclusions.

## I.  Description of the subject

### A.  Introduction

From 1990 up to and including 2000,  Argentina signed various treaties for the promotion and reciprocal protection of investments with different countries.

The aim of these bilateral investment treaties (going forward, BIT or BITs, in singular or plural as appropriate) consisted generically, according to what is said in their Preambles, of "promoting greater economic cooperation between the contracting countries" to achieve "economic development of the countries" and "the increase of prosperity of the peoples" and, specifically, "stimulating private economic initiative" and "private capital flows," as well as "maintaining a stable framework for investment and fair and equitable treatment for investments." (1)

BITs, approved by Argentina by act of Congress, put forth in their articles dispute resolution mechanisms regarding "investment" through international arbitration, either through ad hoc tribunals or by tribunals constituted under specific rules. (2) Various clauses of BITs and of arbitral tribunals constituted under specific rules contain various restrictions on the exercise of national jurisdiction with respect to judicial review.

We briefly describe these clauses and then, after an analysis of the legal nature of BITs under public law, we will weigh the consistency of such provisions within the national Argentine supra-legal framework.

### B.  Clauses restrictive of national jurisdiction in foreign investment matters

### a.  The clauses in BITs

The text of the various BITs signed by the Republic of Argentina (3) responds to a common pattern, without prejudice to certain prima facie variations attributable to the vagaries of trading prior to the completion of agreements and/or the weight of the co-contracting country's legal practice.

Next, by way of representative samples, we describe the most relevant aspects related to covenants restrictive of the exercise of national jurisdiction observable in BITs signed with the Kingdom of Spain, the French Republic, the Kingdom of Great Britain and Northern Ireland, the United States of America and the Federal Republic of Germany, which were duly approved by acts of the National Congress.

* BIT with the Kingdom of Spain

a) If a dispute cannot be settled within six (6) months since the same has been brought it shall be submitted to the competent courts of the Party in whose territory the investment was made (Art. X, 2);

b) Arbitration as the method of dispute resolution becomes inexorable:

b1) if there is no decision on the merits in the courts of the Party in whose territory the investment was made after eighteen (18) months from the initiation of the process or where such a decision exists but the controversy persists (Art. X, 3, a); or,

b2) when both parties to the dispute have so agreed (Art. X, 3, b);

c) The dispute shall be settled by the arbitration panel of ICSID or the United Nations Commission for International Trade Law (hereinafter UNCITRAL) (Art. X, 4);

d) The arbitration judgment shall be binding and each contracting party shall execute it in accordance with its legislation (Art. X, 6).

* BIT with France

a) If a dispute cannot be settled within six (6) months from the time that it has been raised the question shall be submitted, at the request of the investor, to the national jurisdiction of the Contracting Party involved in the dispute, or to international arbitration (Art. 8.2);

b) Once the investor has submitted the dispute to the courts of the Contracting Party involved or to international arbitration, the choice of one or other of these procedures shall be final (Art. 8.2);

c) If international arbitration is the option chosen, the dispute may be brought, at the option of the investor, to ICSID (if the State party acceded to the Convention that created it) or to an ad hoc arbitral tribunal established in accordance with the UNCITRAL Arbitration Rules (Art. 8.3);

d) The arbitration panel shall reach a decision on the basis of the BIT, the laws of the Contracting Party who is involved in the controversy, including rules on conflict of law, and the terms of any agreements concluded in relation to the investment, as well as the principles of international law on the matter (Art. 8.4);

e) The arbitral awards are final and binding on the parties to the dispute (Art. 8.5).

* BIT with the Kingdom of Great Britain and Northern Ireland

a) The activation mechanism of dispute resolution does not require a specific time to have passed since the time the dispute was declared (Art. 8.1);

b) It provides the option of arbitration to either party in terms very similar to the BIT with the Kingdom of Spain (Art. 8.2);

c) Disputes may be referred to ICSID or UNCITRAL arbitration (Art. 8.3);

d) The regulatory criteria for conflict resolution and the value of the award are similar to those provided in the BIT with the Republic of France.

* BIT with the United States of America

a) The activation mechanism of dispute resolution does not require a specific time to have passed since the time the dispute was declared (Art. VII, 2);

b) The investor can choose to resolve the dispute:

b1) in the courts or administrative tribunals of the Party who is party to the dispute (Art. VII, 2, a);

b2) by a dispute settlement mechanism previously agreed upon (Art. VII, 2, b); or,

b3) through ICSID arbitration, UNCITRAL arbitration or other arbitration tribunal after six (6) months have passed since the dispute was declared if alternatives b1) and b2) above do not apply (Art. VII, 3, a).

c) The award shall be final and binding on the parties to the dispute.  The State agrees to carry out without delay the provisions of the award and is responsible for its enforcement in its territory (Art. VII, 6).

 * BIT with the Federal Republic of Germany:  The reasons that favor arbitration, timing, procedures and the value of the award and application of the judgment are virtually identical to those provided in the BIT signed with the Kingdom of Spain (Art. 10).

 * The BITs signed between Argentina and France (Art. 4), the USA (Art. II, 1 and 7), the Kingdom of Great Britain and Northern Ireland (Art. 3) and Germany (Art. 3) allow the removal of the requirement of exhaustion  of jurisdictional procedures agreed in the BIT between Argentina and the Kingdom of Spain by application of the most favored nation clause, which provides that "in all actions governed by the agreement, treatment of investments shall not be less favorable than that accorded by each party to the investments made in its territory by third party investors" (Argentina-Kingdom of Spain BIT, Art. IV, 2) (4).

b.  The ICSID arbitration clauses

The Convention on the settlement of investment disputes between States and nationals of other States that creates ICSID and approves international arbitration procedure establishes, when it comes to our subject, the following:

a) A rebuttable presumption that, if there has been no express statement to the contrary, the consent of the parties to arbitration under the Convention excludes any other remedy (Art. 26);

b) A rebuttable presumption that, if there has been no express statement to the contrary, arbitration may be resorted to without the exhaustion of national administrative or judicial proceedings (Art. 26);

c) The Arbitral Tribunal decides whether it has jurisdiction (Art. 41, 1) (5), being able to do so as a "preliminary issue" or "together with the merits of the matter" (Art. 41.2);

d) The judgment has the value of a final judgment issued by a court of the condemned State (Art. 54, 1) (6) and is executed in accordance with the rules, regarding the execution of judgments, that are in force in the territories that such execution is sought (Art. 54, 3);

e) The judgment may be clarified, revised or canceled in accordance with the mechanisms provided by the Convention, which excludes local jurisdiction (Art. 50, 51, 52 and 53).

**II.  BITs:  Legal status and constitutional control**

A.  Legal nature of bilateral investment treaties

a.  The criminalization of international treaties per the National Constitution of Argentina

The National Constitution of Argentina establishes a classification of international treaties based on the subject matter of regulation.  The differing content adopts a hierarchy that is expressed in its articulation in the Constitution and the law and in the easiness/difficulty with which treaties can enter, progress or leave the national legal system.

The constitutional categories, according to the core themes of the treaties, are as follows:

a) human rights treaties (Art. 75 sec. 22, para. 2 and 3);

b) integration treaties (Art. 75, 24.);

c) treated not included in the previous items signed with other nations or international organizations (Art. 75 sec. 22, para. 1);

d) concordats with the Holy See (Art. 75 sec. 22, para. 1) and,

e) agreements signed by the provinces with acknowledgement by Congress (Art. 124).

For the purposes of this paper we shall confine our analysis to the first three categories of treaties, excluding concordats with the Holy See and international treaties signed by the provinces (7).  To put it another way: We will confine the analysis to international treaties signed by the National State with parties other than the Holy See.

The hierarchy of treaties of the three categories circumscribed derived from the National Constitution of Argentina is:

a) treaties with constitutional status (Art. 75 sec. 22, para. 2); and,

b) treaties with precedence over the law, that in turn may sub-classified into:

b1) treaties that can achieve constitutional status (Art. 75 sec. 22, para. 3); and,

b2) treaties that cannot reach constitutional status (Art. 75 sec. 22, para. 1 and Art. 75 sec. 24).

The conditions of entry into, progression in and exit from the Argentine legal system of international treaties under analysis here recognize:

 With respect to entry:

a) Treaties with "direct" constitutional entry (as specified in Art. 75 sec. 22, para. 2) and,

b) Treaties with "indirect" constitutional entry (by law), which may be sub-classified into:

b1) Treaties that may be enacted into law with a "normal" majority, i.e., an absolute majority of each of the Houses computed for the quorum (Art. 75 sec. 22, paras. 1 and 3) and,

b2) Treaties that may be enacted into law with a "super-majority," i.e., an absolute majority of the total of all of the members in each House (treaties of integration with non-Latin American countries under Art. 75 sec. 24, para. 2);

b3) Treaties that may be enacted into law after two votes by Congress, first with a "normal" majority and second with a "super-majority" (treaties of integration with non-Latin American States under Art. 75 sec. 24, para. 2).

 Regarding progress:

a) Treaties that can progress from a hierarchy superior to the law to a constitutional hierarchy (Art. 75 sec. 22, para. 3) and,

b) Treaties that cannot progress from a hierarchy superior to the law to a constitutional hierarchy (Art. 75 sec. 22, para. 1 and Art. 75, para. 24).

 Regarding the exit:

a) treaties that may exit the Argentine legal system by a law passed with a "normal" majority, i.e., absolute majority of the members of each House to make a quorum (Art. 75, para. 22, para. 1);

b) treaties that may exit the Argentine legal system by a law passed by an absolute majority vote of all members of each House (Art. 75, 24.), and

c) treaties that may exit the Argentine legal system by a law passed by two-thirds of all of the members of each House (Art. 75 sec. 22, para. 2).

  b.  Location of investment treaties in the Argentine constitutional typology

In light of the foregoing typology, bilateral investment treaties must be placed within the category of the treaties referred to in Art. 75 sec. 22, para. 1 of the Constitution.  Consequently:

* they enjoy a hierarchical status above the law;

* they cannot reach the constitutional hierarchical status, and

* they enter and exit through laws passed by an absolute majority of the members of each House of Congress for a quorum (general rule of Art. 78, Constitution).

Their hierarchy puts them a step below the Constitution and one above the law, integrating in this position the legal pyramid which constitutes the "the supreme law of the Nation" in the words of Art. 31 of the Constitution.

B.  The legal control of BITs under the Argentine constitutional system

From the constitutional point of view, investment treaties can be monitored:  a) by reason of their content, and b) by the local courts.

  a.  Content (Art. 27, Constitution)

The control of content is referenced "generally" (as in all infra-constitutional standards) through the degree of coherence of the provisions of the treaty and the Constitution in totum, and "specifically" through a clause of Art. 27 of the Constitution, which forces the Federal Government "to secure their peaceful relations and trade with foreign powers by treaties in accordance with the principles of public law laid down in this Constitution. "

What are the principles of public law which are referred to in Art. 27 of the Constitution?  In our opinion, the clause puts forth, even from a minimalist perspective, the following principles:

* The representative, republican and federal form of government (Art. 1 and conc., Constitution);

* The principle of legality and of reserve (Art. 19, Constitution);

* The principle of equality (Art. 15, 16, 75 sec. 23 and conc., Constitution);

* The non-absolute nature of rights and the standard of reasonableness for their regulation (Art. 14, 28, 99 sec. 2 and conc., Constitution); and,

* The due process of law (Art. 18 and conc., Constitution).

Joaquín V. Gonzalez says that Art. 27 of the Argentine Constitution constitutes a limitation on the powers of Congress, "so that in no case it can compromise, in any form of arbitration, the honor, sovereignty and vital interests of the Nation" and adds: "therefore, the Argentine Congress cannot authorize an agreement with another nation to arbitrate points which concern any of the fundamental principles of the Constitution." (8)

It should be noted in addition that this clause was not shortened with the later constitutional reform of 1994, since from the start, the announcing law made very clear the immutability of the "dogmatic part" of our fundamental text (Law 24.309, Art. 7-Adla, LIV-A, 89 -) and since the very clause which created the hierarchy of international treaties affirmed that it did not repeal any section of the first part of the Constitution (the explanatory paragraph refers to the human rights conventions, although we believe reasoning should extend to investment treaties because of its lower normative hierarchy) (9).

    b.  Jurisdiction (Art. 116, Constitution)

From a jurisdictional standpoint, Art. 116 of the Argentine Constitution establishes the jurisdiction of federal courts to settle disputes related to matters that can be regulated by the aforementioned treaties.  The constitutional reform of 1994 provided for the delegation of national jurisdiction to supranational organizations explicitly (in sec. 24 of Art. 75, dedicated to integration treaties) and indirectly (in sec. 22, second paragraph of the same article, devoted to human rights treaties, to the extent that such agreements provide for delegation); constituents did not foresee the delegation of jurisdiction in the case of treaties in the first paragraph of sec. 22 of Art 75 of the Constitution.

National constitutional doctrine does not deny that the treaties of the first paragraph of sec. 22 of Art. 75  should be subject to judicial review for constitutionality in local judicial venues (10).  This is the view of Bidart Campos (11), Ekmekdjian (12), Gelli (13), Quiroga Lavie (14) and Castorini of Tarquini (15).

**III.  Traditional cases of submission to foreign jurisdiction and local judicial review of constitutionality**

Foreign jurisdiction has been accepted by Argentina in cases unrelated to BITs; the premise of these cases is the intervention of international tribunals on issues of human rights violations and foreign tribunals in the instance of state activity juri gestionis, of a commercial nature.

As will be shown below, in both cases, unlike the hypothetical case of the BIT + ICSID, Argentina has not resigned the ability to review at some point the constitutionality of the debated issue.

    A.  Submission to international jurisdiction with the possibility of preliminary judicial review of constitutionality

The American Convention on Human Rights (hereinafter "the Convention") called "Pact of San José de Costa Rica" incorporated expressly into the National Constitution of Argentina since the reform of 1994 with constitutional hierarchy, provides for the intervention of the Interamerican Court of Human Rights (hereinafter "the Court"), a body with jurisdiction "in all

cases concerning the interpretation and application of the Convention" (Art. 62, 3) and, more specifically, "in case of violation of a right or freedom protected" by the same (Art. 63, 2).

Court intervention can only be activated once initial intervention by the Interamerican Commission of Human Rights (hereinafter "the Commission") (Art. 61, 2), an advisory body envisaged by the aforementioned Convention, has been exhausted; in turn, for the Commission to act, it is necessary, among other requirements, "that domestic remedies have been have been pursued and exhausted in accordance with the principles of International Law generally recognized" (Art. 46, 1, a).  The Commission shall consider inadmissible any petition or statement that does not comply with this requirement (Art. 47, a).

The only exceptions to the principle of prior exhaustion of national jurisdiction are when "the State's legislation does not provide due process of the law for the protection of the right or rights that have allegedly been violated" (Art. 46, 2, a), "the party alleging violation of his rights has not been permitted access to the remedies under domestic law or has been prevented from exhausting" (Art. 46, 2, b) or "there are unjustified delays in the decision on remedies" (Art. 46, 2, c) (16).

The conclusion that is of interest to this work is that the opening of jurisdiction supported by the Argentine Republic in the framework of the American Convention on Human Rights does not inhibit the ability of preliminary judicial review of constitutionality by domestic courts.

B.  Submission to foreign jurisdiction with the possibility of later judicial review of constitutionality

Some commercial activity of the Argentine State, destined to have effects abroad (for example: refinancing debt with foreign banks, buying certain registrable assets abroad, placing securities of external public debt abroad, etc.), regularly incorporates the extension of jurisdiction to foreign courts.

In those cases, the extension of jurisdiction is validated to the extent that:  a) the acts that originate it express an act juri gestionis and not juri imperii of the State, solidifying itself in legal relations typical of private international law, and b) foreign judgments which are a consequence of a conflict originated by state acts juri gestionis require an exequatur for their application in Argentina.

 a.  Acts juri imperii and juri gestionis

The administrative doctrine has differentiated, since yesteryear, within the multiplicity of state actions, between those acts the State makes as a public person and those it makes as a private person (17); more recently, it distinguishes between those acts which the state decides unilaterally and sometimes discretionarily, but always under the framework of the rule of law, in its supreme interests and in situations of privilege and supremacy with relation to individuals (for example: to create taxes, institute fines and levy them, exercise police power, etc.), from those events in which the state acts within the scope of property rights, in a relation of parity with individuals (for example: general commercial acts).  The former are acts are called juri imperii and the latter acts juri gestionis (18). The extension of jurisdiction is within the framework of state acts juri gestionis, being expressly provided for by the Argentine legislation in Art. 1 of the National Code of Civil and Commercial Procedure (hereinafter NCCCP) (19).

 b.  The exequatur

In turn, foreign judgment on disputes relating to state actions juri gestionis requires, for execution in Argentina, the exequatur.

The enforceability or "authorization to enforce" is what separates an enforceable judgment dictated in a foreign country from one that aspires to be one; for this, it has been affirmed that the meaning of the institution is to "convert the foreign sentence into an enforceable Argentine law" through "a process of hearing or re-hearing." (20) It does not involve a re-examination of the legal relationship adjudged abroad; it involves establishing a local judicial seat in adversarial proceedings if the sentence meets certain requirements.  One of the requirements to be met so that there may be a conversion of the foreign sentence to an enforceable law in the country is that it "does not affect the principles of Argentine law enforcement," a standard that permits connecting the foreign judgment to Art. 27 of the Constitution (21).

The conclusion of interest to this work is that the extension of jurisdiction accepted by the Argentine Republic under state acts juri gestionis does not inhibit the ability of the subsequent verification of constitutionality by a national court.

### IV. The incidence of the particular BIT + ICSID conjunction with respect to judicial review of constitutionality

According to what was said above, the logic of the opening or extension of national jurisdiction to international or foreign courts was in Argentina traditionally linked to the possibility of exercising—sooner or later, but in any case at some point—judicial control by one (or more) national court(s).  This authority of local review does not do violence to any principle of international rights; rather, according to the cases cited above, the American system of protection of human rights and the institution of exequatur enjoy unchallenged recognition in international rights.

However, the combination of BIT + ICSID (actually, this should be called the specific combination or specific interpretation of the system of BIT + ICSID) does not allow the cited control.  It contributes a peculiar interpretation given to the meeting of certain elements that are typically private (basically investment and the relationships that flow from it) with other elements that are typically public (the bilateral treaties signed between sovereign nations and the system of judging controversies which comes from an international convention).

We start an intellectual journey beginning with foreign investment.  The principles of "autonomy of will" and "extension of jurisdiction" apply to relations connected with foreign investment to the extent that it is linked to private law.  The corollary of this framework in the context of private international law, would require, prior to the execution of a foreign judgment, an exequatur.  Why is an exequatur not required for judgments emerging from investment disputes within the BIT + ICSID system?  Probably because they are not considered "foreign judgments" but "international decisions," as they are dictated within a framework of arbitration which is functionally based on an international convention activated by a bilateral treaty between sovereign States, to which the principle of pacta sunt servanda applies.

We arrive at public international law based on private international law.  Right, so, if we are in public international law, why not exhaust local jurisdiction before enabling international jurisdiction, as with any disputes that are settled in the American system of human rights, which bring into play values such as life, physical integrity, dignity and people's basic freedoms?  Probably the answer is that exhausting local paths can be dispensed as  commercial and

economic relations as derived from a foreign investment, which "return" to private international law.  This return would lead, in turn, to a return to the text from above (which begins with "We start an intellectual journey..."); soon we would be arriving at this point ... and then we would be forced to repeat a thousand times this circumlocution, which requires us, as a condition of consistency, not to leave the orbit of positive rules that have made this possible.

In sum, the arguments of non-local control only become consistent in a self-referential context and in tension with traditional principles of public and private international law.  An international public law that ignores national public law; a private international law that ignores the exequatur; this produces, in reality, a curious combination whose kinship is affirmed in the grudging turnover of local jurisdictional control.

### V.  Conclusions

* The constitutional reform of 1994 represented an important step in opening up the legal system in Argentina to the international legal system.  Such a connection did not eliminate the boundaries of the normative local block, and it did not subvert the legal hierarchy established by the Argentine Constitution.

* The opening of the Argentine legal system to the international legal system was directed towards clearly favoring the hierarchization of human rights stricto sensu (based on content) and national participation in different variants of integration (based on organization).

* The lato sensu trade agreements signed by the Republic of Argentina with foreign states were hierarchized with the constitutional reform of 1994, ranking above the common law and under the Constitution, applying to them as prescribed by Art. 27 of the Constitution.

* If by virtue of the application of an international treaty such as the Vienna Convention on the Law of Treaties of 1969 (approved by our country by Law 19,865-Adla, XXXII-D, 6412 -), which serves as an interpretative source for other treaties in force (in our case BITs), all of them having a supra-legal and infra-constitutional hierarchy,  local judicial review of constitutionality could be avoided, the possibility of amending the National Constitution through legislation (which approves treaties) would be consecrated, violating the constitutional amendment procedure provided for in Art. 30 and, in turn, the national legal pyramid would be subverted from the time the supra-legal but infra-constitutional treaty prevailed over the Constitution, violating the hierarchical order established in Art. 31 of the National Constitutional, as clarified by Art. 75 sec. 22. (22)

* As a result of the above, it is not acceptable to assume that the Republic of Argentina can yield in the way anticipated (by a law approving a BIT) and definitively (by another law approving an international arbitration mechanism) its power to effectuate judicial review of constitutionality in its courts over trade agreements or the conflicts that arise from their application.

* The ICSID-style arbitration system, which is triggered by certain propositions included in BITs and the consequences of which cannot be analyzed by national courts, is a sealing mechanism (once you enter it, you cannot get out of it) and self-referential (it is a device that interprets itself) that is incompatible with the Argentine legal system, to the extent that it prevents control of content among the text, the interpretation and application of the treaty with standards of a higher hierarchy in force in the country and inhibits the intervention of national courts past enforcing a judgment determined in a foreign jurisdiction.

* The impossibility of local judicial review of unconstitutionality is not a procedural question for Argentina but a substantive question, to the extent that it inhibits weighing the validity of the following principles of Argentine public law, whose observance the National Constitution deems a condition of international trade treaties:  the representative, republican and federal government (Art. 1 and conc., Constitution), the principle of legality and of  reserve (Art. 19, National Constitution), the principle of equality (Art. 15, 16, 75 sec. 23 and conc., Constitution), the non-absolute nature of rights and the guideline of reasonableness for their regulation (Art. 14, 28, 99 sec. 2 and conc. Constitution) and the due process of law (Art. 18 and conc., Constitution).

* Prima facie, violations of the principles of Argentine public law cited above can be found in the combination of  BITs + ICSID in the following assumptions:  the representative form of government to the extent that it inhibits or narrows the activity of national authority (the Legislature on the theory of prohibiting modification of initial legal conditions for investment because of the governance of the so-called "legal stabilization clause" (23) and the Judiciary on the theory of the inability to act on matters of constitutional control); the republican form of government, to the extent that, with the powers of the national Legislature or Judiciary seized or grudgingly handed over, it creates an imbalance in favor of the Executive (who the arbitrators, in large part, appoint to replace the cited national powers), thus blurring the criterion of "separation of powers" that is integral to the republican form of government; the principle of legality and reserve, to the extent that the overestimation of the legal value of trade agreements introduces a change in the Argentine normative hierarchy provided for in Art. 31 of the National Constitution by methods other than those provided by the Constitution in Art. 30; the principle of equality, to the extent that, under certain circumstances and by joint or separate application of  "most favored nation" and/or "legal stabilization" clauses (24), it adopts a situation of discrimination in favor of foreign corporations (25); the non-absolute nature of rights, to the extent of the inhibitory nature of legislative amendment for certain rights tied to the original status of the investment by application of the "legal stabilization" clause; and due process of law, to the extent that when it prevents, frustrates or disrupts access to national jurisdiction, it violates the criterion of natural law or grudgingly gives up suitable local methods of recourse.

* The emerging ICSID jurisprudence relating to the interpretation of BITs tends to generate a widening gap between national and international optics regarding investment disputes and threatens to bring down the level of trust patiently rebuilt between countries like Argentina (and surely there are others) with the international legal system.

In the cited case "Mafezzini, Ricardo c. Kingdom of Spain," under a peculiar application of the "most favored nation" principle, and as if what was at stake was a question of merely procedural nature, the impossibility of exercising local judicial control over foreign trade relations has become multilateralized.  With this precedent, the clause should be renamed "most favored investor."

And, worse yet, with the ruling regarding the acceptance of jurisdiction in "CMS Gas Transmission Company vs. Republic of Argentina," the door (in reality it is a gate) has opened for any minority shareholder to take action against a sovereign state in terms of an investment over which it does not have effective control.  This is a case that, on the pretext of resolving a procedural matter, has dealt a harsh blow, though not yet quantified, to the sovereign nation, in terms of multiplication of litigation, of promotion of the "abuse of [the arbitral] process", of international jurisdictional recklessness and of potential disruption of the contractual renegotiation process in the making.  This precedent reveals how the arbitration system rotates

around itself, on its own interests, ignoring the economic, institutional and social consequences it generates.

* If international arbitration in commercial matters is not assumed as a system, linking itself, on the one hand, with other commercial arbitrations brought against the sovereign state and, on the other hand, and "in some way," with national normative order, the result is visible: the success of the first investor will be inversely proportional to the success of others, since success will "not be reached by everyone." This will result in, among other unfortunate consequences, the distortion of one of the basic objectives put forward in the conclusion of BITs, to achieve a "stable legal framework" and "higher levels of "legal certainty" (26) for foreign investment.

* Overcoming the obstacle of growing distrust means reciprocally accepting the mistakes (and abuses) committed in the past, moderating the purely commercial mentality that is used to examine certain matters (leaving the global socioeconomic context aside), reviewing the arbiters' profiles, their representativeness and their responsibility and, fundamentally, not abandoning common sense, which is the hermeneutic source of good legal faith. (27) As an example: Does a clause that stipulates the length of a contested proceeding in courts in Argentina (and in many other countries!), from the time of initial filing until the attaining of a final judgment, to be eighteen (18) months reflect reality? (28)

* A new default (this time jurisdictional) for countries receiving investment can mean a tough setback not only for investors and for the sustainable and harmonious development of the nations affected, but for the international legal system, which, to the extent it reflects settled and sensible positions over the triumph of blood and fire for a dominant position, allows for the advancement of a universal conscience which, beyond its heterogeneities, is willing to recognize supranational values.

Special for The Law. Rights reserved (Law 11.723).

(1) A description of the benefits of BITs in:  YMAZ VIDELA, Esteban M., "Protection of foreign investment.  Bilateral Treaties.  Its effects on administrative contracts," Ed. The Law, Buenos Aires, 1999; TAWIL, Guido Santiago, "The treaties of mutual protection and promotion of investments.  State responsibility and international arbitration," THE LAW, 2000-D, 1106 and Lisdero Alfredo R. and HELBERT, Dario J., "The protection of foreign investments in Argentina.  Treaties of Reciprocal Protection of Investments and its jurisprudential interpretation," ED, June 13, 2002.

(2) For this purpose, Argentina approved by Law 24,353 (BO 02/09/94) the Convention regarding the settlement of investment disputes between States and Nationals of other States (signed in Washington on March 18, 1965), by which it established the International Centre for Settlement of Investment Disputes (hereinafter ICSID) and approved dispute resolution mechanisms based on conciliation and arbitration.

(3) Agreements on the Promotion and Reciprocal Protection of Investments signed by Argentina (indicating the co-contracting country, date the agreement was signed (dd/mm/yy), number of the ratifying act and date BIT became effective (dd/mm/yy)):

Democratic Republic of Algeria: Date Signed: 04/10/2000; Ratifying act:  25.538/02; Effective:  Not reported.

Republic of India:  Date Signed:  20/08/99; Ratifying act:  25.540/2002; Effective:  Not reported.

Republic of New Zealand:  Date Signed: 27/08/99; Ratifying act:  25.539/2002; Effective: Not reported.

Thailand:  Date signed: 18/02/2000; Ratifying act:  25.532/02; Effective:  Not reported.

Philippines:  Date signed: 20/09/99; Ratifying act:  25.481/01; Effective:  Not reported.

Guatemala:  Date Signed:  21/04/98; Ratifying act:  25.350/00; Effective:  Not reported.

South Africa:  Date Signed:  23/07/98; Ratifying act:  25.352/00; Effective:  Not reported.

Nicaragua:  Date Signed:  10/08/98; Ratifying act:  25.351/00; Effective:  Not reported.

Russian Federation:  Date Signed:  25/06/98; Ratifying act:  25.353/00; Effective:  Not reported.

Costa Rica:  Date Signed:  5/21/97; Ratifying act:  25.139/99; Effective:  Not reported.

El Salvador:  Date Signed:  09/05/96; Ratifying act:  25.023/98; Effective:  08/01/99.

Czech Republic:  Date Signed:  27/09/96; Ratifying act:  24.983/98; Effective:  23/07/98

Lithuania:  Date Signed:  3/14/96; Ratifying act:  24.984/98; Effective:  01/09/98

Panama:  Date Signed:  10/05/96; Ratifying act:  24,971 / 98:  Effective:  22/06/98

Mexico:  Date Signed:  13/11/96; Ratifying act:  24.792/98; Effective:  22/06/98

Morocco:  Date Signed:  13/06/96; Ratifying act:  24.890/97; Effective:  Not in force.

Indonesia:  Date Signed:  7/11/95; Ratifying act:  24.814/97:  Effective:  Not in force.

Cuba:  Date Signed:  30/11/95; Ratifying act:  24.770/97; Effective: 01/06/97.

Vietnam.:  Date Signed:  03/06/96; Ratifying act:  24.778/97; Effective:  06/01/97

Israel:  Date Signed:  7/23/95; Ratifying act:  24.771/97; Effective:  10/04/97

Australia:  Date Signed:  8/23/95; Ratifying act:  24.728/96; Effective:  01/11/97

Republic of Korea:  Date Signed:  5/17/94; Ratifying act:  24.682/96; Effective:  24/09/96

Ukraine:  Date Signed:  09/08/95; Ratifying act:  24.681/96; Effective:  06/05/97

Peru:  Date Signed:  10/11/94; Ratifying act:  24.680/96; Effective:  24/10/96

Malaysia:  Date Signed:  06/09/94; Ratifying act:  24.613/96; Effective:  20/03/96

Finland:  Date Signed:  05/11/93; Ratifying act:  24.614/96; Effective:  03/05/96

Portugal:  Date Signed:  6/10/94; Ratifying act:  24.593/95; Effective:  03/05/96

Croatia:  Date Signed:  2/12/94; Ratifying act:  24.563/95:  Effective:  01/06/96

Jamaica:  Date Signed:  02/08/94; Ratifying act:  24.549/95; Effective:  01/12/95

Venezuela:  Date Signed:  16/11/93; Ratifying act:  24.457/95:  Effective:  01/07/95

Ecuador:  Date Signed:  02/18/94:  Ratifying act:  24.459/95; Effective:  01/12/95

Romania:  Date Signed:  7/29/93; Ratifying act:  24.456/95; Effective: 01/05/95

Bolivia:  Date Signed:  3/17/94; Ratifying act:  24.458/95; Effective:  01/05/95

Senegal:  Date Signed:  04/06/93; Ratifying act:  24.396/94; Effective:  Not in force.

Bulgaria:  Date Signed:  9/21/93; Ratifying act:  24.401/94; Effective:  11/03/97

Armenia:  Date Signed:  04/06/93; Ratifying act:  24.395/94; Effective:  20/12/94

Tunisia:  Date Signed:  6/17/92; Ratifying act:  24.394/94; Effective:  23/01/95

Denmark:  Date Signed:  06/11/92; Ratifying act:  24.397/94; Effective:  02/02/95

Turkey:  Date Signed:  08/05/92; Ratifying act:  24.340/94; Effective:  01/05/95

Hungary:  Date Signed:  02/05/93; Ratifying act:  24.335/94; Effective:  01/10/97

PRC:  Date Signed: 5/11/92; Ratifying act:  24.324/94; Effective:  01/08/94

Republic of Austria: Date Signed:  08/07/92; Ratifying act:  24.238/94; Effective:  01/01/95

Egypt:  Date Signed:  11/05/92; Ratifying act:  24.248/93; Effective:  03/12/93

Netherlands:  Date Signed:  20/10/92; Ratifying act:  24.352/94:  Effective:  1/10/94

Great Britain and Northern Ireland:  Date Signed:  11/12/90; Ratifying act:  24.184/92; Effective:  02/19/93

Belgium and Luxembourg:  Date Signed:  6/28/90; Ratifying act: 24,123 / 92, Effective: 20/05/94

Canada:  Date Signed:  5/11/91; Ratifying act:  24.125/92; Effective:  4/29/93.

USA:  Date Signed:  11/14/91; Ratifying act:  24.124/92; Effective:  10/20/94.

Note Exchange Agreement amending the Treaty (AC / P / CJE N :) Effective:  03/31/92. Note Exchange Agreement amending the Treaty:  Date Signed:  06/11/92; Ratifying act:  24.356/94; Effective: 20/10/94.

Italy:  Date Signed:  5/22/90; Ratifying act:  24.122/92; Effective:  10/14/93

Sweden:  Date Signed:  22/11/91; Ratifying act:  24.117/92; Effective:  28/09/92

Spain:  Date Signed:  3/10/91; Ratifying act:  24.118/92:  Effective 28/09/92

France:  Date Signed:  03/07/91; Ratifying act:  24.100/92; Effective:  03/03/93

Germany:  Date Signed:  04/09/91; Ratifying act:  24.098/92; Effective:  08/11/93

Switzerland:  Date Signed:  4/12/91; Ratifying act:  24.099/92; Effective:  06/11/92

Poland:  Date Signed:  7/31/91; Ratifying act:  Law 24.101/92; Effective:  01/09/92

Chile: Date Signed:  02/08/91; Ratifying act:  24.342/93; Effective:  01/01/95

(4) The clause of the most favored nation in the context of non-use of local jurisdictional remedies has been applied in ICSID Case "Maffezini Augustine vs. Ricardo. Kingdom of Spain," No. ARB/97/7, decided November 13, 2000.

About this:  TAWIL, Guido Santiago, "The investment disputes, the jurisdiction of ICSID and applicable law:  report of the recent decisions in cases Vivendi, Wena and Maffezini," Argentine Journal of the Public Administration System, Buenos Aires, October 2002, year XXV, No. 289, p. 241 et seq.

(5) Use of this attribution has given active legitimation not only to a foreign investor company but also to a minority shareholder of that company.

ICSID Case "Lanco International Inc vs. Republic Argentina" No. ARB/97/6, decided December 8, 1998 and  ICSID Case "CMS Gas Transmission Company v. Republic of Argentina," No. ARB/01/8, decided July 17, 2003 (decision of the arbitral tribunal on jurisdiction exception).

(6) The judgment, temporarily located at the end of the voyage of arbitration, completes the substitution mechanism (now from a "retroactive" perspective) of the rule of exhaustion of domestic remedies, previously reduced or unknown by the text of BITs.  This is so not only because of the equation of the judgment to a domestic court judgment, but also because the rating of "final" applied to that judgment shows that through arbitration and ICSID annulment, it is understood that these resources have been exhausted.  Thus the limitation of sovereignty represented by the renunciation of control of the exequatur presents itself as a corollary of the limitation of sovereignty involved in the renunciation of the jurisdiction of domestic courts in disputes submitted to ICSID.  Vives Chillida, Julio A., "The Center Settlement of Investment Disputes (ICSID)," Ed McGraw-Hill, Madrid, 1998, p. 235.

(7) The possibility that the Argentine provinces, from Art. 124 of the Constitution, may conclude international treaties for the promotion and protection of investments is developed in: NIELSEN, Federico, "The provinces faced with the Treaties for the Promotion and Reciprocal Protection of Investments and its consequences," ED, Buenos Aires, December 31, 2002, p. 1 et seq.

(8) GONZALEZ, Joaquin V., "Complete Works," Ed. National University of La Plata, Buenos Aires, 1935, vol. XI, p. 210 et seq.

(9) The unchanged effectiveness of Art. 27 of the Argentine National Constitution and its supremacy over the treaties framed in the first paragraph of section 22 of Art. 75 of the National Constitution is supported by:  Bidart CAMPOS, Germán J., "Manual of the revised Constitution," t. I, p. 372, Ed Ediar, Buenos Aires, 1998 GELLI, Maria Angelica, "Constitution of Argentina.  Annotated and agreed," p. 244, 591 et seq., Ed. Law, Buenos Aires, 2003; SAGÜÉS, Nestor P., "Elements of Constitutional Law," vol. II, p. 62 et seq., Ed. Astrea, Buenos Aires, 2001, and VANOSSI. Jorge Reinaldo and DALLA VIA, Alberto Ricardo, "Constitutional provisions of treaties," p. 294 et seq., Ed. Abeledo-Perrot. Buenos Aires, 2000.

(10) The Republic of Argentina has traditionally been a champion of the position that defends its national jurisdiction as the ideal scenario for settling disputes involving a foreign investor.  This principle, long-term in public international law, is known as the Calvo doctrine, in

tribute to Argentine diplomat and jurist who, towards the end of the nineteenth century repudiated, on the principle of equality of States, the interference of legislation and /or foreign courts in national courts to resolve legal disputes that involved a foreign investor.

(11) BIDART CAMPOS contends that any statute that inhibits judicial review of constitutionality is unconstitutional.  Bidart CAMPOS, Germán J., op. cit., 1997, vol. III, p. 435.

For him the non-application of a treaty of infra-constitutional range is possible by reason of its unconstitutionality as declared by a national court, but this does not relieve our country of "international responsibility."

Bidart CAMPOS, G., op. cit., t. II, p. 418.

(12) Ekmekdjian, Miguel A., "Constitutional Treaty," t. II, p. 769 et seq., Ed Depalma, Buenos Aires. 1994.

(13) GELLI, Maria Angelica, op. cit., p. 808 et seq..

(14) LAVIE Quiroga, Humberto, BENEDETTI, Miguel Angel and Cenicacelaya, Maria de las Nieves, "Argentine Constitutional Law," vol. I, p. 541, Ed Rubinzal-Culzoni, Buenos Aires, 2001.

For these authors the declaration of unconstitutionality of a treaty as provided in Art. 75 sec. 22 para. 1, does not affect the principle of "pacta sunt servanda."

(15) For this author the declaration of unconstitutionality of a treaty as provided in Art. 75 sec. 22, paragraph 1, of the Argentine Constitution "would only have internal effects and could not be opposed internationally," CASTORINA of TARQUINI, Maria Celia, "Supremacy of the Constitution," in Argentine Institute of Constitutional and Political Studies, "Constitutional Law Reform of 1994," t. I, p. 161, Ed Depalma, Mendoza, 1995.

(16) In the case "Cantos," the American Court of Human Rights held, after weighing factors such as the complexity of the case, the conduct of the applicant and the conduct of the competent authorities, that a "net time" for process of five (5) years in the Supreme Court of the Nation was not "unreasonable" and therefore did not violate the due process of the actor.  The "gross time" for process in the highest court of Argentina was ten (10) years.

American Court of Human Rights, case "Cantos, José María," ruled on November 28, 2002 (Law, 2003-C, 2).

(17) BIELSA, Rafael, "Administrative Law," p. 9 Ed Depalma, Buenos Aires, 1955.

(18) On this topic:  Gualde, Andrea, "State commercial activity as an exception to the origin of sovereign immunity," ED, Constitutional Law Supplement, Buenos Aires, June 26, 2000, p. 16 et seq.

The difference between state acts "juri imperii" and "juri gestionis" and its impact on immunity of jurisdiction was recognized by the Supreme Court in "Vallarino, Edelmiro c. Emabajada of Japan," May 4, 2000 and in "Colonel, Oscar Antonio, et al. v. National State s/ accident," November 9, 2000.

(19) National Code of Civil and Commercial Procedure (hereinafter NCCCP), Art. 1:

"The power given to national courts cannot be extended.

Without prejudice to the provisions of international treaties and by Art. 12, subsection 4 of the Law 48, except for territorial competence in exclusively domestic matters, which may be extended to conform to its parts.  If these issues are international in nature, the extension may be allowed even to the favor of foreign judges or arbitrators acting outside the Republic, except in cases where Argentine courts have exclusive jurisdiction or when the extension is forbidden by law."

Art. 12 sec. 4 of the national law 48 excludes the jurisdiction of national courts and considers it extended to provincial courts in civil cases where "an alien sues a province, or a citizen, or the resident of a province sues a resident of another or before a judge or court of the province, or when being sued the foreigner or the resident of another province answers the complaint without opposition to the plea." In such cases the matter can only give rise to national jurisdiction by interposing the extraordinary remedy provided by Art. 14 of the cited national law 48.

(20) FENOCHIETT O, Carlos Eduardo, "Code of Civil and Commercial Procedure," t. 2, p. 790 et seq., Ed Astrea, Buenos Aires, 1999.

(21) NCCCP, Art. 517:  "Foreign judgments are enforceable under the terms of treaties concluded with the country they come from.

If there are no treaties, they will be enforceable if the following conditions concur:

1) That the judgment, with the authority of res judicata in the State in which it was pronounced, comes from a competent court according to Argentine international jurisdiction rules and is the consequence of a personal action or a real property action, if the property has been transferred to the Republic during or after the trial proceeded abroad.

2) That the defendant against whom the judgment is intended to be executed has been personally served and his defense is guaranteed.

3) The award meets the necessary requirements to be considered valid in the place where it has been issued and the conditions of authenticity required by national law.

4) The award does not affect the principles of Argentine law enforcement.

5) The award does not conflict with another pronounced, before or simultaneously, by an Argentine court."

(22) Moncayo, William, VINUESA, Raul Gutierrez and POSSE, Hortensia, "International Public Law," Vol. I, p. 60, Ed Zavalía, Buenos Aires, 1987.

(23) The "legal stabilization clause" was introduced in Argentine law after the entry into force of the BIT with the Republic of Panama by 24,971 law (BO:  25/06/98-Adla, LVIII-C, 2852 -).  The text of the clause sub-examine is as follows:  "No Contracting Party shall take direct or indirect measures of expropriation or nationalization, or any similar measure, 'including amendment or repeal of laws,' which has the same effect, against investments which it finds in its territory and which belong to investors of the other Contracting Party, unless such measures are taken for reasons of public utility or social interest, defined by the legislation of the host State, on a non-discriminatory basis and under due process of law" (Art. 3 (1)).  The single quote is not original.

(24) Ymaz Videla, Stephen M., op. cit., p. 38. TAWIL, Guido S., "Treaties of Protection and Reciprocal investment promotion ... ," op. Cit., P. 1113.

(25) We have read a sharp critique of this result in:  BEVILLAQUA, Norma N., "Economic Treaties and the Argentine Constitution.  The background of the FTAA," unpublished text, p. 26 et seq..

(26) The drama of this pose is reflected in:  GUERRERO, Raúl, "Treaties in the Constitution 1994," at p. 125 et seq., and p. 180 et seq., Ed. City Argentina, Buenos Aires, 2001.

In the same vein:  SAGÜÉS, Nestor P., "Elements of Constitutional Law," vol. I, p. 153, Ed Astrea, Buenos Aires, 2001.

(27) Do co-contracting parties signing an investment contract act in good faith when they ignore rules of fundamental importance to the internal law of the State receiving the investment, such as the one that establishes the necessary congruence of treaties with the principles of public right, such as the formation of the hierarchical structure of its legal order and the responsibilities of its constitutional bodies?

It must be remembered that within the Argentine legal tradition, national public law principles conform to "standards" such as the comprehensive operation of our institutions or the exercise of jurisdiction of the State's powers of government.

This has made Saavedra Lamas note that justice in the country must be exhausted before any international route is taken and, in the case of recourse to dispute settlement by unconventional means, the arbitration must be adapted to the Constitution and not vice versa. VANOSSI, Jorge y DALLA VÍA, Alberto, op. cit., p. 35, et seq.

(28) A sampling performed by the National Director's Office for Auditing of the Diligent Management of the Nation's Treasury, with a sample of one thousand six hundred (1,600) trials with relevant economic significance in which the National State was the Defendant, filed between 1985 and 2000 and annotated with proceedings in which disputes requiring evidence were heard (e.g. damages, breaches of contract), in other words, ones that are similar in nature to that of a conflict caused by breach of a Bilateral Investment Treaty (BIT), revealed that the "average length" of the judicial proceedings -calculated from the filing of the lawsuit until the obtaining of a trial court judgment- is six (6) years and one (1) month.

The sample, taken from the "performance" of the administrative law courts of the Federal Capital, which are where cases initiated by foreign investors should be filed, also revealed that no case comparable to a breach of BIT case could be decided in eighteen (18) months.

This is not the case of an anomaly attributable to the intervening courts; other samples performed in other jurisdictions regarding proceedings in which disputes requiring evidence are heard produce a similar "average length."

I, Sarah Chandrika, certify under penalty of perjury that I am competent to translate Spanish into English, and that the foregoing translation of this article is true and correct to the best of my abilities.

Executed on this 24th day of ___July___, 2013.

_____
Sarah Chandrika

Sworn to before me this 24th day of ___July___, 2013.

_____
NOTARY PUBLIC

FRANCINE PIAZZA
Notary Public, State of New York
No. 01PI6209851
Qualified in New York County
Commission Expires Aug. 3, 2013

# Exhibit E

ICSID CASE NO. ARB/07/5

INTERNATIONAL CENTRE FOR SETTLEMENT
OF INVESTMENT DISPUTES
WASHINGTON, D.C.

ABACLAT AND OTHERS
(Case formerly known as GIOVANNA A BECCARA AND OTHERS*)
(CLAIMANTS)

and

THE ARGENTINE REPUBLIC
(RESPONDENT)

_____

DECISION ON JURISDICTION AND ADMISSIBILITY
_____

ARBITRAL TRIBUNAL
Professor Pierre Tercier, President
Professor Georges Abi-Saab, Arbitrator
Professor Albert Jan van den Berg, Arbitrator

Secretary to the Tribunal:
Mr. Gonzalo Flores

Date of dispatch to the Parties: 4 August 2011

**Representing Giovanna a Beccara and others**
Ms. Carolyn B. Lamm
Mr. Jonathan C. Hamilton
Ms. Abby Cohen Smutny
Ms. Andrea J. Menaker
Mr. Francis A. Vasquez, Jr.
WHITE & CASE LLP
701 Thirteen Street, N.W.
Washington, D.C. 20005
U.S.A.

and

Avv. Vittorio Grimaldi
Avv. Paolo Marzano
GRIMALDI E ASSOCIATI
Via Pinciana, 25
00198 Rome
Italy

and

Dr. José Martínez de Hoz, Jr.
Dra. Valeria Macchia
PEREZ ALATI, GRONDONA, BENITZ, ARNTSEN
& MARTINES DE HOZ (JR.)
Suipacha 1111 – Piso 18
C1008AAW Buenos Aires
Argentina

**Representing The Argentine Republic**
Dra. Angélina María Esther Abbona
Procuradora del Tesoro de la Nación Argentina
Procuración del Tesoro de la Nación Argentina
Posadas 1641
Buenos Aires (C.P. 1112)
Argentina

and

Mr. Jonathan I. Blackman
Mr. Matthew D. Slater
Mr. Carmine D. Boccuzzi
Ms. Inna Rozenberg
Mr. Ezequiel  Sánchez Herrera
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
U.S.A.

* For the change of name, see § 641 below.

1

# Table of Contents

I.    PARTIES ..................................................................................................................... 10

    A.    CLAIMANTS .......................................................................................................... 10

    B.    RESPONDENT ........................................................................................................ 11

II.   FACTS ........................................................................................................................ 12

    A.    INTRODUCTION ..................................................................................................... 12

        (1)    General Concepts relating to Financial Market and Bonds ...................... 12

        (2)    General Overview on Sovereign Debt Restructuring ............................... 17

        (3)    Argentina's Restructuring of Its Economy and Its Debt in relation to Bonds ......... 22

            (a)    Argentina's Restructuring of Its Economy in the 1990s.............................. 22

            (b)    Argentina's Financial Crisis and Default of 2001 ......................................... 26

            (c)    The Events following Argentina's Default of 2001...................................... 28

            (d)    Argentina's Restructuring of Its Debt in relation to Bonds and Relevant Creditors' Reactions ......... 28

        (4)    Evolution of the Dispute following Argentina's Exchange Offer 2005................... 39

        (5)    New Exchange Offer 2010 ..................................................................... 50

    B.    PROCEDURAL HISTORY.......................................................................................... 51

        (1)    Request for Arbitration and its Registration by ICSID ........................... 51

        (2)    Constitution of the Arbitral Tribunal ..................................................... 53

        (3)    Arbitral Procedure ................................................................................. 55

III.  LAW............................................................................................................................ 77

    A.    INTRODUCTORY REMARKS .................................................................................... 77

        (1)    The Arbitral Procedure .......................................................................... 77

        (2)    Object of the Present Decision............................................................... 78

        (3)    Summary of the Parties' Positions and Relief Sought ............................ 79

            (a)    Respondent's Position and Requests for Relief............................................ 80

            (b)    Claimants' Position and Requests for Relief ................................................ 84

        (4)    Structure of the Present Decision........................................................... 87

    B.    LEGAL BASIS FOR THE TRIBUNAL'S JURISDICTION ............................................... 90

        (1)    Article 25 ICSID Convention ................................................................ 91

        (2)    Argentina-Italy BIT ............................................................................... 93

|  |  | (a) | General Scope and Aim of the Argentina-Italy BIT | 94 |
|  |  | (b) | Article 8 BIT | 96 |
|  | (3) |  | Relationship between Article 25 ICSID Convention and Article 8 BIT | 102 |
|  |  | (a) | In General | 102 |
|  |  | (b) | With regard to the Subject Matter of the Dispute | 102 |
|  |  | (c) | With regard to the Parties | 104 |
|  |  | (d) | With regard to the Procedure to Be Followed | 106 |
|  | (4) |  | Other Relevant Legal Provisions and Principles | 107 |
|  | (5) |  | ICSID, BIT and Mass Claims | 107 |
| C. |  |  | THE ARBITRAL TRIBUNAL'S JURISDICTION | 109 |
|  | (1) |  | Introductory Remarks | 109 |
|  | (2) |  | Legal Dispute Arising out of the BIT – Issues 7 & 6 | 109 |
|  |  | (a) | Issues at Stake and Relevant Legal Provisions | 109 |
|  |  | (b) | Parties' Positions | 112 |
|  |  | (c) | Tribunal's Findings | 115 |
|  |  |  | (i) Alleged Breaches of the BIT | 115 |
|  |  |  | (ii) Contract Claims v. Treaty Claims | 118 |
|  |  |  | (iii) Potential Contract Claims against the Italian Banks | 121 |
|  |  | (d) | Conclusion | 122 |
|  | (3) |  | Legal Dispute relating to an Investment – Issues 9 & 8 | 123 |
|  |  | (a) | Issues and Relevant Legal Provisions | 123 |
|  |  | (b) | Parties' Positions | 128 |
|  |  | (c) | Tribunal's Findings | 133 |
|  |  |  | (i) Definition and Role of an Investment – In General | 133 |
|  |  |  | (ii) Investment under Article 1(1) BIT | 137 |
|  |  |  | (iii) Investment under Article 25 ICSID Convention | 141 |
|  |  |  | (iv) Two Alternative Views on "Investment" Lead to the Same Result | 142 |
|  |  |  | (v) Made in Argentina | 144 |
|  |  |  | (vi) In Compliance with the Law | 147 |
|  |  | (d) | Conclusion | 149 |
|  | (4) |  | Between Argentina and Italian Investors - Issues 10 & 11 | 150 |
|  |  | (a) | Issues and Relevant Legal Provisions | 150 |
|  |  | (b) | Parties' Positions | 156 |
|  |  | (c) | Tribunal's Findings | 158 |
|  |  |  | (i) Jurisdiction Rationae Personae – In General | 158 |
|  |  |  | (ii) With regard to Natural Persons | 159 |
|  |  |  | (iii) With regard to Juridical Persons | 161 |
|  |  | (d) | Conclusion | 165 |
|  | (5) |  | Subject to the Claimants' Written Consent – Issue 2 | 166 |

|  | (a) | Issues and Relevant Legal Provisions | 166 |

|  | (b) | Parties' Positions | 167 |

|  | (c) | Tribunal's Findings | 170 |
|  |  | (i) Law Applicable to the Question of Consent | 170 |
|  |  | (ii) Scope of Examination of the Tribunal | 170 |
|  |  | (iii) Relevant Substantive Validity Requirements | 171 |
|  |  | (iv) Argentina's Standing to Challenge Claimants' Consent | 173 |
|  |  | (v) Existence and Validity of Claimants' Consent | 174 |
|  |  | (vi) Existence of a Clear Consent to ICSID Arbitration | 177 |
|  |  | (vii) Validity of Claimants' Consent to ICSID Arbitration | 178 |

|  | (d) | Conclusion | 183 |

| (6) | Subject to Argentina's Written Consent – Issues 1(a), 4 & 8 | | 183 |

|  | (a) | Issues and Relevant Legal Provisions | 183 |

|  | (b) | Parties' Positions | 185 |

|  | (c) | Tribunal's Findings | 187 |
|  |  | (i) In General | 187 |
|  |  | (ii) Regarding Foreign Debt Restructuring | 187 |
|  |  | (iii) Regarding "Mass Claims" | 188 |
|  |  | (iv) Regarding the Negotiation and 18 Months Litigation Requirement | 193 |
|  |  | (v) Regarding the Forum Selection Clauses | 194 |

|  | (d) | Conclusion | 195 |

| (7) | Conclusion on Jurisdiction | | 195 |

| D. | ADMISSIBILITY OF THE CLAIM | | 201 |

| (1) | Introductory Remarks | | 201 |

| (2) | Mass Action – Issue 1(b) | | 201 |

|  | (a) | Issues and Relevant Legal Provisions | 201 |

|  | (b) | Parties' Positions | 203 |

|  | (c) | Tribunal's Findings | 205 |
|  |  | (i) Interpretation of the Silence of the ICSID Framework | 206 |
|  |  | (ii) Powers of the Arbitral Tribunal under Article 44 ICSID Convention and Rule 19 ICSID Arbitration Rules | 207 |
|  |  | (iii) Nature of the Necessary Adaptations to the ICSID Standard Procedure | 210 |
|  |  | (iv) Admissibility of the Necessary Adaptations | 211 |
|  |  | (v) Policy Considerations | 215 |

|  | (d) | Conclusion | 216 |

| (3) | Consultation Requirement – Issue 4 | | 217 |

|  | (a) | Issues and Relevant Legal Provision | 217 |

|  | (b) | Parties' Positions | 218 |

|  | (c) | Tribunal's Findings | 219 |
|  |  | (i) Existence of Consultations | 219 |
|  |  | (ii) TFA's Role in the Consultations | 220 |
|  |  | (iii) Consultations Requirement as Expression of Good Will | 221 |

|  | (d) | Conclusion | 222 |

(4)     18 Months Litigation Requirement – Issues 4 & 5 ................................ 222

        (a)     Issues and Relevant Legal Provisions.................................... 222

        (b)     Parties' Positions ................................................................... 224

        (c)     Tribunal's Findings ................................................................ 226

                (i)     *The System Put in Place by Article 8 BIT* ................................226
                (ii)    *General Consequences of a Disregard of the System* ...................227
                (iii)   *Consequences of Claimants' Disregard of the 18 Months Litigation*
                        *Requirement*.................................................................................229

        (d)     Conclusion .............................................................................. 231

(5)     Withdrawal and Addition of Claimants - Issues 3(a) and 3(b) ............................ 232

        (a)     Relevant Facts ........................................................................ 232

        (b)     Issues and Relevant Legal Provisions.................................... 234

        (c)     Parties' Positions ................................................................... 238

        (d)     Tribunal's Findings ................................................................ 240

                (i)     *Addition of Claimants* ................................................................240
                (ii)    *Withdrawal of Claimants* ............................................................243
                        (a)     Withdrawal, Discontinuance and Default....................243
                        (b)     Conditions for Discontinuance ....................................245
                        (c)     Terms of Discontinuance ..............................................247
                        (d)     Consequences of the Discontinuance ..........................249

        (e)     Conclusion .............................................................................. 250

(6)     Abuse of Rights – Issue 2(b)........................................................................ 252

        (a)     Issues ...................................................................................... 252

        (b)     Parties' Positions ................................................................... 252

        (c)     Tribunal's Findings ................................................................ 253

                (i)     *Good Faith in the Context of Treaty Claims* ...............................253
                (ii)    *Qualification of the Alleged Abuse of Rights* .............................255
                (iii)   *Lack of Relevant Abuse of Rights*...............................................256

        (d)     Conclusion .............................................................................. 258

(7)     Conclusion on Admissibility ........................................................................ 258

E.      OTHER PROCEDURAL ISSUES ............................................................................... 263

(1)     In General: Managing the Procedure ........................................................... 263

        (a)     Introduction ............................................................................ 263

        (b)     Splitting of the Merits Phase .................................................. 264

        (c)     Conclusion .............................................................................. 265

(2)     Specific Procedural Aspects ......................................................................... 265

        (a)     Admissibility of Substitute Annexes – Issue 3(a)....................... 265

        (b)     Other Procedural Aspects ...................................................... 268

IV.     COSTS ............................................................................................................ 269

V.    THE 11 ISSUES *SERIATIM* -  ANSWERS AND REFERENCES .............................................. 273

VI.   DECISIONS .................................................................................................................... 279

## Abbreviations

In this Decision, the Tribunal adopts the following abbreviations:

- "RfA" refers to Claimants' Request for Arbitration of 14 September 2006.

- "R-MJ" refers to Respondent's First Memorial on Jurisdiction and Admissibility filed on 8 August 2008.

- "C-MJ" refers to Claimants' Counter-Memorial on Jurisdiction filed on 7 November 2008.

- "R-R-MJ" refers to Respondent's Reply Memorial on Jurisdiction and Admissibility filed on 23 February 2009.

- "C-R-MJ" refers to Claimants' Rejoinder Memorial on Jurisdiction filed on 6 May 2009.

- "First Session Tr." refers to the transcript made of the First Session of 10 April 2008 (Tr. p. 1/1 means Transcript on page 1 on line 1).

- "First Session Minutes" refers to the Minutes of the First Session of 10 April 2008.

- "Exh. C[letter]-[N°]" refers to Claimants' exhibits.

- "Exh. R[letter]-[N°]" refers to Respondent's exhibits.

- "Hearing Tr." Refers to the transcript made of the Hearing on Jurisdiction held from 7 to 13 April 2010 (Hearing Tr. Day 1 p. 1/1 means Transcript of the Hearing Day 1,  page 1 on line 1).

- "C-PHB" refers to Claimants' Post-Hearing Brief of 22 June 2010.

- "R-PHB" refers to Respondent's Post-Hearing Brief of 22 June 2010.

With regard to the witness and expert statements,:

- "BIANCHI I" refers to Legal Opinion of Dr. Alberto B. Bianchi of 5 November 2008;

- "BIANCHI II" refers to the Supplementary Legal Opinion of Dr. Alberto B. Bianchi of 6 May 2009;

- "BRIGUGLIO" refers to the Opinion of Prof. Avv. Antonio Briguglio of 13 February 2009;

- "CERNIGLIA" refers to the Declaration of Avv. Massimo Cerniglia of 4 May 2009;

- "COTTANI I" refers to the Expert Report by Joaquín A. Cottani of 7 November 2008;

- "CREMIEUX" refers to the Expert Report of Pierre-Yves Cremieux (Analysis Group, Inc.) of 18 February 2009;

- "HARDIE I" refers to the Expert Report of Iain Hardie of 6 November 2008;

- "ILLUMINATO" refers to the Declaration of Dott. Sergio Mario Illuminato of 10 February 2009;

- "MAIRAL I" refers to the Legal Opinion of Héctor A. Mairal of 6 November 2008;

- "NAGAREDA" refers to the Expert Opinion of Richard A. Nagareda of 19 February 2009;

- "NAVIGANT I" refers to the Expert Report of Brent C. Kaczmarek, CFA (Navigant Consulting, Inc.) of 7 November 2008;

8

-    "PICARDI" refers to the Independent Legal Opinion of Prof. Nicola Picardi of 24 April 2009;

-    "PINGLE I" refers to the Expert Report of Mr. Rex E. Pingle of 7 November 2008;

-    "SLAUGHTER & BURKE-WHITE I" refers to the Expert Witness Statement of Anne-Marie Slaughter and William Burke-White of 8 August 2008;

-    "SUSMEL" refers to the Legal Opinion of Francisco G. Susmel of 5 November 2008.

# I.   PARTIES

### A.   <u>CLAIMANTS</u>

1.     Claimants, as presented by Claimants, are those described in the Annexes A, B and C to the Request for Arbitration, as substituted, the total number of whom at the time of initiation of the arbitration exceeded 180,000[1] (hereinafter referred to as "Claimants").  Annexes A and B to the Request for Arbitration contain a list of natural persons; Annex C to the Request for Arbitration contains a list of juridical entities.

2.     Annex D to the Request for Arbitration contains a power of attorney and delegation of authority for each Claimant being a natural person to White & Case LLP (*see* page 1 above). Annex E to the Request for Arbitration contains a power of attorney and delegation of authority for each Claimant being a juridical person to White & Case LLP (*see* page 1 above).

3.     According to Claimants, Claimants are mostly natural persons of Italian nationality or juridical persons incorporated and existing under the laws of Italy.

4.     Claimants are represented in these proceedings by "*l'Associazione per la Tutela degli Investitori in Titoli Argentini*" (hereinafter "Task Force Argentina" or "TFA"). The nature of TFA's representation, its specific role and position in, and its impact on the present proceedings are disputed between the Parties and will be dealt with by the Tribunal in the relevant part of this Decision.

---

[1]     See C-MJ § 164, stating that the total number of Claimants at the time of filing the C-MJ is 180,285. See also Navigant I § 27 and Cremieux § 22.

### B.   <u>RESPONDENT</u>

5.   Respondent is the Argentine Republic (hereinafter referred to as "Respondent" or "Argentina").

6.   Respondent is represented in this arbitration by its duly authorised attorneys mentioned at page 2 above.

7.   Claimants and Respondent are hereinafter collectively referred to as the "Parties."

# II.  FACTS

### A.   INTRODUCTION

8.    This Decision concerns the jurisdictional phase of a dispute relating to Claimants'
claims for compensatory damages due to Respondent's alleged breach of its
obligations under the *Agreement between the Argentine Republic and the Republic
of Italy on the Promotion and Protection of Investments*, signed in Buenos Aires on
22 May 1990, in two original copies, in the Italian and the Spanish language, both
texts being equally authentic (hereinafter "Argentina-Italy BIT" or "BIT" or
"Treaty") in relation to bonds issued by Respondent, allegedly held by Claimants,
on which payment Respondent defaulted.

9.    Considering the matter of Argentina's sovereign debt restructuring on which
Claimants' claims are based, the Tribunal finds it necessary and appropriate to set
out in this Section II the factual background to Argentina's default and its debt
restructuring, to the extent it is not disputed between the Parties, by describing the
financial market in relation to bonds, followed by a general overview on sovereign
debt restructuring, and subsequently setting forth Argentina's restructuring of its
economy and of its debt in relation to bonds in order to eventually address the
evolution/development of the dispute.

10.   The following summary of the factual background is not meant to be exhaustive,
and simply aims to lay down the general context of the dispute, while focusing on
aspects relevant to this jurisdictional phase.

### (1)   General Concepts relating to Financial Market and Bonds

11.   *(i) Bonds.*  Generally, "bonds" are defined as a debt, in which an interested party
loans money to an entity (corporate or governmental) that borrows the funds for a
defined period of time at certain interest rates.  Bonds are commonly referred to as
fixed-income securities and are one of the three main asset classes, along with
stocks and cash equivalents.

12.    Bonds, generally, have a pre-set final date of repayment, the "maturity" date, and pay interest, "coupon," on pre-set dates until the maturity date, usually on an annual or semi-annual basis.   Bonds are uniquely identified by a 12-character alpha-numerical International Securities Identifying Number or "ISIN."  The ISIN allows electronic trade and settlement in the particular security in markets across the globe.

13.    A set of bonds issued at the same time but having different maturity dates is referred to as "serial bonds."  A single bond issue offered to the public on multiple dates is referred to as "series bonds."

14.    "Sovereign bonds" have the same characteristics as the normal bonds described above, with the specificity that they are issued by governments and are usually denominated in a foreign currency.   "International sovereign bonds" are bonds issued by governments denominated in a foreign currency in foreign markets (i.e., outside the country of the issuer). Bonds issued by governments in the country's own currency are referred to as "government bonds."

15.    A popular example of sovereign debt security is the instrument of "Brady Bonds," first proposed in 1989. They are named after former U.S. Treasury Secretary Nicholas Brady, who supported the effort to restructure emerging market debt instruments, following the 1980s debt crisis. Brady Bonds were issued by governments in developing countries as a conversion of bank debts into loans.  The key innovation behind the introduction of Brady Bonds was to allow commercial banks to exchange their claims vis-à-vis developing countries into tradable instruments, allowing them to get the debt off their balance sheets.  Due to their classification as bonds, rather than bank loans, Brady Bonds were much easier to trade to a broader range of financial market actors.  Given that Brady Bonds were in many cases very large by the standards of the bond markets at the time, they were seen as one of the most liquid emerging market securities.  Brady Bonds were collateralized, i.e., the repayment of principal and, in some cases, part of the interest payments, was backed by U.S. government bonds ("Treasuries"), which the

debtor country purchased, using a combination of International Monetary Fund, World Bank, and the country's own foreign currency reserves.   The collateral involved made Brady Bonds considerably more attractive to potential investors than ordinary, uncollateralized bonds of the issuing country.   The two main types of Brady Bonds are (i) "par bonds," issued at the same value as the original loan, with the coupon on the bonds being below market rate and principal and interest payments are usually guaranteed; and (ii) "discount bonds," issued at a discount to the original value of the loan, with the coupon on the bonds being at market rate and principal and interest payments usually guaranteed.

16.  Brady Bonds are the origin of the emerging sovereign bond market in its current form. The Brady Bond process ended during the 1990s.

17.  *(ii) Process of Issuing Bonds.*   The process of issuing new bonds involves a chain of sales in order to achieve distribution of the issued bonds to the final investor.

18.  The bond issuer enters into an agreement with a group of banks, which undertake to subscribe to and purchase a bond. These banks, commonly referred to as the "Subscribers" or "Lead Managers," then organize together with other banks, the so-called "Underwriters" or "Co-Managers," a syndicate. The members of this syndicate, jointly referred to as the "Participants," each underwrite differing parts of this bond, depending on their status in the syndicate.   These Participants then distribute their specific part of the bond to further "Intermediaries," such as commercial banks, pension funds and other financial institutions, which in turn may or may not distribute their own part to their clients, including individual investors. Thus, the purpose of the subscribers, underwriters and intermediaries is to act as a distribution conduit.

19.  Originally, bonds were traded in the form of negotiable bearer instruments, imposing significant handling costs and security risks. As trading volume grew, systems were developed to "dematerialize" tradable securities, i.e., to eliminate

both the need for certificates and maintenance of a complete security register by the issuer. Therefore, centralized depository systems were established allowing electronic trading of the securities through electronic accounts (so-called "non-certified securities").[2] On a global scale, a system has developed whereby issuers deposit a single "global certificate" representing all the outstanding securities of a class or series with a "universal depository," such as The Depository Trust Company ("DTC"), Depository Trust & Clearing Corporation ("DTCC"), Euroclear or Clearstream. All securities traded through a universal depository are registered in electronic form, on the books of various Intermediaries (so-called "book-entry form") between the ultimate investor, e.g., a retail investor, and the banks participating in the universal depository, i.e., the Participants. The securities, e.g., bonds, are then traded and settled on the basis of changes in the registration of the accounts opened with the Participants for Intermediaries (i.e., Sub-Participants) and the sub-accounts opened with the Intermediaries for their clients.

20.    Each global certificate is identified by a special number (CUSIP for DTC, ISIN for Euroclear) and each Participant's account is also identified. The system uses the global certificate's identification number to keep track of transfers and ownership of the relevant securities. The universal depository issues computer-generated position listing reports indicating the position of the relevant Participant in the global certificate and the amount thereof. Final investors' position on their securities is usually evidenced by account statements issued by one of the Participants or intermediaries. It is disputed between the Parties whether the use of such central depository systems creates different categories of holders or owners of the relevant categories (see §§ 374, 411, 415 below).

---

[2]        SUSMEL, §§ 7 and 11.

15

21.  The final investor can be anyone and anything from hedge funds, pension funds, central banks, to individuals.  With respect to the investor, a distinction is made between "institutional" and "retail" investors.

22.  "Institutional investors" are those that are themselves institutions.

23.  "Retail investors" are those who are individuals, investing on their own behalf.  A bond issued sold to "retail" means, thus, the bond issued is sold to an individual investor. Retail investors who are less-wealthy individuals prefer the certainty of investing in fixed-income bonds to the greater volatility of the stock market.  Such retail investors tend to be "buy and hold" investors who buy the bond and hold it until maturity. Consequently, "buy and hold" investors trade little.

24.  A "retail bank" is referred to when a bank purchases bonds from the larger banks which typically serves as underwriters and sells bonds to individual investors, usually through its branch networks.

25.  *(iii) The Bond Market.*  The bond market can be divided into a "primary market" and a "secondary market."

-  The "primary market" is defined as the market for newly issued bonds.

-  The "secondary market" is defined as the market where previously issued securities are bought and sold.

26.  Thus, the distinguishing difference between the two markets is that in the "primary market," the money for the bonds is received by the issuer of the bonds from an investor, in principle the Underwriters, whereas in the "secondary market," the securities are simply assets held by one investor selling them to another investor.

27.  *(iv) Rating of Bonds.*  Usually, bonds issues are rated by agencies expressing an opinion as to the creditworthiness of bonds.  One of the most important rating agencies is Moody's Investor Services (hereinafter "Moody's") assigning a rating

16

on a scale from AAA to C.  Another important rating agency is Standard & Poor's, using a rating scale from AAA to D.  The rating scales are based on the probability of default by the issuer in question.

**(2)** **General Overview on Sovereign Debt Restructuring**

28.   *(i) Sovereign Default.*   The reason for a State to engage in sovereign debt restructuring is the default of the State on its sovereign debt. In this connection, the Tribunal refers to the description of sovereign default as defined by Standard & Poor's:[3]

> Standard & Poor's generally defines default as the failure to meet a principal or interest payment on the due date (or within the specified grace period) contained in the original terms of a debt issue.
>
> Question can arise, however, when applying this definition in different situations and to different types of sovereign obligations. Standard & Poor's considers a sovereign to be in default under any of the following circumstances:
>
> For local and foreign currency bonds, notes, and bills issued by the central government and held outside the public sector of the country, a sovereign default occurs when the central government either fails to pay scheduled debt service on the due date or tenders an exchange offer of new debt with less-favorable terms than the original issue.  While a central government's failure to service debt owed to public sector entities, to meet a lease or other nondebt obligation, or to pay on a guarantee may be indicative of significant political/economic stress and imminent default, such an event in and of itself does not constitute a sovereign default.  If a debt issue is rated on the basis of payment of one of these nondebt financial obligations and the sovereign's failure to pay results in a default on the rated issue, the rating of that specific issue will fall to 'D'.
>
> For local currency issued by the central bank, a sovereign default takes place when notes are converted into a new currency of less than equivalent face value.
>
> For private sector bank loans incurred by the central government, a sovereign default occurs when the central government either fails to pay scheduled debt service on the due date, or negotiates with the bank creditors a rescheduling of

---

[3]      Exh. C-127, p. 19; see also PINGLE I, § 31.

principal and/or interest at less-favorable terms than in the original loan. Such rescheduling agreements covering short- and long-term bank debt are considered defaults even where, for legal or regulatory reasons, creditors deem the rescheduling to be voluntary.

In some cases, rescheduled sovereign bank loans are ultimately extinguished at a discount from their original face value. Typically, such episodes involve exchange offers (such as those linked to the issuance of Brady bonds), debt/equity swaps related to government privatization programs, and/or buybacks for cash. Standard & Poor's considers such transactions as defaults when they feature less-favorable terms than the original obligation.

[...]

29.    *(ii) Sovereign Debt Restructuring.*   Sovereign debt restructuring has the aim of preserving the functioning of the defaulting State as well as the international financial system while equitably protecting the interests of the creditors.

30.    The modern sovereign debt restructuring is rooted in the establishment of the International Monetary Fund (hereinafter "IMF") at the Bretton Woods Conference in July 1944. According to its Articles of Agreement, the IMF is to "[t]o promote exchange stability, to maintain orderly exchange arrangements among members, and to avoid competitive exchange depreciation."[4]  Thus, the IMF's purpose is, *inter alia,* to prevent sovereign defaults through monitoring and lending, including providing emergency loans intended to assist sovereigns to avoid default in a time of potential crisis.

31.    Considering that the size of defaulting government debt has increased exceptionally while the IMF resources have expanded only slightly, it became clear that negotiating an agreement with the IMF is not a central part of modern sovereign debt restructuring anymore.

---

[4]    Article 1§ 3 of the Articles of Agreement of the International Monetary Fund.

32.   Rather, from the 1950s through the 1970s, the bigger part of lending to sovereigns was provided by other States or their agencies.  The outcome was the establishment of the Paris Club in 1956, when Argentina agreed to meet its public creditors in Paris.

33.   The Paris Club consists of a group of sovereign lenders "whose role is to find coordinated and sustainable solutions to the payment difficulties experienced by debtor countries."[5] The Paris Club considers itself as a "non institution," remaining strictly informal.  However, its work is based on a number of rules and principles agreed by the creditor States in order to facilitate the decision making process and the conclusion of agreements between the member States of the Paris Club and the debtor State.[6]

34.   The principles of the Paris Club are summarized as follows: (i) decision making on a case-by-case basis; (ii) consensus among the participating creditor States; (iii) conditionality upon the debtor State providing a precise description of its economic and financial situation, that it has implemented and is committed to implement reforms to restore its economic and financial situation, and that it has demonstrated track record of implementing reforms under an IMF program; (iv) solidarity among the creditor States of the Paris Club to agree to act as a group in their dealings with a given debtor State; and (v) comparability of treatment, i.e., that a debtor State in agreement with its Paris Club creditor States should not accept from its non-Paris Club creditors terms of treatment of its debt less favorable to the debtor than those agreed with the Paris Club.[7]

---

[5]   http://www.clubdeparis.org/

[6]   *Ibid.*; http://www.imf.org/external/np/exr/facts/groups.htm.

[7]   http://www.clubdeparis.org. See also PINGLE I, § 83 and SLAUGHTER & BURKE–WHITE I, § 22.

35.   In the late 1980s and early 1990s, the nature of sovereign borrowing changed to "emerging market debt," and ultimately led to the establishment of the London Club, given that the effectiveness of the Paris Club was limited in this market sector.  The emerging debt market was rooted in flows of private capital from larger banks in developed, high-income States, which sought to take advantage of the higher interest rates available through loans to sovereigns in the developing world. Introduced by the Baker Plan, named after U.S. Treasury Secretary James Baker, both debtors and creditors understood that funding from international financial institutions depended on a rescheduling agreement with private creditors, i.e., commercial bank lending.

36.   Generally, a debtor initiates a process in which a London Club "Advisory Committee" is formed, which is chaired by a leading financial firm and includes representatives from other exposed firms. Upon signing of a restructuring agreement, the Advisory Committee is dissolved.[8] Such restructuring agreement is based on three principles: (i) case-by-case approach, (ii) voluntary participation of the borrowing banks, and (iii) restructuring designed based on the market situation.[9]

37.   In the mid-1990s, caused by the substantial issuing of Brady Bonds, mentioned in ¶ 15 above, the vast majority of sovereign borrowing from private sources came from bond issues by sovereign States. In the light of the ever growing number of holders of interests in or under a sovereign bond, the closed negotiating framework of the Paris and London Clubs showed its limits.[10] Thus, a new mechanism was developed in the form of an "exchange offer."

---

[8]      http://www.imf.org/external/np/exr/facts/groups.htm.

[9]      See also PINGLE I, § 88 and SLAUGHTER & BURKE–WHITE I, § 25 referring to LEX RIEFFEL, *Restructuring Sovereign Debt: The Case For Ad Hoc Machinery* 27-29 (2003), § 108.

[10]     SLAUGHTER & BURKE–WHITE I, §  29 *et seq*.; PINGLE I, § 96.

38.   While many elements of an exchange offer are disputed between the Parties, they do seem to agree on the main object of an exchange offer, which may be summarized as follows: In an exchange offer, the sovereign facing default develops a new issue of bonds that are within the sovereign's ability to pay and acceptable to most bond holders and offers such new bonds in exchange for the old bonds in the hope of securing the acceptance of a supermajority of the bondholders.

39.   Although the Parties agree that the terms and conditions of an exchange offer should ideally aim to ensure an equitable balance between the interests of the sovereign in restructuring its debt according to its payment abilities and the interests of the creditors, they disagree on how and when such aim is best achieved.

40.   Currently, there exists no formal legal framework establishing precise steps to be followed by the defaulting sovereign or the creditors. Nevertheless, an informal regime has developed consisting of the following principles: (i) sovereign to signal the need of debt restructure; (ii) communication between the sovereign and the creditors; (iii) consensus and consent on the terms of the restructure; and (iv) equitable burden sharing.[11]

41.   Remaining inefficiencies in the sovereign restructuring practices, in particular with regard to the risk created by holdout creditors, continue to trigger a series of proposals for improvements. Existing proposals include the creation of an international bankruptcy mechanism modelled on U.S. domestic bankruptcy law, or the development of contractual "collective action clause" to be included in bonds in

---

[11]   SLAUGHTER & BURKE-WHITE I, §§ 42 *et seq.* and §§ 87 *et seq.* referring to a proposal of the IMF.

order to bind a holdout minority to new payment terms agreed upon by a supermajority of bondholders.[12]

**(3)** **Argentina's Restructuring of Its Economy and Its Debt in relation to Bonds**

42. After having laid down the basic concepts necessary to understand the general context of the dispute, the present section focuses on the economic context prevailing in Argentina preceding, during and following the issuance of the bonds at stake in the present dispute.

*(a)    Argentina's Restructuring of Its Economy in the 1990s*

43. In the 1990s, following the 1980s debt crisis, Argentina embarked on an ambitious effort to restructure its economy in order to encourage growth and reduce debt and inflation by deregulating its economy and privatizing certain industries. Argentina's Convertibility Plan of 1991 was part of the strategy aimed at addressing inflation, by pegging the Argentine peso to the U.S. dollar and limiting the printing of additional currency to an amount necessary to purchase surpluses of U.S. dollars in the foreign exchange market.

44. *(i) Issuing of Sovereign Bonds.*  Issuing sovereign bonds was one of the pillars of restructuring Argentina's economy in the early 1990s. Thus, on 29 October 1992, Law No. 24,156, the Law on Financial Administration and Control Systems (hereinafter "LFA") was enacted,[13] being the legal foundation for Argentina to issue bonds. It contains several requirements as described below:[14]

---

[12]    See SLAUGHTER & BURKE-WHITE I, §§ 87 *et seq*. and §§ 90-91referring with regard to collective action clauses to a report of the IMF encouraging such clauses (report available on http://www.imf.org/external/np/g22/ifcrep.pdf).

[13]    Exh. CLA-ARG-297.

[14]    See MAIRAL I, §§ 39-44. These requirements are not disputed by Respondent.

- Legal Authorization: Either a specific law authorizes the loan, or the loan is included in a general authorization contained in the annual budget law. The relevant law may authorize either the Executive or the Secretary of the Treasury to execute relevant transactions. The annual budget law shall specify the type of debt, the maximum amount authorized for the transaction, the minimum repayment schedule, and the purpose of the financing.[15]

- Executive Decision: An executive decision (called a "Decree") is issued to approve the debt transaction specifically or to authorize the Ministry of Economy or the Secretary of the Treasury to execute transactions up to a certain amount. Alternatively, the enabling law may authorize the Ministry of Economy or the Secretary of the Treasury directly to enter into sovereign debt transactions.

- Central Bank opinion: The Central Bank issues an opinion as required by Article 61 of the LFA concerning the impact of the debt on Argentina's balance of payments.[16]

- Intervention of the National Office of Public Credit: This office certifies that the amount of the sovereign debt transaction is within the limits provided by the relevant budget law, and thus complies with Article 60 of the LFA that provides that Government agencies cannot execute debt transactions that are not authorized by the General Budget Law of the respective year or in another specific law.[17]

---

[15]    Article 60 LFA.

[16]    Exh. CLA-ARG-297.

[17]    *Ibid.*

- Approval of the terms and conditions: A decision of the Ministry of Economy or of the Secretary of the Treasury approves the terms and conditions of the bonds, including the subscription agreement, the paying agency agreement, and the prospectus, and authorizes a Government officer to execute the appropriate documentation.

- Legal opinion by the *Procuración de Tesoro* or the Legal Office of the Ministry of Economy:  The *Procuración de Tesoro* or, as the case may be, the Legal Office issues an opinion on the validity of the transaction at stake and certain other requirements.  This opinion represents the official position of the Argentine State on the issue.

45.  In addition to enacting a series of laws and decrees, Argentina also implemented various programs facilitating issuing sovereign bonds.

46.  In particular, in order to raise capital, Argentina implemented the Brady Bond program and started issuing Brady Bonds in early 1993.

47.  Argentina intended to develop a diversified market by issuing bonds in the international financial markets.

48.  The process of Argentina issuing bonds in Europe was by relying on large investment banks as its lead managers, which studied the markets and competed with each other for Argentina's business. Argentina's choice of its lead managers were investment banks such as BNP Paribas, CS First Boston, Deutsche Bank, J.P. Morgan, and Morgan Stanley. Thereafter, banking syndicates were established to underwrite and distribute differing volumes of bonds, depending on the underwriters' status in the syndicate.

49.  The lead managers would design, together with Argentina, a general bond issuance strategy. Based thereon, they would then suggest to Argentina which commercial banks would participate as co-managers, based, namely, on their ability to reach

investors with a profile fitting the bond issuance strategy. In this respect, while it is not disputed that Argentina participated in marketing efforts to banks and large institutional purchasers, the Parties disagree whether Argentina's bond issuance strategy targeted the Italian retail market, as submitted by Claimants.

50.   In total, from 1991 through 2001, Argentina placed over US$ 186.7 billion in sovereign bonds across both domestic and international capital markets.[18] This included 179 bonds issued in the international capital markets that raised a total of approximately US$ 139.4 billion, of which 37% were denominated in US$, 22% were denominated in Euros, 11% were denominated in Yen, 11% were denominated in Deutsche Mark, 7% were denominated in Italian Lira, 3% in Argentine Pesos and 9% in other currencies.[19]  Out of the 179 bonds issued by Argentina, 173 were denominated in foreign currencies; six were denominated in Argentine Pesos. Claimants allegedly purchased 83 of the 173 foreign currency bonds.[20]

51.   The 83 bonds allegedly purchased by Claimants are governed by the laws of different jurisdictions, were issued in different currencies, and listed on various international exchanges, such as Buenos Aires, Frankfurt, Hong Kong, Luxembourg, Milan, Munich, and Vienna. These bonds generally paid a fixed coupon with the final maturity varying from three to thirty years.[21]

---

[18]   COTTANI I, § 22, referring to Chart "All Argentine External Bonds, 1991-2001," derived from Bloomberg and Ministry of Economy, "Títulos Públicos Emitidos en Moneda Nacional" and "Títulos Públicos Emitidos en Moneda Extranjera" (Charts of Argentine Government Bonds in Domestic and Foreign Currency), 31 December 2001. See also R-MJ § 11, and Exh. RE-195.

[19]   NAVIGANT I, Table 2; see also C-MJ §§ 117-118.

[20]   COTTANI I, § 22, See also R-MJ § 11, and Exh. RE-195.

[21]   HARDIE I, § 19; CREMIEUX, §§ 9 et seq.

(b)   *Argentina's Financial Crisis and Default of 2001*

52.   By the late 1990s, Argentina began to suffer a severe economic recession and consequent reduction of fiscal revenues, leading Argentina to incur additional debt.[22]

53.   The Parties disagree on the specific causes of this recession. Respondent emphasizes external factors such as the Asian, Russian and Brazilian financial crises in 1997, 1998 and 1999 respectively; the raising of interest rates in the US; the appreciation of the US dollar from 1995 to 1999 affecting export prices; etc.[23] In contrast, Claimants invoke failures on Argentina's side as important factors leading to the recession.[24]

54.   These adverse economic developments reflected mainly in two ways on the Argentine economy:

(i)   Substantial "capital flight": Many businesses and individuals fearing a devaluation of the peso started to withdraw money from the Argentine banking system. By the end of 2001, those withdrawals allegedly amounted to approximately US$ 15 billion,[25] endangering the entire banking system and forcing Argentina's central bank to expend substantial parts of its international reserve to defend the value of the peso, and forcing the Government to introduce restrictions on the withdrawal of bank deposits.

---

[22]   R-MJ § 20.

[23]   R-MJ §§ 7 *et seq.* and 13 *et seq.*

[24]   C-R-MJ §§ 108 *et seq.*

[25]   R-MJ § 16, Ex. RE-132.

(ii)   Decrease of capital inflow: As a result of a loss of confidence in the Argentine economy, capital inflows from foreign direct investment declined significantly.[26]

55.   As the need for debt relief became clear, Argentina took in 2001 various measures in an attempt to restructure its economy and lighten its debt. Such measures included cutting both federal and provincial government spending, adopting a zero-deficit law, improving its tax administration system, and supporting competition with tax cuts for exporters, as well as global exchange offers in February, June and November 2001.[27]

56.   These efforts apparently did not suffice to redress the situation. By December 2001, Argentina had allegedly come to a point where it was unable to avoid deferring interest and principal payments on all of its external bond debt owed to both foreign and Argentine creditors.[28]

57.   These economic difficulties were accompanied by considerable political and social unrests, leading eventually to the resignation of the then President Fernando de la Rúa and his entire cabinet on 19 December 2001.

58.   On 23 December 2001, Argentina defaulted by publicly announcing the deferral of over US$100 billion of external bond debt owed to both non-Argentine and Argentine creditors.[29]

---

[26]   R-MJ § 17.

[27]   R-R-MJ §§ 22-23, and §§ 65-66, see also Exh. RE-195, RF-26.

[28]   R-MJ § 24.

[29]   R-R-MJ § 66.

*(c)    The Events following Argentina's Default of 2001*

59.    After President de la Rúa's resignation of 19 December 2001, various difficult attempts to appoint a new president were made. On 1 January 2002, Congress eventually elected Mr. Eduardo Duhalde as President.

60.    In January 2002, Congress declared a public emergency in social, economic, administrative, financial and exchange matters with the passage of the Public Emergency and Reform Law of 2002 (the "Emergency Law").[30] The Emergency Law, among other things, terminated the parity between the peso and the dollar. This "pesification" was followed by a substantial devaluation of the peso.

61.    The effects of the economic crisis on ordinary Argentine citizens were devastating. According to Argentina, by May 2002, unemployment had reached 21.5%, an 8% increase over 1998, the year the crisis began. Another 19% of the population was underemployed. The poverty level increased to 54.3% of the Argentine urban population and the indigence level reached 22.7%.[31]

*(d)    Argentina's Restructuring of Its Debt in relation to Bonds and Relevant Creditors' Reactions*

62.    The substantial devaluation of the peso further accentuated the weight of debt in foreign currencies, which constituted an important part of Argentina's total debt. This led Argentina to envisage the restructuring of its foreign debt.

63.    Based on figures produced by Respondent, by the end of 2002, Argentina's total public debt burden was approximately US$ 137 billion, representing approximately

---

[30]    R-MJ § 30.

[31]    R-MJ § 32.

130% of its GDP in 2002, and among which approximately US$ 76 billion was owed to resident and non-resident public bondholders.[32]

64.    In relation to the restructuring of its foreign debt, according to figures brought forward by Respondent in 2003 and relied upon by Claimants, more than US$ 27.5 billion worth of bonds were held by European bondholders, of which approximately US$ 22.2 billion were held by retail bondholders, including US$ 13.5 billion owned by Italian bondholders (approximately 600,000 persons).[33]

65.    On 18 September 2002, pursuant to a resolution of the Executive Committee of the Italian Banking Association (hereinafter "ABI"), eight major Italian banks (Banca Antonveneta, Banca Intesa, Banca Sella, BNL, Iccrea Banca, Monte dei Paschi di Siena, San Paolo, and UniCredito) established *l'Associazione per la Tutela degli Investitori in Titoli Argentini* or "Task Force Argentina" or "TFA" in Rome (see § 4 above).  TFA is organized under Italian law as an *associazione non riconosciuta*, funded by its members' contributions and headed by Dr. Nicola Stock as its president.[34]

66.    The aim of TFA is to "represent the interests of the Italian bondholders in pursuing a negotiated settlement with Argentina."[35] Bondholders wishing to make use of this possibility and to be represented by TFA were requested to sign a "Mandate for the

---

[32]    R-MJ § 33.

[33]    COTTANI I, § 46, referring to the presentation of the Secretariat of Finance, Ministry of Economy and Production "Argentina – From Stabilization to Economic Growth" of August 2003 at: http://www.argentinedebtinfo.gov.ar/documentos/europe_presentation_english_august.pdf.

[34]    http://www.tfargentina.it/chisiamo.php.

[35]    C-MJ § 180, which reflects the wording to be found in Italian on http://www.tfargentina.it/chisiamo.php.  See also TFA's Bylaws 2002, Article 2, which provide that "to represent free of charge and on the basis of a mandate the interests of Italian investors in Argentinean securities within the framework of the debt restructuring operations to be negotiated with the Argentinean authorities or other Argentinean issuers" (translation provided by the Tribunal).

Protection of the Interests Connected with the Bonds involved in the 'Argentinean Crisis'" (so called "TFA Negotiating Mandate"). [36] The specific role and the legitimacy of TFA's actions under this mandate is disputed between the Parties and will be subject to further examination (see §§ 449 *et seq.* below).

67.   The TFA Negotiating Mandate provides – *inter alia* – as follows:

> The undersigned [...]
>
> HAVING ACKNOWLEDGED THAT:
>
> banks and financial intermediaries have created the Association for the Protection of Interests of the Investors in the Argentinean Bonds ("*Associazione per la Tutela degli Interessi degli Investiotori in Titoli Argentini*"), which has the following purposes:
>
> to represent, free of charge and on the basis of a mandate, the interests of the subscribers of Argentinean bonds in the frame of the restructuring of the debt, which will be subject to the negotiation with the Argentinean Authorities or with other Argentinean issuers;
>
> to make available its own consulting and assistance activity, to the above purposes;
>
> to handle the relationships with the Argentinean diplomatic and consular Authorities, with the central and local Authorities of such country, with the International Monetary Fund, with the European Central Bank and with the various National Central Banks, with the Italian Government and Parliament as well as, more in general, with each other economic and political, private and public, national and international authority, organisation and institution, with which the Association will deem necessary or appropriate to consult or co-operate;
>
> to attend the negotiations for the restructuring of the debt with the Argentinean Authorities or with other Argentinean issuers at any national or international seat, in accordance with the Bylaws of the Association and with the decisions taken by the management bodies of the Association;
>
> to make the requests and proposals which as might deem appropriate in the interests of the holders of the bonds represented by it and to obtain the necessary consent of such holders (the way and the timing thereof will be decided).
>
> DELEGATES

---

[36]   Exh. C-417.

> The aforementioned Association to represent himself during any stage of the negotiations in connection with the receivables of the bonds indicated in the exhibit hereof.
>
> The undersigned hereby undertakes to communicate promptly in writing to the bank any amendments which may occur in the holding the bonds indicated in the exhibit hereof.
>
> The undersigned may terminate this proxy, in writing, with a notice of 15 days, provided that the same proxy will be considere[d] terminated in the case of sale of all the bonds indicated in the same exhibit.
>
> (Emphasis in the original)

68.  Allegedly, over 450,000 Italian persons and entities claimed to have held Argentine bonds for an aggregated nominal amount of US$ 12 billion and submitted their mandates to TFA.[37]

69.  While the Parties are in agreement that discussions took place between TFA and Respondent in order to reach a solution for the outstanding debt, they disagree whether these discussions can be considered to constitute proper negotiations between TFA, on behalf of Claimants, and Respondent.  The Tribunal will analyze the exchanges between TFA and Respondent in its findings where appropriate and necessary.[38]

70.  In September 2003, Argentina reached an agreement with the IMF concerning a three-year credit package of approximately US$ 12.5 billion.[39]

71.  On 22 September 2003, Argentina presented an initial debt restructuring strategy known as the "Dubai Proposal," focusing on the objective of obtaining a reduction in the face value of the unrestructured debt:[40]

---

[37]     Exh. C-RA-11, 12 and 13; see further C-MJ § 182 and Exh. C-372.

[38]     See below §§ 559 *et seq*.

[39]     R-MJ § 36 and Exh. RE-137.

"[...]

We also have to ensure liquidity with a new maturity profile in line with Argentina's real repayment capacity.

Finally, although our decision is not to increase Argentina's debt, but to reduce it, we have to facilitate a responsible return to the capital markets to ensure compliance with the commitments assumed under the restructuring.

[...]

The debt to be restructured i[s] defined as "eligible debt". It includes all the bonds issued before the cutoff date, December 31, 2001. To have an idea of the size and complexity of Argentina's debt, the eligible debt encompasses 152 different bonds, issued originally in 14 different currencies, which have been reduced to seven thanks to the Euro, and subject to eight different legislations.

[...]

Undoubtedly, our proposal must be based on Argentina's repayment capacity in the medium and long term.

The bond swap and the amendment of the issuance conditions, in the cases in which such amendment is possible, will take place simultaneously. The menu will include comparable bonds, equivalent in terms of present value.

[...]

We would like to make clear again that there will be no discrimination among bondholders.

[...]

Summing up, we want to have a smaller number of bonds, a smaller number of currencies and jurisdictions so that the resulting bonds may have a higher liquidity.

[...]

The new bonds will be: Discount bonds, whose value evidences the haircut in the face value; Par bonds, which suffer no face value reduction or a small face value reduction, but that offer coupons and longer payment terms; and last of all Capitalized Bonds. Our offer will also include different alternatives for such bonds, with coupons including a lower fixed interest rate coupled with a variable rate indexed on the basis of the growth of Argentina's GDP. These indexed bonds reflect our intention to share the benefits of increased growth in the medium term and to pay a lower interest rate flow in the case of possible slowdowns of or drops in Argentina's GDP. It seems to be a reasonable

---

[40]     Exh. RE-138, pp. 14, 21, 22, 24.

option since nobody knows which Argentina's economy growth rate will be in, let's say, five or ten years.

[...]"

72. On 12 January 2004, the Global Committee of Argentina Bondholders (hereinafter "GCAB") was founded in Rome. Its founding members were three major bondholder groups, the Argentine Bond Restructuring Agency, the Argentine Bondholders Committee (hereinafter "ABC"), and TFA as well as two banks, Bank of Tokyo-Mitsubishi and Shinsei Bank. At the time of GCAB's founding, the members represented more than half a million retail investors and more than 100 institutions, including banks, funds, partnerships, and committees, with total holding of US$ 37 billion in nominal value.[41] Nicola Stock, chairman of TFA, and a representative of ABC were appointed as chairmen of GCAB.

73. The aim of GCAB was to allow a better coordination of the various members' efforts to negotiate with Argentina "in order to achieve an efficient and fair restructuring of the debt of Argentina."[42] To achieve this purpose, the Steering Committee of GCAB was to "establish a plan of action and guidelines for a single, global strategy."[43]

74. Following the publication of the Dubai Proposal, discussions were held between creditor groups, such as GCAB and TFA, and Respondent, whereby the Parties disagree on whether these discussions can be considered "good faith" negotiations or consultations, each of them accusing the other of a lack of good faith.[44] The

---

[41]    Exh. C-163.

[42]    Exh. C-297.

[43]    Exh. C-297.

[44]    C-MJ §§ 197-198; R-MJ §§ 87-97, and 99 in which Respondent described GCAB as "TFA-dominated."

Tribunal will analyze any exchanges between such creditor groups and Respondent in its findings where appropriate and necessary.[45]

75.   On 27 April 2004, Argentina issued a press release announcing its intention to file Form 18-K/A with the U.S. Securities and Exchange Commission in "early June 2004" concerning a proposal of a debt restructuring exchange offer.[46]

76.   On 10 June 2004, Argentina filed Form 18-K/A with the U.S. Securities and Exchange Commission, describing the basic terms of its exchange offer.[47] In Autumn 2004, the Argentine Government filed further documents with the U.S. Securities and Exchange Commission and other relevant national securities regulators laying out details of the exchange offer (hereinafter "Exchange Offer 2005").[48]   The Exchange Offer 2005 opened on 14 January 2005 and closed on 25 February 2005.

77.   On 14 January 2005, Argentina launched the Exchange Offer 2005, pursuant to which bondholders could exchange 152 different series of bonds, on which Argentina had suspended payment in 2001, for new debt that Argentina would issue.  The Exchange Offer 2005 provided to the beneficial owners of the roughly US$ 81.8 billion in eligible outstanding debt a choice of options from which to choose the form of their new debt. The bondholders could choose par bonds with the same principal but a lower interest rate than the non-performing debt, discount bonds with reduced principal but a higher interest rate, or quasi-par bonds with a principal and interest rate falling between the two other bond options.  Each bond offered was accompanied by securities with payment conditioned upon Argentina's

---

[45]      See below §§ 559 *et seq.*

[46]      Exh. C-165.

[47]      Exh. RE-152.

[48]      See e.g. Exh. RE-155.

gross domestic product ("GDP-Linked Securities").   The first page of the Prospectus Supplement to the Prospectus of 27 December 2004 states:[49]

> "The Republic of Argentina
>
> Offers to Owners of
>
> Each Series of Bonds listed in Annex A to this Prospectus Supplement
>
> (collectively, the "Eligible Securities")
>
> To exchange Eligible Securities for its
>
> Par Bonds due December 2038 ("Pars"),
>
> Discount Bonds due December 2033 ("Discount"),
>
> Quasi-Par Bonds due December 2045 ("Quasi-pars") and
>
> GDP-linked Securities that expire in December 2035 ("GDP-linked Securities")
>
> collectively, the "New Securities," on the terms and conditions described in this prospectus supplement.
>
> The GDP-linked Securities will initially be attached to the Pars, Discounts and Quasi-pars.
>
> The aggregate Eligible Amount (as defined below) of all Eligible Securities currently outstanding is U.S.$81.8 billion, comprising U.S.$79.7 billion of principal and U.S.$21 billion of accrued but unpaid interest as of December 31, 2001, based on exchange rates in effect on December 31, 2003.
>
> [...]"

78.   On 9 February 2005, Law 26,017 was enacted, referred to by Claimants as the "Cram Down Law," and hereafter referred to as "Emergency Law" or "Law 26,017." It was promulgated on 10 February 2005 and published in the Official Gazette on 11 February 2005.  The Emergency Law provides, *inter alia*, that with regard to those bonds which were eligible for but were not exchanged in the Exchange Offer 2005 (i) the Executive Branch of the government shall not reopen

---

[49]     Exh. RF-28.

the exchange process; and (ii) the national government is prohibited from entering into any juridical, extra-juridical or private transaction:

> "**ARTICULO 1°** -- Sin perjuicio de la vigencia de las normas que resulten aplicables, los bonos del Estado nacional que resultan elegibles para el canje establecido en el Decreto N° 1735 del 9 de diciembre de 2004, que no hubiesen sido presentados al canje según lo establecido en dicho decreto, quedaran sujetos adicionalmente a las disposiciones de la presente ley.
>
> **ARTICULO 2°** -- El Poder Ejecutivo nacional no podrá, respecto de los bonos a que se refiere el artículo 1° de la presente, reabrir el proceso de canje establecido en el Decreto N° 1735/04 mencionado.
>
> **ARTICULO 3°** -- Prohíbese al Estado nacional efectuar cualquier tipo de transacción judicial, extrajudicial o privada, respecto de los bonos a que refiere el artículo 1° de la presente ley.
>
> **ARTICULO 4°** -- El poder Ejecutivo nacional deberá, dentro del marco de las condiciones de emisión de los respectivos bonos, y de las normas aplicables en las jurisdicciones correspondientes, dictar los actos administrativos pertinentes y cumplimentar las gestiones necesarias para retirar de cotización en todas las bolsas y mercados de valores, nacionales o extranjeros, los bonos a que se refiere el artículo anterior.
>
> **ARTICULO 5°** -- El Poder Ejecutivo nacional remitirá al Honorable Congreso de la Nación un informe que refleje los efectos del canje y los nuevos niveles de deuda y reducción de la misma.
>
> **ARTICULO 6°** -- Sin perjuicio de lo establecido precedentemente, los bonos del Estado nacional elegibles de acuerdo a lo dispuesto por el Decreto N° 1735/04, depositados por cualquier causa o título a la orden de tribunales de cualquier instancia, competencia y jurisdicción, cuyos titulares no hubieran adherido al canje dispuesto por el decreto antes citado o no hubieran manifestado, en forma expresa, en las respectivas actuaciones judiciales, su voluntad de no adherir al mencionado canje antes de la fecha de cierre del mismo, según el cronograma establecido por el referido decreto N° 1735/04, quedarán reemplazados, de pleno derecho, por los "BONOS DE LA REPÚBLICA ARGENTINA A LA PAR EN PESOS STEP UP 2038", en las condiciones establecidas para la asignación, liquidación y emisión de tales bonos por el Decreto N° 1735/04 y sus normas complementarias.
>
> [...]"

79.　In the non-official English translation provided by Respondent, these articles provide as follows:[50]

> "Article 1 - Notwithstanding the validity of applicable rules, the national Government's bonds eligible for the exchange established in Decree No. 1735 of December 9th, 2004, which were not exchanged as established in said decree, shall be subject additionally to the provisions of the present law.
>
> Article 2 - The national Executive Branch shall not, with respect to the bonds to which Article 1 of the present law refers, reopen the exchange process established in said Decree No. 1735/04.
>
> Article 3 - The national Government is precluded from entering into any type of judicial, extra-judicial or private settlement with respect to the bonds to which Article 1 of the present law refers.
>
> Article 4 - The national Executive Branch shall, within the framework of the issuing conditions of the respective bonds and the applicable rules in the relevant jurisdictions, issue appropriate administrative acts and effect necessary steps to delist the bonds to which the previous article refers from all exchanges and markets, domestic and foreign.
>
> Article 5 – [not translated]
>
> Article 6 - Notwithstanding the above established, the bonds of the national Government eligible under the terms of Decree No. 1735/04, deposited pursuant to any cause or title on the order of any court of any venue, competence, and jurisdiction, whose depositary has not participated in the exchange provided for in the above-mentioned decree or who has not indicated, in express form, in their respective court proceedings, their desire not to participate in said exchange before its expiration date, according to the timeline established by said decree No. 1735/04, shall be replaced, by operation of law, with the 'BONDS OF THE ARGENTINE REPUBLIC AT PAR IN PESOS STEP UP 2038,' according to the terms established for the assignment, liquidation and issue of such bonds by Decree No. 1735/04 and its complementary norms."

80.　On 25 February 2005, the period for submitting tenders pursuant to the Exchange Offer 2005 expired, 76.15% of all holdings having participated in the Exchange Offer 2005, [51] following which Argentina issued approximately an aggregate

---

[50]　Exh. RD-121.

[51]　R-MJ § 40; C-R-MJ § 205.

principal amount of US$ 15 billion in par bonds, US$ 11.9 billion in discount bonds, ARG$ 24.3 billion (US$ 8.3 billion) in quasi-par bonds and US$ 62.3 billion in GDP-Linked Securities.[52]  Forty-four percent of the new debt was denominated in indexed pesos.[53] The Exchange Offer 2005 settled on 2 June 2005.

81.   The Claimants did not participate in the Exchange Offer 2005.

82.   The announcement and filing of the Exchange Offer 2005 was followed by a series of court litigations initiated by creditors unsatisfied with the terms and conditions of the Exchange Offer 2005. According to Respondent, these series of court cases included the following lawsuits:

(i)   Over 130 lawsuits brought in the US, mostly in New York, seeking repayment of approximately US$ 3.3 billion in principal and accrued interest.[54]   These lawsuits include the *Urban* Case, in which a German corporation - H.W. Urban GmbH - and holder of two series of Argentine bonds initiated a class action,[55] the *Agritech* Case and the *Gandola* Case in which many of the plaintiffs are also Claimants in the present arbitration.[56] These cases were stayed by the New York District Court upon request of plaintiffs in favor of the pending ICSID proceeding.[57]

(ii)   Over 470 court proceedings filed against Argentina in Germany, with claims amounting to a total of approximately EUR 106 million. Among these cases,

---

[52]   Exh. RE-195, p. 135.

[53]   PINGLE I, § 254.

[54]   R-MJ § 53 *et seq.*

[55]   *H.W. Urban GmbH et al. v. The Republic of Argentina*, 02 Civ. 6699 (TPG) (SDNY), see Exh. C-193, p. 3.

[56]   *Agritech S.R.L. et al. v. Republic of Argentina*, 06 Civ. 15393 (TPG) (SDNY), see Exh. RD 143, and *Gandola & C. S.P.A., et al. v. Republic of Argentina*, see Exh. C-505.

[57]   Exh. RD-148 and RD-154.

judgment would have been entered against Argentina in 115 cases for a total amount of EUR 39 million plus interest.[58]

(iii)   Thirteen lawsuits filed against Argentina in Italy before civil courts, with claims amounting to a total of approximately EUR 71 million. [59]

83.   Except for the US litigations referred to below (see § 193), the Arbitral Tribunal has not been informed of the specific developments and status of these various litigations.

**(4)   Evolution of the Dispute following Argentina's Exchange Offer 2005**

84.   On 28 February 2006, TFA wrote a letter to the Argentine Ministry of Economy and Production, Minister Lic. Felisa Miceli:[60]

"Dear Minister Miceli:

As you are well aware, Associazione per la Tutela degli Investitori in Titoli Argentini – Task Force Argentina ("TFA"), is a member and co-founder of the Global Committee of Argentina Bondholders ("GCAB") and a member of the International Group of Rome for Argentina Bondholders ("IGOR").  Together with and as a member of the GCAB group, and separately, on its own, TFA has contacted repeatedly the Government of the Argentine Republic ("Argentina") in an effort to resolve amicably the dispute arising out of Argentina's default on and expropriation of TFA bondholders' investments, and lack of fair and equitable treatment of the TFA bondholders in violation of the Agreement between the Republic of Italy and the Argentine Republic on the Promotion and Protection of Investments signed in Buenos Aires on May 22, 1990 ("Bilateral Investment Agreement"), and Italian law.

In furtherance of our efforts on behalf of hundreds of thousands of Italian bondholders/creditors to recover on defaulted Argentine debt we have engaged in several years of unceasing efforts to initiate meaningful negotiations with Argentina.  We write to remind you that beginning around

---

[58]     R-MJ § 59.

[59]     R-MJ § 60 and R-R-MJ §§ 95 *et seq*.

[60]     Exh. C-418.

November of 2002, we have continuously attempted, directly and through IGOR and GCAB, to recover the debt owed by Argentina to our constituents through negotiations and in this regard have notified Argentina of the bondholders' dispute on numerous occasions, including, *inter alia*, specifically that (1) we disapproved of the unilateral Argentine exchange offer and Argentina's obstructionist tactics with external creditors; and (2) we expected Argentina to engage in good faith negotiations with us to arrive at an acceptable debt restructuring plan.  As you may recall, we have communicated often and repetitively in an attempt to resolve the bondholders' dispute amicably including, *inter alia*:

- November 28, 2002 meeting with Minister of the Economy Lavagna, Undersecretary of Finance Madcur and Ambassador Kelly in Rome.

- December 3, 2002 meeting with Secretary for Economic Policy Tangelson in Rome.

- February 7, 2003 meeting with new Argentine Ambassador Roggiero in Rome.

- February 10-14, 2003 meetings with Minister Lavagna, Undersecretary of Finance Nielsen, Undersecretary of Finance Madcur and Director General Mirrè of the Ministry of International Affairs in Buenos Aires.

- March 26, 2003 meeting with Undersecretary of Finance Nielsen and Undersecretary of Finance Madcur in Rome.

- May 23, 2003 letter from TFA to Minister Lavagna notifying him that we represented 400,000 Italian bondholders with holdings totaling Euro 13 billion, and expressing our hope that we would soon be able to begin negotiations to reach terms for Argentina's bond restructuring that would be acceptable to the TFA bondholders.

- July 17, 2003 letter from TFA to Secretary of Finance Nielsen attempting to confirm a consultative group meeting and informing that we would prefer to participate as a "negotiating group."

- July 25, 2003 meeting with Secretary Nielsen in Rome.

- August 25, 2003 letter from TFA to Secretary Nielsen reminding Argentina that it had given assurances at the prior meeting in Rome that Argentina's restructuring proposal "would not occur without the consultation with, and, if possible, the pre-agreement of, the representatives of the major creditors…."  We further stated that we would not "stand idly by a situation which cannot reach a shared and acceptable solution."

- September 22, 2003 participation in a presentation by Minister Lavagna during the IMF meeting in Dubai.

- September 23, 2003 meeting with Secretary Nielsen in Dubai.

- October 22, 2003 meeting with Secretary Nielsen in Rome.

- November 10, 2003 letter from TFA to Secretary Nielsen reminding Argentina that we intend to be a "negotiating group," rather than simply a "consultative group."

- November 12, 2003 letter from IGOR to Minister Lavagna informing Argentina that its debt restructuring proposal had been "rejected by all the major investor groups." We further reiterated our ongoing desire to "negotiate in good faith with Argentina a fair and sustainable restructuring of the government's foreign debt." Finally, we prepared and included a set of parameters for sustainable debt restructuring for Argentina, and warned that "[i]f Argentina does not enter good faith negotiations with its major creditors and [instead] pursues the implementation of a debt restructuring along the lines the government has proposed, many bondholders will reject it and will resort to legal action in an effort to protect their interests." Secretary Nielsen's follow-up letter to creditors dated November 14, 2003 stated that Argentina was committed to pursuing "good faith negotiations toward a successful debt restructuring that attracts broad participation from creditors."

- November 26, 2003 meeting with Mr. Facundo Vila, representative in Italy of the Ministry of Economy of Argentina, in Rome.

- January 13, 2004 letter from GCAB to Minister Lavagna inviting formal negotiations with respect to defaulted Argentine debt.

- January 27, 2004 letter from GCAB to Minister Lavagna reiterating our hope that "you will be starting negotiations with the GCAB […]"

- February 18, 2004 letter from GCAB to Minister Lavagna stating that we "look forward to initiating this constructive [negotiation] process, a process that has not yet begun…."

- February 25, 2004 meeting with Mr. Federico Molina, representative of the Argentine Embassy to the United States, in New York and representatives of GCAB.

- February 27, 2004 meeting with new Argentine Ambassador Taccetti in Rome.

- April 16, 2004 meeting with representative of the Argentina Ministry of the Economy in Buenos Aires and representatives of GCAB.

- May 4, 2004 letter from GCAB to Minister Lavagna reconfirming that further to the April 16, 2004 meeting in Buenos Aires, "GCAB is prepared to initiate direct and good faith negotiations with the Argentine government…."

- May 13, 2004 letter from GCAB to Minister Lavagna informing Argentina that "GCAB is still waiting to be invited for the agreed technical meeting with the Argentine government…."

- May 26, 2004 letter from GCAB to Minister Lavagna requesting the proposed agenda and timing for the "previously discussed technical meeting and productive negotiations leading to an acceptable deal…."

- June 8, 2004 letter from GCAB to Minister Lavagna stating that "it is now essential to initiate the good faith negotiation process to which the government committed in order to reach an acceptable deal…."

- June 21, 2004 letter from GCAB press release announcing GCAB's retention of Bear Stearns as its financial advisor to assist it in negotiation with Argentina and stating that "GCAB remains fully committed to starting serious negotiations directly with Argentina."

- June 25, 2004 letter from GCAB to Minister Lavagna informing Argentina of GCAB's retention of Bear Stearns as its financial advisor and stating that "[w]e are hopeful that GCAB and Argentina, with the active assistance of our respective advisors, will be able to swiftly achieve an equitable, consensual and mutually beneficial solution…."

- August 18, 2004 letter from White & Case LLP on behalf of GCAB to Minister Lavagna stating that despite Argentina's assertions to the contrary, "there is no basis under U.S. law or market practice for you to assert that the Republic is prohibited from communicating or negotiating with GCAB at the present time…" and that "the need for negotiations between the Republic and GCAB is more urgent than ever."

- August 26, 2004 letter from GCAB to Minister Lavagna stating that "no negotiations [have occurred] between Argentina and GCAB…despite Argentina's commitment to the International Monetary Fund and the G-7 to do so" and reiterating "GCAB's desire that Argentina seek to resolve its external debt crisis in the proven and mutually beneficial way through negotiations…."

- February 3, 2005 GCAB press release condemning Minister Lavagna's announcement of a proposed law that would prohibit any future offer to bondholders who did not accept the current exchange offer commenced by Argentina on January 12, 2005, and stating that this proposal "ignores the various international legal systems under which the defaulted debt was issued", and that "Congressional action in Argentina will not supersede rights under international law."

In addition to such meetings and correspondence, GCAB delivered presentations at several meetings with creditors of Argentina, at which representatives of Argentina were present, setting forth our position concerning a strategy for resolving the dispute between Argentina and the bondholders/creditors.   Additionally, GCAB notified representatives of Argentina that we did not "endorse Argentina's current unilateral offer, and [were] evaluating all other options, not excluding litigation, to protect investors' rights."  Despite our clear warnings, our communicated disapproval of Argentina's strategy of avoidance and our repeated efforts to negotiate

illustrated by the communications listed above, Argentina continues to refuse to negotiate with us in good faith.

Given that Argentina has steadfastly failed to negotiate with us, and has defaulted on and expropriated the bonds of our constituents, we are left with little choice. Accordingly, we hereby provide you <u>final</u> notice that:

we and TFA bondholders remain unsatisfied with Argentina's refusal to negotiate in good faith as we fully contemplated you would under Article 8 of the Bilateral Investment Agreement; and

Argentina has sixty (60) days from receipt of this correspondence to pay the monies it owes to the hundreds of thousands of Italian bondholders/creditors TFA represents.

If Argentina fails to resolve the dispute amicably and pay within sixty (60) days, the TFA bondholders will have no choice but to commence legal proceedings against Argentina in one or more appropriate for a ([*sic*]) to recover the amounts due. On behalf of the TFA bondholders, who are Italian nationals not domiciled in Argentina, and who acquired their bonds prior to Argentina's default, we hereby accept the offer of consent, expressed by Argentina in Article 8 of the Bilateral Investment Agreement, to submit the dispute to the International Centre for Settlement of Investment Disputes for settlement by arbitration pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States.

If Argentina refuses to resolve the dispute amicably, we invite you to contact me and/or counsel for the anticipated litigation, Carolyn Lamm of White & Case LLP, to negotiate a memorandum of understanding on an agreed procedure that would facilitate the resolution of the hundreds of thousands of TFA bondholder claims in the most expeditious way for all parties.

Sincerely,

Associazione TASK FORCE ARGENTINA (TFA)

(signed)

Nicola Stock"

85. Unsatisfied with the situation, TFA seriously considered the initiation of an ICSID arbitration against Argentina. For this purpose and in order to be able to represent the concerned Italian bondholders, a new mandate (so-called "TFA Mandate Package") was designed by TFA in and consisting of the following documents:

- A Letter of Instructions to Bondholders ("TFA Instruction Letter"), explaining the object and modalities of the ICSID arbitration and setting forth instructions for the bondholders how to participate.[61]

- A Declaration of Consent, Delegation of Authority, and Power of Attorney ("Power of Attorney"), in favor of White & Case.[62]

- A Grant of Mandate to TFA ("TFA Mandate"), in which the signatory mandates TFA to act as coordinator of the ICSID arbitration.[63]

- A questionnaire, seeking information and documents related to nationality and ownership of the bonds. [64]

- Additional instructions regarding gathering of documents.[65]

86.  In the TFA Instruction Letter, in addition to the specific instructions on how to participate in the ICSID proceedings, TFA set forth some basic rules of conduct for the bondholders. In particular it provided that:

> "8.  SOME RULES OF THE LEGAL ACTION PLANNED BY TFA THAT SHOULD BE KEPT IN MIND
>
> In keeping with the transparency that has always been a hallmark of TFA's activities to protect Italian bondholders, we wish to highlight some basic rules that the conduct of the ICSID arbitration on behalf of numerous Italian Investors makes it necessary to impose on all of you.
>
> First of all, the ICSID arbitration is available only to persons who qualify as "investors", that is, to persons who can demonstrate that they purchased and have title to Argentine bonds. Failure to meet this requirement would not only jeopardize the position of the individual participant in the initiative, but could endanger the success of the legal proceeding for the other bondholders as well. It is therefore evident that, for anyone who intends to initiate the ICSID arbitration, it will not be possible to bring a legal action in Italy against the credit institution that sold the bonds to them and at the same time demand the right to continue the proceedings before ICSID; likewise, those who have already filed a claim against their banks may not participate in the ICSID arbitration. Indeed, a final judgment issued by an Italian court of last resort declaring null and void or voiding the agreement for the purchase of the

---

[61]    Exh. RA-1.

[62]    Exh. RA-3.

[63]    Exh. RA-2.

[64]    Exh. RA-4.

[65]    Exh. RA-7.

security would cause your status as an investor to cease to exist, whereas such status is indispensable to bring an ICSID arbitration.

<u>Does this mean that participating in the ICSID arbitration will prevent you from suing the credit institutions at a later day ?</u> Not at all! Anyone who wants to change his/her mind and abandon the ICSID arbitration can do so freely: it will be sufficient to withdraw from the ICSID proceeding, revoke White & Case's power of attorney *ad litem* and TFA's mandate in order to initiate whatever legal proceedings is deemed most appropriate. **It is not possible, however, to conduct at the same time two different legal proceedings that are incoherent with one another.**

Finally, we note that the proceedings before ICSID will not toll the running of the statute of limitations to bring your claims, if any, against the banks.

[…]

The peculiarity and complexity of the case to be presented before ICSID on behalf of TFA make it necessary, for reasons of coherence and uniformity of the representation of all Italian bondholders, to have a single attorney in the proceedings (White & Case) and that the latter have a single interlocutor (TFA). This also requires compliance with certain rules that make it possible for the representation of bondholders, taken as a group, to remain logical and coherent. Accordingly:

(a)     it will not be possible to give instructions directly to the attorneys at "White & Case" (or the Italian lawyers at "Grimaldi e Associati", who will act solely as TFA's out of court advisors): they will coordinate directly with TFA, which, as mentioned before, will act as your sole agent;

(b)     in lum [sic!], TFA, acting in the collective interest of all bondholders, will operate autonomously, taking into consideration their general interest without being able to adopt different conducts for each or only some of the various bondholders at their request;

(c)     nor will it be possible to conduct autonomously the proceeding initiated jointly with all the bondholders; accordingly, any revocation of TFA's mandate or of the power of attorney *ad litem* of the American lawyers must necessarily be preceded by withdrawal from the ICSID proceeding; in other words, it will not be possible to revoke TFA's mandate so as to deal individually with your American lawyer or to appoint other agents. Revoking the mandate or the power of attorney without having previously withdrawn from the proceeding will result in renunciation of the mandates received by TFA and "White & Case", respectively.

[...]"

(Emphasis in the original)

87.   In the Power of Attorney, the signatory makes the following declarations and statements:

"Each of the Undersigned […]

hereby […]

1.  Declares that he/she owns the following bonds issued by the Argentine Republic, as described on Tab 1.

2.  Declares his/her irrevocable consent to submit, jointly with other similarly situated bondholders, the dispute arising under the […] [BIT] due to the nonpayment by the Argentine Republic […] of amounts owed under the above-mentioned bonds, including inter alia, the full face amount of the bonds plus interest, fees and damages, for settlement by arbitration to the International Centre for Settlement of Investment Disputes ("ICSID") in Washington […], and/or other related litigation outside Italy to assert claims and/or enforce rights of the Undersigned arising as a result of the non-payment of the Argentine bonds. The Undersigned further declares his/her acceptance of the Argentina's offer of consent to ICSID jurisdiction, which is contained in Article 8 of the Agreement [ie the BIT], as of January 1, 2006 and reconfirms any such acceptance and notification of the dispute previously provided. The Undersigned's consent also covers such other actions that may be deemed necessary or useful to pursue the Undersigned's rights in this dispute.

Delegates to the law firm of White & Case LLP […], in particular Carolyn B. Lamm, Esq. and any other attorney of White & Case LLP outside of Italy that she designates, the authority and confers the power of attorney to represent the Undersigned, jointly with other similarly situated bondholders, in the furtherance of their interests with respect to their above-described bondholdings. Such delegation of authority and power of attorney includes without limitation the authority and power:

(i) to accept Argentina's offer of consent to ICSID arbitration under the Agreement, as of January 1, 2006, and to reconfirm any such consent and/or notice of dispute previously provided;

(ii) to initiate and conduct for the Undersigned and on his/her behalf an ICSID arbitration against Argentina and any related litigation or other proceedings outside Italy to protect and further the Undersigned's interests in relation to the above-mentioned dispute.

[…]

Further instructions regarding this delegation may be made from time to time by any duly appointed agent of the Undersigned.

1.  Acknowledges and agrees that this power of attorney is conferred pursuant to the laws of the District of Columbia to lawyers practicing in the District of Columbia, […]"

88.  In the TFA Mandate, the object of TFA's mandate is described as follows:[66]

### "OBJECT

Subject to all legal requirements that may from time to time be applicable, the Agent is hereby entrusted with the assignment of providing for the coordination of any arbitral and judicial proceedings of the kind described in the premises hereto that may be undertaken in the name and on behalf of the holders of Bonds pursuant to the Power of Attorney and this Mandate, for the recovery of their investment in the Bonds. In particular, and solely by way of examples, it shall be the Agent's responsibility:

-  to give to the attorneys appointed pursuant to the Power of Attorney any instructions that the Agent, in its role as coordinator, deems useful or appropriate for the purpose of bringing about a positive outcome of the proceedings;

-  to appoint other attorneys directly, in addition to es [sic!] replacements for those appointed pursuant to the Power of Attorney, so that they may represent the Principals in proceedings filed outside Italy, in judicial or other venue, including, but not limited to, ICSID arbitral tribunals;

   -  to revoke the mandates granted to the attorneys identified in the Power of attorney and those appointed pursuant to the preceding paragraph. Accordingly, consistently with the Agent's role as sole coordinator of legal proceedings commenced by the Agent, it is understood that the Principal(s) may revoke the powers of attorney *ad litem* granted to the above-mentioned attorneys only through the Agent, by instructing it in writing to that effect;

   -  to perform organizational functions entrusted to it using the Italian banking system or any other means that may be necessary or appropriate for the initiation and conduct of the legal proceedings described in the Power of Attorney and this Mandate. […]

   -  to appoint arbitrators, experts and advisors;

   -  if it deems it appropriate, to bring against Argentina, outside Italia, in judicial venues having jurisdiction, or before domestic or international arbitral tribunals, or before any conciliation and mediation body, any additional proceeding that may be necessary for the purposes of obtaining reimbursement of principal and payment of interest on the Bonds, or proceedings seeking damages arising out of the failure to

---

[66]    Exh. RA-2.

ICSID CASE NO. ARB/07/5

comply with the Bonds, or out of the measures adopted by the Argentine Authorities;

- to negotiate and enter into settlement agreements with Argentina, in judicial venues or otherwise, […]

- to participate in any type of bondholders' meeting or similar collective decision-making body and to vote in the name and on behalf of the Principal(s);

- to send any communication or notice on behalf of the Principal(s), in order to toll the running of the statute of limitation or other time limits, in relation to the Republic of Argentina, […];

- to collect on behalf of the Principal(s) the payments received from Argentina and to transfer them through the credit institutions serving as depositaries for the Bonds to the current accounts that will be specified by the Principal(s);

- to obtain recognition and enforcement outside Italy of the arbitration awards issued by the ICSID arbitral tribunal – as well as of any other awards or judgments that may be issued by any adjudicating body outside Italy with respect to the object of this Mandate – […];

- to withdraw from any actions in any legal proceedings contemplated by the Power of Attorney and/or this Mandate, in the name and on behalf of all bondholders who have granted an identical power of attorney *ad litem* and an identical mandate, or to withdraw from any actions in the name and on behalf of the Principal(s), in any of the instances described in Article 4 below;

- to arrange for the banks serving as depositaries for the Bonds to subject the same to transfer restrictions; […]

- in general, to take any step that it deems useful for the recovery of the amounts due under the Bonds, subject always, as an absolute priority, to equal treatment of all of the owners of bonds issued by Argentina who have signed an identical power of attorney or attorney *ad litem* and an identical mandate."

89. The TFA Mandate further provides for following terms and conditions of revocation:

**"EXCLUSIVITY, REVOCATION AND RENUNCIATION**

Principal also grants this Mandate in the interest of all of the other bondholders who have granted an identical power of attorney *ad litem* and an identical mandate; such interest arises out of the need to coordinate the arbitral and judicial proceedings mentioned in the premises hereto. Accordingly:

(i)    This Mandate, pursuant to Article 1723 of the Civil Code, will not terminate if revoked by the Principal(s), unless there exists a just cause for such revocation; such revocation will become effective upon expiration of the fifteen day period following the time when the Agent became aware of the same;

(ii)    even in the absence of just cause, the Principal(s) may validly revoke this Mandate if he/they has/have previously withdrawn from every judicial and arbitral proceeding referred to in the premises hereto which are pending at the time of such revocation; such revocation will become effective upon expiration of the fifteen day period following the time when the Agent became aware of the same;

(iii)    if the Principal(s) should initiate any legal action conflicting with the interests pursued by TFA on behalf of all of the bondholders who have granted an identical power of attorney *ad litem* and an identical mandate, by means of any legal proceedings contemplated by this Mandate or the Power of Attorney, with particular reference to the consolidated proceeding before the ICSID: (a) White & Case, as specified in the Instructions to Bondholders, may without any notice whatsoever renounce the mandate granted to them by means of the Power of Attorney; (b) the Agent may renounce this Madate;

[…]

(v)    if the Principal(s) revoke the Power of Attorney without the prior agreement of the Agent, the Agent may renounce this Mandate.

In any event, the Agent shall have the right to renounce this Madate at any time, by giving at least fifteen (15) business days written notice to the Principal(s).

[…]"

(Emphasis in the original)

90.   TFA's member banks arranged for the distribution and collection of the Mandate Package among their clients during March and April 2006, which was – according to Claimants' figures – accepted by over 180,000 Italian bondholders.[67]

91.   On 14 September 2006, White & Case filed the Request for Arbitration with ICSID on behalf of these Italian bondholders, Claimants to the present arbitration.

---

[67]    C-MJ § 261, see also NAVIGANT I, § 27 and CREMIEUX, § 22.

(5)    **New Exchange Offer 2010**

92.    In April 2010, Respondent announced the launching of a new Exchange Offer (hereinafter the "Exchange Offer 2010").

93.    This offer was launched on 3 May 2010 and aimed to "restructure and cancel defaulted debt obligations of Argentina represented by Pre-2005 Eligible Securities, to release Argentina from any related claims, including any administrative, litigation or arbitral claims and to terminate legal proceedings against Argentina in respect of the tendered Eligible Securities in consideration for the issuance of New Securities and, in certain cases, a cash payment."[68]

94.    In this offer, Respondent invited "the Owners of each Series of Bonds listed in Annexes A-1 and A-2 and related claims (collectively, the 'Eligible Securities') to submit offers to exchange Eligible Securities for New Securities and, in certain cases, cash, on the terms and conditions described [t]herein." [69] The bonds listed in Annexes A-1 and A-2 are bonds in which Claimants hold security entitlements, and Claimants were thus eligible to tender into this Exchange Offer 2010.

95.    The launching of this Exchange Offer 2010 required the temporary suspension of certain effects of the Emergency Law until the earlier of two dates – 31 December 2010 or the date on which the Executive Branch, through the Ministry of Economy and Public Finance, announces the conclusion of the second restructuring process of Argentina's nonperforming debt securities.[70] In addition, Argentina further took administrative and legislative steps in connection with the Exchange Offer 2010, approving the budget providing the amount of debt that Argentina may issue,

---

[68]    See Exchange Offer Prospectus (Exh. C-999B), p. 6; see also Annex A to R-PHB § 76.

[69]    *Idem*

[70]    See Annex A to R-PHB § 79.

namely through the Exchange Offer 2010, and authorizing the necessary administrative registrations and issuance of new securities, etc.[71]

96.   Whilst in Claimants' view this Exchange Offer 2010 was just another punitive offer imposing harsh exchange terms,[72] even less favorable than the Exchange Offer 2005, Respondent contends that it merely reflected the result of adequate consultations with creditors' groups.[73]

97.   A considerable number of Claimants eventually tendered into this Exchange Offer 2010, which led to their withdrawal from the present proceedings (see §§ 216 *et seq.* below).

### B.   PROCEDURAL HISTORY

### (1)   Request for Arbitration and its Registration by ICSID

98.   On 14 September 2006, Claimants filed their Request for Arbitration, accompanied by Annexes A through E.

99.   On 26 September 2006, ICSID transmitted to Respondent the Request for Arbitration.

100. On 20 October 2006, Respondent sent a letter to ICSID requesting the latter not to register the case arguing that Claimants lack standing to sue and that the nature of this "group claim" entail Respondent's defense right.   Respondent therefore concluded that ICSID has no jurisdiction over the dispute.

101. On 20 November 2006, Claimants responded to Respondent's letter dated 20 October 2006 arguing that ICSID must register the case according to Article 36(3)

---

[71]     See Annex A to R-PHB § 80.

[72]     CL-PHB §§ 139 *et seq.*, § 144.

[73]     Annex A to R-PHB § 76.

ICSID Convention.   It based its position on two legal opinions rendered by Prof. Christoph Schreuer and Prof. Rudolf Dolzer dated 2 and 16 November 2006, respectively.[74]

102.  On 18 December 2006, Respondent responded to Claimants' letter of 20 November 2006.  Respondent again requested ICSID not to register the case alleging that ICSID lacks jurisdiction and that Respondent never consented to an arbitration concerning such kind of claims initiated by "groups of people" or "class action."

103.  On 19 and 22 December 2006, Claimants submitted supplemental Annexes in relation to information contained in Annexes A through E, and submitted Annexes K and L. The substitute annexes reflect: (i) an addition of certain Claimants (separately listed in Annex K), (ii) the withdrawal of certain Claimants (separately listed in Annex L), (iii) limited corrections and substitutions to the information on Claimants (Annexes A-E), (iv) the revision of the aggregate amounts (Annex I), and (v) the addition of one new bond series (Annex J).

104.  On 6 January 2007, Claimants responded to Respondent's letter of 18 December 2006 insisting that ICISD register the case and arguing (i) that it is up to the Tribunal to decide on the jurisdiction, and (ii) that the claim at stake is not a "class action" but a joint claim in which each Claimant initiates arbitration on its own behalf, and therefore covered by ICSID's jurisdiction.

105.  On 24 January 2007, Respondent responded to Claimants' submissions of 19 and 22 December 2006 opposing the incorporation of new Claimants in the arbitration. According to Respondent, the changes made to the Request for Arbitration

---

[74]     See letter from Prof. Christoph Schreuer of 2 November 2006 and letter from Prof. Rudolf Dolzer of 16 November 2006 both attached to Claimant's letter of 20 November 2006 addressed to the Secretary-General of ICSID.

regarding the identity and number of Claimants is inadmissible.   Further, Respondent reiterated its request that the case be refused registration.

106.  On 1 February 2007, Claimants responded to Respondent's letter of 24 January 2007 insisting that the case be registered "as soon as possible."

107.  On 5 February 2007, Claimants submitted "substituted versions" of Annexes A through E, K, L, I and J. The substitute annexes reflect: (i) the withdrawal of certain Claimants (listed separately in Annex L), (ii) certain corrections and substitutions to the documentation for other Claimants, and (iii) the revision of certain aggregate amounts based on the foregoing adjustments (Annexes I and J).

108.  On 7 February 2007, concluding that the dispute is not manifestly outside the jurisdiction of ICSID, the Secretary-General of the ICSID registered Claimants' Request for Arbitration with accompanying Annexes A through L, and issued the Notice of Registration.

**(2)    Constitution of the Arbitral Tribunal**

109.  On 7 February 2007, the Secretary-General of ICSID invited the Parties to communicate any provisions agreed by them regarding the number of arbitrators and the method of their appointment.

110.  On 9 March 2007, Claimants suggested that the arbitral tribunal be composed of three arbitrators, one arbitrator to be appointed by each Party and the third, who shall be the President of the Tribunal, to be appointed by agreement of the Parties, and appointed Prof. Albert Jan van den Berg, a national of The Netherlands, as arbitrator.

111.  On 12 March 2007, ICSID confirmed receipt of Claimants' letter of 9 March 2007 and further stated that no further steps regarding the appointment of Prof. van den Berg could be taken until the Parties inform the Centre of their agreement regarding the method for the constitution of the arbitral tribunal.   It therefore invited

Respondent to accept Claimants' proposals or make other proposals regarding the constitution of the arbitral tribunal.

112. On 27 April 2007, Claimants sent a letter to the ICSID informing that the Parties have not reached agreement on the method of constituting the Tribunal, and therefore requested that the Tribunal be constituted according to Article 37(2)(b) ICSID Convention, given that more than 60 days had passed since the registration of the Request for Arbitration. Claimants then confirmed the appointment of Prof. van den Berg and suggested the name of a person to serve as President of the Tribunal.

113. On 7 May 2007, Respondent opposed Claimant's suggestion for President and suggested instead another candidate. Respondent further appointed Prof. Georges Abi-Saab, a national of the Arab Republic of Egypt, as arbitrator.

114. On 14 May 2007, ICSID informed the Parties that Prof. van den Berg and Prof. Abi-Saab accepted their appointments as arbitrators and enclosed copies of their signed declarations according to Rule 6(2) ICSID Arbitration Rules.

115. On 25 August 2007, Claimants informed ICSID that the Parties have not been able to reach an agreement regarding the appointment of the third, presiding arbitrator and therefore requested ICSID to make the appointment in accordance with Article 38 ICSID Convention and Rule 4 ICSID Arbitration Rules.

116. On 28 August 2007, ICSID confirmed receipt of Claimants' letter of 25 August 2007 and announced that it would proceed with the appointment after consultation with both Parties in accordance with Rule 4(4) ICSID Arbitration Rules.

117. On 8 November 2007, the Secretary-General of the ICSID proposed a candidate to serve as President of the Tribunal and invited the Parties to comment before 19 November 2007.

118.  On 16 and 19 November 2007 respectively, Respondent and Claimants both objected to the appointment of the person proposed by the Secretary-General of the ICSID.  On 29 November 2007, the Secretary-General informed the Parties of its intention to propose to the Chairman of ICSID's Administrative Council the appointment of Dr. Robert Briner, of Switzerland, as the President of the Tribunal.

119.  On 6 February 2008, the Secretary-General of the ICSID informed the Parties and the arbitrators that the Tribunal is deemed to be constituted by (i) Professor Albert Jan van den Berg (appointed by Claimants), (ii) Professor Georges Abi-Saab (appointed by Respondent) and (iii) Dr. Robert Briner (appointed by ICSID pursuant to Article 38 ICSID Convention).  Further, the Tribunal was informed that Mr. Gonzalo Flores, Senior Counsel at ICSID, would serve as the Secretary to the Tribunal.

120.  On 26 February 2008, Respondent requested further information from Dr. Briner on his past experience and his positions in companies and financial institutions.

121.  On 28 February 2008, Dr. Briner provided further information on his past experience and current positions.  On the same day, Respondent acknowledged and thanked Dr. Briner for his response.

122.  On 27 July 2009 Dr. Robert Briner resigned as President of the Tribunal due to health reasons.  On 2 September 2009 Prof. Pierre Tercier, a Swiss national, was appointed, by agreement of the parties, as the new President of the Tribunal.

**(3)   Arbitral Procedure**

123.  On 10 March 2008, ICSID sent a letter to the Parties and the Tribunal with organisational details concerning the First Session to be held on 10 April 2008 at the seat of the Centre in Washington D.C.  The Parties were invited to comment on the proposed draft provisional agenda before 3 April 2008.

124. During March 2008, various exchanges of correspondence took place concerning Respondent's request that the information contained in Claimants' Annexes be provided to it in an appropriate form. On 31 March 2008, the ICSID informed the Parties that the Tribunal had taken note of the Parties' correspondences and had decided to defer its ruling on the matter until the First Session of 10 April 2008.

125. On 3 April 2008, both Parties sent their comments on the provisional agenda for the First Session (see § 123 above). Whilst Respondent had "no comment to make," Claimants made several comments and suggestions regarding the various items of the agenda.

126. On 9 April 2008, Claimants sent a letter expressing their concerns about Respondent's statement that it "has no comments to make" on the provisional agenda for the First Session. Claimants feared to be prejudiced if Respondent was to raise any such comments during the First Session.

127. On 10 April 2008, the First Session was held at the seat of the Centre in Washington, D.C. at which a procedural calendar for the further conduct of the proceedings was established.  During the First Session it was agreed that the arbitration will be bifurcated in a jurisdictional and a merits phase.  With regard to the jurisdictional phase, the Tribunal invited the Parties to agree on a joint list of preliminary issues to be submitted before 2 May 2008.  The Tribunal stated that it would then decide over any remaining divergence and communicate its decision on 9 May 2008.

128. On 2 May 2008, both Parties sent letters announcing that they could reach an agreement on only very limited issues and laid down their respective position concerning the remaining divergences on the scope of the jurisdictional phase. Respondent further requested that Claimants submit the list of the members of Task Force Argentina, and that that the schedule discussed at the First Session be amended to account for document discovery.

129. On 5 and 8 May 2008 respectively, each Party commented on the other Party's submission of 2 May 2008.

130. On 9 May 2008, after receiving and considering the Parties' submissions on the scope of the jurisdictional phase and in the light of the Parties' disagreement, the Tribunal submitted a "List of issues to be addressed during the jurisdictional first phase of the proceedings" (hereafter "List of 11 Issues of 9 May 2008"), listing the following 11 issues covering Claimants and Respondent's main positions and objections:

> "(1)  Does the consent of Argentina to the jurisdiction of the Centre include claims presented by multiple Claimants in a single proceeding?  If so, are the claims admissible?
>
> (2)  Is the Declaration of Consent signed by the individual Claimants submitted in this proceeding valid; and what is the role and relevance of Task Force Argentina (if any) in this proceeding?
>
> (3)  Is the submission of substitute annexes to the Request for Arbitration permissible?  Is it possible to add further Claimants after the filing of the claim?
>
> (4)  Were the Claimants entitled to initiate ICSID arbitration in light of the 18-month domestic litigation clause at Article 8(2) of the Argentina-Italy BIT?
>
> (5)  What are the consequences (if any) of the Most-Favored-Nations-Clause (MFN) contained in Article 3(1) of the Argentina-Italy BIT?
>
> (6)  Does the Tribunal have jurisdiction to hear Claimants' claims for violation of the MFN provisions contained in Article 3(1) of the Argentina-Italy BIT with reference to the so-called umbrella clause contained in Article 7(2) of the Argentina-Chile BIT?
>
> (7)  Are the Claimants' claims contract claims or Treaty claims and what (if any) are the consequences of this determination?
>
> (8)  Does the Tribunal have jurisdiction over claims where the relevant bond contains a forum selection clause which refers to national courts, but not to ICSID?
>
> (9)  Do the bonds in question satisfy the definition of "Investment" under Article 1(1) of the Argentina-Italy BIT with respect to the provisions on investment "in the territory" of Argentina and in "compliance with the laws and regulations of Argentina"?
>
> (10)  Without making a determination with respect to any individual Claimant, does the Tribunal have jurisdiction *ratione personae* pursuant

to Article 25 of the ICSID Convention and Article 1(2) of the Argentina-Italy BIT, and its Additional Protocol, over each Claimant who is a natural person and who ultimately is found to have the following characteristics: (i) a natural person with Italian nationality on September 14, 2006 (*i.e.*, the date of the filing of the Request for Arbitration) and February 7, 2007 (*i.e.*, the date of registration of the Request); (ii) who on either date was not also a national of the Argentine Republic; and (iii) who was not domiciled in the Argentine Republic for more than two years prior to making the investment?

(11) Without making a determination with respect to any individual Claimant, does the Tribunal have jurisdiction *ratione personae* pursuant to Article 25 of the ICSID Convention and Article 1 of the Argentina-Italy BIT over each Claimant that is a juridical person with Italian nationality on September 14, 2006 (*i.e.*, the date of the filing of the Request for Arbitration)?"

131. An amended procedural calendar was further agreed upon. Also, the Tribunal invited Claimants to submit by 23 May 2008 a complete list of all present members of Task Force Argentina.

132. On 23 May 2008, Claimants submitted the list of current members of Task Force Argentina, according to the Tribunal's request of 9 May 2008, but nevertheless raised certain concerns, in particular regarding the submission of documents on behalf of a third party.

133. On 8 August 2008, Respondent filed its First Memorial on Jurisdiction and Admissibility, accompanied by exhibits and expert reports by Prof. Barry J. Eichengreen, Prof. Anne-Marie Slaughter and Prof. William Burke-White.

134. On 8 October 2008, after discussions concerning a possible rescheduling of the hearing and after having heard and taken into account both Parties' positions as well as the availability of all participants, the Tribunal decided that the hearing date would not be changed and still take place on the week of 22 June 2009, as agreed upon on 9 May 2008.

135. On 7 November 2008, Claimants filed their Counter-Memorial on Jurisdiction, accompanied by substitute versions of Annexes A through E, K and L; exhibits; witness statements by Mr. Stefano De Grandi, Mr. Mario Flagella, Mr. Richard Liebars, Mr. Raffaele Martino, Mr. Ajata Mediratta, Mr. Fabrizio Modoni, and Mr. Roberto Ranieri; and expert reports by Dr. Alberto B. Bianchi, Ms. Elizabeth J. Cabraser, Dr. William R. Cline, Dr. Joaquín A. Cottani, Prof. Rudolf Dolzer, Dr. Pablo E. Guidotti, Prof. Geoffrey C. Hazard, Prof. Natalino Irti, Mr. Brent Kaczmarek, Prof. Salvatore Maccarone and Prof. Fabrizio Maimeri, Dr. Héctor A. Mairal, Prof. Annibale Marini, Mr. Rex Pingle, Prof. W. Michael Reisman, Mr. Stephen Schaefer, Prof. Christoph Schreuer, Dr. Francisco G. Susmel, and Dr. Guillermo O. Teijeiro.

136. On 17 November 2008, the Parties exchanged their requests for document production pursuant to the schedule set forth in the letter of 9 May 2008.

137. On 18 November 2008, Respondent sent a letter stating that Claimants had not complied with the deadline for submission of their Counter-Memorial on Jurisdiction. It argued that the transmittal letter sent to ICSID was received on 8 November 2008, 12:02 am and that subsequent emails were received at 02:31 am. It further complained that it received the Spanish version of the Counter-Memorial on Jurisdiction only on 11 November 2008, i.e., four days after the deadline set forth in the Tribunal's letter of 9 May 2008 (see § 130 above). Respondent therefore requested that the deadline for submission of its Reply Memorial on Jurisdiction scheduled for 20 February 2009 be extended to 24 February 2009. It further expressed its wish that the Tribunal would not allow further failures to comply with the established deadlines, absent special circumstances under the terms of Rule 26 ICSID Arbitration Rules.

138. On 18 November 2008, the Tribunal advised the Parties that the hearing would take place from Friday, 19 June 2009, through Wednesday, 24 June 2009.

139.  On 24 November 2008, Claimants responded to Respondent's letter of 18 November 2008 asking the Tribunal to reject Respondent's request for extension of time and giving further explanations on why its Counter-Memorial on Jurisdiction and related documents were sent out late.  Claimants further stressed that while Respondent had 15 weeks to prepare its Reply Memorial on Jurisdiction, Claimants were only given 10.5 weeks to prepare their Rejoinder Memorial on Jurisdiction.

140.  On 5 December 2008, the Parties submitted their respective "Redfern Schedules" listing their specific requests for document production by the other Party and their objections to the other Party's requests.

141.  On 10 December 2008, the Tribunal granted Respondent's request for extension of the deadline for submission of its Reply Memorial on Jurisdiction to 23 February 2009.

142.  On 12 December 2008, the Tribunal issued Procedural Order No. 1 ruling on the Parties' production for document requests.

143.  Subsequently, correspondence was exchanged between the Parties with regard to (i) Respondent's compliance with Order No. 1, referred to in § 142 above; and (ii) the progress on reaching a conclusion on a confidentiality agreement.  None of the issues could be solved among the Parties who requested the Tribunal's directions.

144.  On 22 December 2008, the Parties exchanged documents in accordance with Annex A of the Tribunal's Procedural Order No.1.   Respondent's submission of documents appeared to be incomplete.

145.  On 9 February 2009, Respondent completed its document production as ordered in Procedural Order No. 1 (see § 142 above).

146.  On 12 February 2009, the Tribunal directed Respondent to provide an accompanying table to the produced documents which contained references to each

specific request that the Tribunal had ordered Respondent to comply with in Procedural Order No. 1, referred to in § 142 above.  Further, the Tribunal invited the Parties to continue their discussions in order to arrive at a Confidentiality Agreement and stated that if the Parties cannot come to such an agreement and if so requested by a Party, the Tribunal will hear the Parties on this matter at the occasion of the June 2009 Hearing and then take the necessary steps.

147.  On 23 February 2009, Respondent filed its Reply Memorial on Jurisdiction and Admissibility, accompanied by exhibits; witness statements by Mr. Enrique H. Boilini, Avv. Gianluca Fontanella, Dr. Sergio Mario Illuminato, Ms. Noemi C. La Greca, Mr. Federico Carlos Molina, Ambassador Guillermo Nielsen, and Hon. Luigi Olivieri; and expert reports by Prof. Avv. Guido Alpa, Prof. Avv. Antonio Briguglio, Dr. Pierre-Yves Cremieux, Avv. Remo Danovi, Prof. Barry J. Eichengreen,  The Forensic Document Examination Division of the Argentine Federal Police, Ms. Rachel Hines, Prof. Jorge Kielmanovich, Prof. Daniel Marx, Abog. Ismael Mata, Prof. Arthur R. Miller, Prof. Richard A. Nagareda, Prof. Nouriel Roubini, Prof. Alessandro Penati, Prof. Avv. Andrea Perrone, Mr. Héctor Jorge Petersen and Mr. Héctor Jorge Petersen (h), Prof. Anne-Marie Slaughter and William Burke-White, and Prof. Charles W. Wolfram.

148.  On 9 March 2009, Respondent submitted the table of documents referencing each specific document according to the Tribunal's directions of 12 February 2009 (see § 146 above).

149.  On 22 April 2009, Claimants requested that Respondent be ordered to submit documents complementing its previous production, i.e., charts and proposals and other pages accompanying the Analysis Memoranda relating to the bonds issued by Respondent.

150. On 6 May 2009, Respondent responded to Claimants letter of 22 April 2009 and requested that Claimants' request for further document production be rejected.

151. On 6 May 2009, Claimants filed their (English) Rejoinder Memorial on Jurisdiction, accompanied by exhibits; witness statements by Mr. Massimo Cerniglia, Mario Flagella, Richard Liebars, Ajata Mediratta, and Fabrizio Modoni; and expert reports by Alberto B. Bianchi, Elizabeth J. Cabrazer, Dr. William R. Cline (second expert opinion), Joaquín A. Cottani, Professor Dr. Dr. Rudolf Dolzer (supplemental expert opinion),  Mrs. Cristiana Franco, Mr. Mario Franco, Mr. Alberto Bravo, Pablo E. Guidotti (supplemental expert report), Mr. Iain Hardie (supplemental expert report), Geoffrey C. Hazard JR (supplemental legal opinion), Prof. Natalino Irti (supplemental pro veritate legal opinion), Salvatore Maccarone and Fabrizio Maimeri (supplemental legal opinion), Héctor A. Mairal (supplemental legal opinion), Prof. Annibale Marini (supplemental pro veritate legal opinion), Mr. Brent C. Kaczmarek (supplemental expert report), Prof. Nicola Picardi, Rex E. Pingle (supplemental expert opinion), and Prof. W. Michael Reisman (second opinion).

152. Subsequently, correspondence was exchanged between the Parties with regard to Respondent's requests to amend the schedule of 9 May 2008 with regard to the designation of witnesses and experts and the submission of documents relating to direct and cross-examination of such witnesses and experts for the forthcoming hearing and to hold a pre-hearing conference.

153. On 11 May 2009, the Tribunal announced that it would, for the time being, not make any decision with respect to the designation of witnesses and experts for the forthcoming hearing and invited the Parties to confer and try to reach an agreement, reverting to the Tribunal by 15 May 2009.  It further stated that it would be prepared to hold a pre-hearing conference call during the first week of June 2009.

154. On 14 May 2009, Respondent reiterated its concerns already raised in its letter of 8 May 2009 concerning Claimants' late submission of their Rejoinder Memorial on

Jurisdiction and related documents. Whilst electronic copies of the documents were received by ICSID only after the midnight deadline of 6 May 2009, Respondent received the Spanish version of the Rejoinder Memorial on Jurisdiction only on 9 May 2009. Respondent consequently requested the Tribunal to disregard Claimants' late submissions in application of Rule 26(3) ICSID Arbitration Rules.

155. On 15 May 2009, in accordance with the deadline set in the Tribunal's letter of 11 May 2009 (see § 153 above), the Parties submitted to the Tribunal their respective positions concerning the various pre-hearing and hearing matters. Respondent further requested that an additional hearing of 10 days be set.

156. On 18 May 2009, Claimants provided certain explanations on the delay in submitting their Rejoinder Memorial on Jurisdiction and requested that Respondent's request to disregard such Rejoinder Memorial on Jurisdiction be rejected.

157. On 20 May 2009, the Parties exchanged further correspondence concerning the various pre-hearing and hearing matters. While Respondent insisted that each Party be given the right to cross-examine every witness and expert presented by the other Party and that additional hearing time be arranged, Claimants requested that Respondent's requests be denied.

158. On 20 May 2009, Claimants requested the Tribunal to order Respondent to immediately produce the complementary documents requested in their letter of 22 April 2009 (see § 149).

159. On 21 May 2009, the Tribunal ruled that it accepted Claimants' Rejoinder Memorial on Jurisdiction despite its delayed submission. It further set forth certain principles for conduct of the forthcoming Hearing on Jurisdiction confirming, among others, that the hearing would last 5.5 days, defining the scope of direct examination of witnesses and experts and setting new deadlines for the designation

of witnesses and experts and submission of documents for direct and cross-examination.

160. On 26 May 2009, the Tribunal requested Respondent to produce the documents requested by Claimants in their letter of 20 May 2009 or to otherwise give specific reasons for not producing such documents before 5 June 2009.

161. On 28 May 2009, in accordance with the deadline set in the Tribunal's letter of 21 May 2009 (see § 159 above), the Parties submitted their designation of witnesses and experts relevant to the jurisdictional phase.  Whilst Claimants did not directly designate witnesses or experts from Respondent for cross-examination, it reserved the right to do so in case Respondent would designate any such witnesses or experts for direct examination and to expand the scope of redirect examination of Claimants' witnesses or experts accordingly.  Respondent submitted a list of witnesses and experts from Claimants for cross-examination and a list of its own witnesses and experts for direct examination.

162. On 29 May 2009, Respondent objected to Claimants position in its letter of 28 May 2009 contending that Claimants had not complied with the Tribunal's request to designate the witnesses and experts for direct and cross examination and that Claimants should not have the right to further designate such witnesses or experts or to expand the scope of their re-direct examination.

163. On 31 May 2009, Claimants objected to Respondent's position in its letters of 28 and 29 May 2009.  With regard to Respondent's designation of witnesses and experts for direct examination, Claimants objected to the examination of Respondent's handwriting experts and experts on US and Italian tax law.  With regard to Respondent's designation of witnesses and experts for cross-examination, Claimants objected to the examination of Mr. Stock and of their own handwriting experts. Claimants further objected to Respondent's request to extend the daily hearing schedule.

164. On 2 June 2009, the Tribunal ruled that (i) the Parties' handwriting experts shall not be examined at the hearing because the issue of authenticity of the Claimants' signatures related to circumstances concerning individual Claimants and were thus not covered by this jurisdictional phase and (ii) Mr. Stock shall not be called as a witness because he has not submitted any statement, opinion or report (i.e., he is not a witness or expert). Regarding the daily hearing schedule, the Tribunal decided not to change it but remained open to discuss the issue during the Hearing. This decision was taken by majority, as communicated to the Parties on 3 June 2009.

165. On 3 June 2009, the deadline set in the Tribunal's letter of 21 May 2009 (see § 159 above), Respondent submitted its documents for direct and cross-examination accompanied by an index, and requested disclosure of documents regarding the direct testimony by Prof. Briguglio and Prof. Nagareda.

166. On 5 June 2009, the deadline set in the Tribunal's letter of 26 May 2009 (see § 160 above), Respondent explained why it deemed that it should be relieved from any obligation to produce any documents called by Claimants in their letter of 20 May 2009 (see § 158 above).

167. On 7 June 2009, Claimants insisted that Respondent be ordered to produce the documents as requested in their letter of 20 May 2009 (see § 158 above).

168. On 7 June 2009, Claimants also responded to Respondent's submission of 3 June 2009 and raised the following two main objections: (i) Claimants consider Respondent's submission of its "Supplemental Exhibits" as untimely, abusive and partly in disregard of confidentiality obligations, and (ii) Claimants objected to Respondent's designation of Prof. Nagareda and Prof. Briguglio for direct examination because such direct examination would exceed the scope of examination set forth in the Tribunal's letter of 21 May 2009 (see § 159 above).

169. On 8 June 2009, the Tribunal communicated the organizational details of the Hearing on Jurisdiction to be held from 19 June 2009 through 24 June 2009.

170. On 8 June 2009, Respondent reacted to the Tribunal's decision of 2 June 2009 (see § 164) expressing concerns that "two of the members of the Tribunal have simply taken an incomprehensible decision" by not admitting to call the handwriting experts as experts during the Hearing on Jurisdiction and requested that the Tribunal reconsider its decision of 2 June 2009.

171. On 9 June 2009, Claimants responded to Respondent's letter of 8 June 2009 and requested that the Tribunal reject Respondent's requests.

172. On 9 June 2009, the President of the Tribunal informed the Parties that in light of certain recent health problems, he would not be allowed to travel to Washington, D.C. for the Hearing on Jurisdiction.

173. On 9 June 2009, Claimants acknowledged that the Hearing on Jurisdiction was postponed and understood that related deadlines were presently suspended, including with respect to the submission of examination documents, etc.

174. On 17 June 2009, the Tribunal decided on several issues regarding the Hearing: (i) with respect to the issues raised by the Parties in relation to the Hearing, in particular to the testimony of fact and expert witness, the Tribunal reserved its decision for a later stage during the proceedings, once the new dates for the Hearing have been established; (ii) with respect to Claimants' request for the production of documents as contained in their letter of 20 May 2009, it was denied; (iii) with regard to Claimants' objection of 7 June 2009 regarding Respondent's submission of 3 June 2009, the Tribunal invited Respondent to state its position, especially with regard to Claimants' objection relating to confidential material, before 24 June 2009.

175. On 24 June 2009, Respondent responded to Claimants' letters of 7 and 9 June 2009 (see §§ 168 and 171 above) in accordance with the Tribunal's instructions (see § 174 above). Respondent insisted on the relevance of the question of the authenticity of some of the Claimants' signatures for this jurisdictional phase. With regard to

66

the confidentiality issue, Respondent stressed that it had not submitted any document filed in sealed proceedings and that there was no general rule of confidentiality governing ICSID arbitration proceedings. It therefore requested that Claimants' objections be rejected.   Respondent further complained about Claimants' position, as reflected in their letter of 9 June 2009 (see § 173 above), to suspend the deadline for submission of documents for cross-examination and requested that the Tribunal order Claimants to immediately present such documents.

176. On 6 July 2009, Claimants responded to Respondent's letter of 24 June 2009 requesting once again that the Tribunal (i) exclude the use of confidential documents and (ii) refuse to undo its decision of 2 June 2009 concerning the handwriting experts. Claimants further requested that the Tribunal issue a confidentiality order protecting the confidentiality of the current proceedings. Claimants also stressed that the suspension of the deadline for submission of documents for witnesses' and experts' examination was in accordance with the Tribunal's communication of 9 June 2009.

177. On 8 and 16 September 2009, Claimants suggested new dates concerning pre-hearing issues and the Hearing on Jurisdiction. It further requested anew that the Tribunal reject Respondent's request to reconsider the Tribunal's decision of 2 June 2009 and asked the Tribunal to strike Respondent's supplemental exhibits and confidential material as submitted by Respondent on 3 June 2009. It also insisted on its request for a confidentiality order.

178. On 16 September 2009, Respondent requested the Tribunal to set an entirely new calendar, including dates for witnesses and experts hearings, and considering an additional two weeks for the Hearing on Jurisdiction. It further insisted on the examination of the handwriting experts during the Hearing and on the admission of its documents submitted on 3 June 2009.

179. On 17 and 23 September 2009, Claimants responded to Respondent's letter of 16 September 2009 and formulated the following requests: (i) with regard to the Hearing, that Respondent's requests to overturn previous decisions on hearing days be denied; (ii) with regard to witnesses and experts, that Respondent's requests to re-open the designation of witnesses, to overturn the Tribunal's decision on handwriting experts, and to refuse the direct examination of Prof. Briguglio and Prof. Nagareda be denied; (iii) with regard to the documents for the Hearing, that the admission of Respondent's "Supplemental Exhibits" be limited to those relating expressly to the scope of direct testimony of Claimants' experts and witnesses; and (iv) that Claimants' request for a confidentiality order be granted.

180. On 14 October 2009, after the procedure had been staying still due to the unfortunate circumstances affecting Dr. Briner and eventually leading to his resignation, the procedure was actively resumed through a joint telephone conference between the Tribunal (with Prof. Pierre Tercier as new President of the Tribunal (see § 122 above)), the Secretary and the Parties. During the conference call, new pre-hearing deadlines and hearing dates, as well as other organisational aspects were discussed. At the conclusion of the telephone conference, four procedural matters were left open for decision by the Tribunal: (i) whether or not to allow direct and cross-examination of the handwriting experts, (ii) whether or not to allow direct examination of Professors Richard A. Nagareda and Antonio Briguglio, (iii) dates for the hearing on jurisdiction and admissibility and thereto related, pre-hearing dates, as well as (iv) the standard of confidentiality to be applied in the present proceeding.

181. On 1 December 2009, the Tribunal issued its Procedural Order No. 2, in which (i) it admitted – under certain restrictions – the direct and cross-examination of the handwriting experts; (ii) it admitted the direct examination by Respondent of Professors Richard A. Nagareda and Antonio Briguglio, and by Claimant of Professor Nicola Picardi; and (iii) it set the dates for the Hearing on Jurisdiction to 7 April 2010 to 13 April 2010.

182.  On 11 December 2009, Claimants requested some further clarifications concerning Procedural Order No. 2 with regard to the procedure for examination of the handwriting experts and the scope of examination in general.

183.   On 28 December 2009, the Tribunal provided the Parties with further clarifications on Procedural Order No. 2 and enclosed a draft hearing agenda inviting the Parties to comment thereon by 22 January 2010. It further invited Claimants to submit by 22 January 2010 the documents to be used for its direct, cross and re-direct examination and not yet in the record while Respondent was given a deadline until 19 February 2010 to comment thereon.

184.  On 19 January 2009, Claimants requested clarifications regarding its duty to submit any supplemental exhibits not yet in the record for use during direct, cross and re-direct examination, alleging that the outstanding decision of the Tribunal concerning the admissibility of part of Respondent's Supplemental Exhibits played a role on the scope of Claimants' submission.

185.  On 21 January 2010, the Tribunal decided on Claimants' enquiry of 19 January 2010, postponing (i) Claimants' deadline for submitting any additional exhibits for witness and expert examination until the issuance of the imminent Procedural Order No. 3 and (ii) Respondent's deadline for commenting on Claimants' submission.

186.  On 22 January 2010, the Parties submitted their comments on the draft Agenda for the Hearing on Jurisdiction:

(i)     Respondent informed the Tribunal that it had no objection to the draft agenda. Nevertheless, due to scheduling issues, it requested a change in the examination order of certain expert witnesses. It further designated the specific handwriting experts to be examined during the Hearing on Jurisdiction.

(ii)   Claimants requested to be given more time for their opening and closing statements and to amend the hearing schedule accordingly. They further requested a change in the order of examination of certain expert witnesses due to their limited availability.

187.   On 27 January 2010, the Tribunal issued its Procedural Order No. 3 ruling on the standard of confidentiality to be followed in the present proceeding and rejecting the admissibility of Respondent's Exhibits RE-427, RE-428, RE-429, RE-435, RE-440, RE-452, RE-462, RE-488, RE-489, RE-490, RE-491, RE-492, RE-493, RE-494, RE-495, RE-496, RE-497, RE-498, RE-499, RE-504 and RE-528, as well as of any other exhibit relating to an expert report or to a transcript of expert examination issued in another arbitration.

188.   On the same day, according to the Tribunal's directions of 21 January 2010 (see § 185 above), the Tribunal invited Claimants to submit any additional exhibits not yet in the record for use during direct, cross- and re-direct examination by 1 February 2010. Respondent was invited to comment on Claimants' submission by 22 February 2010. This latter deadline was subsequently corrected by the Tribunal to 1 March 2010.

189.   On 1 February 2010, Claimants filed their supplemental exhibits not yet in the record for use during direct, cross- and re-direct examination, as requested by the Tribunal in its letters of 28 December 2009 and 27 January 2010.

190.   On 2 February 2010, Respondent informed the Tribunal that on 26 January 2010, Dr. Osvaldo César Gugliemino had resigned from his position as Attorney General of Argentina and that the President of the Argentine Republic had appointed Dr. Joaquín Pedro da Rocha as his successor. On 27 December 2010 Dr. Joaquín Pedro da Rocha was replaced by Dr. Angelina María Esther Abbbona as Argentina's Attorney General .

191. On 1 March 2010, Respondent filed its comments on Claimants' submission of 1 February 2010, including a series of additional documents (see § 189 above).

192. On 2 March 2010, Claimants reacted to Respondent's submission of 1 March 2010 raising various objections against the submission of additional documents by Respondent. Claimants requested that the Tribunal issue an immediate order directing that the documents submitted by Respondent not be admitted to the record and announced that they would respond in full to Respondent's submission within one week.

193. On 8 March 2010, Respondent sent a letter to the Tribunal concerning a new claim that Claimants would allegedly have initiated before the Federal Court of the Southern District of New York, including as Plaintiffs some of the Claimants, as well as two other litigation procedures initiated in the US. Respondent consequently asked the Tribunal to invite Claimants (i) to inform whether or not these three proceedings "are the only one initiated in New York or in any other jurisdiction relating to security entitlements in Argentine bonds that comprise individuals or companies that are also Claimants in this arbitration" and (ii) to confirm whether or not all the Claimants in any of these proceedings are also Claimants in this arbitration.

194. On 9 March 2010, ICSID forwarded directions from the Tribunal to the Parties dated 5 March 2010 and 9 March 2010 regarding (i) an updated hearing agenda and (ii) the question of the submission of documents for expert and witness examination.

195. On 9 March 2010, Claimants submitted a letter in which they substantiated their previously raised objections (see § 192 above) against Respondent's submission of documents of 1 March 2010.

196. On the same day, Respondent submitted a second expert report from Hector Jorge Petersen and Hector Jorge Petersen (h) concerning the authenticity of signatures

attributed to Claimants and appearing in the powers of attorneys, together with an accompanying note.

197. On the same day, Claimants objected strongly to the submission by Respondent of such report and accompanying note.

198. On 10 March 2010, ICSID sent out a letter to the Parties conveying a message from the Tribunal stating as follows:

> "Counsel shall not send any further documents until the Arbitral Tribunal has issued its upcoming Procedural Order on the admissibility of all documents relating to the expert and witness examination, including the latest submission by Respondent. In this respect, the Tribunal has taken due note of the Claimants' objection thereto. However, in order to prevent a further escalation of this issue preventing the Tribunal to focus on the substantial issues of the hearing, the Tribunal invites the Parties to refrain from any further comments until reception of the upcoming Procedural Order."

199. On 11 March 2010, notwithstanding the Tribunal's directions of 10 March 2010, Respondent submitted a letter insisting that Messrs. Petersens' report submitted on 9 March 2010 (see § 196 above) be admitted. On the same day, Claimants stressed that this submission was in violation of the Tribunal's directions of 10 March 2010 and reserved the right to respond in due course.

200. On 18 March 2010, the Tribunal issued its Procedural Order No. 4 in which it set forth certain principles on the admissibility and use of the documents submitted for witness and expert examination and invited the Parties to submit certain documents and information in view of the upcoming Hearing on Jurisdiction.

201. On 22 March 2010, the Tribunal held a pre-hearing joint telephone conference together with the Parties and ICSID concerning the organization and agenda of the Hearing on Jurisdiction scheduled on 7-13 April 2010. At the conclusion of the telephone conference, the following procedural matters were left open: (i) the specific order of examination of experts and witnesses, (ii) the presence of experts

and witnesses during the hearing, and (iii) the specific role and presence of TFA during the Hearing on Jurisdiction.

202. Between 25 March 2010 and 1 April 2010, correspondence was exchanged between the Parties and the Tribunal concerning various issues relating to the Hearing on Jurisdiction, such as the admissibility of documents to be used for expert and witness examination, Respondent's request for immediate access to Claimants' online database, information on the existence of parallel proceedings relating to Claimants' security entitlements and the role and presence of TFA during the Hearing on Jurisdiction.

203. On 29 March 2010, the Tribunal advised the Parties of its decision on the matters left open during the telephone conference of 22 March 2010 (see § 201 above). The Tribunal therein (i) confirmed the order of examination of experts as witnesses as set forth in the draft agenda circulated to the Parties on 5 March 2010, (ii) gave further specification as to the use of the time allocated to each Party, and (iii) set forth rules as to the presence of experts and witnesses during the Hearing on Jurisdiction.

204. On 2 April 2010, the Tribunal issued its Procedural Order No. 5, in which it ruled over the admissibility of the documents designated by the Parties for expert and witness examination and admitted TFA to attend the Hearing on Jurisdiction "as Claimants 'agent', without prejudice to the pending issue of the validity of its mandate." This Procedural Order was then complemented on 6 April 2010 by Procedural Order No. 6, in which the Tribunal ruled on the admissibility of further documents designated by Respondent for witness and expert examination.

205. From 7 April 2010 to 13 April 2010, the Hearing on Jurisdiction took place at the seat of the Centre in Washington D.C. After hearing the Opening Statements of Counsel to both Parties, the Parties proceeded with the examination of the following witnesses and experts: Prof. Richard A. Nagareda, Prof. Avv. Antonio

Briguglio, Subinspector Lucio Pereyra, Mr. Héctor Jorge Petersen, Mr. Massimo Cerniglia, Mr. Mario Franco, Mr. Brent C. Kaczmarek, Prof. W. Michael Reisman, Mr. Stefano De Grandi, Mr. Joaquín A. Cottani, Prof. Christoph Schreuer, Prof. Nicola Picardi, Mr. Héctor A. Mairal and Professor Dr. Dr. Rudolf Dolzer. The last two days were dedicated to the Parties' Closing Statements.

206. On 22 April 2010, the Tribunal sent a letter to the Parties with instructions concerning the submission of the Post-Hearing Briefs to be submitted by both Parties by 14 June 2010.

207. On 20 May 2010, the Tribunal issued its Procedural Order No. 7, in which it ruled on the admissibility of new documents not yet in the record and which both Parties wished to submit in order to use them in their upcoming Post-Hearing Briefs.

208. On the same day, the Tribunal sent a letter to the Parties listing nine questions that the Tribunal wished the Parties to address in the Post-Hearing Briefs.

209. On 25 May 2010, both Parties filed new documents admitted into the procedure under Procedural Order No. 7. These documents were submitted by the Parties as C-998 to C-1003 with regard to Claimants, and RD-484 and RF-92 with regard to Respondent.

210. On 9 June 2010, the Tribunal granted an extension of the deadline for the submission of the Post-Hearing Briefs to 22 June 2010.

211. On 22, 23 and 25 June 2010, the Parties submitted their Post-Hearing Briefs, together with their response to the Tribunal's nine questions raised in its letter of 20 May 2010 (see § 209 above).

212. On 25 June 2010, Respondent complained about the delay of the submission of some parts of Claimants' Post-Hearing Brief, which was received during the night of 22-23 June 2010 and requested that the Tribunal disregard such submission.

213.  On 7 July 2010, after having given Claimants the opportunity to comment on Respondent's letter of 25 June 2010 and after considering both Parties' respective positions, the Tribunal accepted both Parties' Post-Hearing Briefs.

214.  On 22 July 2010, Claimants requested the postponement of the deadline for the submission of the Parties' Statements of Cost due on 22 July 2010. After having invited Claimants to elaborate on the reasons for their request and after having given Respondent the opportunity to comment thereon, the Tribunal decided by Procedural Order No. 8 dated 3 August 2010, to reject Claimants' request for postponement of the deadline for the submission of the Parties' Statements of Cost and invited both Parties to submit their Statements of Cost within 24 hours upon receipt of Procedural Order No. 8

215.  On 4 August 2010, the Parties filed their Statements of Cost.

216.  On 5 October 2010, Claimants filed a letter submitting that certain Claimants, who tendered into the Exchange Offer 2010, would no longer participate in the present arbitration, thereby reducing the number of remaining Claimants to approximately 60,000. Claimants attached to their letter updated versions of Annexes A, B, C and L to the Request for Arbitration, the latter containing a list of all Claimants who have withdrawn from the arbitration since 14 September 2006.

217.  On 22 October 2010, Respondent responded to Claimants' letter of 5 October 2010 and requested the Tribunal (i) to require Claimants to promptly inform which Claimants have tendered their security entitlements into the Exchange Offer 2010 and (ii) to order that the Argentine Republic and those Claimants with respect to which proceedings will be discontinued under the terms set forth in its letter, equally bear the arbitration costs, and each of them bear their own cost, and that such order of discontinuance be rendered in due course.

218.  On 27 October 2010, Claimants requested that Respondent's requests raised in its letter of 22 October 2010 be denied based on the following main arguments:

(i) with regard to Respondent's request for information on the identity of Claimants having tendered into the Exchange Offer 2010, this request has been rendered moot because Respondent is already in possession of such information as Claimants already have submitted a complete list of all Claimants having withdrawn from the arbitration since 14 September 2006 and (ii) with regard to Respondent's request regarding costs issues as to withdrawn Claimants, this request constitutes an attempt to raise new issues regarding costs and should therefore be rejected and stricken from the record, or alternatively, Claimants should be given the opportunity to brief the Tribunal in full as to this issue.

219. On 2 November 2010, Respondent responded, contending that (i) Claimants' objections to its requests was based on old arguments; (ii) that the information as to the identity of Claimants having tendered into the Exchange Offer 2010 is necessary, since these Claimants would have accepted to abandon, dismiss, withdraw and/or discontinue any proceedings pending against Argentina whilst Claimants who have withdrawn irrespective of the Exchange Offer 2010 have not made such undertaking; (iii) that Claimants are in a better position than Respondent to provide such information; and (iv) that Respondent's request regarding costs was to be understood as a modality of the request for an order of discontinuance, which the Tribunal shall be free to issue when considered appropriate.

220. On 26 November 2010, the Tribunal issued its Procedural Order No. 9 in which it rejected Respondent's request for further specific information on the identity of the Claimants having tendered into the Exchange Offer 2010 and announced that the question of the allocation of the arbitration costs concerning the Claimants who withdrew would be dealt with in the Tribunal's upcoming determination on jurisdiction together with the question of the withdrawal of certain Claimants.

# III. LAW

### A. INTRODUCTORY REMARKS

### (1)   The Arbitral Procedure

221.   The present procedure is subject to the ICSID legal framework, including the Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 1965 (hereinafter "ICSID Convention"), the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (hereinafter the "Institution Rules"), the Rules for Procedure for Arbitration Proceedings (hereinafter the "ICSID Arbitration Rules") and the Administrative and Financial Regulations, in their versions as amended in 2006.

222.   The Arbitral Tribunal has been duly constituted on 6 February 2008 pursuant to Articles 37 and 38 ICSID Convention and Rule 4 ICSID Arbitration Rules (see § 119 above). Following the sudden and unfortunate death of the President of the Arbitral Tribunal, Dr. Robert Briner, Prof. Pierre Tercier was appointed by agreement of the Parties on 2 September 2009 as the new President of the Arbitral Tribunal according to Rule 11 ICSID Arbitration Rules.  The Parties have not raised objections to the nomination and appointment of any of the present members of the Arbitral Tribunal.

223.   Through the various rounds of exchange of written submissions and through the Hearing on Jurisdiction held in Washington D.C. from 7 to 13 April 2010, both Parties have been given wide and equal opportunity to present their case with regard to the jurisdictional and admissibility issues of the present case.[75]

---

[75]   Hearing Tr. Day 7 pp. 1941/14 –1942/10.

224. Having read the Parties' written submissions, having listened to the Parties, the testimony of their witnesses and experts during the Hearing on Jurisdiction, and based on the deliberations held among the members of the Tribunal, the Arbitral Tribunal considers itself in a position to render the present Decision on Jurisdiction.

### (2)   Object of the Present Decision

225. The main object and aim of the present decision is to examine the Centre's jurisdiction and the Tribunal's competence over the Claimants' claims against Argentina and, to the extent that there is competence and jurisdiction, to determine whether or not such claims are admissible.  In what follows, the Tribunal will use for convenience the terms jurisdiction and competence interchangeably, without however ignoring the difference between the two concepts (see § 245 below).

226. During the First Session of 10 April 2008[76] (see § 127 above) and as further set forth in the Tribunal's letter of 21 May 2009 (see § 159 above), it was agreed that the present jurisdictional phase is limited to general issues and shall not include "issues touching specifically upon each individual claimant," except where the presentation of the general issue (of jurisdiction or admissibility) cannot be done without reference to a particular situation.

227. As such, the present decision does not aim at determining whether or not the Tribunal has jurisdiction with regard to each specific Claimant. Instead, it will set forth the general requirements for the Tribunal's jurisdiction regarding the present case and the admissibility of Claimants' claims, and will examine to what extent these requirements can be considered fulfilled without entering into issues touching specifically upon each individual Claimant. To the extent that the Tribunal considers that the general requirements for its jurisdiction and for the admissibility

---

[76]     First Session Tr. p. 140/17 and p. 141/3-9.

of Claimants' claims are fulfilled, it will determine how to address relevant jurisdictional issues touching specifically upon individual Claimants. These issues will then be dealt with in a later decision according to a procedure to be further determined.

228. With regard to relevant general issues of jurisdiction and admissibility, the Tribunal, in its letter of 9 May 2008, provided the Parties with a "List of issues to be addressed during the jurisdictional first phase of the proceedings" identifying 11 issues which are listed above (see § 130 above).

229. These 11 issues cover Claimants' and Respondent's main positions and objections with regard to the Tribunal's hearing and handling of the case, and address various issues including jurisdictional, admissibility and other procedural issues.

230. Whilst this decision will address the 11 issues listed above, it will not follow the order of such 11 issues.

231. After a brief summary of the Parties' positions (see section (3) below), the Tribunal will make a short presentation of the legal basis for the Tribunal's jurisdiction (section B below). The Tribunal will then set forth the requirements for ICSID's jurisdiction and determine to what extent these requirements can be deemed fulfilled without entering into issues specifically touching upon individual Claimants (section C below) and, to the extent these requirements are fulfilled, address relevant issues relating to the admissibility of the claims (section D below) and other procedural issues related thereto (section E below).

### (3)  Summary of the Parties' Positions and Relief Sought

232. The Parties hold opposing views with regard to the jurisdiction of the Arbitral Tribunal and the admissibility of the present proceedings. The Parties' respective positions and the requests for relief they seek from the Tribunal can be summarized as follows:

(a)   *Respondent's Position and Requests for Relief*

233. In general, Respondent rejects Claimants' claims in their entirety and contends that Claimants have not asserted a plausible or *prima facie* case for violation of any of the protections of the Argentina-Italy BIT. According to Respondent, Respondent could not and consequently did not pay its external debts according to their terms, but offered Claimants, on a non-discriminatory basis, a voluntary exchange offer for new debt on other terms, which Claimants were free to reject with all their rights intact.[77]

234. With respect to the jurisdiction, Respondent objects to the ICSID's jurisdiction and the Tribunal's competence over Claimants' claims based mainly on the following arguments:

(i)   Respondent contends that the conditions for ICSID jurisdiction are not fulfilled and that Claimants' claims are an unprecedented abuse of the investment treaty regime, brought without legal basis and for a fundamentally illegitimate motive. According to Respondent, this is a claim of approximately 180,000 unrelated Claimants, arising out of different purported investments acquired individually by each Claimant at different times and under different circumstances.[78] The ICSID Convention would not permit such collective claim, nor would the Argentina-Italy BIT. Therefore, Respondent submits that Claimants' claim is a legally unsupported attempt to turn a sovereign's non-payment of external debt that is governed by other States' laws which provide for remedies in the courts of those other States into a violation of investment treaty protection.[79]

---

[77]   R-MJ § 4; R-PHB §§ 364 *et seq.*

[78]   R-MJ §1.

[79]   R-PHB §§ 363 *et seq.*

(ii)     Further, Respondent declares that it has not consented to such a proceeding in any of the relevant instruments. Therefore, to force Respondent into such a proceeding without its consent would be a fundamental denial of due process, as well as a breach of the ICSID Convention's "outer limits."[80] In addition, even if jurisdiction was to be admitted, the way this proceeding has been initiated would not be in compliance with the requirements of the BIT with regard to preliminary conduct of amicable negotiations and court proceedings,[81] and would, in any event, be inefficient, unmanageable and contrary to Respondent's right to due process.

(iii)    Respondent also contends that Claimants' purported consent is equally invalid because TFA, as the sole mover and controller of Claimants' claims, violated the duty of full and truthful disclosure by an un-conflicted representative and thereby vitiated any consent given by Claimants. TFA solicited Claimants' consents to instituting this arbitration, over which they have no control, by fraud and half-truths with the aim of diverting those customers from claiming against the TFA member banks, while prescription in Italy runs in favor of the TFA member banks.[82] In addition, the consent allegedly given by Claimants is not irrevocable as required by Article 25(1) of the ICSID Convention.[83]

(iv)     Respondent further submits that the contractual entitlements created by and acquired by Claimants in secondary securities markets outside Argentina are not "investments made in the territory" of Argentina in the sense of the ICSID Convention or the Argentina-Italy BIT. Respondent also contends that

---

[80]     R-MJ §1, R-PHB §§ 7-8, 19-59.

[81]     R-PHB § 267-291; R-PHB §§ 72-141.

[82]     R-MJ § 2; R-PHB § 142, §§ 158-200.

[83]     R-PHB § 227.

in most instances, the sales of the entitlements to Claimants by the members of TFA were not in accordance with Argentine law as they violated both contractual restrictions on such sales and relevant legal regulations. Respondent derives from this that the Tribunal lacks jurisdiction *ratione materiae*.[84]

(v)   The Tribunal further lacks jurisdiction *ratione personae* as Claimants have not shown that they are "investors" or that they have satisfied the nationality requirements of the Argentina-Italy BIT.[85]   Respondent also disputes Claimants' standing, contending that Claimants in their capacity as holders of security entitlements have only a remote and attenuated relationship to the underlying bonds through secondary market transactions that violated relevant law.[86]

(vi)   Further, Respondent submits that Claimants' claims are not treaty claims because they depend fundamentally on non-performance of contractual payment obligations for which the relevant contractual instruments provide non-Argentine legal rights and remedies that could not be and were not affected by any act of Respondent.[87]

(vii)   Finally, Respondent contends that Claimants listed in Annex L of the Request for Arbitration have not validly withdrawn from the arbitration and, since

---

[84]   R-MJ § 3, R-PHB §§ 394-405, § 478.

[85]   R-MJ § 3, R-PHB § 500.

[86]   R-MJ § 3, R-PHB § 394-405.

[87]   R-MJ § 4, R-PHB § 363, §§ 366-371.

White & Case does not represent them, they have not submitted any of the required pleadings and face default.[88]

235.   Based on these considerations, Respondent requests that the Tribunal issue an award:[89]

"(a)   Determining that it lacks competence and that ICSID lacks jurisdiction over this case;

(b)   In the alternative, determining that it lacks competence and ICSID lacks jurisdiction because both Argentina and Claimants have not provided valid consent to this proceeding, and, further, TFA's abuse of right in bringing the claims in this proceeding renders invalid such consent as Claimants may have offered and inadmissible these proceedings;

(c)   In the alternative, determining that it lacks jurisdiction *ratione materiae*;

(d)   In the alternative, determining that it lacks jurisdiction *ratione personae* or that Claimants lack standing;

(e)   In the alternative, determining that Claimants have not satisfied the necessary prerequisites for bringing a claim under the Argentina-Italy BIT;

(f)   In the alternative, determining that Claimants listed in Claimants' Annex L have defaulted and ordering them to pay a *pro rata* share of Argentina's costs;

(g)   Ordering Claimants to pay all of Argentina's costs, expenses, and attorneys' fees; and

(h)   Granting any further relief requested against Claimants that the Tribunal deems fit and proper."

236.   The above Requests for Relief as contained in the Respondent's Post-Hearing Brief of 22 June 2010 (§ 501) and its Reply Memorial on Jurisdiction and Admissibility of 23 February 2009 (§ 730) are slightly different from the Requests for Relief it

---

[88]   R-R-MJ §§ 638-639; R-PHB §§ 253-266.

[89]   R-PHB § 501.

formulated in its First Memorial on Jurisdiction and Admissibility of 8 August 2008 and providing as follows:[90]

> "(a)   Determining that it lacks competence and that ICSID lacks jurisdiction to entertain this collective action;
>
> (b)   In the alternative, determining that it lacks competence and ICSID lacks jurisdiction because Claimants have not provided valid consent, and, further, TFA's abuse of right in bringing the claims in this proceeding renders invalid such consent as Claimants may have offered;
>
> (c)   In the alternative, determining that it lacks jurisdiction ratione materiae;
>
> (d)   In the alternative, determining that it lacks jurisdiction ratione personae or that Claimants lack standing;
>
> (e)   In the alternative, determining that Claimants have not satisfied necessary prerequisites to bringing a claim under the Argentina-Italy BIT;
>
> (f)   Ordering Claimants to pay all of Argentina's costs, expenses, and attorneys' fees; and
>
> (g)   Granting any further relief requested against Claimants that the Tribunal deems fit and proper."

237.   In addition, in its letters of 22 October 2010 and 2 November 2010 (see §§ 217 and 219 above), Respondent requested the Tribunal to issue an order for discontinuance concerning the Claimants who had withdrawn from the proceedings.

### (b)   Claimants' Position and Requests for Relief

238.   Claimants submit that throughout the 1990s, Respondent proceeded to issue over 170 sovereign bonds, intentionally targeting retail investors, including in particular Italian retail investors like Claimants. By virtue of Argentina's subsequent acts surrounding its default in late 2001 and directed at all Claimants collectively, Claimants were deprived of the value of their investments. In particular, Claimants raise the following allegations:

---

[90]   See R-MJ § 401.

(i)     Respondent first repudiated its obligations under the bonds and, subsequently, refused to negotiate with bondholders thereby pursuing a unilateral, punitive exchange offer targeting, *inter alia*, Italian retail investors, including Claimants;

(ii)    Thereafter, Respondent enacted legislation repudiating all obligations to Claimants, which destroyed the value of their investments;[91]

(iii)   Respondent's acts as a rogue debtor violated its international treaty obligations, the reason why Claimants submitted claims pursuant to the "Argentina-Italy BIT" and under the auspices of the International Centre for Settlement of Investment Disputes (hereafter "ICSID"). [92]

239.    In their Request for Arbitration of 14 September 2006, Claimants formulated the following Requests for Relief:

> "212. Claimants hereby request that the Arbitral Tribunal to be constituted in this case issue a final award:
>
> 1.    Declaring that the Argentine Republic has breached its obligations under the Argentina-Italy BIT, and is liable to Claimants therefor;
>
> 2.    Awarding Claimants compensatory damages in an amount to be specified at a later stage;
>
> 3.    Awarding Claimants costs associated with these proceedings, including all professional fees and disbursements;
>
> 4.    Awarding Claimants pre-award and post-award interest at a rate to be fixed; and
>
> 5.    Awarding Claimants such further or other relief as the Tribunal may deem appropriate.
>
> 213. Claimants reserve the right to amend this Request for Arbitration and assert additional claims as permitted by the ICSID Convention and the ICSID Arbitration Rules."

---

[91]   C-MJ §§ 2-10.

[92]   C-MJ §§ 7-8.

240. After the initiation of these proceedings, the Tribunal decided to deal first with issues of jurisdiction and admissibility and to deal with the merits of the case in a second phase (see §§ 127-130 above).

241. Within such context and with regard to the jurisdictional phase of the present proceedings as limited in scope to the extent described above (§§ 127-130), Claimants contend that ICSID and the Tribunal have full jurisdiction over Claimants' claims, which meet all relevant requirements set forth in the ICSID Convention, Arbitration Rules and the Argentina-Italy BIT.[93]

242. Consequently, Claimants request that the Tribunal decide as follows with respect to the 11 issues presented in this jurisdictional phase (see § 130 above):[94]

> "(1) Argentina consented to arbitrate claims by multiple Claimants, and those claims are admissible.
>
> (2) Claimants' consent to arbitrate pursuant to a valid declaration of consent, and the role of Task Force Argentina or any other alleged conflict does not vitiate such consent.
>
> (3) Claimants' submission of substitute annexes to the Request for Arbitration was permissible.
>
> (4) Claimants were entitled to commence arbitration and the 18-month domestic litigation clause in Article 8(2) of the Argentina-Italy BIT was not a barrier.
>
> (5) The MFN clause allows Claimants to bypass any requirement to resort to domestic court before commencing arbitration.
>
> (6) By operation of the MFN clause, Claimants can benefit from the protection of the umbrella clause in the Argentina-Chile BIT.
>
> (7) The Tribunal has jurisdiction over Claimants' prima facie treaty claims under the Argentina-Italy BIT.

---

[93]   C-MJ § 15; C-R-MJ § 353, §§ 656, 675, §§ 788, 793 and 798;  C-PHB § 6.

[94]   C-MJ Section IV § 22 ; C-R-MJ Section IV; see further C-PHB § 449.

(8)   The Tribunal's jurisdiction over Claimants' treaty claims is unaffected by any forum selection clauses in Claimants' bonds.

(9)   The bonds held by Claimants satisfy the definition of "investment" under Article 1(1) of the Argentina-Italy BIT and the ICSID Convention.   Their investments were made "in the territory" of Argentina and "in compliance with the laws and regulations of Argentina."

(10)   The Tribunal has jurisdiction *ratione personae* pursuant to Article 25 of the ICSID Convention over Claimants who are natural persons, provided certain requirements are met.

(11)   The Tribunal has jurisdiction *ratione personae* pursuant to Article 25 of the ICSID Convention over Claimants that are juridical persons and had Italian nationality on September 14, 2007."

243.   Claimants also request the Tribunal to order Respondent to bear all legal fees and expenses incurred by Claimants in connection with this arbitration.[95]

### (4)   <u>Structure of the Present Decision</u>

244.   As mentioned above (see §§ 225 *et seq.* above), the present decision deals with general questions of jurisdiction, as well as admissibility.

245.   The Convention does not define the concept of "jurisdiction" of the Centre or of "competence" of the Tribunal contemplated in Articles 25 and 41 ICSID Convention (see § 225 above).[96] Nevertheless, in their Report, the Executive Directors have interpreted the concept of "jurisdiction of the Centre" as a "convenient expression to mean the limits within which the provisions of the Convention will apply and the facilities of the Centre will be available for

---

[95]   C-MJ Section IV § 23.

[96]   The differences between the concept of "jurisdiction" of the Centre compared to the concept "competence" of the arbitral tribunal seem to be more linked to the difference in the nature and role of the Centre compared to the arbitral tribunal rather then to a real difference of concept, see GEROLD ZEILER, "Jurisdiction, Competence and Admissibility," in: International Investment Law for the 21st Century, Essays in Honour of Christoph Schreuer, Oxford University Press 2009, pp 77-81.

conciliation and arbitration proceedings." In other words, the concept of jurisdiction under the Convention also covers issues which may usually be regarded as issues of "admissibility."[97] It is thus not surprising that some tribunals have questioned the usefulness of the term in the framework of ICSID.[98]

246.  Within the context of the present dispute and its particularities, it is useful and important to distinguish issues of jurisdiction from issues of admissibility for the following reasons.

247.  Although a lack of jurisdiction or admissibility may both lead to the same result of a tribunal having to refuse to hear the case, such refusal is of a fundamentally different nature[99] and therefore carries different consequences:[100]

   (i)    While a lack of jurisdiction *stricto sensu* means that the claim cannot at all be brought in front of the body called upon, a lack of admissibility means that the claim was neither fit nor mature for judicial treatment;[101]

---

[97]    See e.g. *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Respondent's Preliminary Objections on Jurisdiction and Admissibility of 18 April 2008, §§ 11 *et seq.* (hereinafter "*Rompetrol*"). In contrast, some authors and tribunals have expressed a different view on this topic: see e.g. ZEILER, op. cit. fn. 96, pp. 90-91, who, referring to the Methanex case, supports the view that since the objections mentioned in Rule 41 ICSID Arbitration Rules do not include objections of inadmissibility of the claim, this provision does not confer to the Tribunal a separate power to rule on objections to admissibility.

[98]    CHRISTOPH SCHREUER, The ICSID Convention: A Commentary, Cambridge University Press, 2nd edition, 2009, Ad Art. 25 § 18 and references quoted therein.

[99]    See in this respect Paulsson, who called them "as different as night and day" (JAN PAULSSON, "Jurisdiction and Admissibility," in G. AKSEN, K. H. BÖCKSTIEGEL, M.J. MUSTILL, P.M. PATOCCHI, and A.M. WHITESELL (eds), Global Reflections on International Law, Commerce and Dispute Resolution, Liber Amicorum in honour of Robert Briner (2005), pp. 601 *et seq.*).

[100]   See also ZEILER, op. cit. fn. 96, pp. 81 *et seq.*

[101]   See PAULSSON, *op. cit.* fn. 99, and *The Société Générale de Surveillance v. Republic of the Philippines*, (ICSID Case ARB/02/6), Decision of 29 January 2004 (§ 153), 8 *ICSID Reports* 518 (hereinafter "*SGS v. Philippines*").

(ii)    Whereby a decision refusing a case based on a lack of arbitral jurisdiction is usually subject to review by another body, a decision refusing a case based on a lack of admissibility can usually not be subject to review by another body;

(iii)    Whereby a final refusal based on a lack of jurisdiction will prevent the parties from successfully re-submitting the same claim to the same body, a refusal based on admissibility will, in principle, not prevent the claimant from resubmitting its claim, provided it cures the previous flaw causing the inadmissibility.

248.    Therefore, and in the light of the many objections raised in the present proceedings with regard to various aspects of ICSID's jurisdiction and proceedings, the Tribunal has deemed it not only appropriate but also necessary to distinguish issues relating to ICSID's jurisdiction *stricto sensu* and admissibility issues.

249.    In this respect, the guiding thought of the Tribunal for distinguishing issues of jurisdiction from issues of admissibility has been the following cornerstone consideration:

> **If there was only one Claimant, what would be the requirements for ICSID's jurisdiction over its claim ? If the issue raised relates to such requirements, it is a matter of jurisdiction. If the issue raised relates to another aspect of the proceedings, which would not apply if there was just one Claimant, then it must be considered a matter of admissibility and not of jurisdiction.**

250.    This thought will be further developed along the Tribunal's analysis which is structured as follows:

(i)    The Tribunal will start with a short presentation of the fundaments and scope of the Tribunal's competence as deriving from the relevant legal provisions of the BIT and the Convention (see section B below);

(ii)   Based on this presentation, the Tribunal will then set forth the requirements for its jurisdiction as set forth by the relevant legal provisions and examine to what extent these requirements can be considered fulfilled without entering into issues specifically touching upon individual Claimants (see section C below);

(iii)   To the extent these requirements can be considered fulfilled, the Tribunal will address relevant issues relating to the admissibility of the claims (see section D below); and

(iv)   Finally, to the extent that the Tribunal comes to the conclusion that it has, in principle, jurisdiction and that the claims are, in principle, admissible, it will address other procedural issues relevant for the conduct of the present proceedings (see section E below).

**B.**   **LEGAL BASIS FOR THE TRIBUNAL'S JURISDICTION**

251.   It is not contested between the Parties that the Tribunal's jurisdiction must be based on the relevant provisions of the Argentina-Italy BIT as well as Article 25 ICSID Convention.[102]   What is, however, disputed is the scope of jurisdiction as deriving from these instruments and provisions.

252.   Before entering into the analysis of the various jurisdictional and other procedural requirements for ICSID arbitration, the Tribunal considers it useful to briefly discuss the scope of application and effect of the relevant legal provisions.  This will facilitate the determination of the specific scope of ICSID's jurisdiction and the Tribunal's competence in the present dispute, which will serve as basis for the Tribunal's analysis of the jurisdictional requirements.

---

[102]   C-MJ § 308; R-MJ § 174, R-R-MJ § 241.

**(1)   Article 25 ICSID Convention**

253.   To recall, Article 25 of the ICSID Convention provides:

> "(1)   The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.  When the parties have given their consent, no party may withdraw its consent unilaterally.
>
> (2)   "National of another Contracting State" means:
>
> (a)   any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and
>
> (b)   any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.
>
> [....]"

254.   Article 25 ICSID Convention is generally understood as prescribing the following requirements for ICSID's jurisdiction:

255.   *(i)   Existence of a legal dispute*: The ICSID Convention does not provide for a definition of what constitutes a "legal dispute." ICSID tribunals have generally defined this concept as referring to "disputes regarding the existence or scope of a legal right or obligation, or to disputes regarding the nature or extent of the reparation to be made for the breach of a legal obligation."[103] Similarly, the

---

[103]   See REED/PAULSSON/BLACKABY, Guide to ICSID Arbitration, Kluwer International, 2004, p. 15. See also 2011 ed., p. 26.

International Court of Justice defines a dispute as "a disagreement on a point of law or fact, a conflict of legal views or interests between parties."[104]

256.   *(ii)   A dispute arising directly out of an "investment"*: In order to be subject to ICSID's jurisdiction, the dispute must concern an "investment" and the claims put forward by either Party must arise directly from such investment. Again, the ICSID Convention does not provide for any definition or explanation of the terms "arising directly out of" or "an investment."[105] Attempts by tribunals to define the concept of investments are numerous and will be examined further below when determining whether an investment may be deemed to exist in the present case (see §§ 343 *et seq.* below).

257.   *(iii)   A dispute between a Contracting State and a national of another Contracting State*: The dispute must exist between a Host State having ratified the Convention and an investor of another State, having also ratified the Convention.  With regard to the investor, the nationality requirement is understood to be two-fold, i.e., subject to a positive and a negative requirement: (i) the investor must possess the nationality of a Contracting State, and (ii) not simultaneously possess the nationality of the Host State. The fulfilment of the nationality requirement set forth in Article 25 is considered an objective condition to the Convention's application, which is not subject to the Contracting Parties' arrangement. Article 25(2) however, does not provide for a definition of the concept of nationality, which is according to general principles of international law left to the law of the State of which nationality is claimed. Article 25(2) merely provides certain clarifications as to the time at which the nationality requirement must be fulfilled, while drawing a distinction between natural persons and juridical persons. In addition, with regard

---

[104]   See the case concerning East Timor, I.C.J. Reports 1995, pp. 89, 99. See also SCHREUER, *op. cit.* fn.98, Ad Article 25 § 42 and references quoted in footnote n. 44.

[105]   SCHREUER, *op. cit.* fn.98, Ad Article 25 § 85.

to juridical persons, Article 25(2) provides the parties with the possibility to take into account foreign control over a juridical person when determining its nationality for the purposes of the Convention.

258. *(iv)   Existence of a written consent of both Parties*:   In order for consent for ICSID's jurisdiction to be given, a State must not only have generally consented to ICSID's jurisdiction by becoming a party to the ICSID Convention, it must also have consented to ICSID's jurisdiction in the specific case at hand. This specific consent must then be matched by the consent of the concerned investor. Consent must be given in writing and be explicit. However, the Convention does not define the concept of written form, and in practice the form of such consent has evolved and may differ depending on the type, contractual- or treaty-based, of the dispute. Within the context of BIT-based arbitration, it is widely admitted that an arbitration clause contained in a BIT and providing for ICSID arbitration constitutes a valid written offer for ICSID arbitration by the relevant State. Actually, Article 8(3) of the BIT in the present case states with so many words: "With this purpose and under this Agreement, each Contracting Party grants its anticipated and irrevocable consent that any dispute may be subject to arbitration."   Such an offer of consent may be validly accepted by an investor through the initiation of ICSID proceedings.[106]

### (2)   Argentina-Italy BIT

259. On 22 May 1990, the Republic of Italy and the Argentine Republic signed the Argentina-Italy BIT which entered into effect on 14 October 1990, and on which Claimants' claims as well as the Tribunal's competence are allegedly based.

---

[106]   SCHREUER, *op. cit.* fn. 98, Ad Art. 25 §§ 427 et seq., § 448; REED/PAULSSON/BLACKABY, *op. cit.* fn. 103, p. 35.

*(a)    General Scope and Aim of the Argentina-Italy BIT*

260. With regard to the general purpose of the Argentina-Italy BIT, the preamble of the
BIT provides as follows:

261. In its authentic Spanish version:

> "[…]
>
> Con el deseo de crear condiciones favorables para una mayor cooperación
> económica enre los dos Países y, en particular, para la realización de
> inversiones por inversores de una Parte Contratante en el territorio de la otra
> y;
>
> Considerando que la única manera de establecer y conservar un adecuado
> flujo internacional de capitales es a través del mantenimiento de un clima
> satisfactorio para las inversiones dentro del respeto a las leyes del país
> receptor;
>
> Reconociendo que la conclusión de un Acuerdo para la promoción y la
> reciproca protección de las inversiones contribuirá a estimular las iniciativas
> empresariales que favorezcan la prosperidad de las dos Partes contratantes.
>
> […]"

262. In its authentic Italian version:

> "[…]
>
> desiderando creare condizioni favorevoli per una maggiore cooperazione
> economica fra i due Paesi ed, in particolare, per la realizzazione di
> investimenti da parte di investitori di una Parte Contraente nel territorio
> dell'altra;
>
> considerando che l'unico modo per stabilire e mantenere un adeguato flusso
> internazionale di capitali consiste nell'assicurare un clima propizio agli
> investimenti, nel rispetto delle leggi del Paese ricevente;
>
> riconoscendo che la conclusione di un Accordo per la Promozione e la
> reciproca Protezione degli Investimenti contribuirà a stimolare iniziative
> imprenditoriali idonee a favorire la prosperità delle due Parti Contraenti,
>
> […]"

263. In its unofficial English translation by Claimants:

> "[…]
>
> Desiring to create favourable conditions for greater economic cooperation
> between the two States and, in particular, for the realization of investments by

investors of one Contracting Party in the territory of the other Contracting Party;

Considering that the only way of establishing and maintaining an appropriate international flow of capital is to ensure a favourable climate for investments, in compliance with the laws of the receiving State;

Recognizing that entering into this Agreement on the Promotion and Protection of Investments will stimulate entrepreneurial intiatives which will increase the prosperity of both Contracting Parties.

[…]

264. In accordance with this general aim of the BIT, the BIT is then construed as follows:

(i)    Article 1 provides for definitions of various key terms used throughout the BIT, including the terms "investment," "investor," "returns" and "territory";

(ii)   Articles 2 to 6 contemplate various standards of investment protection and promotion, including fair and equitable treatment to investors of the other Contracting Party (Article 2(2)), national treatment standard and most-favored nation principle (Article 3), compensation for damages or losses related to certain events (Article 4), protection against nationalization and expropriation (Article 5), assurance of the possibility to transfer and repatriate capital, revenues, considerations and compensation of damages (Article 6), while Article 7 extends such protection to subrogated parties;

(iii)  Articles 8 and 9 provide for a mechanism of settlement of disputes, Article 8 applying to disputes between investors and a Contracting Party (see § 267 below), and Article 9 applying to disputes between the Contracting Parties, i.e., Argentina and Italy;

(iv)   Article 10 contemplates the principle that if another applicable law or treaty provides for a more favorable treatment, such more favorable treatment shall apply;

(v)   Articles 11 to 13 are of a more technical nature and address questions of entry into force and duration of the BIT.

265.  In addition to the core of the BIT, Argentina and Italy further signed an "Additional Protocol," which provides specifications and clarifications concerning Articles 1 and 3 BIT:

(i)   With regard to Article 1 BIT and the concept of "individual" investor defined therein, the Additional Protocol provides for specific domiciliation requirements for individuals of a Contracting Party to benefit from the protection of the BIT;

(ii)  With regard to Article 3 (and Article 10) BIT and the principles of most favored nation and most favorable treatment contemplated therein, the Additional Protocol specifies the scope of application of these principles: (a) with regard to problems relating to the entry, stay, work and movement in each Contracting Party's territory of relevant citizens of the other Contracting Party and their families and (b) in general, by excluding from its scope of application "investments made within facilitated credit set forth in bilateral agreements" such as the Treaty signed in Rome on 10 December 1987 and establishing a Particular Association between Italy and Argentina and the General Treaty of Cooperation and Good Relationships signed in Madrid on 3 June 1988 between Argentina and Spain.

266.  In summary, the Argentina-Italy BIT resembles other BITs concluded at that time and does not contain any "out of the ordinary" provision or principle.

(b)   *Article 8 BIT*

267.  As mentioned above (§ 264), in Article 8 BIT, Argentina and Italy set forth the principles for settlement of disputes arising between investors of one Contracting Party and the other Contracting Party, i.e., the Host State.

268.  Articles 8(1) through 8(9) BIT in the Spanish authentic text provides as follows:

"1.    Toda controversia relativa a las inversiones que surja entre un inversor de una de las Partes Contratantes y la otra Parte, respecto a cuestiones reguladas por el presente Acuerdo será, en la medida de lo posible, solucionada por consultas amistosas entre las partes en la controversia.

2.    Sí esas consultas no aportaran una solución, la controversia podrá ser sometida a la jurisdicción administrativa o judicial competente de la Parte Contratante en cuyo territorio está situada la inversión.

3.    Sí todavía subsistiera una controversia entre inversores y una Parte Contratante, luego de transcurrido un plazo de dieciocho meses desde la notificación del comienzo del procedimiento ante las jurisdicciones nacionales citadas en el párrafo 2, la controversia podrá ser sometida a arbitraje internacional.

A ese fin, y de conformidad con los términos de este Acuerdo, cada Parte Contratante otorga por el presente su consentimiento anticipado e irrevocable para que toda controversia pueda ser sometida al arbitraje.

4.    A partir del momento en que se inicie un procedimiento arbitral, cada una de las partes en la controversia adoptara todas las medidas necesarias a fin de desistir de la instancia judicial en curso.

5.    En caso de recurrirse al arbitraje internacional, la controversia sera sometida, a elección del inversor, a alguno de los organos de arbitraje designados a continuación:

a) Al Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (C.I.A.D.I.) creado por el «Convenio sobre el arreglo de diferencias relativas a Inversiones entre Estados y nacionales de otros Estados », abierto a la firma en Washington el 18 de marzo de 1965, cuando cada Estado parte en el presente Acuerdo haya adherido a aquel. Mientras dicha condición no se cumpla, cada una de las Partes Contratantes da su consentimiento para que la controversia sea sometida al arbitraje de conformidad con el reglamento del Mecanismo Complementario de Conciliación y Arbitraje del Centro Internacional de Arreglo de Diferencias Relativas a Inversiones.

b) A un tribunal de arbitraje "ad hoc" establecido para cada caso. El Arbitraje se efectuara de acuerdo con el Reglamento Arbitral de la Comisión de la Naciones Unidas para el Derecho Mercantil Internacional (C.N.U.D.M.I.) al cual se refiere la Resolución de la Asamblea General de las Naciones Unidas No. 31/98 del 15 de diciembre de 1976. Los árbitros seran tres. Si los mismos no son nacionales de la Partes Contratantes, deberan ser nacionales de Estados que tengan relaciones diplomáticas con ellas.

6.    Ninguna de la Partes Contratantes que sea parte en una controversia podra plantear, en ninguna etapa del proceso de arbitraje, ni de la ejecución de una sentencia arbitral, excepciones basadas en el hecho que el inversor, parte contratante en la controversia, haya percibido una indemnificación destinada a

97

cubrir todo o parte de la perdidas sufridas, en cumplimento de una poliza de seguro o de la garantia prevista en Articulo 7 del presente Acuerdo.

7.    El tribunal arbitral decidirá sobre la base del derecho de la Parte Contratante parte en la controversia – incluyendo las normas de esta ultima relativas a conflictos de leyes -, las disposiciones del presente Acuerdo, los terminos de eventuales acuerdos particulares concluídos con relación a la inversión, como asi también los principios de derecho internacional en la materia.

8.    Las sentencias arbitrales serán definitivas y obligatorias para las partes en la controversia. Cada Parte Contratante se compromete a ejecutar las sentencias de conformidad con su legislación nacional y de acuerdo a las convenciones internacionales en la materia vigentes para ambas Partes Contratantes.

9.    Las Partes Contratantes se abstendran de tratar, a través de los canales diplomáticos, argumentos concernientes al arbitraje o a un proceso judicial ya en marcha hasta que los procedimientos correspondientes hubieran sido concluidos, salvo que las partes en la controversia no hubieran cumplido el laudo del tribunal arbitral o la sentencia del tribunal ordinario, según los términos de cumplimiento establecidos en el laudo o en la sentencia."

269.   Article 8(1) through 8(9) BIT in the Italian authentic text provides:

"1.    Qualsiasi controversia relativa agli investimenti insorta tra una Parte Contraente ed un investitore dell'altra, riguardo problemi regolati dal presente Accordo, sarà per quanto possibile risolta mediante consultazioni amichevoli tra le parti in controversia medesime.

2.    Se tali consultazioni non consentissero una soluzione, la controversia potrà essere sottoposta alla competente magistratura ordinaria od amministrativa della Parte Contraente nel cui territorio si trovi l'investimento.

3.    Ove tra un a Parte Contraente ed investitori sussista ancora controversia, dopo trascorso un periodo di 18 mesi dalla notifica di inizio di una azione avanti le magistrature nazionali indicate al paragrafo 2, tale controversia potrà essere sottoposta ad arbitrato internazionale. A tale effetto ed ai sensi del presente Accordo, ciascuna Parte Contraente conferisce fin d'ora consenso anticipato ed irrevocabile affinché qualsiasi controversia possa essere sottoposta all'arbitrato.

4.    Fin dal momento in cui abbia avuto inizio un procedimento arbitrale, ciascuna delle parti nella controversia adotterà ogni utile iniziativa intesa a desistere dall'azione giudiziale in corso.

5.    In caso di ricorso all'arbitrato internazionale, la controversia sarà sottoposta, a scelta dell'investitore, a uno degli organismi di arbitrato qui di seguito indicati:

a.     al Centro Internazionale per la Risoluzione delle Controversie relative ad Investimenti (I.C.S.I.D.), istituito dalla Convenzione sul "Regolamento delle Controversie relative agli investimenti tra Stati e cittadini di altri Stati", aperta alla firma in Washington il 18 marzo 1965, qualora ognuno dei Paesi parte nel presente Accordo vi avesse aderito. Ove questa condizione non sussista, ciascuna delle Parti Contraenti conferisce il proprio consenso affinché la controversia sia sottoposta ad arbitrato, in conformità alla regolamentazione sui "meccanismi" aggiuntivi per la conciliazione e l'arbitrato del Centro Internazionale per il Regolamento delle Controversie relative ad Investimenti.

b.     Ad un Tribunale arbitrale "ad hoc" istituito caso per caso. L'arbitrato si effettuerà secondo il Regolamento Arbitrale della Commissione delle Nazioni Unite sul Diritto Commerciale Internazionale (UNCITRAL), di cui alla Risoluzione dell'Assemblea Generale delle Nazioni Unite 31/98 del 15 dicembre 1976: Gli arbitri saranno in numero di tre e, se non cittadini delle Parti Contraenti, dovranno essere cittadini di Paesi che abbiano relazioni diplomatiche con le Parti Contraenti.

6.     Nessuna delle Parti Contraenti, che sia parte in una controversia, potrà sollevare in una fase della procedura di arbitrato né in sede di esecuzione di una sentenza di arbitrato, eccezioni basate sul fatto che un investitore parte avversa abbia, per effetto di una polizza di assicurazione o della garanzia prevista all'Articolo 7 del presente Accordo, ricevuto un indennizzo destinato a coprire in tutto od in parte le perdite subite.

7.     Il Tribunale Arbitrale deciderà sulla base del diritto della Parte Contraente parte nella controversia – comprese le norme di quest'ultima relativi ai conflitti di leggi -, delle disposizioni del presente Accordo, di clausole di eventuali particolari accordi relativi all'investimento, nonché sulla base dei principi di diritto internazionale applicabili in materia.

8.     Le sentenze arbitrali definitive vincolanti per le parti nella controversia. Ciascuna Parte Contraente si impegna ad eseguire le sentenze, in conformità alla propria legislazione nazionale ed alle Convenzioni internazionali in materia vigenti per ambo le Parti Contraenti.

9.     Le parti Contraenti si asterranno dal trattare per via diplomatica argomenti attinenti ad un arbitrato od un procedimento giudiziario già in corso, finché le procedure relative non siano concluse e le parti nella controversia non abbiano poi adempiuto al lodo del tribunale arbitrale od alla sentenza del competente tribunale interno, secondo i termini di adempimento stabiliti nel lodo o nella sentenza medesimi."

270.  Article 8(1) through 8(9) BIT in Claimants' unofficial English translation provides:

"1.     Any dispute in relation to the investments between a Contracting Party and an investor of the other Contracting Party in relation to the issues

governed by this Agreement shall be settled, if possible, by means of amicable consultation between the parties to the dispute.

2.     If the dispute has not been settled in such consultation, it may be subject to the competent ordinary or administrative court of the Contracting Party in the territory of which the investment is located.

3.     If, after 18 months from the notification of commencement of an action before the national courts indicated in the above paragraph 2, the dispute between the Contracting Party and the investors still continues to exist, it may be subject to international arbitration.

With this purpose and under this Agreement, each Contracting Party grants its anticipated and irrevocable consent that any dispute may be subject to arbitration.

4.     Since the commencement of the arbitration proceeding, each disputing party will adopt any initiative suitable to desist from the judicial action in course.

5.     In case of international arbitration, the dispute will be subject, upon choice of the investor, to one of the following arbitration bodies:

        a)     International Centre for Settlement of Investment Disputes (I.C.S.I.D.), established under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States opened for signature in Washington on March 18, 1965, provided that both Contracting Parties are parties to the said Convention. If this condition is not satisfied, each of the Contracting Parties agrees that the dispute shall be subject to arbitration in compliance with the Additional Facility Rules for conciliation and arbitration of the International Centre for Settlement of Investment Disputes.

        b)     Ad hoc arbitration tribunal. The arbitration will be carried out according to the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), approved by the General Assembly Resolution 31/98 of December 15, 1976. There will be three arbitrators who, if not citizens of the Contracting Parties, must be the citizens of the countries with which the Contracting Parties have diplomatic relations.

6.     No Contracting Party which is a party to the dispute is allowed to raise, during the arbitration procedure or while the arbitration decision is being enforced, exceptions based on the fact that the investor involved in the dispute received, in force of an insurance policy or security provided under Art. 7 hereof, a compensation which covers, in whole or in part, the losses suffered.

7.     The arbitration tribunal will decide on the basis of the laws of the Contracting Party involved in the dispute – including its rules on the conflict of laws – and of the provisions of the Agreement, of clauses of any particular agreements relating to the investment, as well as on the basis of the applicable principles of international law.

8.     The arbitration decisions will be definitive and binding on the parties to the dispute. Each Contracting Party undertakes to enforce the decisions in

> compliance with its national legislation and international conventions applicable to both Contracting Parties.
>
> 9.     The Contracting Parties will refrain from diplomatic negotiations on issues relating to an arbitration or judicial proceeding in course, until the related proceeding has not been concluded and the parties have not complied with the arbitration decision or the decision of the competent internal court according to the terms of performance provided in such arbitration or judicial decision."

271. Thus, whilst Article 8(1) firstly defines the scope of its application by referring to "any dispute relating to the investments between a Contracting Party and an investor of the other Contracting Party in relation to the issues governed by this Agreement," Article 8(1) to (3) then provides for three different settlement mechanisms: (i) amicable consultations (Article 8(1)), (ii) proceedings before the competent ordinary or administrative court of the Host State (Article 8(2)), and (iii) international arbitration (Article 8(3)).

272. Article 8(4) to 8(8) further contains supplementary principles applicable where a party initiates international arbitration proceedings, providing for either ICSID or *ad hoc* arbitration upon the choice of the investor (Article 8(5)), as well as for a choice of law in favor of the law of the Host State, the provisions of the BIT, as well as the applicable principles of international law (Article 8(7)). Article 8(9) finally prohibits the Contracting Parties from conducting diplomatic negotiations on issues relating to an ongoing litigation or arbitration.

273. Article 8 BIT is at the heart of the Parties' controversy regarding the question of the Tribunal's jurisdiction: The Parties not only disagree on the scope and nature of the disputes subject to the settlement mechanisms set forth in Article 8, but also on how these three mechanisms interact, and in particular whether some of them are a mandatory prerequisite to the coming into play of other mechanisms, and if so, whether or not they have been duly complied with.

**(3)    Relationship between Article 25 ICSID Convention and Article 8
BIT**

   *(a)    In General*

274.   As mentioned above, Article 8(5) BIT provides that in case of an international
arbitration initiated under Article 8(3) BIT, the dispute would be subject, upon the
choice of the investor, to either ICSID or *ad hoc* arbitration under the UNCITRAL
Arbitration Rules.

275.   In other words, through the express designation of ICSID arbitration in Article 8
BIT, Italy and Argentina, which are both Contracting Parties to the ICSID
Convention, express their  consent required under Article 25 ICSID Convention to
submit specific disputes with nationals of each other to ICSID arbitration. The
scope of this consent is therefore defined by and must be determined according to
the relevant provisions of the BIT, and in particular by Article 8.

276.   In this respect, the Parties disagree on the actual and admissible scope of this
consent. They disagree on how these two provisions - Article 25 ICSID Convention
and Article 8 BIT - interact, and in particular on whether Article 25 ICSID
Convention sets forth the outer limits of the consent given under Article 8 BIT and,
if so, whether the Parties' consent as expressed in Article 8 goes beyond these outer
limits.

   *(b)    With regard to the Subject Matter of the Dispute*

277.   According to Article 8(1) BIT, the settlement mechanism provided for in Article 8,
including ICSID arbitration, applies to "[a]ny dispute in relation to the investments
between a Contracting Party and an investor of the other Contracting Party in
relation to the issues governed by this Agreement."

278.   Through this phrase, Argentina and Italy defined the nature and kind of disputes
that the Contracting Parties wished to submit to the dispute settlement mechanisms

102

provided under Article 8, i.e., disputes "in relation to the investments" made "in relation to the issues governed by this Agreement."

279.   Insofar as ICSID arbitration is concerned, this phrase arguably implements the requirements of Article 25 reserving ICSID jurisdiction to "legal disputes arising directly out of an investment." To recall, Article 25(1) ICSID Convention provides as follows (see § 253 above):

> "(1)   The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.  When the parties have given their consent, no party may withdraw its consent unilaterally."

(i)   To the extent that the BIT provides an investor with specific rights for the protection of its investment, a dispute relating to the existence, scope or violation of such a right can be deemed a "legal dispute" in the sense of Article 25 ICSID Convention.

(ii)   To the extent that Article 8(1) requires a "relation" between the dispute and the investment, it would appear to implement the requirement of Article 25(1) ICSID Convention that only disputes arising "directly out of an investment" is subject to ICSID's jurisdiction.  Now, it is true that Article 8(1) does not expressly provide for the need of "directness" between the investment and the dispute and merely requires the existence of a "relation" between them. The question thus arises whether such less restrictive wording may be considered going beyond ICSID's outer limits and should therefore be interpreted with due regard to the requirement of "directness" of such relationship.  This question will be addressed in more detail below when determining the existence of a legal dispute arising out of the BIT (below §§ 301 *et seq.*).

(c)     *With regard to the Parties*

280.  As mentioned above (§257), Article 25 ICSID Convention requires that the dispute at stake exists between a Host State having ratified the Convention and an investor of another Contracting State. To this extent, ICSID arbitration initiated under Article 8 BIT may only take place between the Host State, i.e., Argentina or Italy, and an investor of the other State's nationality. This is duly reflected in Article 8(1) BIT, which applies only to disputes between "a Contracting Party and an investor of the other Contracting Party." As such, Article 8(1) BIT reflects the objective requirements of Article 25 ICSID Convention that the investor be of the nationality of a Contracting State other than the Host State.

281.  With regard to the nationality of the investor, Article 25 ICSID does not provide for any specification as to when an investor is deemed to be of the nationality of a particular State. Thus, while the requirement that the investor be of the nationality of a Contracting State other than the Host State is an objective requirement, the criteria to determine whether such requirement is fulfilled are not set forth by the ICSID Convention and may therefore be further determined by the Contracting Parties to the Convention.

282.  In this respect, the BIT contains the following provision with regard to the nationality of an investor:

• Article 1(2) BIT provides as follows:

"2. "Investor" shall mean any individual or corporation of one Contracting Party that has made, makes or undertakes to make investments in the territory of the other Contracting Party.

a)    "individual" shall mean, for each Contracting Party, an individual who is a citizen of such Contracting Party, in compliance with the laws thereof;

b)    "corporation" shall mean, in relation to each Contracting Party, any entity incorporated in compliance with the legislation of a Contracting Party, having its office in the territory of such Party and being recognized thereby, such as public entities that conduct economic

activities, partnerships and corporations, foundations and associations, independent of whether liability is limited or not. "

- Par. 1 of the Additional Protocol provides as follows:

"1.   With reference to Article 1:

a)   Individuals of each Contracting Party who, when making an investment, maintained their domicile for more than two years in the Contracting Party in the territory of which the investment was made, cannot benefit of this Agreement.

If an individual of one Contracting Party maintains at the same time its registered residence in its State and domicile in the other State for more than two years, he/she will be considered equivalent, for the purposes of this Agreement, to individuals of the Contracting Party in the territory of which they made investments.

b)   The domicile of an investor will be determined in compliance with laws, regulations and provisions of the Contracting Party in the territory of which the investment was made."

283. While Article 1(2) BIT focuses on the definition of the term of "investor," the Additional Protocol sets forth further eligibility criteria for an investor to benefit from the protection offered by the BIT. As such, these provisions aim to define the general scope of application *rationae personae* of the BIT, including but not limited to issues of nationality.

284. Within this context, Article 1(2) BIT requires that the investor be (i) with regard to physical persons, an individual having citizenship of the other Contracting Party, according to the latter's laws, and (ii) with regard to corporations, a corporation being incorporated in the other Contracting Party's territory in accordance with its legislation.

285. Thus, the BIT provides that the question of whether an investor is an "investor of the other Contracting Party" in the sense of Article 8(1) BIT is subject to the law of the Contracting State of which nationality is claimed. This can be said to reflect Article 25 ICSID Convention, which does not impose any criteria with regard to the determination of the nationality.

286. In addition thereto, the Additional Protocol to the BIT sets forth further criteria of eligibility for an investor to benefit from the protection offered under the BIT, in particular domiciliation requirements, which are to be examined under the laws of the Host State, i.e., Argentina.

287. In summary, under the BIT, an investor must not only be of the nationality of the other Contracting Party, but it must further fulfil the domiciliation requirements of Par. 1 of the Additional Protocol.

   *(d)   With regard to the Procedure to Be Followed*

288. As mentioned above (§ 271), Article 8 BIT provides for three different types of dispute settlement mechanisms and the Parties disagree on the scope and nature of the disputes subject to these mechanisms, as well as on the interaction of these three mechanisms. In particular, it is disputed between the Parties whether these three mechanisms are to be considered as mere alternatives or whether they provide for a sequential dispute resolution system implementing a mandatory three-steps mechanism, in which arbitration constitutes the ultimate step to be initiated only after completion of the first two steps.

289. Whilst Article 25 ICSID Convention sets forth the requirements for the Centre's jurisdiction, and the ICSID Arbitration Rules further set forth the specific rules to be followed in order to initiate arbitration proceedings falling under ICSID's jurisdiction, the ICSID framework is silent with regard to the question of whether such arbitration proceedings can be rendered conditional upon the fulfilment of further requirements, and if so, what are the effects of such additional requirements on ICSID's jurisdiction for handling of the case.

290. Whether or not Article 8 BIT provided for additional requirements and whether these requirements should be deemed of such nature and importance to be an inseparable part of the Parties' consent will be addressed below when examining

the existence and scope of the Parties' consent to ICSID jurisdiction (see §§ 423 *et seq.* and §§ 467 *et seq.* below).

**(4)    Other Relevant Legal Provisions and Principles**

291.   The Tribunal takes guidance from the Vienna Convention on the Law of Treaties ("Vienna Convention") in particular Article 31 ("General rule of interpretation") and 32 ("Supplementary means of interpretation").

292.   As already mentioned in the Tribunal's Procedural Order No. 3 of 27 January 2010, this Tribunal shares the generally accepted view that the decisions of ICSID tribunals, like those of other investment dispute settlement mechanisms, are not legally binding precedents. Consequently, the Tribunal does not consider itself bound by previous decisions of other international tribunals.

293.   However, the Tribunal is also of the opinion that, subject to the specific provisions of a treaty in question and of the circumstances of the actual case, it should pay due consideration to earlier decisions of international tribunals, where it believes that such consideration is appropriate in the light of the specific factual and legal context of the case and the persuasiveness of the legal reasoning of these earlier decisions.[107]

**(5)    ICSID, BIT and Mass Claims**

294.   The present proceedings are particular insofar as they gathered as of the date of their initiation, on Claimants' side, over 180,000 individuals and corporations. In the light of this figure, the present proceedings can be qualified as "mass claims" proceedings. The same remains true despite the recent withdrawal of several

---

[107]    On the precedential value of ICSID decisions, *see* GABRIELLE KAUFMANN-KOHLER, Arbitral Precedent: Dream, Necessity or Excuse? Freshfields lecture 2006, in Arbitration International Vol. 23 (2007) No. 3, pp. 368 *et seq.*; see also AUGUST REINISCH, The Role of Precedents in ICSID Arbitration, in Austrian Arbitration Yearbook 495-510 (2008).

thousands of Claimants, thereby reducing the number of remaining Claimants to approximately 60,000 (see § 216 above), subject to the Tribunal's decision on whether such "withdrawal" is admissible.

295.  While it has happened in the past that multiple claimants initiated ICSID arbitration proceedings, this appears to be the first case in ICSID's history that "mass claims" are brought before it.

296.  It is undeniable that the large number of Claimants raises a series of questions and challenges. In particular, the large number of Claimants makes it impossible to treat and examine each of the 180,000 claims (or 60,000 claims for that matter) as if it were a single claim, and certain generalisations and/or group examinations will be unavoidable. The question thus arises whether these or any other relevant characteristics of the present "mass claims" which will be addressed further below, may constitute a hurdle to ICSID's jurisdiction and/or to the admissibility of the claims (see §§ 480 and §§ 515 *et seq.*).

297.  Neither the ICSID framework nor the BIT addresses the issue of such mass proceedings and therefore fail to provide a clear answer to this question. Also, the Parties disagree on how this silence should be interpreted and what it means with regard to the present mass proceedings. While Respondent argues that, in the light of their characteristics, mass proceedings are contrary to the system of ICSID arbitration and were not covered by Respondent's consent, Claimants, in contrast, hold the view that the "mass" aspect of the claim is a mere procedural aspect, which does not raise any issues of consent or jurisdiction, and which can thus be duly addressed by the arbitrators under their usual power to rule upon the procedure of the arbitration.

298.  Consequently, the issue of the "mass claims" will have to be addressed under a two-fold approach: first, within the context of the Parties' consent (see §§ 480 *et*

*seq.* below), and secondly, within the context of admissibility of the present proceedings (see §§ 506, 515 *et seq.* below).

### C.   THE ARBITRAL TRIBUNAL'S JURISDICTION

### (1)   Introductory Remarks

299.   As mentioned above (see § 250(ii) above), this section will deal with the question of the Tribunal's jurisdiction over the claims. In particular, it will focus on examining whether the four basic conditions for jurisdiction are given. If so, the Tribunal will deal with issues of admissibility in the next section.

300.   Thus, after dealing with the nature of the dispute and examining whether it arises out of the BIT ((2)) and relates to an "investment" (jurisdiction *rationae materiae* ((3)), the Tribunal will address relevant issues of nationality, capacity and characteristics of the Parties involved (jurisdiction *rationae personae*) ((4)), before examining the existence and scope of Claimants' and then Argentina's consent ((5) &(6)).

### (2)   Legal Dispute Arising out of the BIT – Issues 7 & 6

#### (a)   *Issues at Stake and Relevant Legal Provisions*

301.   It is uncontested between the Parties, that there is a dispute which can be considered a "legal dispute" in the sense of Article 25 ICSID Convention. What is contested between the Parties is whether this legal dispute arises out of rights and obligations contemplated in the BIT, or whether they are of a mere contractual nature arising out of the relevant bond documents relating to the Claimants' security entitlements. In other words, the Parties disagree whether the claims submitted to this Tribunal fall within the scope of protection of the BIT.

302.   Thus, the issues to be determined by the Tribunal here are the following:

- Do the present claims arise out of the BIT, i.e., are they so-called treaty claims or, on the contrary, pure contract claims or claims of another nature? (see Issue No. 7 of the List of 11 Issues of 9 May 2008)

- What, if any, are the consequences of this determination? In particular:

  (i)   If they are treaty claims, would the alleged facts, if proven, possibly constitue a treaty violation?

  (ii)  If they are contract claims or claims of another nature, or in case of a treaty claim where the alleged facts would not constitue a violation  of the treaty, can their case still be heard based on the MFN Clause of Article 3(1) BIT in connection with the Umbrella Clause contained in the Argentina-Chile BIT? (See Issue No. 6 of the List of 11 Issues of 9 May 2008)

303. In this context, it is to be recalled that according to generally accepted practice, the task of the Tribunal at the stage of determining whether it has jurisdiction to hear a claim under an investment treaty merely consists in determining whether the facts alleged by the claimant(s), if established, are capable of constituting a breach of the provisions of the BIT which have been invoked.[108] In performing this task, the Tribunal applies a *prima facie* standard, both to the determination of the meaning and scope of the relevant BIT provisions invoked as well as to the assessment of whether the facts alleged may constitute breaches of these provisions on its face. In the words of the tribunal in *Saipem v. Bangladesh*: "If the result is affirmative,

---

[108]   *Saipem S.p.A. v. The People's Republic of Bangladesh* (ICSID Case No. ARB/05/07), Decision on Jurisdiction and Recommendation on Provisional Measures of 21 March 2007, §§ 84 *et seq*. (hereinafter "*Saipem*").

jurisdiction [rationae materiae] will be established, but the existence of breaches will remain to be litigated on the merits."[109]

304.   The key legal provisions and documents in dealing with the above issues are the following: Articles 1, 2, 3, 4, 5 and 8 of the BIT, Article 7(3) of the Argentina-Chile BIT, as well as the relevant bond documents, including but not limited to the Subscription Agreements between the subscribers and Argentina,[110] the Syndication Agreements between the syndicate of banks and Argentina,[111] the sales contracts between the commercial banks and the final purchaser of the securities, as well as the Offering Circulars of the relevant bonds,[112] their Terms and Conditions, and other documents related to the bonds.[113]

305.   In particular, Article 3 of the Argentina-Italy BIT in the unofficial English translation submitted by Claimants provides as follows:

"1.     Neither Contracting Party shall in its territory subject investments made by the investors of the other Contracting Party, returns and other assets relating to such investments, as well as all other issues governed by this Agreement, to treatment less favourable than that which  it accords to its own investors or the investors of third States.

2.      The provision of paragraph 1 hereof does not apply to advantages and privileges that one Contracting Party accords or will accord to third countries as a consequence of its participation in customs or economic unions, common market associations, free exchange zones or as a consequence of regional or sub-regional agreements, multilateral international economic treaties or treaties against double taxation, other tax treaties or treaties aimed at simplifying cross-border exchanges."

---

[109]   *Saipem*, § 91.

[110]   See e.g. Exh. C-122 and RF-18.

[111]   See e.g. Exh. C-123, C-350 and C-353.

[112]   See e.g. Bond 1 Offering Circular Exh. C-1.

[113]   See e.g. Trust Deed Exh. C-93, Fiscal Agency Agreement Exh. C-95, etc.

306. Article 7(2) of the Argentina-Chile BIT in the unofficial English translation submitted by Claimants further provides as follows:

> "Each Contracting Party shall observe any other obligation that it has entered into in relation to the investments of nationals of companies of the other Contracting Party in its territory."

    *(b)    Parties' Positions*

307. *Respondent's Position.*   Respondent contests that the present claims are "treaty claims" falling under the scope of protection of the BIT. Respondent supports this position with the following main arguments:

(i)    The operative facts of which Claimants complain are simply those attendant to non-payment under the bonds, i.e., to a contractual claim, which do not fall under the scope of protection of the BIT. None of the sovereign acts Claimants rely upon is capable of falling within the substantive protection of the BIT, because those acts did not and could not impair the rights represented by Claimants' security entitlements since they were not created and are not governed by Argentine law and are enforceable outside Argentina.[114]

(ii)    Under such circumstances the Tribunal simply lacks jurisdiction, and such jurisdiction may not be extended through an import of the Umbrella Clause contained in the Argentina-Chile BIT based on the MFN clause of Article 3(1) of the Argentina-Italy BIT.[115]

---

[114]    R-PHB §§ 363 *et seq.*

[115]    R-R-MJ, §§ 543 *et seq.*

- First, the MFN clause cannot override core matters (such as an Umbrella Clause) which must be subject to specific negotiations between the Contracting Parties.

- Second, Articles 1, 3 and 8 BIT are limited to "matters regulated in this Agreement," and the tribunal would thus have no jurisdiction over claims based on standards not regulated in the BIT, such as an Umbrella Clause.  The MFN clause in the Argentina-Italy BIT cannot be construed to extend the jurisdiction of an arbitral tribunal to categories of disputes beyond those set forth in the jurisdictional clause of the basic treaty. Claimants are seeking to establish jurisdiction over a type of claim not covered by the grant of jurisdiction of Article 8 of the Argentina-Italy BIT.

- Third, the MFN treatment granted in Article 3(1) of the Argentina-Italy BIT is limited to "treatment in Argentina's territory." Argentina's obligations under the bonds would not qualify as "treatment in Argentina's territory" in the light of the foreign forum selection clauses contained in the bond documents, and would therefore not qualify for MFN treatment.

- Finally, based on Article 8(7) BIT which requires to give due regard to "the terms of any particular agreement entered into regarding the investment," Claimants cannot rely on the Umbrella Clause of the Argentina-Chile BIT to override the contractually agreed fora contained in the bond documents.

308. Alternatively, in the event Claimants' claims were considered treaty claims, Respondent contends that Claimants have failed to establish a *prima facie* breach of the BIT by Respondent. In this respect, Respondent contends that a mere invocation of various BIT provisions, as done by Claimants, may not suffice to satisfy the

*prima facie* standard as otherwise the standard would be meaningless. [116] Respondent insists that Argentina is not a rogue debtor, that the 2001 crisis was unprecedented and could not be resolved merely through economic reform, that Argentina's actions were in accord with the actions of other sovereign debtors, and that there was no bad faith on Argentina's side. [117]

309. *Claimants' Position.* In contrast, Claimants contend that the present claims are sufficiently established as treaty claims deriving from violations of the BIT and arising from sovereign acts of Argentina: [118]

(i) Claimants need at this stage only present plausible treaty claims capable of falling within the scope of the BIT in order to establish jurisdiction.

(ii) Claimants' claims are directed at Respondent's failure to meet its international law obligations, and in particular its obligations under the BIT, based on Argentina's exercise of sovereign authority. This is duly reflected and supported in their submissions. These claims are therefore sufficiently established as treaty claims for the purpose of the jurisdictional phase.

(iii) These treaty claims are distinct from and their nature unaltered by any contract claims they may have against Argentina.

310. Alternatively, in the event Claimants' claims were considered contractual claims, Claimants contend that these claims would fall within the jurisdiction of the Tribunal and the scope of protection offered under the Argentina-Italy BIT through the operation of the MFN clause of Article 3(1) allowing Claimants to invoke the Umbrella Clause contained in the Argentina-Chile BIT: A breach of the Umbrella

---

[116]   R-R-MJ §§ 528-529.

[117]   R-MJ §§ 46 *et seq.*, R-R-MJ §§ 68 *et seq.*

[118]   C-MJ §§ 656-661; C-PHB §§ 355 et *seq.*

Clause contained in the Argentina-Chile BIT would simultaneously constitute a breach of the MFN clause of Article 3(1) Argentina-Italy BIT, which in turn clearly constitutes a "matter regulated in this agreement" in the sense of Article 8 BIT and therefore falls within the scope of jurisdiction of the Tribunal.

### (c)   *Tribunal's Findings*

#### (i)   Alleged Breaches of the BIT

311. As mentioned above (see §§ 302-303), for the Tribunal to have jurisdiction its task at the stage of determining whether it has jurisdiction to hear a claim under an investment treaty merely consists in determining whether the facts alleged by the claimant(s), if established, are capable of constituting a breach of the provisions of the BIT which have been invoked and that in performing this task, the Tribunal is to apply a *prima facie* standard, both to the determination of the meaning and scope of the relevant BIT provisions invoked as well as to the assessment of whether the facts alleged may constitute breaches of these provisions on its face.

312. Claimants allege the following breaches by Respondent of various provisions of the BIT, in particular of Articles 2, 3 and 5:[119]

  (i)   The violation by Argentina of its obligations under Article 2(2) BIT to accord Claimants fair and equitable treatment, by ignoring any concept of proportionality in responding to its temporary financial crisis and continuing to impose through arbitrary legislative and other regulatory actions an unjust excessive burden on Claimants long after the abatement of any issues;[120]

  (ii)  The violation by Argentina of its obligations under Article 2(2) BIT to abstain from adopting discriminatroy measures that impair the enjoyment of

---

[119]   RfA, Section V, §§ 179-211.
[120]   RfA, Section V, § 186.

Claimants' investments, by discriminating between Claimants (and other international investors) on the one hand, and domestic investors in Argentine pension funds on the other hand, by shielding such domestic investors from the negative impact on their investments of Argentina's acts surrounding its financial restructuring;[121]

(iii)   The violation by Argentina of its obligation under Article 3(1) BIT to provide national treatment to Claimants, by providing a more favorable treatment to its domestic investors, in particular its pension funds, than to Claimants, shielding the former from some of the economic effects of the moratorium whilst not extending these advantages to the Claimants;[122]

(iv)   The violation by Argentina of its obligation under Article 5 BIT not to expropriate Claimants' investments without payment of adequate, effective and immediate compensation, by expropriating Claimants of their investment through the unilateral restructuring of its public debt and the enactment of legislation thereby destroying the value of Claimants' investment;[123]

(v)   The violation by Argentina of its obligation under Article 3(1) BIT to accord most-favored nation treatment to Claimants' investments and in connection with Article 7(2) Argentina-Chile BIT, according to which   Argentina undertook to observe any other obligation that it has entered into in relation to the investments of nationals of the other contracting party. By not respecting its obligations under the bonds, Argentina would have violated Article 7(2)

---

[121]   RfA § 190.

[122]   RfA §§ 193-104.

[123]   RfA §§ 196-198.

Argentina-Chile BIT, which in turn, constitutes a violation of Article 3(1) Argentina-Italy BIT.[124]

313. The facts on which Claimants base their above allegations relate to the acts of Argentina preceding and following its public default in December 2001, and in particular the way it consulted with its creditors, the way it reached a decision on how to deal with its foreign debt, and the nature, scope and effects on Claimants' security entitlements of the legislation and regulations it promulgated in implementation of its decision.

314. The Tribunal considers that, *prima facie*, these facts, if established, are susceptible of constituting a possible violation of at least some of the provisions of the BIT invoked by Claimants, particularly:

(i) The arbitrary promulgation and implementation of regulations and laws can, under certain circumstances, amount to an unfair and inequitable treatment. It may even further constitute an act of expropriation where the new regulations and/or laws deprive an investor from the value of its investment or from the returns thereof.

(ii) The allegations by Claimants with regard to different treatment afforded to domestic investors, such as Argentine pension funds, are susceptible of constituting a discriminatory treatment in breach of the obligation to refrain from discriminatory measures and to provide for national treatment.

315. Consequently, it is sufficient to note – at this stage - that the facts as presented by Claimants, if proven, are susceptible of constituting a violation of the BIT provisions invoked by Claimants. Whether Claimants' presentation of the facts is

---

[124]   RfA §§ 199 *et seq.*

accurate will, if necessary, be examined during the merits stage of these proceedings.

<div align="center">(ii)   Contract Claims v. Treaty Claims</div>

316. It is in principle admitted that with respect to a BIT claim an arbitral tribunal has no jurisdiction where the claim at stake is a pure contract claim. This is because a BIT is not meant to correct or replace contractual remedies, and in particular it is not meant to serve as a substitute to judicial or arbitral proceedings arising from contract claims. Within the context of claims arising from a contractual relationship, the tribunal's jurisdiction in relation to BIT claims is in principle only given where, in addition to the alleged breach of contract, the Host State further breaches obligations it undertook under a relevant treaty. Pure contract claims must be brought before the competent organ, which derives its jurisdiction from the contract, and such organ – be it a court or an arbitral tribunal – can and must hear the claim in its entirety and decide thereon based on the contract only.

317. As an exception to this principle, a BIT sometimes provides for a so-called "Umbrella Clause," which requires a State to observe any obligation arising from particular commitments it has entered into with regard to investments.[125] Under a broad - and not undisputed - interpretation of these clauses as adopted by some arbitral tribunals and scholars, a State's breach of contract with a foreign investor or breach of an obligation under another treaty or law becomes, by virtue of an Umbrella Clause contained in the relevant BIT, a breach of the BIT actionable through the mechanism provided in such treaty, i.e., through ICSID arbitration.[126]

---

[125]   ETHAN SHENKMAN / JASON FILE, Contract Claims in Investment Treaty Arbitrations: Recent Umbrella Clause Case Developments, in The International Comparative Legal Guide to: International Arbitration, Global Legal Group Ltd., 6th edition 2009, p. 1..

[126]   See, e.g., SHENKMAN/FILE, *op. cit.* fn.125, p. 1 et seq.; KIM ROONEY, ICSID and BIT Arbitrations in China, in Journal of International Arbitration, Vol. 24, No. 6 (2007), p. 695; EDWARD BALDWIN / MARK KANTOR / MICHAEL NOLAN, Limits to Enforcement of ICSID Awards,

*(footnote cont'd)*

The present Argentina-Italy BIT does not contain such Umbrella Clause. Nevertheless, Claimants contend that, based on the MFN clause of Article 3 of the BIT, they are entitled to invoke and rely on the Umbrella Clause contained in the subsequent Argentina-Chile BIT. This theory, however, only applies in case the Tribunal considers that the claims at stake are pure contract claims.

318. A claim is to be considered a pure contract claim where the Host State, party to a specific contract, breaches obligations arising by the sole virtue of such contract. This is not the case where the equilibrium of the contract and the provisions contained therein are unilaterally altered by a sovereign act of the Host State. This applies where the circumstances and/or the behavior of the Host State appear to derive from its exercise of sovereign State power. Whilst the exercise of such power may have an impact on the contract and its equilibrium, its origin and nature are totally foreign to the contract.

319. It is undisputed that Claimants, as owners of security entitlements, have a potential contract claim against Argentina for payment of the principal amount and interest of such security entitlement.[127] This relationship is of a private and contractual nature, subject to the terms and conditions of the bonds, which vary depending on the bond series. The terms and conditions of the relevant bonds provide for forum selection clauses, whereby the specific fora again vary from one series of bond to another.

---

in Journal of International Arbitration, Vol. 23, No. 1 (2006), pp. 3 et seq.; EMMANUEL GAILLARD, Investment Treaty Arbitration and Jurisdiction over Contractual Claims. The SGS Cases Considered, in TODD WEILER (ed.), International Investment Law and Arbitration, Leading Casese from the ICSID, NAFTA, Bilateral Treaties and Customary International Law, Cameron May, 2005, pp. 325 et seq. and 336 et seq.

[127]   See Annex A to R-PHB § 8, although the Parties disagree with regard to the conditions for the exercise of such claims..

119

320. It is undisputed that Argentina, as debtor of the bonds, has failed to perform its obligations under these bonds. Argentina may (or may not) thereby have breached contractual obligations towards Claimants or other owners of security entitlements; this question is not at stake here. What is, however, relevant is that Argentina justifies its failure based on the exceptional circumstances surrounding its public default and linked to its devastating financial situation at the end of 2001. The Emergency Law that Argentina enacted thereafter was a reaction to these circumstances and part of an attempt to redress the finances of Argentina.

321. The Emergency Law had the effect of unilaterally modifying Argentina's payment obligations, whether arising from the concerned bonds or from other debts. Argentina does not contend that it had any contractual right of doing so, such as for example, a force majeure provision. Argentina has not invoked any contractual or legal provision excusing its non-performance of its contractual obligations towards Claimants. In fact, Argentina relies and justifies its non-performance based on its situation of insolvency, which has nothing to do with any specific contract.

322. It is true that an insolvent debtor may in principle benefit from special regimes such as bankruptcy or other mechanisms of financial redress, and such mechanisms can very well affect the way a contract is performed by partially or fully liberating the debtor from its obligations thereunder. However, such a mechanism is subject to specific rules and conditions. First of all, it requires a legal basis contemplating the basic principle and then providing for its implementation through the designation of competent authorities, the formulation of a specific procedure taking into account both the debtor's and the creditors' interests, and the provision of distribution principles of the debtor's assets with regard to the entirety of the creditors' group and not just with regard to a specific contract or creditor.

323. In the present case, the situation is somewhat peculiar, since the debtor is a sovereign State. Argentina, which considered itself insolvent, decided to promulgate a law entitling it not to perform part of its obligations, which Argentina

had undertaken prior to such law, and fixing sovereignly the modalities and terms of such liberation. Such a behavior derives from Argentina's exercise of sovereign power. Thus, what Argentina did, it did based on its sovereign power; it is neither based on nor does it derive from any contractual argument or mechanism.

324. In other words, the present dispute does not derive from the mere fact that Argentina failed to perform its payment obligations under the bonds but from the fact that it intervened as a sovereign by virtue of its State power to modify its payment obligations towards its creditors in general, encompassing but not limited to the Claimants.

325. Whilst it is true that there exists no international bankruptcy regime for States, certain principles have nevertheless been developed by the international community with regard to sovereign debt restructuring. The scope and content of these principles, as well as the question whether or not Argentina complied with these principles are matters relating to the merits of the present dispute and are, at this stage, not relevant. It is only relevant to note that the dispute, and in particular Claimants' claims and Argentina's defense thereto, relate to the actions Argentina took in order to remedy its financial insolvency. Such actions were based on a sovereign decision of Argentina outside of a contractual framework. Thus, Argentina's actions were the expression of State power and not of rights or obligations Argentina had as a debtor under a specific contract.

326. **Consequently**, the Tribunal considers that the claims brought forward by Claimants in the present arbitration are not pure contractual claims but treaty claims based on acts of a sovereign, which Claimants allege are in breach of Argentina's obligations under the BIT.

(iii)   Potential Contract Claims against the Italian Banks

327. Respondent repeatedly brought forward that Claimants' claims against Argentina are "covered-up" contract claims, which should actually be directed against the

banks and not against Argentina. Whether or not Claimants may have any contractual or other claims against the Italian banks, who acted as Intermediaries or Participants in the bond distribution process (see § 18 above), is irrelevant.

328. The present proceedings focus solely on whether Argentina complied with its obligations of protection and promotion of Italian investments under the BIT. In other words, it only concerns the direct relationship between Argentina (the Host State) and the Claimants (the alleged investors) as arising out of the BIT, and not their relationship as arising out of the bond distribution process under the relevant contractual bond documents, which involve other actors such as the banks.

329. For the purpose of examining Claimants' rights and Argentina's obligations under the BIT, third parties such as banks intervening in the process of the bond issuance and distribution are to be considered auxiliaries of Argentina, who helped the latter create the basis for Claimants' alleged investment.

330. If such third parties, in particular the Italian banks, have breached any of their own obligations towards Argentina and/or the Claimants, redress can be sought by either Argentina and/or Claimants against these banks under the remedies provided for in the relevant contractual bond documents or in the applicable statutory laws and/or regulations concerning purchase and sale of securities.  Such liability, however, does not seem to derive from the BIT and would therefore in principle have no place in the present proceedings.

    (d)   *Conclusion*

331. In conclusion, and in response to Issue No. 7 , the Tribunal holds that the claims at stake are treaty claims in nature and fall under the scope of the BIT and therewith under the jurisdiction *rationae materiae* of the Tribunal, and in particular:

    (i)   The allegations of Claimants and the facts on which these allegations are based are susceptible of constituting a violation of provisions of the BIT and establish the Tribunal's jurisdiction with regard to the present claims;

(ii)    The claims brought forward by Claimants in the present arbitration are not
       pure contractual claims but treaty claims based on acts of Argentina, a
       sovereign, which Claimants allege are in breach of Argentina's obligations
       under the BIT;

(iii)   If third parties, in particular the Italian banks, have breached any of their own
       obligations towards Argentina and/or the Claimants, redress can be sought by
       either Argentina and/or Claimants against these banks under the remedies
       provided for in the relevant contractual bond documents or in the applicable
       statutory laws and/or regulations concerning purchase and sale of securities.
       Such liability, however, does not seem to derive from the BIT and would
       therefore in principle have no place in the present proceedings.

332. Under these circumstances, the Tribunal considers that it is not necessary anymore
     to examine Issue No. 6, i.e., whether the Tribunal may also have jurisdiction based
     on the Umbrella Clause of the Argentina-Chile BIT in connection with the MFN
     Clause of the Argentina-Italy BIT. To the extent that the Tribunal's jurisdiction
     already derives from the treaty nature of the claims at stake, the question of the
     interaction between the Umbrella Clause of the Argentina-Chile BIT and the MFN
     Clause of the Argentina-Italy BIT becomes moot.

### (3)   Legal Dispute relating to an Investment – Issues 9 & 8

#### (a)   Issues and Relevant Legal Provisions

333. It is uncontested between the Parties that Claimants' claims arise in connection
     with their security entitlements in the relevant Argentine bonds. However, the
     Parties disagree whether these claims can be considered arising out of an
     investment within the meaning of Article 1 of the BIT and Article 25(1) ICSID
     Convention, since Respondent contests that the security entitlements at stake
     constitute investments in the sense of Article 1 of the BIT and Article 25(1) ICSID
     Convention.

334. Thus, the issues to be determined by the Tribunal here are the following:

- Analyzing the term "investment" as defined in Article 1(1) BIT and establishing whether bonds and thereto related security entitlements fall within the scope of such definition (see Issue No. 9 of the List of 11 Issues of 9 May 2008).

- If so, it may possibly have to be determined whether such definition is in line with the spirit of the term "investment" in Article 25 ICSID Convention.

- If so, determining whether the investment was made:

  (i)    "in compliance with the law,"

  (ii)   "in the territory of Argentina," and

  (iii)  in this respect determining whether the forum selection clauses influence the place where the alleged investment is deemed to have been made (see Issue No. 8 of the List of 11 Issues of 9 May 2008).

335. The key legal provisions in dealing with the above issues are the following: Articles 1(1), 8 BIT (see §§ 268-270 above), Article 25 ICSID Convention, as well as the forum selection clauses contained in the relevant bond documents.[128]

336. In particular, Article 1(1) BIT in the unofficial English translation submitted by Claimants provides:

    "Article 1
    Definitions
    For the purposes of this Agreement:

---

[128]    See e.g. RF-5, Trust Deed § 17.2; see also Exh. RF-6, 1993 FAA § 20; Exh. RF-7, 1994 FAA § 22, Exh. RF-8, Swiss Bond Prospectus § 13, etc..

1.   "Investment" shall mean, in compliance with the legislation of the receiving State and independent of the legal form adopted or of any other legislation of reference, any conferment or asset invested or reinvested by an individual or corporation of one Contracting Party in the territory of the other Contracting Party, in compliance with the laws and regulations of the latter party.

In particular, investment includes, without limitation:

(a)   movable and immovable property and any other property rights such as collateral securities over the property of third parties – to the extent they may be used for investment;

(b)   shares, quotas and other holdings, including minority or indirect holdings, in companies incorporated in the territory of one of the Contracting Parties;

(c)   bonds, private or public financial instruments or any other right to performances or services having economic value, including capitalized revenues;

(d)   credits which are directly related to an investment, lawfully created and documented pursuant to the legislation in force in the State where the investment is made;

(e)   copyrights, intellectual or industrial property rights – such as patents, licenses, registered trademarks, secrets, industrial models and designs – as well as technical

(f)   processes, transferrals of technological know-how, registered business names and goodwill;

(g)   any right of economic nature conferred under any law or agreement, as well as any license and concession granted in compliance with the applicable provisions governing the performance of the related economic activities, including prospecting, cultivating, extracting and exploiting of natural resources." [129]

337.   In comparison thereto, Article 1(1) BIT as published in the Boletín Oficial de la República Argentina No. 27,480 of 25 September 1992 provides as follows:

---

[129]   The English text of the BIT differs from the Italian and Spanish text of the BIT in that Article 1(g) in the English text of the BIT is equal to Article 1(f) in the Italian and Spanish text and a part of Article 1(e) of the Italian and Spanish text, namely, "processes, transferrals of technological know-how, registered business names and goodwill" is included in the English text of the BIT as Article 1(f). In the Tribunal's view the omission in Article 1(e) and addition of a further sub-paragraph in Article 1 of the English text BIT appears to be a mistake. Therefore, the Tribunal relies on the Italian and Spanish text of the BIT as being equally authentic.

"ARTICULO 1

Definiciones

A los fines del presente Acuerdo:

1.      El término "inversión" designa, de conformidad con el ordenamiento jurídico del país receptor e independientemente de la forma jurídica elegida o de cualquier otro ordenamiento jurídico de conexión, todo aporte o bien invertido o reinvertido por personas físicas o jurídicas de una Parte Contratante en el territorio de la otra, de acuerdo a las leyes y reglamentos de esta última.

En este marco general, son considerados en particular como inversiones, aunque no en forma exclusiva:

(a)     bienes muebles e inmuebles, como también cualquier otro derecho "in rem", incluidos–en cuanto sean utilizables para inversiones—los derechos reales de garantía sobre propiedad de terceros;

(b)     acciones, cuotas societarias y toda otra forma de participación, aun minoritaria o indirecta en las sociedades constituidas en el territorio de una de las Partes Contratantes;

(c)     obligaciones, títulos públicos o privados o cualquier otro derecho a prestaciones o servicios que tengan un valor económico, como también las ganancias capitalizadas;

(d)     créditos directamente vinculados a una inversión, regularmente contraídos y documentados según las disposiciones vigentes en el país donde esa inversión sea realizada;

(f)     derechos de autor, de propiedad industrial o intelectual –tales como patentes de invención; licencias; marcas registradas; secretos, modelos y diseños industriales--, así como también procedimientos técnicos, transferencias de conocimientos tecnológicos, nombres registrados y valor llave;

(g)     cualquier derecho de tipo económico conferido por ley o por contrato y cualquier licencia o concesión de acuerdo con las disposiciones vigentes que regulan estas actividades económicas, incluyendo la prospección, cultivo, extracción y explotación de los recursos naturales."

338.   As to the official Italian version of Article 1(1) BIT, it provides as follows:

"Articolo 1

Definizioni

Ai fini del presente Accordo:

1. Per investimento si intende, conformemente all'ordinamento giuridico del Paese ricevente ed indipendentemente dalla forma giuridica prescelta o da qualsiasi altro ordinamento giuridico di riferimento, ogni conferimento o bene

investito o reinvestito da persona fisica o giuridica di una Parte Contraente nel territorio dell'altra, in conformità alle leggi e regolamenti di quest'ultima.

In tale contesto di carattere generale, sono considerati specificamente come investimenti, anche se non in forma esclusiva:

a.     beni mobili ed immobili, nonché ogni altro diritto in rem, compresi - per quanto impiegabili per investimento - i diritti reali di garanzia su proprietà di terzi;

b.     azioni, quote societarie e ogni altra forma di partecipazione, anche se minoritaria o indiretta, in società costituite nel territorio di un delle Parti Contraenti;

c.     obbligazioni, titoli pubblici o privati o qualsiasi altro diritto per prestazioni o servizi che abbiano un valore economico, come altresì redditi capitalizzati;

d.     crediti direttamente collegati ad un investimento, regolarmente assunti e documentati secondo le disposizioni vigenti nel Paese in cui tale investimento sia effettuato;

e.     diritti d'autore, di proprietà industriale od intellettuale - quali brevetti di invenzione; licenze; marchi registrati; segreti, modelli e designs industriali - nonché procedimenti tecnici, trasferimenti di conoscenze tecnologiche, denominazioni registrate e l'avviamento;

f.     ogni diritto di natura economica conferito per legge o per contratto, nonché ogni licenza e concessione rilasciata in conformità a disposizioni vigenti per l'esercizio delle relative attività economiche, comprese quelle di prospezione, coltivazione, estrazione e sfruttamento di risorse naturali."

339.   To recall (see § 270 above), Article 8(7) BIT provides as follows:

"The arbitration tribunal will decide on the basis of the laws of the Contracting Party involved in the dispute – including its rules on the conflict of laws – and of the provisions of the Agreement, of clauses of any particular agreements relating to the investment, as well as on the basis of the applicable principles of international law."

340.   The relevant bond documents contained forum selection clauses, according to which disputes arising out of the bonds and thereto related titles, such as coupons, were submitted to the jurisdiction of specific courts of various different countries and cities. Below are two examples of such forum selection clauses:

-     From the Swiss Bond Prospectus (RF-8, § 13):

"Any dispute which might arise between Bondholders and/or Couponholders on the one hand and the Republic on the other hand regarding the Permanent Global Certificate, the Bonds and/or the Coupons shall be settled in accordance with Swiss law and falls within the jurisdiction of the Ordinary Courts of the Canton of Geneva, the place of jurisdidion being Geneva, with the right of appeal to the Swiss Federal Court of Justice in Lausanne, where the law permits, whose decision shall be final. Only for that purpose and for the purpose of execution in Switzerland, the Republic elects legal and special domicile at the Embassy of the Republic of Argentina, Jungfraustrasse 1, 3005 Bern, Switzerland, which has agreed forthwith to notify the Republic of any communication received under this Section.

The above-mentioned jurisdiction is also exclusively valid for the declaration of cancellation of Bonds and Coupons.

The Republic hereby irrevocably submits to the nonexclusive jurisdiction of the above mentioned Swiss courts and any Federal court sitting in the City of Buenos Aires as well as any appellate court of any thereof, in any suit, action or proceeding against it arising out of or relating to the Bonds."

- From the Trust Deed with Chase Manhattan Trustees Limited (RF-5, § 17.2):

"17.2 Jurisdiction: The Republic irrevocably submits to the jurisdiction of the courts of England; any New York State or Federal court sitting in the Borough of Manhattan, New York City; and the courts of the Republic of Argentina (the "Specified Courts") over any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Notes, the Coupons or the Trust Deed (a "Related Proceeding"). The Republic waives any objection to Related Proceedings in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have been brought in an inconvenient forum. The Republic also agrees that a final non-appealable judgment in any-such---Related Proceeding (a "Related Judgment") shall be conclusive and binding upon it and may be enforced in any Specified Court or in any other courts to the jurisdiction of which the Republic is or may be subject (the "Other Courts"), by a suit upon such judgment."

(b)   *Parties' Positions*

341. Respondent contends that the security entitlements purchased by Claimants do not constitute an investment within the meaning of Article 25(1) ICSID Convention. Respondent bases its position on the following main arguments:

(i)    *No investment in the sense of Article 25(1) ICSID*: In order to qualify as "investment" under Article 25(1) ICSID, a specific economic transaction or operation must meet certain objective criteria known as the "*Salini* factors," including typically (a) a substantial contribution of the investor, (b) a certain duration, (c) the existence of an operational risk, (d) a certain regularity of profit, and (e) a contribution to the economic development of the host State. [130] According to Respondent, these criteria are not met (or the information provided by Claimants is not sufficient to determine whether they are met). Respondent further contends that the concept of investment in Article 25(1) ICSID Convention, as defined by the *Salini* factors, determines the outer limits of ICSID's jurisdiction with regard to the nature of the disputes. As such, parties cannot override such outer limits by providing for a broader definition of the term "investment." In addition to *Salini*, Respondent relies upon a number of other ICSID arbitrations. [131]

(ii)   *No investment "made within the territory of Argentina"*: Respondent contends that even if Claimants' security entitlements were to be considered investments, they are not made within the territory of Argentina as required by Article 1 BIT. According to Respondent, these security entitlements do not show a sufficiently significant physical and legal connection to Argentina because (i) they did not cause any transfer of money into the territory of Argentina, (ii) they are located outside of Argentina and are beyond the

---

[130]    R-MJ §§ 266-270; R-R-MJ §§ 425-468, referring, *inter alia*, to *Salini Construttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (ICSID Case No. ARB/00/4), Decision on Jurisdiction of 23 July 2001, § 52, 42 ILM 609,622 (2003) (hereinafter "*Salini*"). See also R-PHB §§ 406 *et seq*.

[131]    R-R-MJ §§ 425-432, referring, *inter alia*, to *Joy Mining Machinery Ltd. v. Arab Republic of Egypt* (ICSID Case No. ARB/03/11), Award on Jurisdiction of 6 August 2004, § 50, 19 ICSID Rev. 486, 499; *Mitchell v. Democratic Republic of Congo* (ICSID Case No. ARB/99/7), Decision on Annulment of Award of 1 November 2006, § 25; *Malaysian Historical Salvors, SDN, BHD v. Malaysia* (ICSID Case No. ARB/05/10), Decision on Jurisdiction of 17 May 2007, § 55.

latter's scope of territorial jurisdiction based on the foreign law and forum selection clauses contained in the relevant bond documents, and (iii) the indirect holding systems of these entitlements implicates a cut-off point beyond which claims are not permissible because they have only a remote connection with the investment.[132]

(iii)   *Investment not "in compliance with Argentinean law"*: Respondent further contends that Claimants' security entitlements were not purchased in compliance with the laws and regulations of Argentina as required by Article 1 BIT. According to Respondent, the terms "in compliance with the laws and regulations of [Argentina]" must be read in connection with Article 8(7) BIT, which refers not only to Argentine law but also to Italian and European law, as well as to "the terms of any particular agreements entered into regarding the investment," i.e., to the specific selling restrictions contained in the relevant bond documents, and general principles such as the principle of good faith. Respondent contends that where any relevant provisions or principles are violated, the investment becomes illegal and cannot be protected by the BIT. Based on the alleged violation by the Italian banks of various European laws and regulations, of the specific selling restrictions allegedly prohibiting the sale to retail purchasers, and of the principle of good faith, Respondent contends that Claimants' security entitlements have been purchased in violation of applicable laws and regulations and do therefore not qualify for protection under the BIT.[133]

---

[132]   R-PHB §§ 455 *et seq*.

[133]   R-R-MJ §§ 500-508, referring to *Plama Consortium Ltd. v. Bulgaria* (ICSID Case No. ARB/03/24), Award of 27 August 2008, §§ 140, 143-144, 146; *Inceysa v. El Salvador* (ICSID Case No. ARB/03/26)**,**  Award of 2 August 2006, §§ 219 *et seq*.. See also R-PHB §§ 461 *et seq*.

342.  In contrast, Claimants bring forward that their security entitlements in Argentine bonds constitute an investment in the sense of Article 25(1) ICSID Convention and the Argentina-Italy BIT. Claimants justify their position based mainly on the following arguments:[134]

(i)   *"Investments" in the sense of Article 25(1) ICSID Convention and Article 1 BIT*:  Claimants bring forward that Article 25(1) ICSID Convention does not define the concept of investment, and leaves this definition to the Contracting Parties. In this respect, Article 1 BIT contains a definition of what is to be considered an investment. Claimants contend that Claimants' security entitlements clearly constitute investments in the sense of Article 1 BIT because they duly qualify as "bonds, private or public financial instruments or any other right to performances or services having economic value" and/or "any right of economic nature conferred under any law or agreement" within the meaning of Article 1(1) lit. c and lit. f BIT.  In addition, Claimants further contend that the security entitlements fulfill all necessary *Salini* factors, while these factors are not to be seen as rigid but need to be appreciated adopting a flexible and pragmatic approach and giving due consideration to the economic reality of the investment at stake.[135] Looking at the economic reality of the bond issuance process, and the role therein of Claimants' security entitlements, Claimants' investment constitute a substantial contribution, carry a certain risk, produce regular profits, are of a certain duration and contributed to Argentina's economic development.

---

[134]   See C-PHB §§ 376 *et seq*.

[135]   C-MJ §§ 699-719, referring, *inter alia*, to *Salini*, 622; *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania* (ICSID Case No. ARB/05/22), Award of 24 July 2008, §§ 312, 314, 316-318 . See also C-PHB §§ 391 *et seq*.

*(ii)*    *Investment "made within the territory of Argentina"*: Claimants contend that Claimants' investment were made within the territory of Argentina, because that is where the bonds funds were ultimately made available. In this respect Claimants bring forward that *(a)* it is not necessary that funds be physically transferred to the Host State, as long as the funds are made available to the Host State; *(b)* even Argentine tax law considers these bonds as located in Argentina for tax purposes; *(c)* the bonds have a strong connection to Argentina, since they were issued by the Argentine Government pursuant to Argentinean law; and *(d)* Argentina knew and supported the sales of security entitlements to retail investors and are therefore estopped from claiming that Claimants are too remotely connected to the bonds.[136]

*(iii)*    *Investment made in compliance with Argentinean law*: According to Claimants, the terms "in compliance with the laws and regulations of [Argentina]" of Article 1 BIT refer to Argentinean law only. In this respect, Argentina does not dispute that the bonds were issued in compliance with Argentine sovereign debt legislation, so that the requirement of compliance with Argentinean law is met. Claimants contend that a potential breach by the Italian banks of other laws and regulations is irrelevant to the qualification of the bond and/or security entitlements as protected investment. Further, even if any non-Argentinean laws or regulations were to be considered, Claimants contend that Argentina is estopped from relying on the breach of such laws or regulations, since Argentina fully knew and controlled the bond issuance process and thereby knew and accepted such breaches.[137]

---

[136]    See C-PHB §§ 431 *et seq.*

[137]    See C-PHB §§ 436 *et seq.*

(c)    *Tribunal's Findings*

(i)    <u>Definition and Role of an Investment – In General</u>

343.    In order for the Tribunal to have jurisdiction *rationae materiae* over the dispute, it is necessary that a dispute, as defined by the terms of the claims, relate to an investment.  Thus, the question of the definition of the concept of investment is to this extent relevant for the stage of the jurisdiction.

344.    In this respect, a number of arbitral tribunals hold the view that whether or not a dispute at stake relates to an investment is subject to a two-fold test, i.e., a sort of "double barrelled" test:

-    On the one hand, the alleged investment must fit into the definition of investment as provided by the relevant BIT, which reflects the limits of the State's consent;

-    On the other hand, the alleged investment must also correspond to the inherent meaning of investment as contemplated by the ICSID Convention, which sets the limits of ICSID's jurisdiction and the Tribunal's competence.

345.    Looking at the definition of investment provided in Article 1(1) BIT (see §§ 336-338 above), it corresponds largely to the definition of other contemporaneous BITs, such as the BIT between Italy and Bangladesh of 1990 (Article 1), between Italy and Bolivia of 1990 (Article 1), between Italy and Kuwait of 1987 (Article 1), between Italy and Uruguay of 1990 (Article 1), between Argentina and Belgium/Luxembourg of 1990 (Article 1), between Argentina and the United Kingdom of 1990 (Article 1). [138]

---

[138]    Regarding BITs signed by Italy, see Volume RB to R-MJ. These BITs are also available on http://www.unctadxi.org/templates/DocSearch_____779.aspx.

346. Analysing the concept of an investment, one can identify two different aspects thereof: (i) the contribution that constitutes the investment, and (ii) the rights and the value that derive from that contribution.

347. These two aspects are addressed somewhat differently by the BIT and the ICSID Convention as interpreted by a number of arbitral tribunals:

(i)   The definition provided at Article 1(1) BIT, and in particular the list of examples of what is considered an investment under the BIT, is drafted in a way describing the rights and values which may be endangered by measures of the Host State, such as an expropriation, and therefore deserve protection under the BIT. Thus the focus here is on the rights and the value that potential contributions from investors may generate. Nevertheless, this definition is of course based on the premise of the existence of such contribution. This namely derives from the wording of other provisions such as for example Article 2 of the BIT which provides that "[E]*ach Contracting Party shall encourage investors of the other Contracting Party to invest in its territory*."

(ii)  In contrast, the concept of investment as contempated by the ICSID Convention relates more to the contribution itself. As mentioned above (see § 256), Article 25 ICSID Convention does not provide for any specific definition of the concept of investment, and this silence was intended by the drafters of the Convention in order to leave certain room to further develop this notion. Thus, a number arbitral tribunals have attempted to further define the concept of investment under Article 25 ICSID Convention. This has been regularly done by reference to some or all of the so-called *Salini* factors, developed in the *Salini* decision (see § 341 above). According to these *Salini* factors, for a transaction or activity to qualify as "investment" in the sense of Article 25 ICSID Convention, it would require (i) a contribution, (ii) of a certain duration, (iii) of a nature to generate profits or revenues, (iv) showing a particular risk, and (v) of a nature to contribute to the economic

development of the Host State. This definition focuses on the nature of the contribution constituting the investment, and not on the rights and value deriving therefrom.

348. At this juncture, it may be recalled that whilst BITs in general, including the present BIT, address both substantive investment protection rules and dispute resolution procedure, the ICSID Convention is concerned mainly with dispute resolution rules. Bearing this distinction and the above considerations in mind, the Tribunal makes the following analysis.

349. If it is obvious that the definition of Article 1(1) BIT and the criteria developed by a number of arbitral tribunals with regard to Article 25 ICSID Convention do not coincide, this is so because they can be said to focus each on a different aspect of the investment, i.e., they each look at the investment from a different perspective.[139] The two perspectives can be viewed to be complementary, and to merely reflect a two-folded approach of the BIT and the ICSID Convention towards investment: At first, it is about encouraging investments, i.e., creating the frame conditions to encourage foreign investors to make certain contributions, and once such contributions are made, it is about protecting the fruits and value generated by these contributions. Following this interpretation, the double approach can also be considered as being illustrated in the Preamble of the ICSID Convention as well as in the BIT:

- According to the Preamble of the ICSID Convention, one of the key considerations of the Convention is "the need for international cooperation for economic development, and the role of private international investment therein" combined with the recognized need to establish international dispute

---

[139] See *Malicorp Limited v. The Arab Republic of Egypt* (ICSID Case No. ARB/08/18), Award of January 2011, § 110.

settlement mechanisms ensuring effective protection of such private international investments;

-   According to the Preamble of the BIT, it aims to "create favorable conditions for greater economic cooperation between the two States, in particular, for the realization of investments,"[140] which presupposes the implementation of material standards of protection of such investments as set forth in Articles 2 to 5, combined with effective procedural remedies as established in Articles 8 and 9.

350. Thus, within this interpretation, as it arises further from the wording of Article 1(1) and the aim of the BIT, the definition of investment provided in the BIT focuses on what is to be protected, i.e., the fruits and value generated by the investment, whilst the general definitions developed with regard to Article 25 ICSID Convention focus on the contributions, which constitute the investment and create the fruits and value. In summary, a certain value may only be protected if generated by a specific contribution, and – vice versa – contributions may only be protected to the extent they generate a certain value, which the investor may be deprived of.

351. In other words, if it is to be applied, the "double barrelled" test does not mean that one definition, namely the definition provided by two Contracting Parties in a BIT, has to fit into the other definition, namely the one deriving from the spirit of the ICSID Convention. Rather, it is the investment at stake that has to fit into both of these concepts, knowing that each of them focuses on another aspect of the investment.

---

[140]   Translated by the Tribunal from the Italian version "creare condizioni favorevoli per una maggiore cooperatzione economica fra i due Paesi ed, in particolare, per la realizzazione di investimenti." The Spanish version has the same meaning "crear condiciones favorables para una mayor cooperación económica entre los dos Países y, en particular, para la realización de inversiones."

136

(ii)   Investment under Article 1(1) BIT

352.  According to the Tribunal's own English translation of Article 1(1) BIT, the term "investment includes, without limitation":

-    lit. (a): "movable and immovable goods, as well as any other right in rem, including – to the extent usable as investment – security rights on property of third parties;"

-    lit. (b): "shares, company participations and any other form of participation, even if representing a minority or indirectly held, in companies established in the territory of a Contracting State;"

-    lit. (c): "obligations, private or public titles or any other right to performances or services having economic value, including capitalized revenues;"

-    lit. (d):"credits which are directly linked to an investment, which is constituted and documented in accordance with the provisions in force in the State where the investment is made;"

-    lit. (e):"copyrights, intellectual or industrial property rights – such as invention patents, licenses, registered trademarks, secrets, industrial models and designs – as well as technical processes, transfer of technology, registered trade names and goodwill;"

-    lit. (f): "any right of economic nature conferred under law or contract, as well as any license and concession granted in compliance with the applicable provisions applicable to the concerned economic activities, including the prospection, cultivation, extraction and exploitation of natural resources."

353.  Analysing the structure of the various subsections of Article 1(1), it appears that they reflect a categorization of various types of investments from the perspective of rights and values that they generate: lit. (a) refers to property rights on movable and

immovables, lit. (b) relates to participations into companies, lit. (c) refers to financial instruments, lit. (d) refers to credits, lit. (e) to rights on immaterial property and technology transfer, and lit. (f) to all kinds of further rights of economic value.

354. Firstly, this list covers an extremely wide range of investments, using a broad wording and referring to formulas such as "independent of the legal form adopted," or "any other" kind of similar investment. It even contains a residual clause in lit. (f), encompassing "any right of economic nature conferred under law or contract." In other words, the definition provided for in Article 1(1) is not drafted in a restrictive way. Based on its wording, as well as on the broader aim of the BIT as described in the Preamble, Article 1(1) cannot be seen to have intended to adopt a restrictive approach with regard to what kind of activity or dealing was meant to qualify as an investment.

355. Secondly, lit. (c) specifically addresses financial instruments. It is true that the term "obligations" is a broad term and can refer to any kind of contractual obligation, i.e., debt, and it is also true that the term "title" is also very broad. However, put in the context of the further terms listed in lit. (c) such as "economic value" or "capitalized revenue," as well as considering that lit. (f) already deals with the more general concept of "any right of economic nature," lit. (c) is to be read as referring to the financial meaning of these terms. Thus, the term "obligation" may be understood as referring to an economic value incorporated into a credit title representing a loan. This kind of obligations would in the English language more commonly be called "bond," rather than "obligation." Similarly, the term "title" in Spanish and Italian would be more accurately translated into the English term of "security," which means nothing more than a fungible, negotiable instrument representing financial value.

356. Thus, the Tribunal finds that the bonds, as defined above in § 11, constitute "obligations" and/or at least "public securities" in the sense of Article 1(1) lit. (c) of the BIT.

357. With regard to the security entitlements that Claimants hold in these bonds, they also represent "securities" in the sense of Article 1(1) lit. (c), since they constitute an instrument representing a financial value held by the holder of the security entitlement in the bond issued by Argentina.

358. The question now is whether the connection between the security entitlements and the bonds could be seen as so remote as to consider that the dispute is not "directly" related to an investment, since the dispute related primarily to the rights arising from Claimants' security entitlements. The Tribunal sees no valid reason that would support such conclusion:

- The bonds at stake were always meant to be divided into smaller negotiable economic values, i.e., securities. It has been sufficiently demonstrated by Claimants that the underwriters would not have subscribed to any of the bonds, without having previously ensured that the bonds were re-sellable to the Intermediaries and their end customers;

- The security entitlements are the result of the distribution process of the bonds through their division into a multiude of smaller securities representing each a part of the value of the relevant bond. The security entitlements have no value per se, i.e., independently of the bond;

- The fact that the distribution process happens electronically, without the physical transfer of any title, does not change anything to the fact that rights effectively passed on to acquirers of security entitlements in the bonds.

359. In other words, whatever the technical nuances between bonds and security entitlements may be, they are part of one and the same economic operation and they make only sense together.

360. This is confirmed by the scope and the terms of the Exchange Offer 2010. Although Respondent insists that under the underwriting agreements, the underwriter committed to a single lump-sum payment to Argentina for the issuance of the bonds and after that took all responsibility for selling the bonds on the open market,[141] Argentina at the same time admits that the tendering of holders of security entitlements into the Exchange Offer 2010 was necessary to discharge Argentina in connection with the issuance of the bonds, including the payment in connection with security entitlements.[142] Whilst it is true, as contended by Argentina,[143] that the requirements for eligibility under the Exchange Offer 2010 have no relationship whatsoever to the requirements for ICSID jurisdiction or the question whether BIT protection exists under the BIT, they are relevant to understand the relationship between the security entitlements and the bonds. In this respect, it cannot be ignored that by considering holders of security entitlements, such as Claimants, a necessary component of the Exchange Offer 2010, Argentina admitted their importance within the broader context of the bond issuance and distribution process. If the Underwriters were really the sole purchasers of the bonds and thereby the sole "bondholders," why would it be necessary to "engage [into the Exchange Offer 2010] all parties that had beneficial interests in the bonds"[144]? Why would that not bear on the Underwriters' shoulders? Because this is not the way an

---

[141]   Annex A to R-PHB § 3.

[142]   Annex A to R-PHB §§ 69-70. "In particular, in order to retire some or all of the defaulted bonds through the Exchange Offer, Argentina had to find a way to engage all parties that had beneficial interests in the bonds" (§ 70).

[143]   Annex A R-PHB § 67.

[144]   Annex A R-PHB § 70.

Exchange Offer is meant to work, and this evidences that bonds and security entitlements therein cannot be regarded as two separate investments relating to different rights or values.

361. Consequently, the bonds and Claimants' security entitlements therein are both to be considered "investments" in the sense of Article 1(1) lit. (c) BIT.

(iii) <u>Investment under Article 25 ICSID Convention</u>

362. Under Article 25 ICSID Convention, the relevant question is whether the bonds and the security entitlements therein were generated by a contribution that is in line with the spirit and aim of Article 25 ICSID Convention.

363. One approach would be to follow the *Salini* criteria and check whether the contribution made by Claimants fulfil all these requirements. However, and irrespective of the adequacy of the individual *Salini* criteria, the Tribunal finds that this would not be the right approach, for the following main reason.

364. If Claimants' contributions were to fail the *Salini* test, those contributions – according to the followers of this test – would not qualify as investment under Article 25 ICSID Convention, which would in turn mean that Claimants' contributions would not be given the procedural protection afforded by the ICSID Convention. The Tribunal finds that such a result would be contradictory to the ICSID Convention's aim, which is to encourage private investment while giving the Parties the tools to further define what kind of investment they want to promote. It would further make no sense in view of Argentina's and Italy's express agreement to protect the value generated by these kinds of contributions. In other words – and from the value perspective – there would be an investment, which Argentina and Italy wanted to protect and to submit to ICSID arbitration, but it could not be given any protection because – from the perspective of the contribution – the investment does not meet certain criteria. Considering that these criteria were never included in the ICSID Convention, while being controversial

and having been applied by tribunals in varying manners and degrees, the Tribunal does not see any merit in following and copying the *Salini* criteria. The *Salini* criteria may be useful to further describe what characteristics contributions may or should have. They should, however, not serve to create a limit, which the Convention itself nor the Contracting Parties to a specific BIT intended to create.

365.   The other approach consists in verifying that Claimants made contributions, which led to the creation of the value that Argentina and Italy intended to protect under the BIT.  Thus the only requirement regarding the contribution is that it be apt to create the value that is protected under the BIT.

366.   In this respect, there is no doubt that Claimants made a contribution: They purchased security entitlements in the bonds and thus, paid a certain amount of money in exchange of the security entitlements. The value generated by this contribution is the right attached to the security entitlements to claim reimbursement from Argentina of the principal amount and the interests accrued. As mentioned above (see §§ 352-361), this right is protected under Article 1(1) lit. (c) of the BIT.

367.   Consequently, the Tribunal finds that Claimants' purchase of security entitlements in Argentinean bonds constitutes a contribution which qualifies as "investment" under Article 25 ICSID Convention.

(iv)   <u>Two Alternative Views on "Investment" Lead to the Same Result</u>

368.   If the so-called "double-barrelled" test is not applied in the present case and no distinction is made as is stated in §§ 346-351 above, the result is the same.

369.   According to one alternative view, it is argued that, in the case of a BIT arbitration under the ICSID Convention, the "double barrelled" test need not be applied since the ICSID Convention does not contain a definition of "investment" and the State Parties to the BIT have agreed to such a definition in a treaty between them, i.e., the

BIT.[145]  That view leads also to the conclusion that there is an "investment" in the present case because, as mentioned above (§§ 352-361), the bonds and Claimants' security entitlements therein are both to be considered "investments" in the sense of Article 1(1) lit. (c) BIT.

370.   A third view on this question also leads to the same result.  Pursuant to that view, the term "investment" has an objective meaning in itself.  Accordingly, the term "investment" *under the BIT* has an inherent meaning, irrespective of whether the investor resorts to ICSID or UNCITRAL arbitration.  As it is observed by the tribunal in *Romak S.A. v. Uzbekistan*, conducting its proceedings on the basis of the UNCITRAL Arbitration Rules:

> The term "investment" has *a* meaning in itself that cannot be ignored when considering the list contained in Article 1(2) of the [Germany – Ukraine] BIT.
>
> . . . . The Arbitral Tribunal therefore considers that the term "investments" under the BIT has an inherent meaning (irrespective of whether the investor resorts to ICSID or UNCITRAL arbitral proceedings) entailing a <u>contribution</u> that extends over a <u>certain period of time</u> and that involves some <u>risk</u> . . . .  By their nature, asset types enumerated in the BIT's non-exhaustive list may exhibit these hallmarks. But if an asset does not correspond to the inherent definition of "investment," the fact that it falls within one of the categories listed in Article 1 does not transform it into an "investment." In the general formulation of the tribunal in *Azinian*, "*labelling ... is no substitute for analysis*."[146]
>
> (Emphasis in original)

371.   The term "investment" *per se* in Article 1(1) of the Argentina – Italy BIT can indeed be analysed in the same manner as the term "investment" in Article 25 of the ICSID Convention (see §§ 362-367 above).  That analysis is similar to the

---

[145]   See for an overview regarding this issue, *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16 (Germany/Ukraine BIT), Award of 31 March 2011, §§ 137-143.

[146]   *Romak S.A. v. The Republic of Uzbekistan* (PCA Case No. AA280), Award of 26 November 2009, § 180 and § 207.

analysis on the basis of the criteria identified above in *Romak* (i.e., a contribution that extends over a certain period of time and that involves some risk). The conclusion is again that Claimants' purchase of security entitlements in Argentinean bonds constitutes a contribution which qualifies as "investment" *per se* under Article 1(1) of the BIT.

(v)   Made in Argentina

372. In order to determine whether Claimants' investment was made in Argentina, the Tribunal will first determine the place where an investment is generally considered to be made (i), and then examine whether the presence of forum selection clauses in contractual documents relating to the investment may influence such a determination (ii).

373. *(i)   With regard to the place where the investment is considered made,* Respondent contends that the investment cannot be considered "made in the territory of Argentina," because the purchase price paid by Claimants for their security entitlements never ended up in Argentina. Instead, only the lump sum payment made by the underwriters to Argentina can be considered made in the territory of Argentina, whilst payments for purchases of security entitlements were made to the various Intermediaries.

374. The Tribunal finds that the determination of the place of the investment firstly depends on the nature of such investment. With regard to an investment of a purely financial nature, the relevant criteria cannot be the same as those applying to an investment consisting of business operations and/or involving manpower and property. With regard to investments of a purely financial nature, the relevant criteria should be where and/or for the benefit of whom the funds are ultimately used, and not the place where the funds were paid out or transferred. Thus, the

relevant question is where the invested funds ultimately made available to the Host State and did they support the latter's economic development? This is also the view taken by other arbitral tribunals.[147]

375. A further question is whether it is necessary that investment of purely financial nature be further linked to a specific economic enterprise or operation taking place in the territory of the Host State. Based on the above consideration (see § 355) that in Article 1 BIT Argentina and Italy designated financial instruments as an express kind of investment covered by the BIT and thereby intending to provide such investment with BIT protection, the Tribunal considers that it would be contrary to the BIT's wording and aim to attach a further condition to the protection of financial investment instruments.

376. Respondent makes an additional argument out of the fact that the payment of the purchase price occurred after the payment of the lump sum price by the underwriters, and that only the latter payment can be considered to have been made available to Argentina. The Tribunal is of the opinion that such argument ignores the reality of the bond issuance process. Indeed, although the payment of the lump sum price for the bonds and the payment of the purchase price by the individual holders of security entitlements happened at different points in time, the latter constitutes the basis for the former. As mentioned above (see § 359 ), the bonds and the security entitlements are part of one and the same economic operation and they make only sense together: Without the prior insurance to be able to collect sufficient funds from the individual purchasers of security entitlements, the

---

[147]     See e.g. *Fedax N.V. v. Republic of Venezuela* (ICSID Case No. ARB/96/3), Decision of the Tribunal on Objections to Jurisdiction of 11 July 1997, § 41. See also *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/01/13), Decision of the Tribunal on Objections to Jurisdiction of 6 August 2003, §§ 136-140, where emphasis was led on the fact that the aim of SGS's activity was to "raise the financial revenue of the State" (§ 139); *SGS v. Republic Philippines*, §§ 111.

underwriters would never have committed to the payment of the lump sum payment. In other words, the lump sum payment is an advance made by the underwriters to Argentina on the future payments of individual investors.

377. Thus, the funds generated by the purchase of the relevant security entitlements are – for the purpose of establishing where they were made – no different than the lumps sum payment paid by the underwriters for the bonds.

378. There is no doubt that the funds generated through the bonds issuance process were ultimately made available to Argentina, and served to finance Argentina's economic development. Whether the funds were actually used to repay pre-existing debts of Argentina or whether they were used in government spending is irrelevant. In both cases, it was used by Argentina to manage its finances, and as such must be considered to have contributed to Argentina's economic development and thus to have been made in Argentina.

379. *(ii)    With regard to the question whether the presence of forum selection clauses in contractual documents* relating to the investment may influence the determination of the place of investment, Respondent contends that based on the forum selection clauses contained in the bond documents, the bonds must be considered located outside of Argentina and beyond the latter's scope of territorial jurisdiction. The Tribunal considers Respondent's argument inapposite for two main reasons:

-       Following Respondent's line of argumentation would mean that forum selection clauses determine the place where contractual performance is supposed to take place. *In casu*, Claimants' purchase of security entitlement would be considered made at the place of the selected forum. The Tribunal disagrees with this view. Rather, forum selection clauses are clauses of a procedural nature aiming to determine the place of settlement of a dispute

relating to a contractual performance. They have nothing to do with the place where a party is supposed to perform its obligations;

- Even if forum selection clauses had an influence on the place of contractual performance, they would not be relevant to determine the place where the investment, pursuant to Article 1(1) BIT and Article 25 ICSID Convention, was made. As mentioned above (see §§ 319 *et seq.*), rights and obligations deriving from the BIT have an independent basis from rights and obligations deriving from the contract, and may as such – in principle – not be affected by contractual provisions dealing only with contractual rights and obligations.

380.   Consequently, the Tribunal finds that the relevant bonds and Claimants' security entitlements therein are both to be considered 'made in the territory of Argentina'.

(vi)   <u>In Compliance with the Law</u>

381.   Respondent contends that Claimants' investment, i.e., the purchase of security entitlements, were not made in compliance with the law, because these purchases would have been done in violation by the Italian banks of certain selling restrictions applicable to the bonds, as well as to local regulations regarding the marketing of such financial instruments and the principle of good faith. According to Respondent, these violations would be relevant to appreciate the legality of the investment in the light of Article 8(7) of the BIT.

382.   At the stage of the jurisdiction, the Tribunal's examination is limited to verifying the existence of a dispute relating to an investment, and focuses thus on the definition of the investment (see §§ 343 *et seq.* above). It is not concerned yet with the question whether the investment was validly made, i.e., whether it fulfils the necessary requirements to enjoy full protection under the BIT. This will be a matter to be dealt at the merits stage of the present dispute, subject to the Tribunal's findings on jurisdiction.

383. Thus, at this stage the Tribunal's examination is limited to the question whether the investment fits into the definition of Article 1(1). In contrast, Article 8(7) of the BIT deals with the law applicable to the merits of the dispute, and may be relevant when appreciating the validity of the investment. It may however not serve as a basis to extend the definition of an investment as provided for in Article 1(1) of the BIT. These two provisions have different contexts and different purposes.

384. With regard to the "lawfulness" of the investment, which forms part of the definition of the concept of investment under Article 1(1) BIT, Article 1(1) par. 1 merely requires that the investment be made "in compliance with the laws and regulations of the [Host State]," i.e., Argentina. It is undisputed between the Parties that the bonds have been issued by Argentina in accordance with the relevant laws and regulations (see § 44 above).[148] As such, they were made "in compliance with the laws and regulations of Argentina."

385. The alleged breach of applicable regulations Respondent relies on, concerns breaches allegedly committed by the Italian banks and not by Claimants. As mentioned above (see § 327 *et seq.*), such breaches should not be relevant for the purpose of examining Claimants' rights and Argentina's obligations under the BIT. As such, an alleged misconduct of the Italian banks may not render the security entitlements unlawful pursuant to Article 1(1) BIT. Whether it may render such investment invalid under the laws applicable to the dispute according to Article 8(7) BIT is an issue to be dealt with at the merits stage of the present dispute, subject to the Tribunal's findings on jurisdiction.

---

[148]   See R-MJ §§ 521 "the issuances of the bonds were in conformity with Argentine Law."

386. Consequently, the relevant bonds and Claimants' security entitlements therein are both to be considered made "in compliance with the laws and regulations of [Argentina]" pursuant to Article 1(1) BIT.

       *(d)*    *Conclusion*

387. In conclusion, and in response to Issue No. 9 and 8, the Tribunal holds that the present dispute arises out of an investment pursuant to Article 1 BIT and (if needed) Article 25(1) ICSID Convention. In particular:

(i)    According to one view, the "double-barrelled" test developed with regard to the concept of "investment" does not mean that the definition of investment provided by two States in a BIT has to fit into the definition deriving from the spirit of the ICSID Convention. Rather, arguably, it is the investment at stake that has to fit into both of these concepts, knowing that each of them focuses on another aspect of the investment;

(ii)    In any event, the relevant bonds and Claimants' security entitlements therein are both to be considered "investments" pursuant to Article 1(1) lit. (c) BIT;

(iii)    If needed to be applied, Claimants' purchase of security entitlements in Argentinean bonds constitute a contribution which qualifies as "investment" under Article 25 ICSID Convention;

(iv)    The relevant bonds and Claimants' security entitlements therein are both to be considered made "in compliance with the laws and regulations of [Argentina]" pursuant to Article 1(1) BIT;

(v)    The bonds and Claimants' security entitlements therein are both to be considered "made in the territory of Argentina."

**(4)**    **Between Argentina and Italian Investors - Issues 10 & 11**

    *(a)*    *Issues and Relevant Legal Provisions*

388.    It is uncontested that Argentina has the necessary capacity to be a party to the present arbitration. Therefore, the present section will focus on determining relevant issues concerning Claimants. These issues appear to be threefold: (i) the issue of nationality, whereby it is contested whether Claimants qualify as "Italian" in the sense of the BIT; (ii) the issue of legal capacity, whereby it is disputed whether those Claimants which are corporations have the necessary capacity to be a party to the BIT and can be protected thereunder; and (iii) the issue relating to the "investor" status of Claimants, whereby it is disputed whether Claimants, who have purchased their security entitlements through various layers of intermediaries, can still be classified as the "investor," i.e., the party having made the investment.

389.    In this regard, it should be recalled that according to the First Session of 10 April 2008[149] and the Tribunal's letter of 21 May 2009, the present analysis is limited to general issues and shall not include "issues touching specifically upon each individual claimant," except where the presentation of the general issue (of jurisdiction or admissibility) cannot be done without reference to a particular situation.[150]

390.    Consequently, the present decision will not decide on whether Claimants have the Italian nationality or necessary capacity, but it will merely confirm which are the conditions which Claimants must fulfil so as to qualify as a party under the BIT. With regard to the issue relating to the investor status of Claimants, the present decision will not address the individual investor status of each Claimant. Rather, it will be limited to address from a general perspective whether a party purchasing a

---

[149]    First Session Tr. p. 140/17; p. 141/3-9.

[150]    See Conference Call of 14 October 2009.

security entitlement in the way Claimants allege they purchased their security entitlements would qualify as investor in the sense of the BIT.

391.  Thus, the issues to be determined by the Tribunal here are the following:

-   What are the conditions under which physical persons may benefit from the protection of the BIT, and thereby be a party to the present arbitration? (see Issue No. 10 of the List of 11 Issues of 9 May 2008)

-   What are the conditions under which juridical entities may benefit from the protection of the BIT, and thereby be a party to the present arbitration? (see Issue No. 11 of the List of 11 Issues of 9 May 2008), and in particular, do corporations established under Italian law and which do not have "legal personality" benefit from such protection and capacity?

-   Does a party which acquires a security entitlement in a bond through similar mechanisms as used in the present case for the purchase by Claimants of their security entitlements still qualify as the party making the investment, i.e., as the investor?

392.  The key legal provisions and documents in dealing with the above issues are the following: Article 1 BIT, Article 1 of the Additional Protocol to the BIT, Article 25(2) ICSID Convention, and Articles 36, 75, 78 Italian Civil Procedure Code.

393.  Articles 1(2) and (3) BIT in the unofficial English translation submitted by Claimants provides:

"2.   "Investor" shall mean any individual or corporation of one Contracting Party that has made, makes or undertakes to make investments in the territory of the other Contracting Party.

(a)   "individual" shall mean, for each Contracting Party, and individual who is a citizen of such Contracting Party, in compliance with the laws thereof.

(b)   "corporation" shall mean, in relation to each Contracting Party, any entity incorporated in compliance with the legislation of a Contracting

151

Party, having its office in the territory of such Party and being recognized thereby, such as public entities that conduct economic activities, partnerships and corporations, foundations and associations, independent of whether their liability is limited or not.

3.    For the purposes of this Agreement, legal deeds and capacity of corporations in the territory of the Contracting Party receiving the investment will be governed by the legislation of that Contracting Party."

394.   In comparison thereto, the relevant parts of Article 1(2) BIT as published in the Boletín Oficial de la República Argentina No. 27,480 of 25 September 1992 provide as follows:

"2.    El término "inversor" comprende toda persona física o jurídica de una Parte Contratante que haya realizado, realice o haya asumido la obligación de realizar inversiones en el territorio de la otra Parte Contratante.

-    Por "persona física" se entiende, con relación a cada una de las Partes Contratantes, toda persona física que tenga la ciudadanía de ese Estado, de acuerdo a sus leyes.

-    Por "persona jurídica" se entiende, con relación a cada una de las Partes Contratantes, cualquier entidad constituido de conformidad con la legislación de una Parte Contratante, con sede en el territorio de esa Parte y por esta ultima reconocida, tales como entidades públicas que realizan actividades económicas, sociedades de personas o de capitales, fundaciones y asociaciones, independientemente de que su responsabilidad sea limitada o no.

-    A los efectos del presente Acuerdo, los actos jurídicos y la capacidad de cada persona jurídica en el territorio de la Parte Contratante donde se efectúa la inversión serán regulados por la legislación de esta última."

395.   As to the official Italian version of Article 1(2) and 3 of the Italian text of the Argentina-Italy BIT, it provides as follows:

"2.    Per "investitore" si intende ogni persona fisica o giuridica di una Parte Contraente che abbia effettuato, effettui o abbia assunto obbligazione di effettuare investimenti nel territorio dell'altra Parte Contraente.

a.    Per "persona fisica" si intende, per ciascuna Parte Contraente, una persona fisica che abbia la cittadinanza di tale parte, in conformità a le sue leggi.

b.    Per "persona giuridica" si intende, con riferimento a ciascuna Parte Contraente, qualsiasi entità costituita conformemente alla normativa di una parte Contraente, con sede nel terrtorio di tale Parte e da questa

ultima riconosciuta, come Enti pubblici che esercitino attività econonmiche, società di persone o di capitali, fondazioni, associazinoe e, questo, indipendentemente dal fatto che la loro responsabilita sia limitata o meno.

3.    Agli effetti del presente Accordo, gli atti giuridici e la capacità di ciascuna persona giuridica nel territorio della Parte Contraente destinataria di un investimento, saranno regolati dalla legislazione di quest'ultima."

396.  In addition, Article 1 Additional Protocol to the BIT provides as follows in the various languages:

(i)    In the unofficial English version:

"1.    With reference to Article 1:

a)    Individuals of each Contracting Party who, when making an investment, maintained their domicile for more than two years in the Contracting Party in the territory of which the investment was made, cannot benefit of this Agreement.

If an individual of one Contracting Party maintains at the same time its registered residence in its State and domicile in the other State for more than two years, he/she will be considered equivalent, for the purposes of this Agreement, to individuals of the Contracting Party in the territory of which they made investments.

b)    The domicile of an investor will be determined in compliance with laws, regulations and provisions of the Contracting Party in the territory of which the investment was made."

(ii)   In the official Spanish version:

"Con referencia al Articulo 1:

a)    No podrán prevalerse del Acuerdo las personas fisicas de cada Parte Contratante que, al momento de efectuar la inversión, hubieran tenido su domicilio por más de dos años en el territorio de la Parte Contratante donde la inversión se realizó.

En caso que una persona física de una Parte Contratante tuviera simultaneamente residencia registrada en su país y domicilio por más de dos años en el de la otra Parte Contratante se equipararrá, a los fines del presente Acuerdo, a las personas físicas nacionales de la Parte Contratante en cuyo territorio se realizó la inversión.

153

b)     El domicilio de un inversor será determinado de conformidad con las leyes, reglamentos y disposiciones de la Parte Contrante en cuyoterritorio se realizó la inversión."

(iii)   In the Italian official version:

"1. Con riferimento all'Articolo 1:

a)     Non potranno beneficiare dell'Accordo le persone fisiche di ciascuna Parte Contraente le quali, al momento di effettuare un investimento, abbiano mantenuto il loro domicilio per più di due anni nella Parte Contraente nel cui territorio l'investimento sia stato realizzato.

Qualora una persona fisica di una Parte Contraente mantenga contemporaneamente la residenza anagrafica nel proprio Paese ed il domicilio per più di due anni nell'altro, essa verrà equiparata, ai fini del presente Accordo, alle persone fisiche della Parte Contraente nel cui territorio abbia realizzato investimenti.

b)     Il domicilio di un investitore sarà determinato in conformità alle leggi, regolamenti e disposizioni della Parte Contraente nel territorio della quale l'investimento sia stato realizzato."

397.  Article 36 Italian Civil Code in its original Italian version provides as follows:

"**Art. 36 Ordinamento e amministrazione delle associazioni non riconosciute**

L'ordinamento interno e l'amministrazione delle associazioni non riconosciute come persone giuridiche sono regolati dagli accordi degli associati.

Le dette associazioni possono stare in giudizio nella persona di coloro ai quali, secondo questi accordi, e conferita la presidenza o la direzione (Cod. Proc. Civ. 75, 78)."

398.  Partly based on the translation provided by Prof. Picardi,[151] which the Tribunal considers to be a fair reflection of the Italian version, Article 36 can be translated as follows:

---

[151]     PICARDI, § 229.

> **"Art. 36 Organisation and administration of non-recognized associations**
>
> The internal organization and administration of associations not recognized as juridical persons are regulated according to the association agreement.
>
> Said associations may stand in court through the person who, in accordance with such agreement, hold the office of president or director (Civil Procedure Code 75, 78)."

399. Article 75 and 78 Italian Civil Procedure Code in their original Italian version provide as follows:

> **"Art. 75.  (Capacita' processuale)**
>
> Sono capaci di stare in giudizio le persone che hanno il libero esercizio dei diritti che vi si fanno valere.  Le persone che non hanno il libero esercizio dei diritti non possono stare in giudizio se non rappresentate, assistite o autorizzate secondo le norme che regolano la loro capacita'.  Le persone giuridiche stanno in giudizio per mezzo di chi le rappresenta a norma della legge o dello statuto.  Le associazioni e i comitati, che non sono persone giuridiche, stanno in giudizio per mezzo delle persone indicate negli artt. 36 e seguenti del codice civile.
>
> […]
>
> **Art. 78.  (Curatore speciale)**
>
> Se manca la persona a cui spetta la rappresentanza o l'assistenza, e vi sono ragioni di urgenza, puo' essere nominato all'incapace, alla persona giuridica o all'associazione non riconosciuta un curatore speciale che li rappresenti o assista finche' subentri colui al quale spetta la rappresentanza o l'assistenza.
> Si procede altresi' alla nomina di un curatore speciale al rappresentato, quando vi e' conflitto d'interessi col rappresentante."

400. These provisions can be translated as follows:

> **"Art. 75**.  (Capacity to stand in a legal proceeding)
>
> Those who can freely exercise rights as object of a claim can stand in a corresponding legal proceeding. Those who cannot freely exercise rights cannot stand in a corresponding legal proceeding if they are not represented, assisted or authorized according to the rules governing their legal capacity. Legal entities stand in a proceeding through the person that legally represents them according to the law or their articles of association. Associations and committees, who are not a legal entity, stand in a legal proceeding through the individuals indicated by Articles 36 et seq. of the Civil Code.

[…]

**Art. 78. (Guardian *ad litem*)**

As long as the person entitled to the representation or assistance is and remains absent and there are grounds for urgency, a guardian *ad litem* can be appointed to represent individuals who are lacking legal capacity, legal entities or non-recognized associations. The guardian *ad litem* will leave its office upon intervention of the person entitled to the representation or assistance. A guardian *ad litem* is also appointed in case of conflict of interests between the legal representative and the individual or entity which is represented in the proceeding."

*(b)   Parties' Positions*

401.   Respondent submits that the Tribunal lacks jurisdiction *rationae personae* with regard to Claimants who are natural persons. Respondent's main arguments are as follows:

(i)      Claimants are not investors within the meaning of Article 1(2) BIT because (i) Claimants did not make an investment in the territory of the Argentine Republic, and (ii) Claimants lack standing because in their capacity as holders of security entitlements acquired through multiple intermediaries they are only remotely connected with the underwriters and the underlying bonds;[152]

(ii)     Claimants have failed to provide any evidence whatsoever of compliance with the nationality requirements of Article 25 ICSID Convention and the nationality and domicile requirements of the BIT and its Additional Protocol. Referring to arbitral tribunals, Respondent contends that the nationality requirement of a claim before an ICSID tribunal has in each case to be satisfied before an ICSID proceeding can be initiated or even registered. With regard to natural persons, Respondent has serious doubts that the individual Claimants listed in Annexes A and B meet the nationality and

---

[152]      R-MJ §§ 271-283; 365; 374-475; R-R-MJ §§ 590-600; 642-651.

domicile requirements and submit that there is a high likelihood of the existence of thousands of cases of dual nationality.[153] With regard to juridical persons, Respondent contends that to qualify as a "juridical person" under Article 1(2) BIT the concerned entity must have legal personality, which is not the case of apprpoximately 40% of the Claimants listed in Annex C such as "assoziani non-recognosciuta," ecclesiastical associations, local branches of national associations, trade unions, political parties, etc. [154]

402.   In contrast, Claimants contend that the Tribunal has jurisdiction *rationae personae* pursuant to Article 25 ICSID Convention and Article 1(2) BIT and its Protocol over each and every Claimant who (i) is a natural person and who was an Italian national on 14 September 2006 and 7 February 2007, was not an Argentine national at either of those dates, and was not domiciled in the Argentine Republic for more than two years prior to making his or her investment;[155] and (ii) is a juridical entity that on 14 September 2006 was duly organized under Italian law with its principal place of business in Italy and that did not have Argentine nationality on that date.[156]

403.   With regard to Respondent's objections, Claimants requests the Tribunal to reject them based on the following main arguments:

(i)      Respondent does not contest the principle that the Tribunal has jurisdiction over the Claimants fulfilling the above mentioned requirements, but raises

---

[153]    R-MJ § 365; R-R-MJ §§ 590-600, referring to *Mihaly International Corporation v. Democratic Republic of Sri Lanka* (ICSID Case No. ARB/00/2), Award of 15 May 2002, § 120; *Champion Trading Company and Ameritrade International Inc. v. Arab Republic of Egypt* (ICSID Case No. ARB/02/9), Decision on Jurisdiction of 21 October 2003, §§ 3.1-3.4. See also R-PHB §§ 480 *et seq.*

[154]    R-MJ § 366, R-R-MJ §§ 602-611, referring to C-MJ § 863.

[155]    C-MJ §§ 830; 853. See also C-PHB §§ 443 *et seq.*

[156]    C-MJ §§ 854; 865. See also C-PHB §§ 446 *et seq.*

objections based on the standing of individual Claimants and lack of specific evidence;

(ii)    These objections are improper at this stage of the proceedings. Respondent is trying to arbitrate the factual issues pertaining to each Claimant's standing contesting the *prima facie* evidence of nationality. The task of establishing nationality is a task that the Tribunal expressly postponed until after it has made a determination that it has jurisdiction over the claim;

(iii)   Claimants contend that they will submit adequate evidence of nationaliy in due time, such information being already available in Claimants' database;

(iv)    With regard to juridical persons, Respondent's objection regarding the alleged lack of legal personality is inapposite. Claimants contend that legal personality is not a prerequisite to qualify as juridical person under Article 1(2) BIT. Since the definition of "juridical person" of Article 1(2) lit. b BIT expressly includes foundations and associations, independent of whether their liability is limited or not, Claimants contend that the term "juridical person" does not solely refer to entities with legal personality. According to Claimants, the relevant element to determine whether a Claimant is a juridical person under Article 1(2) lit. b BIT is whether it has the right to litigate. All entities involved have such right.

(c)    *Tribunal's Findings*

(i)    Jurisdiction *Rationae Personae* – In General

404.   As already set forth above (see §§ 280-287 and 392-396), the Tribunal's jurisdiction *rationae personae* derives from, Article 1(2) BIT and Article 1 Additional Protocol to the BIT, Article 25 ICSID Convention and has to be established based on the requirements set forth therein.

405. In other words, as called to decide on a dispute arising out of the BIT, the Tribunal has jurisdiction *rationae personae* over any person, who is entitled to claim protection under this BIT and who has the capacity to conduct arbitration thereunder.

406. The question thus is under what conditions Claimants can be considered to be entitled to claim protection under the BIT and have capacity to be a party to the present arbitration.

(ii)   With regard to Natural Persons

407. Based on the relevant legal provisions and as described above (see §§ 280-287 and 392-396), in order to benefit from the protection of the BIT and be a party to the present ICSID arbitration conducted thereunder, a physical person must:

(i)   Have the Italian nationality on the relevant date, such date being the date on which the Parties consented to arbitration (*in casu* the date of filing of the Request for Arbitration, see § 49 above), i.e., 14 September 2006, as well as the date of registration of such Request, i.e., 7 Frebruary 2007. The question of whether a person has on such date the Italian nationality is subject to Italian law;

(ii)   Not have the Argentinean nationality on neither of the relevant dates. The question of whether a person has Argentinean nationality is subject to Argentinean law;

(iii)   Not have been domiciled in the Argentine Republic for more than two years prior to making the investment. The question of whether a person has been domiciled in Argentina is subject to Argentinean law;

(iv)   Have made an investment, which falls within the scope of the BIT.

408. It appears that these conditions are actually not contested by Respondent, whose objections relate to whether these conditions are fulfilled.

409. Whilst it is true that in order to establish the Tribunal's jurisdiction *rationae personae* these conditions need to be fulfilled with regard to each Claimant, the present decision does not aim at making a determination with respect to any individual Claimant and only aims to determine the general conditions for its jurisdiction over such Claimants. Insofar, it is not necessary at this stage to determine whether the information submitted by Claimants so far sufficiently evidences the fulfilment of these conditions.

410. Thus, Respondent's doubts as to the nationality or domicile of certain Claimants are irrelevant at this stage.

411. With regard to Respondent's objection as to the quality of investors of Claimants, it is based on the allegedly remote connection between the security entitlements and the original underwriters and underlying bonds. This objection has to be rejected for the Tribunal has come to the conclusion, in the preceding section (see § 358 above), that not only the bonds themselves, but also any security entitlement held in those bonds and distributed by the Participants and other Intermediaries to Claimants constitute an investment in the sense of Article 1 BIT and Article 25 ICSID Convention. Thus, to the extent that Claimants are holders of such security entitlements, they are to be considered "investors" under the terms of the BIT and subject to the Tribunal's jurisdiction *rationae personae*.

412. **Consequently**, at this stage of the proceedings, it is sufficient to establish that pursuant to the relevant legal provisions, the Tribunal has jurisdiction *rationae personae* over each and any Claimant being a natural person (i) with Italian nationality on 14 September 2006 and 7 February 2007, (ii) who on either date was not also a National of the Argentine Republic, (iii) who was not domiciled in the Argentine Republic for more than two years prior to making the investment, and

(iv) has made an investment falling under the scope of the BIT, whereby Claimants having purchased a security entitlement in one of the concerned bonds issued by Argentina are to be considered "investors."

> (iii)   <u>With regard to Juridical Persons</u>

413. Based on the relevant legal provisions and as described above (see §§ 280-287 and 392-396), in order to benefit from the protection of the BIT and be a party to the present ICSID arbitration conducted thereunder, a juridical person must:

(i)   Have the Italian nationality on the relevant date, such date being the date on which the Parties consented to arbitration (in casu, the date of filing of the Request for Arbitration, see § 91 above), i.e., 14 September 2006. The question of whether a person has on such date the Italian nationality is subject to Italian law.

As transposed into the BIT, this requirement of "nationality" means that the concerned juridical person must be an Italian "corporation" in the sense of Article 1(2)(b) BIT, i.e., an entity incorporated in compliance with the legislation of Italy, having its office in the territory of Italy and being recognized thereby.

(ii)   Have made an investment, which falls within the scope of the BIT.

414. Respondent's objections are manifold. Insofar as they do not relate to the basic principles, but rather to whether the above-mentioned conditions have been fulfilled, they will be disregarded at this stage of the proceedings. Respondents however also contends that the concept of corporation set forth in Article 1(2)(b) BIT applies only to corporations possessing legal personality under Italian law, and further reiterates its objection as to the quality of investors of Claimants due to the allegedly remote connection between the security entitlements and the bonds.

415. With regard to the latter objection, it has to be rejected for the same reasons as mentioned above (see § 411).

416. With regard to the nature of the capacity necessary for corporations to benefit from the protection of the BIT and be a party to the present arbitration, the Tribunal is of the opinion that neither Article 1(2)(b) BIT nor Article 25 ICSID Convention limits the scope of eligible entities to those having full legal capacity, and also encompasses entities which enjoy limited civil capacity to the extent that such entities have the capacity to make an investment under the BIT and further to sue and to be sued.

417. The reasons are the following:

(i)    Based on the wording of Article 1(2)(b) BIT and the situation under Italian law, it has to be concluded that not only entities with full legal capacity qualify as "juridical persons" under Article 1(2)(b) BIT. Under Article 36 Italian Civil Code (quoted at § 397 above), associations not recognized as legal entities (hereinafter "non-recognized associations") have the procedural capacity to stand in court and to be represented by their president or director. In other words, whilst non-recognized associations may not have legal personality, they possess certain attributes of legal personality and in particular the right to sue and to be sued.[157] To the extent that the relevant Claimants had the capacity to make the relevant investment, and that they also have the statutory right to litigate in their own names, and that their constituents all have the requisite nationality, the "juridical person" requirement of Article 25(2)(b) ICSID Convention must be considered satisfied.

---

[157]    See PICARDI, §§ 228 et seq.

(ii)    The ICSID Convention does not define the concept of juridical person, and does in particular not expressly require a non-natural investor to have specific legal personality.[158] Thus, although this question is controversial, the Tribunal finds that the ICSID Convention does not provide for a clear "yes or no" answer and that the specific requirements regarding the legal personality of a non-natural investor therefore eventually depends on the scope *rationae personae* of the relevant BIT and the legal capacity required for a non-natural investor to acquire an investment protected by the BIT under the law applicable to such investor and to sue or be sued in its own name with regard to such investment.[159]

(iii)   Where a non-natural investor falls within the definition of juridical persons provided for in the BIT, and where such investor has under the law applicable to it the legal capacity to acquire an investment protected under the BIT and to sue and to be sued, it would be contrary to the purpose of the BIT and the ICSID Convention to deny such investor the capacity to initiate ICSID arbitration. Indeed, it would make no sense to allow on one hand an investor to make an investment protected under the BIT, and deny on the other hand such investor the right to invoke protection under the BIT for violation of the rights attached to such investment.

418.  Having regard to these considerations, the Tribunal finds that in order to qualify as "juridical person" under Article 1(2)(b) BIT it is sufficient that Italian law affords

---

[158]    See SCHREUER, op. cit. fn. 98, Ad Article 25 § 689, and references to the historical debate concerning the term of juridical person.

[159]    See *Consorzio Groupement L.E.S.I.-DIPENTA v. People's Democratic Republic of Algeria* (ICSID Case No. ARB/03/08), Award of 10 January 2005, §§ 37 et seq., where the Tribunal recognized the capacity of an "external" consortium to be a party to an arbitration, based on its capacity to act in its own name, to sue and to be sued. The Tribunal rejected its jurisdiction not because of a lack of legal capacity of the claimant, but because the claimant was not the party bound by the contract underlying the investment, see § 37(iii).

those Claimants who constitute entities or other forms of organizations with the capacity to make the investment and the right to litigate in their own name. It is not necessary that they be granted full legal personality under Italian law.

419.  In the light of the limited scope of the present decision, it is not necessary at this stage to determine which of the Claimants constitute entities in the sense of Article 1(2)(b) BIT.

420.  In addition, in order to benefit from the protection of the BIT and be a party to the present arbitration, these entities must fulfil the criteria of "Italian nationality." According to general international law, applied to corporate entities and other forms of organizations, the nationality requirement means that such entities and organizations must be duly constituted and organized under Italian law and/or have their '*siège social*' in Italy. [160] These requirements do not really seem to be disputed between the Parties, Respondent's objections focusing solely on whether they have been met. [161] This question is however premature at this stage and will be examined when dealing with questions relating to individual Claimants (see § 227 above).

421.  **Consequently**, at this stage of the proceedings, it is sufficient to establish that pursuant to the relevant legal provisions the Tribunal has jurisdiction *rationae personae* over each and any Claimant being a juridical person with Italian nationality on 14 September 2006, meaning that it was on such date constituted in compliance with the legislation of Italy, had its *siège social* in the territory of Italy, and was recognized by Italian law in the sense that it had the civil capacity to make such investment and to litigate in its own name.

---

[160]    See SCHREUER, *op. cit.* fn. 98, Ad Article 25 §§ 694 *et seq.*, and references quoted therein.

[161]    See R-MJ § 364 and R-PHB § 491, where Respondent states that "Claimants did not produce any *prima facie* evidence of being incorporated, having their seat in Italy and being recognized under Italian law," thereby implicitly admitting that the law of incorporation and/or recognition and the place of the seat are the relevant criteria to determine the nationality of non-natural investors.

(d)    *Conclusion*

422. In conclusion, and in response to Issues Nos. 10 and 11, the Tribunal finds that without making a determination with respect to any individual Claimant, it has jurisdiction *rationae personae* pursuant to Article 1(2) BIT, and its Additional Protocol, and Article 25 ICSID Convention, over each Claimant:

(i)    **who is a natural person** and who ultimately is found:

- to have had Italian nationality on 14 September 2006 and 7 February 2007;

- not to also have had Argentinean nationality on either of such dates;

- not to have been domiciled in the Argentine Republic for more than two years prior to making the investment;

- to have been an investor as of the date of the alleged breach by Argentina of its treaty obligations.

(ii)    **who is a juridical person** and who ultimately is found to have had the Italian nationality on 14 September 2006, meaning that it:

- was on such date constituted in compliance with the legislation of Italy;

- had its *siège social* in the territory of Italy; and

- was recognized by Italian law in the sense that it had the civil capacity to make an investment under the BIT and to litigate in its own name, without necessarily having full legal personality.

**(5)**    **Subject to the Claimants' Written Consent – Issue 2**

      *(a)*    *Issues and Relevant Legal Provisions*

423.  It is contested between the Parties whether Claimants validly consented to submit the present dispute to ICSID jurisdiction. In particular, Respondent challenges the validity of the TFA Mandate Package and contends that the mandate given by Claimants in this TFA Mandate Package is not fit to constitute a consent in the sense of Article 25(1) ICSID Convention. Claimants, on the other hand, contest Argentina´s entitlement to challenge the validity of Claimants' consent.

424.  Again, in accordance with the limits of the jurisdictional phase, the present decision will not decide whether each Claimant has validly consented to the present arbitration. The Tribunal will limit its analysis to the question whether Claimants' consent, as expressed in the relevant documents of the TFA Mandate Package, is fit to constitute a valid consent to the present ICSID arbitration taking into account the representation mechanism implemented by the TFA Mandate Package.

425.  Thus, the specific issues to be determined by the Tribunal here are the following:

-    What is the law applicable to the question of the validity of the Parties' consent?

-    How far need the Tribunal go when examining the existence of consent to ICSID arbitration? In particular:

    (i)    Is the Tribunal's scope of examination limited to the mere existence of a consent, or does it further extend to the validity of such consent?

    (ii)    If extending the Tribunal´s scope of review also to the validity of such consent, what are the relevant validity requirements? In this respect, does the multiplicity of Claimants impose certain additional requirements as to the form and content of Claimants' consent to arbitration?

(iii)   What is the relevance and consequence of the argument that Argentina lacks standing to challenge the validity of Claimants' consent?

-   To the extent specific requirements apply to the validity of the consent, are these requirements fulfilled (see Issues 2(a) & 2(b) of the List of 11 Issues of 9 May 2008)? In particular:

(i)   What is the role and effect of the TFA Mandate Package, other thereto related documents and the Request for Arbitration with regard to Claimants' consent?

(ii)   What is the role and impact on Claimants' consent of the alleged conflict of interest allegedly affecting TFA?

(iii)   Can the consent provided for in the TFA Mandate Package be considered "irrevocable" in the sense of Article 25(1) ICSID Convention.

426.   The key legal provisions and other documents in dealing with the above issues are the following: Article 8 BIT, Article 25(1) ICSID Convention, the TFA Mandate Package, and Rule 18 ICSID Arbitration Rules.

427.   As to the specific content and wording of the TFA Mandate Package, it is set forth above in §§ 86-89.

*(b)   Parties' Positions*

428.   Respondent contends that Claimants have not validly consented to the present ICSID arbitration, based mainly on the following arguments:

*(i)   Claimants' consent does not fulfill the applicable substantive requirements*: First, Respondent contends that Claimants' consent is vitiated by TFA's conflict of interests (which aims to protect the Italian banks from their liability towards Claimants), and was obtained through TFA's

167

misrepresentations and non-disclosure of relevant information. As such, it was given in violation of the good faith principle and has been fraudulently obtained. TFA's improper conduct is evidenced by the existence of counterfeited signatures on the relevant documents of the TFA Mandate Package.[162] Second, the terms of the TFA Mandate Package provide TFA with full control over the arbitration and deprives Claimants' of basic procedural rights, which is inadmissible. Claimants can therefore not be considered to be legitimately represented by TFA and White & Case in these proceedings and may therefore not be deemed to have validly consented to the present arbitration.[163] Third, Claimants have not agreed to the "irrevocability" of the purported consent represented in the TFA Mandate, and can therefore not perfect an ICSID arbitration agreement.[164]

(ii)   *Claimants' consent does not fulfill the applicable form requirements*: Respondent contends that according to Italian law, the Powers of Attorney issued to TFA and White & Case should have been executed in front of a notary. This has not been done.  In addition thereto, there exist strong doubts about the authenticity of the Claimants' signature on the relevant documents of the TFA Mandate Package, including the Power of Attorneys. Thus, the relevant Powers of Attorney are invalid and Claimants can therefore not be considered to have validly consented to the present ICSID arbitration.[165]

---

[162]   R-PHB §§ 144 *et seq.*

[163]   R-PHB §142, §§ 201 *et seq.*

[164]   R-PHB §§ 225 *et seq.*

[165]   R-MJ § 205, R-PHB § 144.

429. In contrast, Claimants contend that they have validly consented to submit a dispute like the present one to ICSID arbitration. Claimants submit that their consent is fully valid, based on the following main arguments: [166]

(i) Claimants validly consented in writing to arbitrate this dispute (through the signature of the Power of Attorney), which is all that is required as a matter of international law. The documentation Claimants submitted is more than sufficient to demonstrate Claimants' consent and there is no ground for the Tribunal to second-guess Claimants' consent;

(ii) The role of TFA is irrelevant in determining whether Claimants consented to arbitrate;

(iii) In any event, TFA's role is entirely proper. Argentina's allegation of fraud is wrong and based on the speculative assertion that Claimants have a claim against the Italian banks. Further, there is no conflict of interest; on the contrary, TFA and Claimants have a convergent interest to win these proceedings;

(iv) Formal requirements of Italian law are not applicable to the Powers of Attorneys, which are subject to the law of the District of Columbia;

(v) Respondent's policy argument as to the impact of an ICSID arbitration on sovereign debt restructuring are irrelevant and inaccurate.

---

[166] C-MJ §§ 390 *et seq*., C-R-MJ §§ 355 *et seq*. See aso C-PHB §§ 104 *et seq*, and §§ 244 *et seq*.

(c)    *Tribunal's Findings*

(i)    Law Applicable to the Question of Consent

430.  As mentioned above (see § 274), Article 8 and in particular Article 8(3) contemplate the Parties' consent required under Article 25(1) ICSID Convention. It is widely acknowledged that the question of the existence and validity of consent in the sense of Article 25(1) ICSID Convention is not subject to the law applicable to the merits designated in Article 42 ICSID Convention, but rather to Article 25 ICSID Convention itself and the instruments expressing such consent.[167] This is also the view of the present Tribunal, which considers that questions of consent under Article 25 ICSID Convention are subject to principles of international law, and not pursuant to any particular national law.[168] This applies not only with regard to the material content of the consent, i.e., to its substantive validity, but also with regard to its form, i.e., to its formal validity. In this respect, Article 8(7) BIT, which refers to the law applicable to the merits of the dispute in the sense of Article 42 ICSID Convention, is irrelevant for the determination of the existence of consent.

(ii)    Scope of Examination of the Tribunal

431.  It is undisputed that the Tribunal must verify the existence of a consent, as an objective condition to its jurisdiction (see § 258 above). However, the question of the scope of such examination arises: How far does the examination of the Tribunal need to go in order to verify the existence of consent? And, in particular, is such examination limited to the existence of consent, or should it extend also to the formal and substantive validity of such consent?  What, if any, are the documents or other evidence that may be required from Claimants to verify the existence and/or validity of such consent?

---

[167]    See e.g. SCHREUER, op. cit. fn. 98, § 578 *et seq*. and references quoted therein.

[168]    See also *Ceskoslovenska Obchodni Banka, A.S. v. the Slovak Republic* (ARB/97/4), Decision of the Tribunal on Objections to Jurisdiction, § 35.

432. With regard to the formal requirements, Article 8 BIT does not appear to impose any specific form requirement, whilst Article 25(1) ICSID Convention only requires the consent to be in "written" form. No notarization or supplementary other procedure is requested.

433. With regard to the substantive requirements, both Article 8 BIT and Article 25(1) ICSID Convention are silent and there are no internationally recognized specific rules regarding such requirements. In addition, Article 25(1) ICSID Convention does not require the submission of any particular document or evidence. This question is therefore to be assessed by the Tribunal.

434. As such, one could argue that a tribunal's role is limited to the examination of the existence of a written document, incorporating the parties' consent to submit the dispute to ICSID arbitration, without further examination regarding other aspects of such consent.

435. However, the Tribunal's view is that such an approach may – depending on the circumstances – not give sufficient regard to the crucial role of consent, which constitutes the cornerstone of ICSID and BIT arbitration. Under the particular circumstances of the present case and the nature and scope of Respondent's objections, the Tribunal considers that it not only has the duty to examine the existence of a written document incorporating a consent to submit the present dispute to ICSID arbitration, but it should also ask itself whether such consent reflected Claimants' sincere intention.

(iii)   Relevant Substantive Validity Requirements

436. As mentioned above (see § 435), the Tribunal believes that in the present case its examination regarding consent should go beyond the mere formal existence of the consent. In this respect, the Tribunal finds that reference should be made to international law and in particular the general principles of law requiring that any

consent be genuine and intended, i.e., free from coercion, fraud and/or from any essential mistake.

437.   Thus, consent that was not freely given, i.e., given under threats or coercion, was in fraudulently induced,[169] or was based on an essential mistake[170] may not constitute a valid consent under general principles of law. It is generally admitted that under such circumstances the party, who is victim of coercion, fraud or mistake may avoid the contract. The Tribunal holds that the same principle should apply to the concept of consent under Article 8(3) and Article 25(1) ICSID Convention.

438.   At this point, a distinction should be drawn between the genuine character of the consent and the motivations lying behind this consent. The reasons why a person decides to give its consent to a specific commitment are in principle irrelevant for it to be valid, provided they are based on a correct understanding of the underlying facts and law. In other words, an investor who consents to ICSID arbitration must understand and want to initiate ICSID arbitration as a dispute resolution means for the dispute at stake. The reasons why such investor opts for ICSID arbitration, the question whether or not the decision to give its consent is a "good" decision, e.g., whether it is the best way to get the sought redress or whether there may be further more suitable options, is in contrast irrelevant for the validity of the consent, provided such consent was free and informed.

439.   With regard to the "irrevocability" of the consent, this irrevocability is not a prerequisite of a valid consent but rather a consequence of the existence of a valid consent: If a party has validly consented to ICSID arbitration, such consent is

---

[169]   A consent is fraudulously induced when it is based on a willfully inaccurate representation on a willful concealment of information, which in accordance with good faith and fair dealing should have been disclosed.

[170]   A mistake is considered essential, where the party would not have given it consent had it known about the mistake.

irrevocable. Thus, although irrevocability and validity go hand in hand, irrevocability does not constitute a separate validity requirement. Thus, whilst it is necessary, it is also sufficient that the party giving its consent be aware of and agrees with such irrevocable nature.

440. Consequently, the Tribunal shall examine not only the existence of a written document incorporating consent, but also the validity of such consent, whereby the only relevant validity requirement is that such consent be given in a free and informed manner. Other validity requirements which may apply under national laws to specific kinds of contracts or actions are however irrelevant and will not be taken into account by the Tribunal.

(iv)    Argentina's Standing to Challenge Claimants' Consent

441. Claimants contend that Argentina does not have standing to challenge Claimants' consent and that such challenge could only be raised by Claimants themselves.

442. Indeed, the avoidance of a contract based on a coercion, fraud or mistake is in principle reserved to the party whose consent is affected by such flaw. It can in principle not be invoked by the other party, who has validly consented to the contract.

443. However, the particularity of the case is that the alleged fraud and/or mistake is alleged to have been caused by a third party, TFA. The question therefore arises whether the party, validly bound by its own consent, can invoke the other party's flawed consent to challenge the validity of the contract.

444. Considering (i) the crucial role of consent in ICSID and BIT arbitration, (ii) the relevant third party, i.e., TFA's role in the present dispute, and (iii) the fact that Argentina had no link with or control over TFA, the Tribunal considers that Argentina is not precluded from invoking a lack of consent from Claimants in relation to TFA's role and behaviour.

173

445. However, this does not mean that all of Respondent's arguments are admissible or otherwise fit to establish a lack of consent. The Tribunal shall stick to the scope of examination and the validity requirements described above (§§ 431-440) and address only those arguments which fall within the scope of such examination. In addition, when proceeding to such examination, the Tribunal shall give due regard to the fact that Claimants themselves do not invoke such lack of consent, which may impose a higher standard of proof than if the mistake or fraud is invoked by the affected party itself.

(v)   Existence and Validity of Claimants' Consent

446. As mentioned above (§ 258), within the context of BIT based arbitration, it is widely admitted that consent is given through the initiation of ICSID proceedings, which constitutes the acceptance by an investor of the Host State's offer to arbitrate. Thus, it is the Request for Arbitration that embodies the consent of the investor, unless the investor has otherwise previously expressed its consent, e.g. in a notice of dispute. Where such Request is filed by a lawyer, that lawyer must be duly authorized to do so, based on an appropriate power of attorney. In other words, in such a circumstance, it is the power of attorney instructing the lawyer to launch the arbitration proceedings on behalf of the investor and the request thereby filed by the empowered attorney which contain and simultaneously constitute the consent of the investor.

447. As mentioned before (see § 430 above), the validity of such power of attorney as embodiment and expression of an investor's consent is thus subject to general principles of international law. Indeed, one must distinguish the validity of the power of attorney itself and the validity of the consent embodied therein. While the former is a matter of procedure (and thereby of admissibility) and is regulated in Rule 18 ICSID Arbitration Rules, the latter is a matter of jurisdiction and subject to the law applicable to the consent itself, i.e., international law.

174

448. Therefore, objections regarding the formal invalidity of a power of attorney would – if at all – be relevant under Rule 18 ICSID Arbitration Rules. In this respect, it should be stressed that the filing of ICSID arbitration is not an action reserved to lawyers admitted to practice in a specific jurisdiction or bar. It is open to any investor, irrespective of its legal qualifications and such investor is not required to resort to the assistance of a lawyer, although such assistance may in practice be highly recommended. Consequently, even if lawyers are asked to intervene by preparing and participating to the ICSID proceedings on the investor's behalf, there is no reason to impose on such lawyers and their principal specific limitations or restrictions existing in their home jurisdiction and applicable to domestic court or arbitration proceedings. This is so irrespective of whether or not lawyers are, under the locally applicable professional rules, prevented from representing or limited in the way of representing such an investor in ICSID arbitration, and may engage their liability towards their client and/or relevant authorities in their home jurisdiction. It may, under certain circumstances, further raise questions with regard to the admissibility of the arbitration proceedings initiated by such lawyers (see §§ 506 *et seq.* below). It may however in principle not affect the validity of Claimants' consent to ICSID arbitration, unless the circumstances at hand simultaneously constitute a fraud, a coercion or a mistake in the sense described above (see §§ 436-440) and being the basis for the investor's consent.

449. Thus, the core question in order to determine the validity of Claimants' consent is the following:

> **In view of the content and specificities of the TFA Mandate Package, the alleged circumstances surrounding its signature and the representation mechanism implemented by such Package, can Claimants' consent to ICSID arbitration still be considered a free and informed consent?**

450. The TFA Mandate Package is composed of (i) the TFA Instruction Letter, (ii) the Power of Attorney, (iii) the TFA Mandate, and (iv) additional questionnaires and instructions, as further described above (see §§ 85-89).

451. The TFA Instruction Letter provides in section 8 thereof some "basic rules that the conduct of the ICSID arbitration on behalf of numerous Italian Investors makes it necessary to impose on all of [the bondholders]."[171] These rules focus mainly on two issues: (i) the eligibility of a person to participate in the ICSID arbitration, and (ii) rules concerning the conduct of such arbitration:

- With regard to the eligibility requirements, the TFA Instruction Letter requires that a person wishing to participate in the ICSID arbitration must be an "investor," i.e., hold a security entitlement in the relevant Argentine bonds. In addition thereto, the TFA Instruction Letter sets forth that anyone who intends to initiate ICSID arbitration may not bring – as long as the arbitration proceedings are ongoing – any legal action in Italy against any credit institution, i.e., bank, that sold the bonds to them. The TFA Instruction Letter justifies this restraint by an alleged risk that legal proceedings against the banks may lead to the annulment of the purchase of the bonds, which in turn would annihilate the status of "investor" of the concerned person. Nevertheless, the TFA Instruction Letter also provides that it is possible for the "investors" to change their mind and revoke the mandates related to the ICSID arbitration, whereby a revocation of these mandates in principle triggers the investor's withdrawal from the ICSID proceeding. It is further mentioned that the running of the statute of limitations for claims against the banks will not be tolled by the participation to the ICSID proceeding.

---

[171]    See TFA Instruction Letter (Exh. RA-2), Section 8, first paragraph.

- With regard to the rules concerning the conduct of the arbitration, the TFA Instruction Letter introduces and explains the role of TFA and the appointed lawyers White & Case, further described in the TFA Mandate. Based on these two documents, TFA is given all powers to take any action necessary to conduct the arbitration and/or settle the dispute, without direct consultation with Claimants, who are deprived of the right to give instructions either to TFA or to White & Case. The TFA Instruction Letter and the TFA Mandate justify this restraint as necessary for reasons of coherence and uniformity of representation of all Italian bondholders, and base it on the principle that TFA's role is to act in the collective interest of all bondholders.

452. Based on the TFA Instruction Letter and the TFA Mandate, as well as the supplementary documentation included in the TFA Mandate Package, each Claimant then had to sign a Power of Attorney, in which it (i) declared being a holder of relevant Argentine bonds, (ii) declared giving its irrevocable consent to submit to ICSID arbitration and to accept Argentina's offer to arbitrate contained in Article 8 BIT, and (iii) conferred to White & Case the power to initiate and conduct on its behalf the ICSID arbitration and other actions necessary to manage the Claimant's rights as deriving from its status as bondholder.

(vi)   Existence of a Clear Consent to ICSID Arbitration

453. The Tribunal holds that the Power of Attorney constitutes a written power of attorney and contains a clear and unambiguous expression of irrevocable consent by the relevant Claimant to initiate ICSID arbitration against Argentina in relation to its non-payment of amounts due under the relevant bonds, and to entrust White & Case with the conduct of such arbitration. Based thereon, this Power of Attorney constitutes a written consent in the sense of Article 25(1) ICSID Convention.

454. Further, the Tribunal finds that:

- Whether or not this Power of Attorney also complies with Italian law or law of the District of Columbia is irrelevant for the purpose of assessing its validity under Article 8 BIT and Article 25(1) ICSID Convention. This conclusion is based on the assumption that the Powers of Attorney were signed by the relevant Claimants. The argument of a possible falsification of certain signatures is irrelevant at this stage, and will – if necessary – be examined when dealing with issues relating to individual Claimants.

- Further, objections relating to the validity of the Power of Attorney itself fall under Rule 18 ICSID Arbitration Rules and are not of a nature to challenge the validity of the consent embodied therein (see § 448 above).

- In addition, Claimants' intention to participate to the ICSID proceedings is further confirmed by the series of further documents, such as copies of identification documents and documents establishing the holding of the security entitlement, which each Claimant had to submit together with the TFA Mandate Package.

(vii)  <u>Validity of Claimants' Consent to ICSID Arbitration</u>

455. Thus, the question now is whether the consent of the Claimants, who signed this Power of Attorney, may have been truncated by coercion, fraud or an essential mistake caused by TFA and/or White & Case. Respondent alleges that the restraints set forth in the TFA Mandate Package preventing Claimants from freely pursuing the banks is fraudulent, to the extent that it is based on a misrepresentation of key facts and legal issues aiming at unduly protecting the banks from law suits and with the effect of depriving Claimants of a redress against such banks. In other words, Respondent's argument suggests that these documents concealed TFA's real purpose, i.e., protecting its banks, and that had Claimants known such real purpose, they would not have given their consent to the TFA Mandate Package and thereby to ICSID arbitration.

456. The system put in place by the TFA Mandate Package provides for certain restrictions, such as the waiver of Claimants to sue the Italian banks for the duration of the ICSID proceedings, limitations related thereto imposed on the revocation of the TFA Mandate Package, and the principle that Claimants are passive participants to the arbitration, all relevant decisions being made by TFA and White & Case on behalf of these Claimants,. With regard to these restrictions and limitations the Tribunal finds as follows:

457. (i)   *With regard to Claimants' inability to give instructions and make decisions regarding the conduct of proceedings*, the Tribunal holds that this restriction was clearly set forth in the TFA Mandate Package. In this respect, Claimants were aware that by accepting the TFA Mandate Package, they would be unable to exercise themselves certain procedural rights individually, and in particular they would not be in a position to instruct the lawyers and direct the proceedings individually. In addition, it is also understandable that proceedings involving several thousand claimants cannot be conducted in the same manner as proceedings with a handful of claimants, and that the coordination and management of such proceedings may therefore affect the scope of power and freedom of the parties to decide on how to conduct the proceedings. The question may arise whether this cutting into Claimants' rights may have gone too far. This question is however not a question of consent: Claimants knew what they were doing. It is a question of admissibility: Is it admissible for Claimants to entrust a third party with rights as extensive as those of TFA? This question will thus be addressed together with other issues of admissibility (see §§ 536 *et seq.* below).

458. (ii)   *With regard to Claimants' inability to sue the banks whilst ICSID arbitration is ongoing*, the Tribunal finds that this restriction (rightfully or wrongfully) indeed benefits the banks. Under the TFA Mandate Package scheme, banks are protected from being sued by Claimants as long as the ICSID arbitration is ongoing and Claimants participate thereto. Based thereon, Respondent alleges that TFA, whose membership is composed of such banks, is affected by a conflict of interest which

truncates Claimants' consent. The Tribunal holds that the restriction imposed on Claimants with regard to the temporary limitation to sue the banks is neither fraudulent, nor does it attach Claimants' consent with any essential mistake. The reasons are the following:

- Whilst the representation mechanism implemented by the TFA Mandate Package does impose certain restrictions on Claimants, it should not be forgotten that it also actually entitles Claimants to conduct ICSID arbitration, at the cost and expense of the TFA's member banks. Indeed, it is very unlikely that many of the Claimants would individually be in a position to initiate and conduct ICSID arbitration, if they had to finance the arbitration themselves.

- It is further true that the TFA member banks may indirectly benefit from this scheme, since there is a likelihood of reducing the risks that they get sued by Claimants. However, there is no certainty regarding the existence of scope of any claims against the TFA member banks and these banks are actually paying a certain price for this "risk reduction," since they are financing the ICSID proceedings. In other words, from TFA's perspective, the TFA Mandate Package is a sort of a risk insurance, for which they pay a premium (the cost of the ICSID arbitration), in return for which they are protected to a certain extent against a risk (lawsuits from Claimants).

459. This scheme may appear uncommon and it raises questions relating to TFA's role in the proceedings, such as issues of conflict of interests between TFA and Claimants. However, these are more considerations of admissibility of the proceedings, rather than of consent of Claimants (see §§ 529 *et seq.* below). The key factor with regard to Claimants' consent is not related to the motivations of TFA, but rather to the question whether through the TFA Mandate Package Claimants' were fraudulently induced in doing something they did not want to do, or whether they unconsciously waived a right or lost an option, which – if

conscious thereof – they would not have been willing to concede at the price of being able to conduct ICSID arbitration.

460. Respondent argues that Claimants would not have agreed to ICSID arbitration had they been better aware of the risks related to such ICSID arbitration, in particular the alleged risk of losing their potential claims against the TFA member banks. The Tribunal finds that Respondent has failed to bring sufficient evidence supporting such contention.

461. The Tribunal holds that the TFA Mandate Package contains sufficient information to allow Claimants to make an informed consent. It clearly sets forth that during the ICSID arbitration Claimants cannot simultaneously initiate legal claims against the TFA member banks and that the statute of limitation for such claims is not tolled. Further, it is also comprehensive with regard to the way the proceedings will be conducted, restricting Claimants from exercising themselves a number of decisional and procedural rights. Of course, one could argue that some information of the TFA Mandate Package could have been better explained or should have been more comprehensive. However, one should also take into account that the present dispute is not a consumer dispute, although a number of the Claimants may have a consumer like profile. It is a dispute surrounding multi faceted financial investments. Thus, the degree and nature of the information provided did not need be of the same extent and nature than in the context of pure consumer transactions, and TFA was entitled to assume a certain level of sophistication and knowledge of the investors.

462. Thus, based on the information contained in the TFA Mandate Package the Tribunal finds that it allowed Claimants to make an informed choice between (i) ICSID arbitration at the cost of TFA and at the temporary detriment of Claimants' potential claims against TFA's member banks, or (ii) civil litigation against the banks, at Claimants' own expense and without the option of simultaneous ICSID arbitration against Argentina.

463.  In addition, even if the TFA Mandate Package did not contain sufficient information or did to some extent misrepresent certain information, such a flaw would have been cured by the subsequent events. Indeed, various associations started to assist Italian purchasers of Argentinean bonds by disseminating information on available legal means and even by supporting them in the revocation of the TFA Mandate Package, the tolling of the prescription period and/or the filing of legal claims against the banks.[172] Thus, even if at the time of signature of the TFA Mandate Package, some of the Claimants did not have a full picture of what they were doing, they were able to get such a full picture afterwards through the various actions of associations, legal proceedings and news reports on the ongoing ICSID arbitration. Given that Claimants themselves do not invoke a lack of consent, it is sufficient that they were in a position to appreciate the scope of their commitment to ICSID arbitration, and it is irrelevant whether or not they eventually really understood such commitment.

464.  Thus, whilst the Tribunal does not take a position on TFA's representation scheme resembling a "seduction operation," there is no indication that such operation was systematically fraudulent, coercive or otherwise caused Claimants to agree to ICSID arbitration based on an essential mistake.

465.  **Consequently**, the Tribunal considers that there is at this stage no indication that Claimants' consent to ICSID arbitration through the TFA Mandate Package and the initiation of the present proceedings by White & Case in accordance with such package would be invalid.

---

[172]    See CERNIGLIA, §§ 4 *et seq.*,  see also Hearing Tr. Day 4 pp. 933/10-939-22, and pp. 952/8-953/21; and ILLUMINATO, §§  3-5, 9.

(d)    *Conclusion*

466. In conclusion and in response to Issue No. 2, the Tribunal holds that the way in which Claimants consented to the ICSID arbitration through the relevant documents contained in the TFA Mandate Package is – as a matter of principle – valid. In particular:

(i)    Based on the circumstances leading to the execution of the documents embodying Claimants' consents, in particular, the Declaration of Consent and the Power of Attorney, there is at this stage no indication that such execution would have been achieved based on systematical fraud, coercion or essential mistake vitiating Claimants' consent;

(ii)   Whether or not such fraud, coercion or mistake may exist with regard to individual Claimants based on the specific circumstances of the individual case remains open and will be addressed, to the extent necessary and appropriate, when dealing with issues concerning individual Claimants;

(iii)  Questions regarding TFA's specific role and relevance, as well as issues relating to conflict of interests or breach of professional obligations by White & Case are issues relating to the admissibility of the proceedings, and not to the validity of Claimants' consent. They will be addressed, to the extent necessary and appropriate, when dealing with the issue of admissibility (see § 642 *et seq.* below).

**(6)    Subject to Argentina's Written Consent – Issues 1(a), 4 & 8**

(a)    *Issues and Relevant Legal Provisions*

467. It is uncontested that through Article 8(3) BIT, Argentina, in principle, consented to ICSID arbitration with regard to a dispute falling within the scope of the BIT and according to the terms and conditions set forth therein. Whilst the principle is not contested, the scope and the modalities of this consent are disputed. In particular, it

is disputed between the Parties whether Respondent's consent, as expressed in the BIT, covers "mass claims" within the context of sovereign debt restructuring.

468.  Thus, the specific issues to be determined by the Tribunal here are the following:

-   What is the scope of Argentina's consent under Article 8, and in particular:

    (i)   Does the fact that the dispute relates to sovereign debt restructuring somehow exclude Argentina's consent to ICSID arbitration?

    (ii)  Which are the elements of the dispute that must be covered by Argentina's consent, and in particular:

        -   Is the multiplicity of Claimants an element that must be covered by Argentina's consent or is it only a procedural modality? (see Issue 1(a) of the List of 11 Issues of 9 May 2008)

        -   Is the previous negotiation and litigation requirement an element which draws the limits of the consent, or is it a modality of the consent? (see Issue 4 of the List of 11 Issues of 9 May 2008)

    (iii) Based thereon, can Argentina be considered to have consented to the present proceedings? (see Issue 1(a) of the List of 11 Issues of 9 May 2008)

-   What are, if any, the effects of the contractual forum selection clauses in the relevant bond documents on Argentina's consent? (see Issue 8 of the List of 11 Issues of 9 May 2008)

469.  The key legal provisions and other documents in dealing with the above issues are the following: Articles 1 and 8 BIT in connection with Article 25(1) ICSID

Convention, (see §§ 336 and 268 *et seq.* above), as well as the forum selection clauses contained in the relevant bond documents.[173]

(b)   *Parties' Positions*

470.  With regard to Argentina's consent, Respondent contends that it has not and cannot be considered to have consented in any of the relevant instruments to ICSID arbitration over a dispute relating to sovereign debt restructuring and taking the form of an unprecedented mass action.

471.  Respondent bases its position on the following main arguments:[174]

(i)   The ICSID framework is silent concerning the possibility of collective proceedings;

(ii)  At the time of the conclusion of ICSID Convention and BIT, collective claims were allowed neither in Italy nor in Argentina, and could therefore not have been envisaged by Argentina;

(iii) The present proceeding is an unprecedented proceeding, neither Party could have expected;

(iv)  The present proceeding would change the nature of ICSID claims as it was envisioned, from one focused on studied analysis of the grievances brought by an individual investor for a singular, precise harm, to one focused on mass or class claims in which the circumstances of each Claimants can no longer be realistically examined and the peculiarities of each investment are ignored in favor of the lowest common denominator;

---

[173]   See above § 340.

[174]   R-MJ §§ 136 *et seq.*, R-R-MJ §§ 138 *et seq.*, 159 *et seq.*, 168 *et seq.*, §§ 183 *et seq*, R-PHB §§ 11 *et seq.*

(v)     The opening of ICSID arbitration with regard to sovereign debt restructuring would be counterproductive and go against current efforts to modernize foreign debt restructuring process;

(vi)    The forum selection clauses contained in the bond documents clearly show that Argentina did not consent to submit the disputes arising from the bonds to ICSID arbitration;

(vii)   Argentina's consent to ICSID arbitration is, in any event, conditional upon the compliance with the preliminary negotiation and litigation requirement set forth in Articles 8(1) and (2).

472.   In contrast, Claimants contend that Argentina validly consented to submit a dispute like this one to ICSID arbitration:[175]

(i)     Claimants contend that Respondent gave its express consent to ICSID arbitration in the BIT and its consent contains no limitation on the number of Claimants who may submit such dispute. This is evidenced by the use of the plural in Article 8 BIT, as well as by the nature of some of the types of investment listed in Article 8(1) BIT, which necessarily implies a plurality of investors;

(ii)    Claimants further submit that the existence of forum selection clause contained in the contractual documents may not influence the validity of the consent given by Argentina with regard to treaty claims;

(iii)   Claimants finally contend that Article 8 sets forth three alternative dispute resolution mechanisms, none of them being a pre-condition to the others. Consequently, the non-compliance with the negotiation or litigation

---

[175]   C-MJ §§ 113 *et seq.*, C-R-MJ §§ 292 *et seq.*, C-PHB §§ 147 *et seq.*,

mechamism provided in Article 8(1) and Article 8(2) has no bearing on Respondent's consent to arbitration.

    *(c)*   *Tribunal's Findings*

       (i)   <u>In General</u>

473. As mentioned above (§ 258), within the context of BIT based arbitration, it is widely admitted that consent of the Host State is given through the provision in the relevant BIT of a dispute resolution clause providing for ICSID arbitration. This is the case of Article 8, in particular Articles 8(3) and 8(5) BIT, in which Argentina consented to submit "disputes relating to investments" and "in relation to the issues governed by this Agreement" to ICSID arbitration, if so chosen by the investor.

474. As arises from sections(2) and (3) above, the present dispute is a dispute arising out of the BIT and relating to an investment. So far, it is a dispute falling within the scope of Argentina's consent as expressed in Article 8 BIT.

475. In view of the specificities of the present arbitration, the question arises whether Respondent's consent covers all relevant elements of the present dispute.

      (ii)   <u>Regarding Foreign Debt Restructuring</u>

476. With regard to Respondent's argument that ICSID arbitration should be excluded concerning disputes arising from foreign debt restructuring, the Tribunal finds that this argument is without merit.

477. It is to be recalled that a State has the possibility under Article 25(4) ICSID Convention to notify the Centre of the class or classes of disputes from that it would not consider submitting to the jurisdiction of the Centre. No such notification has been made by Argentina.

478. In the absence of such notification, the core question with regard to ICSID's jurisdiction is whether the investment at stake is protected under the concerned BIT

providing for ICSID arbitration in case of breach of such protection. If this is the case, then the State's consent must be considered to extend to such investment and the dispute falls within the scope of ICSID's jurisdiction.

479. To the extent that the Tribunal has accepted that actions of Argentina relating to its foreign debt restructuring may, in principle and under certain circumstances, affect Claimants' rights and are therefore susceptible of constituting a violation of provisions of the BIT (see §§ 311-330, 331 above), there is no reason to exempt foreign debt restructuring situations from the scope of application of the BIT.

(iii)   Regarding "Mass Claims"

480. It should be stressed that there is no uniform terminology concerning the various kinds of proceedings involving a high number of parties, and that various jurisdictions, courts and authors refer to different terms and meanings. For the sake of simplicity and clarity, the Tribunal will refer to "mass proceedings" as a qualification for the present proceedings, whereby this term should be understood as referring simply to the high number of Claimants appearing together as one mass, and without any prejudgment on the procedural classification of the present proceedings as a specific kind of "collective proceedings" recognized under any specific legal order.

481. Respondent contends that its consent does not extend to disputes taking the form of "mass proceedings," mainly because the "mass" aspect of the proceedings is not possible within the normal ICSID framework and implies adaptations to such framework, which cannot be done by the Tribunal itself and are of such importance that they must be specifically covered by Respondent's consent.

482. In order to determine whether the "mass" aspect of the present arbitration should be subject to the express consent of Respondent, it is first necessary to examine more in detail the nature and characteristics of such proceedings, which fall under the more general concept of "collective proceedings."

483.  *(i)  Types of Collective Proceedings and their Key Features.*  It is impossible to list all the various types of collective proceedings existing worldwide within the context of court litigation or arbitration. A certain categorization into two main types of collective proceedings is, however, possible:[176]

- *Representative proceedings*: Some jurisdictions address collective injuries by creating mechanisms allowing claims to be brought for representative relief. Whilst forms of representative relief vary greatly, they have in common that a high number of claims arise as one single action. The mechanism in which these claims are brought together vary and can be categorized by reference to their approach to three different issues: (i) the nature of the claim, with regard to which representative relief can take the form of a purely procedural device available regardless of the type of substantive law at issue, or be limited to certain fields of law (e.g., consumer law, antitrust, etc.); (ii) the nature of the representative, who can be a private named individual on behalf of a large group of unnamed others or an approved intermediary entity on behalf of all injured individuals; (iii) the nature of the relief, which can take the form of individual damages or representative relief (e.g., declaratory or injuctive relief).

- *Aggregate proceedings*: Some jurisdictions address collective injuries through judicial aggregation of claims, such as, for example, the English Group Litigation Order (GLO), which results in the creation of a judicial registry of individual claims that arise out of the same fact pattern, and then are assigned to the same judge for management purposes. Whilst this sort of

---

[176]    For a quick overview see STACY I. STARCK, From Class to Collective: The De-Americanization of Class Arbitration, in Arbitration International, Vol. 26 No. 4 (2010), pp 493-548, pp 501-508, which refers further to a third type, i.e., "settlement-only proceedings," which permit parties to a mass dispute to create a collective for settlement purposes only.

collective proceeding is relatively uncontroversial in the context of court proceedings, where courts can simply apply pre-existing rules of procedure regarding joinder, intervention or consolidation to create the necessary procedure, the situation is more delicate in the context of arbitration. Although certain principles and mechanisms have developed through the concept of "multiparty and multicontract arbitrations," typically involving a handful of parties, many issues remain where the number of parties reaches the "mass" level.

484. The Tribunal will refrain from trying to identify and give a name to further sub-categories in order to avoid endless discussions over the correct terminologies. Suffice is to say that although various legal systems have developed certain types of collective proceedings, their scope, modalities and effects remain different from one jurisdiction to another, and that there is, as of today, no harmonized approach towards such collective proceedings. Nevertheless, it appears that all these various forms of collective proceedings share a common "raison d'être": Collective proceedings emerged where they constituted the only way to ensure an effective remedy in protection of a substantive right provided by contract or law; in other words, collective proceedings were seen as necessary, where the absence of such mechanism would *de facto* have resulted in depriving the claimants of their substantive rights due to the lack of appropriate mechanism.[177]

485. The issues raised by the development of collective proceedings are manifold and depend on the type of collective proceedings. In the context of arbitration, these issues arise in slightly different terms and focus mainly around the following problems: Representative proceedings raise issues relating to consent, especially for those who subscribe to a view of arbitration that requires the parties' explicit

---

[177]   See STARCK, *op. cit.* fn.176, pp 183-212, pp 195-196.

consent not only to arbitration of the dispute but also to the procedure to be used in the arbitration. In contrast, aggregate proceedings raise issues of a more technical nature, in particular the question whether ordering the parties to proceed collectively is within the scope of the Tribunal's discretion and authority.

486.  Looking at the way the present arbitration was initiated, the present proceedings appear to be aggregate proceedings, in which each individual Claimant is aware of and consented to the ICSID arbitration. As such, the present proceedings cannot be compared to US class-actions, in which a representative initiates a proceeding in the name of a class composed of an undetermined number of unidentified claimants. In the present arbitration, the number of Claimants is established and so is their identity.

487.  However, one cannot ignore that some features of the present proceedings, in particular the way it is conducted, resemble representative actions: Although Claimants made the individual and conscious choice of participating to the arbitration, their participation is thereafter limited to a passive participation in the sense that a third party, TFA, represents their interests and makes on their behalf all the decisions relating to the conduct of the proceedings. The high number of Claimants further makes it impossible for the representative to take into account individual interests of individual Claimants, and rather limits the proceedings to the defense of interests common to the entire group of Claimants.

488.  In summary, the present proceedings seem to be a sort of a hybrid kind of collective proceedings, in the sense that it starts as aggregate proceedings, but then continues with features similar to representative proceedings due to the high number of Claimants involved.

489.  *(ii) "Mass" Aspect and Consent.*  As mentioned above (see §§ 453-455 and § 474), both Parties have consented to ICSID arbitration as dispute resolution method for disputes arising out of the BIT. The only remaining question is whether a specific

consent regarding the specific conditions in which the present arbitration would be conducted is required, i.e., regarding the form of collective proceedings.

490. This question led the Tribunal to the conclusion that the answer should be in the negative, mainly for the following reasons:

- Assuming that the Tribunal has jurisdiction over the claims of several individual Claimants, it is difficult to conceive why and how the Tribunal could loose such jurisdiction where the number of Claimants outgrows a certain threshold.  First of all, what is the relevant threshold ? And second, can the Tribunal really 'loose' a jurisdiction it has when looking at Claimants individually ?

- In addition, the collective nature of the present proceeding derives primarily from the nature of the investment made. The ICSID Convention aims at promoting and protecting investments, without however further defining the concept of investment and leaving this task to the parties through relevant instruments such as BITs (see §§ 257 and 362 *et seq.* above). Thus, where the BIT covers investments, such as bonds, which are susceptible of involving in the context of the same investment a high number of investors, and where such investments require a collective relief in order to provide effective protection to such investment, it would be contrary to the purpose of the BIT and to the spirit of ICSID, to require in addition to the consent to ICSID arbitration in general, a supplementary express consent to the form of such arbitration. In such cases, consent to ICSID arbitration must be considered to cover the form of arbitration necessary to give efficient protection and remedy to the investors and their investments, including arbitration in the form of collective proceedings.

491. Thus, with regard to the "mass" aspect of the present proceedings, the Tribunal considers that the relevant question is not "has Argentina consented to the mass

proceedings?", but rather "can an ICSID arbitration be conducted in the form of 'mass proceedings' considering that this would require an adaptation and/or modification by the Tribunal of certain procedural rules provided for under the current ICSID framework?" If the answer is in the affirmative, then Argentina's consent to ICSID arbitration includes such mass aspect. If the answer is in the negative, then ICSID arbitration is not possible, not because Argentina did not consent thereto but because mass claims as the ones at stake are not possible under the current ICSID framework.

492. **Consequently**, the Tribunal is of the opinion that the "mass" aspect of the present proceedings relates to the modalities and implementation of the ICSID proceedings and not to the question whether Respondent consented to ICSID arbitration. Therefore, it relates to the question of admissibility and not to the question of jurisdiction. It will thus be addressed below when dealing with admissibility issues (see §§ 515 *et seq.* below).

(iv)   Regarding the Negotiation and 18 Months Litigation Requirement

493. Respondent argues that the requirement of negotiation and litigation set forth in Articles 8(1) and 8(2) are of such a nature and importance that they constitute an essential part of and motive for Respondent's consent to ICSID arbitration. In other words, Respondent contends that it would not have consented to ICSID arbitration if such arbitration had not been made conditional upon the implementation of a prior mechanism of negotiation and 18 months litigation.

494. The present issue comes down to the following question: What is conditional? Respondent's consent to ICSID jurisdiction or the implementation of such consent in a case as the present one? Indeed, there is a difference between conditioning its consent to ICSID jurisdiction to the fulfilment of a pre-condition, and conditioning the effective implementation of such consent, i.e., the possibility to resort to ICSID arbitration, to the fulfilment of such a pre-condition.

495.  In the case at hand, the question is not as much "has Argentina consented to ICSID jurisdiction?"  This would make little sense in the light of Argentina´s adherence to the Washington Convention and its acceptance of ICSID arbitration under Article 8 BIT for the present type of dispute (see § 474 above). The question is rather "under what circumstances will ICSID arbitration be possible under the terms of Argentina's consent?"

496.  The Tribunal is of the opinion that the negotiation and 18 months litigation requirements relate to the conditions for implementation of Argentina's consent to ICSID jurisdiction and arbitration, and not the fundamental question of whether Argentina consented to ICSID jurisdiction and arbitration. Thus, any non-compliance with such requirements may not lead to a lack of ICSID jurisdiction, and only – if at all – to a lack of admissibility of the claim, and will thus be addressed when dealing with issues of admissibility (see §§ 567 *et seq.* below).

(v)   Regarding the Forum Selection Clauses

497.  Respondent further argues that the introduction of forum selection clauses in the relevant bond documents is to be interpreted as an exclusion of consent to ICSID arbitration for disputes deriving from such bonds.

498.  The Tribunal cannot follow Respondent in this respect as it conflates contract claims and treaty claims. As explained above (see §§ 316 *et seq.*), even though Claimants claims relate to the bonds, they are based on alleged breaches by Argentina of the BIT and not on contractual rights provided to Claimants under the bond documents. The forum selection clauses apply only to claims based on contractual rights, and may not affect treaty claims, which the bond documents did neither anticipate nor deal with.

499.  Consequently, the presence of forum selection clauses in the contractual bond documents is irrelevant for the assessment of the existence and/or validity of Argentina's consent to ICSID arbitration.

(d)   *Conclusion*

500.   In conclusion and in (partial) response to Issues Nos. 1(a), 4 and 8, the Tribunal finds that Argentina validly consented to submit the present dispute to ICSID jurisdiction and arbitration. In particular:

(i)    The fact that the present dispute relates to foreign debt restructuring is *per se* irrelevant to the determination of Argentina's consent to ICSID arbitration;

(ii)   Argentina's consent to ICSID jurisdiction includes claims presented by multiple Claimants to the extent that such claims are admissible under the ICSID framework;

(iii)  The negotiation and litigation requirement provided in Articles 8(1) and (2) of the BIT does not condition Argentina's consent to ICSID jurisdiction and arbitration, and merely relates to the circumstances under which such consent is to be given full effect and be implemented;

(iv)   The presence of forum selection clauses in the contractual bond documents are irrelevant to the determination of Argentina's consent to ICSID arbitration.

**(7)   Conclusion on Jurisdiction**

501.   Based on the above considerations, the Tribunal concludes that it has jurisdiction over the present claims as follows:

(i)    The claims at stake are treaty claims in nature and fall under the scope of the BIT and therewith under the jurisdiction *ratione materiae* of the Tribunal (see §§ 331-332 above). In particular:

-      The allegations of Claimants and the facts on which these allegations are based are susceptible of constituting a violation of provisions of the

BIT and establish the Tribunal's jurisdiction with regard to the present claims;

-   The claims brought forward by Claimants are not pure contractual claims but treaty claims based on acts of Argentina, a sovereign, which Claimants allege are in breach of Argentina's obligations under the BIT;

-   If third parties, in particular the Italian banks, have breached any of their own obligations towards Argentina and/or the Claimants, redress can be sought by either Argentina and/or Claimants against these banks under the remedies provided for in the relevant contractual bond documents or in the applicable statutory laws and/or regulations concering purchase and sale of securities. Such liability, however, does not seem to derive from the BIT and would therefore in principle have no place in the present proceedings;

-   Under these circumstances, the Tribunal considers that it is not necessary anymore to examine Issue No. 6, i.e., whether the Tribunal may also have jurisdiction based on the Umbrella Clause of the Argentina-Chile BIT in connection with the MFN Clause of the Argentina-Italy BIT. To the extent that the Tribunal's jurisdiction already derives from the treaty nature of the claims at stake, the question of the interaction between the Umbrella Clause of the Argentina-Chile BIT and the MFN Clause of the Agrentina-Italy BIT becomes moot.

(ii)   The present dispute arises out of an investment pursuant to Article 1 BIT and Article 25(1) ICSID Convention (see § 387 above). In particular:

-   According to one view, the "double-barrelled" test developed with regard to the concept of "investment" does not mean that the definition

196

of investment provided by two States in a BIT has to fit into the definition deriving from the spirit of the ICSID Convention. Rather, arguably, it is the investment at stake that has to fit into both of these concepts, knowing that each of them focuses on another aspect of the investment;

- In any event, the relevant bonds and Claimants' security entitlements therein are both to be considered "investments" pursuant to Article 1(1) lit. (c) BIT;

- If needed to be applied, Claimants' purchase of security entitlements in Argentinean bonds constitute a contribution which qualifies as "investment" under Article 25 ICSID Convention;

- The relevant bonds and Claimants' security entitlements therein are both to be considered made "in compliance with the laws and regulations of [Argentina]" pursuant to Article 1(1) BIT;

- The bonds and Claimants' security entitlements therein are both to be considered "made in the territory of Argentina."

(iii) With regard to the jurisdiction *rationae personae* and without making a determination with respect to any individual Claimant (see § 422 above), the Tribunal has jurisdiction *rationae personae* pursuant to Article 1(2) of the Argentina-Italy BIT, its Additional Protocol and Article 25 ICSID Convention, over each Claimant:

- **who is a natural person** and who is ultimately found:

    • to have had Italian nationality on 14 September 2006 and 7 February 2007;

197

- not to also have had Argentinean nationality on either of such dates;

- not to have been domiciled in the Argentine Republic for more than two years prior to making the investment;

- to have been an investor as of the date of alleged breach by Argentina of its treaty obligations.

- **who is a juridical person** and who is ultimately found to have had the Italian nationality on 14 September 2006, meaning that it:

- was on such date constituted in compliance with the legislation of Italy;

- had its *siège social* in the territory of Italy; and

- was recognized by Italian law in the sense that it had the civil capacity to make an investment under the BIT and to litigate in its own name, without necessarily having full legal personality.

(iv) The way in which Claimants consented to the ICSID arbitration through the relevant documents contained in the TFA Mandate Package is – as a matter of principle – valid (see § 466 above). In particular:

- Based on the general circumstances leading to the execution of the documents embodying Claimants' consents, in particular the Declaration of Consent and the Power of Attorney, there is at this stage no indication that such execution would have been achieved based on fraud, coercion or essential mistake vitiating Claimants' consent;

- Whether or not such fraud, coercion or mistake may exist with regard to individual Claimants based on the specific circumstances of the

individual case remains open and will be addressed, to the extent necessary and appropriate, when dealing with issues concerning individual Claimants;

- Questions regarding TFA's specific role and relevance, as well as issues relating to conflict of interests or breach of professional obligations by White & Case are issues relating to the admissibility of the proceedings, and not to the validity of Claimants' consent. They will be addressed, to the extent necessary and appropriate, when dealing with the issue of admissibility (see § 642 *et seq.* below).

(v) Argentina validly consented to submit the present dispute to ICSID jurisdiction and arbitration (see § 500 above). In particular:

- The fact that the present dispute relates to foreign debt restructuring is *per se* irrelevant to the determination of Argentina's consent to ICSID arbitration;

- Argentina's consent to ICSID jurisdiction includes claims presented by multiple Claimants to the extent that such claims are admissible under the ICSID framework;

- The negotiation and litigation requirement provided in Articles 8(1) and (2) of the BIT does not condition Argentina's consent to ICSID jurisdiction and arbitration, and merely relates to the circumstances under which such consent it to be given full effect and implemented;

- The presence of forum selection clauses in the contractual bond documents are irrelevant to the determination of Argentina's consent to ICSID arbitration.

502. **Consequently**, with regard to the relevant issues set forth in the List of 11 Issues of 9 May 2008, the Tribunal finds as follows:

(i)    **Issue 1(a)**: Argentina's consent to the jurisdiction of the Centre includes claims presented by multiple Claimants in a single proceeding;

(ii)   **Issue 2(a)**: The Declaration of Consent signed by the individual Claimants submitted in this proceeding is in principle valid, whereby the potential existence of a fraud, coercion or essential mistake invalidating the consent of a specific individual Claimant based on the specific circumstances of the individual case remains open and will be dealt with in a later stage of the proceedings;

(iii)  **Issue 5**: The MFN clause has no consequences on the ICSID's jurisdiction and the Tribunal's competence;

(iv)   **Issue 6**: Whether the Tribunal may also have jurisdiction based on the Umbrella Clause of the Argentina-Chile BIT in connection with the MFN Clause of the Argentina-Italy BIT is irrelevant to the extent that the Tribunal's jurisdiction already derives from the treaty nature of the claims at stake;

(v)    **Issue 7**: Claimants' claims are to be considered Treaty Claims arising out of the BIT and therewith fall under the jurisdiction *ratione materiae* of the Tribunal;

(vi)   **Issue 8**: The presence of forum selection clauses referring to national courts in the bond documents do not apply to Treaty Claims and do thereby not affect the Tribunal's jurisdiction over such Treaty Claims;

(vii)  **Issue 9**: The bonds in question, and in particular the security entitlements held by Claimants in these bonds, qualify as "Investment" under Article 1(1) BIT made "in the territory of Argentina" and "in compliance with the laws and regulations of Argentina";

(viii) **Issue 10**: The Tribunal has jurisdiction *rationae personae* over each Claimant who is a natural person to the extent set forth above in § (7) (iii);

(ix) **Issue 11**: The Tribunal has jurisdiction *rationae personae* over each Claimant who is a juridical person to the extent set forth above in § (7) (iii).

503. The remaining Issues 1(b), 2(b), 3(a), 3(b), 4 and 5 are issues of admissibility and will be dealt with in the section below.

### D.  ADMISSIBILITY OF THE CLAIM

### (1)  Introductory Remarks

504. In section C above, the Tribunal has established that it has – as a matter of principle and without making a determination with respect to any individual Claimants – jurisdiction over the present dispute. However, in order for the Tribunal to hear the present case, it is further necessary that the claims raised by Claimants be admissible.

505. As mentioned above (see §§ 245 *et seq.*), the difference between jurisdictional and admissibility issues is not always clear. Consequently, some of the issues addressed in this section may have been invoked by the Parties within the context of the Tribunal's jurisdiction. However, the Tribunal considers that these issues are not matters of jurisdiction but of admissibility. Where this applies, any argument raised by the Parties with regard to these issues and aiming to establish a lack of jurisdiction is addressed below as an argument of lack of admissibility.

### (2)  Mass Action – Issue 1(b)

#### (a)  Issues and Relevant Legal Provisions

506. Although the Tribunal considers that the "mass" aspect is not a hurdle to its jurisdiction, it must further examine whether this "mass" aspect is – as it is a point of dispute between the Parties – admissible under the current ICSID framework.

507.  Thus, the specific issues to be determined by the Tribunal here are the following:

-   Is a "mass action" like the present one compatible with the current ICSID framework and spirit, also giving due regard to the existing framework for sovereign debt restructuring?

-   If so, what are the procedural adaptations that the Tribunal would need to implement in order to make such a "mass action" workable in an ICSID arbitration. In particular:

    (i)   With regard to admissibility requirements, should the Tribunal refer to principles applicable to "class actions" and other aggregate litigations as known under certain legal regimes?

    (ii)  With regard to modalities of the procedure, may the Tribunal limit procedural rights of one Party where such limitation is necessary to ensure the other Party's procedural rights?

-   Are such adaptations covered by the Tribunal's power to decide on procedural issues?

508.  The key legal provisions in dealing with the above issues are the following: Article 44 ICSID Convention and Rule 19 ICSID Arbitration Rules.

509.  Article 44 ICSID Convention provides as follows:

> "Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question."

510.  Article 19 ICSID Arbitration Rules provides as follows:

"The Tribunal shall make the orders required for the conduct of the proceeding."

(b)   *Parties' Positions*

511. Respondent contends that mass proceedings as the present one are not admissible under the current ICSID framework. To support its position, Respondent brings forward the following main arguments:[178]

(i)   The ICSID framework does not provide and does not allow mass claims. Article 44 ICSID Convention simply permits the Tribunal to decide procedural questions with respect to matters over which it already has jurisdiction. It does not provide a basis for the Tribunal to exercise jurisdiction over proceedings that are not authorized by the ICSID Convention and to which the parties did not consent in the relevant BIT;

(ii)   The present mass action cannot be compared to a multi-party arbitration, and resembles more a type of class action. Even if such mass claim was considered allowed under the current ICSID framework, the way this arbitration was initiated and conducted is not in compliance with generally recognized principles applicable to class actions and similar collective proceedings (e.g., regarding the role and position of the representative);

(iii)   Such mass claim proceedings are unmanageable because individualized facts and circumstances are relevant not only for the merits but also for the jurisdiction (e.g., whether the specific investment was made in accordance with applicable laws, whether the Claimants' signature are all authentic, etc.) and could not be duly ascertained.

_____

[178]   See R-MJ §§  138 *et seq.*, 154 *et seq.*, 264; R-R-MJ §§ 159 *et seq.*, 178 *et seq.*, 184 *et seq.*; R-PHB §§ 22 *et seq.*

512. In addition, Respondent contends that the opening of ICSID arbitration with regard to sovereign debt restructuring would be counter-productive in so far as it would encourage hold outs.[179] As such, it would go against current efforts to modernize foreign debt restructuring processes. Consequently, in order to preserve the efficiency of foreign debt restructuring mechanisms, the Tribunal should deem the present claims inadmissible.

513. In contrast, Claimants contend that the present mass proceedings are within the jurisdictional limits of ICSID, the question of its management being a question of mere procedure covered by Article 44 ICSID Convention and thereby within the power of the Tribunal. Claimants' main arguments are as follows:[180]

(i) This proceeding is not different from any other multi-party arbitration, the only particularity being the unusually high number of Claimants. Multi-party proceedings are widely admitted under current ICSID arbitration practice, and since the ICSID framework contains no limitation on the number of possible parties, there is no reason to treat this claim differently from any other multi-party arbitration;

(ii) Collective proceedings are further consistent with the purpose and object of the BIT, since the high number of Claimants is inherent to the nature of the investments protected by the BIT (see § 490 above);

(iii) The present claims are proper and manageable: (a) Claimants are from a single jurisdiction, they have identical claims arising out of the same State measures under the same BIT and stand in an identical posture vis-à-vis Respondent; (b) the individual facts and issues detailed by Respondent (i.e.,

---

[179]   R-MJ §§ 62.

[180]   C-MJ §§ 313 *et seq.*, 333 *et seq.*, 350 *et seq.*; C-R-MJ §§ 316 *et seq.*, C-PHB §§ 125 *et seq.*, §§ 190 *et seq.*

the individual circumstances of the purchase of the bonds) are not material to the Tribunal's core task of determining whether a specific set of actions taken by Argentina constituted a violation of the BIT; (c)  Argentina's due process rights would not be infringed; and (d) the Tribunal is well-equipped to adopt procedures to handle the claims under Article 44 ICSID Convention. Consequently, it is only just and efficient to hear these cases jointly.

514.  With regard to the policy argument raised by Respondent, Claimants contend that Respondent's view is outdated and irrelevant. The major threat to the efficiency of foreign debt restructuring would be rogue debtors, such as Argentina. Consequently, opening the door to ICSID arbitration would create a supplementary leverage against such rogue debtors and therefore be beneficial to the efficiency of foreign debt restructuring.

(c)    *Tribunal's Findings*

515.  As mentioned above (see §§ 489-492), the Tribunal finds that the issue of whether or not the present mass proceedings could be conducted in the form of collective proceedings is an issue of admissibility and not of consent.

516.  To recall, Respondent contends that arbitration in the form of collective proceedings is not provided for by ICSID, that this silence is a "qualified silence" that should be interpreted to mean that collective arbitration is not possible and not admissible under the current ICSID framework, and in particular that the Tribunal cannot rely on Article 44 ICSID Convention or Rule 19 ICSID Arbitration Rules to create its own solution to the problems raised by the high number of Claimants.

517.  It is undisputed that the ICSID framework contains no reference to collective proceedings as a possible form of arbitration. The key question here is how to interpret this silence. In particular, the Tribunal is tasked with the assessment of whether this silence should be considered a "qualified silence," meaning an intended silence indicating that it does not allow for something that is not provided,

or whether it is to be considered a "gap," which was unintended and which the Tribunal has the power to fill. In the latter case, the Tribunal shall further determine whether the adaptations which would be needed to fill this gap, i.e., to manage the present proceedings, fall within the scope of its powers as deriving from Article 44 ICSID Convention and/or Rule 19 ICSID Arbitration Rules.

(i)     Interpretation of the Silence of the ICSID Framework

518.   As mentioned above (see §§ 489-492), the Tribunal finds that, in the light of the absence of a definition of investment in the ICSID Convention, where the BIT covers investments which are susceptible of involving a high number of investors, and where such investments require a collective relief in order to provide effective protection to such investment, it would be contrary to the purpose of the BIT, and to the spirit of ICSID, to require in addition to the consent to ICSID arbitration in general, a supplementary express consent to the form of such arbitration.

519.   For these same reasons and as further developed below, the Tribunal finds that it would be contrary to the purpose of the BIT and to the spirit of ICSID to interpret this silence as a "qualified silence" categorically prohibiting collective proceedings, just because it was not mentioned in the ICSID Convention:

-     First, at the time of conclusion of the ICSID Convention, collective proceedings were quasi inexistant, and although some discussions seem to have taken place with regard to multi-party arbitrations, these dicussions were not conclusive on the intention to either accept or refuse multi-party arbitrations, and even less so with regard to the admissibility of collective proceedings;

-     ICSID sets forth a standard arbitration mechanism. Insofar as investments can be of a varying nature and scope, it is possible that the current ICSID procedure may not be fully adapted to resolve a dispute arising out of any kind of investment. Indeed, where an investment, protected under a BIT

providing for ICSID arbitration, shows certain particular characteristics, these characteristics may influence the way of conducting the arbitration, and lead the Tribunal to make certain adaptations to the standard procedure in order to give effect to the choice of ICSID arbitration. The need for certain adaptations to the standard ICSID arbitration procedure merley derives from the impossibility to anticipate all kinds of possible investments and disputes, and is certainly not a sufficient motive to simply close the door of ICSID arbitration to investors who are not "standard investors" having made "standard investments." However, it is understood that adaptations made to the standard procedure must be done in consideration of the general principle of due process and must seek a balance between procedural rights and interests of each party.

520.   Thus, the silence of the ICSID framework regarding collective proceedings is to be interpreted as a "gap" and not as a "qualified silence." Consequently, the Tribunal has, in principle, the power under Article 44 ICSID Convention to fill this gap. However, this does not mean that the scope of this power is unlimited. Rather, the Tribunal is bound by the limits set forth by Article 44 ICSID Convention.

(ii)   Powers of the Arbitral Tribunal under Article 44 ICSID
Convention and Rule 19 ICSID Arbitration Rules

521.   As mentioned above (see § 509), Article 44 ICSID Convention provides that where the ICSID framework is silent on a procedural question, which is also not subject to the parties' agreement, the Tribunal shall decide the question. Within the context of arbitration proceedings, this rule is further complemented by Rule 19 ICSID Arbitration Rules, according to which "the Tribunal shall make the orders required

for the proceeding." These provisions are the mere expression of the inherent power of any tribunal to resolve procedural questions in the event of lacunae.[181]

522. As a matter of principle, the power of a tribunal is limited to the filling of gaps left by the ICSID Convention and the Arbitration Rules. In contrast, a modification of existing rules can only be effected subject to the parties' agreement, in accordance with minimum standards of fair procedure and to the extent that the rules to be modified are not mandatory (in the sense that they restate mandatory provisions of the Convention).[182]

523. A tribunal's power is further limited to the filling of gaps left by the ICSID framework in the specific proceedings at hand, and a tribunal's role is not to complete or improve the ICSID framework in general.  As such, a tribunal's power to fill gaps will usually be limited to the design of specific rules to deal with specific problems arising in the proceedings at hand.

524. Considering the above, the Tribunal cannot:

- modify the current arbitration rules without the Parties' consent. A revision of the ICSID Arbitration Rules can only be done by the Administrative Council, which is the body competent to adopt the Arbitration Rules under Article 6(1)(c) ICSID Convention; or

- adopt a full set of rules of procedure unless the Parties have agreed that the Arbitration Rules adopted by the Administrative Council should not apply without substituting their own rules.

---

[181]    See e.g. SCHREUER, *op. cit.* fn. 98, Ad Article 44 § 54.

[182]    See e.g. SCHREUER, *op. cit.* fn. 98, Ad Article 44 §§ 20 *et seq*.

525. The Tribunal, however, can and ought to fill gaps left where the application of existing rules are not adapted to the specific dispute submitted to ICSID arbitration. In such a case, the filling of the gap does not consist of an amendment of the written rule itself, but rather of an adaptation of its application in a specific case.

526. As mentioned above (see §§ 518-520), the Tribunal finds that the silence of the ICSID Convention concerning collective proceedings is to be seen as a "gap." As such, the Tribunal has, in principle, the power to fill this gap. The key question at hand thus, is the following:

> **Can the Tribunal fill the gap created by the collective aspect of the claim on an *ad hoc* basis and through the design of specific rules, or would this require the creation and/or modification of general rules which are under the competence of the Administrative Council?**

527. This question cannot (and should not) be answered in the abstract. Not only would this imply creating general principles thereby relying on a terminology, which is as diverse and varied as the currently existing forms and modalities of collective proceedings, but it would also go beyond the powers of the Tribunal to fill a specific gap regarding the conduct of specific proceedings. What the Tribunal however can (and should) do is to analyse this question in a concrete manner, i.e., asking itself (i) what are the specific rules that would be necessary in order to be able to conduct the present proceedings under the ICSID framework, and (ii) can these specific rules, in the light of their nature and scope, be considered to fall within the power of the Tribunal as deriving from Article 44 ICSID Convention and Rule 19 ICSID Arbitration Rules.

528. When answering these questions, the Tribunal shall, in accordance with the principles of interpretation of treaties, not only ask itself whether, from a technical perspective, it can make such adaptations, but also whether, based on the object and purpose of the ICSID Convention, it should do so.

(iii)   Nature of the Necessary Adaptations to the ICSID Standard
        Procedure

529. Notwithstanding the high number of Claimants involved, the Tribunal must
examine not only the elements necessary to determine its jurisdiction (i.e., the
nationality of the Claimants, their status of investor and the existence of their
investment, etc.), but also those necessary to establish Claimants' claims and
relating to the merits of the case (i.e., the existence of a breach by Argentina of its
obligations under the BIT, the effect of such breach on Claimants' investment,
etc.). Thus, the high number of Claimants may not serve as an excuse not to
examine such elements and adaptations to the procedure may therefore not affect
the object of the Tribunal's examination.

530. However, it appears that adaptations to hear the present case collectively would
concern not that much the object of the examination, but rather (i) the way the
Tribunal will conduct such examination, and/or (ii) the way Claimants are
represented.

531. With regard to the examination, it is undeniable that the Tribunal will not be in a
position to examine all elements and related documents in the same way as if there
were only a handful of Claimants. In this respect, the Tribunal would need to
implement mechanisms allowing a simplified verification of evidentiary material,
while this simplification can concern either the depth of examination of a document
(e.g. accepting a scanned copy of an ID document instead of an original), or the
number of evidentiary documents to be examined, and if so their selection process
(i.e. random selection of samples instead of a serial examination of each document)
(see §§ 668 *et seq*. below). However, such a simplification of the examination
process is to be distinguished from the failure to proceed with such examination.

532. With regard to the mechanism of representation, it is true that TFA has been
provided with powers which may go beyond the power granted to a normal agent
under Rule 18 ICSID Arbitration Rules (see §§ 455 *et seq*. above). Admitting the

present collective proceedings would thus also mean accepting TFA's role as due representative of Claimants.

533.  **In conclusion**, the procedure necessary to deal with the collective aspect of the present proceedings concerns the method of the Tribunal's examination, as well as the manner of representation of Claimants. However, it does not affect the object of such examination. Further, the Tribunal remains obliged to examine all relevant aspects of the claims relating to Claimants' rights under the BIT as well as to Respondent's obligations thereunder subject to the Parties' submissions.  Thus, it is the manner in which the Tribunal will conduct such examination which may diverge from usual ICSID proceedings.

<div align="center">(iv)   <u>Admissibility of the Necessary Adaptations</u></div>

534.  Considering the above (§§ 529-533), the adaptations required to deal with the collective aspect of the claims are issues which relate strictly to the manner of conducting the present proceedings, and in particular, how to collect and weigh evidence. In other words, the nature of these measures and their scope do not exceed the powers of the Tribunal as deriving from Article 44 ICSID Convention and Rule 19 ICSID Arbitration Rules.

535.  The Tribunal is entitled to proceed with such adaptations under the relevant provisions of the ICSID framework. As mentioned above (see § 528), the Tribunal is, however, of the opinion that it should not only examine whether it can do so but also whether it should do so based on the aim and purpose of the ICSID Convention and in particular, with regard to the equilibrium established by the Convention with regard to the Parties' respective rights.

536.  For this purpose, the Tribunal will firstly examine the implications of the intended adaptations. These implications are twofold: (i) It will not be possible to treat each Claimant as if he/she was alone and certain issues, such as the existence of an expropriation, will have to be examined collectively, i.e., as a group; and (ii) the

<div align="center">211</div>

implications will likely limit certain of Claimants' and Argentina's procedural rights to the extent that Claimants have to waive individual interests in favor of common interests of the entire group of Claimants, while Argentina will not be able to bring arguments in full length and detail concerning the individual situation of each of the Claimants.

537. The Tribunal finds it appropriate to compare the consequences of these implications to the consequences of rejecting the claims for lack of admissibility and requesting each Claimant to file an individual ICSID claim. In this regard, the Tribunal finds that not only would it be cost prohibitive for many Claimants to file individual claims but it would also be practically impossible for ICSID to deal separately with 60,000 individual arbitrations. Thus, the rejection of the admissibility of the present claims may equal a denial of justice. This would be shocking given that the investment at stake is protected under the BIT, which expressly provides for ICSID jurisdiction and arbitration.

538. Thus, the question arises whether in the light of the present circumstances it would be justified to set strict boundaries to certain of the Parties' procedural rights, while adapting a method of examination so as to give actual effective protection to the investment. The challenge lies in finding the right balance.

539. In the search for the right balance, the Tribunal considers the following issues to be relevant: (i) under what conditions is it acceptable to change the method of examination from individual to group treatment; (ii) to what extent are Argentina's defense rights affected in comparison to 60,000 separate proceedings; and (iii) is it admissible to deprive Claimants of certain procedural rights, such as provided for under the TFA Mandate Package?

540. *(i)*    *Pre-conditions for group treatment*: The Tribunal is of the opinion that group examination of claims is acceptable where claims raised by a multitude of claimants are to be considered identical or at least sufficiently homogeneous. The

question is thus whether Claimants' claims are to be considered identical or sufficiently homogeneous.

541.  In this respect, it is important to recall that the present proceedings concern only potential treaty claims and do not deal with any contractual claims Claimants may have against Argentina and/or the banks (see §§ 316-332 above). Thus, the identity or homogeneity requirement applies to the investment and the rights and obligations deriving therefrom based on the BIT and not to any potential contractual claims. In other words, in the present case, it is irrelevant whether Claimants have or do not have homogeneous contractual rights to repayment by Argentina of the amount paid for the purchase of the security entitlements. The only relevant question is whether Claimants have homogeneous rights of compensation for a homogeneous damage caused to them by potential homogeneous breaches by Argentina of homogeneous obligations provided for in the BIT.

542.  Therefore, the specific circumstances surrounding individual purchases by Claimants of security entitlements are irrelevant. If Italian or other banks have breached any obligations they had towards Claimants or Argentina, such a breach is to be addressed in a recourse action against the relevant banks (see §§ 327-330 above) and is foreign and external to the present arbitration which concerns solely Argentina's behavior with regard to Claimants' investment.

543.  With regard to the nature of the claims deriving from the BIT, it appears to be homogeneous:

-       The rights deriving from Claimants' investment and Argentina's obligations to protect these rights are the same with regard to all Claimants to the extent that they derive from the same BIT and the same provisions. Indeed, first, the provisions of the BIT invoked by Claimants are identical for all Claimants; second, the rights allegedly affected all derive from Claimants' purchase in

Italy of security entitlements in Argentinean bonds; third, all these security entitlements were subject to the Exchange Offer 2005 (see § 312 above);

- The events leading to the alleged disregard of such rights and obligations, i.e. to the breach by Argentina of the relevant provisions, are the same towards all Claimants. They all relate to the acts of Argentina preceding and following its public default in December 2001, and in particular the way it consulted with its creditors, the way it reached a decision on how to deal with its foreign debt, as well as the way it implemented such decision, namely through its Exchange Offer 2005 and the legislation and regulations relating thereto. In doing so Argentina treated all Claimants in the same manner and did not differentiate between different kinds of Claimants (see § 313 above).

- The legislation and regulations promulgated and implemented by Argengina, together with the implementation of its Exchange Offer 2005, affected all Claimants in the same way. Thus, the potential damage caused to Claimants is, by nature the same for all Claimants although the scope of such damage will of course depend on the scope of their individual investment.

544. Consequently, Claimants' claims are to be considered sufficiently homogeneous to justify a simplification of the examination method and procedure.

545. *(ii)   Effects on Argentina's defense rights*: It appears that the effect of such examination method and procedure on Argentina's defense rights is limited and relative. Whilst it is true that Argentina may not be able to enter into full length and detail into the individual circumstances of each Claimant, it is not certain that such approach is at all necessary to protect Argentina's procedural rights in the light of the homogeneity of Claimants' claims. In addition, the only alternative would be to conduct 60,000 separate proceedings. The measures that Argentina would need to take to face 60,000 proceedings would be a much bigger challenge to Argentina's

effective defense rights than a mere limitation of its right to individual treatment of homogeneous claims in the present proceedings.

546. *(iii)   Deprivation of Claimants' procedural rights*: It is undeniable that the TFA Mandate Package has the effect to depriving Claimants of a substantial part of their procedural rights, such as the decision on how to conduct the proceedings, the right to instruct the lawyers, etc. However, as mentioned above (see §§ 457-465), the setting of strict boundaries in relation to Claimants' procedural rights has been consciously accepted by Claimants in order to benefit from the collective treatment of their claims before an ICSID tribunal. In addition, the Tribunal did not find that such agreement was affected by any vice which would render it invalid. Consequently, the Tribunal sees no reason to disregard – as a matter of principle – Claimants' conscious choice.

547. **In conclusion**, under the present circumstances, the procedure necessary to deal with Claimants' claims in a collective way is admissible and acceptable under Article 44 ICSID Convention, Rule 19 ICSID Arbitration Rules, as well as under the more general spirit, object and aim of the ICSID Convention.

(v)   Policy Considerations

548. To recall (see § 476 above), the Tribunal found that Respondent's arguments regarding the appropriateness of ICSID proceedings in the context of sovereign debt restructuring are not an impediment to the Respondent's consent to ICSID arbitration.

549. Similarly, the Tribunal finds that those policy arguments are also not an impediment to the admissibility of Claimants' claims. In the Tribunal's view, such policy arguments are inapposite. As mentioned above (§ 478), the real question is whether the investment at stake is protected under a BIT providing for ICSID arbitration in case of breach of such protection. If this is the case, then ICSID has jurisdiction, and it would be wrong to hinder the effective exercise of such

jurisdiction through the rejection of the admissibility of the claims based merely on policy considerations. This is all the more the case here as the present policy considerations are controversial and based on Respondent's assumption that the biggest threat to the stability and fairness of sovereign debt restructuring are holdout creditors.

550. Policy reasons are for States to take into account when negotiating BITs and consenting to ICSID jurisdiction in general, not for the Tribunal to take into account in order to repair an inappropriately negotiated or drafted BIT. The present BIT is clear, it includes bonds and security entitlements (see §§ 352-361 above). Whether or not ICSID is the best way to deal with a dispute relating to these bonds and security entitlements in the context of foreign debt restructuring is irrelevant. The Parties chose ICSID arbitration for this kind of dispute. They, as well as the Tribunal, are bound by such choice and cannot evade it based on controversial policy reasons.

(d)   Conclusion

551. In conclusion and in (partial) response to Issue No. 1(b), the Tribunal holds that the mass aspect of Claimants' claims does not constitute an impediment to their admissibility. In particular:

(i)    The silence of the ICSID framework regarding collective proceedings is to be interpreted as a "gap" and not as a "qualified silence;"

(ii)   The Tribunal has, in principle, the power under Article 44 ICSID Convention to fill this gap to the extent permitted under Article 44 ICSID Convention and Rule 19 ICSID Arbitration Rules;

(iii)  The procedure necessary to deal with the collective aspect of the present proceedings concern the method of the Tribunal's examination, as well as the manner of representation of Claimants. However, it does not affect the object of such examination. Thus, the Tribunal remains obliged to examine all

relevant aspects of the claims relating to Claimants' rights under the BIT as well as to Respondent's obligations thereunder subject to the Parties' submissions;

(iv)   Such procedure is admissible and acceptable under Article 44 ICSID Convention, Rule 19 ICSID Arbitration Rules, as well as under the more general spirit, object and aim of the ICSID Convention;

(v)   Respondent's policy arguments regarding the appropriateness of ICSID proceedings in the context of sovereign debt restructuring are irrelevant for the determination of the admissibility of the claims.

### (3)   Consultation Requirement – Issue 4

#### (a)   *Issues and Relevant Legal Provision*

552.   Article 8(1) BIT provides that the investor and the Host State shall in case of a dispute try first to settle their dispute through the means of amicable consultation. The Parties hold diverging views as to the nature of this consultation requirement and the consequence of a non-compliance therewith on the admissibility of the present claims.

553.   Thus, the specific issues to be determined by the Tribunal here are the following:

-   Is the requirement of preliminary amicable consultation a mandatory requirement, which constitute a hurdle to the admissibility of a claim introduced without fulfilling such requirement? (connected with Issue 4 of the List of 11 Issues of 9 May 2008)

-   If so, can the consultation requirement be considered to have been met in the present case?

-   If not, should Claimants be considered to have been released from such consultation requirement based on the futility rule?

554. The key legal provision concerning the above issues is Article 8(1) BIT, which in its unofficial English version provides as follows (see § 267 *et seq.* above):

> "1.   Any dispute in relation to the investments between a Contracting Party and an investor of the other Contracting Party in relation to the issues governed by this Agreement shall be settled, if possible, by means of amicable consultation between the parties to the dispute."

> (b)   *Parties' Positions*

555. In Respondent's view, Article 8 BIT articulates a multi-layered, sequential dispute resolution system setting forth mandatory requirements which Claimants have not complied with and therefore, constitute a jurisdictional bar.

556. In particular, Respondent submits that Article 8 provides for a mandatory three-step dispute resolution as further supported by the wording and spirit of Article 8(3) and 8(4) BIT.[183]

557. With regard to the consultation requirement, Respondent contends that Claimants have not complied therewith because (i) it is unclear  how far TFA actually represented Claimants at the time of the talks between TFA and Respondent, (ii) TFA's attitude was one of bad faith, and (iii) the talks with TFA concerned Argentina's default and not any alleged treaty violation.

558. In contrast, Claimants contend that Article 8 BIT may not constitute a bar to the present arbitration based mainly on the following arguments:[184]

(i)   Based on the permissive language used, Article 8 BIT aims to provide the parties with different options of dispute resolution and does not institute a compulsory multi-layered, sequential dispute resolution system;

---

[183]   R-MJ §§ 382 *et seq.*; R-R-MJ §§ 652 *et seq.*; R-PHB §§ 267 *et seq.*

[184]   C-MJ §§ 544 *et seq.*; C-R-MJ §§ 543 *et seq.*; C-PHB §§ 323 *et seq.*

(ii)   Even if the Tribunal considered that Article 8 instituted a mandatory multi-layered sequential dispute resolution system, Claimants have complied with the various requirements. With regard to the requirement of amicable consultation, Claimants have complied with this requirement through TFA and it is Argentina which refused to negotiate with TFA. In order to conduct adequate consultation talks in the sense of Article 8(1) BIT it is not necessary to identify the specific legal basis of the dispute during the consultations, but it is sufficient that the talks relate to the facts at the basis of the dispute;

(iii)   Any further attempt at consultation would have been futile in the light of the Emergency Law, which prohibits the Argentinean Government from entering into a settlement agreement.

### (c)   *Tribunal's Findings*

#### (i)   Existence of Consultations

559.   According to the Parties, after the announcement of Argentina's default, talks took place between TFA and the Argentinean Government and continued until 2005.[185] TFA conducted these talks in the name of Italian bondholders, who signed the TFA Negotiating Mandate with the aim to "represent the interests of the subscribers of Argentinean bonds in the frame of the restructuring of the debt, which will be subject to the consultation with the Argentinean Authorities or with other Argentinean issuers." [186]

560.   Thus, based on the wording of the TFA Negotiating Mandate, the object of the consultations to be conducted by TFA were not limited to contractual claims and encompassed all "interests" of the Italian bondholders in relation to the

---

[185]   See above § 84.

[186]   See above § 66.

restructuring of Argentina's debt. It further arises from the correspondence between TFA and the Argentinean authorities that TFA's complaints towards Argentina did not only focus on the mere non-payment of its debt by Argentina but also on the way Argentina was handling these issues through its restructuring plan and its attitude towards creditors. As such, TFA's talks with Argentina also encompassed the main facts on which Claimants based their present claims. For consultation talks to be conducted in accordance with Article 8(1) BIT, it is not necessary to identify or name specific legal issues. Rather, it is sufficient that the context of the dispute be the same as the context of the dispute brought forward under Article 8 BIT. Consequently, the talks conducted by TFA with the Argentine authorities can be considered talks aiming at a settlement of the present claims.

(ii)   TFA's Role in the Consultations

561.  The remaining question is whether TFA can be considered to have been representing Claimants during these talks. Indeed, it is not entirely clear how many of the Italian bondholders who signed the TFA Negotiating Mandate are also Claimants to the present arbitration. However, this question can remain open for the following reason: Whilst Argentina contends that it is unclear how far TFA actually represented Claimants at the time of the talks, Respondent did not contend having otherwise tried to contact Claimants to conduct separate talks.[187] Thus, although it may be unclear how many of the Claimants signed the TFA Negotiating Mandate, it is undeniable that TFA did represent to a certain extent the interests of some of the Italian bondholders and that Argentina could not have been unaware that a considerable number of Italian bondholders had not accepted its Exchange Offer and that a dispute had arisen in this respect. Thus, Argentina cannot allege that Claimants failed to fulfil the consultation requirement of Article 8(1) based on the

---

[187]   Respondent actually contends that "Argentina has no way of even knowing who such owners [of security entitlements] are," see Annex A to RSP PHB § 6.

denial of TFA's authorities without trying to engage in talks with such Italian bondholders or at least setting up conditions under which Argentina would recognize TFA's authority.

562. Under these circumstances, the Tribunal finds that Argentina is precluded from invoking a failure on Claimants' side to fulfil the consultation requirement under Article 8(1) BIT.

(iii)   Consultations Requirement as Expression of Good Will

563. In addition, even if it considered the present circumstances not sufficient to comply with the consultation requirement of Article 8(1) BIT, this would still not constitute a hurdle to the admissibility of Claimants' claims for the following reason:

564. In the view of the Tribunal, the consultation requirement set forth in Article 8(1) BIT is not to be considered of a mandatory nature but as the expression of the good will of the Parties to try firstly to settle any dispute in an amicable way:

- This derives first from the wording of Article 8(1) BIT which provides that consultations should be conducted "*en la medida del possible*" or "*per quanto possibile*," i.e., "to the extent possible." Indeed, Article 8(1) BIT is not drafted in any way as to impose the consultation requirements upon the Parties under any circumstances. It is only refers to the possibility of such amicable settlement talks, whereby such term is to be reasonably understood as referring not only to the technical possibility of settlemen talks, but also to the possibility, i.e. the likelihood, of a positive result.

- It also derives from the general purpose and aim of such provision, which is to allow amicable settlement where such settlement is wanted and supported by both Parties. Where one or both Parties did not have the good will to resort to consultation as an amicable means of settlement, it would be futile to force the Parties to enter into a consultation exercise which is deemed to fail from

the outset. Willingness to settle is the *sine qua non* condition for the success of any amicable settlement talk.

565.   As such, the Tribunal considers that a potential non-compliance with the consultation requirement set forth in Article 8(1) BIT would simply express that the premises for an amicable settlement were not given because one or both of the Parties were not willing to give the dispute an amicable end. As such, it could not be considered to constitute *per se* a hurdle to the admissibility of the claim, thereby preventing any other dispute resolution means provided in Article 8 BIT to come to play.

    *(d)*    *Conclusion*

566.   In conclusion and in (partial) response to Issue No. 4, the Tribunal holds that the prior consultation requirement set forth in Article 8(1) BIT does not constitute an impediment to the admissibility of Claimants' claims. In particular:

(i)   Consultations did take place between TFA, as representative of Italian bondholders, and Argentina;

(ii)   Argentina is precluded from invoking the non-fullfilment by Claimants of the consultation requirement; and

(iii)   Even if Claimants were considered not to have fulfilled this requirement, this non-compliance would simply express that the premises for an amicable settlement were not given and cannot be interpreted as constituting a hurdle to the admissibility of Claimants' claims.

**(4)**    **18 Months Litigation Requirement – Issues 4 & 5**

    *(a)*    *Issues and Relevant Legal Provisions*

567.   To recall, Article 8(2) BIT provides for a requirement to resort to local courts for a duration of 18 months in case the previously-conducted consultations have failed.

The Parties hold diverging views as to the nature of this litigation requirement and the consequence of a non-compliance therewith on the admissibility of the present claims.

568. On the basis of the Parties' submissions, the specific issues to be determined by the Tribunal in this regard are the following:

- Is the 18 months litigation requirement a mandatory prior prerequisite for the conduct of arbitration proceedings, the non-fulfillment of which constitutes a hurdle to the admissibility of a claim? (see Issue 4 of the List of 11 Issues of 9 May 2008)

- If so, can Claimants be considered to have been released from the 18 months litigation requirement, either

  • based on the futility rule or

  • based on the MFN clause of Article 3(1) BIT in connection with the "more favorable" arbitration clause contained in the Argentina-Chile BIT? (see Issues 4 and 5 of the List of 11 Issues of 9 May 2008).

569. The key legal provisions and other documents in dealing with the above issues are the following: Articles 3(1) and 8(2)-(4) BIT and Article 10 Argentina-Chile BIT.

570. The wording and content of Articles 3(1) and 8(1) to (4) BIT is reproduced above at §§ 305 and §§ 267 *et seq*.

571. Article 10 Argentina-Chile BIT provides as follows in its Spanish authentic version:

> "(1)   Toda controversia relativa a las inversiones en el sentido del presente Tratado, entre una Parte Contratante y un nacional o sociedad de la otra Parte Contratante será, en la medida de lo posible, solucionada por consultas amistosas entre las dos partes en la controversia.

(2)    Si la controversia no hubiera podido ser solucionada en el término de seis meses a partir del momento en que hubiera sido planteada por una u otra de las partes, será sometida, a pedido del nacional o sociedad.

--    o bien a jurisdicciones nacionales de la Parte Contratante implicada en la controversia;

--    o bien al arbitraje internacional en las condiciones descriptas en el párrafo 3.

Una vez que un nacional o sociedad haya sometido la controversia a las jurisdicciones de la Parte Contratante implicada o al arbitraje internacional, la elección de uno u otro de esos procedimientos será definitiva.

(3)    En caso de recurso al arbitraje internacional la controversia podrá ser llevada ante uno de los órganos de arbitraje designados a continuación a elección del nacional o sociedad;

Al Centro Internacional de Arreglo de Diferencias Relativas a inversiones (CIADI), creado por el "Convenio sobre Arreglo de Diferencias Relativas a las Inversiones sobre Estados y Nacionales de otros Estados", abierto a la firma en Washington el 18 de marzo de 1965, cuando cada Estado parte en el presente Convenio haya adherido a aquél. Mientras esta condición no se cumpla, cada Parte Contratante da su consentimiento para que la controversia sea sometida al arbitraje conforme con el Reglamento del Mecanismo Complementario del CIADI;

A un tribunal de arbitraje ad hoc establecido de acuerdo con las reglas de arbitraje de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional (CNUDMI)."

### (b)    *Parties' Positions*

572.  As mentioned above (see §§ 555 *et seq*.), Respondent contends that Article 8 BIT articulates a multi-layered, sequential dispute resolution system setting forth a three-step mandatory process which Claimants have not complied with and therefore, constitutes a jurisdictional bar. Accordingly to Respondent, this is in particular true with regard to the 18 months litigation requirement, which Claimants have not fulfilled.[188]

---

[188]    R-R-MJ §§ 661 *et seq*., 694 *et seq*.

573. Respondent further contends that the arguments invoked by Claimants in order to circumvent the 18 months litigation requirement are not convincing: [189]

   (i)   The mere argument that resort to domestic courts would involve time or money may not render such litigation "futile."

   (ii)  The Emergency Law does not prevent Claimants from submitting a dispute before the Argentinean courts under the BIT.

   (iii) Claimants may not invoke the MFN clause to circumvent the mandatory consultation requirement for the following reasons: (a) the MFN clause applies only to investments, not to dispute resolution mechanisms; (b) the MFN clause concerns only treatment "in the territory" of Argentina whereas arbitration is to be conducted abroad; (c) it cannot be stated that the resort to Argentinean courts is necessarily a "less favorable" treatment; and (d) even if the MFN clause operates to incorporate the dispute resolution clause under the Argentina-Chile BIT, Claimants have still failed to conduct adequate consultations so that the necessary requirements for arbitration under the Argentina-Chile BIT are not met either.

574. In contrast and as mentioned above (see § 558 above), Claimants contend that Article 8 BIT aims to provide the Parties with different options of dispute resolution and does not institute a compulsory multi-layered, sequential dispute resolution system. In other words, the 18 months litigation requirement is not a mandatory prior prerequisite for the initiation of arbitration proceedings and its non-compliance is therefore irrelevant.[190]

---

[189]   R-MJ §§ 387 *et seq.*; R-R-MJ §§ 661 *et seq.*, 694 *et seq.*; R-PHB §§ 267 *et seq.*

[190]   C-MJ §§ 544 *et seq.*; C-R-MJ §§ 543 *et seq.*; C-PHB §§ 323 *et seq.*

575. Even if considered a mandatory preliminary requirement, Claimants submit that they should be relieved from having to comply with such requirement for the following two main reasons: (i) because conducting litigation before the Argentine courts would have been futile and would have defeated the very object and purpose of the BIT, and (ii) even if not considered futile, Claimants would be exempted from any potential obligation to go before local courts based on the broad wording of the MFN clause of Article 3(1) BIT, which entitles Claimants to invoke the more favorable dispute resolution clause contained in the Argentina-Chile BIT and which does not require prior court litigation.[191]

   *(c)   Tribunal's Findings*

576. It is undisputed that Claimants did not submit their dispute to the Argentine courts before initiating the present arbitration. Thus, the first question is whether Claimants should have done so.

   (i)   The System Put in Place by Article 8 BIT

577. Article 8 BIT provides for three different types of dispute resolution means: amicable consultations (Article 8(1)), proceedings before the ordinary or administrative courts of the concerned State (Article 8(2)), and international arbitration (Article 8(3)). As to the relationship between these three mechanisms, the Tribunal finds that both the structure of Article 8 BIT as well as its wording indicate a certain order among these three means:

-   Article 8(1) establishes the core principle of amicable consultations as the first and foremost means of dispute settlement;

---

[191]   C-MJ §§ 557 *et seq.*, §§ 594 *et seq.*; C-R-MJ §§ 556 *et seq.*, §§ 643 *et seq.*; C-PHB §§ 330 *et seq.*, §§ 347 *et seq.*

- Article 8(2) then introduces the second means, i.e., the submission of the dispute to the ordinary or administrative courts, applicable under the following circumstance: "if the dispute has not been settled in such consultations." Thereby, the recourse to courts is linked to some extent to the absence or failure of amicable consultations;

- Article 8(3) then introduces the method of international arbitration whereby it is introduced within a specific context: "[i]f, after 18 months from the notification of commencement of an action before the national courts indicated above in paragraph 2, the dispute between the Contracting Party and the investors still continues to exist […]";

- Article 8(4) then provides that in case of commencement of arbitration proceedings, each disputing party shall take any appropriate measures to desist from the judicial action in course.

578. Thus, the order, structure and wording of Article 8 clearly indicate that these three dispute resolution means were, to some extent, interconnected, with the underlying idea that it is the failure of one of them that would trigger the next one. In other words, Article 8 did not provide for a mere "pick and choose" solution, leaving the disputing parties free to pick any of the means at any time. Article 8 provided for an integrated system, built upon a certain hierarchy or order of the three interconnected means of dispute resolution.

(ii)   General Consequences of a Disregard of the System

579. At the same time, the wording of Article 8 BIT itself does not suffice to draw specific conclusions with regard to the consequence of non-compliance with the order established by Article 8. In this respect, regard should be given to the context, as well as to the purpose and aim of Article 8. The system put in place by Article 8 is a system aimed at providing the disputing parties with a fair and efficient dispute settlement mechanism. As such, the idea of fairness and efficiency must be taken

into account when interpreting and determining how the system is supposed to work and what happens if one part of the system fails or is otherwise disregarded by one party.

580. Thus, the Tribunal is of the opinion that Claimants' disregard of the 18 months litigation requirement is in itself not yet sufficient to preclude Claimants from resorting to arbitration. The real question is whether this disregard, based on its circumstances, can be considered compatible with the object and purpose of the system put in place by Article 8, or whether it goes against it.

581. Answering this question requires to examine more in detail the object and purpose as well as the meaning of the 18 months litigation requirement and the interests at stake. According to Respondent, the 18 months litigation requirement was put in place to give the Host State the opportunity to address the allegedly wrongful act within the framework of its own domestic legal system and to provide a chance to resolve the dispute in a potentially shorter period than international arbitration.[192] In this respect, it would be irrelevant whether the 18 months time frame is a realistic time frame for the reaching of a final decision, the purpose of this paragraph being merely to provide the Host State with an opportunity to address the issue before resorting to international arbitration.  Thus, the relevant question is not "could the dispute have been efficiently settled before the Argentine courts?", but "was Argentina deprived of a fair opportunity to address the dispute within the framework of its own domestic legal system because of Claimants' disregard of the 18 months litigation requirement?"

582. This question in turn requires a weighting of the interests of the Parties, i.e., of Argentina in being given the opportunity to address the dispute through the

---

[192]     R-PHB § 290.

framework of its domestic legal system, and of Claimants in being provided with an efficient dispute resolution mechanism. Thus, the Tribunal is of the view that the disregard of the 18 months litigation requirement can only be considered incompatible with the system of Article 8 where it unduly deprived the Host State of a fair opportunity to address the issue through its domestic legal system. In this respect, the Tribunal considers that this opportunity must not only be a theoretical opportunity, but there must be a real chance in practice that the Host State, through its courts, would address the issue in a way that could lead to an effective resolution of the dispute.

583. Where, based on the overall circumstances of the case, it appears that such opportunity was only theoretical and/or could not have led to an effective resolution of the dispute within the 18 months time frame, it would be unfair to deprive the investor of its right to resort to arbitration based on the mere disregard of the 18 months litigation requirement. The reason is that such disregard would not have caused any real harm to the Host State, whilst in contrast, the deprivation of the investor's right to resort to arbitration would, in effect, deprive him of an important and efficient dispute settlement mean.

584. This conclusion derives more from a weighting of the specific interests at stake rather than from the application of the general principle of futility: It is not about whether the 18 months litigation requirement may be considered futile; it is about determining whether Argentina's interest in being able to address the specific claims through its domestic legal system would justify depriving Claimants of their interests of being able to submit it to arbitration.

(iii) Consequences of Claimants' Disregard of the 18 Months Litigation Requirement

585. By not resorting to the Argentine courts, Claimants disregarded the 18 months litigation requirement. It is further established that Claimants had the possibility to bring claims before the Argentine courts. However, looking at the nature of the

229

claims that were available to Claimants, the Tribunal finds that none of them would have been suited to address the present claims in such a way as to effectively resolve the dispute:

- *Claims for compensation*: Claims for compensation for the damage caused to Claimants by Argentina's actions surrounding its default were deemed to fail in view of the Emergency Law and other relating decrees and budget laws,[193] which prohibited the Argentine government from entering into any juridical, extra-juridical or private transaction. Thus, even in the case that Claimants would have won the case before the courts, the government would still have been under the impossibility to pay out the compensation.[194]

- *Claims for unconstitutionality of the Emergency Law*: Claimants could have initiated proceedings aiming at declaring the Emergency Law unconstitutional for breach of the BIT. However, claims for compensation could only be filed once the Emergency Law would have been considered unconstitutional, which is highly unlikely to have been possible within the 18 months time frame.

586.   In addition, the Tribunal finds that in the light of the uproar created by Argentina's Emergency Law, the Argentinean Government could have arranged for an examination of the constitutionality of the Emergency Law. Such examination could have brought clarity on the effectiveness of claims before the Argentinean courts against the Argentinean Government. However, Argentina did apparently not see the need to proceed with such examination.

---

[193]   See also Law 25,561 of January 2002 and Resolution 73/2002, by which Argentina deferred the repayment of its sovereign debt, and the subsequent decrees and budget laws maintaining such deferral, see BIANCHI I, § 42 and BIANCHI II, §§ 59 *et seq.*

[194]   See BIANCHI I, §§ 42 *et seq.* and BIANCHI II, §§ 59 *et seq.*

587. In addition, it should be noted that Argentina's legal system does generally not provide for mass claims mechanisms,[195] and that Claimants would therefore have needed to initiate separate claims. [196] This would have been incredibly burdensome for them and for the courts, and would very likely have caused substantial delay in the handling of the cases by the courts.

588. In the light of the Emergency Law and other relevant laws and decrees, which prohibited any kind of payment of compensation to Claimants, the Tribunal finds that Argentina was not in a position to adequately address the present dispute within the framework of its domestic legal system. As such, Argentina's interest in pursuing this local remedy does not justify depriving Claimants of their right to resort to arbitration for the sole reason that they decided not to previously submit their dispute to the Argentinean courts.

589. Under these circumstances, the Tribunal considers that it is not necessary anymore to examine Issue No. 5, i.e., whether the MFN clause contained in Article 3(1) BIT may have entitled Claimants to rely on the allegedly more favorable dispute resolution clause contained in Article 10(1) Argentina-Chile BIT.

    *(d)    Conclusion*

590. In conclusion and in (partial) response to Issues Nos. 4 and 5, the Tribunal holds that the disregard by Claimants of the 18 months litigation requirement does not preclude them from resorting to ICSID arbitration. In particular, the Tribunal finds that:

(i)    Article 8 provides for an integrated dispute resolution mechanism built upon a certain hierarchy or order of three interconnected means whereby the

---

[195]    See NAGAREDA, §§ 8, 15-16; MATA, §§ 52 *et seq.*, R-R-MJ § 152.

[196]    See MATA, §§ 35 *et seq.*, 49 *et seq.*

wording of Article 8 itself does not suffice to draw specific conclusions with regard to the consequences of non-compliance with the order established by Article 8.

(ii)   The question whether Claimants' disregard of the 18 months litigation requirement justifies precluding them from resorting to arbitration requires a weighting of interests between Argentina's interest to be given the opportunity to address the dispute through the framework of its domestic legal system and Claimants' interest in being provided with an efficient dispute resolution means.

(iii)  Based on the circumstances of the present case and in particular the Emergency Law and other relevant laws and decrees, Argentina's interest in pursuing the 18 months litigation requirement does not justify depriving Claimants of their right to resort to arbitration for the sole reason that they decided not to previously submit their dispute to the Argentinean courts.

591.  In view of the above conclusions, the question whether Claimants could have relied on the MFN clause of Article 3(1) BIT in connection to Article 10(1) Argentina-Chile BIT in order to evade the 18 months litigation requirement (Issue No. 5 of the List of 11 Issues of 9 May 2008) is moot.

**(5)   Withdrawal and Addition of Claimants - Issues 3(a) and 3(b)**

*(a)   Relevant Facts*

592.  The following facts may be recalled in connection with the issues relating to the withdrawal and addition of Claimants:

-   Claimants, as presented by Claimants, are those described in the Annexes A, B and C to the Request for Arbitration, the total number of whom at the time

of initiation of the arbitration exceeded 180,000.[197]   Annexes A and B to the Request for Arbitration contain a list of natural persons; Annex C to the Request for Arbitration contains a list of juridical entities.[198] (see § 1 above)

-   On 19 and 22 December 2006, Claimants submitted supplemental Annexes in relation to information contained in Annexes A through E, and submitted Annexes K and L. The substitute annexes reflect: (i) an addition of certain Claimants (separately listed in Annex K), (ii) the withdrawal of certain Claimants (separately listed in Annex L), (iii) limited corrections and substitutions to the information on Claimants (Annexes A-E), (iv) the revision of the aggregate amounts (Annex I), and (v) the addition of one new bond series (Annex J). (see § 103 above)

-   On 5 February 2007, Claimants submitted "substituted versions" of Annexes A through E, K, L, I and J. The substitute annexes reflect: (i) the withdrawal of certain Claimants (listed separately in Annex L), (ii) certain corrections and substitutions to the documentation for other Claimants, and (iii) the revision of certain aggregate amounts based on the foregoing adjustments (Annexes I and J). (see § 107 above)

-   On 7 February 2007, the Secretary-General of the ICSID registered Claimants' Request for Arbitration with accompanying Annexes A through L, and issued the Notice of Registration. (see § 108 above)

---

[197]   See C-MJ § 164, stating that the total number of Claimants at the time of filing the C-MJ is 180,285. See also Navigant I § 27 and Cremieux § 22.

[198]   Annex D to the Request for Arbitration contains a power of attorney and delegation of authority for each Claimant being a natural person to White & Case LLP (*see* page 1 above). Annex E to the Request for Arbitration contains a power of attorney and delegation of authority for each Claimant being a juridical person to White & Case LLP.

- On 7 November 2008, Claimants filed their Counter-Memorial on Jurisdiction, accompanied by substitute versions of Annexes A through E, K and L. (see § 135 above)

- On 5 October 2010, Claimants filed a letter submitting that certain Claimants, who tendered into the Exchange Offer 2010, would no longer participate in the present arbitration, thereby reducing the number of remaining Claimants to approximately 60,000. Claimants attached to their letter updated versions of Annexes A, B, C and L to the Request for Arbitration, the latter containing a list of all Claimants who have withdrawn from the arbitration since 14 September 2006. (see § 216 above)

- On 26 November 2010, the Tribunal issued its Procedural Order No. 9 in which it rejected Respondent's request for further specific information on the identity of the Claimants having tendered into the Exchange Offer 2010 and announced that the question of the allocation of the arbitration costs concerning the Claimants who withdrew would be dealt with in the Tribunal's upcoming determination on jurisdiction together with the question of the withdrawal of a number of Claimants. (see § 220 above)

    (b)    *Issues and Relevant Legal Provisions*

593. As summarized in the preceding section, between the filing of the Request for Arbitration and its registration, as well as thereafter, the number of Claimants has changed and, from time to time, Claimants have submitted substitute annexes with updated information on the number and identity of Claimants. It is disputed between the Parties whether it is admissible to change the number of Claimants once the Request for Arbitration has been filed, and what the consequences of such changes are.

594. Thus, the specific issues to be determined by the Tribunal in this regard are the following:

    (i)     To what extent is it admissible to add new Claimants to the present arbitration proceedings? And if so, what are the consequences of such addition? (see Issue No. 3(b) of the List of 11 Issues of 9 May 2008);

    (ii)    To what extent is it admissible to withdraw existing Claimants? And, to the extent possible, what are the conditions for withdrawing existing Claimants? In addition, what are the consequences of a withdrawal of a Claimant?

595. The key legal provisions and other documents in dealing with the above issues are the following: Articles 36, 44 and 45 ICSID Convention; Rules 24, 25 and 44 ICSID Arbitration Rules; and Rules 1 *et seq.* ICSID Institution Rules.

596. Article 36 ICSID Convention provides as follows:

> "(1)   Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.
>
> (2)   The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.
>
> (3)   The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dis- pute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register."

597. To recall, Article 44 ICSID Convention provides as follows:

> "Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question."

598. Article 45 ICSID Convention provides as follows:

"(1)   Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.

(2)    If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so."

599.   Rules 24 and 25 ICSID Arbitration Rules provide as follows:

"Rule 24
Supporting Documentation

Supporting documentation shall ordinarily be filed together with the instrument to which it relates, and in any case within the time limit fixed for the filing of such instrument.

Rule 25
Correction of Errors

An accidental error in any instrument or supporting document may, with the consent of the other party or by leave of the Tribunal, be corrected at any time before the award is rendered."

600.   Rule 44 ICSID Arbitration Rules provide as follows:

"Discontinuance at Request of a Party

If a party requests the discontinuance of the proceeding, the Tri- bunal, or the Secretary-General if the Tribunal has not yet been consti- tuted, shall in an order fix a time limit within which the other party may state whether it opposes the discontinuance. If no objection is made in writing within the time limit, the other party shall be deemed to have acquiesced in the discontinuance and the Tribunal, or if appropriate the Secretary-General, shall in an order take note of the discontinuance of the proceeding. If objection is made, the proceeding shall continue."

601.   Articles 1 and 2 ICSID Institution Rules provide as follows:

"Rule 1
The Request

(1)   Any Contracting State or any national of a Contracting State wishing to institute conciliation or arbitration proceedings under the Convention shall address a request to that effect in writing to the Sec- retary-General at the seat of the Centre. The request shall indicate whether it relates to a conciliation or an arbitration proceeding. It shall be drawn up in an official language of the Centre, shall be dated, and shall be signed by the requesting party or its duly authorized represen- tative.

(2)   The request may be made jointly by the parties to the dispute.


Rule 2
Contents of the Request

(1) The request shall:

(a)   designate precisely each party to the dispute and state the address of each;

(b)   state, if one of the parties is a constituent subdivision or agency of a Contracting State, that it has been designated to the Centre by that State pursuant to Article 25(1) of the Convention;

(c)   indicate the date of consent and the instruments in which it is recorded, including, if one party is a constituent subdi- vision or agency of a Contracting State, similar data on the approval of such consent by that State unless it had notified the Centre that no such approval is required;

(d)   indicate with respect to the party that is a national of a Contracting State:

(i)   its nationality on the date of consent; and

(ii)   if the party is a natural person:

(A)   his nationality on the date of the request; and

(B)   that he did not have the nationality of the Contracting State party to the dispute either on the date of consent or on the date of the request; or

(iii)   if the party is a juridical person which on the date of consent had the nationality of the Contracting State party to the dispute, the agreement of the parties that it should be treated as a national of another Contract- ing State for the purposes of the Convention;

(e)   contain information concerning the issues in dispute indi- cating that there is, between the parties, a legal dispute aris- ing directly out of an investment; and

(f)   state, if the requesting party is a juridical person, that it has taken all necessary internal actions to authorize the request.

(2)   The information required by subparagraphs (1)(c), (1)(d)(iii) and (1)(f) shall be supported by documentation.

(3)   "Date of consent" means the date on which the parties to the dispute consented in writing to submit it to the Centre; if both parties did not act on the same day, it means the date on which the second party acted."

(c)   *Parties' Positions*

602. Respondent contends that Claimants' repeated use of substitute annexes to unilaterally change the identity of Claimants is incompatible with the ICSID Convention and Rules. In particular:

(i)    The addition of new Claimants after the filing of the Arbitration Request is not permissible without Argentina's consent. It is in breach of Article 36 ICSID Convention and may not be justified by Rule 25 ICSID Arbitration Rules, which does not apply to corrections concerning the number and identity of the parties themselves.[199]

(ii)   The withdrawal of Claimants is not admissible without the consent of Argentina or the permission by the Secretary-General according to Rule 44 ICSID Arbitration Rules. This derives from the irrevocable nature of a State and/or investor's consent to ICSID arbitration. Claimants cannot rely on Article 44 ICSID Convention to override the irrevocable nature of the parties' consent, which constitutes a prerequisite for ICSID's jurisdiction. Consequently, the Claimants listed in Annex L remain parties to the present arbitration without however being represented by White & Case and are thus, without adequate representation.[200] In their latest correspondence, Respondent has stated that it does not oppose the discontinuance of the proceedings in respect of those Claimants who, among those listed in Claimants' Annex L, have entered into the Exchange Offer 2010, and that it

---

[199]    See R-PHB §§ 240 *et seq.*

[200]    See R-PHB §§ 258 *et seq.*

would agree to the discontinuance as to Claimants having withdrawn for other reasons, provided they agree to discontinuance on the same terms as those applicable to those who have tendered into the  Exchange Offer 2010.[201]

603. Claimants contend that the addition and withdrawal of Claimants through the submission of substitute annexes is fully consistent with the ICSID framework and that the Tribunal has full authority to accept these annexes under Article 44 ICSID Convention. Claimants support their position with the following main arguments:[202]

(i)  *Before the Registration:* Claimants contend that the admissibility of annexes submitted before the registration is part of the Request for Arbitration accepted by ICSID Secretary-General and is thus not reviewable by the Tribunal. It has already been admitted.

(ii)  *After the Registration:* The submission of substitute annexes is fully consistent with ICSID framework and their amendment is further authorized by Rule 25 ICSID Arbitration Rules.

(iii)  *No prejudice to Respondent:* In addition, Claimants contend that the changes to the annexes do not prejudice Respondent because most of them were submitted before the constitution of the Arbitral Tribunal so that none of Respondent's defense rights were affected. While Claimants assert that no new Claimants were added after the registration of the Request for Arbitration, they contend that the withdrawal of certain Claimants after the registration actually benefit Respondent so that it cannot claim any prejudice in this respect.

---

[201]  See letter from Respondent of 22 October 2010 (see above §217)

[202]  See C-MJ §§ 503 *et seq.*, C-R-MJ §§ 507 *et seq.*,C-PHB §§ 309 *et seq.*

*(d)   Tribunal's Findings*

604.  The question of the addition and withdrawal of Claimants was addressed by the Parties together with the issue of the admissibility of substituted annexes to the Request for Arbitration. The Tribunal considers that, whilst the addition and withdrawal of Claimants has been effected through the submission of specific substitute annexes, questions regarding the additions and withdrawal of Claimants are to be distinguished from questions regarding the admissibility of modifications to instruments or supporting documents filed in the form of the substitute annexes. Indeed, the question of being a claimant is one of the cornerstones of ICSID's jurisdiction and not just part of any instrument or supporting document in the sense of Rule 25 ICSID Arbitration Rules submitted in support of allegations made in the Request for Arbitration or other written submissions. The question concerning the admissibility of the substitute annexes as "any instrument or supporting document" will therefore be addressed separately (see §§ 672 *et seq*. below).

(i)   <u>Addition of Claimants</u>

605.  It appears that all additions of Claimants have been made by means of Annex K, as substituted, before the Notice of Registration of the Request for Arbitration of 7 February 2007. Claimants therefore contend that the admissibility of such additions, as contemplated in the submission of substitute Annex K, has already been accepted by the ICSID Secretary-General when registering the Request for Arbitration.

606.  It is true that the ICSID Secretary-General reviews the request for arbitration and takes the decision whether to accept or refuse to register it.  However, this examination is limited to making sure that the request for arbitration in question contains all information requested in Article 36 ICSID Convention in connection with Rules 1 *et seq*. ICSID Institution Rules, including information on the identity of the parties, and that the request for arbitration is not "manifestly outside the jurisdiction of the Centre."  Where certain documents or information are missing,

the ICSID Secretary-General will prompt the parties to submit the additional information or documents before accepting the request.  Only where the ICSID Secretary-General considers that a request for arbitration is manifestly outside ICSID's jurisdiction he or she will refuse to register a request.  Thus, the scope of examination of the ICSID Secretary-General is limited and cannot be considered to cover all aspects relevant to ICSID's jurisdiction and/or to the admissibility of the case as such.

607. As mentioned above, the addition of Claimants is to be distinguished from other corrections or additions to supporting information or documents. The identity of Claimants is a core element of ICSID's jurisdiction. Consequently, the question of who are the actual Claimants to the present arbitration cannot be considered to have been definitely dealt with by the ICSID Secretary-General and is subject to the examination of the Tribunal. This question includes the question of who duly initiated the arbitration.

608. Article 36 ICSID Convention requires as a matter of principle that relevant information on the parties' identity be submitted with the request for arbitration. In this regard, two issues arise in connection with the present arbitration:

- Firstly, the timing of the information relating to Claimants: The identity of Claimants was changed, in the sense that Claimants were added, after the filing of the Request for Arbitration;

- Secondly, the form in which information on Claimants' identity was submitted: Instead of inserting relevant information in the Request for Arbitration, Claimants submitted information on their identity in the form of annexes to such Request.

609. With regard to the timing of the submission of the annexes, the Tribunal does not consider it problematic for the following two main reasons: (i) Article 36 ICSID Convention does not prohibit that the lack of relevant information in the request for

arbitration may be cured before its registration; it actually conforms to ICSID's practice and the powers of the Secretary-General to give parties the opportunity to complement their request for arbitration before its registration if any core information is missing; and (ii) since the question of the identity of the Claimants is subject to the Tribunal's competence, it can only be finally examined once the Tribunal is constituted. When the Tribunal took over the case and started with the examination, all new Claimants had already been added, and the examination of "old" and "new" Claimants jointly did not cause any particular prejudice to Respondent.

610. One further point is Respondent's argument that the subsequent addition of Claimants in fact constituted the filing of new requests for arbitration, which should have been the object of separate proceedings.  However, the Tribunal finds that this does not lead to the inadmissibility of the addition of Claimants for two main reasons:

- First, it is possible to unilaterally withdraw a request for arbitration before its registration and one could easily consider the withdrawal of one among several Claimants through the withdrawal of its request for arbitration. This would not lead to any particular problem and would just reduce the number of Claimants.  Conversely, under the circumstances of the present case, it is also possible to add claimants prior to the registration of the request for arbitration.

- Second, the question of addition of Claimants to a claim is closely related to the question of whether "mass proceedings" are admissible under the ICSID framework. The Tribunal considers that such proceedings were admissible (see §§ 515-551 above), and the nature of such mass proceedings may require making certain adjustments to the number and identity of Claimants.

611. In conclusion, the Tribunal considers that the addition of Claimants after the filing of the Request for Arbitration and before its registration through the submission of Annex K, as substituted, is admissible and does not contravene any of the provisions of the ICSID Convention and Rules.

612. **Consequently**, the Tribunal rules that the present arbitration proceedings were validly initiated by all the Claimants mentioned in Annex K as being in the record before the date of the Notice of Registration of the Request for Arbitration, i.e., 7 February 2007.

(ii)   <u>Withdrawal of Claimants</u>

613. Since the filing of the Request for Arbitration on 14 September 2006, Counsel for Claimants informed ICSID, the Tribunal and Respondent on various occasions of the "withdrawal" of several thousands of Claimants from the proceedings. This "withdrawal" happened in several stages, namely, on 19/22 December 2006, 5 February 2007, 7 November 2008, and 5 October 2010 (see §§ 103, 107, 135 and 216 above, as summarized in § 592 above) and was effected through the submission of substitute versions of Annex L, listing each time the Claimants who were withdrawing.  All in all, it is common ground between the Parties that out of approximately 180,000 Claimants about 120,000 have purportedly withdrawn.

(a)   Withdrawal, Discontinuance and Default

614. With regard to "withdrawals" announced before the Notice of Registration of the Request for Arbitration on 7 February 2007, they are unproblematic since it is admitted under Rule 8 ICSID Institution Rules that a claimant may unilaterally withdraw its request for arbitration before its registration. As such, Claimants listed in Annex L of 19 and 22 December 2006 and the substitute Annex L of 5 February 2007 are deemed to have validly withdrawn their Request for Arbitration.

615. With regard to "withdrawals" announced after the date of the Notice of Registration, the situation is different. After the registration of a request for

arbitration, a claimant may not unilaterally withdraw its request for arbitration without the consent of the other party. In other words, once a request for arbitration is registered, a unilateral withdrawal by a party is no longer possible and a party may only be excluded from the proceedings through the mechanism of discontinuance under Rules 43 and 44 ICSID Arbitration Rules.

616. Thus, the notices by which Counsel for Claimants informed the Tribunal and Respondent of the withdrawal of further Claimants on 7 November 2008 and 5 October 2010 in the form of substitute versions of Annex L cannot, by themselves, effect the withdrawal of the concerned Claimants from the proceedings.

617. However, as an expression of the desire of these Claimants not to participate anymore in the proceedings, these notices may be interpreted in a twofold manner: (i) as requests for discontinuance of the proceedings pursuant to Rule 44 ICSID Arbitration Rules and/or (ii) as announcement of default by the concerned Claimant in the sense of Article 45 ICSID Convention.

618. In order to determine whether the concerned Claimants' "withdrawal" is to be considered a request for discontinuance or a default, the Tribunal has to consider the following: Did the concerned Claimants wish to withdraw from the ICSID proceedings, i.e., not participate anymore, or did they merely wish to revoke the TFA Mandate Package and continue to be part of the proceedings but without being represented by TFA and White & Case.

619. Based on Claimants' submissions, it appears that the intention of the concerned Claimants was to withdraw from the proceedings in the sense of not being anymore part thereof, contrary to the wish to continue the proceedings in a different setting of representation. The latter would anyway not be possible under the terms of the TFA Mandate Package, which interlinks the withdrawal from the ICSID arbitration and the revocation of the TFA Mandate Package (see §§ 86 *et seq.*).

620. **Consequently**, the Tribunal holds that the concerned Claimants' "withdrawal" is to be considered a request for discontinuance pursuant to Rule 44 ICSID Arbitration Rules, thereby subject to the conditions and modalities set forth in Rule 44.

(b)        Conditions for Discontinuance

621. According to Rule 44 ICSID Arbitration Rules (quoted at § 600 above), the Tribunal may only issue an order for discontinuance where the other party has not objected thereto. In case of objection, Rule 44 provides that "the proceedings shall continue," meaning that the Tribunal shall issue an award on the dispute as initially commenced.

622. Respondent's position regarding the concerned Claimants' withdrawal is the following: Initially, Respondent objected to the withdrawal of Claimants and insisted that these Claimants be considered in default, that the proceedings be continued and that any award be considered binding on these Claimants.[203]

623. In its communication of 22 October 2010 (see § 217 above), Respondent changed its position stating as follows:

> "[…] the Argentine Republic does not oppose discontinuance of the proceedings in respect of those Claimants who, among those listed in Claimants' Annex L, have entered into the 2010 Exchange Offer.
>
> […]
>
> In any event, the Argentine Republic would consider agreeing to discontinuance as to Claimants wishing to withdraw for other reasons, provided they agree to discontinuance on the same terms as those applicable to those who tendered into the 2010 Exchange Offer."

624. With regard to the terms of discontinuance "applicable to [the Claimants] who tendered into the 2010 Exchange Offer," Respondent refers to the acceptance by

---

[203]    R-MJ § 372, R-R-MJ § 638.

245

such Claimants "to abandon, dismiss, withdraw and discontinue such proceedings (with each party to bear its own attorney fees and costs, except that Argentina shall not bear any court fees)."[204] The full paragraph of the relevant part of the Exchange Offer 2010 prospectus provides as follows:

> "[…] your tendered Eligible Securities are not the subject of any administrative, litigation, arbitral, or other legal proceedings against Argentina or the trustee or fiscal agent of such Eligible Securities (including claims for payment of past due interest, principal or any other amount sought in connection with your tendered Eligible Securities or for compensation of lawyers' costs and court fees), except that, to the extent that your tendered Eligible Securities are the subject of such proceedings, (a) **you agree to abandon, dismiss, withdraw and discontinue such proceedings (with each party to bear its own attorney fees and costs, except that Argentina shall not bear any court fees) in full and final settlement** thereof if and to the extent that cancellation of the tendered Eligible Securities and settlement (including delivery of your New Securities and payment of cash, if applicable) occur pursuant to the terms of the Invitation, and you agree to promptly take any necessary or appropriate steps to implement such withdrawal and dismissal, including, without limitation, the termination of any power of attorney or agency agreement, (b) you hereby authorize Argentina (or its legal counsel) to file any document with any administrative body, court, tribunal or other body before which any such proceedings are pending or that has issued or recognized any payment order, judgment, arbitral award or other such order in order to have the proceedings withdrawn, dismissed and discontinued with prejudice and (c) you agree to deliver and hereby authorize your legal counsel to deliver to your custodian, the information agent and Argentina (or its legal counsel) without undue delay following the Early Settlement Date or the Final Settlement Date, as applicable, all additional documents, court filings or further authorizations as requested by Argentina to withdraw, dismiss and discontinue with prejudice any pending administrative, litigation, arbitral or other legal proceeding against Argentina in full and final settlement thereof." (Emphasis added)

625. In its letter of 22 October 2010, Respondent simplifies the above cost requirements as follows:

---

[204]    See Respondent's letters of 2 November 2010 and C-999B, p. 88 § 20.

> "In addition, we note that the terms of the 2010 Exchange Offer provide that the Argentine Republic would not be responsible for any costs in connection with any proceeding dismissed pursuant to acceptance of the 2010 Exchange Offer.  Accordingly, the Argentine Republic respectfully requests the Tribunal to order that **the Argentine Republic and those Claimants with respect to which proceedings will be discontinued under the terms of this letter, equally bear the arbitration costs, and each of them bear their own costs.**"

(Emphasis added)

626.  As mentioned above (§623), Respondent also extends those conditions to Claimants who have purportedly withdrawn for other reasons.

627.  In summary, the terms of the discontinuance under the Exchange Offer 2010 as simplified in Respondent's letter of 22 October 2010 are two-fold:

- They imply the acceptance of a specific allocation of costs relating to present arbitral proceedings, and

- They imply the "full and final" character of the discontinuance, i.e., with prejudice to reinstatement.

(c)      Terms of Discontinuance

628.  The Tribunal can only order discontinuance to the extent it is accepted by Respondent, i.e., to the extent that such discontinuance would be "full and final" and that costs be allocated as requested by Respondent.

629.  The Tribunal finds Respondent's conditions acceptable.  It considers that in the present case a discontinuance under Article 44 ICSID Arbitration Rules is of a "full and final" character:

- It is "final" in the sense that the discontinuance bears prejudice to reinstatement and that the Claimants affected by the discontinuance may neither "resume" the present proceedings nor institute new proceedings based on the same claim. Based on the circumstances of the present case, in particular the fact that it is Claimants who decided to withdraw – after several

years and without specifying any particular reason - from proceedings which they themselves initiated and which required substantial defense work and efforts from Argentina, it would not be fair to allow them to withdraw now and to re-file the same claim later.

- Further, it is "full" in the sense that it applies to the entirety of the claims of the concerned Claimants and not only to some of them or to some aspects thereof.

630. With regard to the allocation of costs, Rule 44 ICSID Arbitration Rules does not provide for any specific rule. The Tribunal therefore refers to Article 61(2) ICSID Convention, according to which, the tribunal has, unless otherwise agreed by the parties, the power to determine the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses shall be paid.

631. In the exercise of such power and discretion, the Tribunal considers that the terms of the discontinuance concerning the costs as suggested by Respondent are reasonable. After all, Claimants are the ones who initiated the present proceedings, and Claimants, or at least the majority of them, are the ones who decided not to pursue the proceedings any longer. Thus, it is reasonable that they bear, at least partly, the arbitration costs. On the other hand, it is also likely that Respondent's overall behavior in 2010 with regard to Claimants' claims played a certain role in Claimants' decision to continue or withdraw from the present proceedings. For example, one of the aims of the Exchange Offer 2010 was to provide a way to release Argentina from claims related to the bonds; another one was to terminate legal proceedings against Argentina in respect of the tendered Eligible Securities in consideration for the issuance of New Securities (see § 93 above). Thus, the Tribunal finds that both sides bear an equal share of the cost burden. Therefore, the Tribunal accepts the cost allocation as suggested by Respondent.

632.  In summary, Respondent and the Claimants subject to discontinuance shall each bear half of the arbitration costs (i.e., the fees and expenses of the Tribunal members and the charges for use of the Centre's facilities) and bear their own cost. In other words, the concerned Claimants and Respondent shall not be held liable for each other's cost, which include in particular legal costs.

633.  The manner in which those costs are to be attributed is addressed in Chapter IV below ("Costs").

634.  Based on the foregoing, the Tribunal issues the cost order in the Dispositive part of this Decision (see § 713 below).

635.  **In conclusion**, the terms of a discontinuance of the proceedings pursuant to Rule 44 ICSID Arbitration Rules with regard to Claimants listed in Annex L as substituted at 5 October 2010 are not subject to any relevant objection from Respondent.

(d)      Consequences of the Discontinuance

636.  For the sake of clarity, the Tribunal finds it useful to specify the consequences and implications of a discontinuance of the proceedings with regard to the withdrawing Claimants.

637.  With regard to the proceedings, discontinuance means that the proceedings involving the Claimants who are withdrawing will terminate. Within the context of a claim involving multiple Claimants, and in which only a certain number of the Claimants withdraw, discontinuance does not mean the termination of the entire proceedings. Rather, only those Claimants who are withdrawing will stop being parties to the present proceedings.  Thus, as long as one Claimant remains, the present proceedings will continue. Only once the number of withdrawing Claimants

is equal to the number of Claimants having filed the Request for Arbitration as adjusted in Annex K before the date of the Notice of Registration of the Request, it would mean the end of the entire proceedings.[205]

638. With regard to the scope of application of the present Decision, it means that Claimants having withdrawn from the proceedings will not be subject to nor bound by the Decision, except for the considerations in the present section (5) and subject the cost order at § 713 below.

639. As mentioned before (see § 629 above), the discontinuance by the concerned Claimants is in the present case with prejudice to reinstatement.

   (e)   *Conclusion*

640. In conclusion and in (partial) response to Issues Nos. 3(a) and 3(b), the Tribunal finds that the present arbitral proceedings have been effectively initiated by all Claimants listed in Annex K as substituted before the Notice of Registration of the Request for Arbitration of 5 February 2007.  The Tribunal further finds that the present arbitral proceedings are discontinued as of the date of dispatch of the present Decision with regard to all Claimants listed in Annex L as substituted by Claimants on 5 October 2010.  In particular:

(i)    The addition of Claimants after the filing of the Request for Arbitration and before its Notice of Registration through the submission of substitute versions

---

[205]    See also *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A v. Argentine Republic* (ICSID Case No. ARB/03/19), Procedural Order No. 1 Concerning the Discontinuance of Proceedings with Respect to Aguas Argentinas S.A. of 14 April 2006 and *Aguas Provinciales de Santa Fe S.A., Suez, Sociedad General de Aguas de Barcelona S.A, and Interagua Servicios Integrales de Agua S.A. v. Argentine Republic* (ICSID Case No. ARB/03/17), Procedural Order No. 1 *Concerning the Discontinuance of Proceedings with Respect to Aguas Provinciales de Santa Fe S.A.* of 14 April 2006.

of Annex K is admissible and does not contravene any of the provisions of the ICSID Convention and Rules;

(ii)   The withdrawal of Claimants before the date of the Notice of Registration of the Request for Arbitration is admissible and these Claimants are thus deemed to have validly withdrawn their Request for Arbitration;

(iii)   The withdrawal of Claimants after the registration of the Request for Arbitration is to be considered as a request for discontinuance pursuant to Rule 44 ICSID Arbitration Rules, which is to be granted to the extent that Respondent does not object thereto;

(iv)   The terms of a discontinuance of the proceedings pursuant to Rule 44 ICSID Arbitration Rules with regard to Claimants listed in Annex L as submitted by Claimants on 5 October 2010 are not subject to any relevant objection from Respondent;

(v)   The request for discontinuance is therefore granted and the proceedings are herewith discontinued with regard to all Claimants listed in Annex L as substituted, the latest one have been submitted by Claimants on 5 October 2010;

(vi)   The Tribunal issues the cost order set forth below at § 713 below (see also § 682 *et seq.* below).

641.   As an administrative measure, the present proceedings are herewith renamed "*Abaclat et al. v. Argentine Republic*," Ms. Giovanna a Beccara being one of the Claimants having withdrawn and Ms. Abaclat being the next Claimant in alphabetical order.

**(6)**   **Abuse of Rights – Issue 2(b)**

    *(a)*   *Issues*

642.   It is disputed between the Parties whether the Tribunal should refuse to hear the case based on the argument that the initiation of the present proceedings would constitute an abuse of rights by TFA which should not be entertained by the Tribunal.

643.   Thus, the specific issues to be determined by the Tribunal are the following:

-   As a matter of principle, can the alleged abuse of rights by TFA constitute an impediment to hearing the case?

-   If so, has there been an abuse of rights by TFA in the present case?

    *(b)*   *Parties' Positions*

644.   Respondent contends that the Tribunal should refuse jurisdiction on the grounds of abuse of process. In Respondent's view, the initiation of this proceeding constitutes an abuse of rights by TFA which is pursuing hidden interests, foreign to Claimants' interest in the present arbitration.[206] The Tribunal should not exercise its powers for purposes other than those established by the consent of the Contracting Parties to the ICSID Convention.

645.   Opposing Respondent's submissions in this regards, Claimants contend that the abuse of rights theory is not applicable in international proceedings. Further, according to Claimants, even if applicable, there is no relevant abuse of rights in the present case because the alleged abuse of rights would be committed by TFA

---

[206]   R-MJ §§ 241 *et seq.*, R-R-MJ §§ 394 *et seq.*, R-PHB §§ 230 *et seq.*

and not by Claimants. Such abuse of rights is not imputable to Claimants and would therefore be irrelevant.[207]

### (c)    Tribunal's Findings

646.  The theory of abuse of rights is an expression of the more general principle of good faith. The principle of good faith is a fundamental principle of international law, as well as investment law.[208] As such, the Tribunal holds that the theory of abuse of rights is, in principle, applicable to ICSID proceedings and has, in fact, been previously applied by several ICSID and non-ICSID tribunals in investment cases.[209] The question is thus whether the conditions of an abuse of rights are met, and – if so – what the consequences of such abuse may be.

### (i)    Good Faith in the Context of Treaty Claims

647.  Within the context of treaty claims, a breach of the good faith principle can be invoked with regard to two main aspects of the claim:

(i)    With regard to the context and the way in which the investment was made, and for which the investor seeks protection ("material good faith"); and

---

[207]   C-MJ §§ 473 *et seq*., C-R-MJ §§ 483 *et seq*., R-PHB § 216 *et seq*.

[208]   See e.g. HERSCH LAUTERPACHT, Development of International Law by the International Court, London, 1958, p. 164. "There is no right, however well established, which could not, in some circumstances, be refused recognition on the ground that it has been abused." See also *Mobil Corporation and others v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/07/27), Decision on Jurisdiction of 10 June 2010, §§ 169 *et seq.* (hereinafter "*Mobil*") and references quoted therein.

[209]   *Mobil*, §§ 169 *et seq.; Chevron Corporation and Texaco Petroleum Company v. The Republic of Ecuador* (UNCITRAL, PCA Case No. 34877), Interim Award of 1 December 2008, §§ 125-149, § 141 (hereinafter "*Chevron*"); *Phoenix Action Ltd v.The Czech Republic* (ICSID Case No. ARB/06/5), Award of 15 April 2009, §§ 107 (hereinafter "*Phoenix*"); *Aguas del Tunari S.A. v. Republic of Bolivia* (ICSID Case No. ARB/02/3), Decision on Respondent's Objections to Jurisdiction of 21 October 2005, § 321 (hereinafter "*Aguas del Tunari*"); *Tokios Tokelés v.Ukraine* (ICSID Case No. ARB/02/18), Decision on Jurisdiction of 29 April 2004, § 56 (hereinafter "*Tokios Tokelés*"). Comp. with *Rompetrol*, § 115.

(ii)    With regard to the context and the way in which a party, usually the investor, initiates its treaty claim seeking protection for its investment ("procedural good faith").

648.    With regard to breaches of material good faith, different tribunals have followed two different approaches.[210] Either they have dealt with the question of material good faith within the context of the examination of the Tribunal's jurisdiction or within the context of the examination of the legality of the investment:

(i)    It can be seen as an issue of consent and thus of jurisdiction, where the consent of the Host State cannot be considered to extend to investments done under circumstances breaching the principle of good faith;

(ii)    It can be seen as an issue relating to the merits, where the key question is whether the circumstances in which the relevant investment was made are meant to be protected by the relevant BIT.

649.    With regard to breaches of procedural good faith, there are also two approaches possible. Either one addresses the issue within the context of jurisdiction or within the context of admissibility:

(i)    It can be seen as an issue of consent and thus of jurisdiction, where one party considers procedural aspects to be key components of the consent of the Host State; or

(ii)    It can be seen as an issue of admissibility, where the key question is whether the way in which the investor initiated the proceedings, although in

---

[210]    Compare for example *Mobil* and *Phoenix*, where the issue was considered one hindering jurisdiction, with *Rompetrol, Aguas del Tunari* and *Chevron*, where the tribunals touched upon the issue at the jurisdictional phase but considered it had its place at the stage of the merits.

accordance with the applicable provisions, aim to obtain a protection, which he is – under the principle of good faith – not entitled to claim.

650. The difference between these various approaches carries important practical consequences and ought to be carefully examined. There are certainly good reasons in support for each of these approaches, and the choice of the appropriate approach will eventually depend on the circumstances of the case at stake.

(ii)    Qualification of the Alleged Abuse of Rights

651. At present, Respondent's contentions with regard to abuse of rights are mainly threefold: [211]

(i)    Respondent contends that Claimants did not acquire the investment in accordance with the principle of good faith due to the Italian banks' alleged behavior consisting in the breach of various selling restrictions and other related obligations;

(ii)    Respondent contends that the way these proceedings were initiated and are conducted amount to an abuse of rights by TFA, who is pursuing its own interests to the detriment of Claimants' real interests;

(iii)    Respondent has never consented to ICSID proceedings being conducted under such circumstances.

652. With regard to Respondent's first contention referred to in § 651 above, the Tribunal considers it to relate to the merits of the case. The Tribunal has already set forth above (see §§ 381-386) that for the purposes of jurisdiction, the Claimants' investment were to be considered made in accordance with the applicable law and that any misconduct of the Italian banks could not be imputed to Claimants.

---

[211]    R-MJ §§ 241 *et seq*., R-R-MJ §§ 394 *et seq*., R-PHB §§ 230 *et seq*.

653. The only remaining question is whether the circumstances invoked by Respondent could lead to the conclusion that Claimants' investments do not deserve the protection of the BIT. The Tribunal finds that this issue requires to be addressed in relation to the merits of Claimants' claim for the following reasons:

- Based on the principle of severability of the arbitration clause: Even if the investment was considered to be invalid, it would not *per se* invalidate the jurisdiction of the Tribunal to decide on its validity;

- The circumstances invoked require a more detailed factual analysis than what is usually conducted at the stage of jurisdiction (see § 303 above), which justifies dealing with these issues together with the relevant allegations of breaches of the BIT by Respondent.

654. With regard to the second and third contentions referred to in § 651 above, the Tribunal has already found above (see §§ 489 *et seq.*) that Respondent's consent covered the mass aspect of the proceedings and that TFA's role therein was not of such a nature as to vitiate Claimants' consent (see §§ 455 *et seq.*). Consequently, a potential abuse of rights allegedly committed by TFA would not relate to the jurisdiction of the present Tribunal and could only – if at all – relate to its admissibility.

655. **Consequently**, the Tribunal will limit its analysis to the question whether Respondent's allegation that TFA abused the ICSID process to pursue hidden interests, foreign to the interests of Claimants with regard to their investment, may render the present proceedings inadmissible.

(iii)   Lack of Relevant Abuse of Rights

656. Respondent's allegations of abuse of rights and abuse of process are directed against TFA.  Respondent submits that the Tribunal should not allow the present proceedings because TFA is pursuing its own interests, which conflict with

Claimants' interests, and which are foreign to the interests that the BIT and the ICSID Convention aim to protect.

657. The Tribunal finds that, even if TFA was pursuing interests which conflict with Claimants' interests, this would not lead to the inadmissibility of Claimants' claims for the following reasons:

- For ICSID proceedings to be dismissed based on an abuse of rights, it would be necessary that the abuse concerns the very rights that ICSID proceedings aim to protect, i.e., the investors' rights under the relevant BIT.

- In the present arbitration, the alleged abuse of rights does not concern Claimants' rights as arising out of the BIT but TFA's interests as arising out of Claimants' pursuit of ICSID proceedings.

- Respondent has not alleged that Claimants themselves were in any way abusing their right to resort to ICSID arbitration in order to protect their investment.

- Dismissing Claimants' claims would mean depriving them of a remedy they are entitled to invoke, because of the alleged behaviour of a third party on which Claimants have no influence.

658. **In conclusion**, the fact that a third party, such as TFA, may allegedly have taken a certain advantage from the conduct by Claimants of the present ICSID arbitration may be morally condemnable, but it cannot lead to the inadmissibility of Claimants' claims to the extent that the rights Claimants intend to seek protection for are rights protected under the BIT, which are not claimed in an abusive manner by Claimants.

*(d)    Conclusion*

659. In conclusion and in (partial) response to Issue No. 2(b), the Tribunal finds that TFA's role in the proceedings does not amount to an abuse of rights which would justify dismissing Claimants' claims for lack of admissibility.

**(7)    Conclusion on Admissibility**

660. Based on the above considerations, the Tribunal concludes that Claimants' claims are admissible to the following extent:

(i)    The mass aspect of Claimants' claims does not constitute an impediment to their admissibility. In particular:

- The silence of the ICSID framework regarding collective proceedings is to be interpreted as a "gap" and not as a "qualified silence;"

- The Tribunal has, in principle, the power under Article 44 ICSID Convention to fill this gap to the extent permitted under Article 44 ICSID Convention;

- The procedure necessary to deal with the collective aspect of the present proceedings concern the method of the Tribunal's examination, as well as the manner of representation of Claimants. However, it does not affect the object of such examination. Thus, the Tribunal remains obliged to examine all relevant aspects of the claims relating to Claimants' rights under the BIT as well as to Respondent's obligations thereunder subject to the Parties' submissions;

- Such procedure is admissible and acceptable under Article 44 ICSID Convention, Rule 19 ICSID Arbitration Rules, as well as under the more general spirit, object and aim of the ICSID Convention; and

- Respondent's policy arguments regarding the appropriateness of ICSID proceedings in the context of sovereign debt restructuring are irrelevant for the determination of the admissibility of the claims.

(ii)   The prior consultation requirement set forth in Article 8(1) BIT does not constitute an impediment to the admissibility of Claimants' claims. In particular:

- Consultations did take place between TFA, as representative of Italian bondholders, and Argentina;

- Argentina is precluded from invoking the non-fullfilment by Claimants of the consultation requirement; and

- Even if Claimants were considered not to have fulfilled the consultation requirement, this non-compliance would simply express that the premises for an amicable settlement were not given and cannot be interpreted as constituting a hurdle to the admissibility of Claimants' claims.

(iii)  The disregard by Claimants of the 18 months litigation requirement does not preclude them from resorting to ICSID arbitration. In particular:

- Article 8 provides for an integrated dispute resolution mechanism built upon a certain hierarchy or order of three interconnected means whereby the wording of Article 8 itself does not yet suffice to draw specific conclusions with regard to the consequences of a non-compliance with the order established by Article 8;

- The question whether Claimants' disregard of the 18 months litigation requirements justifies precluding them from resorting to arbitration requires a weighing of interests between Argentina's interest to be given the opportunity to address the dispute through the framework of

its domestic legal system and Claimants' interest in being provided with an efficient dispute resolution means;

- Based on the circumstances of the present case and in particular the Emergency Law and other relevant laws and decrees, Argentina's interest in pursuing the 18 months litigation requirement does not justify depriving Claimants of their right to resort to arbitration for the sole reason that they decided not to previously submit their dispute to the Argentinean courts; and

- Consequently, the question whether Claimants could have relied on the MFN clause of Article 3(1) BIT in connection to Article 10(1) Argentina-Chile BIT in order to evade the 18 months litigation requirement is moot.

(iv) In conclusion and in (partial) response to Issues Nos. 3(a) and 3(b), the Tribunal finds that the present arbitral proceedings have been effectively initiated by all Claimants listed in Annex K as substituted before the Notice of Registration of the Request for Arbitration of 5 February 2007. The Tribunal further finds that the present arbitral proceedings are discontinued as of the dater of dispatch of the present Decision with regard to all Claimants listed in Annex L as substituted by Claimants on 5 October 2010. In particular:

- The addition of Claimants after the filing of the Request for Arbitration and before its Notice of Registration through the submission of substitute versions of Annex K is admissible and does not contravene any of the provisions of the ICSID Convention and Rules;

- The withdrawal of Claimants before the date of the Notice of Registration of the Request for Arbitration is admissible and these

Claimants are thus deemed to have validly withdrawn their Request for Arbitration;

- The withdrawal of Claimants after the registration of the Request for Arbitration is to be considered as a request for discontinuance pursuant to Rule 44 ICSID Arbitration Rules, which is to be granted to the extent that Respondent does not object thereto;

- The terms of a discontinuance of the proceedings pursuant to Rule 44 ICSID Arbitration Rules with regard to Claimants listed in Annex L as submitted by Claimants on 5 October 2010 are not subject to any relevant objection from Respondent;

- The request for discontinuance is therefore granted and the proceedings are herewith discontinued with regard to all Claimants listed in Annex L as submitted by Claimants on 5 October 2010;

- The Tribunal issues the cost order set forth below at § 713 below.

(v) TFA's role in the proceedings does not amount to an abuse of rights by Claimants which would justify dismissing Claimants' claims for lack of admissibility.

661. **Consequently**, with regard to the relevant Issues of the List of 11 Issues of 9 May 2008, the Tribunal holds:

(i) **Issue 1(b)**: Claimants' claims are admissible to the extent described in § 660 above;

(ii) **Issue 2(b)**: In the proceedings, TFA is to be seen as Claimants' agent pursuant to Rule 18 ICSID Arbitration Rules, and its role in the proceedings does not amount to an abuse of rights which would justify dismissing Claimants' claims for lack of admissibility;

(iii) **Issue 3(b)**: It is possible to add further Claimants after the filing of the claim, to the extent that additions are made before the date of the Notice of Registration of the Request for Arbitration, i.e., 7 February 2007;

(iv) **Issue 4**: Claimants were entitled to initiate ICSID arbitration notwithstanding the 18-month domestic litigation clause under Article 8(2) BIT;

(v) **Issue 5**: The MFN Clause contained in Article 3(1) BIT has no consequences on the admissibility of the present proceedings.

662. The remaining Issue 3(a) concerning the admissibility of substitute annexes is an issue of procedure and will be dealt with in the section below (see §§ 672-680).

### E.   OTHER PROCEDURAL ISSUES

663.  In sections C and D above, the Tribunal has established that it has – in principle – jurisdiction over the present dispute and that the claims raised by Claimants are – in principle – admissible. In particular, the Tribunal has established that it has the power to model and design the present procedure so as to make it workable to the "mass" nature of the present claims.

664.  This section aims at dealing with general and more specific procedural modalities of such mass proceedings.

### (1)   In General: Managing the Procedure

#### (a)   Introduction

665.  As mentioned before (see § 537 above), the present case involves a number of Claimants, which makes it *de facto* impossible to deal with all them *seriatim*. Based thereon, as well as on the homogeneity of the claims (see § 541 above), the Tribunal considers that it has the power to deal with the present proceedings in the form of collective proceedings as the Tribunal's method of examination (see § 529-533). The Tribunal now needs to determine which specific method of examination would be appropriate in the light of the circumstances of the case.

666.  During the Hearing the Parties and the Tribunal briefly discussed so-called "sampling procedure," also referred to sometimes as "bell weather proceedings," "pilot case proceedings," etc.  The Tribunal contemplates the possibility to resort to such form of collective proceedings in order to deal with certain aspects of the present case.

667.  However, in order to decide whether, and if so, to what extent such sampling procedure constitutes an appropriate approach to the present mass claims, the Tribunal is of the view that it should first obtain an overview with regard to the merits of the present case.

(b)    *Splitting of the Merits Phase*

668.  Therefore, similarly to the jurisdictional phase, the Tribunal rules that the merit phase shall be split in two phases:

- *Phase 1:*  In a first phase, the Tribunal will establish which isssues are the core issues regarding the merits of the case, and, in particular, which conditions would need to be required in order to further resolve Claimants' claims;

- *Phase 2*:  In a second phase, and based on the result of the first phase, the Tribunal will determine how to best address these issues and conditions.

669.  In this respect, the following case scenarios are possible:

(1)    Some issues and/or conditions may be of a general nature and thus apply to all Claimants uniformly. Such issues and/or conditions could be established at once with regard to all Claimants;

(2)    Some issues and/or conditions may, while being generally applicable to all Claimants, present certain objective features that would require making certain distinctions among various groups of Claimants. Such issues and/or conditions could then be established through the putting into place of a sampling procedure;

(3)    Some issues and/or conditions may be so Claimant-specific that their establishment would require a case-by-case analysis, similarly to the specific and individual jurisdictional requirements (see § 227 above).

670.  Consequently, the next phase of the proceedings will be dedicated to determining the core issues regarding the merits of the case, and, in particular, establishing what conditions must be fulfilled for the granting of Claimants' claims. This phase would be implemented through the exchange of written submissions by the Parties, in

which each Party will be invited to comment on whether, and if so to what extent, these conditions can be established with regard to all Claimants (scenario 1), or whether they require the putting into place of a specific procedure for their examination (scenario 2 and/or 3). The exchange of written submissions may be followed by a hearing, if so required by Claimants and/or Respondent or considered necessary by the Tribunal.

### (c)   Conclusion

671. In the light of the above consideration, the Tribunal rules that the merit phase of the present case shall be split in two phases. The first phase will be a general phase aimed at determining the core issues regarding the merits of the case, and in particular establishing what conditions must be fulfilled for further resolving Claimants' claims and determining the best method to examine these issues and conditions. A second phase during which the Tribunal will rule on how to examine the relevant issues and conditions, will put in place an appropriate mechanism of examination and will proceed with such examination.

### (2)   **Specific Procedural Aspects**

### (a)   Admissibility of Substitute Annexes – Issue 3(a)

672. While the issue of the addition and withdrawal of Claimants has been dealt with above (see §§ 592 *et seq.*), this section addresses the amendments to the Annexes which concern other information relevant to individual Claimants, such as contact data, bond information, etc.

673. Thus, in this connection, the specific issue to be determined by the Tribunal is the following:

> **To what extent, if any, were Claimants entitled to amend the information contained in the substitute annexes with regard to Claimants' personal information and bond information?**

674.   The key legal provisions in dealing with the above issue are the following: Article 36 ICSID Convention, Rule 2 ICSID Institution Rules and Rules 24, 25 and 44 ICSID Arbitration Rules. The wording of these provisions is reproduced in § 596 *et seq.* above.

675.   Respondent submits that Claimants have violated the ICSID Convention and ICSID Rules by misusing the substitute annexes to their Request for Arbitration and contends that (i) Claimants violated Article 36(2) ICSID Convention by unilaterally altering the terms of their Request for Arbitration through the substitute annexes and (ii) Claimants' repeated revisions of the Annexes violated Article 36 ICSID Convention.[212] Respondent further contends that the information compiled in Claimants' Annexes are unreliable and unmanageable, thereby preventing Respondent from duly defending its rights.

676.   Claimants contend that the use of the substitute annexes is fully consistent with the ICSID framework and in particular, authorized by Rule 25 ICSID Arbitration Rules. In addition, Claimants submit that their Annexes and database are well-organized, thereby facilitating the searching and management of Claimant-related information.[213]

677.   To the extent that the Tribunal has found that the addition and/or withdrawal of Claimants was admissible (see § 640 above), changes to the information relating to the identity of added and withdrawn Claimants is admissible under Rule 25 ICSID Arbitration Rules.[214] Changes and corrections to the contact information of some Claimants and/or to other supporting information are further also admissible under

---

[212]   R-R-MJ §§ 612-641.

[213]   C-MJ §§ 509 *et seq.*, C-R-MJ §§ 515 *et seq.*

[214]   Rule 25 of the ICSID Arbitration Rules provides: "An accidental error in any instrument or supporting document may, with the consent of the other party or by leave of the Tribunal, be corrected at any time before the award is rendered."

Rule 25 ICSID Arbitration Rules.  For both cases, the Tribunal grants hereby leave for the corrections.  These corrections do not violate Article 36(2) of the ICSID Convention.

678.  In addition, even if – when examining whether individual claims fulfil all necessary requirements - certain information contained in the Annexes and/or database appeared to be missing, erroneous and/or unreliable, this would not justify rejecting at this stage the admissibility of the Annexes. Indeed, it is Claimants who bear the burden to prove that all conditions for the Tribunal's jurisdiction and for the granting of the substantive claims are met. In case relevant information in the Annexes is missing, erroneous or unreliable, this would be taken into consideration by the Tribunal when deciding whether Claimants complied with their burden of proof with respect to the concerned claims and/or Claimants.

679.  With regard to the manageability and reliability of the information contained in the Annexes, the Tribunal sees no reason why the Annexes and the information contained therein should – as a matter of principle - be deemed unmanageable or unreliable. At this stage of the proceedings it is sufficient to note that the Annexes appear to contain all the information required under Article 36 ICSID Convention and Rules 1 *et seq.* ICSID Institution Rules. Further, in conjunction with the online and the Excel database reproducing the information contained in the Annexes, such information is presented in a way sufficiently manageable for the examination of Claimant specific information. The Tribunal considers that this was satisfactorily demonstrated during the Hearing on Jurisdiction by Mr. Brent Kaczmarek.[215]

---

[215]    See Hearing Tr. Day 4 p. 1043/1 – 1051/15; see also NAVIGANT I, §§ 11-24 and NAVIGANT II, sections III & IV.

680. **Consequently**, the Tribunal holds that the Annexes submitted by Claimants are in principle admissible and the latest version of the Annexes as submitted by Claimants on 5 October 2010 is hereby accepted into the record.

      *(b)    Other Procedural Aspects*

681. Any further procedural aspect not addressed in the present Decision, as well as the details of the next phase of the proceedings (see § 671 above) will be discussed at a procedural meeting by telephone or in person with the Parties to be organized shortly after the issuance of the present Decision.

# IV. COSTS

682.  Claimants submitted the following cost claim in their cost submission of 4 August 2010:

|  | INCURRED COSTS (€) | INCURRED COSTS (US$) |
|---|---|---|
| **WHITE & CASE LEGAL FEES & EXPENSES** | | |
| White & Case LLP Procedural Categories | | |
| Claimants' Request for Arbitration | | US$1,057,563.33 |
| Registration of Claimants' Request for Arbitration | | US$350,000.00 |
| Constitution of the Tribunal and First Session of the Tribunal with Attention to Preliminary Procedural Issues; Strategy; and Defense to Challenges to the Tribunal | | US$2,474,546.30 |
| Claimants' Counter-Memorial on Jurisdiction | | US$3,328,452.02 |
| Confidentiality Order Issue | | US$52,638.75 |
| Respondent's Late Document Production | | US$109,011.38 |
| Claimants' Rejoinder on Jurisdiction | | US$2,092,369.68 |
| Handwriting Expert Preparation and Testimony | | US$94,821.00 |
| Respondent's Supplemental Exhibit Document Dumps | | US$114,370.50 |
| June 2009 Hearing Preparations | | US$300,663.75 |
| April 2010 Hearing Preparations & Hearing | | US$3,036,387.16 |
| Arbitration Expenses | | US$1,421,773.20 |
| **Total White & Case Fees & Expenses** | | **US$14,432,597.05** |
| | | |
| **LOCAL COUNSEL FEES & EXPENSES** | | |
| **Total Grimaldi e Associati Fees & Expenses** | €3,196,101.93 | |
| **Total Pérez Alati, Grondona, Benites, Arntsen & Martinez de Hoz (Jr.) Fees & Expenses** | | **US$653,403.71** |
| | | |
| **EXPERT & CONSULTANT FEES & EXPENSES** | €3,973,024.00 | US$2,796,678.41 |
| | | |
| **ICSID COSTS** | | **US$825,000.00** |
| **TOTAL INCURRED COSTS** | €7,169,125.93 | US$18,707,679.17 |

683.  At 4 August 2010 the exchange rate between the Euro and the US Dollar was 1.31. [216]   At that date, Claimants' costs therefore amounted to approximately US$ 28,134,604, and after deduction of the ICSID cost (US$ 825,000, including the registration fee) US$ 27,309,604.

684.  In its cost submission of 4 August 2010, Respondent submitted the following cost claim:

**COSTS OF THE ARGENTINE REPUBLIC**

| ITEM | Argentine Pesos | U.S. dollars | EUROS |
|------|----------------|--------------|-------|
| **TRANSLATIONS** | | | |
| various | 162,078.58 | | |
| **EXPERTS** | 382,065.00 | 17,950.00 | 20,600.00 |
| Fees Cleary Gottlieb Steen & Hamilton LLP | | 9,497,846.59 | |
| **AIR TICKETS, HOTELS & PER DIEMS** | | 1,492,000.00 | |
| | | 87,304.24 | |
| CCA | | 27,428.00 | |
| **PHOTOCOPIES** | 5,631.00 | | |
| **AIR MAIL** | | | |
| DHL's air mails costs | | 1,526.00 | |
| **STATIONARY** | | | |
| Stationary Expenses | 870.00 | | |
| **COMMUNICATIONS COSTS** | | | |
| Communications (land lines) | 2,500.00 | | |
| Communications (Nextel-Movistar-Claro) | 24,107.00 | | |
| **ICSID COSTS** | | | |
| Note SPTN No. 034/AI/08 | | 125,000.00 | |
| Note SPTN No. 025/AI/09 | | 225,000.00 | |
| Note SPTN No. 055/AI/10 | | 200,000.00 | |
| Note SPTN No. 137/AI/10 | | 250,000.00 | |
| **PTN's Costs of the staff** | 1,241,200.00 | | |
| **SUBTOTALS** | 1,818,451.58 | 11,924,054.83 | 20,600.00 |
| **TOTALS IN U.S. DOLLARS** | 469,884.13 | 11,924,054.83 | 26,401.63 |
| **TOTAL COSTS IN U.S. DOLLARS** | | 12,420,340.59 | |

---

[216] http://www.xe.com

685. At 4 August 2010, Respondent's cost amounted to US$ 12,420,340, and after deduction of the ICSID cost (US$ 800,000) US$ 11,620,340.

686. Claimants and Respondent each claim to be entitled to the cost of the proceedings to date on various grounds.  However, the Tribunal has come to the conclusion that it is too early in the present proceedings to rule on costs, except with respect to the Claimants who are subject to discontinuance of the arbitration.  In that regard, it may be recalled that, on 26 November 2010, the Tribunal issued its Procedural Order No. 9 in which it announced that the question of the allocation of the arbitration costs concerning the Claimants who withdrew would be dealt with in the Tribunal's upcoming determination on jurisdiction together with the question of the withdrawal of a number of Claimants.

687. In §§ 628-635 above, the Tribunal held that Respondent and the Claimants subject to discontinuance shall each bear half of the arbitration costs (i.e., the fees and expenses of the Tribunal members and the charges for use of the Centre's facilities) and bear their own cost.

688. The fees and expenses of the members of the Tribunal until 15 June 2011 amount to US$ 1,331,960.45 (see Article 60(2) ICSID Convention; Regulation 14(1) ICSID Administrative and Financial Regulations; Rule 28(1)(a) ICSID Arbitration Rules; Rule 14 Administrative and Financial Rules).

689. The charges for use of the Centre's facilities until 15 June 2011 amount to US$376,641.95 (see Article 59 ICSID Convention; Rule 28(1)(a) ICSID Arbitration Rules.

690. The arbitration cost as defined above, therefore, amount to US$ 1,708,602.4 until 15 June 2011.

691. It is common ground that out of approximately 180,000 Claimants about 120,000 Claimants are subject to discontinuance.  Accordingly, two thirds of the arbitration

costs are to be attributed to the proceedings between the Claimants who are subject to discontinuance and Respondent, being US$1,139,068.3.  They are to be shared equally between Claimants subject to discontinuance and Respondent.  As Claimants and Respondent have advanced equal amounts on account of the arbitration costs and those costs are paid out of the advances, neither side has a cost claim on the other on account of the costs of arbitration.

692. Similarly, the share of each Party's own cost that is to be deemed to be attributable to the proceedings between the Claimants who are subject to discontinuance and Respondent is two thirds.

693. The result of the foregoing is that the reserved portions of the costs between the remaining Claimants and Respondent are insofar as the present phase of the arbitration leading to the Decision on Jurisdiction and Admissibility are concerned with respect to

- the arbitration costs: US$ 569,534.1,

- Claimants' costs: US$ 9,103,200[217] and

- Respondent's costs: US$ 3,873,447.[218]

694. The Tribunal would like to emphasize that its decision on the amounts mentioned in the preceding paragraph, including the reasonableness of the claimed Parties' costs and the allocation (if any), is reserved until a later stage of the proceedings.

---

[217]   I.e., one third of US$ 27,309,604.

[218]   I.e., one third of US$ 11,620,340.

# V.   THE 11 ISSUES *SERIATIM* - ANSWERS AND REFERENCES

695. The Issues set forth in the List of 11 Issues of 9 May 2008 have been addressed in this Decision not *seriatim* for reasons of completeness and consistency (see §§ 225-231 above).   In the present section, the Tribunal will summarize its findings with respect to the Issues set forth in the List of Issues of 9 May 2008 *seriatim* for reasons of convenience.   The summary will include cross-references to the conclusions at the relevant paragraphs.

696. **Issue 1(a)**:

"Does the consent of Argentina to the jurisdiction of the Centre include claims presented by multiple Claimants in a single proceeding?"

- *Answer:*  Argentina's consent to the jurisdiction of the Centre includes claims presented by multiple Claimants in a single proceeding.

- *References:*  § 500 above. See also the findings in relation to Issues Nos. 4 and 8 below.

697. **Issue 1(b)**:

"If so, are the claims admissible?"

- *Answer:*  Claimants' claims are admissible to the extent described in § 660 above.

- *References:* §§ 551 and 660 above.

698. **Issue 2(a)**:

"Is the Declaration of Consent signed by the individual Claimants submitted in this proceeding valid[?]"

- *Answer:* The Declaration of Consent signed by the individual Claimants submitted in this proceeding is in principle valid, whereby the potential existence of a fraud, coercion or essential mistake invalidating the consent of a specific individual Claimant based on the specific circumstances of the individual case remains open and will be dealt with in a later stage of the proceedings.

- *References:* § 466(i)-(ii) above.

699. **Issue 2(b)**:

"[A]nd what is the role and relevance of Task Force Argentina (if any) in this proceeding?"

- *Answer:* In the proceedings, TFA is to be seen as Claimants' agent pursuant to Rule 18 ICSID Arbitration Rules, and its role in the proceedings does not amount to an abuse of rights which would justify dismissing Claimants' claims for lack of admissibility.

- *References:* §§ 466(iii) and 659 above.

700. **Issue 3(a)**:

"Is the submission of substitute annexes to the Request for Arbitration permissible?"

- *Answer:* The Annexes submitted by Claimants are admissible and the latest version of the Annexes as submitted by Claimants is hereby accepted into the record.

- *References:* § 640 above.

701. **Issue 3(b)**:

"Is it possible to add further Claimants after the filing of the claim?"

- *Answer:* It is possible to add further Claimants after the filing of the claim, to the extent that additions are made before the registration of the Request for Arbitration.

- *References:* § 640 (i) above.

702. **Issue 4**:

"Were the Claimants entitled to initiate ICSID arbitration in light of the 18-month domestic litigation clause at Article 8(2) of the Argentina-Italy BIT?"

- *Answer:*    Claimants   were   entitled   to   initiate   ICSID   arbitration notwithstanding the 18-month domestic litigation clause under Article 8(2) BIT.

- *References:*  §§ 500(iii), 566 and 590 above. See also the findings in relation to Issues Nos. 1(a) above and 8 below.

703.  **Issue 5**:

"What are the consequences (if any) of the Most-Favored-Nation-Clause (MFN) contained in Article 3(1) of the Argentina-Italy BIT?"

- *Answer:*   The MFN Clause contained in Article 3(1) BIT has no consequences on the ICSID's jurisdiction and the Tribunal's competence or on the admissibility of the present proceedings.

- *References:*  § 591 above.

704. **Issue 6**:

"Does the Tribunal have jurisdiction to hear Claimants' claims for violation of the MFN provisions contained in Article 3(1) of the Argentina-Italy BIT with reference to the so-called umbrella clause contained in Article 7(2) of the Argentina-Chile BIT?"

- *Answer:*    Whether the Tribunal may also have jurisdiction based on the Umbrella Clause of the Argentina-Chile BIT in connection with the MFN Clause of the Argentina-Italy BIT is irrelevant to the extent that the Tribunal's jurisdiction already derives from the treaty nature of the claims at stake.

- *References:*  § 332 above.

705.  **Issue 7**:

"Are the Claimants' claims contract claims or Treaty claims and what (if any) are the consequences of this determination?"

- *Answer:*  Claimants' claims are to be considered Treaty Claims arising out of the BIT and therewith fall under the jurisdiction *ratione materiae* of the Tribunal.

- *References:*   § 331 above.

706.  **Issue 8**:

"Does the Tribunal have jurisdiction over claims where the relevant bond contains a forum selection clause which refers to national courts, but not to ICSID?"

- *Answer:*   The presence of forum selection clauses referring to national courts in the bond documents do not apply to Treaty Claims and do thereby not affect the Tribunal's jurisdiction over such Treaty Claims.

- *References:*  §§ 387(v) and 500(iv) above.  See also the findings in relation to Issues Nos. 1(a) and 4 above.

707. **Issue 9**:

> "Do the bonds in question satisfy the definition of 'Investment' under Article 1(1) of the Argentina-Italy BIT with respect to the provisions on investment 'in the territory' of Argentina and in 'compliance with the laws and regulations of Argentina'?"

- *Answer:*   The bonds in question, and in particular the security entitlements held by Claimants in these bonds, qualify as "Investment" under Article 1(1) BIT made "in the territory of Argentina" and "in compliance with the laws and regulations of Argentina."

- *References:*   § 387(i)-(v) above.

708. **Issue 10**:

> "Without making a determination with respect to any individual Claimant, does the Tribunal have jurisdiction *ratione personae* pursuant to Article 25 of the ICSID Convention and Article 1(2) of the Argentina-Italy BIT, and its Additional Protocol, over each Claimant who is a natural person and who ultimately is found to have the following characteristics: (i) a natural person with Italian nationality on September 14, 2006 (*i.e.*, the date of the filing of the Request for Arbitration) and February 7, 2007 (*i.e.*, the date of registration of the Request); (ii) who on either date was not also a national of the Argentine Republic; and (iii) who was not domiciled in the Argentine Republic for more than two years prior to making the investment?"

- *Answer:*  The Tribunal has jurisdiction *rationae personae* over each Claimant who is a natural person to the extent set forth above in § 501 (iii).

- *References:*  §§ 422(i) above.

709. **Issue 11**:

> "Without making a determination with respect to any individual Claimant, does the Tribunal have jurisdiction *ratione personae* pursuant to Article 25 of the ICSID Convention and Article 1 of the Argentina-Italy BIT over each Claimant that is a juridical person with Italian nationality on September 14, 2006 (*i.e.*, the date of the filing of the Request for Arbitration)?"

- *Answer:* The Tribunal has jurisdiction *rationae personae* over each Claimant who is a juridical person to the extent set forth above in § 501(iii).

- *References:* §§ 422(ii) above.

710. **Discontinuance:**

- *Answer:* The request for withdrawal, being a request for discontinuance, is granted and the proceedings are herewith discontinued with regard to all Claimants listed in Annex L as substituted, the latest one have been submitted by Claimants on 5 October 2010.

- *References:* § 640(ii)-(vi) above.

711. **Costs:**

- *Answer:* It is too early in the present proceedings to rule on costs, except with respect to the Claimants who are subject to discontinuance of the arbitration. In §§ 632-639, the Tribunal held that Respondent and the Claimants subject to discontinuance shall each bear half of the arbitration costs (i.e., the fees and expenses of the Tribunal members and the charges for use of the Centre's facilities) and bear their own cost.

- *References:* §§ 628-635 above; 682-694 above.

712. **Procedure:** See §§ 663-670 above.

# VI. DECISIONS

713. FOR THE FOREGOING REASONS, and in response to the relief sought by the Parties as quoted in §§ 235-236 above, the Arbitral Tribunal renders the following decisions:

(1)   With regard to the Issues of the List of 11 Issues of 9 May 2008:

(i)   **Issue 1(a)**: Argentina's consent to the jurisdiction of the Centre includes claims presented by multiple Claimants in a single proceeding;

**Issue 1(b)**: Claimants' claims are admissible to the extent described in §660 above;

(ii)   **Issue 2(a)**: The Declaration of Consent signed by the individual Claimants submitted in this proceeding is in principle valid, whereby the potential existence of a fraud, coercion or essential mistake invalidating the consent of a specific individual Claimant based on the specific circumstances of the individual case remains open and will be dealt with in a later stage of the proceedings;

**Issue 2(b)**: In the proceedings, TFA is to be seen as Claimants' agent pursuant to Rule 18 ICSID Arbitration Rules, and its role in the proceedings does not amount to an abuse of rights which would justify dismissing Claimants' claims for lack of admissibility;

(iii)   **Issue 3(a)**: The Annexes submitted by Claimants are in principle admissible and the latest version of the Annexes as submitted by Claimants is hereby accepted into the record.

**Issue 3(b)**: It is possible to add further Claimants after the filing of the claim, to the extent that additions are made before the date of the Notice of Registration of the Request for Arbitration, i.e., 7 February 2007;

(iv)   **Issue 4**:    Claimants were entitled to initiate ICSID arbitration notwithstanding the 18-month domestic litigation clause under Article 8(2) BIT;

(v)   **Issue 5**:    The MFN Clause contained in Article 3(1) BIT has no consequences on the ICSID's jurisdiction and the Tribunal's competence or on the admissibility of the present proceedings.

*(vi)*   **Issue 6**: Whether the Tribunal may also have jurisdiction based on the Umbrella Clause of the Argentina-Chile BIT in connection with the MFN Clause of the Argentina-Italy BIT is irrelevant to the extent that the Tribunal's jurisdiction already derives from the treaty nature of the claims at stake;

(vii)  **Issue 7**: Claimants' claims are to be considered Treaty Claims arising out of the BIT and therewith fall under the jurisdiction *ratione materiae* of the Tribunal;

(viii) **Issue 8**: The presence of forum selection clauses referring to national courts in the bond documents do not apply to Treaty Claims and do thereby not affect the Tribunal's jurisdiction over such Treaty Claims;

(ix)   **Issue 9**: The bonds in question, and in particular the security entitlements held by Claimants in these bonds, qualify as "Investment" under Article 1(1) BIT made "in the territory of Argentina" and "in compliance with the laws and regulations of Argentina";

(x)    **Issue 10**: The Tribunal has jurisdiction *ratione personae* over each Claimant who is a natural person to the extent set forth above in § 501(iii);

(xi) **Issue 11**: The Tribunal has jurisdiction *rationae personae* over each Claimant who is a juridical person to the extent set forth above in § 501(iii).

(2) The request for withdrawal, being a request for discontinuance, is granted and the proceedings are herewith discontinued with regard to all Claimants listed in Annex L as substituted, the latest one have been submitted by Claimants on 5 October 2010;

(3) With regard to costs:

(i) The total amount of arbitration cost, comprising the fees and expenses of the members of the Tribunal and the charges for use of the Centre's facilities, until 15 June 2011 amounts to US$ 1,708,602.4;

(ii) Two thirds of the arbitration costs referred to in paragraph 713(3)(i) above, being US$1,139,068.3, will be borne in half by the Claimants who are subject to discontinuance on the one hand and Respondent on the other other;

(iii) The Claimants who are subject to discontinuance on the one hand and Respondent on the other other shall bear their own cost, which are quantified at two thirds of the cost claimed by Claimants and Respondent each in their Cost Submissions of 4 August 2010;

(iv) The decision regarding the remaining one third of the cost of the present phase is reserved as between the remaining Claimants and Respondent until a later stage of the proceedings.

(4) With respect to the further conduct of the procedure:

(i) The merit phase of the present case shall be split in two phases. The first phase would be a general phase aiming at determining the core

issues regarding the merits of the case, and in particular establishing what conditions must be fulfilled for the granting of Claimants' claims and determining the best method to examine these issues and conditions. A second phase during which the Tribunal will rule on how to examine the relevant issues and conditions and will then proceed with such examination (see § 671 above).

(ii)   The Annexes submitted by Claimants are in principle admissible and the latest version of the Annexes as submitted by Claimants on 5 October 2010 is hereby accepted into the record (see § 680 above).

(iii)  Any fruther procedural aspect not addressed in the present order, as well as the details of the next procedural step (see § 671 above) will be discussed at a joint conference call with the Parties to be organized shortly after the issuance of the present Decision.

[Dissenting Opinion Forthcoming]
_____
Professor Georges Abi-Saab
Arbitrator

_____
Professor Albert Jan van den Berg
Arbitrator

_____
Professor Pierre Tercier,
President

**Abaclat and Others v. Argentina**
**Dissenting Opinion, Georges Abi-Saab**

| Table of Contents | Paras. |
|---|---|
| **I - Introductory Remarks** | 1-19 |
| **II - The Fourth Preliminary Objection** | 20-33 |
| **III - The Ninth Preliminary Objection** | 34-117 |
| *A - Investment under the ICSID Convention in General* | 38-61 |
| *B - Applying the BIT and the Convention to the Alleged Investment* | 62-72 |
| *C - The Territorial Link* | 73-119 |
| *- 1) The Legal Criteria* | 78-87 |
| *- 2) The Material Criteria for Determining the Situs of the "Investment"* | 88-117 |
| **IV - The First Preliminary Objection : Mass Claims, Collective Actions and the Consent of the Respondent** | 120-273 |
| *A - A Plea to Jurisdiction or to Admissibility?* | 122-127 |
| *B - The Legal Nature and Specificities of Mass Claims Actions and their Bearing on the "Consent to Arbitrate"* | 128-145 |
| *C - Judicial Innovation, Collective Proceedings and "Consent to Arbitrate"* | 146-153 |
| *D - The Interpretation of Silence* | 154-175 |
| *E - Mass Claims Processes in International Law* | 176-189 |
| *F - The Limits of Procedural Improvisation* | 194-262 |
| *1) On Filling Gaps* | 210-220 |
| *2) The Scope of the Proposed "Adaptations" and their Incidence on the Rights of the Parties* | 221-244 |
| *3) Balancing of Interests Redux* | 245-262 |
| *G - Epilogue on Policy Considerations* | 263-274 |
| **V – Conclusion** | 275-277 |

**Abaclat and Others**

**(Case formerly known as Giovanna A Beccara and Others)**

**(Claimants)**

**and**

**The Argentine Republic**

**(Respondent)**

**Decision on Jurisdiction and Admissibility**

**Dissenting Opinion**

**Professor Georges Abi-Saab**

## I - Introductory Remarks

**1 -** In spite of my great respect and esteem for my co-arbitrators, I am compelled to part ways with their majority award for imperative reasons of principle, pertaining to substance and method.

**2 -** Substantively, I consider that this Tribunal faces two glaringly insuperable obstacles that prevent it from taking jurisdiction over the collective mass claims action submitted to it, namely:

a - that the sovereign debt instruments (whether we call them "bonds", "obligaciones", "security entitlements" or otherwise) that are at the basis of these claims, do not constitute a "protected investment" under the ICSID Convention and the Argentina-Italy Treaty (see Section III below), and

b - that this *ad hoc* ICSID International Arbitral Tribunal has no jurisdiction under the ICSID Convention and the BIT over the present collective mass claims action, absent Argentina's consent, nor does it have the power to elaborate new procedures to handle such an action (See Section IV below).

**3 -** Saying that does not mean that I accept the rest of the majority award. Indeed, one of the basic reasons of my unease with this excessively long award, is its style of turning around the

2

main issues and drowning them into an ocean of minutia and elaborated details, rather than confronting them frontally and treating them thoroughly. This is why I shall not, in this opinion, enumerate and analyze all the "objects" of my objections, but - while reserving my position on the other preliminary objections of Argentina - shall limit my remarks and analysis mainly to the two fundamental  points mentioned above, which overshadow all the others; not, however, before addressing my second level of disagreement.

**4 -** The second ground of my disagreement with the majority award, is situated at a further remove, at the level of legal method and reasoning, as well as the understanding of some basic principles, rules and concepts of international law, such as jurisdiction and admissibility, and the principles and methods of interpretation ; that which I shall illustrate by using the example of the handling by the majority award of the fourth preliminary objection, based on the requirement of prior consultations and resort to national courts for 18 months before going to arbitration. (See Section II below).

**5 -** However, before turning to these objections, I have to articulate some basic premises and concepts from which my analysis proceeds.

**6 -** i) This is technically an international *ad hoc* arbitral Tribunal. It is  "*ad hoc*" because specially established to hear one specific case, suit or action. It is "international" because it is rooted  in two layers of international treaties : the ICSID Convention and the Bilateral Investment Treaty between Italy and Argentina.  As such it functions under, and is governed by international law, and has to be clearly distinguished from "international" commercial

3

arbitration tribunals, such as those established within the framework of the International Chamber of Commerce, which function under national law and ultimate national judicial control. It is necessary to keep this distinction in mind, as solutions may vary at these two distinct levels; and what is sometimes permissible in municipal law, is not necessarily acceptable in international law.

**7 -** ii) In international law, all tribunals - not only arbitral, but even judicial - are tribunals of attributed, hence limited jurisdiction (*juridictions d'attribution).* There is no tribunal or system of tribunals of plenary or general jurisdiction (*juridiction de droit commun)* that covers all cases and subjects, barring exceptions falling under - i.e. attributed to - the jurisdiction of a specialized tribunal. This is because, in the absence of a centralized power on the international level that exercises the judicial function through a judicial system empowered from above (or rather incarnating the judicial power as part of the centralized power), all international adjudicatory bodies are empowered from below, being based on the consent and agreement of the subjects (i.e. the litigants, *les justiciables)* themselves (with the very limited exception of tribunals created by international organizations in the exercise of their powers under their constitutive treaties, which are also ultimately based on the consent of the subjects that concluded or adhered to these constitutive treaties).

**8 -** iii) This is the reason why, the fundamental principle and basic rule in international adjudication, is that of the consensual basis of jurisdiction. It also explains the prominent place of questions of jurisdiction both in the jurisprudence and in the writings on international adjudication. It explains as well the widely shared perception that the first task

4

of an international tribunal is to ascertain its jurisdiction; and the great care international tribunals take in establishing from the outset, the existence and limits of the consent of the parties before them, on which their jurisdiction is founded.

**9 -** iv) Jurisdiction as a concept in international law, partakes of its generic meaning in the general theory of law; but is further specified and particularized in function of the fundamental principle of the consensual basis of international adjudication.

**10 -** The term "jurisdiction" (from the latin "*jurisdictio",* literally to "pronounce" or "enunciate the law", *dire le droit),* when used in the judicial or adjudicative context, denotes "the legal power of an organ to decide cases (in general) or a case (in particular) by application of law". In other words, it is the empowerment to exercise the judicial function. Thus, jurisdiction refers first and foremost to a *legal power* to exercise a certain type of activity, the judicial function[1].

**11 -** In English, however, the term "jurisdiction" is also used to designate the "ambit" or "sphere" within or over which this power is exercised, though in other languages, such as French and Spanish, another term is used to designate the "ambit", which is "competence". Some writers and arbitral decisions seem to be oblivious of the primary and more

---

[1] See different definitions of the term (putting emphasis on power), in *Black's Law Dictionary* (6th ed., 1990) : *Jurisdiction* : A term of comprehensive import embracing every kind of judicial action...It is *the power* of the court to decide a matter in controversy and presupposes the existence of a duly constituted court with control over the subject matter and the parties... Jurisdiction defines *the powers* of courts to inquire into facts, apply the law, make decisions, and declare judgment... The legal right by which judges exercise their authority...*Power* and *authority* of a court to hear and determine a judicial proceeding; and *a power* to render particular judgment in question..." (emphasis added).

fundamental meaning of jurisdiction as power, limiting the term to the ambit of this power. Jurisdiction as ambit is defined as a four-dimensional sphere, by its extent and limits in time (*ratione temporis)* and space *(ratione loci)*, and over subjects (*ratione personae)* and objects or subjects-matters (*ratione materiae)*.

**12 -** v) In international law, because of its consensual basis, jurisdiction as an ambit is analyzed and scrutinized at two different levels, where adjudication is not intended for one case only, but takes place within an institutional setting, either of a standing organ (such as the ICJ) or a framework within which *ad hoc* tribunals are established (such as the PCA and the ICSID) :

a) - "general jurisdiction" which defines the objective range and outer limits of the ambit for all cases, according to the constitutive instrument of the organ (e.g. the ICJ Statute), or the framework convention (e.g. the ICSID Convention;.

b) - "special jurisdiction" which defines the subjective range and limits of the ambit of jurisdiction of the organ in a particular case, according to the specific jurisdictional title bearing the consent of the parties, on the basis of which the case is brought before the organ.

**13 -** The consent of the parties cannot go beyond the objective limits of the general jurisdiction of the organ, but can restrict its jurisdiction further within these objective limits, by the parties subjecting their consent to additional limits, conditions or reservations. These can relate to any of the four dimensions of the ambit. But they can also relate to the powers of the organ as such (the primary meaning of jurisdiction), as long as this does not touch the hard core requirements of the judicial function, for example by excluding from its powers the

6

indication of provisional measures.

**14 -** In case of ICSID arbitration, the jurisdictional title for general jurisdiction is the Convention itself. For "special jurisdiction", the title is usually two-tiered : the BIT between the two States and the consent in writing of the two parties to the dispute.

**15 -** Thus, for an ICSID *ad hoc* tribunal, a triple-layered consent is usually required. For such a Tribunal to take jurisdiction over a case, it has to ascertain :

a - that the case falls within the jurisdiction of the ICSID as defined by the ICSID Convention and related instruments (Rules of Procedure, etc.);

b - that it falls within the bounds defined by the BIT between the State party to the ICSID arbitration and the national State of the investor (which usually - but not necessarily - also carries the consent of the two states to arbitrate);

c - and that the case is covered by the specific written consent of the parties to the dispute (which can be for the State party, the BIT or another unilateral act bearing its consent. But it can also be a compromissory clause in a contract between the parties; and for the investor it can be the request of arbitration itself).

The Tribunal has to ascertain the existence and scope of the consent of the parties within the limits prescribed by them in each of the above-mentioned instruments.

**16 -** vii) The requirement to ascertain the existence and scope of consent, while strict and exacting in international law, does not mean the restrictive interpretation of the jurisdictional title (the old theory of interpretation in favour of sovereignty, as far as the State party is

7

concerned). But it does not mean either its extensive interpretation beyond "the horizon of foreseeability"; i.e. extending   jurisdiction to what the party or parties could not have foreseen at the time the treaty was  concluded or consent was given. Interpretation is limited here to the establishment of the reality and extent of the consent of the party or parties, at the time it  was given.

**17 -** viii) As with jurisdiction, the concept of admissibility in international law partakes of its generic meaning in the general theory of law, but is further particularized in function of the specificities of international adjudication, including its consensual basis.

**18 -**  Generically, the admissibility conditions relate to the claim, and whether it is ripe and capable of being examined judicially, as well as to the claimant, and whether he or she   is legally empowered to bring the claim to court.

**19 -** It is true that these conditions were adjusted to the specificities of international law, and some additional ones were developed, by way of custom. But none of these conditions has anything to do with the determination of the scope of consent whether to the general or the special jurisdiction of tribunals, contrary to what the majority award asserts (para. 496); these questions being jurisdictional by essence.

## II -  The Fourth Preliminary Objection

**20 -** This objection is based on the non-fulfilment by the Claimants of the requirements of prior consultations (or negotiations) and, in case they fail to settle the dispute, resort to local courts for 18 months before going to arbitration. These two conditions are stipulated in paragraphs 1 to 3 of article 8 of the BIT dealing with the settlement of disputes, which constitutes the second layer of the jurisdictional title in the present case (para. 15 above), and the preliminary objection based on them is presented by the Respondent as a plea to jurisdiction.

**21 -** The majority award rejects this legal characterization on the basis of an incomprehensible distinction between "conditioning its [a State party's] consent to ICSID jurisdiction to the fulfilment of a pre-condition" - which, I presume, would constitute a jurisdictional limitation according to the majority award - and "conditioning the effective implementation of such consent, i.e. the possibility to resort to ICSID arbitration, to the fulfilment of such a pre-condition" (para. 494), which can lead "only - if at all - to a lack of admissibility of the claim" (para. 496).

**22 -** Abstruseness and the absence of any suggested criterion to effect this distinction apart, I can see no legal or logical objective reason to distinguish between the different conditions, reservations or limitations that parties attach to their consent in the jurisdictional title, be it one or a multi-layered one, as in the present case, and be these reservations or conditions related to the general or the special jurisdiction of the tribunal.

**23 -** It is true that, under general international law, the two requirements in question are

9

considered as conditions of admissibility. But when such conditions are included in the jurisdictional title, they condition, like any other reservation inserted in the jurisdictional title, the consent of the party or parties making them, to submit to the jurisdiction of the judicial or arbitral organ, and limit by that much the exercise by the organ of its jurisdiction. In other words, in this case these conditions become conventionally jurisdictional, in addition to being admissibility conditions by their legal nature.

24 - But the fatal blow to the majority opinion's distinction comes from much closer quarters. For the non-adepts at legal analysis, it suffices to read the second sentence of Article 26 of the ICSID Convention ("A contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention"), to discover that such a stipulated requirement conditions the *consent to arbitrate* and not merely "the effective implementation of such consent", whatever that means. As such, it is a limit to jurisdiction, and the plea based on it is a plea to jurisdiction and not to admissibility.

25 - Be that as it may, and regardless of the classification of the objection as a plea to jurisdiction or to admissibility, the result of the non-fulfilment of the requirements should have been the same, the dismissal of the case. But what is even more striking in the treatment by the majority award of these two conditions (under admissibility), is the short shrift it gives them and the cavalier way it disposes of them.

26 - Thus, the requirement of prior consultations, in spite of the peremptory "shall" of article

8/1 of the BIT[2], and the clear text of this paragraph, the majority award practically strikes it out of the treaty, together with the paragraph that stipulates it, on the ground, *inter alia*, that:

> "In the view of the Tribunal, the consultation requirement set forth in Article 8(1) BIT is not to be considered of a mandatory nature but as the expression of the good will of the Parties to try firstly to settle any dispute in an amicable way" (para. 564).

And this is because the provision contains the proviso "to the extent possible". But this proviso is inherent to all "obligations of means" or of "best efforts" (*obligations de moyen),* which would be, according to the majority award's reasoning, devoid of any legal effect and can be simply ignored, rendering the provisions stipulating them totally useless (with no *effet utile)*!

**27 -** More aggravating still, is the manner in which the majority award treated the second of these requirements, that of resorting to Argentinean tribunals for 18 months before initiating arbitration. Here, the majority award admits that this requirement should have been, but was not complied with by the Claimants. But it immediately adds, at para. 579 : "At the same time, the wording of Article 8 BIT itself does not suffice to draw specific conclusions with regard to the consequence of non compliance with the order established by Article 8", and, at para. 580, that "Claimants' disregard of the...requirement is in itself not yet sufficient to preclude Claimants from resorting to arbitration".

---

[2] Article 8 :
1. Any dispute relating to investments that may arise between an investor from one of the Contracting Parties and the other Party, with respect to matters regulated by this Agreement, ***shall*** be, insofar as possible, resolved through amicable consultations between the parties to the dispute" (emphasis added).

**28 -** These last two sentences are very odd indeed. For no instrument, laying down jurisdictional limits or admissibility conditions, specifies the legal consequences of non observance of these limits or non fulfilment of these conditions. These consequences are embedded in the very legal classification of these as jurisdictional limits or admissibility conditions. According to the general rules of law and rules of general international law, non compliance begets the inevitable legal sanction of dismissing the case, as falling outside the jurisdiction of the tribunal or as inadmissible. Only if the parties want to waive or vary this sanction do they address the effect of non compliance in the instrument. Otherwise, in case of silence, it is the rules of general international law that apply.

**29 -** Instead, and in spite of its admission that the requirement is obligatory and that it was not fulfiled, the majority award decides to proceed to a "weighing of the interests of the Parties" (para. 582), it concludes that "it would be unfair to deprive the investor of its right to resort to arbitration based on the mere disregard of the 18 months litigation requirement" (para. 583); adding : "[T]his conclusion derives more from a weighing of the specific interests at stake than from the application of the general principle of futility" (para. 584); before rejecting the preliminary objection.

**30 -** Here again, the majority award takes the liberty of striking out a clear conventional requirement, on the basis of its purely subjective judgment; that which calls for three remarks.

**31 -** First, the "balancing of interests", that the majority award arrogates to itself the right to go behind the text (or across the mirror) in order to operate, has already been done, at the appropriate legislative level, by the parties themselves, introducing the requirement in the Treaty, but limiting it to 18 months. And it was reflected or registered in the clear text. It is not open to the Tribunal, which is now called upon to apply it, to put it into question in the name of a rebalancing of interests more to its liking, at the expense of the one agreed by the parties.

**32 -** Secondly, both the language ("it would be unfair") and the stance of the argument, are those of a tribunal judging *ex aequo et bono*, which is prohibited by the rules of general international law and the ICSID Convention, except by agreement of the parties (Article 42/3); absent which, the judgment is *ultra vires.*

**33 -** Thirdly, the presumed unfairness derives, according to the majority award, from the fact that "the deprivation of the investor's right to resort to arbitration would, in effect, deprive him of an important and efficient dispute settlement means" (para. 583). Elsewhere in the award, it is even contended that the dismissal of the case would deprive the securities holders of *any* effective means of dispute settlement. **But I beg to differ**. For, apart from the Argentinean courts that the Claimants had not even tried, they could have gone to the chosen fora in the security entitlement instruments, which are neutral fora of major financial centers; or to Italian courts, against the banks that sold them the security entitlements in the bonds, and whose ambiguous role, when later grouped as Task Force Argentina, is strongly contested by the Respondent as having diverted the bondholders from those normal fora for

this type of disputes, towards the extraordinary forum of ICSID arbitration, in order to circumvent their own responsibility.

## III - The Ninth Preliminary Objection

**34 -** This objection is based on the contention that the security entitlements in the Argentinean bonds held by the Claimants, do not constitute a covered or protected "investment" under the ICSID Convention and the Bilateral Investment Treaty between Italy and Argentina; and that, in consequence, the Tribunal has no jurisdiction *ratione materiae* over the case.

**35 -** This is, to my knowledge, the first ICSID case that involves a sovereign debt bond (or a security entitlement therein), totally unrelated to a specific project or economic operation or enterprise in the borrowing State. It raises a major issue as to the jurisdiction of ICSID tribunals over a vast new field, with incalculable economic and political ramifications.

**36 -** The assessment of this preliminary objection requires defining what is a protected or covered "investment" under the ICSID Convention and the BIT, and whether the financial security entitlements in question fall within this definition.

**37 -** In what follows, I shall proceed to address these questions by successive approximations, indicating, where appropriate, the points of my divergence from the majority

award.

### *Investment under the ICSID Convention in General*

**38 -** Starting with the ICSID Convention, the task is to identify the purport of the term "investment" in paragraph 1 of article 25, which defines the scope of jurisdiction of the Centre as extending "to any legal dispute arising directly out of an investment...". It is to be noted, however, that beyond this mention, the Convention does not provide expressly a definition of what is meant by "investment" for its purposes.

**39 -** This led to one opinion according to which, since the ICSID Convention does not define "investment", this task is totally abdicated or left to the BIT (or another jurisdictional title, on the basis of which the case is brought before an ICSID arbitral tribunal). In consequence, according to this opinion, there is no need for a "double-barreled" test the claim has to pass, under both the ICSID Convention and the BIT, in order to qualify as an investment. It suffices to qualify only under the BIT (or another jurisdictional title reflecting the consent of the Parties).

**40 -** This opinion does not withstand scrutiny. That the ICSID Convention does not provide an express definition of investment does not automatically imply that the definition is totally left to the BITs. This is because words have an intrinsic meaning, hence a limited and limiting one, however large and vague it may be (although there is always a penumbra around the limits which provides the margin of interpretation). Without limits, words would

be meaningless, because undistinguishable from one another. The intrinsic meaning of a word, which is its "ordinary" meaning, is further specified by the way it is used and the context in which it is used; and if it figures in a treaty, by the object and purpose of the treaty.

**41 -** A clear distinction has to be made between the use of the term "investment" in the financial context and in the ICSID context. In financial markets, "investment" covers the acquisition of any kind of assets such as deposit accounts, debt and equity securities, credit default swaps and derivatives.

**42 -** This over-wide financial concept of investment is fundamentally different from the concept of investment envisaged when drafting the ICSID Convention and followed in its context since. And in the words of the Annulment Committee in *Mitchell v. Democratic Republic of Congo* :

> "It is obvious that the special and privileged arrangements established by the Washington Convention can be applied only to the type of investment which the Contracting States to the Convention envisaged"[3].

**43 -** The *Travaux Préparatoires* of the ICSID Convention reveal the limiting or restricting intent behind the introduction and further qualification of the term "investment" in the provision that became article 25. Thus, in response to concerns about the over-broad jurisdiction *ratione materiae* in the Working Paper which simply referred to "disputes", the

---

[3] Decision on the Application for Annulment of the Award of 9 February 2004 (1 Nov. 2006). ICSID case No ARB/99/7, para. 25.

Preliminary Draft introduced the term "investment" as a qualifier before "disputes", in defining the ambit of jurisdiction ("any existing or future *investment* dispute of a legal nature")[4].

---

[4] *History of the ICSID Convention*, vol. I, pp. 110-112.

**44 -** This was further narrowed in the First Draft : "all legal disputes...arising out of or in connection with any investment"[5]. This formula was in turn strongly attacked as too wide, particularly the clause "in connection with", which was struck out by a vote of 26 to 8, while adding the further qualifier "directly" into the Second (revised) Draft that became the actual formula : "any dispute arising *directly* out of an investment"[6].

**45 -** The purpose for using the term "investment" in article 25/1 was thus to set objective outer-limits to the types of disputes that can be treated within the ICSID[7]; and that is enough to refute the opinion referred to in paragraph 38 above. It is true that these outer-limits bound a vast ambit, to the point of not being clearly visible to some. But they exist all the same.

---

[5] *Ibid*. p. 116.

[6] *Ibid.* p. 118.

[7] The exclusion of certain types of transactions, starting with ordinary commercial transactions, i.e. the purchase of goods and services in the normal course of business, was clearly on the mind of the drafters of the Convention, particularly its main architect, A. Broches (*ibid.* Vol II, p. 83). It was frequently reiterated by ICSID Tribunals, e.g. *SGS v. Pakistan*, (Decision on Jurisdiction, 6 August 2003, para. 133) : "...investment...embod[ies] certain core meaning which distinguishes it from 'an ordinary commercial transaction' such as a simple, stand alone, sale of goods or services"; *Phoenix Action v. Czech* Republic (Award 15 April 2009, para. 96) : "There is nothing like a total discretion, even if the definition [of investment] developed by ICSID case law is quite broad and encompassing. There are indeed some basic criteria and parties are not free to decide in BITS that anything - like a sale of goods or a dowry for example - is an investment".

**46 -** Differently put, the term "investment" in article 25/1 of the ICSID Convention, whilst flexible enough, is not infinitely elastic[8]. It leaves much latitude and a wide margin of interpretation and further specification to States in their BITs; but not to the point of rendering it totally vacuous, without any legal effect. In other words, the term has a hard-core that cannot be waived even by agreement of States parties to a BIT[9].

**47 -** To identify this hard-core, one has to look further into the general context of the ICSID Convention and the circumstances surrounding its elaboration as well as to its object and purpose.

**48 -** It is most significant that the ICSID Convention was elaborated and the Centre established on the initiative and within the framework of the International Bank for Reconstruction and Development; an institution which concentrated its activities since the early sixties almost exclusively to the second facet of its mandate according to its title, i.e. the "development" of the less developed countries.

**49 -** The Preamble of the Convention clearly reveals its "developmental" object and purpose,

---

[8] See Michael Waibel, "Opening Pandora's Box : Sovereign Bonds in International Arbitration" 101 *AJIL* (2007, No. 4), p. 711 at p. 722.

[9] See *Phoenix Action v. Czech Republic, supra* note 7. The Tribunal adds : "...BITs which are bilateral arrangements between two States parties, cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to have access to ICSID. A definition included in a BIT being based on a text agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement".

as a means of encouraging "international cooperation for development, and the role of private international investment therein"; and this by making available "facilities for international conciliation or arbitration", besides the national courts of host States, to settle potential disputes arising from such investments between private foreign investors and those States.

**50 -** The investment that the Convention seeks to encourage by providing it with an international procedural guarantee is that which contributes to the economic development of the host country, i.e. to the expansion of its productive capacity, a contribution that presupposes a commitment to this task not only of economic resources, but also in terms of duration in time and the taking of risk,  with the expectation of reaping profits and/or revenue in return.

**51 -** The different attempts by ICSID tribunals to capture the essence of this hard-core concept of investment in article 25 and formulate it in terms of criteria or conditions - particularly the classical *Salini* criteria[10]; but also in *Phoenix Action v. Czech Republic*[11]; as well as in the recent *Romak S.A. v. Uzbekistan* case[12] -  all turn around the same idea, with minor variations.

---

[10] *Salini Construttori v. Morocco*, Decision on Jurisdiction, 23 July 2001, ICSID case No. ARB/09/4, para. 55-56).

[11] *Supra*, note 7, at para. 82.

[12] PCA case No. AA 280, Award of 26 Nov. 2009, para. 180, 207, quoted in the majority award, para. 370.

20

**52 -** The fact that the *Salini* criteria or the other similar formulations are not expressly laid down in the ICSID Convention does not mean that they do not articulate, perhaps imperfectly, an obligatory requirement of article 25, or that this requirement has no constraining effect if States parties to the ICSID Convention chose to ignore it in their BITs, as the muddled analysis of this issue in the majority award seems at one point to suggest (para. 364, also 351). But the award hedges the issue by contending that in any case, the investment in question satisfies the requirement, at least as formulated in the *Romak v. Uzbekistan* case (para.371); a contention subject to verification below.

**53 -** What type of investment corresponds to this requirement ? It is worth recalling that the main object and purpose of the Convention was to encourage the flow of private foreign investment into developing countries, by making available an additional international procedural facility or guarantee that counter-balances the host State's regulatory authority over investment and economic activities in its territory; in other words, by providing a neutral international forum in case of dispute, as an alternative to submitting to the jurisdiction of the tribunals of the host State.

**54 -** Such facility is basically needed by private foreign direct investment, for it is this type of investment that once it is carried out  in the host country, for example by building factories or establishing enterprises, falls under the imperium of the host State in terms of legislation and adjudication.

**55 -** Direct foreign investment is then the "ideal type" of investment (in the Weberian sense

of the term) for ICSID purposes. But does it exhaust the ambit of ICSID jurisdiction *ratione materiae* ? And if not, how far can an alleged investment depart from the ideal type and still be covered by the Convention, i.e. and still be considered as falling within the objective outer- limits set by article 25 ?

**56 -** This question arises particularly in relation to "portfolio investments" and other financial negotiable products traded in the financial markets, which cover a wide spectrum ranging from standardized instruments such as shares, bonds and loans to structured and derivative products, such as hedges (of currencies, oil, etc.) and credit default swaps.

**57 -** Such widely dispersed off-the shelf financial products, with their high velocity of circulation and their remoteness, the same as their holders, from the State in whose territory the investment is supposed to take place (being traded within seconds at the touch of a button in capital markets, with no involvement or knowledge of the borrowing country, nor passage through the territory or the legal system of that State), seem at first blush to be worlds apart from the direct foreign investment model, which is usually long negotiated and extensively embedded in the legal environment of the host State.

**58 -** This raises acutely the question of the conformity of these financial products with the requirements of article 25 and evokes a kind of informal presumption that, because of their intrinsic characteristics described above, they are excluded *per se*, i.e. automatically, from the protected or covered investments under the Convention.

**59 -** All the same, the empirical evidence reveals that whilst the vast majority of transactions considered by ICSID tribunals to constitute covered or protected investments under the Convention consisted of direct foreign investment, some of these tribunals have also considered negotiable financial products, in certain circumstances, as covered investments. Some BITs also include financial products, or some of them, in their illustrative list of investment.

**60 -** This practice goes against the presumption that financial products are disqualified *per se* and automatically as protected investment under the Convention; that which led a learned commentator to observe that "[p]ortfolio investment(s)...are not excluded as a rule"[13].

**61 -** "Not [being] excluded as a rule" simply means that they are not excluded automatically, *per se*. But it also means that they can be excluded in certain cases. In other words, it means that the exclusion or inclusion cannot be operated automatically, on the basis of the mere classification of the instruments *per se*, but has to be done on a case by case basis, depending on other factors and criteria that lie beyond the mere categorization of the instrument in question; factors and criteria that I examine below in relation to the alleged investment in the present case.

### *Applying the BIT and the Convention to the Alleged Investment*

---

[13] G. Sacerdoti "Bilateral Treaties and Multilateral Instruments on Investment Protection", *Recueil des Cours*, Hague Academy of International Law, vol. 269 (1997), p. 251, at p. 307.

**62 -** Article 1 ("Definitions") of the BIT between Italy and Argentina provides in its first paragraph (in the unofficial English translation of Argentina) :

"For the purposes of this Agreement :

1. The term 'investment' shall mean, in conformity with the legal system of the receiving Country and independently from the legal form adopted or from any other connected legal system, any contribution or asset invested or reinvested by physical or juridical persons of one Contracting Party in the territory of the other, in accordance with the laws and regulations of the latter.

Within this general context, the following are specifically, but not exclusively, considered to be investments :

.....

c. debt obligations, public or private securities or any other right to benefits or services with an economic value, as well as capitalized income;"

**63 -** The Claimants' English translation of lit. c. is somewhat different :

"c. bonds, private or public financial instruments or any other right to performances or services having economic value, including capitalized revenues;"

**64 -** The Tribunal's English translation is as follows :

"c. obligations, private or public titles or any other right to performances of services having economic value, including capitalized revenues;"

24

**65 -** Having examined the wording of this provision and the nature of the alleged investment *in casu*, the majority award concludes that : "Claimants purchase of security entitlements in Argentinean bonds constitute a contribution which qualifies as 'investment' *per se* under Article 1(1) of the BIT" (para. 371).

**66 -** Before reaching this conclusion, the majority award dispenses with the requirements of Article 25 of the ICSID Convention, by examining three alternative theories or views (which it paradoxically counts as two) (para.368). The first is to apply the double-barreled test; but if the alleged investment or contribution satisfies the BIT test, but not the *Salini* test, the former test should prevail, i.e. discarding the requirements of Article 25, according to *Salini* (paras. 363-368). The second view is simply to discard the double-barreled test and require only a BIT test, discarding formally and totally any requirements by the ICSID Convention in this regard! (para. 369). The third view, pays lip service to Article 25 of the Convention by maintaining that, if need be, the  term "investment" *per se* in Article 1/1 of the BIT can be analyzed in the same manner as in Article 25 of the Convention, as interpreted in the *Romak v.Uzbekistan* case (para. 371). From which statement the majority award presumably expects the reader to infer and assume that the alleged investment satisfies the criteria of *Romak*, without any further proof or demonstration on the part or the award, which jumps directly to the conclusion that "Claimants' purchase of security entitlements in Argentinean bonds constitute a contribution which qualifies as investment *per se* under Article 1(1) of the BIT" (para. 371).

**67 -** Be that as it may, this conclusion or finding of the majority award  calls for verification

on several levels, namely, (by ascending order of importance) :

i - Do the securities in question really correspond to Article 1/1/c of the BIT ?

ii - Could they be considered as protected investments in Argentina in view of their legal remoteness, the same as their present holders, from Argentina, and the bonds it initially issued ?

iii - Assuming that both preceding questions are answered in the affirmative, do these securities fulfil the substantive conditions of the Convention and the BIT relating to the contribution, particularly the territorial link ?

**68 -** (i) Concerning the first question : whether the alleged investment is covered by Article 1/1/c of the BIT or not, there is no need to revisit here the controversy over the correct English translation of "obligaciones", and whether it is "bonds" (Claimants), or "debt obligations" (Respondent), or merely "obligations" (Tribunal). On this question I agree with the majority analysis that Article 1/1/c covers financial instruments, and that its language is large enough to encompass the security entitlements in the Argentinean bonds.

**69 -** (ii) The problem raised by the second question is much more complicated than transpires from the simplistic argument by which the majority award brushes it asides, simply affirming that the bonds and the security entitlements "are part of one and the same economic operation" (para. 359).

**70 -** The award fails clearly to distinguish between purchases on the primary market, involving the issuer (Argentina) and the first buyers of the issue (the underwriters), and the

26

secondary market, where previously issued securities are traded, without any involvement of the sovereign debtor. An ICSID Tribunal cannot look only at the economics of a transaction, without taking into consideration its legal framework and structure, in order to determine whether it qualifies as a protected "investment" or not.

**71 -** Even from a purely economic point of view (not to mention the legal perspective), the passage from the primary to the secondary market is neither automatic nor certain. The underwriters of the bonds bear the risk of not attracting enough demand, which is one reason why they receive an underwriting spread. Moreover, they may want to keep bonds as part of their portfolio. Similarly, and also from an exclusively economic point of view, the position of Argentina in these two markets is totally different. In the primary market, Argentina received the proceeds of the initial issuance of the bonds from the underwriters. By contrast, the flow of funds triggered by transactions in the secondary market is exclusively between the buyer and seller of the security entitlements, its volume depending on the conditions prevailing in that market, and bearing no visible relation to the lump-sum received by Argentina from the underwriters at issuance[14].

**72 -** The Tribunal is thus bound to look at the circumstances of the individual purchases of security entitlements, and their traceability to - i.e. the strength or tenuousness of their legal *nexus* with - Argentina, before it can decide whether the  dispute over each of them "aris[es] directly out of an investment"; in other words whether they satisfy the requirements of a

---

[14] See, Waibel, "Opening Pandora's Box", *supra* note 8. p.727.

27

covered or protected "investment" under the Convention and the BIT, on which hinges its jurisdiction *ratione materiae.*

### The Territorial Link

**73 -** Assuming, *arguendo*, that the answer to the first two questions calling for verification is in the affirmative (an assumption that I refute regarding the second question, as just explained above), there remains the third, and more problematic question, namely : do these security entitlements satisfy the other, substantive, conditions of the Convention and the BIT, particularly that of a territorial nexus or link with Argentina ?

**74 -** A territorial link or nexus is inherent in the concept of "investment" in article 25 of the ICSID Convention. The whole idea behind the Convention was to encourage the flow of private foreign investment to developing countries by offering an international guarantee in the form of an alternative neutral adjudication of disputes arising out of such investment in the territory of the host States, typically subject to its laws and courts.

**75 -** In addition, the Argentina-Italy BIT unambiguously requires a territorial link between the alleged investment and the host country. The Preamble of the Argentina-Italy BIT expresses the State parties' intentions to "create favourable conditions for investments by nationals and companies of either State *in the territory of the other*" - a standard formulation found in many BITs. The definition of investment in Article 1 refers to "any contribution or asset invested or reinvested by physical or juridical persons of one Contracting Party *in the territory of the other*", and Article 1/4 carefully delimits the BIT's territorial ambit.

28

**76 -** The BIT's substantive provisions are also conditioned on a territorial link, including :

- Article 2 (protection and promotion of investments) calls on each contracting party to "encourage the making of investments *in its territory* by investors of the other Contracting Party";

- Article 2/2 (full protection and security) obliges each party to refrain from "adopting unjustified or discriminatory measures that impair the management, maintenance, enjoyment, transformation, cessation and liquidation of investments made *in its territory* by investors of the other Contracting Party";

- Article 3 (national and most favoured treatment) likewise contains the qualifier "within its own territory";

- Article 4 (compensation for damage or loss) refers to "the Contracting Party in whose territory the investment was made".

**77 -** This requisite territorial link is clearly absent in the present case. The alleged investment, the security entitlements, are not located in Argentina by applying either the legal or the material criteria for determining such location

**78 -** 1) *The legal criteria* : the financial securities instruments that constitute the alleged investment, i.e. the security entitlements in Argentinean bonds, have been sold in international financial markets, outside Argentina, with choice of law and forum selection clauses subjecting them to laws and fora foreign to Argentina. In fact, they were intentionally situated outside Argentina and out of reach of its laws and tribunals. There is no way then to say (and no legal basis for saying) that they are legally located in Argentina.

29

**79 -** The majority award contests this clear conclusion on two grounds :

a) The first is that the above conclusion "would mean that forum selection clauses determine the place where contractual performance is supposed to take place", whilst they are merely "of a procedural nature aiming to determine the place of settlement of a dispute relating to contractual performance", but "have nothing to do with the place where a party is supposed to perform its obligations" (para. 379).

**80 -** The majority award appears thus to suggest that the determinative factor is the place of performance. If this criterion is applied, there can be no doubt that the place of performance under the securities instruments at issue is invariably outside Argentina, given the use of fiscal agents, paying agents, depositories and places of payment all situated outside Argentina. Factors other than the place of performance also point to the location of the securities in question outside Argentina.

**81 -** Among these other factors, I consider a clause selecting courts external to the host State, as a prominent one in determining where the security instruments, and the underlying right to repayment of the debt, are located[15].

---

[15] *Bayview v. Mexico*, Preliminary Objections, Award of 19 June 2007, paras 101-102.

30

**82 -** To answer the question whether the securities in question are located in Argentinean territory, this Tribunal needs to determine the *situs* of the debt - i.e. the alleged investment - using a systematic approach consistent with well founded and established precedents and drawing on private international law rules. The foreign governing law and foreign forum, while not determinative by themselves, are important factors in determining *situs*. Other factors include the currency of payment, the place of payment and the residence of the intermediaries. On any of these criteria, the transactions at issue here were deliberately structured so as to have their *situs* outside Argentina[16].

**83 -**     b) - The other argument by which the majority award tries to counter the obvious conclusion that the alleged investment is legally located outside Argentina, is that forum selection clauses (ignoring the other numerous connecting factors and criteria mentioned above) are contractual stipulations and as such they are irrelevant for locating the "investment" for the purposes of a "treaty claim", which is based on other rights and obligations derived from the BIT (para. 379).

**84 -** But this facile escape route (*échappatoire*) is to no avail in the instant case. A treaty claim is necessarily based on a right that has been allegedly violated; here, the debt that was not repaid. If this right is created by contract, it is the contract that governs its legal existence and the modalities of this existence, including the location of this right (and its reciprocal

---

[16] See, Zachary Douglas, *The International Law of Investment Claims*, (Cambridge University Press, 2009), p. 171; Michael Waibel, *Sovereign Defaults before International Courts and Tribunals* (Cambridge University Press, 2011), p. 239.

obligation). And the right in the present case has been purposefully located outside Argentina.

**85 -** The treaty claim cannot by-pass or circumvent this right, or change its modalities of existence, including its *situs* according to its legal title - the contract and the applicable law under which it exists - as this right, in its fixed legal configuration, serves as the legal basis underlying the treaty claim.

**86 -** A treaty claim cannot allege a violation of a right, while ignoring the specific legal configuration of this right. The treaty may define the kinds of violation, but the underlying right  subject to these violations, is defined only by its legal title, and the applicable law that governs its existence.

**87 -** In conclusion, the alleged investment, i.e. the financial securities and their underlying debt, by all legally recognized connecting factors and criteria, have their *situs* outside Argentina; a treaty claim based on the nonpayment of this debt, or other violations of the right it represents, cannot change the legal configuration of this right, including its *situs* outside Argentina. In consequence, the alleged investment does not constitute an "investment in the territory of Argentina", and thus falls outside the ambit of jurisdiction of the Tribunal *ratione materiae.*

**88 -** 2) *The material criteria for determining the situs of the "investment"* : As was just explained, the majority award discards the contractual clauses and arrangements stipulated in

the securities instruments as relevant factors for the location of the *situs* of the investment under the BIT and the ICSID Convention, whilst proposing other material or economic criteria. It is noteworthy in this respect that the section under which this question is addressed in the majority award is entitled "Made in Argentina" (i.e. investment "made in Argentina") and not "Made in *the territory* of Argentina", following the language of article 1/1 of the BIT, an omission symptomatic of the result-oriented style of the whole award.

**89 -** The majority award starts by an affirmation that "the determination of the place of the investment... depends on the nature of such investment" (para. 374); to reach the conclusion that an "investment of purely financial nature" need not be "linked to a specific economic enterprise or operation taking place in the territory of the host State" (para. 375), basing itself on arguments it draws from a) Article 1/1/c of the BIT, and b) the nature of the investment. These arguments are examined in what follows.

**90 -** a) Arguments drawn from article 1/1/c of the BIT : The majority award states that :

i - Article 1/1/c "designates financial instruments as an express kind of investment covered by the BIT", i.e. as a covered investment *per se,* or as such; in consequence,

ii - "it would be contrary to the BIT's wording and aim to attach a further condition to the protection of financial investment instruments" (para. 375)

**91 -** First of all, it is necessary to explain what the qualification "*per se*" (frequently used by the award) exactly means in this context. As was already explained (paras. 56-61 above), financial instruments, because of the intrinsic characteristics that appear to be incompatible

33

with the type of investment envisaged in article 25 of the ICSID Convention, suffered from a kind of informal presumption that they are disqualified *per se* (or as such) from constituting a covered investment under the ICSID Convention (para. 58 above). But once a BIT includes these financial instruments in its enumeration of investments covered by the treaty, this presumption is obviously rebutted. However, if these financial instruments are not excluded *per se* (or automatically) that does not mean that they are included *per se*, in the sense of being automatically considered as legally self-sufficient to constitute a protected investment. We have here to recall the distinction (dating back to Roman law) between the *instrumentum* and the *negotium*, the instrument that registers and vehicles a legal act or transaction and the legal transaction itself[17]. Article 1/1/c recognizes the financial securities *per se* as valid *instrumenta* for investment. But the investment itself, as a legal act or transaction that is attested and vehicled by these instruments, has to satisfy the substantive requirements for investment, in article 25 of the ICSID Convention as well as in the BIT, if any.

**92 -** Leaving aside the requirements of article 25 of the Convention discussed above (para. 47-52), does the BIT impose any other substantive conditions ? And is linking the investment "to a specific economic enterprise or operation taking place in the territory of the host State" one of them?

**93 -** Here, the majority award interjects its second argument drawn from article 1/1/c, namely

---

[17] This distinction between the *instrumentum* and the *negotium* was clearly on the mind of the drafters of Article 1/1 of the BIT. Thus, in their enumeration, where they considered that confusion between the two may arise, they expressly made the distinction e.g., under (a) "...including, *to the extent they may be used as investments*, security interests on the property of third Party; under (d) "credits *directly related to an investment*..." (emphasis added).

that, given the designation, in this provision, of financial instruments as covered investments, "it would be contrary to the BIT's wording and aim to attach a further condition to the protection of financial investment instruments" (para. 375).

**94 -**This argument disregards a major fact. Of course, one cannot introduce a "further condition" into the Treaty. However, two such conditions are already writ large therein. It is true that they do not figure in Article 1/1/c itself. But all one has to do is to raise his sight a few lines above this provision to the chapeau of Article 1/1, which applies to all the types and vehicles of investment enumerated under it, including (c), and which defines investment *inter alia* as that made by nationals "of one Contracting Party *in the territory of the other [Party]*, in accordance with the laws and regulations of the latter" (emphasis added).

**95 -** The ordinary meaning of the emphasized words could not be clearer. And how can the fact that the investment has been made or realized in the territory of the host country be proved or demonstrated, except by tracing it to a specific project, enterprise or activity in that territory that corresponds to the economic meaning of investment in article 25 of the ICSID Convention (i.e. that it contributes to the expansion of the country's productive capacity)?

**96 -** b) Arguments drawn from the nature of the investment : Against this clear "territorial imperative" of the Convention and the BIT, the majority award develops a second line of argument or defense, consisting of four mutually supporting affirmations, namely :

i - "The determination of the place of investment depends.... on the nature of such investment"; and  for "an investment of a purely financial nature, the relevant criteria cannot

be the same as those applying to an investment consisting of business operations and/or involving manpower and property";

ii - For "investments of a purely financial nature the relevant criteria should be where and/or for the benefit of whom the funds are ultimately used, and not the place where the funds were paid out or transferred";

iii - "This is also the view taken by other arbitral tribunals";

iv - "Thus, the relevant question is where the invested funds ultimately made available to the Host State [*sic*], and did they support the latter's economic development" (para. 374).

**97 -** None of these affirmations withstands scrutiny.

i - There is absolutely no basis in the ICSID Convention for drawing such a distinction between "investments of a purely financial nature" and other types of investment in this or other respects. Investment under ICSID is a unified category corresponding to the economic meaning of investment. The question that is raised about financial instruments under ICSID concern their high velocity of circulation which distends their link, as well as that of their last holders, with the ultimate economic enterprise or activity that materializes the investment in the economic, i.e. ICSID, sense of the term, within the territory of the host State. The question is not about the necessity of locating this enterprise or activity in the territory of the host State.

**98 -** Indeed, the most persuasive legal justification for admitting financial instruments as protected investments, in spite of their stark contrast to the ideal type of investment under ICSID, the direct foreign investment (see para 55 above), is that these investments finance,

be it at several removes, specific economic projects, enterprises or activities which, had they been undertaken directly by these foreign financial investors, would have constituted foreign direct investment; which of course can only take place within the territory of the host State.

**99 -**   ii - The governing texts, particularly article 1/1 of the BIT, are clear as to the relevant criterion for locating the *situs* of the investment. It is "where" the investment is made or realized, and not "for the benefit of whom".

**100 -** It is ironic that the majority award cites the *SGS v. Republic of the Philippines* decision in support of its position; an award enunciating that : "In accordance with normal principles of treaty interpretation, investments made outside the territory of the Respondent State, however beneficial to it, would not be covered by the BIT"[18]; a dictum repudiating in no uncertain terms the criterion of "for the benefit of whom" proffered by the majority award.

---

[18] *SGS Société Générale de Surveillance SA v. Republic of the Philippines*, ICSID Case No. ARB/02/6 , Decision on Jurisdiction and Admissibility, 24 January 2004, para. 99; see also *Canadian Cattleman for Fair Trade v. United States,* NAFTA, Award on Jurisdiction, 28 January 2008, para. 127.

**101 -**  iii -  Indeed, the cases cited by the majority award do not lend it as much support as it contends and are all quite distinguishable from the present case. The majority opinion cites three awards[19]. Only one of them involves financial instruments, namely *Fedax v. Venezuela.* And it is the only one of the three (as well, to my knowledge, of all other ICSID arbitral decisions) that carries a dictum suggesting the over-loose, ultimate beneficiary test which is followed by the majority award in the present case (but *Fedax* is distinguishable from the present case on facts as explained below).

**102 -** The *Fedax* decision was widely criticized both by other tribunals and in the literature, including by Professor Dolzer, one of the leading legal experts of the Claimants in the present case, who commented in an article  that "the *Fedax* decision is not without ambiguity in its construction of 'investment'"; and in relation to the "territorial dimension of foreign investments", that :

> "...the *Fedax* decision (paragraph 41)...assumed that the absence of a physical transfer of funds will not stand in the way of the existence of an 'investment'. Without explaining the rationale for this view in any detail, the *Fedax* tribunal considered apparently that it is sufficient that the funds made available by the investor are utilized by the host country as the beneficiary of the transaction so as to finance its various

---

[19] In note 147 to paragraph 374. The three awards are : *Fedax N.V. v. Republic of Venezuela* (ICSID Case No. ARB/96/3), Decision of the Tribunal on Objections to Jurisdiction of 11 July 1997, para. 41; *SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/01/13), Decision of the Tribunal on Objections to Jurisdiction of 6 August 2003, paras. 136-140; *SGS v. Republic of the Philippines,* para. 111.

governmental needs"[20].

---

[20] Rudolf Dolzer, "The Notion of Investment in Recent Practice", *in* Charmovitz et al. (eds) *Law in the Service of Human Dignity : Essays in Honour of Florentino Feliciano* (CUP, 2005), p. 261 at pp. 269, 272.

**103 -** Similarly, the *SGS v. The Republic of the Philippines*[21] decision - that the majority award cites in support of its position! - apart from its flat repudiation of the *Fedax* test in the dictum reproduced above (para. 100), spared no effort to distance itself from that case, not only by distinguishing it, but also by pointing to certain factors that severely limit its general relevance (if any). Thus, after noting that "[t]he Tribunal in the *Fedax* case gave a very broad definition of territoriality", it observes in a footnote to that sentence that :

> "The territorial requirement in the BIT [Venezuela-Netherlands] was ...less categorical. It referred to the protection in its territory of investments of nationals of the other Contracting Party...and this only in a clause dealing with entry, not in a general clause defining the scope of the Treaty as a whole".

**104 -** Just after the general remark about the "very broad definition of territoriality",the Tribunal proceeds to distinguish *Fedax* :

> "...but the focus of the decision was whether the endorsee of a promissory note issued with respect to an investment had itself made an investment, and whether the dispute over non-payment of the note arise 'directly' out of an investment within the meaning of Article 25(1) of the ICSID Convention"[22].

---

[21] Cited in note 18 above.

[22] *Ibid.* at para. 110 and footnote 41 in that decision. The Tribunal hints that it would have gone further in the critical analysis (or rather criticism) of *Fedax*, were it not that "Counsel for the Respondent declined to argue that *Fedax* was in this respect wrongly decided, but at any rate the circumstances of the *Fedax* case were very different from the present" (*Ibid.*).

**105 -** *Fedax* is an isolated case. It is an outlier. But I need not expand further on whether it was correctly decided or not, as it is clearly distinguishable in this respect (of territorial link) from the present case on facts; primarily by two significant facts. The promissory notes at issue in *Fedax* were governed by the host State's law. They were not free-standing or unhinged from any specific project or economic activity in the host country, as they were initially given in exchange for the provision of specific services in Venezuela. The issue in that case was whether an endorsement of six promissory notes outside Venezuela severed their link with the underlying transaction, and not about the necessity of the existence of such underlying transaction[23].

**106 -** The other two cases cited by the majority award, *SGS v. Pakistan* and *SGS v. the Republic of the Philippines*, have nothing to support the majority award's position, either in their reasoning and dicta or in their facts. Indeed, one can say the opposite as far as *SGS v. the Republic of the Philippines*,  given its critical and distant position *vis à vis Fedax*, as exposed above. In both *SGS* cases the issue was whether services provided by SGS and attendant expenses largely undertaken outside the territory of the host State, could be considered as an investment "in the territory" of the host State. And in both cases the Tribunals found that a reasonable part of the service and the expenses, though perhaps not the major part, took place in the territory of the host State; and that the service was not constituted of two operations : one outside and the other inside the territory of the host State, but one overall service straddling the frontier of that State, and as such well anchored in its

---

[23] See Waibel, *Sovereign Defaults*, supra note 16, p. 225.

territory.

**107 -** In none of these cases, including *Fedax*, or others in which the question of territoriality was raised, was the need to trace the alleged investment to an underlying specific project or activity within the territory of the host State, questioned. The issue in all these cases was whether what takes place outside the territory of the host State, such as the payment of funds or the endorsement of the promissory notes, distends this link to the point of legally severing it.

**108 -** The situation in the present case is totally different. The security entitlements in question are free-standing, and totally unhinged. They do not form part of an economic project, operation or activity in Argentina. Nor are they issued in support of a public project or a commercial undertaking there. In other words, they have no specific economic anchorage in Argentina, allowing them to be seen and considered as an investment "in the territory of Argentina".

**109 -** The inescapable conclusion of this rapid survey of cases invoked by the majority award in support of its position, is that, unlike these cases, there is a missing link in the present case that prevents the alleged investment from being recognized as covered or protected investment under the BIT and article 25 of the Convention, namely the traceability of the alleged investment (or its link, be it tenuous) to an underlying specific economic project or operation taking place in the territory of Argentina.

**110 -**  iv - In order to surmount this tough obstacle, the majority award resorts to an

42

astounding exercise of logical gymnastics, operating a double logical somersault that ends up standing the sequence of legal reasoning on its head, by way of two unverifiable (and for one totally untenable) assumptions,

**111 -** a) As concerns the first of these assumptions, the majority award asserts that : "*There is no doubt that the funds* generated through the bonds issuance process were *ultimately made available to Argentina* [and here comes the first logical jump dissimulated by the first assumption] and *served to finance Argentina's economic development*" (para. 378, emphasis added). Thus, according to the majority award, any loan or funds made available to a government (and regardless of the way it uses them, which is "irrelevant") must be deemed, by virtue of an unrebuttable presumption, to be contributing to the development of the country of that government, and thus corresponding to the economic concept of investment of article 25 of the ICSID Convention (i.e. contributing to the expansion of the productive capacities of the country).

**112 -** But this presumption is rebuttable on two grounds. First, not every loan can constitute an investment in the sense of the Convention. A simple loan in itself is merely an "ordinary commercial transaction". For it to become an investment, it has to fulfil the conditions discussed above. This is why, for example, in the enumeration of the various types of protected investment in article 1/1 of the BIT, under (d), "credits", which are a species of loans, are qualified by the clause "which are directly linked to an investment".

**113 -** The other ground on which this first presumption is rebuttable is the mere fact that not

43

all funds made available to governments are necessarily used as "investment" in projects or activities contributing to the expansion of the productive capacities of the country. Such funds can be used to finance wars, even wars of aggression, or oppressive measures against restive populations, or even be diverted through corruption to private ends. This is why, for such loans to constitute investments under the ICSID Convention, they have to be concretely traced, even at several removes, to a particular productive project or activity in the territory of the host country; and not merely by postulating a stop-gap abstract assumption that does not hold its ground.

**114 -**     b) The second assumption is even more remarkable than the first, and totally dependent on it. In fact, it is undetachable from it; thus one has to formulate them together, in something like the following : Because the funds were made available to Argentina and used by it (whatever the use which is "irrelevant" and which is not traceable or proven, but assumed), these funds "as such, must be considered to have contributed to Argentina's economic development [first assumption] *and thus* [and here comes the second assumption dissimulating the second logical jump] to have been made in Argentina" (para. 378, emphasis added). Put in straight forward language, without the ellipsis, the proposition would be : As the funds made available to Argentina *must be considered* (i.e. assumed) to have contributed to Argentina's economic development, they also, and as a necessary consequence, *must be considered* (or assumed) to have been made in Argentina.

**115 -** Thus, by assuming a contribution to the economic development of Argentina, one necessarily assumes also its location in Argentina, without having to demonstrate or prove

either. The falsity of such reasoning is too evident to need further elaboration.

**116 -** Moreover, the presumed logical necessity of drawing or deducing the second presumption from the first is also false. It suffices to recall in this regard the dictum of *SGS v. the Republic of the Philippines* that "investment made outside the territory of the Respondent State, however beneficial to it, would not be covered by the BIT", and the example it gives of "the construction of an embassy in a third State or the provision of security services to such an embassy" which "would not involve investments in the territory of the State whose embassy it was, and would not be protected by the BIT"[24].

**117 -** Here again, the logical legal sequence is stood on its head. Rather than demonstrating the contribution by tracing the alleged investment to (or proving its link with) a productive project or activity in the territory of the host State, the majority award deduces a *situs* from a presumed contribution hanging in the air.

**118  - *In conclusion***, the present case is, to my knowledge, the first one to come before an ICSID tribunal in which the alleged investment is totally free-standing and unhinged, without any anchorage, however remote, into an underlying economic project, enterprise or activity in the territory of the host State. None of the logical short-cuts put forward by the majority award to palliate this absence, holds water.

---

[24] Case cited in note 16 above, at para. 99.

**119 -** As both the ICSID Convention and the BIT require that the investment be made in the territory of the host State for the investment to be covered by the treaty and fall within the jurisdictional ambit of ICSID, and as this territorial link is lacking in the present case, I conclude that in the absence of a "protected investment", the case has to be dismissed, as falling outside the jurisdiction *ratione materiae* of the Tribunal.

### IV - The First Preliminary Objection : Collective Mass Claims Actions and the Consent of the Respondent

**120 -** This preliminary objection is based on the contention of the Respondent that its consent to arbitrate by acceding to the ICSID Convention and concluding the BIT does not cover collective mass claims actions, including the present one; that handling mass claims in a single arbitral case or proceeding, or as one  arbitral suit or action, necessarily undermines the due process rights of the Respondent and would be unmanageable; and that, in any case, the Tribunal is not empowered, under the Convention and the Rules of Procedure, to effect the procedural changes enabling it to handle such an action.

**121 -** The preliminary objection raises three issues :

1 - Does the consent of Argentina cover collective mass claims actions ? and is this a question of jurisdiction or of admissibility as contended by the majority award ?

2 - What is the legal nature of collective mass claims actions or suits, and what are the problems and questions they raise, particularly as to the due process rights of the parties and

46

to the  interpretation of the scope of arbitral clauses  - i.e. the jurisdictional title - both in municipal and in international law.

3 - Finally, does the Tribunal have the power to effect the procedural changes, or "adaptations" as it calls them, that it needs to be able to handle the case (para. 491).


*A - A Plea to Jurisdiction or to Admissibility ?*

**122 -**   The majority award adopts, "for distinguishing issues of jurisdiction from issues of admissibility", the following criterion :

"If there was only one Claimant, what would be the requirements for ICSID's jurisdiction over its claim ? If the issue raised relates to another aspect of the proceedings, which would not apply if there was just one Claimant, then it must be considered a matter of admissibility and not of jurisdiction" (para. 249).


**123 -** Applying this criterion to the present case, the majority award "answers in the negative" the question "whether a specific consent  regarding the specific conditions in which the present arbitration would be conducted is required", on the basis of the following argument :

"Assuming the Tribunal has jurisdiction over claims of several individual claimants ...it is difficult to conceive why and how the Tribunal could 'loose' jurisdiction where the number of claimants outgrows a certain threshold...what is the relevant  threshold? And can the Tribunal really 'loose' jurisdiction it has when looking at Claimants individually ?" (paras. 484-490).

**124 -** On that basis, the majority award dismisses Argentina's objection :

> "Issue 1(a) : Argentina's consent to jurisdiction of the Centre includes claims
> presented by multiple Claimants in a single proceeding" (para. 502).

**125 -** The majority award considers that :

> "...the relevant question is not 'has Argentina consented to the mass proceedings', but
> rather 'can ICSID arbitration be conducted in the form of 'mass proceedings'
> considering that this would require an *adaptation and/or modification* by the Tribunal
> of certain procedural rules provided for under the current ICSID framework"?
> (para.491); "which is a question of admissibility" (para. 492).

**126 -** This legal recharacterization of Argentina's plea by the majority award is, in my view,
conceptually wrong. It adopts an extremely narrow, in fact partial, concept of jurisdiction,
limiting it to the ambit within which jurisdiction is exercised. But, as explained above (para.
10 ff), jurisdiction is first and foremost a power, the legal power to exercise the judicial or
arbitral function. Any limits to this power, whether inherent or consensual, i.e. stipulated in
the jurisdictional title (consent within certain limits, or subject to reservations or conditions
relating to the powers of the organ) are jurisdictional by essence. They are no less
jurisdictional, in fact more so, than the limits relating to one of the four dimensions of the
ambit within which jurisdiction is exercised (para. 13 above).

**127 -** The preliminary objection of Argentina draws precisely upon this category of limits to
jurisdiction as a power, maintaining that Argentina's consent cannot be interpreted to cover

the power of the Tribunal to hear collective mass claims actions requiring resort to atypical or abnormal procedures. If that is the purport of the preliminary objection, then finding that the Tribunal has jurisdiction *ratione materiae* over the subject-matter of one claim or even the 60.000 claims (a finding that I already refuted, for absence of a protected investment in the previous section), neither disposes of this preliminary objection, nor does it address it in anyway.

### B - The Legal Nature and Specificities of Collective Mass Claims Actions and their Bearing on the "Consent to Arbitrate"

**128 -** To address this preliminary objection, one has first to examine the legal nature and specific characteristics  of mass claims actions, and the abnormal or atypical procedures their  handling requires, to be able to evaluate whether a mere consent to submit to arbitration can be construed as extending to include  them or not.

**129 -** In their pleadings, particularly during the oral phase, the Parties and their legal experts paid special attention to the legal characterization of the present proceedings. The Respondent considered it not a simple multi-party action, but a collective mass claims action; one of the leading experts in the field called by the Respondent, Professor Richard Nagareda, classified it as a class action. Counsel to the Claimants, by contrast, argued that it is a mere multi-party action; as there is no limit to the number of parties in such an action and no known threshold that separates a multi-party from a collective mass claims action. Later on, Counsel to the Claimants spoke of a non-class aggregate proceeding.

49

**130 -** The majority award tries to skirt round the subject (in order not to tie its hands) by using the neutral expression " 'mass proceedings'...as referring simply to the high number of Claimants appearing together as one mass, and without any prejudgement on the procedural classification of the present proceedings as a specific kind of 'collective proceedings' recognized under any specific legal order" (para. 480). But it does not quite succeed in keeping this neutral stance; for after summarizing part of a recent article surveying different types of collective proceedings[25], it ends up classifying the present proceedings as a hybrid, partaking of two species. But this exercise in legal genetic engineering, like all genetic engineering, risks producing a monster. In any case, it does not work here for reasons expounded below.

**131 -** The survey of different types of collective proceedings, based on Strong's article, classifies them in two categories :

---

[25] Stacy I. Strong, "From Class to Collective : The De-Americanization of Class Arbitration". *Arbitration International*, vol. 26, No 4(2010), pp. 493-548. Footnote 176 of the Award, wrongly cites the author's name as Stark, and not Strong.

i - *Aggregate procedures* : I use advisedly "procedures" rather than "proceedings", because the aggregation takes place before the "proceedings" properly speaking, i.e. the adjudicative or judicial phase of examining the claims. It consists of aggregating or centralizing the different individual claims arising "out of the same fact pattern", as in the present case, in different ways. In England, the Group Litigation Order establishes a judicial registry of these claims, which are then assigned to the same judge for management purposes. In the US, such related claims are "consolidated in a single federal venue to ensure efficiencies of scale during the pre-trial period", beyond which "the cases are separated and heard individually regarding issues of liability and/or damages"[26].

**132 -** Both methods are legal techniques for rationalizing the distribution of individual claims arising from the same events, upstream, at the pre-trial or pre-judicial stage. But once the individual claims are before the tribunals for judgment, they are handled as such i.e. as individual claims, according to the normal procedures, though the tribunals can use procedural devices normally available to them, such as joinder and consolidation, for purposes of procedural economy. But there is no change or alteration of the procedure followed to handle these claims other than as normal individual claims. And it is on this last point that the "aggregate procedures" model does not suit the purposes of the majority award.

**133 -** ii - *Representative proceedings* : This is the most important type of collective proceedings, its prime example being "class actions" that emerged relatively recently in the

---

[26] Strong, *ibid.* p. 504.

US and elsewhere. The other species of representative proceedings are in fact minor variations on the theme of class actions.

**134 -** Class actions or representative proceedings can be brought either by a member of the class, acting as a kind of *negotiorum gestor* on behalf of the other members of the class (who can join in or take their distance from the action through the techniques of "opting in" or "opting out") or by an agent representing the whole class, such as a consumers association or the Sierra Club.

**135 -** What makes class actions or representative proceedings (unlike aggregate claims subject to aggregate procedures only at  the pre-trial or pre-judicial stage), feasible or amenable to be treated judicially or adjudicatively in one single proceedings or as one action, is that in a class actions or representative proceedings there is, in the final analysis, only one claim, albeit with many, or even a mass of claimants. The tribunal deals thus with one claim and can examine every aspect of it specifically, through adversarial debate and scrutiny that guarantees to the parties, particularly the respondent, all their due process rights.

**136 -** The first attempts to introduce class actions, which are the prime model of representative proceedings, were related to issues of public interest such as the protection of the environment or the consumers. In this, they recall (at least in their rationale, without necessarily assimilating them to) an ancient ancestor, the institution of *actio popularis*, whereby a citizen, in the name of the community, acts in defense of an indivisible public good. And the remedies sought in class actions were geared to the nature of these types of

52

public interest claims, namely declaratory judgments and injunctive relief, i.e. orders to cease and desist, that are the same for all claimants and which are formulated as a function of the subject-matter of the claim, and not as a function of  the personality, or the number of the claimants, or their individual subjective grievances.

**137 -** It is true, as is stated in the majority award, that in some jurisdictions, the relief "can take the form of individual damages or representative relief (e.g. declaratory or injunctive relief)" (para. 483). But the majority award omits to reproduce from Strong's article it excerpts the following comment on the cumulation of the two types of relief :

> "One approach allows class claimants to pursue individual damages as well as other types of relief. This technique, which is common in the US, has met with a great deal of criticism internally, since the provision of individual damages in a representative suit is seen in many (but not all) civil law systems as violating the defendant's right to defend against individualized, as opposed to generalized claims, as well as the rights of individualized members of the collective to conduct their own individualized cases"[27].

**138 -** After this brief survey of the two main types of "collective proceedings", the majority award proposes a legal characterization of the present case as "a sort of hybrid kind of collective proceedings, in the sense that it starts as aggregate proceedings, but then continues with features similar to representative proceedings due to the high number of claimants

---

[27] Strong, *ibid*, at p. 504.

involved" (para. 488).

**139 -** However, as mentioned above, this exercise of legal genetic engineering does not work. First of all, there is no explanation whatever of the reason or cause nor of the trigger of such a transmutation of the proceedings, starting as one thing that no sooner transforms itself into quite another. It is understandable that the case starts as aggregate proceedings, in the sense explained above and in the majority award, considering that it groups a multitude of individual claims arising out of the same fact pattern. But these remain individualized claims. Following the aggregate procedures model  simply means that they would be collected and managed during the pre-trial or strictly pre-judicial or pre-arbitral phase, in order to rationalize their funneling to other tribunals that will examine them judicially as individual claims. But they would not change nature or characteristics as a result of their prior aggregation. They remain individualized claims.

**140 -** For the proceedings to change suddenly into a representative one, the individual claims have to be cast into one claim or transformed into identical fungible claims, which comes down to the same thing (one claim, multiplied by the number of claimants) to enable the tribunal to treat them judicially as one. But this is not possible here, as the claims retain their individualized character.

**141 -** To skirt round this fundamental problem, the majority award resorts to the slippage technique, considering that "group examination of claims is acceptable where claims raised by a multitude of claimants are to be considered identical or *at least sufficiently*

*homogeneous*" (para 540; emphasis added ).

**142 -** However, homogeneity is in the eyes of the beholder. One can always reach a sufficient level of homogeneity, i.e. common denominators, by  climbing up the ladder of abstraction and/or by weeding out all the specificities of the claims that appear inconvenient. And that is precisely what the majority award does with the claims under consideration.

**143 -** Indeed, the majority award sets aside all the specificities of the claims concerning the security entitlements (price, date of purchase, place of purchase, in which currency, applicable law, chosen forum, etc.) as characteristics relevant only to the contractual rights of their holders, i.e. to contract claims; while what counts here, according to the majority award, are the treaty claims, which are homogeneous (paras. 541-543). And the majority award harps on the adjective "homogeneous", by repeating it throughout this part  in almost every line. But no amount or repetition can exorcize the fundamental flaws in this line of argument. Indeed, it suffices to ask, how can the Tribunal for example evaluate a treaty claim for compensating damages caused to an asset, without knowing (or while making abstraction of) the time the asset was acquired, the price paid for it and the currency of denomination ?

**144 -** If one examines what the majority award calls "the claims deriving from the BIT" (para. 543), which it considers "homogeneous", the result is clear. They are claims related to the Argentinean economic crisis that led to Argentina's cessation of payment. In other words, this crisis constitutes "the same fact pattern" out of which the claims arose, and which is the criterion used for resorting to "aggregate proceedings", according to the majority award. But

55

as the award itself states, this aggregation takes place only at the pre-trial, or pre-judicial phase. By contrast, during the judicial phase, the claims are treated individually. In other words, the "level of homogeneity" resulting from the circumstance that the claims arose "out of the same fact pattern", is sufficient for aggregating and registering them for purposes of pre-trial management and rationalizing their funneling towards the tribunals that will ultimately examine them as individual claims; but not sufficient for what the majority award calls "group examination", i.e. their examination as if they are one claim (as in a class action or a representative proceedings), which they are not, either in fact or in law.

**145 -** The efforts of the majority award at legal genetic engineering lead nowhere. The hybrid proceedings, brain-child of the majority award's legal imagination, lacks a theoretical basis to stand on, let alone a solid legal basis. It also raises the question of the extent to which such an imaginary "hybrid action" and, for that matter, the particularities of collective proceedings in general, have a bearing on the interpretation of the "consent to arbitrate".

### C - Judicial Innovation, Collective Proceedings and "Consent to Arbitrate"

**146 -** In their pleadings, counsel and legal experts for the Claimants argued - to incite this Tribunal to do the same - that in the US, courts foreshadowed class actions and devised their procedures, before they were formally adopted by legislation and integrated in the codes of civil procedure.

**147 -** Regardless of the veracity of this narrative and assuming it is true, it does not help

much supporting the conclusion sought to be drawn from it, i.e. that the same can be done by this *ad hoc* international arbitral Tribunal. This is because courts in general are part of the judiciary, the judicial branch or arm of the State. Their judicial power, i.e. jurisdiction, thus stems from above, and not from the consent of the parties or litigants before them. As repositories of the judicial power of the State, they have some leeway, particularly in common law jurisdictions, to develop the law and engage, within reasonable limits, in legal experimentation; unlike arbitral tribunals that draw their jurisdiction from the consent of the parties and have to confine their judicial activities within the bounds of this consent.

**148 -** Even in the U.S, the national jurisdiction where it is contended that the courts foreshadowed class action and devised procedures for them before they were enshrined in legislation, the US Supreme Court, in two successive decisions in 2010 and 2011, has been quite strict in interpreting consent and underscoring the need to respect its bounds, when it came to arbitration, in response to exactly the same question that is put to this Tribunal, i.e. "Does a regular arbitration clause cover class actions ?"

**149 -** I realize that the majority award, following in this the Claimants, refuse to consider the present collective mass claims action as a class action, although its "hybrid model" ends up being a "representative proceeding", which is more or less the same thing. But the US Supreme Court's reasoning and answer turns on the "mass" character of the action rather than on its characterization as a class action or otherwise.

**150 -** In the first of these cases, *Stolt-Nielsen S.A. v. Animal Feeds International Corp*[28], the Court held :

> "An implicit agreement to authorize class-action arbitration... is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator".[29]

**151 -** The Court also noted that the "changes brought about by the shift from bilateral arbitration to class-action arbitration [are] fundamental"; and concluded that  consent to class-action arbitration cannot be "presumed" from the parties "mere silence", given the fundamental differences between class-action arbitration and bilateral arbitration[30].

---

[28] 130 S.Ct.1758 (2010).

[29] *Ibid.* at 1774.

[30] Slip Opinion, at 22-23.

**152 -** In the second case *AT&T Mobility LLC v. Concepcion ET UX* (2011)[31], the Court, while referring to *Stolt-Nielsen*, and building on it, goes even further, in highlighting the difference between the two types of arbitration :

> "Class arbitration...interferes with fundamental attributes of arbitration...class arbitration greatly increases risks to defendants. The absence of multilayered review makes it more likely that errors will go uncorrected. That risk of error may become unacceptable when damages allegedly owed to thousands of claimants are aggregated and decided at once. Arbitration is poorly suited to these higher stakes"[32].

**153 -** The powerful reasoning of these two judgments and the strong arguments they put forward - the fundamental differences between the two modes of arbitration, the regular bilateral one and the class action or representative proceedings arbitration; differences that "change the nature of arbitration"; and the great risks to which the later mode exposes defendants - all converge to highlight the necessity of a special consent of the parties in order to resort to class action or representative proceedings arbitration; consent that cannot be merely deduced or assumed from a simple consent to go to arbitration.

### D - The Interpretation of Silence

**154 -** The majority award totally ignores  this widely known and commented upon

---

[31] 563 US (2011), (decision of 27 April 2011).

[32] Slip Opinion, at 2.

jurisprudence and arguments. Instead, it goes into a cursory  "interpretation of the silence of the ICSID Framework".

155 - The  reasoning of the majority award can be summarized as follows : given the "object" of the BIT and the "spirit" of the ICSID Convention, which are presumably, according to the majority award, reduced solely to affording "effective protection" to investments and investors, "where the BIT covers investments which are susceptible to involve a high number of investors...it would be contrary to the purpose of the BIT and the spirit of ICSID to require in addition to the consent to ICSID arbitration in general a supplementary express consent to the form of such arbitration" (para. 518); i.e. "it would be contrary to the purpose of the BIT and to the spirit of ICSID to interpret this silence as a 'qualified silence' categorically prohibiting collective proceedings, just because it was not mentioned in the ICSID Convention" (para. 519). And if consent to ICSID arbitration covers collective proceedings, it has also - presumably by necessity or necessary implication - to cover the power of the Tribunal  to devise the adequate procedures to deal with them, in derogation of "the standard procedure" (para. 519).


156 - This wobbly line of argument by affirmation, assumption and reasoning by necessity, does not withstand scrutiny. In the first place, it is premised on the assumption that the Tribunal has jurisdiction *ratione materiae* over the subject-matter of the mass claims; an assumption that I have refuted in the previous section.


157 - Secondly, the reasoning is also premised on and proceeds from a purely subjective, truncated and partial representation of the object and purpose of the ICSID Convention and

the BIT, which is a recurrent theme throughout the award. The reader cannot but be struck by the repetition *expressis verbis* in two successive paragraphs (para. 518 and 519), at a few lines interval, of the reference to the "spirit" of the ICSID Convention and the "purpose" of the BIT. Spiritism apart, the object and purpose of these two treaties - the ICSID Convention and the BIT - are described as being exclusively to afford maximum protection to foreign investment and foreign investors; as if these treaties were "unilateral contracts" creating rights for the benefit of one party only. In consequence, according to this vision, all the provisions of these treaties have to be interpreted exclusively with this aim in mind.

**158 -** Viewed from this perspective,  all the limitations to the jurisdiction of ICSID tribunals, whether inherent or patiently and carefully negotiated and stipulated in the treaty to protect the interests of the State party (which are after all, the collective interests of its population) are seen as obstacles in the way of achieving the "purpose" of the treaties, which have to be overcome at any price and by whatever argument.

**159 -** This unilateral vision is in stark contrast to the "object and purpose" of the ICSID Convention, as expressed in the Report of the Executive Directors in the following terms :

> "While the broad objective of the Convention is to encourage a larger flow of private international investment, the provisions of the Convention maintain a careful balance between the interests of investors and those of host States".[33]

---

[33] Report of the Executive Directors on the Convention, para. 13.

**160 -** Proceeding from these premises, the majority award simply affirms that "it would be contrary to the purpose of the BIT and to the spirit ICSID to interpret this silence [of the ICSID Convention or Framework as it calls it] as a 'qualified silence' categorically prohibiting collective proceedings, just because it was not mentioned in the ICSID Convention" (para. 519).

**161 -** The majority award does not explain at any length what it exactly means here by "qualified silence", nor why it considers that this concept does not apply in the present case or the consequences of its application or non application. This results in confusion at two levels, the first of which relates to the meaning and relevance of the term *in casu*. "Qualified silence" is not a term of art; for example, it does not appear in law dictionaries. Occasionally, however, one encounters, in writings on American constitutional law, such expressions as "the qualified silence of the law-maker" (or "the intentional imperfection of the law"). They describe, in a piece of legislation dealing with a particular subject, its silence over certain substantive issues falling within the subject treated, that were left intentionally open (for future legislative treatment, for lack of consensus, etc.). In consequence, analogy cannot be used to extend the legal regulation to these issues by those who subsequently interpret and apply the law, as this would go against the intent of the law-maker.  But this is a completely different context, poles apart from that of establishing the existence and scope of the individual consent of a State to submit to arbitration,  which is what is at issue here.

**162 -** This brings me to the second level of confusion in the majority award. Indeed, the award, in its analysis, confuses here two layers of consent (see above para.15) :

a) the consent or acceptance to be bound by the ICSID Convention as such, by ratifying or acceding to it, which by itself does not contain any consent or obligation to arbitrate; and

b) the specific acceptance by a State to submit a dispute or certain disputes to arbitration within ICSID, whether by way of a BIT or otherwise (a compromissory clause, etc.), which constitutes the specific jurisdictional title.

The two do not coincide in time nor necessarily in their scope (para. 13 above).

**163 -** Argentina's jurisdictional plea is directed more specifically to the second layer of consent, though it covers both layers; whilst  the majority award addresses only the first layer, ignoring almost totally the second layer of consent, which is the crux of Argentina's plea.

**164 -** If what is at issue here is Argentina's specific consent to arbitrate, then what counts most in the interpretation of the jurisdictional title is the establishment of the validity and scope of that consent at the time it was given. It is thus paradoxical,  that in order to support its affirmation that the ICSID Convention's silence  over "collective proceedings", is not a "'qualified silence' categorically prohibiting [such] proceedings", the majority award advances the argument that "at the time of conclusion of the ICSID Convention, collective proceedings were quasi inexistent, and although some discussions seem to have taken place with regard to multi-party arbitrations, these discussions were not conclusive on the intention to either accept or refuse multi-party arbitrations, and even less so with regard to admissibility of collective proceedings" (para. 519).

**165 -** It is paradoxical because this argument supports exactly the opposite proposition to that which the award is attempting to prove. The fact that class actions or representative proceedings were almost unknown in national jurisdictions, and more so on the international level, at the time of the conclusion of the ICSID Convention in the mid-sixties of the last century, proves that these representative proceedings were way beyond the "horizon of foreseeability" of the drafters of the ICSID Convention. Those drafters could not have envisaged such proceedings; nor is there any basis to assume that they would have included them, had they envisaged them, given the fundamental differences between these proceedings and the arbitration model familiar to them (as discussed below). Those drafters were simply creating a framework for *ad hoc* international arbitration, within the parameters of *ad hoc* international arbitration as they knew them at that time, particularly its specific consensual basis for every case, as with all international adjudication. They were not establishing an open-ended standing court of general jurisdiction (*juridiction de droit commun*) covering all possible present and future disputes. This is clearly reflected in the last paragraph of the Preamble of the ICSID Convention :

> "Declaring that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration"

**166 -** Thus, the above argument of the majority award based on the unforeseeability of collective actions at the time of drafting the Convention, paradoxically bears in favour of interpreting the silence of the ICSID Convention as not extending to cover such an extra-

ordinary type of judicial activity as representative proceedings or class actions.  However, even if we assume *arguendo* that the ICSID Convention can be over-stretched by subsequent interpretation, pushing back its outer-limits to accommodate collective proceedings, this would not apply to the second layer of consent, the specific consent to arbitrate within the ICSID framework.

**167 -** Here, the interpretation of the jurisdictional title has to establish the reality, validity and scope of consent, as it was given, at the time it was given, by each party. And it is here that the "interpretation of silence" of the jurisdictional title becomes crucial : Does the mere "consent to arbitrate" within the ICSID framework cover mass claims actions and proceedings (whatever we call them) ?

**168 -** As a rule, silence does not have a meaning in itself. It cannot be made to speak one way or another; unless it is surrounded by circumstances that impregnate it with a certain meaning; what is called in civil law and in French "*silence circonstancié*", a more expressive term than "qualified silence" which is also used, on rare occasions, in international law in the same sense[34].

**169 -** The circumstances that surround and impart meaning to silence, can be factual or legal. Both these types of circumstances exist and can easily be identified *in casu*.

---

[34] See for example the WTO Panel Report *Guatemala - Definitive Anti-Dumping Measures on Grey Portland Cement from Mexico,* Report of the Panel of 24 October 2000, at para. 8.23 : "We note that 'acquiescence' amounts to 'qualified silence', whereby silence in the face of events that call for a reaction of some sort may be interpreted as a presumed consent". See also, in the same sense, Mark Villiger, *Customary International Law and Treaties* (The Hague, Kluwer, 1977), p. 39.

**170 -** The elements of fact or factual circumstances that qualify the silence of a jurisdictional title by which a State consents to ICSID arbitration, in the sense of limiting it to normal bilateral (or limited multiparty) arbitration, thus excluding collective mass claims actions or representative proceedings, are simply the great differences between these two types of proceedings.

**171 -** The sheer difference in volume and number of claims and claimants between the bilateral or even the limited multiparty arbitration (14 Claimants in the largest case in ICSID)[35], which permits an individual, detailed and adversarial examination of every claim and claimant, and the 60.000 claimants in the instant case, is staggering. It constitutes what is called in physics a "quantum leap" (*saut qualitatif*) which transforms quantitative change beyond a certain point into qualitative change[36]. The change here is from the micro-analysis and treatment of individual phenomena (i.e. claims and claimants) individually, into the

---

[35] *Bernardus Henricus Funnekotter and others v. Zimbabwe*. ICSID Case No. ARB/05/6, Award of 22 April 2009.

[36] The argument raised at one point by the Claimants, but not taken up by the majority award (though occasionally it seems to imply it), that collective mass claims actions are mere multi-party actions as there is no recognized threshold that separates them, is extremely tenuous, verging on the absurd. International law knows several such situations. For example, up to now there is no agreed or generally recognized threshold that separates air space, which is part of the territory of the State, from outer-space which is a *res communis*. Similarly, until the Montego Bay UN Convention on the Law of the Sea of 1982, there was no general agreement on the width of the territorial sea, i.e. on the threshold that separates that sea, which is part of the territory of the State, from the high seas. But here again, the absence of an agreed threshold did not mean that these two areas did not have, or prevented them from having two radically different legal status. In any case, whatever the threshold that separates, or the criterion for distinguishing, multi-party actions from collective mass claims actions, it is obvious that 60.000 claims fall on the side of collective mass claims actions.

macro-analysis and treatment of large masses of individual phenomena as an impersonal whole, that cannot take into consideration the individuality of the components.

**172 -** It is precisely this fundamental difference that the US Supreme Court highlighted in the *Stolt Nielsen* judgement when it found that representative proceedings or "class action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator"[37].

**173 -** The other type of circumstances that can surround silence and impart it with meaning and significance, are of a legal nature, pertaining to the legal context of the interpreted instrument, such as the concepts of "course of performance", "course of dealing" and "trade usages", in interpreting contracts, or other legal concepts and principles that form part of the legal environment of the interpreted instrument. One such legal concept or rule which is well known in the arbitration environment but over which the majority award passes in silence, is described in a very recent article by the same author quoted by the majority award, S.I. Strong[38], as follows :

---

[37] *Supra* note 29, and accompanying quotation.

[38] S.I. Strong, "Does Class Arbitration 'Change the Nature' of Arbitration ? *Stolt Nielsen, AT&T* and Return to First Principles", 17 *Harvard Negotiation Law Review* , (forthcoming 2012), available electronically at http://ssm/abstract=179128.

"[T]he first question raised in every arbitration is whether the parties have agreed to arbitrate this particular dispute. This issue ... can be termed 'primary consent'... Instead, class arbitration focuses for the most part on what can be called 'secondary consent', meaning consent to this particular type of procedure". She adds : "*This concept is by no means unique to class disputes, since traditional multiparty arbitrations are also required to establish secondary consent in cases where the arbitration agreements are silent or ambiguous as to multiparty treatment*"[39].

**174 -** According to this concept or rule, the need to establish secondary consent applies to both multi-party arbitration and *a fortiori* to collective mass claims actions or representative proceedings.

---

[39] *Ibid,* pp. 55-56, emphasis added, footnotes omitted. In footnote 255, Strong cites Lew et al, *Comparative International Commercial Arbitration* (2003), on the need to establish secondary consent in both class and traditional multiparty arbitration; and in note 256 she cites numerous cases on the requirement of secondary consent in multiparty arbitrations.

**175 -** This applies also in the ICSID context. That we have no precedents or writings about the subject is simply because the issue did not arise until now before an ICSID tribunal as concerns collective mass claims actions. Concerning multi-party arbitrations, as the majority award states, the issue was raised during the drafting of the ICSID Convention, but the question was left open. It was debated during the latest revision of the Rules, but again was not expressly addressed in the revised Rules of 2006. But the absence of written regulation does not mean absence of rules. Indeed, the few cases of multi-party arbitrations that took place within the ICSID framework (and also NAFTA), were always either with the clear agreement of the parties or with no objection from the Respondent, which amounts to an implied consent. Thus, the rule of "secondary consent" was consistently upheld in multi-party arbitration[40]. And if this is the case in multi-party arbitrations, *a fortiori* it has also to be the case for collective mass claims actions.

### E - Mass Claims Processes in International Law

**176 -** Most of the analysis up to now has been of the "consent to arbitrate" and its limits in national legal systems, including international commercial arbitration which is, in the final analysis, subject to national law and national judicial control. But of course ICSID arbitration is situated on the international level, i.e. in international law, which is, as described above (paras. 8,16) much more strict and exacting as regards the requirement of consent and its

---

[40] Schreuer, *The ICSID Convention. A Commentary* (2d edition, 2009), p. 163, para. 279, cites the *Klöckner v. Cameroon* case, where Cameroon initially raised the objection that the use of the word "national" in singular in Article 25(1) of the ICSID Convention barred an arbitration with multiple parties on the Claimants side, but subsequently dropped the objection.

ascertainment as basis of jurisdiction.

**177 -** The foregoing analysis thus applies *a fortiori* and with greater legal force when it comes to *ad hoc* international arbitral tribunals, such as the ICSID tribunals, and the interpretation of the "consent to arbitrate" before them. The analysis leads inexorably to the conclusion that a mere "consent to arbitrate" does not cover the fundamentally different and atypical proceedings of collective mass claims actions, such as the present one (whether we qualify them as collective, class, representative, aggregate or otherwise), and that a "secondary consent" is required for such proceedings to be covered.

**178 -** In their written and oral pleadings, counsel and legal experts  for the Claimants argue that several mass claims processing programs took place on the international level in recent time, with a view to convincing the Tribunal    a) that such procedures are possible and admissible on the international level; and   b) that the Tribunal, by analogy, has jurisdiction and is empowered to do the same, which also implies, according to them, the Tribunal's power to devise the appropriate procedures to handle such mass claims.

**179 -** Although the majority award chose to ignore this aspect, I consider it important and highly relevant to examine the other experiences of processing mass claims in international law, in order to establish what can or cannot be done in the present case.

**180 -** The analogy that counsel and legal experts for the Claimants sought to draw between the mass claims processing programs that existed up to now on the international level and the

present collective mass claims action, is a false analogy. It glosses over fundamental differences between these programs and the present case.

**181 -** First and foremost among these differences is the legal basis on which these programs were established, and which is the crux of the matter here under discussion, namely whether the Respondent, by merely consenting to arbitration within the ICSID framework, has also consented to arbitrate the present collective mass claims action.

**182 -** If we examine all the examples of international mass claims programs that have been mentioned by counsel and legal experts for the Claimants, and which are discussed in one of the Claimants legal annexes to which recurrent reference was made[41], covering indeed all the known instances, we note the following common major features that distinguish them from the present case :

**183 -** a) Each one of them, without exception, was specifically established to process a particular set of mass claims. None of them was set in motion by an application to a standing Tribunal, or on the basis of a prior compromissory clause (or another prior jurisdictional title) as in the present case.

**184 -** b) In all these cases, with one exception, the program, as a specific response to a specific crisis ("the same set of facts" giving rise to the claims), was established by an

---

[41] CLA 185. In fact, it is an excerpt of a book edited by Judge Howard Holtzman and Edda Kristjansdottir, *International Mass Claims Processes : Legal and Practical Perspectives* (OUP 2007), prepared under the auspices of the PCA Steering Committee on International Mass Claims.

agreement between the parties, i.e. on the basis of the consent of all parties concerned. The one exception is the United Nations Compensation Commission (the UNCC), which was established by the Security Council, using its exceptional powers (mandatory on all member States) under Chapter VII of the UN Charter.

**185 -** The fact that all known cases, save for the UNCC, which is of no relevance to the present case, are based on a special agreement between the parties, is of particular significance to the present case, and to the point under discussion here, namely whether a mere consent to arbitrate within the ICSID framework covers subsequent collective mass claims actions. If in all known international cases (barring the fiat of the Security Council) a special agreement is needed, then, in the absence of such agreement, but within an already existing arbitral framework, at least a "secondary consent" is needed.

**186 -**    c) All these mass claims processing programs on the international level, with one notable exception (and another minor one, see below note 42) took the form of administrative compensation commissions, quasi-judicial bodies rather than fully judicial or arbitral tribunals. Of course, they are subject to certain due process requirements, but this is not the same as judicial or arbitral due process. Thus, the procedure is normally non-adversarial, and the remedies can be in terms of flat-rate compensation, etc. The treatment of claims is not necessarily individual. Although, in the UNCC for example, for State claims and large individual claims, the examination was individual. This type of procedure is not relevant to the present case, where the requirements of the judicial or arbitral function and the judicial or arbitral due process have to be completely and strictly observed.

**187 -** The one notable exception is the Iran-US Claims Tribunal. And this exception proves the rule. Claims are dealt with individually, though occasionally related claims were dealt with in one case (as is done in all ordinary tribunals). The Iran-US Claims Tribunal was established by special agreement to deal with a specific set of claims. And it functions not as an *ad hoc* tribunal dealing with all these claims at one go, in one suit or action, but as a standing regular Tribunal examining claims individually and adversarially[42], the same as the old Mixed-Arbitral Tribunals of the 19th and early 20th century.

**188 -**    d) None of these mass claims processing programs, whether called Tribunal, Commission or otherwise, took on itself or was authorized to invent its own procedures from scratch. The main parameters of these procedures, particularly the ones that deviate from the normal patterns and are thus more controversial, were set out in the agreement or the legal instrument establishing the body (or their drafting and revision were kept in the hands of the Parties or the organ that established the program).

**189 -** On all these crucial points, the international precedents and experiences make it abundantly clear the necessity of the agreement of all parties in order to establish a mechanism with jurisdiction to process a particular set of mass claims  - or collaterally,  to endow an already existing body or framework with such jurisdiction - and to devise the procedures for so doing; in stark contradiction with the findings of the majority award in the

---

[42] The other minor exception is the first phase of The Claims Resolution Tribunal for Dormant Accounts in Switzerland (CVRT-I), which also functioned along similar lines.

present case.

**190 -** *My conclusion* on the first preliminary objection of Argentina is that, in conformity with what is followed both on the national law level, including in international commercial arbitration, and on the international law level, which is the applicable law in the present case, a mere acceptance to arbitrate does not cover collective mass claims actions (regardless of the denomination) and that a special or secondary consent is needed for such collective actions.

**191 -** In consequence, Argentina's consent to the ICSID Convention and the BIT does not extends to collective mass claims actions, and this Tribunal lacks jurisdiction to hear the present case.

**192 -** And if the Tribunal has no jurisdiction to hear the case, the question of whether it has the power to devise, revise or adapt the rules of procedure to handle it, becomes moot.

**193 -** But as the majority award found that the Tribunal has jurisdiction over the present collective mass claims action and that, in consequence - reasoning by necessity - it also has to have the power to devise or "adapt" the rules of procedure to handle it, I feel duty bound to address this last question.

*F - The Limits of Procedural Improvisation*

74

**194 -** Even if *arguendo* the Tribunal had jurisdiction to hear the present collective mass claims action (which I already refuted), it still faces a fundamental obstacle that prevents it from proceeding as the majority award proposes to do. This insuperable obstacle is that the Tribunal is not authorized, nor has the power, under the ICSID Convention and the Arbitration Rules, to adopt *proprio motu* (on its own motion or initiative), a whole set of rules of procedure, replacing the normal "Arbitration Rules" or large segments thereof, without the agreement of the Parties or the approval of the Administrative Council, even if it is only for the purposes of handling the present case.

**195 -** Two points of clarification are here in order. First, although this question was raised as part of Argentina's first preliminary objection, it is based on different grounds, as it assumes *arguendo* that Argentina's double consent to the ICSID Convention and the BIT covers collective mass claims actions, which is precisely what Argentina contests in its first preliminary objection. If Argentina's consent is also mentioned here, it is as a third type or layer of consent envisaged in Article 44 of the ICSID Convention, when it refers to rules of procedure "agreed by the parties", in the context of  elaborating rules of procedure for a specific case; on the assumption that the Tribunal has already established its jurisdiction over the case. The distinction between these three layers of consent (to Convention, BIT and within Article 44), should always be kept in mind, which is not the case of the majority award.

**196 -** The second point of clarification concerns the legal nature of this preliminary point. What is in question here is the inherent and institutional limitations on the power of the

Tribunal to devise, revise or "adapt" the rules of procedure in a specific case, i.e. certain limits on its powers in exercising its judicial or arbitral function. As such, it is essentially a question of jurisdiction - jurisdiction in its first and foremost sense of the legal power to exercise the judicial or arbitral function (see above para.10) - and not a question of admissibility as maintained by the majority opinion.

**197 -** Be that as it may, the results of the examination of this issue must be the same. For if it leads to a finding that the Tribunal is not empowered to undertake the "revisions" or "adaptations" set out in the majority award, the award would be *ultra vires,* regardless of the legal characterization by the award of this preliminary issue.

**198 -** The majority award, having determined that the silence of the "ICSID framework" over collective mass claims actions constitutes a "gap" - i.e. an unintended omission - and not a "qualified silence" - i.e. a deliberate exclusion or limitation (while glossing over the limits of Argentina's consent to arbitrate), seeks to rest its power to fill this so-called "gap" on Article 44 of the ICSID Convention and Article 19 of the Arbitration Rules, describing them as "the mere expression of the inherent power of any tribunal to resolve procedural questions in the event of lacunae" (para. 521).

**199 -** Article 19 of the Arbitration Rules, entitled "Procedural Orders", provides :

"The Tribunal shall make the orders required for the conduct of the proceedings".

This Article has nothing to do with filling gaps. It merely states the obvious, that the Tribunal controls and directs the unfolding of the proceedings through procedural orders, frequently

reflecting also the agreement of the parties. It thus decides such matters as fixing the time-limits, the language or languages used, whether the case will have one or two phases, etc., as well as deciding on the different requests of the parties and the incidents of procedure.

**200 -** Article 44 of the ICSID Convention is more to the point here under discussion. Enunciating the applicable procedural law, it provides, in its second sentence :

> "If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question".

**201 -** It is clear from this text that the situation envisaged in that provision is that of an issue arising in the course of the proceedings which is not addressed by any specific rule of the applicable procedural law. In other words, it is a situation where no rule exists at all; and not one where a rule exists, but may not provide the best or most suitable solution to the issue at hand, which raises the question of revising or replacing the existing rule rather than filling a gap.

**202 -** It is also clear from the text that what is envisaged in terms of "filling a gap" is the odd missing rule (by inadvertence or oversight) or a small missing element or cog of a rule necessary for its implementation, what is called in the general theory of law a "technical gap"; and not whole sets or chapters of rules that cover complete segments of procedure (such as the administration of proof or the role and due process rights of the parties in the proceedings). Such major subjects require a "legislative jurisdiction" (the jurisdiction of the

77

parties or the organ that adopted the initial legal regulation), going far beyond the limited power of filling gaps that can be encompassed within the judicial or arbitral function.

**203 -** Indeed, all the examples that can be found of the exercise of such a power, whether in the ICSID framework or by other international tribunals, never go beyond such limited gaps calling for one specific norm or rule to fill it. Thus, in the ICSID context, the examples that can be found of decisions taken in the exercise of the power granted by Article 44 are limited to admitting an *amicus curia* submission (in *Suez and AWG v. Argentina);* or staying proceedings pending the determination, by some other competent forum, of an issue relevant to the tribunal's own decision (*SGS v. the Republic of the Philippines)*[43].

**204 -** The majority award is conscious of these limitations. Thus, after affirming its power to fill gaps under article 44, it adds : "...this does not mean that the scope of this power is unlimited...the Tribunal is bound by the limits set forth by Article 44" (para. 520). It then proceeds to articulate these limits as follows :

> "[T]his power is limited to filling gaps left by the ICSID Convention and the Arbitration Rules...[i]n contrast [to] a *modification* of existing rules [which] can only be effected subject to the parties' agreement.."(para. 522, emphasis added). It is "further limited to the filling of gaps... in the specific proceedings at hand... [i.e.] limited to the design of specific rules to deal with specific problems arising in the proceedings at hand" (para. 523). Thus, "the Tribunal cannot  i) modify the current

---

[43] See Schreuer, *The ICSID Convention. A Commentary* (2nd ed. 2009), Art. 44, paras 57, 58).

arbitration rules [presumably in a specific case] without the Parties consent; ii) adopt a full set of procedure unless the Parties have agreed that the Arbitration Rules.... should not apply without substituting their own rules" (para. 524).

**205 -** Problems however arise when the majority award tries to demonstrate how what it proposes to do, by designing specific rules to replace a good part of the "Arbitration Rules", falls within these limits. The award starts by posing the key question :

> "Can the Tribunal fill the gap created by the collective aspect of the claim on an *ad hoc* basis and through *the design of specific rules,* or would this require the creation and/or modification of general rules which are under the competence of the Administrative Council ?" (para. 526, emphasis added).

**206 -** Responding to this question by the simple application of the limits on the power of the Tribunal under Article 44, as formulated by the majority award itself, leads logically, and inescapably in my submission, to a clear negative answer.

**207 -** But the majority award tries to fudge this clear answer by considering that "[t]his question cannot (and should not) be answered in the abstract...[but] in a concrete manner, i.e. asking itself  (i) what are the [needed] specific rules...and  (ii) can [they] be considered to fall within [the power of] Article 44 ?" (para. 527).

**208 -** The majority award then embarks on a tortuous argumentation , ending with  the Tribunal arrogating to itself the power to set aside, in large measure, the existing Rules of

Procedure, and replacing them by another set of rules of its own; acting as a legislator, be it for one case.

**209 -** In order critically to examine the  reasoning of the majority award in a comprehensible manner, rather than analyzing it statement by statement, I propose to divide the arguments into three categories, corresponding to the three lines of the shifting strategy of justification followed by the award  in defense of its proposed course of action :

i) that it is merely filling a gap;

ii) that in any case it is introducing innocuous changes that do not affect the substantive rights of the parties and only minimally their procedural rights;

iii) and to the limited extent to which these latter rights are affected, their limitation is justified by a balancing of the interests of the parties.

*a) - On Filling Gaps :*

**210 -** Having declared that the power of the Tribunal under Article 44 of the Convention "is limited to filling gaps" and does not extend to "a modification of existing rules" (para. 522), the majority award proceeds to describe the method it proposes to fill the gap, consisting in "the design of the specific rules... that would be necessary in order to be able to conduct the present proceedings" (para. 526-527);  "...the adaptations required relat[ing] strictly to the manner of conducting the present proceedings" (para. 534). In other words,  "it is the manner in which the Tribunal will conduct such examination [of the claims, i.e. the controverted rights and obligations of the Parties] which may diverge from the usual ICSID proceedings" (para. 534).

**211 -** But if the new specific rules cover "the manner in which the Tribunal will conduct [the] examination of the [claims]" or "the conduct of the present proceedings", this obviously covers most of what is usually covered by the rules of procedure, including those in the Convention and the Arbitration Rules. And these new rules "*diverge from the usual ICSID proceedings*", i.e. Rules of Procedure (emphasis added). In other words, they set them aside and replace them *in casu.*

**212 -** Obviously, this has nothing to do with filling gaps. First we are not speaking here of a gap, in the current sense in rules of procedure of a "technical gap" - the odd, inadvertently unprovided for contingency, or the small missing detail (like a cog or a screw) necessary for implementing a rule - which can be filled by a  tribunal or another implementing organ. We are speaking here of whole chapters, segments or sections of regulation. Technically, this is an "unauthentic" or "legislative gap", calling not for filling a small gap, but for a complement of the legal regulation, which needs a "legislative jurisdiction",  belonging to the organ or the parties who adopted the original instrument to be complemented, but which lies beyond the "adjudicative jurisdiction" of the implementing organ.

**213 -** Secondly, what the majority award proposes to do is not "filling a gap", but modifying ("diverging from") the existing rules of procedure. A gap or lacuna is a void, an empty legal space not covered by any rule. But here we have a complete legal regulation, covering almost  every instance of the proceedings. What the majority award proposes is to replace most of it by another set of rules, which cannot be seen, by any stretch of imagination, as filling a void.

It is clearly a modification or revision of the existing rules,  though limited to the current case.

**214 -** The majority award tries to defend its position as follows :

> "The Tribunal...can and ought to fill gaps left where the application of existing rules are not adapted to the specific dispute submitted to ICSID arbitration. In such a case, *the filling of the gap does not consist of an amendment of the written rule itself, but rather of an adaptation of its application in a specific case"* (para. 525, emphasis added).

**215 -** This statement is extraordinary in at least two ways : first, it insists on using the language of "filling gaps", in the presence of norms dealing with the matter, i.e. where no gap exists, while realizing full well that the suitability of the existing rules is another matter that raises the question of their amendment, and not of filling gaps.

**216 -** Whence the second extraordinary feature of this argument, the distinction between "an amendment of the written rule itself" and "an adaptation of its application in a specific case" by "deviating" from its prescriptions, i.e. replacing it by another "specific rule", as abundantly described in the majority award. This baffling distinction is reminiscent of that other mystifying one between "conditioning... consent to ICSID jurisdiction to the fulfillment of a condition" and "conditioning the effective implementation of such consent... to the fulfillment of such a precondition" (discussed above, paras. 21-24).

**217 -** But no amount of sophistry and playing on words or newspeak can conceal the fact that the proposed adaptations "diverge from the usual ICSID proceeding" (para.533), i.e. from the existing Rules of Procedure. Nor can they transform the legal nature of this act or operation, dubbed here as "adaptation" which does not consist of providing for an inadvertently overlooked minor contingency or a small missing detail  in an existing rule needed for its implementation that would correspond to the meaning of "filling a gap"; but of *changing* or *substituting* the existing rules by other "specific rules", which clearly constitute an amendment, modification or revision of the existing rules; an operation which lies beyond the limited power granted to the Tribunal under Article 44 of the Convention.

**218 -** Nor does the fact that this so-called "adaptation" is effected only for the purposes of the current case, change the legal nature of the act or operation. After all, the jurisdiction of the Tribunal is limited to the case before it and its powers and even existence, do not extend beyond that. But in the specific case before it, the Tribunal will not follow the normative prescriptions of the written rule, but will substitute for them other normative prescriptions that "diverge" from them (rather than merely complement something that is missing in the normative prescriptions, which would correspond to the description of "filling a gap").  This means that in this specific case, the existing rule or rules have been "amended", "modified", "revised" or more radically discarded and totally replaced. In other words, the arbitrators would have exercised a "legislative jurisdiction" or "power", that lies beyond what is provided for in Article 44 of the Convention.

**219 -** And if in every case or whenever the arbitrators in a specific case consider that there

are more suitable or appealing rules of procedure, according to their will of whim, these arbitrators can brush aside the written rules of procedure in deciding the case before them, what would remain of the "written rule" and its binding normative effect ? It would be reduced to a mere recommendatory directive at the discretion of the Tribunal. It is true that the "Arbitration Rules" are largely *jus dispositivum*. But they can be replaced in a specific case only by the agreement of the parties, and not by the fiat of the Tribunal over the objection of a party.

**220 -** The artificial and tenuous character of this argument of the majority award, concerning the legal nature of the operation or act of "adaptation" (and whether it is "filling a gap" or an "amendment" of the Rules of Procedure), explains the slippage of the award's reasoning to a second line of defense, namely that, in any case, the "adaptations" envisaged are innocuous, with no or negligible consequence on the rights of the parties.

*b) The Scope of the Proposed "Adaptations" and their Incidence on the Rights of the Parties*

**221 -** In its second line of defense or justification, the majority award starts by trying to minimize the magnitude of the "adaptations" it proposes to undertake by such statements as: "...the adaptations...relate strictly to the manner of conducting the present proceedings, and in particular how to collect and weigh evidence" (para. 534; see also paras. 530,531,533).

**222 -** But once the rules governing the manner in which the proceedings are conducted

84

throughout a case (particularly the presentation and adversarial examination of the controverted claims and their supporting evidence by the parties and the assessment of these claims and the weighing of the evidence by the Tribunal) are covered by the "specific rules" designed by the Tribunal for the particular case under consideration, how much else is left to be governed by the regular rules of procedure ? In fact, the proposed "adaptations" cover large expanses,  if not most of what is included in any rules of procedure.

**223 -** Another argument in the same vein of minimizing the import of the proposed changes or "adaptations" of the rules of procedure, is the insistence of the majority award that these "adaptations" do not affect the merits, i.e. the controverted claims, but only the manner in which they will be examined and the way the Tribunal will conduct the proceedings. In other  terms, the majority award contends that these "adaptations" will not affect the substantive rights and obligations of the parties (para. 530-534). This implies, however, that by contrast they may touch their procedural rights (which the award acknowledges,  and tries to justify later on, as discussed below). And after briefly describing the proposed "adaptations" in terms of simplification of the marshalling and weighing of evidence and the examination of the claims[44], the award states that "such simplification of the examination process is to be distinguished from the failure to proceed with such examination" (para. 531).

---

[44] [I]t is undeniable that the Tribunal will not be in a position to examine all elements and related documents in the same way as if there were only a handful of Claimants.... [but  will resort to] a simplified verification of evidentiary material concern[ing] either the depth of examination of a ducument... or the number of documents to be examined, and if so their selection process..." (Para. 531).

**224 -** These affirmations and statements are properly baffling, for several reasons : first, Article 44, which is here under discussion, deals exclusively with rules of procedure. It goes without saying that the Tribunal has no power under this article or in general to touch the controverted substantive rights and obligations of the parties, that constitute the "object" or "subject-matter" of the claims before the Tribunal. The Tribunal is here to judge, not to retouch, these rights and obligations. If what the Tribunal does on the procedural level affects these substantive rights and obligations, such action of the Tribunal is clearly both illegal and *ultra vires*.

**225 -** Secondly, the implication that as long as the "adaptations" by the Tribunal are confined to "set[ting] strict boundaries to certain of the Parties' procedural rights" (para. 538), in fact abridging or curtailing these rights, without touching directly the Parties' substantive rights, such adaptation would be justified, is based on a clear fallacy. This fallacy consists of the radical distinction between substantive and procedural rights, and the treatment of the later as a second class category of rights at the disposal and discretion of the Tribunal (a distinction reminiscent of the manner in which  the majority award distinguishes between jurisdiction and admissibility).

**226 -** This radical distinction is false because if a substantive right, or a right *tout court,* is defined in the general theory of law as "an interest (or a value) protected by law", then the procedural rights or guarantees that back it up are an essential part of this legal protection; their curtailment, abridgement, or violation in any way, automatically puts in serious jeopardy the substantive rights they protect. It is a sheer aberration to try radically to separate

86

the two the way proposed by the majority award, pretending that the limitation of one (the procedural rights) does not affect the other (the substantive rights).

**227** - In the third place, the statement that the "simplification" of the examination of the claims and the evidence should be distinguished from failure to operate such an examination at all, is off the mark. Obviously, if the Tribunal does not examine the claims and the evidence, it would have totally failed to exercise its judicial or arbitral function. The question is not whether it has undertaken such an examination or not, but whether the so-called "simplified examination" it proposes to do, meets the judicial and arbitral standards of due process. The answer to this question depends on the extent to which the simplification affects the procedural rights of the parties, particularly the defense rights of the Respondent.

**228 -** The majority award tries to minimize the impact of its proposed "simplification" of the procedure (linguistic slippage again from the more alarming "adaptations" to the rather virtuous "simplification"), to hide the real legal nature of the operation, i.e. "modification". It does so by describing briefly the effects of the "adaptation" on the respective rights of the two parties.

**229 -** Starting with the *Claimants*, which is the easier case, the majority award states that the adaptation would concern only "the way [they] are represented" (para. 530), acknowledging "that TFA has been provided with powers which may go beyond the power granted to a normal agent under Rule 18 ICSID Arbitration Rules" (para.532). But the award immediately adds : "Admitting the present collective proceedings would thus also mean accepting TFA's

87

role as due representative of Claimants" (para. 532).

**230 -** This last sentence is yet another extraordinary statement. By which leap of faith, does the taking of jurisdiction by the Tribunal over the case, even in the form of a collective action, (assuming that the Tribunal has jurisdiction, an assumption I refuted above), justify and render legal and acceptable to the Tribunal the exorbitant status and powers of TFA ? Again reasoning by necessity that is not evident.

**231 -** Later on, the majority award justifies the exorbitant character of "the TFA Mandate Package [which] has the effect to  depriving [sic] Claimants of a substantial part of their procedural rights", by the fact that it "has been consciously accepted by Claimants" (para. 546). This can be a valid justification, subject to public policy limitations, if this consent were fully informed and not tainted by fraud or forgery; that which is ascertained by the majority award, but which is contradicted by certain recent criminal condemnations for forgery (of the signatures of the mandates given to TFA) by Italian courts, that the majority award refused to take into consideration.

**232 -** Be that as it may, what counts most here is the effects of the new "specific rules" or "adaptations" on the rights of the Respondent, who has contested throughout the power of the Tribunal to introduce these "adaptations"; unlike the Claimants who have defended the power of the Tribunal to do so, and thus can be legitimately presumed to have accepted the incidence of these adaptations on their procedural rights, in their own self-interest.

88

**233 -** The "[e]*ffects on Argentina's defense rights"* of the proposed "adaptations" are assessed by the majority award as follows :

> "It *appears* that the effect of such examination method and procedure on Argentina's defense rights is *limited and relative*. Whilst it is true that Argentina may not be able to enter into full length and detail into the individual circumstances of each Claimant, it is *not certain* that such approach is at all necessary to protect Argentina's procedural rights in the light of the homogeneity of Claimants' claims"" (para. 545, emphasis added; see also para. 536).

**234 -** This minimalist representation of the effects of the "adaptations" on the rights of the Respondent - which contrasts with their more constraining description elsewhere in the majority award (e.g. para. 538) - calls for the following critical comments :

**235 -** i) Justifying the abridgement and curtailment of the procedural rights of the Respondent, particularly as concerns the individual examination of claims (and claimants) by the argument that the mass claims in question are sufficiently homogeneous, does not stand scrutiny (see above, paras. 139-142).

**236 -** This is because it is an absolute due process right of a respondent in a judicial or arbitral proceeding, to have every element of the claim or claims presented against him, examined by the tribunal, through adversarial debate that affords him full opportunity to contest and refute these elements one by one, if he can..

**237 -** This procedural right of respondents does not necessarily preempt any and all "group examination of claims" (para. 540). For as long as the mass claims are cast into one claim (with a mass of claimants) or are identical claims (which comes to the same thing as the tribunal, by examining one, would have examined them all) - which is the case for example of "class actions" - the tribunal can examine adversarially all the aspects and components of this one claim, in spite of the multitude of the claimants, totally safeguarding the due process rights of the respondent[45].

**238 -** But in the present case, the Claimants vigorously refute the characterization of their collective mass-claims action as class action. And although these mass-claims can be considered as arising "out of the same fact pattern", and thus share some common features (whence a degree of homogeneity), they are not identical and preserve some individualized features that distinguish them from one another. To the extent that the individual claims in the mass differ from each other, it is the absolute due process right of the defense, and the obligation of the Tribunal, to have them examined individually and adversarially by the Tribunal. The Tribunal has also to address and pass judgement on each of them and state the reasons on which it bases its judgement (Article 48/3 of the ICSID Convention). Failure to meet these requirements is a cause of annulment under the ICSID Convention (Art. 52/d).

**239 -** A "group examination" of mass claims that feature certain individual differences

---

[45] Even in class actions, as noted by the US Supreme Court in the *AT&T Mobility LLC v. Concepcion ET UX* case, "class arbitration greatly increases risks to defendants" (see above para. 152). These risks are exponentially greater when the mass is composed of differentiated claims.

among themselves, can at best deliver rough or approximate justice. It may satisfy the due process requirements of an emergency mass claims program or an administrative compensation commission. But it definitely falls well below the stringent due process standard of judicial or arbitral proceedings.

**240 -**  ii)  One cannot but note the hesitant and guarded language of the above-quoted assessment by the majority award of the effect of the "adaptations" on Argentina's defense rights :  - "it *appears*" that the effect "*is limited and relative*"; "*it is not certain that such approach*" of individual examination of differentiated claims "*is at all necessary to protect Argentina's defense rights*" (above, para. 234).

**241 -** This language of "appearance" (of an effect being "limited and relative") and of "uncertainty" (whether a due process guarantee is "at all necessary" to protect a right), reflects an evident unease of the majority award with its own argument, and its awareness of its frail and risky character. For good reason. For here, the majority award is treading rather heavily on the highly sensitive due process grounds.

**242 -** In the first place, the individual adversarial examination of differentiated (or non-identical) claims is an essential part of the very "object" or "subject-matter" of the Respondent's procedural defense rights, and is not a mere "approach", as the majority award calls it,  which it has decided to dispense with, because it  considers that "it is uncertain" that such an examination "is at all necessary to protect Argentina's procedural rights". In other words, according to the majority award, "it is not certain" that the subject-matter of a right  -

what it prescribes and legally guarantees for its holder - "is at all necessary" for the protection of that same right!

**243 -** Apart from logical confusion, this statement of the majority award reveals something even more serious, namely, that the Tribunal has substituted itself for the Respondent and decided in his place the question whether it is necessary for him to exercise some of his procedural defense rights or not. Moreover, it has answered the question on the basis of impressions and "appearance", almost by guesswork - "it is uncertain" - in order to reach the result it wanted to reach.

**244 -** Procedural rights, the same as substantive rights, are not at the disposal and the discretion of the Tribunal. If they are ascertained, they have to be upheld and enforced by the Tribunal; not confiscated, scuttled, abridged or curtailed by it. But this is exactly what the majority award has done in the present case. By imposing the "adaptation" or "simplified procedures", that deny Argentina an individual adversarial examination of the differentiated mass claims, the majority award has unlawfully curtailed the Respondent's defense rights and thus flagrantly violated the due process arbitral standards, apart from being manifestly *ultra vires*.

### c) Balancing of Interests Redux

**245 -** The majority award tries to evade this inexorable conclusion by shifting its argument, through yet another slippage, to a third line of defense or justification of the "adaptations", to wit, the balancing of the interests of the Parties. A balancing that the majority award operates

by comparing the consequences or effects of the "adaptations" on the rights of the Parties "with the consequences of rejecting the claims for lack of admissibility" (para. 537), in order to answer the question "whether it would be justified to set strict boundaries to certain of the Parties' procedural rights, so as to give actual effective protection to the investment" (para. 538).

**246 -** According to the majority award, the consequences of *admitting* the "adaptations" ("special rules, "simplified examination", etc.) on the procedural rights of the Parties are minimal, and the outcome beneficial ("the effective protection of the investment"). The "adaptations" pose no problem for the *Claimants*, who have requested and defended them all along, and accept their consequences in their own self-interest of protecting their investment. As far as the *Respondent* is concerned, according to the majority award (discussed above, para.232ff.), "[i]t appears that the effect of such [simplified] examination... on Argentina's defense rights is limited and relative", and "it is not certain" that the due process guarantees curtailed by the "adaptations" are "at all necessary to protect Argentina's procedural rights" (para. 545).

**247 -** By contrast, the consequences of *dismissing the case on grounds of inadmissibility* would be serious and prejudicial, according to the majority award. The "only alternative" left to *Claimants* would be for each of them "to file an individual ICSID claim" which would be "cost prohibitive to many claimants...[and] may equal a denial of justice" (para. 537). It would also "be a much bigger challenge to Argentina's [the *Respondent's*] effective defense rights...to conduct 60.000 separate proceedings... than [their] mere limitation" by the

"adaptations" (para. 545).

**248 -** On the basis of this exercise of "balancing the interests" of the Parties' at stake, according to its own subjective representation and evaluation of these stakes, the majority award finds that the "adaptations", i.e. "the procedure necessary to deal with Claimants' claims in a collective way", are "admissible and acceptable under Article 44 ICSID Convention, Rule 19 Arbitration Rules, as well as under the more general spirit, object and aim of the ICSID Convention" (para. 547).

**249 -** This exercise of balancing of interests calls for critical examination. It is intrinsically wrong, lies beyond the powers of the Tribunal and is based on wrong premises, as shown in what follows.

**250 -** The "balancing of interests" as operated by the majority award is intrinsically wrong because, by making the admissibility of the "adaptations" depend on the comparison of the consequences of their admission on the procedural rights of the Parties "with the consequences of rejecting the claims for lack of admissibility" (para. 537), the majority award is *treating these rights as "variables"* (or rather as dependant variables), whose recognition, scope and enforceability by the Tribunal are to be determined as a function of the Tribunal's subjective evaluation of the right balance of interests between the parties, which thus becomes, according to this logic, the parametric gauge of these rights. This is standing the legal logic on its head. A tribunal is duty bound to apply the law, i.e. to enforce rights not to put them in question, according to its own evaluation of extra-legal (or opportunity) considerations, be they its subjective representation of the interests of the

Parties.

251 - Such "balancing of interests" lies beyond the powers of the Tribunal. For, as explained earlier (para. 31), the Tribunal thus acts as if the rules do not exist, and are not themselves the result or outcome of a balancing of interests by those who adopted them. It is at that level, the legislative or conventional level, that the balance of interests takes place, the level of establishing the rules, not of applying them, which is that of tribunals. It is not open to the Tribunal to arrogate to itself the legislative jurisdiction or power of re-examining the rules in order to revise of refashion them, in the name of a rebalancing of interests of its own, according to its will or whim. In other words, such an exercise of "balancing of interests" is clearly *ultra vires* the powers of the Tribunal.

252 - Apart from the illegality and *ultra vires* character of the "balancing of interests", as represented and operated in the majority award, substantively the exercise is based on false premisses of law and fact.

253 - i - To say that the only alternative open to the securities holders if the present collective action is found inadmissible would be for each of them to file an individual ICSID claim, is wrong in fact. For as already shown (above para 33), apart from the Argentinean tribunals, that were not even tried, all the emphasis in the securities entitlement instruments was put on the chosen forum therein for dispute settlement, i.e. the tribunals of some of the major financial centres of the world as *the* judicial guarantee of the financial investment, beyond the reach of Argentina's law and tribunals. ICSID arbitration was never mentioned in

95

these instruments, nor in the advertisements and the road-shows for the sale of the instruments (as abundantly shown in the pleadings). The one judicial guarantee or recourse that stood out was the chosen forum.

**254 -** Moreover, one should not forget the Italian courts which were seized by some of the securities entitlement holders who succeeded on numerous occasions in obtaining relief against the banks that sold them the securities. This largely explains the creation by these very banks of the TFA and their belated discovery of ICSID arbitration as a way of deflecting responsibility from themselves.

**255** - ii - To say that dismissing the case for inadmissibility of the adaptations, "may equal a denial of justice" is triply wrong, because it is based on three false assumptions. In the first place, to imply that this would deprive the claimants from any efficient dispute settlement means, is wrong as just explained.

**256 -** Secondly, in order to speak of a denial of justice, a tribunal must first have jurisdiction over the case. But this Tribunal lacks jurisdiction *ratione materiae* over the claims (Part III above). It lacks jurisdiction to hear collective mass claims actions, as falling outside Argentina's consent to arbitrate (Part IV, *A* to *E* above), and it lacks the power to revise the Arbitration Rules in the instant case, in the absence of both Parties consent, as just discussed. Speaking of "denial of justice" in these circumstances is out of place.

**257 -** Thirdly, it is also out of place and even odd in international law to speak in general of

96

an absence of a competent forum (which is not the case here, as per para 253-254 above), in terms of "denial of justice". This is because international law, given its a-centralized character, has no system of courts or tribunals of plenary or general jurisdiction (*juridictions de droit commun*) covering all cases and litigants, barring a specific exception attributing jurisdiction over a particular type of matter or litigant to another specialized organ, and where every dispute or every claim can ultimately and necessarily find a competent forum to handle it. By contrast, as explained earlier (para 7), all international courts and tribunals are tribunals of attributed jurisdiction (*juridictions d'attribution*); a jurisdiction based on the consent of the parties or litigants and confined within the limits of this consent.

**258 -** iii - In fact, the majority award tries to claim the same powers as a tribunal of plenary or general jurisdiction through interpretation by calling on the "spirit", "aim" and/or "object and  purpose" of the ICSID Convention and the BIT, "in accordance with the principles of interpretation of treaties" (para. 528). But the principles of treaty interpretation, as codified in articles 31 and 32 of the Vienna Convention on the Law of Treaties of 1969, prescribe starting with the text in its context and be guided by the object and purpose of the treaty, if need be, to clarify any subsisting ambiguity. These principles do not prescribe nor justify, the invocation left and right by the Tribunal, of the object and purpose, as subjectively represented by it, in order to deduce directly from them the solutions it seeks to reach, jumping over text, context and general rules of international law applicable to the matter. Yet, this is exactly what the majority award does all along, as already noted (see e.g. para. 24, 157-159 above).

**259 -** In the specific context of "balancing of interests" discussed here, the majority award sollicites the object and purpose of the ICSID Convention and the BIT, according to its subjective and partial interpretation of them as being exclusively the effective protection of the investment, notwithstanding the legitimate interests of the host State, in order to answer in the affirmative the rhetorical question it put at the outset. To recall, this question was "whether...it would be justified to set strict boundaries to [i.e. abridge] certain of the Parties' procedural rights [but in fact only to the Respondent's, as the Claimants requested the "adaptations"  in their self-interest]... so as to give actual effective protection to the investment", i.e. the Claimants (para 538). And the answer, reached through the involved reasoning discussed above, is the award's finding that the "adaptations" are "admissible and acceptable under article 44 ICSID Convention, Rule 19 Arbitration Rules, as well as under the more general spirit, object and aim of the ICSID Convention (para. 547).

**260 -** Put in simple words, the answer is that the Tribunal can abridge the procedural rights of one party, the Respondent, against its will, in order to give greater ("actual effective") protection to the investment, i.e. to the other Party,  the Claimants' investors. The one-sidedness of this alleged balancing of interests is too glaring to need any further elaboration.

**261 -** This is symptomatic of a general strategy followed throughout by the majority opinion, consisting of three stages :

     i  - starting with a subjective, partial and truncated representation of the object and purpose of the ICSID Convention and the BIT, as being exclusively the effective protection of investment, all but totally disregarding the legitimate interests of the host State;

ii - considering, in consequence, that all limitations on the jurisdiction and powers of the Tribunal are obstacles in the way of achieving this object and purpose, that should be "down-graded", (even with untenable arguments) from "jurisdictional" to "admissibility" issues; wrongly assuming that admissibility is less important in its function and legal effects than jurisdiction;

iii - assuming wrongly again that questions of admissibility, are at the discretion of the Tribunal, which can dismiss them at will as a result of its own subjective "balancing of interests" in the light of "the more general spirit, object and aim of the ICSID Convention" (para. 547), as interpreted by the Tribunal.

Needless to say, this strategy has very little to do with rigourous legal reasoning and deciding by law and all the characteristics of sheer policy.

**262 -** My *conclusion* on this sub-section (IV F) in general is that the "adaptations" of the Arbitration Rules that the majority award prescribes for hearing the present case are manifestly *ultra vires* the powers of the Tribunal under Article 44 of the Convention and Rule 19 of the Arbitration Rules.

*G  -  Epilogue on Policy Considerations*

**263 -** Considering what has just been said, it is ironic that the majority award dismisses offhand the "Respondent's arguments regarding the appropriateness of ICSID proceedings in the context of sovereign debt restructuring" (para. 548); adding that

"[P]olicy reasons are for States to take into account when negotiating BITs and consenting to ICSID jurisdiction in general, not for the Tribunal to take into account in order to repair an inappropriately negotiated or drafted BIT" (para. 550).

**264 -** The majority award should have heeded its own directive, rather than read, or in effect write, into the Convention, the BIT and the Arbitration Rules, what is not there, but what it wishes  to see there.

**265 -** Indeed, the majority award accepts, in full and without reasoning, the Claimant's contention that Argentina's policy arguments are "outdated and irrelevant" (para. 514), calling them - in only slightly varied terms - "irrelevant and inaccurate" (para. 429(v). It also seemingly subscribes to the Claimant's policy argument that "opening the door to ICSID arbitration would create a supplementary leverage against such rogue debtors and therefore be beneficial to the efficiency of foreign debt restructuring" (ibid.). In order to create such leverage over sovereign debtors, which the ICSID Convention did not foresee and which financial markets did not contemplate, then or now, the majority award fashions an unprecedented procedure for adjudicating the present claim of more than 60.000 holders of Argentinean debt, out of the thin air of the tribunal's gap-filling powers under article 44 of the ICSID Convention. Driven in part by controversial policy considerations, hidden behind references to the spirit of the ICSID Convention and the purpose of the BIT, the majority award blows hot and cold at the same time, uncritically adopting the Claimant's policy arguments over the Respondent's, to which it hardly gave any attention.

**266 -** Up to this point, the reasoning in this dissenting opinion has kept to strict law, and this is how a judicial or arbitral decision should be. But a judge or an arbitrator, particularly an international one, cannot be totally blind to the social, economic and political environment which constitutes the larger context of the case. Policy considerations should never be determinative of a judicial or arbitral decision. But, within the permissible margin of interpretation, they can shed light on what makes sense or nonsense among possible alternative solutions, when seen against the larger background.

**267 -** In this respect, the following three major policy issues or queries, collaterally raised and necessarily affected by any decision taken in this case,  should have been given more attention:

**268 -**  i - As noted earlier (para. 35), this is the first ICSID case that involves a sovereign debt financial instrument (but I leave the sovereign debt aspect to the following point), that is totally unhinged and detached from any specific economic activity or project in the host country; in other words, completely detached from any form of investment in the economic sense of the term, which is also that of ICSID Convention. Affirming the jurisdiction of ICSID Tribunals over such instruments, would extend it over a vast new field. It would cover virtually all capital market transactions, ranging from standardized financial instruments, such as shares and bonds to structured and derivative products, such as hedges and credit default swaps. It would thus open the way to converting them from specialized tribunals, dealing with disputes arising out of a special type of investment, into commercial tribunals of general jurisdiction, covering all manners of financial transactions, including the most

speculative varieties, which have nothing to do, in fact are light years away from the economic investment for the encouragement of which the ICSID Convention was concluded.

Is this the direction for ICSID tribunals to follow?

**269 -** ii - This is also the first ICSID case, to my knowledge, that involves sovereign debt. It raises *prima facie* a crucial question : do ICSID tribunals have jurisdiction over sovereign debt instruments issued internationally, expressed in foreign currency and payable abroad, governed by various external laws and subject to the jurisdiction of various external courts, and traded as dematerialised security entitlements in global capital markets ?

**270 -** The majority award evades addressing this question frontally and on its merits, by purportedly deciding the issue on another ground, i.e. finding that these are financial instruments that are, as such, covered by the BIT (a finding refuted in Section III above). But evading the question does not dispose of it. For it remains central not only for the jurisdictional reach of ICSID arbitration in this particular case, but in relation to financial market transactions in general, as discussed in the previous point. The answer also matters greatly for the larger problem of sovereign debt crisis management, i.e. for the manner in which the international community and countries borrowing abroad will resolve the present and future sovereign debt crises and how the burden for such crises will be shared between taxpayers and creditors; a perennial challenge that is now occupying the daily headlines and confronting countries at all levels of development.

**271 -** Indeed, in view of the actual profound structural crisis of the international financial system; the absence of agreed international procedures regulating State bankruptcy; and the intense international discussions and efforts to improve the sovereign debt restructuring process, the present case raises, in an accute manner, an international public policy issue about the workability of future sovereign debt restructuring, should ICSID tribunals intervene in sovereign debt disputes. It suffices to ponder the potential disrupting effect of different *ad hoc* tribunals following separate ways or deciding at cross purposes with the desperate international efforts to reconstruct a semblance of a coherent international financial architecture. Such decisions can also potentially unravel patiently negotiated settlements (through the effect of the most favoured creditor clause inserted in most settlements). Ramifications that are depicted in a recent article as "opening Pandora's box" for sovereign debt[46].

Is this a proper role for ICSID's tribunals ?

**272 -** iii - Finally, the third policy consideration is a cautionary one. It is to caution against the tendency of certain ICSID tribunals to consider any limitation on their jurisdiction - whether inherent in the adjudicative function or carefully negotiated and stipulated in the ICSID Convention or the BITs, to protect the legitimate interests of State parties - as an obstacle in the way of achieving the object and purpose of these treaties, which they interpret as being exclusively to afford maximum protection to investment, notwithstanding the legitimate interests of the host State.

**273 -** Viewed as such, these limitations have to be disposed of, according to the tribunals in

---

[46] Michael Waibel, *supra* note 8.

question, at any price, be it the proper interpretation of the law. This leads to tenuous and untenable interpretations, particularly of jurisdictional titles, over-stretching the text beyond the breaking point, in order to extend jurisdiction to where it does not exist, particularly beyond its underlying consent.

**274 -** This misguided tendency, purporting to serve progress by expanding the rule of law and the role of adjudication in international society, is the worst disservice that can be rendered to the very positive movement that has characterized the last two decades towards increasing resort to adjudication and the multiplication of adjudicative fora on the international level. It is undermining the credibility not only of the ICSID system, but of the very idea of objective international adjudication, by eroding the confidence of States, whose consent remains the basis of jurisdiction, in the objectivity and good judgement of those to whom they may entrust the ascertainment of their rights. The risk of a back-lash is already pointing its head, it threatens to stop net, if not roll back the movement of progressive judicialisation of international law.

What is the proper and prudent course for ICSID tribunals to take in this regard?

**V - Conclusion**

**275 -** In conclusion, and while reserving my position on the other preliminary objections raised by Argentina, I consider and find that the first and ninth objections are valid and

should have been accepted and given effect by the Tribunal.

**276 -** In consequence, I consider and find

a) that this Tribunal has no jurisdiction *ratione materiae* over the sovereign debt instruments (security entitlements in Argentinean bonds) that are at the basis of the mass claims before the Tribunal, because they do not constitute a covered or protected investment under the ICSID Convention and the BIT, in the absence of a territorial link with Argentina;

b) that this Tribunal has no jurisdiction under the ICSID Convention and the BIT over the present collective mass claims action, absent the consent of Argentina, nor does it have the power to devise new procedures to hear such an action.

**277 -**   For these reasons, and with all due respect for my co-arbitrators, I cannot concur in the majority award and enter this dissenting opinion.

Georges Abi-Saab

28 October 2011

105

# Exhibit F



 Imprimir | Regresar a la nota

El país | Sábado, 16 de junio de 2012

**LA PRESIDENTA SE REUNIO CON EMPRESARIOS Y GARANTIZO QUE APUNTALARA EL CRECIMIENTO**

# "Vamos a tomar las medidas necesarias"

**Más de cuarenta representantes de las principales empresas de Estados Unidos participaron del almuerzo con CFK en el Council of Americas. La Presidenta habló de YPF, del dólar y de la crisis internacional.**

**Por Victoria Ginzberg**

Desde Nueva York



Cristina Kirchner, en el centro de la mesa principal, junto a empresarios norteamericanos y funcionarios argentinos.

"Tough questions, very good answers" ("Preguntas difíciles, muy buenas respuestas"), así resumió uno de los empresarios la reunión con la presidenta Cristina Kirchner que se realizó ayer en la sede del Council of Americas, en Nueva York. Al encuentro, que duró más de una hora, concurrieron más de cuarenta hombres y mujeres de negocios. Allí, CFK remarcó el crecimiento de la economía argentina, habló de su interés en propiciar inversiones conjuntas entre el sector privado y el Estado y explicó por qué se nacionalizó YPF. Sobre la empresa petrolera, anunció un road show para "hacer una oferta de modelos de negocios, producción, explotación y servicios". También se refirió a la crisis que afecta a la Eurozona. En ese sentido, envió un mensaje interno ("vamos a tomar todas las medidas necesarias para sostener el crecimiento y seguir incluyendo a los argentinos") y uno hacia el exterior: "Estamos ante un nuevo mundo, una nueva etapa y va a exigir nuevas definiciones y nuevas soluciones. Este enfermo no se cura con viejos medicamentos ni con recetas viejas. Que los médicos cambien las recetas, porque si no finalmente la gente elegirá también nuevos médicos".

Cerca del mediodía, varios hombres de traje y algunas mujeres comenzaron a entrar en el edifico de estilo neofederal que la familia Rockefeller donó al think tank de política y economía vinculado con "las Américas". Varios llevaban una valija de mano, señal que acababan de llegar del aeropuerto o que partirían para allí enseguida después del encuentro. Coches lujosos, pero no limusinas, los esperaron estacionados sobre Park Avenue, incluso a doble fila. Las banderas norteamericana y la argentina lucían por encima de la entrada principal, que da a la más elegante y residencial avenida de la ciudad. Cristina Kirchner usó la puerta que está sobre la calle 68. Allí la recibió Susan Seagal, directora del Council, quien conoce a CFK desde sus tiempos de senadora y primera dama.

## Gira mágica y misteriosa

En la reunión hubo altos ejecutivos de, entre otras empresas, IBM, JP Morgan, Ford, Fox, DirecTV, Cargill, Barrick Gold, Walmart, Procter & Gamble, Pfizer, Monsanto y Microsoft. Especial interés despertó la presencia de las petroleras Exxon y Chevron, que ya se habían reunido con el ministro de Planificación, Julio De Vido, luego de la nacionalización de YPF, con el fin de explorar posibilidades de hacer alianzas con la petrolera argentina para ampliar las inversiones del sector e incrementar la producción. El encuentro fue privado, pero el discurso de CFK se pudo escuchar a través de un televisor colocado en la planta baja del Council. Cuando salieron, luego del almuerzo, la mayoría de los asistentes se retiraron a las apuradas. Los que aceptaron conversar, remarcaron que le habían preguntado sobre todos los temas (el dólar, el control de precios, el petróleo) y que se habían quedado conformes con el resultado.

La Presidenta anunció que YPF hará un road show "para hacer una oferta de los modelos de negocios de producción y explotación y de servicios que hoy puede tener el mundo petrolero, con lo que constituye la empresa más importante de la República Argentina". Un road show es un evento en el que se da a conocer una marca o producto a sus potenciales inversores de manera directa a través de una gira por distintas ciudades. La Agencia Nacional de Hidrocarburos de Colombia, por ejemplo, realizó en mayo viajes a Nueva York y muchas otras ciudades del mundo para promover la licitación de 109 zonas petroleras y gasíferas. En la delegación argentina no se conocían ayer detalles de los planes de YPF, aunque se daba por hecho que la gira la encabezaría el presidente de la empresa, Miguel Galuccio, y con que Houston es un destino cantado.

Hubo más menciones a YPF. CFK señaló que la adquisición por parte del empresario mexicano Carlos Slim del 8 por ciento del paquete accionario era una "buena noticia" y luego se detuvo para explicarles a los ejecutivos presentes el porqué de la estatización del 51 por ciento de la compañía. "Hemos elegido el camino más difícil, podríamos haber hecho una nacionalización; una estatización del ciento por ciento del capital de YPF. Pero hemos elegido solamente tomar lo que nos permite el control de la compañía, seguir en la Bolsa de Nueva York, lo cual nos obliga a controles muy importantes, por la Comisión de Valores de nuestro país y de la SEC (la Comisión de Valores de Estados Unidos)". Mencionó que "no fue una expropiación que hubiéramos deseado hacer; simplemente por primera vez en la Argentina –en los últimos 17 años– habíamos tenido un déficit hidrocarburífero de más de 3000 millones, que nos comía parte de nuestro excelente superávit comercial y la política de la empresa (Repsol) era de desinversión en el país". Según mencionaron luego los ministros de Relaciones Exteriores, Héctor Timerman, y de Industria, Débora Giorgi, los empresarios le preguntaron a la Presidenta dónde veía YPF en cinco o diez años y ella respondió que "su sueño era que la política petrolera sea una política de Estado, que sirva para el desarrollo nacional y que sea una empresa de la que todos podamos estar orgullosos".

## Proyectos

Además de Timerman, Giorgi y De Vido, a la larga mesa del salón Bolívar del Council of Americas también se sentaron el ministro de Economía, Hernán Lorenzino, y el secretario de Legal y Técnica, Carlos Zannini. La Presidenta recordó allí que Estados Unidos es el segundo inversor en la Argentina, con más de 500 empresas, y que el 60 por ciento de las empresas más importantes de este país tiene desarrollo y crecimiento permanente en la Argentina.

Durante el encuentro anunció, mientras mostraba el prospecto, una inversión de Monsanto por 1800 millones de dólares (ver aparte). También ponderó un proyecto del laboratorio Pfizer, junto con ELEA, para la producción de una vacuna. Luego, Giorgi destacó que la empresaria de Pfizer pidió la palabra durante el encuentro para manifestar su satisfacción por el trabajo conjunto que están llevando a cabo.

## La crisis

Case 1:12-cv-03877-TPG   Document 17   Filed 07/26/13   Page 499 of 522

La Presidenta se refirió a la crisis europea y a su impacto en la Argentina. "Logramos acumular una gran cantidad de reservas que nos dan una posición de manejo sólido de no prolongarse demasiado la crisis en la Eurozona y si Estados Unidos pueda volver a convertirse en un motor de la economía mundial. Como los datos no son alentadores, obviamente los mercados reaccionan y pese a toda la solidez que hemos hecho, esto también tiene impacto en nuestra economía. Pero sostenemos que va a tener mucho menor impacto de lo que puede tener en otros países", dijo. Y aprovechó para hacer su diagnóstico y proponer un tratamiento, algo que seguramente retomará la semana próxima cuando participe en Los Cabos, México, de la reunión del G-20. "El principal problema que hoy afronta el mundo, más que económico, es una falta de liderazgo político claro y concreto de cómo abordar la crisis", señaló. Luego explicó que a su entender la crisis se resuelve a través del fortalecimiento del mercado interno, con acciones que favorezcan la demanda agregada en vez de políticas dirigidas al sector financiero. Y aunque señaló que en el marco de la situación mundial es posible que la Argentina no avance a las tasas de los últimos años, dijo que tomaría todas las medidas necesarias para sostener el crecimiento.

Contó una anécdota para respaldar sus argumentos. Relató que el año pasado, cuando se reunió con Nicolas Sarkozy en el Palacio Elíseo, ella le sugirió que, para solucionar los problemas de Grecia, deberían hacer algo similar a lo que hizo la Argentina en 2001, esto es, una reestructuración de la deuda con una quita, "de modo que el esfuerzo sea compartido". Sarkozy, entonces, se tiró hacia atrás y le dijo: "No, eso es imposible". "Bueno –concluyó la Presidenta–, a los pocos meses ya estaban hablando del 60 por ciento de la quita en Grecia y hoy Nicolás no preside Francia."

© 2000-2013 www.pagina12.com.ar | República Argentina | Todos los Derechos Reservados

Sitio desarrollado con software libre GNU/Linux.

**"We will take the necessary measures"**

More than forty representatives of major United States companies participated in lunch with CFK in the Council of the Americas.  The President spoke of YPF, the dollar and the international crisis.

By Victoria Ginzberg

From New York

"Tough questions, very good answers," is how one businessman summed up the meeting with President Cristina Kirchner which was held yesterday in the head office of the Council of the Americas, in New York.  The meeting, which lasted more than an hour, was attended by more than forty men and women in business.  There, CFK highlighted the growth of the Argentine economy, spoke of her interest in promoting joint investment between the private sector and the State, and explained why YFP was nationalized. Regarding the oil company, she announced a road show to "make an offering of business, production, exploitation and services models." She also referred to the crisis affecting the Eurozone.  In that sense, she sent an internal message ("we will take all the necessary measures to sustain growth and continue including Argentines") and one to the outside: "We are facing a new world, a new stage and will demand new definitions and new solutions.  This sickness cannot be cured with old drugs or with old recipes.  Physicians must change their prescriptions, because if they don't, people will eventually choose new physicians."

Around noon, several men in suits and some women began to enter in the building of neo style that the Rockefeller family donated to the policy and economy think tank linked to "the Americas."  Several had suitcases in hand, who had just arrived from the airport or signaling that they would be heading there immediately after the meeting.  Luxury cars, but no limousines, waited for them, parked and double-parked outside on Park Avenue.  American and Argentine flags hung above the main entrance, facing the city's most elegant and residential avenue.  Cristina Kirchner used the door located on 68th Street.  There she was received by Susan Seagal, Director of the Council, who knows CFK since their days as Senator and first lady.

**Magic and Mysterious Tour**

In attendance at the meeting were senior executives from such companies as IBM, JP Morgan, Ford, Fox, DirecTV, Cargill, Barrick Gold, Walmart, Procter & Gamble, Pfizer, Monsanto and Microsoft.  Of special interest was the presence of oil companies Exxon and Chevron, which had met with Planning Minister Julio De Vido, following the nationalization of YPF, to explore possibilities of alliances with Argentina to expand oil sector investment and increase production.  The meeting was private, but CFK's speech could be heard through a television placed on the ground floor of the Council.  When they left, after lunch, most of the attendees were removed in a hurry.  Those who agreed to talk remarked that she had been asked about all topics (the dollar, price controls, oil) and that they had been satisfied with the result.

The President announced that YPF will do a road show "make an offering of business, production, exploitation and services models that the oil world can have today, which is the most important company of Argentina."  A road show is an event in which a brand or product is

described to potential investors directly through a tour of various cities.  The National Hydrocarbons Agency of Colombia, for example, in May, conducted trips to New York and many other cities around the world to promote the bidding for 109 oil and gas zones. The Argentina delegation yesterday did not provided details of YPF's plan, although it is assumed that the company president, Miguel Galuccio, will head the road show, and that Houston is an intended destination.

There were more references to YPF.  CFK said the acquisition by the Mexican businessman Carlos Slim of 8 percent of the shares was "good news" and then stopped to explain to the executives present the reason for nationalization of 51 percent of the company.  "We have chosen the most difficult path, we could have performed a complete nationalization, nationalization of one hundred percent of YPF.  But we chose to only take that which allowed us control of the company, remain on the New York Stock Exchange, which binds us to very important controls, by the Securities Commission of our country and the SEC (the Securities Commission of the United States)."  She mentioned that "It was not an expropriation that we wanted to do, but rather, for the first time in Argentina - in the last 17 years - we had a hydrocarbon deficit of over 3 billion, that was eating away at our excellent trade surplus and the Company (Repsol) policy was to divest the country."  According to foreign ministers, Héctor Timerman, and Industry, Debora Giorgi, who spoke later, business owners asked the President where she saw YPF in five or ten years and she replied that "her desire was that oil policy would be a State policy, encouraging national development, and that it be a company of which we can all be proud."

### Projects

Besides Timerman, Giorgi and De Vido, at the long table in the Bolívar room of the Council of Americas also sat Economy Minister Hernan Lorenzino and Legal and Technical Secretary Carlos Zannini.  The President recalled there that the U.S. is the second-largest investor in Argentina, with more than 500 companies, and that 60 percent of the largest companies in this country have development and growth in Argentina.

During the meeting, while showing the prospectus, she announced that Monsanto had made a $1.8 billion investment (see separate article).  She also considered a Pfizer laboratory project, together with ELEA, for the production of a vaccine.  Then, Giorgi requested that the businesswoman from Pfizer speak at the meeting to express their satisfaction with the joint work being undertaken.

### The Crisis

The President referred to the European crisis and its impact on Argentina.  "We managed to accumulate a large amount of reserves that give us a solid driving position as long as the crisis in the Eurozone is not too prolonged and if America can again drive the global economy. Since the data is not encouraging, obviously the markets react and despite all our efforts, this also has an impact on our economy.  But we believe that it will have far less impact than it might have in other countries," she said.  She took the opportunity to diagnosis and propose a treatment, something that surely will resume next week at the G-20 meeting in Los Cabos, Mexico.  "The main problem facing the world today, more than economic, is a lack of clear and consistent

political leadership in addressing the crisis," she said.  She explained that in her view the crisis is resolved by strengthening the domestic market, with actions promoting aggregate demand rather than targeting financial sector policies.  And although she noted that in the context of the world situation that Argentina cannot advance to the rates of recent years, she said it would take all necessary measures to sustain growth.

She told an anecdote to support her arguments.  She said that last year, when she met Nicolas Sarkozy at the Elysee Palace, she suggested to him that, to solve the problems of Greece, they should do something similar to what Argentina did in 2001, which is, a debt restructuring at a discount, "so that the effort is shared."  Sarkozy then pulled back and said, "No, that's impossible."  "Well," concluded the President, "within a few months, they were talking about a 60 percent haircut in Greece, and today Nicolas no longer presides in France."

I, Spencer Ricks, certify under penalty of perjury that I am competent to translate Spanish into English, and that the foregoing translation of this news article is true and correct to the best of my abilities.

Executed on this 23rd day of _____July_____, 2013.


_____
Spencer Ricks


Sworn to before me this 23rd day of _____July_____, 2013.


_____
NOTARY PUBLIC

FRANCINE PIAZZA
Notary Public, State of New York
No. 01PI6209851
Qualified in New York County
Commission Expires Aug. 3, 2013

# Exhibit G

 LexisNexis®

**Argentina's renationalization of YPF: A push to manage oil on its own terms; Many have criticized Argentina's move to renationalize its oil as a populist bid likely to isolate it from the global economy. But the takeover is in line with changing power dynamics in the region.**

The Christian Science Monitor
May 12, 2012 Saturday

Copyright 2012 Christian Science Publishing Society All Rights Reserved

**Length:** 892 words

**Byline:** Jonathan Gilbert Correspondent, Whitney Eulich Staff writer

| Body |
| --- |

As glitter rained down over 100,000 screaming fans in a Buenos Aires soccer stadium late last month, President Cristina Fernández de Kirchner trumpeted her government's takeover of Argentina's biggest oil company, YPF.

"We have recovered one of the most emblematic companies in Argentina," said President Kirchner, who expropriated the majority shares held by Spanish energy giant Repsol. "This government is looking for new forms of intervention: The state cannot turn away from its economic and social responsibilities."

Amid the largely youthful crowd waving pro-government banners and singing in vociferous support was Marcos Huenchullán, who traveled 1,000 miles from Bariloche to attend the rally. "In time, we will all reap the rewards of state control of YPF," said Mr. Huenchullán, calling the renationalization "historic."

Kirchner's approval rating in Argentina has jumped from 42 percent to 60 percent since the controversial renationalization April 16. Many in the United States and Europe have criticized Kirchner's move as a populist bid that is likely to isolate Argentina from the global economy - and perhaps a sign that she is moving toward a Hugo Chávez-style model of nationalization on a broad scale. But the takeover is in line with changing power dynamics in the region, where countries with lucrative natural resources want to - and can - take control of their own resources, despite what outside players might prefer.

In a sign of strong national support, the bill to expropriate Repsol's shares received expedited approval in both the Argentine Senate and Congress, where it was even backed by opposition parties.

"What you're really seeing is a renationalization that reflects, I think, very important power changes," says Terry Karl, professor of Latin American Studies at Stanford University in Palo Alto, Calif.

That may not mean a devastating drop-off in foreign investment in Argentina, as many are predicting, however. The country recently discovered new shale and gas oil reserves, and has more than once defied dire predictions about its economy.

After a severe economic recession in the late 1990s, Argentina defaulted on nearly $93 billion in foreign debt, winning the country a reputation as a pariah. But it recovered using its own approach - against the advice of the international community.

Alienation and isolation

Kirchner insists that YPF needs to be controlled by the state so that Argentina can stop importing energy - $9.4 billion last year - and become self-sufficient. But as part of a broader protectionist policy, which includes foreign-exchange controls and restrictions on imports, the renationalization could drive away even more investors.

"This is a decisive moment for Argentina: With the expropriation of YPF, it is confirming its isolation," says Jorge Castro, a political analyst in Buenos Aires. "The arbitrary confiscation of YPF from Repsol, which broke international law, will alienate Argentina from the world."

Argentina's renationalization of YPF: A push to manage oil on its own terms; Many have criticized Argentina's move to renationalize its oil as a populist bid

The move to renationalize YPF, which was privatized in 1992, spurred the European Union to announce it would limit imports of Argentine biodiesel. The US and other countries condemned the expropriation: Even neighboring Brazil expressed concern.

Dr. Castro says Argentina needs to attract capital, not push it away, if it wants to maintain the economic growth of the past decade. Currently, only about 10 percent of all foreign investment in South America goes to Argentina, far less than to countries such as Brazil, Colombia, and Chile. Argentina is facing a fiscal deficit and a reported inflation rate of more than 20 percent. Critics say the expropriation of YPF is a short-term move designed to placate the masses and deflect attention away from domestic economic problems.

The YPF takeover sends a chilling message, says Boris Segura, a Latin America analyst at New York investment bank Nomura. "The hostile business environment in Argentina has kept investors away for a while," Mr. Segura says. "Even if YPF does not represent the beginning of a politics of expropriation, the damage is done: Argentina is perceived as a risk."

On their own terms

Despite Kirchner's less than diplomatic approach to nationalizing YPF - directors were forced to leave their Buenos Aires offices after government officials moved in via an emergency decree to take control - she has recognized the need for foreign investment. Just days before her Buenos Aires rally, the economy vice minister and minister of planning met with international oil companies, including Chevron and ExxonMobil, to discuss joint exploitation of the huge Vaca Muerta shale and gas oil reserves discovered late last year in southwest Argentina. Some point to this as a signal that the government is encouraging foreign investment in the sector, but on its own terms.

Investment in the oil sector is a risk some companies will be willing to take, despite the hostility of the Kirchner regime, Segura says.

Oil is a limited resource. Oil company executives have "recognized that economic energy nationalism is the new reality in town," says Miguel Tinker Salas, professor of Latin American history at Pomona College in Claremont, Calif. "Unless you can find dramatic reserves elsewhere, you just know you are dealing with state-owned energy."

Get daily or weekly updates from CSMonitor.com delivered to your inbox. Sign up today.

---

**Classification**

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Subject:** ECONOMIC CONDITIONS (90%); NATIONALIZATION (90%); TAKEOVERS (90%); STADIUMS & ARENAS (90%); OIL & GAS INDUSTRY (90%); GLOBALIZATION (89%); POLITICS (89%); IMPORT TRADE (88%); EXTERNAL DEBT (85%); PUBLIC DEBT (78%); LEGISLATIVE BODIES (78%); RECESSION (78%); ECONOMIC NEWS (78%); NATURAL RESOURCES (77%); ENERGY EXPORTS & IMPORTS (77%); OIL & GAS EXPLORATION (77%); LEGISLATION (76%); PROTECTIONISM (75%); INTERNATIONAL RELATIONS (73%); FOREIGN INVESTMENT (71%); COLLEGE & UNIVERSITY PROFESSORS (63%); ETHNIC & CULTURAL STUDIES (63%)

**Person:** CRISTINA FERNANDEZ DE KIRCHNER (92%); NESTOR KIRCHNER (79%); HUGO CHAVEZ (58%)

**Geographic:** BUENOS AIRES, ARGENTINA (93%); SAN FRANCISCO BAY AREA, CA, USA (79%); CALIFORNIA, USA (92%); ARGENTINA (99%); UNITED STATES (92%); EUROPE (79%)

**Load-Date:** May 14, 2012

# Exhibit H



Publicado en *Portafolio.co*

portafolio.co > Argentina > Repsol demandaría a Argentina por US$10.500 millones

Por Redacción portafolio.co
Creado *2012-04-16 22:17*

# Repsol demandaría a Argentina por US$10.500 millones

Abril 16 de 2012 - 10:17 pm

## Comisión Europea (CE) suspendió reunión del comité conjunto UE-Argentina para abril y considera expropiación como ilegal.

"Debido al clima que se ha creado por esta situación, la Comisión Europea y la alta representante (de la política exterior, Catherine Ashton) han decidido posponer la reunión del comité conjunto UE-Argentina que estaba previsto para los días 19 y 20 de abril" en Buenos Aires, señaló Pia Ahrenkilde, portavoz del Ejecutivo comunitario, en la rueda de prensa diaria.

"Entendemos que la expropiación que se planea en este caso es ilegal si tiene lugar sin una compensación justa, adecuada y pronta", agregó la portavoz.

Poco antes, Repsol había indicado que reclamará a Argentina, de al menos, 10.500 millones de dólares (8.000 millones de euros) por su participación en YPF, compañía a la que otorga un valor total de 15.800 millones de dólares, en virtud de la Ley de Privatización y los Estatutos de YPF.

La compañía española entiende que para llevar a cabo la expropiación del 50,1 por ciento de la compañía, el Gobierno del país austral debería lanzar una OPA (oferta pública), explicó en una multitudinaria rueda de prensa el presidente de Repsol, Antonio Brufau.

La CE estudia el proyecto de ley que la presidenta argentina, Cristina Fernández, envió este lunes al Congreso para expropiar YPF para "determinar en estrecha consulta y en contacto con las autoridades españolas el próximo paso a dar y analizar todas las posibles opciones que están a disposición" de Madrid y de la UE, explicó la portavoz.

El comisario europeo de Comercio, Karel De Gucht, enviará además una carta a su homólogo argentino, el ministro del ramo, para expresarle la "seria preocupación" de

la Comisión por el anuncio del Gobierno argentino, indicó Ahrenkilde.

El presidente del Ejecutivo comunitario, José Manuel Durao Barroso, que ha seguido de cerca el asunto y que ha estado en contacto con el presidente del gobierno español, Mariano Rajoy, se mostró poco antes "seriamente decepcionado" con la decisión de argentina.

Asimismo, instó al Gobierno del país austral a respetar sus compromisos y obligaciones internacionales, especialmente aquellos que resultan del acuerdo bilateral sobre la protección de inversiones con España.

Barroso les pidió a los servicios de la Comisión Europea que sigan de cerca este asunto y que le den máxima prioridad.

Ahrenkilde recalcó en la rueda de prensa diaria que YPF representa "una importante inversión" de la Unión Europea (UE) en Argentina y la expropiación anunciada "envía una señal muy negativa a los inversionistas internacionales, que buscan por supuesto estabilidad y previsibilidad para sus inversiones".

La medida del Gobierno de Cristina Fernández, reiteró la portavoz, "puede dañar seriamente el clima de negocios en Argentina" y "crea inseguridad jurídica, no solamente para la empresa española Repsol, sino también para otras compañías de la UE".

Por todo ello, la Comisión Europea pidió enérgicamente al Ejecutivo argentino que garantice el cumplimiento del país con los acuerdos internacionales que ha suscrito.

LAS RAZONES DE ARGENTINA

Argentina intervino la petrolera YPF y buscará expropiar un 51 por ciento de la empresa controlada por la española Repsol-YPF, una decisión que acentúa la presencia estatal en la economía y disparó un conflicto con Madrid, que amenazó con represalias.

La presidenta argentina, Cristina Fernández, anunció entre aplausos que enviará al Congreso un proyecto para expropiar la mayoría de YPF, la empresa más grande del país, a la que culpa por una caída en la producción de hidrocarburos que obliga a realizar importaciones y erosiona el superávit comercial.

"YPF es de todos, quiero que lo tengamos muy claro", dijo Fernández en un discurso por cadena nacional. Según legisladores y gobernadores, el Congreso aprobaría rápidamente la propuesta, que Fernández dijo que busca darle al país libertad para decidir su política energética y recuperar un perdido autoabastecimiento.

La mandataria detalló que las acciones que se buscan expropiar son exclusivamente las que tiene Repsol-YPF y no la de otros socios privados.

Ante ese anuncio, el Gobierno de España dijo que interpreta la decisión como "un gesto hostil".

"El Gobierno condena con absoluta energía la arbitraria decisión de Argentina de expropiar las acciones de Repsol en YPF", dijo el ministro español de Asuntos Exteriores, José Manuel García Margallo, tras una reunión de urgencia con el

presidente del Gobierno, Mariano Rajoy. "Habrá consecuencias", agregó.

Previamente Fernández dijo que no respondería lo que calificó como amenazas hechas desde España.

"Esta Presidenta no va a contestar ninguna amenaza, no va a responder ningún exabrupto, no se va a hacer eco de la falta de respeto ni de frases insolentes, porque represento a los argentinos, soy una jefa de Estado, no una patotera (matona)", dijo.

Repsol-YPF tiene un 57,4 por ciento de YPF, mientras que el Grupo Petersen, el mayor accionista local y perteneciente a la familia local Eskenazi, posee un 25,4 por ciento. La firma española dijo que considera 'ilícita' la decisión del gobierno argentino.

## PÉRDIDA DE VALOR BURSÁTIL

La capitalización total actual de YPF es de unos 46.765 millones de pesos, o 10.640 millones de dólares al tipo de cambio oficial, según datos de la Bolsa de Comercio de Buenos Aires.

La firma ha perdido más de 4.000 millones de dólares de valor de mercado en lo que va del año.

La ley de expropiación de Argentina prevé, como primera instancia, un acuerdo entre las partes sobre el valor a pagar. Sin un acuerdo, se avanza a un proceso judicial en el que un magistrado pide al Estado que fije el precio de la transacción.

Goldman Sachs dijo en un informe que no está claro cuánto pagará el Gobierno por el 51 por ciento de YPF y si el resto de sus accionistas estarían dispuestos a continuar como minoritarios.

Los bonos de la deuda soberana de Argentina aceleraron levemente su caída tras el anuncio.

Analistas afirman que esto es una radicalización en la política del gobierno argentino en estatizaciones.

## EMPRESAS EUROPEAS LAMENTAN LA EXPROPIACIÓN DE YPF Y MÁS MEDIDAS

La asociación de empresas europeas y las cámaras de comercio de la Unión Europea lamentaron este martes la expropiación de la YPF a la petrolera española Repsol por el Gobierno argentino, así como otras recientes medidas que pueden limitar las exportaciones con destino a ese país.

La patronal europea (BusinessEurope) y las cámaras de comercio de la UE (EuroChambres) enviaron hoy una carta conjunta a la presidenta argentina, Cristina Fernández, en la que señalan que la expropiación constituye una "decisión desafortunada" que "representa una señal muy negativa para los inversores, tanto a nivel nacional como internacional".

Las dos entidades resaltan en su carta la importancia de la "seguridad jurídica" y recuerdan que la protección y las garantías de las inversiones constituyen "el principal pilar" de las transacciones empresariales a nivel mundial.

"Una ruptura de estos principios básicos puede conducir a consecuencias internacionales negativas y devastadoras", añade la misiva, firmada por los presidentes de BusinessEurope, Jürgen Thumann, y de EuroChambres, Alessandro Barberis.

Los dos responsables empresariales europeos expresaron también su "profunda preocupación" por las recientes medidas "impuestas" por el Gobierno argentino contra las importaciones.

Esas medidas "imponen costes considerables a las industrias y empresas de la UE y limitan la exportación de productos, servicios e inversiones a Argentina", recalcaron. Además, consideraron que esas restricciones al comercio "son incompatibles con los compromisos de Argentina con la Organización Mundial de Comercio".

En un comunicado separado, BusinessEurope (que representa a las organizaciones de empresas de los países de la UE) se muestra "altamente alarmada" por las medidas "altamente proteccionistas y discriminatorias" del Gobierno argentino, y pide a la Unión Europea que tome "todas las acciones necesarias para defender los intereses comerciales y las inversiones de la UE en Argentina".

**AGENCIAS**

Publicidad

Repsol will claim damages from Argentina for US$10,500 million



Published in *Portafolio.co*
portafolio.co > Argentina > Repsol demandaría a Argentina por US$10.500 millones

By Redacción portafolio.co
Created *2012-04-16 10:17 p.m.*

# Repsol will claim damages from Argentina for US $10,500 million

April 16, 2012 – 10:17 p.m.

**European Commission (EC) suspended meeting of the joint EU-Argentina committee for April and considers expropriation to be illegal.**

"Because of the climate created by this situation, the European Commission and the high representative (for foreign policy, Catherine Ashton) have decided to postpone the meeting of the joint EU-Argentina committee that was set for April 19 and 20" in Buenos Aires, said Pia Ahrenkilde, spokesperson for the community's Executive, at the daily press conference.

"We understand that the expropriation that is planned in this case is illegal if it takes place without fair, sufficient and speedy compensation," the spokesperson added.

Shortly before, Repsol had indicated that it will claim from Argentina at least 10,500 million dollars (8,000 million euros) for its share in YPF, a company to which it[sic] attributes a total worth of 15,800 million dollars, based on the Privatization Law and the Articles of Association of YPF

The Spanish company understands that to execute the expropriation of 50.1% of the company, the Government of that southern hemisphere country should make an OPA (Public Acquisition Bid), the president of Repsol, Antonio Brufau explained at a heavily attended press conference.

The EC is studying the bill that the Argentinean president, Cristina Fernández, sent to Congress this Monday to expropriate YPF in order to "determine in close consultation and contact with the Spanish authorities the next step to be taken and to analyze all possible options available" to Madrid and the EU, the spokesperson explained.

The European Trade Commissioner, Karel De Gucht, will also send a letter to his Argentinean opposite number, the minister for that area, to express to him the "serious concern" of

Repsol will claim damages from Argentina for US$10,500 million

the Commission caused by the Argentinean Government's announcement, Ahrenkilde said.

The president of the community's Executive, José Manuel Durao Barroso, who has monitored the matter closely and has been in contact with the president of the Spanish government, Mariano Rajoy, said shortly before that he was "seriously disappointed" by Argentina's decision.

Also, he urged the southern hemisphere country to respect its international commitments and obligations, especially those that stem from the bilateral agreement with Spain on protection of investments.

Barroso requested that the departments of the European Commission closely monitor this matter and give it maximum priority.

Ahrenkilde emphasized at the daily press conference that YPF represents "an important investment" in Argentina for the European Union (EU) and the expropriation announced "sends a very negative signal to international investors, who of course are looking for stability and predictability for their investments."

The measure taken by Cristina Fernández's government, the spokesperson repeated, "may seriously harm the business climate in Argentina" and "creates legal insecurity, not only for the Spanish Repsol company, but also for other EU companies."

Because of all this, the European Commission urged the Argentinean Administration to guarantee the country's compliance with the international agreements that it has signed.

ARGENTINA'S ARGUMENTS

Argentina intervened in the YPF oil company and will seek to expropriate 51% of the company controlled by the Spanish company Repsol-YPF, a decision that underscores the State's presence in the economy and has triggered a conflict with Madrid, which threatens retaliatory measures.

The Argentinean president, Cristina Fernández, announced, to applause, that she will put before Congress a bill to expropriate most of YPF, the largest company in the country, which it blames for a drop in hydrocarbon production, making imports necessary and eroding the trade surplus.

"YPF belongs to everyone, I want us to be very clear about that," said Fernández in a nationally broadcast speech. According to legislators and governors, Congress would quickly approve the proposal, which Fernández said seeks to give the country the freedom to determine its energy policy and to recover its self-sufficiency, now lost.

The president explained that the shares that are sought for expropriation are exclusively those held by Repsol-YPF and not those of other private partners.

At that announcement, the Government of Spain said that it interprets the decision as "a hostile gesture."

"The Government most strongly condemns Argentina's arbitrary decision to expropriate Repsol's shares in YPF," the Spanish Minister for Foreign Affairs, José Manuel García Margallo, said, after an emergency meeting with the

Repsol will claim damages from Argentina for US$10,500 million

President of the Government, Mariano Rajoy. "There will be consequences," he added.

Previously Fernández said that she would not respond to what she termed threats made from Spain.

"This President is not going to respond to any threat, is not going to respond to any accusation, is not going to echo any disrespect or insolence because I represent Argentineans, I am a head of State, not a bully (thug)," she said.

Repsol-YPF has a 57.4% share in YPF, while the Petersen Group, the biggest local shareholder, which belongs to the local Eskenazi family, possesses 25.4% The Spanish company said that it considers the decision of the Argentinean government "illegal."

## LOSS OF MARKET VALUE

YPF's total current capital is some 46,765 million pesos or 10,640 million dollars at the official exchange rate, according to data from the Buenos Aires Stock Exchange.

The company has lost more than 4,000 million dollars in market value so far this year.

Argentinean expropriation law provides, in the first instance, for an agreement between the parties regarding the value to be paid If there is no agreement, it moves to legal proceedings in which a magistrate asks the State to determine the price of the transaction.

Goldman Sachs said in a report that it is not clear how much the Government will pay for the 51 per cent of YPF and if the rest of its shareholders would be prepared to continue as minority shareholders.

After the announcement, there was in increased drop in Argentinean sovereign debt bonds.

Analysts maintain that this is a radicalization of the Argentinean government's policy on nationalizations.

## EUROPEAN COMPANIES LAMENT THE EXPROPRIATION OF YPF AND OTHER MEASURES

This Tuesday, the association of European companies and the chambers of commerce of the European Union lamented the YPF expropriation by the Argentinean Government from the Spanish Repsol company, as well as other recent measures that may limit exports intended for that country.

European employers (BusinessEurope) and the chambers of commerce of the EU (EuroChambres) today sent a joint letter to the Argentinean president, Cristina Fernández, in which they say that the expropriation is an "unfortunate decision" that "is a very negative signal for investors, at both the national and the international level."

The two entities stress in their letter the importance of "legal security" and point out that investment protection and guarantees are "the chief support" for business transactions at a global level.

Repsol will claim damages from Argentina for US$10,500 million

"A breach of these basic principles may lead to negative and devastating international consequences," the letter, signed by the presidents of BusinessEurope, Jürgen Thumann, and EuroChambres, Alessandro Barberis, goes on to say.

The two European leaders also expressed their "deep concern" regarding the recent measures "imposed" by the Argentinean Government against imports.

Those measures "impose considerable costs on EU industries and companies and limit the exporting of products, services and investments to Argentina," they stressed. Moreover, they considered that those restrictions on trade "are incompatible with Argentina's commitments to the World Trade Organization."

In a separate statement, BusinessEurope (which represents company organizations in the EU countries) says it is "greatly alarmed" by the "highly protectionist and discriminatory" measures taken by the Argentinean Government, and asks the European Union to take "all necessary measures to defend the commercial interests and investments of the EU in Argentina."

**AGENCIES**

Advertising

TRANSPERFECT

City of New York, State of New York, County of New York

I, Mariela Lopez, hereby certify that the article entitled "Repsol will claim damages from Argentina for US $10,500 million", dated April 16, 2012 is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Mariela Lopez

Sworn to before me this
Friday, July 26, 2013

Signature, Notary Public

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016

Stamp, Notary Public

# Exhibit I

lanacion·com

Miércoles 18 de abril de 2012 | Publicado en edición impresa

lanacion.com | Política | Expropiación de YPF

La pelea por el petróleo / Tenso debate en el Senado por la expropiación de YPF

## Kicillof: "No vamos a pagarles lo que dicen"

Axel Kicillof y De Vido advirtieron que para definir el precio que le corresponderá a Repsol deducirán multas y otros eventuales daños

Por **Gabriel Sued** | LA NACION

U n día después de anunciar un **plan para expropiar YPF** , el Gobierno afirmó ayer en el Congreso que no pagará la indemnización que reclama la empresa española Repsol, a la que la Casa Rosada pretende quitarle por ley y recuperar para el Estado el 51 por ciento de las acciones de la compañía petrolera.

Así lo informaron el viceministro de Economía, Axel Kicillof, y el ministro de Planificación Federal, Julio De Vido. Flamantes interventores en YPF, ambos **expusieron en un plenario de comisiones del Senado** , en defensa del proyecto de ley que declara de "interés público" la producción y comercialización de hidrocarburos y dispone la expropiación de la mayor parte de las acciones de Repsol.

"No le vamos a pagar lo que ellos dicen, sino el costo real de la empresa. Dicen que son 10.000 millones de dólares. ¿Y eso dónde está?", sostuvo Kicillof, que expuso durante dos horas y media. "Los tarados son los que piensan que el Estado tiene ser estúpido y comprar todo según el estatuto de YPF", agregó, en un discurso de fuerte defensa de las políticas oficiales.

Era el inicio de un debate caliente que se extendió durante casi siete horas y en el que opositores y oficialistas tuvieron duros cruces verbales y, a los gritos, intercambiaron chicanas y acusaciones. El debate en comisión concluirá hoy, cuando el Frente para la Victoria prevé emitir un dictamen favorable para tratar la iniciativa en el recinto, el miércoles próximo.

En su debut público como viceministro de Economía, Kicillof explicó que, como dice la ley de expropiación, el precio de las acciones lo fijará el Tribunal de Tasación. Pero reveló que antes de pagar se tendrá en cuenta el daño ambiental producido en las distintas áreas explotadas por YPF. "Repsol va a tener que pagar por el daño ambiental. Estamos haciendo un relevamiento con los gobernadores", coincidió De Vido. El ministro reveló que hay petroleras que ya se pusieron en contacto para asociarse con YPF, como Exxon, Total y Petrobras.

Para anticiparse a los eventuales reclamos que hará la compañía española, el viceministro de Economía sostuvo que, desde su ingreso a YPF, en 1998, Repsol había puesto 13.000 millones de dólares y había retirado 22.000 millones de dólares.

Con una crudeza poco habitual, Kicillof explicó que el Gobierno había decidido impulsar la expropiación porque, ante la necesidad de autoabastecimiento energético, requería que los objetivos de YPF coincidieran con los del Estado. "Es una empresa que tiene que alinearse a un modelo de crecimiento y que no hemos logrado que lo haga", expuso, y destacó que la producción de petróleo se había reducido a la mitad durante la última década. Denunció, además, que la empresa había desabastecido al mercado local. "Nos han desabastecido para torcernos la muñeca y sacarnos más precio", dijo.

## EL "VACIAMIENTO"

Sin cuestionamientos de fondo al plan de expropiación, la oposición recordó que había sido el gobierno peronista de Carlos Menem el que impulsó la privatización de la empresa, destacó el apoyo de la entonces diputada provincial Cristina Kirchner a esa iniciativa, cuestionó el ingreso del grupo Eskenazi a la petrolera y atribuyó al Gobierno la responsabilidad por lo que los funcionarios calificaron en un proceso de "vaciamiento" de YPF, consumado en los últimos nueve años.

A ese último blanco apuntó María Eugenia Estenssoro, de la Coalición Cívica. En una exposición que, por lo extensa, generó el enojo del senador Aníbal Fernández, encargado de conducir el debate, Estenssoro recordó que el representante del Estado en el directorio de YPF aprobó lo actuado en la empresa entre 2008 y 2010. En 2008 se permitió que el grupo Eskenazi se quedara con el 25% de las acciones de la petrolera y que lo pagara con los dividendos de la propia YPF. En 2009 y 2010 se aprobaron balances correspondientes a 2008 y 2009, en los que se decidió la remisión de utilidades del 255 y del 140%, respectivamente. "¿Por qué los funcionarios avalaron ese vaciamiento? Deberían renunciar y dar explicaciones ante la Justicia", afirmó la senadora.

Los radicales también apuntaron al llamado proceso de argentinización de YPF, con el ingreso del grupo Eskenazi, que no será afectado por la expropiación. Para ello, Ernesto Sanz citó un discurso de hace un año, en la sede de YPF, en el que la Presidenta felicitaba y nombraba por sus nombres de pila a Sebastián Eskenazi, gerente general de YPF, y a Antonio Brufau, CEO de Repsol.

Tanto Kicillof como De Vido sostuvieron que se había decidido avanzar sobre las acciones de Repsol y no sobre el resto porque esa empresa es la que controla y es, a juicio de los funcionarios, la responsable de la desinversión de los últimos años.

También hubo quejas porque, de aprobarse la expropiación, YPF no quedará sujeta a los controles de la Auditoría General de la Nación (AGN) ni de la Sindicatura General de la Nación (Sigen) y porque sólo las provincias petroleras participarán de los dividendos de la compañía.

## EN VOZ ALTA

"[Repsol] No es una empresa que haya apostado al crecimiento del país y menos al crecimiento de la industria nacional "

"Que no nos vengan a decir [por Repsol] que les estamos sacando algo que era suyo. [...] No les vamos a pagar lo que ellos quieran "
**AXEL KICILLOF**
**Viceministro de Economía**

"El déficit energético de la Argentina se encuentra estrechamente asociado a la política desarrollada por Repsol"
**JULIO DE VIDO**
**Ministro de Planificacion Federal**

"Nos llama la atención por qué Kicillof no mencionó la responsabilidad de la familia Eskenazi ¿Por qué se expropia solamente a la parte española?"
**GERARDO MORALES**
**Senador nacional - UCR Jujuy**

"De exportar hidrocarburos pasamos a ser un importador neto. ¿Todo ese plantel va a liderar la recuperación de YPF?"
**MARIA EUGENIA ESTENSSORO**
**Senadora nacional - Coalicion Cívica**

"¿La Presidenta sabía o ignoraba que había vaciamiento?"
**ERNESTO SANZ**
**Senador nacional - UCR Mendoza**

lanacion•com

Wednesday, April 18, 2012 | **Published in
print edition**

lanacion.com | Politics | Expropriation of YPF

The fight for oil/Tense debate in the Senate over the expropriation of YPF

`   ## Kicillof: "We are not going to pay them what they are saying"

Axel Kicillof and De Vido warned that to determine the price that will apply to
Repsol they will deduct fines and other possible damages

By **Gabriel Sued** | LA NACION

One day after announcing a **plan to expropriate YPF**, the Government stated yesterday in
Congress that it will not pay the compensation claimed by the Spanish Repsol company, an oil
company 51 per cent of whose shares the Casa Rosada [Pink House – residence of the
President of Argentina] intends to legally take and reclaim for the State.

This information came from the Deputy Minister for the Economy, Axel Kicillof, and the Federal
Planning Minister, Julio De Vido. As brand-new auditors for YPF, both **of them spoke at a
plenary Senate commissions session** in defense of the bill that declares the production and
marketing of hydrocarbons to be of "public interest" and provides for the expropriation of the
majority of Repsol's shares.

"We are not going to pay them what they are saying, but rather the company's real cost. They
say that it's 10,000 million dollars. And where is that?" said Kicillof, who spoke for two and a half
hours. "The morons are those who think that the State has to be stupid and buy everything in
accordance with YPF's statute," he added, in a speech strongly defending official policies.

It was the **start to a heated debate** that lasted almost seven hours and during which opponents
and government party members had harsh verbal exchanges and, amidst shouting, exchanged
quibbles and accusations. The commission debate will conclude today, when the Frente para la
Victoria [Victory Front party] expects to issue an opinion favoring dealing with the initiative in
session next Wednesday.

Making his public debut as Deputy Minister for the Economy, Kicillof explained that, as the law on
expropriations says, the price of the shares will be determined by the Tax Court. But he revealed
that, before paying, the environmental damage that has occurred in the various areas developed
by YPF will be taken into account. "Repsol is going to have to pay for the environmental damage.
We are collecting data from the governors," De Vido added. The minister revealed that there are
oil companies, such as Exxon, Total and Petrobras, that have already been in contact in order to
become partners with YPF,

In order to anticipate any possible claims that the Spanish company might make, the Deputy
Minister for the Economy argued that, since joining YPF, in 1998, Repsol had put in 13,000
million dollars and had taken out 22,000 million dollars.

With unaccustomed harshness, Kicillof explained that the Government had decided to move
forward with expropriation because, faced with the need for energy self-sufficiency, it needed
YPF's objectives to coincide with those of the State. "It's a company that has to conform to a
growth model and we have not managed to make it do so," he stated, while stressing that oil
production had fallen by half in the last ten years. He decried furthermore the fact that the
company had undersupplied the local market. "They have undersupplied us in order to twist our
arm and get more money out of us," he said.

THE "DRAINING [literally, emptying]"

Without basically questioning the expropriation plan, the opposition pointed out that it had been
the Peronist government of Carlos Menem that had pushed for the privatization of the company;
they emphasized the support for that initiative given by Cristina Kirchner, at that time a provincial
representative, they questioned the Eskenazi group's joining the oil company and said it was the
government that was responsible for what the officials called a process of "draining" YPF, which
had occurred in the last nine years.

It was María Eugenia Estenssoro of Coalición Cívica [Civic Coalition] who attacked on this front.
In a presentation that, because of its extended length, incurred the wrath of Senator Aníbal
Fernández, who was responsible for conducting the debate, Estenssoro pointed out that the
State's representative on the YPF board approved what happened in the company between 2008
and 2010. In 2008 the Eskenazi group was allowed to have 25% of the oil company's shares and
to pay for it with YPF's own dividends. In 2009 and 2010, budgets for 2008 and 2009 were
approved, in which it was decided to remit earnings of 255% and 140% respectively. "Why did
the officials approve that "draining"? They should resign and answer to the courts," the Senator
maintained.

The radicals [members of the party UCR, Radical Civic Union] also specified the so-called
process of "argentinization" of YPF, with the entry of the Eskenazi group, which will not be
affected by the expropriation. In this regard, Ernesto Sanz quoted a speech from one year ago,
at the YPF headquarters, in which the President [Kirchner] congratulated Sebastián Eskenazi,
general manager of YPF, and Antonio Brufau, CEO of Repsol, and called them by their Christian
names.

Both Kicillof and De Vido maintained that the decision had been made to move forward with Repsol's shares and not with the rest because that company is the one that has control and is, in the judgment of officials, the one responsible for the divestment of the last few years.

There were also complaints because, if the expropriation is approved, YPF will not be subject to inspections by the National Auditor General's Office (AGN) nor by the National Auditing Commission (Sigen) and because only the oil provinces will share in the company dividends.

<mark>IN A LOUD VOICE</mark>

"[Repsol] It is not a company that has backed the growth of the country much less the growth of national industry"

"They [Repsol] shouldn't come and tell us that we are taking from them something that was theirs. […] We are not going to pay them whatever they want"
**AXEL KICILLOF**
**Deputy Minister for the Economy**

"Argentina's energy deficit is closely linked to the policy developed by Repsol"
**JULIO DE VIDO**
**Minister for Federal Planning**

"We are struck by the fact that Kicillof did not mention the responsibility of the Eskenazi family Why is only the Spanish part being expropriated?"
**GERARDO MORALES**
**National Senator – UCR [Radical Civic Union] Jujuy**

"From being an exporter of hydrocarbons we went to being a net importer. Are these the people that are going to lead the recovery of YPF?"
**MARIA EUGENIA ESTENSSORO**
**National Senator – Civic Coalition**

"Did the President know or not know that there was 'draining'?"
**ERNESTO SANZ**
**National Senator – UCR Mendoza**



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Mariela Lopez, hereby certify that the article entitled "Kicillof: We are not going to pay them what they are saying", dated April 18, 2012 is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Mariela Lopez

Sworn to before me this
Friday, July 26, 2013

Signature, Notary Public

RYAN ALEXANDER DROST
Notary Public - State of New York
No. 01DR6262048
Qualified in NEW YORK County
My Commission Expires MAY 21, 2016
Stamp, Notary Public