UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REPSOL YPF, S.A. and TEXAS YALE CAPITAL
CORP., Individually and On Behalf of All Others Similarly
Situated,

                                  Plaintiffs,

      -against-

REPUBLIC OF ARGENTINA,

                              Defendant.

12 Civ. 3877 (TPG) (FM)

## AFFIDAVIT OF GUSTAVO NAVEIRA IN SUPPORT OF PLAINTIFFS' ARGUMENTS

Pursuant to 28 U.S.C. § 1746, I, Gustavo Naveira, state the following:

1.    I am an attorney authorized to practice law in Argentina. From 1979 to 1984, I was a Judge in charge of a First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires, and from 1984 to 1986 I acted as Judge of the Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires. A copy of my *curriculum vitae* which shows my professional and academic background is attached hereto as *Exhibit A*.

2.    I have been asked by the legal counsel for the plaintiffs in this action, Repsol S.A. (formerly known as Repsol YPF S.A.; "Repsol") and Texas Yale Capital Corp. ("Texas Yale," and together with Repsol, "Plaintiffs") to state my legal opinion on a class action lawsuit filed by Plaintiffs against the Argentine Republic ("Argentina" or the "Argentine State") before the United States District Court, Southern District of New York.

3.    I have been asked to state my expert legal opinion with respect to the following questions:

## I.    Procedural Questions

A.    Whether, generally, litigating against the Argentine State before Argentine courts entails greater delays than suing a private party.

B.    Whether, in the proceedings identified in *Exhibit B*—instituted against Argentina, YPF S.A. ("YPF") or YPF Gas S.A. ("YPF Gas")—before Argentine federal courts challenging the seizure of control over YPF and YPF Gas by Argentina based on Argentine Law No. 26,741,[1] Executive Orders Nos. 530/12,[2] 532/12,[3] 557/12[4] and 732/12[5] and acts issued as a consequence of such legal rules, there have been significant delays, which, in some cases, resulted in a denial of justice.

C.    Whether, under the Argentine procedural law applied by federal courts, there are rules similar to Rule 23 of the Federal Rules of Civil Procedure of the United States of America ("Rule 23").

D.    Which is the court tax system that would apply and which are the associated costs related to a lawsuit before Argentine Federal Courts similar to that brought by the Plaintiffs before this United States District Court.

---

[1] Law No. 26,741, published in the Official Gazette on May 7, 2012, declared the 51% of the shares of YPF and YPF Gas, held by Repsol, subject to expropriation and established the immediate "temporary occupation" of these shares by the Executive Branch.

[2] Executive Order No. 530/12 published in the Official Gazette on April 16, 2012, ordered the intervention of YPF for a period of 30 days. "Intervention" in this case meant the replacement of the Board of Directors of YPF by government officers who thereafter exercised all the functions of the Board.

[3] Executive Order No. 532/12 published in the Official Gazette on April 17, 2012, appointed the Secretary of Economic Policy and Development Planification of the Ministry of Economy and Finance, Mr. Kicillof as under-intervertor of YPF.

[4] Executive Order No. 557/12 published in the Official Gazette on April 19, 2012, which extended the effects of Executive Order No. 530/12 to YPF Gas.

[5] Executive Order No. 732/12 published in the Official Gazette on May 16, 2012, which extended for 30 days the intervention of YPF and YPF Gas.

E.    Whether the impartiality and independence of the Argentine Judiciary is being jeopardized by measures adopted or actions taken by other Branches of Argentina's Federal Government.

F.    Whether any of the proceedings instituted by the Plaintiffs before Argentine federal courts in connection with Law No. 26,741, Executive Orders Nos. 530/12, 532/12 and 732/12 and acts issued as a consequence of such legal rules, has a similar or the same object as the lawsuit filed before this United States District Court.

G.    Whether the proceeding before the National Appraisals Court (*Tribunal de Tasaciones de la Nación*) (the "NAC") constitute a bar to this litigation or to the launching of the tender offer ["OPA", for its Spanish acronym] as provided by the YPF Bylaws.-----------------------------------

H.    Whether the process known as *Pre Trial Discovery* is provided for under the Argentine procedural law applied by federal courts, and, if so, to what extent, and which the main procedural rules applicable to the document production and the examination of witnesses are.----------------------------

## II.    Contract Questions

A.    Whether the term "acquisition" as used in the YPF Bylaws requires the acquirer to become the legal owner of the shares. Also, whether the temporary occupation provided by Law No. 26,741 triggers the obligation to launch the tender offer.

B.    Whether under Argentine law more generally the term "acquisition" requires the acquirer to become the owner of the property.

C.    Whether an "acquisition" must be permanent under either the YPF Bylaws or Argentine law.

4.    For the preparation of this expert opinion, I have had access to the documents set forth in *Exhibit B* at several meetings with Repsol's attorneys. Based on the aforementioned documents and my professional knowledge of the legal issues in question, here follows my opinion:

3

## I.    PROCEDURAL QUESTIONS

## A.    <u>GENERAL    CONSIDERATIONS    ON    LITIGATION    AGAINST</u> <u>ARGENTINA BEFORE ARGENTINE COURTS</u>

5.    Litigating against Argentina before the Argentine courts entails significantly longer delays than suing a private party.

6.    In order to bring a lawsuit against the Argentine State, it is necessary to previously exhaust administrative remedies.[6] Exhaustion of administrative remedies takes a significant amount of time since the administrative body seldom renders an express decision within the deadlines established by law (which, in a case such as the present one—claiming damages resulting from a breach of contract—would be from 135 to 180 business days in order to consider that a tacit denial exists)[7] and, thus, claimant must normally wait from six to nine months to be in a position to submit a legally admissible court complaint.

7.    Once the lawsuit has been filed, the court may take several months to decide whether the claim is procedurally admissible. Then, once admitted, the claim must be notified to the Attorney General's Office (*Procuración del Tesoro de la Nación*) at least 30 business days before serving the complaint.[8] Once the complaint has been served, the government has 60 business days to answer in accordance with the Argentine Federal Code of Civil and Commercial Procedure (the "<u>Code of Procedure</u>").[9] All this means that 12 to 18 months normally elapse before the Argentine State responds to the complaint.

8.    It is common that a final court judgment by Argentina's Supreme Court of Justice ("<u>CSJN</u>", for its Spanish acronym) in a case instituted against the Argentine State takes more than ten years.

---

[6] Law No. 19,549, Sections 23-32.

[7] Law No. 19,549, Sections 31-32.

[8] Law No. 25,344, Section 8.

[9] Code of Procedure, Section 338.

9.      Further delays occur during the enforcement stage, where in theory the Argentine State has two years to comply with money judgments,[10] but in practice it takes much longer.[11]

**B.      THE DELAY AND DENIAL OF JUSTICE OF ARGENTINE COURTS IN PROCEEDINGS AGAINST ARGENTINA, YPF OR YPF GAS**

10.     In the course of the meetings held with Repsol's attorneys in Argentina, I had access to documents that evidence the existence of a significant delay on the part of Argentine courts in certain proceedings against Argentina, YPF, or YPF Gas instituted by Repsol, Repsol Butano S.A., directors (or former directors) and minority shareholders of YPF (jointly referred to as "Petitioners") in connection with Law No. 26,741, Executive Orders Nos. 530/12, 532/12, 557/12 and 732/12 (the Law and Executive Orders concerning the expropriation of YPF and YPF Gas) and acts issued as a consequence of such legal rules.

11.     In thirteen court proceedings instituted by Petitioners, the First Instance courts declined jurisdiction fourteen times on their own motions.[12] Similar petitions filed before two courts potentially having jurisdiction (the federal court in contentious administrative matters and the federal court in civil and commercial matters) were rejected by both courts, which attributed jurisdiction to each other.[13]

12.     On the basis of jurisdictional issues or inadmissible arguments (*e.g.*, that granting injunctive relief in the face of the challenge to an unconstitutional measure entailed accepting the "presumption of unconstitutionality" of the rule),[14] Argentine courts avoided ruling on Law No. 26,741, and Executive Orders Nos. 530/12, 532/12, 557/12 and 732/12.

---

[10] This results from the need to include the amount resulting from the judgment in the next budget law as provided by Law No. 23,982, Section 22.

[11] HUTCHINSON, TOMÁS, "*El proceso de ejecución de sentencias contra el Estado*", Revista Latinoamericana de Derecho, Year I, number 1, January-June 2004, pp. 289-355 (pointing out that once the judgment is rendered a new administrative proceeding must be initiated in order to pursue compliance with the judgment by the Argentine State).

[12] This is the case of the claims identified as (1), (2), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12) and (13) in *Exhibit B*.

[13] This is the case of the claims identified as (10) and (11) in *Exhibit B*.

[14] This is the case of the claim identified as (10) in *Exhibit B*.

13.   In three cases, based on the jurisdictional issues raised by the courts themselves
(although those issues under the rules in effect at the time did not disqualify them
from granting injunctive relief),[15] Argentine courts avoided ruling on petitions
until, on several occasions, the passage of time rendered them moot.[16]

14.   Various courts and administrative bodies incurred inexplicable errors and
questionable procedural steps, all of which exerted a negative impact on
Petitioners, namely: (a) a First Instance Court—once the Court of Appeals had
determined that the dispute fell within the First Instance Court's jurisdiction—
instead of abiding by such decision and proceeding to hear the case, erroneously
forwarded the file to the CSJN (a course of action not supported by any legal
rule), which then took over a month to remand the file to the First Instance
Court;[17] (b) another First Instance Court ordered that the Attorney General's
Office be notified of the existence of the proceedings by means of an official letter
(so that the Argentine State could learn of the existence of the proceedings in
advance) before ruling on the injunctive relief requested, even though the petition
of such relief should have been decided *ex parte*;[18] (c) another First Instance Court
compelled an individual to prove his standing to deliver a letter rogatory, despite
the fact that the letter itself evidenced the individual's authorization to do so;[19]
and (d) the Ministry of Foreign Affairs of the Argentine Republic forwarded an
incomplete file to the relevant Argentine court, which was compelled to request
the Ministry to forward the missing portions thereof.[20]

15.   In general, the circumstances listed *supra* have led to undue and unusual delays:
in one case, it took over nine months from the filing of the petition to decide the
jurisdictional issue;[21] in another case, it took over six months from its reception by

---

[15] Code of Procedure, Section 196. Although, in principle, judges should abstain from granting injunctive
relief when they are not competent to entertain the main action, the injunctive relief granted by an
incompetent court is valid if justified under urgency grounds. (*See* COLOMBO, CARLOS J. - KIPER,
CLAUDIO M., Código Procesal Civil y Comercial de la Nación, anotado y comentado, Volume II, 2nd
edition, La Ley, 2006, p. 491).

[16] This is the case of the claims identified as (1), (2) and (3) in *Exhibit B*.

[17] This is the case of the claim identified as (2) in *Exhibit B*.

[18] This is the case of the claim identified as (11) in *Exhibit B*.

[19] This is the case of the claim identified as (8) in *Exhibit B*.

[20] This is the case of the claim identified as (8) in *Exhibit B*.

[21] This is the case of the claim identified as (12) in *Exhibit B*.

the Ministry of Foreign Affairs of the Argentine Republic to act on a letter rogatory only for notification purposes.[22]

16.     In sum, according to the documents analyzed, in these proceedings instituted against Argentina, YPF or YPF Gas: (i) Argentine courts raised an unreasonable number of jurisdictional issues; (ii) Argentine courts mostly avoided considering the merits of the questions submitted before them, even within the limited framework of the injunctive relief requested by Petitioners; (iii) in some cases, Argentine courts incurred considerable delays in rendering decisions, which may be deemed a denial of justice; (iv) Argentine courts and administrative bodies incurred an unusual number of inexplicable errors to the detriment of Petitioners; and (v) there were undue delays in the course of the proceedings as a consequence of the procedural errors listed in items (i), (ii), (iii) and (iv).

C.     **THE ABSENCE OF ARGENTINE RULES OF PROCEDURE SIMILAR TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

17.     Argentina lacks rules of procedure at the federal level similar to Rule 23. Thus, it is very unlikely that an Argentine court would allow a collective action instituted by shareholders.

18.     The second paragraph of Section 43 of the Argentine Constitution (the "Constitution") provides for a summary action (*acción de amparo*) to challenge any form of discrimination, as well as the violation of environmental rights, antitrust rules, users' and consumers' rights, and collective rights in general. The summary proceeding for the protection of the rights mentioned *supra* (*inter alia*, collective rights) may be instituted by the affected party, the ombudsman or the associations which foster such rights, registered in compliance with the law. However, these new constitutional rules on collective actions would not apply to an action brought by a group of shareholders as such. ---------------------------------

19.     At the federal level, Argentina has no rules of procedure —of a general nature— that regulate the collective actions incorporated into the second paragraph of

---

[22] This is the case of the claim identified as (8) in *Exhibit B*.

Section 43 of the Constitution. Certain rules of procedure have been issued on specific matters only.[23]

20.   In the absence of general rules of procedure, Argentine courts have laid down some guidelines on collective actions. The landmark case on the matter is captioned "*Halabi, Ernesto c. PEN -Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986*" ("Halabi")[24], and was issued on February 24, 2009, by the CSJN. The Halabi case involved non-economic rights.[25] With regard to economic rights, the CSJN has stated that, being individual rights, the general rule of legal standing is that these rights are to be exercised by the titleholder and not through collective actions.[26] This general rule would preclude a class or collective action on behalf of a group of shareholders, such as the lawsuit here.

21.   In Halabi, the CSJN maintained that, with regard to legal standing, there are three categories of rights: (i) individual rights,[27] (ii) collective rights involving public goods,[28] and (iii) collective rights concerning homogeneous individual interests.[29] The CSJN understood that the right involved in Halabi was a collective right concerning a "homogeneous individual interest."

22.   In Halabi, the CSJN also established the following requirements relating to "homogenous individual interest" for purposes of whether a case may be brought as a collective action: (i) there must be a single and complex event which harms a

---

[23] Thus, Law No. 25,675 on Environmental Protection has incorporated certain rules of procedure for collective actions on environmental matters (Sections 30 and 32). Law No. 26,361, which amended Law No. 24,240 on Consumer Protection, incorporated some rules of procedure for collective actions for the protection of the rights of users and consumers (Sections 52, 53, 54 and 55 of Law No. 24,240).

[24] CSJN, February 24, 2009, "*Halabi, Ernesto c/P.E.N. -ley 25.873 dto. 1563/04- s/amparo-ley 16.986*", Fallos 332:111.

[25] Plaintiff was an attorney who claimed that both Law No. 25,873 and its implementing regulation Executive Order No. 1,563/04, were unconstitutional, as they authorized the intervention of all telephone and network communications as well as the registration of information on users.

[26] CSJN, June 26, 2007, "*Defensor del Pueblo de la Nación inc. Dto. 1316/02 c. PEN dtos. 1570/01 y 1606/01 s/Amparo Ley 16.986*", Fallos 330:2800.

[27] The action is aimed at ensuring the protection of divisible and non-homogeneous rights and is characterized by the request for redress of an essentially individual damage pertaining to each aggrieved party.

[28] The action is aimed at ensuring the protection of a collective interest (such as the environment) belonging to the community as a whole, the subject-matter of which must be indivisible and universal.

[29] The action is not aimed at ensuring the protection of a collective interest, as it concerns totally divisible individual rights. There is a single or continued event which harms several interests, and thus, homogeneous factual grounds are identifiable.

relevant plurality of individual rights; (ii) the action must focus on the common effects, and not on the individual aspects, and (iii) the nature or amount of the individual interests involved must not warrant the filing of individual lawsuits. The third requirement has been understood by the Federal Court of Appeals in Contentious Administrative Matters as only allowing collective actions when each individual and separate interest is not of sufficient importance to merit an individual action.[30]

23.    Although in Halabi, the CSJN urged the Argentine Congress to enact laws on collective actions, no such laws have been enacted thus far, which is why Argentina lacks rules of procedure at the federal level similar to Rule 23. Moreover, the guidelines developed by Argentine courts face two fundamental limitations. First, the Argentine court system is not governed by the principle of *stare decisis* followed in the *Common Law*, and thus, the importance of case law as a source of law is more limited in scope than that in the United States of America.[31] Second, unlike the legal system governing class actions in the United States, Argentina has no rules on class certification or on other key aspects of class actions.

24.    The different panels of the Court of Appeals in Commercial Matters have issued contradictory judgments on the standing to sue in collective actions concerning only economic matters. In fact, whereas some panels acknowledge the standing to sue of consumer associations in issues related to Law No. 24,240 on Consumer Protection (*e.g.* concerning life insurance),[32] others have rejected standing on the grounds that economic matters do not entail homogeneous individual interests.[33] However, there are no precedents regarding a class action on merely economic

---

[30] CNACAF, Panel II, April 17, 2013, "*Lahitou Juan Pablo c/EN-PEN-ENRE y otros s/varios*".

[31] BORDA, GUILLERMO A., Manual de Derecho Civil. Parte General, Editorial Perrot, 1991, p. 60.

[32] Panel C (CNCom, March 19, 2010, "*Damnificados Financieros Asociación Civil para su Defensa c. Banco Río de la Plata S.A. s. Ordinario*") and Panel D (CNCom, November 5, 2009, "*Consumidores Financieros c. Banco Piano S.A.*").

[33] Panel A (CNCom, September 2, 2010, "*ADECUA c. Toyota Compañía Financiera S.A. y ot. s. Ordinario*"; November 16, 2010, "*Damnificados Financieros Asociación Civil para su Defensa c. BBVA Banco Francés SA s. Sumarísimo*"; December 28, 2012, "*Consumidores Financieros Asociación Civil para su Defensa c. Banco Patagonia S.A s. Ordinario*", *inter alia*) and Panel B (CNCom, October 21, 2009, "*Damnificados Financieros Asociación Civil para su Defensa c. Citibank N.A. s. Sumarísimo*").

grounds brought by a single individual instead of jointly with an association, in which the plaintiff's standing to sue has been recognized.[34] Nor are there precedents of a class action involving economic claims of an individual magnitude similar to the one filed here before this United States court.

25.   Based on the foregoing, given that this lawsuit involves only economic claims, and that the amounts at stake are large enough to warrant individual actions, it is highly unlikely that Argentine courts would conclude that one or more shareholders of YPF have sufficient standing to file a class action similar to this one brought in the United States.

## D.   LITIGATION COSTS

26.   In Argentina, court proceedings are subject to prior payment of a fee, known as "court tax" (*tasa de justicia*), to be paid at the outset of the process by the party who institutes a lawsuit. The court tax is established by the Legislative Branch of every jurisdiction (*i.e.*, the Federal Congress or the Legislature of the relevant province, respectively). At the federal level (which, for this purpose, also includes most courts for the Autonomous City of Buenos Aires), the court tax is equal to 3% (three per cent) of the amount claimed.[35]

27.   The CSJN has characterized the court tax as a tax whereby "[t]*he taxable event giving rise to the duty to pay the court tax is the provision of a service by the jurisdictional body in relation to the claim filed, and lies with the person who institutes the relevant proceedings*".[36]

---

[34] Rivera has pointed out that the Argentine system of collective actions is still at an initial stage of development and that these actions have not been useful yet to protect the most substantive economic rights of individuals. There is case law which shows that collective actions find limitations when the action seeks to safeguard economic rights and the amounts at stake are significant, adding that it is of utmost importance that Congress passes a law on this issue, taking into account the experience of other countries. *See* RIVERA, JULIO CÉSAR (H), "*La Legitimación de las acciones colectivas*", in "Derecho Procesal Comercial", II, directed by Graziabile, Darío, Ed. Abeledo Perrot, Buenos Aires, 2013, p. 1502.

[35]   Law No. 23,898, Section 2.

[36]   CSJN, February 27, 1996, "*Techint Compañía Técnica Internacional c/ Corrientes, Provincia de s/ ejecución por A 10.932.954*", Fallos 319:139.

28. Pursuant to the laws governing the organization of the Judiciary, the amounts collected as "court tax" are specific resources owned by the Argentine Judiciary, which are part of its annual investment and expenditure budget.[37]

29. The court tax is determined according to the value of the subject-matter of litigation:

(i) In proceedings where the subject-matter of litigation has no monetary value, plaintiff shall pay ARS 70 (Argentine pesos seventy) as court tax.[38]

(ii) Where plaintiff claims payment of a certain amount of money ("determined amount"), for the purpose of calculation of the relevant court tax, the principal, currency depreciation, and the interest accrued claimed as of the institution of the proceedings shall be taken into account.[39] Plaintiff shall pay a court tax equal to 3% of the aggregate amount thereof.

(iii) Where the amount claimed may not be determined as of the filing of the lawsuit ("indeterminable amount"), plaintiff shall pay ARS 70 (Argentine pesos seventy) as court tax, and the final amount thereof shall be determined later, upon conclusion of the proceedings.[40]

(iv) Where plaintiff claims payment of an amount of money which has not but may, in principle, be determined ("determinable amount"), plaintiff shall pay a court tax equal to 3% (three per cent) of the amount estimated as principal and interest. The estimate made by plaintiff may be challenged by the Tax Authority, and is ultimately determined by the court. In the event that the amount estimated by plaintiff be considerably lower than that ultimately determined, the court may impose a fine ranging from 5% to 30% of the difference between both figures.[41]

30. In general, courts follow strict criteria in relation to the payment of the court tax, as well as in the determination of the amount thereof. In particular, courts have adopted a restrictive approach towards claims that a lawsuit has no monetary

---

[37] Law No. 23,853, Section 3 (a).

[38] Law No. 23,898, Section 6.

[39] Law No. 23,898, Section 4 (a).

[40] Law No. 23,898, Section 5, second paragraph.

[41] Law No. 23,898, Section 4 (d).

value or that the value thereof is "indeterminable". This approach has been summarized by legal scholars as follows: "*Case law agrees on one thing: No one shall be exempted from payment of the court tax*".[42]

31. In the instant case, if Plaintiffs' action against the Argentine State were brought in Argentina, it is highly probable that the court, either at the request of the Tax Authority or on its own, would take the position that (i) the claim has a monetary value, and (ii) such value may be determined at the outset of the litigation (*i.e.*, is of a "determinable amount") by applying the parameters set forth in Section 7 of the YPF Bylaws.

32. Because the amounts relating to the tender offer, the launching of which is sought by Plaintiffs, would be for billions of dollars, the court tax would certainly be in excess of one hundred million dollars.

33. The court tax is triggered by the mere filing of the complaint. Subsequent abandonment of the litigation does not eliminate the liability for the court tax thus triggered.

34. In addition, pursuant to procedural laws applicable at the federal level, the general principle is that the losing party is to bear all the expenses incurred by the other. Only as an exception may the court depart from this principle where the circumstances of the case so warrant, stating its reasons, under penalty of annulment.[43]

35. Litigation costs include, in addition to the court tax, all expenses incurred in the course of the proceedings, as well as all expenses incurred in order to prevent it, other than those deemed useless or superfluous.[44] In particular, litigation costs include: (i) the fees of the legal counsel for the prevailing party, and (ii) the fees of experts.

36. Here, fees could be hundreds of millions of dollars. Fees are established by the court pursuant to the relevant regulations, which set fees as a percentage of the

---

[42]     GORDILLO, AGUSTÍN, "*La implacable tasa de justicia*", published in La Ley 1995-E. This construction criterion is consistent with the allocation of the amounts collected as court fees, which, as it has already been explained, are specific resources owned by the Argentine Judiciary.

[43]     Code of Procedure, Section 68.

[44]     Code of Procedure, Section 77.

amount claimed, rather than on a time basis.[45] The statutory fees of the legal counsel for the prevailing party –including the fees pertaining to the lawyer and the attorney– must range from 14% to 28% of the amount of the claim for first instance.[46] This amount should be added to the fees arising from their work before the Court of Appeals and the CSJN, which may range for each instance from 25% to 35% of the fees established for the first instance.[47] Costs would increase in the event that the case were heard by one of the recently created Federal Courts of Cassation.[48] The same percentages set for the regulation of fees for work before Courts of Appeals would be applicable to this possible stage. Fees of experts are also calculated as a percentage —albeit lower than for counsel— on the amount involved. Consequently, the professional fees of counsel and experts, in the aggregate, could amount to hundreds of millions of dollars.[49]

37.   A court can award professional fees below statutory percentages only as an exception.[50] In any event, with respect to Plaintiffs' claims, assuming the court calculated their value according to Section 7 of the YPF Bylaws, even if the court departed from the statutory amounts, the fees would still be many millions of dollars.

38.   Based on the foregoing, legal scholars have asserted that litigation costs in Argentina operate as a barrier to access to justice, since they work as a disincentive to the filing of lawsuits against the Argentine State.[51] However, the Argentine State has not acknowledged these reasons, which may lead to an actual denial of justice. Indeed, Argentina has been held liable by the Inter-American

---

[45]   Law No. 21,839 and rules supplementary thereto.

[46]   Sections 7 and 9 of Law No. 21,839. The total fees established on account of performance before the Court of First Instance (including those pertaining to the lawyer, the attorney, and court-appointed experts) may not exceed, in the aggregate, 25% of the amount of the judgment (Argentine Civil Code, Section 505).

[47]   Law No. 21,839, Section 14.

[48]   For a reference to the law on creation of such courts, see *infra*.

[49]   *See*, for example, Decree-Law No. 16,638/1957, which regulates accountant experts' fees.

[50]   Law No. 24,432, Section 13.

[51]   MAIRAL, HÉCTOR A., "*El silencio de los tribunales argentinos*", Res Pública Argentina, Issue 2007-3, p. 7. An English translation of this article titled "The Silence of Argentine Courts" may be found at http://www.iilj.org/gal/documents/HectorMairal.ThesilenceoftheArgentinecourts.pdf.

Court of Human Rights for the extremely high litigation costs imposed on an individual, whose lawsuit against the State has been rejected.[52]

39.  Procedural legislation at the federal level provides that parties showing that they lack resources may file a "motion for leave to litigate *in forma pauperis*". This benefit entails an exemption—total or partial—from payment of the court tax and such other litigation costs as may apply. However, in principle, the motion for leave to litigate *in forma pauperis* may not be granted to corporations. In such regard, the CSJN has maintained in cases of this kind that "*the admission thereof is to be subject to a careful and thorough analysis*".[53]

40.  Along these lines, the CSJN has also held that it may be assumed that companies claiming extremely high amounts may apply to a loan in order to pay for the court tax. Therefore, in such cases, the motion for leave to litigate *in forma pauperis* may not be granted.[54]

41.  In the case under analysis, it is clear that Repsol is a solvent company. In addition, in the lawsuit it may institute against the Argentine State, as explained above, the court might consider the claim to be worth billions of dollars. Under such circumstances, the motion for leave to litigate *in forma pauperis* could not be admitted.

42.  Thus, it is likely that Plaintiffs would have to pay an amount in excess of one hundred million dollars in court fees to bring this case in Argentina, and could face more than one hundred million dollars in attorneys' fees awards were they to lose.

E.   **CURTAILMENT OF THE JUDICIAL INDEPENDENCE**

43.  The Congress has recently passed a number of laws implementing reforms on important aspects of the organization and functioning of federal courts.

---

[52] Inter-American Court of Human Rights, "*Cantos vs. Argentina*", Judgment of November 28, 2002, Series C No. 97.

[53]      CSJN, October 20, 1996, "*Estructuras Tafí S.A. c. Provincia de Tucumán*", JA 1997-I-74.

[54]      CSJN, July 11, 2006, "*Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos*", Fallos 329:2719.

44.   Among these laws, the most important are the following: (i) Law No. 26,853, on the creation of new Federal Courts of Cassation;[55] (ii) Law No. 26,854, setting forth the new regime of injunctive relief in proceedings to which the Argentine State or its decentralized agencies are a party; and (iii) Law No. 26,855, introducing important amendments to the composition and functioning of the Council of Magistracy.[56]

45.   These laws were pushed forward with great emphasis by the Executive Branch and approved by the Congress in a swift procedure, and are framed within the context of the so-called "Democratization of Justice".[57] The most salient features of these reforms are the following:

(i)   <u>Federal Courts of Cassation</u>. The creation of these courts, as an intermediate instance between the Courts of Appeal and the CSJN, has been subject to serious criticism.[58] It has been held that *"besides the alleged official purposes, the creation of these new Courts of Cassation is actually aimed at three undeniable targets: (a) delaying as much as possible lawsuits against the State; (b) centralizing in three Courts of Cassation sited in the Federal Capital City the review of all decisions issued by the federal chambers of the country, and (c) appointing biased+++++++++++ judges (i.e.,* in favor of the Government) *by means of an "abbreviated procedure".*[59]

(ii)  <u>Injunctive Reliefs</u>. The new regime on injunctive reliefs has also been criticized, since it imposes a more restrictive approach in relation to injunctive reliefs

---

[55]      Law No. 26,853 provided for the creation of: (i) the Federal Court of Cassation in Contentious Administrative Matters; (ii) the Federal and National Court of Cassation in Labor and Social Security Matters, and (iii) the Federal and National Court of Cassation in Civil and Commercial Matters.

[56]      Pursuant to Section 114 of the Constitution, the Council of Magistracy shall be in charge of the selection of the judges and the management of the Judiciary.

[57]      In her speech of March 1, 2013, at the opening of the Congress' ordinary sessions, the Argentine President announced the submission of these bills for the alleged purpose of *"carrying out a deep democratization"* of the Judiciary.

[58] OTEIZA, EDUARDO, *"El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854"*, La Ley Special Supplement, May 2013 (pointing out that the Federal Courts of Cassation imply that the judicial proceedings will take longer and enhance the vulnerability of fundamental rights).

[59]      BIANCHI, ALBERTO B., *"Crónica de una inconstitucionalidad manifiesta"*, La Ley, June 26, 2013.

requested by private parties against the State, limiting the court's power and restricting their margin of discretion in this matter.[60]

   (iii)   <u>Council of Magistracy</u>. The reforms to this body have been widely questioned, in the understanding that they are aimed at "*politicizing*" the Council of Magistracy, thus affecting judges' independence.[61] Pursuant to the amendments introduced, the majority of the Council's members would be elected by means of elections in which they should run as political parties' candidates. In addition, majorities required for the Council to decide the opening of the proceedings for the removal of federal judges would be reduced. Under this reform, the Council may, by simple majority (which, in turn, will depend on the majority party), suspend any federal judge.[62]

46.   The so-called "Democratization of Justice" was harshly criticized by many of the most representative entities, which pronounced themselves against these measures.[63]

47.   Regarding these reforms the Latin American Federation of Judges held: "*[T]he changes proposed imply a serious danger for the existence of the Argentine Republic itself. The Argentine citizens being the ones harmed since the submitted bills materially alter the operation of the Judiciary and in no way do they deal with a reform that broadens the possibility of exercising rights; on the contrary,*

---

[60] GIL DOMÍNGUEZ, ANDRÉS, "*La inconstitucionalidad e inconvencionalidad del régimen de medidas cautelares dictadas en los procesos en los que el Estado es parte (Ley 26.854)*", La Ley, Special Supplement, May 2013 (pointing out that several Sections of Law No. 26,854 infringe the right to effective judicial remedy and the right to summary proceedings. Also, it is argued that the law gives rise to a situation of inequality between the State and private parties); OTEIZA, EDUARDO, "*El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854*", La Ley, Special Supplement, May 2013 (indicating that validity periods of the injunction reliefs which is of six months for ordinary procedures and three months for summary procedures are unconstitutional and violate Sections 8 and 25 of the American Convention on Human Rights).

[61] GELLI, MARÍA ANGÉLICA, "*Las inconstitucionalidades de la ley del Consejo de la Magistratura*", La Ley, June 26, 2013 (stating that the reform affects judicial independence and impartiality as well as the judicial guarantees of the Argentine citizens); OYAHANARTE, MARTÍN, "*Reforma a la Justicia: la integración del Consejo de la Magistratura por académicos ajenos al ámbito jurídico es inconstitucional*", MJ –DOC.6229-AR, April 10, 2013 (claiming that the reform violates Section 114 of the Constitution).

[62] Section 7 (15) of Law No. 24,937, as amended by Section 6 of Law No. 26,855.

[63]    Among them: the National Association of Magistrates and Officials of the Federal Judiciary, the Argentine Federation of the Magistracy and Judicial Office, the Female Judges Argentine Association, the Law School of Buenos Aires University, the Argentine Procedural Law Association, the Argentine Constitutional Law Association, the Democratic Justice Civil Association, National Academy of Buenos Aires of Law and Social Sciences.

*they curtail the independence of the Judicial Power [...]. The partidization of the Council of the Magistracy, the body in charge of the selection and control of the performance of judges, is fostered*".[64]

48.  Accordingly, the Peace and Justice Committee of the Argentine Episcopal Conference reflected as follows: "*The actual or threatened use of state power to influence judges in favor of the interests of the Government should be utterly rejected and may never be justified on the basis of alleged or actual pressures, apparently symmetrical, exerted by private parties [...] The popular election of the members of the Council of Magistracy is a mechanism which seems to be inconsistent with constitutional rules, and which, in any case, will turn a technical and rigorous body into a scenario of struggles among political parties. The politicization of judges is inadmissible and jeopardizes the neutrality expected therefrom [...] The creation of new judicial instances (Courts of Cassation) announced [...] entails more delays in the settlement of disputes in the context of proceedings which are already too slow. Therefore, it is reasonable to suspect that the purpose is not to speed up proceedings, but to create courts higher than those existing, comprising judges customized by present majorities, which may modify case law in a sense favorable to the political authority*".[65]

49.  In addition, the United Nations Special Rapporteur on the Independence of Judges and Lawyers, Gabriela Knaul held: "*[I] call Argentina to set clear procedures and objective criteria for the removal and sanction of judges, and that judges be granted an effective remedy to challenge such decisions, so as to safeguard judicial independence*".[66]

50.  A few weeks ago, the CSJN held several provisions of Law No. 26,855 on the Council of Magistracy unconstitutional by considering them in violation of Section 114 of the Constitution.[67] Such decision led to the announcement of new initiatives concerning a reform of the Judiciary, such as the proposals of depriving

---

[64] Statement by the Latin American Federation of Judges, dated April 18, 2013.

[65] Statement dated March 6, 2013, published in El Derecho, April 17, 2013, p. 22.

[66] Statement dated April 30, 2013, published at http://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=13275&LangID=S.

[67] CSJN, June 18, 2013, "*Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho s/ acción de amparo c/ Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. N° 3034/13)*", R. 369. XLIX.

the CSJN of its power to manage the Judiciary,[68] creating a new court with exclusive jurisdiction to rule on the constitutionality of laws[69] and increasing the number of members of the CSJN.[70]

51. These recent developments have worsened a crisis of independence of the Judiciary which had certainly existed long before.

52. In 2005, a survey conducted among Argentine attorneys revealed that almost 90% of the respondents believed that Argentine courts are not independent from political power.[71]

53. In 2008, the current Chief Justice of the CSJN held that "*there are practices affecting judicial independence*" and that "*there is no judge in the country assigned to major cases who has not been the subject of a formal charge against him*".[72]

54. Therefore, the independence of Argentine courts was jeopardized even before the enactment of the reforms included in the so-called "Democratization of the Judiciary". These reforms, along with others that may be applied in the near future, make this scenario even worse.

55. In this case, given the high level of exposure of the issue and the strong interest of the Argentine State in obtaining a favorable decision, it is reasonable to assume that in the context of a trial the judges who would have to rule on the Argentine State's obligation to launch the tender offer would face considerable pressure to

---

[68] Draft bill submitted to Congress by Representative Carlos Kunkel and others on June 26, 2013, file No. 4935-D-2013.

[69] News article published in "La Nación", on July 10, 2013, available at: -------------------------------------- http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-quiere-crear-un-tribunal-de-constitucionalidad-para-eludir-a-la-corte.

[70] News article by Adrián Ventura, published in "La Nación" on April 27, 2013, available at http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte; news article published in "Clarín" on April 26, 2013, available at http://www.clarin.com/politica/Zaffaroni-Corte-Reforma_judicial_0_908309336.html; news article published in "El Cronista" on April 27, 2013, available at http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html.

[71] News article published in "La Nación" newspaper on October 21, 2005, and available at http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-justicia-no-es-independiente.

[72] News article published in *iProfesional.com*, Legal Section, on February 18, 2008.

rule in favor of Argentina. In this scenario, the fate of Plaintiffs' claims could well be conditioned by non-legal factors.

**F.**  **THE SCOPE OF THE COMPLAINTS FILED BY REPSOL IN ARGENTINA**

56.  I have had access to copies of the complaints filed by Repsol in Argentina against the Argentine State and YPF.

57.  Repsol has not filed any complaint before Argentine courts seeking that the Argentine State be ordered to launch the tender offer, or seeking compensation for failure to launch the tender offer.

58.  In proceedings instituted before Argentine courts, Repsol has only noted the failure by the Argentine State to launch the tender offer, without requesting that it be compelled to do so or seeking damages for that failure. It did so in the proceedings instituted to challenge the decisions adopted—with the participation and vote of the Argentine State exercising rights arising from the stock owned by Repsol subject to expropriation—at YPF shareholder' meetings held on (i) June 4, 2012, (ii) July 17, 2012, and (iii) September 13, 2012.

59.  In those challenges, Repsol seeks the annulment of any decisions taken at said meetings on the grounds that the Argentine State (i) did not have a legitimate title to exercise rights on shares owned by Repsol which are subject to "temporary occupation," and (ii) violated Section 7 (h) of the YPF Bylaws whereby, for as long as the tender offer is not carried out, the Argentine State may not exercise the rights in connection with YPF's shares subject to expropriation.[73] In these court actions, Repsol did not request the launching of the tender offer, nor did it require the payment of any compensation to YPF's shareholders who would have received the tender offer had Argentina complied with its obligations set forth in the YPF Bylaws.

---

[73] Section 7 (h) of the YPF Bylaws provides that, where a person acquires control over YPF absent compliance with the requirement to launch a tender offer, *"[t]he shares and securities acquired in violation of the provisions [...] shall give no right to vote or to collect dividends or to other form of distribution as may be made by the Company and shall not be computed when determining the quorum present at any each of the meetings of shareholders of the Company."* This provision is specifically applicable to the Argentine State, as set forth by Section 28 of the YPF Bylaws.

G.   **IRRELEVANCE TO THIS LITIGATION OF THE PROCEEDING BEFORE THE NATIONAL APPRAISALS COURT**

60.   Pursuant to the General Expropriation Law No. 21,499 and Law No. 26,741, the value of the shares of YPF subject to expropriation shall be determined initially by the NAC.

61.   Despite its name, the NAC is an administrative agency that belongs to the Argentine Executive Power that initially fixes, without the intervention of the expropriated party, the value of the asset subject to expropriation that Argentina must deposit with the competent judicial court in order to take possession of the asset subject to expropriation. If the owner of the asset subject to expropriation considers such price insufficient, it may request that the judicial court fix it.

62.   In the instant case, the value set by the NAC could apply—if at all—only to the shares subject to expropriation, but not to the remaining shares of YPF, which are the ones involved in the present litigation.

63.   Contrary to Dr. Arecha's argument, the determination that the NAC could reach would have no relevance to this litigation. The value of the non-expropriated shares involved in this case is to be determined in accordance with the rules of Section 7 of the YPF Bylaws. This determination will not be affected by whichever value is ultimately set by the NAC or by the Argentine courts for the shares subject to expropriation.

64.   Therefore, the proceeding before the NAC does not constitute a bar either to the admissibility of this complaint or to the launching of the tender offer as provided in the YPF Bylaws.

65.   Similarly, Dr. Arecha's assertion whereby the "purposes" of Laws Nos. 21,499 and 26,741 are inconsistent with the tender offer regime set forth in the YPF Bylaws is merely dogmatic. Throughout the Sections of Law No. 26,741, I find no evidence whatsoever of any purpose to repeal rules contained in YPF's Bylaws which regulate specific cases of acquisition and/or change of control of the company. This shows that the tender offer requirement has remained unaltered. Dr. Arecha's argument fails to consider the violation of the owners of the shares not subject to expropriation, which as property rights are also protected by the

Constitution.[74] Within such framework, nothing prevents the Argentine State from following the procedure provided for in Sections 7 and 28 of the YPF Bylaws. YPF's minority shareholders have a vested right to have a tender offer launched for the acquisition of their shares in accordance with the YPF Bylaws.

## H.   PRE TRIAL DISCOVERY IS A LEGAL PROCEDURE ALIEN TO ARGENTINE LAW – PROCEDURAL RULES APPLICABLE TO THE PRODUCTION OF EVIDENCE

66.   The Code of Procedure, which is the procedural law applicable in the federal courts of Argentina, does not provide for the so-called *Pre Trial Discovery*. Case-law[75] and legal scholarly writings[76] assert that this process is alien to Argentine law.

67.   The Code of Procedure states that evidence must be offered by plaintiff in the complaint and by defendant in the answer.[77]

68.   Among other means of evidence under the Code of Procedure, the court may order one party to produce documents identified by the other party and/or the examination of witnesses.[78] This order is issued by the judge at the evidence stage. Only exceptionally, the court may order the production of evidence at an earlier phase of the proceedings.

1. Document production

69.   The Argentine procedural system for document production is restrictive compared to the U.S. system as described to me. Documents that may be required to be produced by the other party must be individually identified by the requesting

---

[74] Constitution, Section 17. *See also* CSJN, "*Bourdieu, Pedro Emilio c/ Municipalidad de la Capital*", Fallos: 145:307 (1925).

[75] CSJN, "*Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios*", Fallos 321:667 (pointing that the Argentine system does not have a legal proceeding similar to the U.S. discovery period); Federal Court of Appeals in Civil and Commercial Matters, Panel II, "*R., J. J. c. LR3 Radio Belgrano y otros*", February 10, 1995, JA 1997-I-211 (indicating that Argentine law does not apply the U.S. discovery period).

[76] FEUILLADE, MILTON C., "*La prueba en el proceso con elementos extranjeros*", JA 2008-IV-1516.

[77] Code of Procedure, Section 333.

[78] Code of Procedure, Section 388.

party. The requesting party cannot request to the counter-party the production of categories or classes of documents.[79] Moreover, compliance with the order is not an obligation but a mere burden upon the party being required to produce. Accordingly, failure to submit the requested documentation creates a mere presumption against that party only if, based on other facts, there is a strong likelihood about the existence and contents of such documentation.[80]

70.   Court proceedings are normally instituted through the submission of the complaint. However, exceptionally, plaintiff may commence the court proceedings by requesting the production of some evidence in advance, *i.e.* prior to the submission of the complaint.[81]

71.   The request for advance production of evidence shall only be granted if there are reasonable grounds to believe that the production of evidence would be impossible or very difficult during the evidence stage. This procedure is exceptional in nature[82] and is not intended to prepare evidence for the complaint, but rather attempts to preserve specific evidence that could be impossible or very difficult to produce at the appropriate procedural stage.[83] Documentary evidence that may be produced at this early stage includes the exhibition, safekeeping or

---

[79] In this regard, legal scholars have stated that: "*The petition for document production shall be accurate as regards both material identification of the document and the consequences of non-submission, expressly set forth by law*" (CARAMELO DÍAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA I. HIGHTON – BEATRIZ A. AREÁN (Directors), Volume 7, Hammurabi, Buenos Aires, 2007, p. 648).

[80] In this regard, legal scholars have stated that: "*Since it is a burden, disregarding the demand or refusing to submit the documentation merely exposes the relevant party to the potential risk of triggering a presumption against it, but does not authorize taking action to force submission or applying penalties*" (CARAMELO DÍAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA I. HIGHTON – BEATRIZ A. AREÁN (Directors), Volume 7, Hammurabi, Buenos Aires, 2007, p. 648).

[81] Code of Procedure, Section 326.

[82] "*Evidence assurance under Section 326 of the Argentine Code of Civil and Commercial Procedure is an exceptional procedure which should only be granted where the filing person is likely to lose evidence or find it impossible or very difficult to produce it at a later stage, which requires thoroughly explaining why such exception should be granted and evidencing the supporting grounds*" (Federal Court of Appeals in Civil and Commercial Matters, Panel I, "*Domnicz, José y otro v. Camino del Atlántico S.A.*", November 12, 2002, DJ 2003-1-944).

[83] CNCom, Panel A, "*Chiri S.A. y otros c. House of Fuller*", December 23, 1998, LL 1998-D-240. The early production of evidence requires previously summoning the other party. If this is not possible and there are reasonable grounds of urgency to do so, this summons could be replaced with the intervention of the Defender of Absent Parties (ELENA I. HIGHTON – BEATRIZ A. AREÁN, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, Volume 6, Hammurabi, Buenos Aires, 2006, p. 131).

seizure of duly identified documents for conservation purposes. Only particular, specifically-identified documents may be requested, not categories or classes of documents.

72. Furthermore, before filing the complaint, the plaintiff may request the performance of preliminary procedures.[84] These procedures are also exceptional in nature[85] and are aimed at gathering information or documentation, provided that said information or documentation cannot be obtained by other means. The examples provided by the Code of Procedure and by case law also refer only to specific and previously-identified documents.[86]

2. Examination of witnesses and parties' oral statements (*absolución de posiciones*)

73. Pursuant to the Code of Procedure,[87] witness examination is subject to specific rules and follows court practice. Under these rules and practices, witnesses in Argentine federal court proceedings are not questioned (either in direct or cross examination) by the parties' counsel. Instead, the party which proposes the witness submits its questions in writing to the court before the hearing.[88] Normally a court clerk, not the judge (who generally is not present at the hearing) then poses those questions –verbatim or amended as the clerk sees fit– to the witness. Once the witness has answered the first set of questions, opposing counsel may propose its own questions (orally) for the court to be made to the witness. The court may decide whether or not to ask those questions –verbatim or as amended.[89]

---

[84] Code of Procedure, Section 323.

[85] CNCom, Panel B, "*Sistemas Médicos S.A. c. St. Jude Medical*", March 16, 1995, LL 1996-B-158.

[86] For instance, a will shall be shown whenever the petitioner believes he is the heir, co-heir or legatee, if he cannot obtain it by means of a judicial measure; in case of disturbance (*evicción*) the seller or the buyer must exhibit the titles or another instrument referring to the property sold. *See* Code of Procedure, Section 323.

[87] Code of Procedure, Sections 439-447.

[88] Code of Procedure, Section 429.

[89] Code of Procedure, Section 442.

74.   Government officers, even those of a middle rank such as undersecretaries, [90] do not have to appear personally before the court and testify orally, but submit a written statement based on the questions delivered in writing.

75.   The only witness evidence that may be produced prior to submitting the complaint includes those witnesses who are very elderly, seriously ill or about to leave the country.[91]

76.   A party to a court proceeding cannot be deposed as a witness in such proceeding. A party may call the other party as such (*i.e.*, as a party but not as a witness), to provide oral statements before the court on the matters in dispute (*absolución de posiciones*).[92] In the case of legal entities —such as the Argentine State— usually its legal representative, or someone appointed by her, declares on behalf of the entity. This means of evidence may only be requested once the complaint has been already filed.

77.   While being deposed in this manner (*i.e.*, as a party and not as a witness), a party does not commit perjury if he or she does not tell the truth, whether it be a criminal or a civil case.[93]

78.   In litigation against the Argentine State, the officer legally empowered to provide these statements on behalf of the State is not required to appear before the court and delivers a written statement.[94] Executive Order No. 1102/86 delegated to the Government counsel the power to deliver these written statements.[95] According to a former Deputy Attorney General, this often means that these statements are delivered by the same counsel that has prepared the

---

[90] Code of Procedure, Section 455; CSJN procedural rule dated December 20, 1967.

[91] Code of Procedure, Section 326 (1).

[92] Code of Procedure, Sections 404-425.

[93] FALCÓN, ENRIQUE M., Tratado de Derecho Procesal Civil, Comercial y de Familia, III, Rubinzal Culzoni, Buenos Aires, 2006, p. 125 (explaining that under Argentine law, the party "may lie freely" when delivering oral statements even under oath, without any criminal liability); Palacio, Lino Enrique, Derecho Procesal Civil, IV, 4th edition, Abeledo Perrot, Buenos Aires, 2011, p. 442 (stating that Argentine law does not provide for specific sanction against perjury by the parties).

[94] Code of Procedure, Section 407.

[95] The Attorney General for the Argentine Treasury, the Deputy Attorney General for the Argentine Treasury, and the Legal Directors of the Public Administration.

24

answer to the complaint and, in practice, grants an opportunity to the Argentine State to amend or elaborate further on the answer to the complaint.[96]

79.    The above rules are mandatory in any federal court proceeding related to litigation instituted in Argentina.

80.    In connection with the production of evidence before Argentine federal courts ordered in court proceedings conducted abroad, Argentina and the United States are parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[97] and the Inter-American Convention on Letters Rogatory.[98] These Conventions provide that, in principle, the court which executes a letter rogatory shall apply its own law as to the methods and procedures to be followed. However, upon request of the authority that has issued the letter rogatory, a special method or procedure may be followed, if this is not incompatible with the domestic law of the State of execution.[99] Argentine courts have complied with a request by a U.S. court to produce witness evidence under terms established in the letter rogatory.[100]

81.    Based on the foregoing, the taking of evidence in Argentina pursuant to a letter rogatory issued by a United States court could follow the rules on witness examination specified in such letter rogatory.

82.    To sum up, in any domestic litigation before Argentine federal courts, the production of documents held by the other party or the examination of witnesses will only be allowed within the limited scope provided by the Code of Procedure. In contrast, pursuant to the Hague Convention and the Inter-American Convention on Letters Rogatory, the production of evidence in Argentina in connection with foreign litigation could, at least to some extent, follow the rules of the court where such litigation is being conducted.

---

[96] GARCÍA PULLÉS, FERNANDO RAÚL, Tratado de lo contencioso administrativo, II, Hammurabi, Buenos Aires, 2004, p. 661.

[97] *See* Law No. 23,480.

[98] *See* Law No. 23,503.

[99] DATES, LUIS E.,"Cooperación judicial internacional procesal en materia probatoria", La Ley 2007-D, 1150; FEUILLADE, MILTON C.,"La prueba en el proceso con elementos extranjeros", La Ley 2009-A, 1197.

[100] CNCiv, Panel I, February 24, 2000, *"Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto"*.

## II. CONTRACT QUESTIONS

**A.   THE OBLIGATION TO LAUNCH A TENDER OFFER UNDER YPF'S BYLAWS AND THE MEANING OF "ACQUISITION" AS USED IN SAID BYLAWS**

83.   The Argentine State acquired control over YPF in mid-2012. Since then, the Argentine State has been exercising voting and economic rights (*e.g.*, collection of dividends)[101] in a public and evident manner with respect to the majority of YPF shares.

84.   Since Repsol has lost the capacity to "form the corporate will" (*i.e.*, to vote the majority of the shares) at regular shareholders' meetings and to appoint or revoke the appointment of a majority of directors or members of the supervisory committee, and because such rights are currently exercised by the Argentine State since the enactment of Law No. 26,741, it is clear that there was an acquisition of control in YPF.[102]

85.   Under the language of the YPF Bylaws, the obligation to launch a tender offer is triggered by obtaining control, without the transfer of property of the shares being necessary.

86.   Section 28 of the YPF Bylaws, relating to "Provisions applicable to acquisitions by the National Government," provides that: "...*(A) The provisions of subsections e) and f) of Section 7 (with the sole exception of the provisions of*

---

[101] The Argentine State has collected dividends pertaining to the "shares subject to expropriation" as evidenced by YPF Letter dated April 25, 2013, which I have had before me and attach hereto as *Exhibit C*, according to which "exercise of all rights" pertaining to the shares subject to expropriation belong to the Argentine State. As per such text, it must be concluded that the nature of such collection has been final, on account of the Argentine State, and not on account of Repsol.

[102] Companies Law, also applicable to YPF, establishes that the existence of control depends on gathering enough votes to form the corporate will or exerting dominant influence as a result of the shares or existing special relations. *See* Law No. 19,550, Section 33. Executive Order No. 677/01, in force at the relevant time, and the new Capital Markets Law, which replaced it, applicable to corporations under the public offering system, like YPF, provide the following definition of "Controlling Entity," "controlling group," or "group of control": "*A natural person or legal entity holding, whether directly or indirectly, individually or collectively, as the case may be, a participation under any title in the capital stock or securities with voting rights conferring such holder, legally or de facto, and if de facto on a stable basis, the right to cast the number of votes required to form corporate will at regular shareholders' meetings or to appoint or revoke the appointment of a majority of directors or members of the supervisory committee*" (Law No. 26,831, Section 2).

*paragraph B of the said Section) shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, (1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or (2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock provided for in subsection (a) of section 6 of these By−laws upon registration thereof with the Public Registry of Commerce. Should class A shares represent a lower percentage than the one previously mentioned, the provisions set forth in point (2) of this Section shall not be applicable. Instead, the general criteria set forth in subsection (d) of Section 7 shall apply.*"

87.    Section 7(i) then defines what an "indirect" acquisition is, and establishes that an indirect acquisition *may* occur through "*holdings of shares through trusts, depository receipts ("ADR") or through other similar mechanisms*". None of these mechanisms require a formal transfer of title to the shares as a condition to trigger the obligation to launch the tender offer for the stock acquisition referred to in Section 7. Likewise, Section 28 expressly provides that an "acquisition" may occur "*directly or indirectly, by any means or instrument*" and thus does not require transfer of title.

88.    Moreover, the text of Section 28(A)(1) has even clearer language that defeats, *per se*, the construction proposed by Dr. Arecha in paragraphs 21 and 24 of his opinion. According to the text of Section 28 of the YPF Bylaws, an "acquisition" by Argentina of YPF shares triggers the rules of Section 7, paragraphs (e) and (f), when, as a result thereof, Argentina "becomes the owner, *or exercises the control of,*" more than 49% of the Company's capital. This means that an "acquisition" can result either from the ownership of shares or from the control over them: in both cases the obligation to make the tender offer is triggered.

89.    Thus, in this case, the "temporary occupation" under Law No. 26,741, through which the Argentine State admittedly acquired control over YPF shares that account for 51% of the capital stock, is governed by the rules of the YPF

27

Bylaws. Section 28 of the YPF Bylaws states that the manner in which the Argentine State has acquired control—whether "directly or indirectly, by any means or instrument"—over YPF is irrelevant for the purpose of the obligation to launch a tender offer. As a consequence, such provision also applies to the Argentine State's "occupation" of the rights resulting from the shares subject to expropriation.

90.   This conclusion would not change if the rule provided in sub paragraph (A)(2) of Section 28 of YPF's by-laws were to be applied instead of that of sub-paragraph (A)(1) thereof. Since Argentina at present owns Class A shares that represent less than 5% of the YPF's capital, the rule of sub-paragraph (A)(2) would refer back to Section 7, paragraph (d), which also triggers the obligation to launch the tender offer when the party becomes the owner of or exercises "control of" the shares of YPF.

## B.   GENERAL MEANING OF THE TERM ACQUISITION UNDER ARGENTINE LAW

91.   Under Argentine law the term acquisition does not require the acquirer to take title. Even if the YPF Bylaws were silent as to whether a tender offer was triggered by a change in control, the generic term "acquisition" would also be satisfied by a change in control over the relevant assets. Under Argentine law, the term "acquisition" is much broader in meaning than Dr. Arecha maintains, restricting it to obtaining title to "property".

92.   Pursuant to the Argentine law, as defined in the Civil Code and applied in other legislation, the term "acquisition" is satisfied not only by the acquisition of "property", but also by the acquisition of "control",[103] "possession",[104] and "tenancy"[105] of certain things.

93.   In the instant case, the Argentine State has admittedly acquired control of YPF through the "occupation" of the shares subject to expropriation as established by

---

[103] Law No. 25,156, Section 6.

[104] Argentine Civil Code, Section 2355.

[105] Argentine Civil Code, Section 2460.

Law No. 26,741, and granted itself full exercise of all rights associated with those shares.

94.   The Argentine State has also acquired "possession" of all the rights pertaining to the shares, which in essence is equal to the possession of the shares.   The Argentine Civil Code defines as *possessor* the person who holds a thing in his power, with the intention of subjecting it to the exercise of a right of property,[106] while such Code defines a *holder* as any person who is in position to perform acts of ownership as to a thing, but only with the intention of possessing in the name of another.[107]

95.   Dr. Arecha and one of the experts appointed by YPF Gas in the court proceedings on annulment of shareholders' meetings pending in Argentina both acknowledge that Repsol has lost "possession" of the shares subject to expropriation. In paragraph 6 of his opinion, Dr. Arecha describes the temporary occupation in the following terms:

*"A temporary occupation is a legal tool governed by Law 21,499 and Article 2,512 of the Civil Code, by which the Government may, for reasons of public interest that justify the <u>dispossession</u> of property from a private entity, use and enjoy that property temporarily (…)"*(emphasis added).

96.   Likewise, Dr. Marcer, in his opinion rendered upon request of YPF Gas (under Argentina's control) in the proceedings seeking the annulment of shareholders meetings, held that the intervention of YPF and YPF Gas (provided for by Executive Orders Nos. 530/12 and 557/12, respectively) implied the "dispossession" of Repsol.[108]

97.   Hence, it is evident that, if Repsol lost "possession", such "possession" was acquired by the Argentine State.

98.   As another example, pursuant to Antitrust Law No. 25,156, an acquisition of a company may result from the acquisition of *"the property, or any right over*

---

[106] Argentine Civil Code, Section 2351.

[107] Argentine Civil Code, Section 2461.

[108] *See* Opinion by Alberto Marcer submitted in re "Repsol Butano S.A. c/ YPF Gas S.A. S/ impugnación de asamblea", before the Commercial Court of First Instance in the City of Buenos Aires No. 3, Clerk's Office No. 6 (File No. 103,181), p. 61, third paragraph.

*shares . . .*".[109]   The Argentine State has admittedly acquired the rights over the shares.

99.   In addition, the very same dictionary cited by Dr. Arecha acknowledges that an acquisition occurs by obtaining the rights associated with the object: "*In specific legal terms, it means obtaining a thing or right in order to reap such monetary benefits as may be relevant*".[110] According to the dictionary of the *Real Academia Española* (Spanish Royal Academy) *obtener* (to obtain) means "*to reach, get and achieve something which is deserved, requested or claimed*". This definition does not require that the thing be reached, gotten and achieved in the capacity of owner.

100.   Dr. Arecha concedes that the Argentine State has acquired the rights associated with the shares in paragraph 12 of his opinion, thus demonstrating that it has "reached" or "achieved" control over the shares.

101.   Dr. Arecha's argument based on Section 215 of the Companies Law whereby the new holder of shares needs to be registered in the Stock Ledger so that the transfer of ownership becomes effective is misplaced. First, as explained above, the term "acquisition" has a broader meaning than acquisition of ownership. Second, the Registry for the Deposit of Shares and Attendance to Shareholders' Meetings (*Libro de Depósito de Acciones y Registro de Asistencia a Asambleas*), which must reflect the records in the Stock Ledger of YPF,[111] expressly indicates that the Argentine State exercises the political and economic rights pertaining to the "shares subject to expropriation", while Repsol and The Bank of New York are acknowledged as mere formal owners of such shares without any rights upon them.

102.   The "occupation" ordered by Law No. 26,741 therefore satisfies numerous common meanings of "acquisition" under Argentine law, by obtaining control of the shares, obtaining possession of the shares, and obtaining rights over the

---

[109] Law No. 25,156, Section 6.

[110] Enciclopedia Jurídica Omeba, Volume I.A, Ed Bibliográfica Omeba, 1979, p. 518.

[111] The Stock Ledger is carried by Caja de Valores S.A. (Argentina's clearing agency) under the instructions of YPF.

shares. Therefore, both under the YPF Bylaws as well as under Argentine law, the Argentine State has acquired the YPF shares.

## C.   IRRELEVANCE OF THE TEMPORARINESS OF THE ACQUISITION UNDER THE YPF BYLAWS

103.   An acquisition does not need to be permanent, under either the terms of the YPF Bylaws or the normal meaning of the term "acquisition".

104.   First, the YPF Bylaws do not require that "acquisition" be permanent. Section 7 (h) of the YPF Bylaws expressly acknowledges that even temporary acquisitions trigger the obligation to launch a tender offer. Pursuant to this Section, sanctions for not complying with the tender offer requirement shall remain effective until the acquirer has lost control over YPF. Likewise, Section 28 of the YPF Bylaws does not in any way exclude acquisitions of a temporary nature from the tender offer rules.

105.   Second, even if the YPF Bylaws were silent as to whether a "temporary" acquisition triggered the tender offer, in accordance with Argentine law, an acquisition does not necessarily mean that the acquirer has obtained a right on a permanent basis. Acquisition may be temporary.

106.   Under the Argentine Civil Code parties may agree upon the acquisition of rights, including *in rem* rights, for a limited time. Furthermore, some *in rem* rights under Argentine law may only be acquired for a limited time. That is the case, for instance, of the right of usufruct, which may only be acquired by a corporation for a maximum of twenty years,[112] or trusts, which may be subject to a term no longer than thirty years.[113]

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

In Buenos Aires, Argentine Republic, on July 26, 2013.

Gustavo Naveira

---

[112] Argentine Civil Code, Section 2828.

[113] Law No. 24,441, Section 4(c).

# EXHIBIT A

**CURRICULUM VITAE**

**I.-     PERSONAL INFORMATION**

   (1)  Last and first names

      **NAVEIRA,** Gustavo Adolfo

   (2)  Place and date of birth

      Buenos Aires, Republic of Argentina

      September 9, 1945

   (3)  Professional Address

      Bouchard 680, piso 5°, Buenos Aires

      Tel. 54-11-5272-7000, Fax  54-11-5272-7001

      E-mail: gnaveira@ntmdall.com

**II.- UNIVERSITY DEGREE**

      Lawyer, 1970, School of Law and Social Sciences, University of Buenos

Aires

**III.-  OFFICES HELD IN THE JUDICIARY**

   •   Clerk of the First Instance Court in Commercial Matters in the
      Autonomous City of Buenos Aires No. 20, appointed on April
      30, 1970

   •   Clerk of Panel B of the Court of Appeals in Commercial Matters
      in the Autonomous City of Buenos Aires

   •   Judge in charge of First Instance Court in Commercial Matters
      in the Autonomous City of Buenos Aires No. 15, appointed on
      May 7, 1979, with the agreement of the Honorable Argentine
      Senate according to Executive Order No. 1,530 dated May 21,
      1984

   •   Judge of the Court of Appeals in Commercial Matters in the
      Autonomous City of Buenos Aires, Panel B, appointed by
      Executive Order No. 3,228 dated September 30, 1984, with the
      agreement of the Honorable Argentine Senate

**IV.-  OFFICES HELD IN THE ARGENTINE MINISTRY OF JUSTICE**

   •   Argentine Undersecretary of Justice, appointed on July 1st,
      1997, Executive Order No. 600

1

- Secretary of Technical and Legislative Affairs of the Ministry of Justice, appointed on November 29, 1997, Executive Order No. 1,127
- Member of the Executive Committee of the School of Mediation, Resolution No. 200 dated March 16, 1998
- Member of the Advisory Committee of the Center for Social-Legal Studies, Resolution No. 675 dated September 21, 1998
- Alternate Representative and Executive Secretary of the Building Infrastructure Committee of the Federal Judiciary in the Autonomous City of Buenos Aires, appointed on March 25, 1998, Ministry of Justice Resolution No. 228. Leader of a team of lawyers, engineers and architects who prepared the Terms and Conditions for National and International Public Bidding Process No. 4/99 and 5/99 for an urban development for the construction of courts in the City of Buenos Aires
- Chairman of the Award Committee in the National Bidding Process for Preliminary Designs for an urban development for the construction of courts in the City of Buenos Aires

## V.- __PUBLICATIONS__

1. ***Algunas notas sobre el art. 48 de la ley 24.522*** (ED, 09.28.95), written together with attorneys Marta E. Acuña and Edgardo Daniel Truffat and accountant Jorge E. Basile.

2. ***El arancel del art. 32 de la ley 24.522: Demasiadas dudas, escasas certezas*** (ED, 11.28.95), written together with attorneys Jorge Basile and Edgardo Daniel Truffat.

3. ***Proyectos de reforma a la ley 24.522. Cuadro Comparativo. Comentario a la informalmente llamada "Ley de fe de erratas"*** (E.D., Legislación Argentina, Boletín No. 18), written together with attorneys Jorge Emilio Basile and Edgardo Daniel Truffat.

4. ***Comentarios al proyecto del senador San Millán de reforma del art. 202 de la Ley de Sociedades Comerciales*** (E.D.L.A., No. 11), written together with attorneys Jorge Emilio Basile and Edgardo Daniel Truffat.

5. ***El Estudio jurídico y la pérdida de oportunidad de negocios*** (E.D. 12.11.97), written together with attorney Edgardo Daniel Truffat.

2

6.  *Para iniciar la polémica: El "anteproyecto de reformas a la ley de concursos y quiebras N°. 24.522" y la oportunidad de la reforma* (E.D. 12.26.97), written together with attorney Edgardo Daniel Truffat.

7.  *Comentario al fallo de la Cámara Nacional Comercial ¿Deslealtad sin daño?* (E.D., vol. 170-22).

8.  *Proyecto de reglamento para el Comité de Acreedores*, paper for the First End-of-the-World Symposium on Private Law, written together with attorney Edgardo Daniel Truffat.

9.  *El Anteproyecto de Sociedades Anónimas Deportivas*, Revista del Colegio Público de Abogados de la Capital Federal No. 18 (11-98).

10. *Monopolios actuales vs. Monopolios conjeturales*, Sports Corporations, written together with attorney Edgardo Daniel Truffat, report on the administration of Raúl Granillo Ocampo, published by the Ministry of Justice, single edition 11/99.

11. *Concurso Nacional de Anteproyectos Ciudad Judicial*, Revista de Arquitectura No. 193 (6/99) of Sociedad Central de Arquitectos.

12. *Firma Digital: Tratamiento legislativo de su regulación*, Revista del Colegio Público de Abogados de la Capital Federal No. 27 (9/99), written together with engineer Alejandro J. Román.

13. *El Documento Electrónico y la Firma Digital al Servicio de la optimización del Servicio de Justicia*, speaker in the Seminar organized by Centro de Estudios de Informática y Derecho (C.E.I.D.) reporting to the Ministry of Justice, held in the Autonomous City of Buenos Aires, September 27 and 29,1999.

14. *La Mediación Previa Obligatoria. Vehículo de comunicación de la realidad e instrumento para la adopción de políticas públicas*, written together with attorney Ester Riesel.

15. *El embargo del artículo 83 inciso 3) de la ley de sociedades comerciales (¿Herramienta automática o semiautomática?)*, written together with attorney Eduardo Daniel Truffat, Revista Errepar, Volume XIII, No. 164, July 2001.

16. *Algo mas sobre la suspensión de las decisiones asamblearias*, written together with attorney Eduardo Daniel Truffat, Errepar, Volume XIII, No. 169, December 2001, p. 613 et seq.

17. *Uzal y S.A. La Razón: el fin del principio*, written together with attorney Eduardo Daniel Truffat, Revista del Colegio Público de Abogados de la Capital Federal, December 2001/No. 52, p. 48 et seq.

18. *El presidente del directorio de una sociedad anónima no puede ni debe proclamarse "yo", el Supremo*, written together with attorney Eduardo Daniel Truffat, Forum of Córdoba, supplement on corporate law, Year I, No. 1, 2001.

19. *Una medida cautelar concursal conmocionante,* written together with attorney Eduardo Daniel Truffat, La Ley, supplement on bankruptcy proceedings, published on February 5, 2002.

20. *Breves reflexiones sobre los ilícitos societarios a la luz del art. 173, inc. 7° del Código Penal*, written together with attorney Pablo Arguibay Molina, ED March 7, 2002.

21. *La Crisis Económica y La Actividad Legislativa. Breve Referencia Histórica*, written together with attorney Eduardo Daniel Truffat, Revista de las Sociedades y Concursos No. 15, Ed. Ad Hoc, March/April 2002.

22. *El síndico societario: ¿control de legalidad o de gestión?*, written together with attorney Eduardo Daniel Truffat, El Derecho, issue dated 04.25.02.

23. *¿Plata perdida o tiempo perdido?*, written together with attorney Eduardo Daniel Truffat, El Derecho, September 15, 2003.

24. *¿Personas o máscaras jurídicas?*, written together with attorney Eduardo Daniel Truffat, Errepar, Revista de Doctrina Societaria y Concursal, No.191, October 2003.

25. *Prueba societaria difícil*, written together with attorneys Eduardo Daniel Truffat and Javier A. Lorente, E.D., published on November 14, 2003.

26. *El síndico, en el anteproyecto de reforma de la ley de sociedades*, written together with attorney Eduardo Daniel Truffat, E.D., published on July 7, 2004.

27. *¿Seguro de retiro o retiro del seguro?*, E.D., published on August 6, 2004.

28. *Respuesta conjetural* to *Sobre las técnicas de "personalización" de las sociedades y "la colegialidad"*, written by Eduardo Daniel Truffat together with attorney

4

Francisco Naveira, Errepar, Revista de Doctrina Societaria y Concursal No. 232, pp. 190/192, March 2007

## VI.- PARTICIPACION IN THE DRAFTING OF LEGISLATIVE BILLS:

- Sports Corporations, Message No. 159/99 (03.04.99).
- Amendment to Law No. 22,172, Message No. 559/99 (05.24.99).
- Regulation of Internal and National Arbitration, replacing Book VI of the Code of Civil and Commercial Procedure for the Autonomous City of Buenos Aires, Message No. 577/99 (05.28.99).
- Corporate Cooperation Agreement, Message No. 856/99 (08.09.99).
- Substitution of Article 23, Law No. 19,550, Message No. 838/99 (08.02.99).
- Concession, License and Permits of National Public Services and similar forms. File No. 2189/99 submitted by Representative Vensentini (05.03.99).
- Incorporation as domestic law of the Model Law on International Commercial Arbitration adopted by the United Nations Commission on International Trade Law (UNCITRAL), Message and Law, Interim Resolution No. 1,363/99.
- Draft Message and Law: Warrants. Interim Resolution No. 1,362/99.

# EXHIBIT B

List of Documents Analyzed

General documents

(1)     Copies of the file captioned "*Gomis Sáez, Antonio c/ Estado Nacional - PEN - Medida Cautelar*", No. 26,981/2012, Federal Court of First Instance in Contentious Administrative Matters No. 4, Clerk's Office No. 7.

(2)     Copies of the file captioned "*Forwood, Walter Cristian c/ PEN – DTOS. 530 y 532/12 s/ Medida Cautelar (Autónoma)*", No. 12,881/2012, Federal Court of First Instance in Contentious Administrative Matters No. 7, Clerk's Office No. 13.

(3)     Copies of the file captioned "*Gallego, José Manuel c/ EN-PEN-DTO 530/12 557/12 s/ Medida Cautelar (Autónoma)*", No. 13,223/2012, Federal Court of First Instance in Contentious Administrative Matters No. 5, Clerk's Office No. 10.

(4)     Copies of the file captioned "*De San Martín, José y otro c/ Estado Nacional Poder Ejecutivo s/ Proceso de Conocimiento*", No. 4,201/2012, Federal First Instance Court in Civil and Commercial Matters No. 6, Clerk's Office No. 11.

(5)     Copies of the file captioned "*Comisión Nacional de Valores c/ Repsol YPF S.A. s/ Queja*", No. 12,815/2012, Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel F.

(6)     Copies of the file captioned "*Repsol Butano S.A. c/ YPF Gas S.A. s/ Ordinario*", No. 103,181, First Instance Court in Commercial Matters No. 3, Clerk's Office No. 6.

(7)     Copies of the file captioned "*Repsol S.A. y otros c/ YPF S.A. s/ Ordinario*", No. 103,144, First Instance Court in Commercial Matters No. 3, Clerk's Office No. 6.

(8)     Copies of the file captioned "*Repsol YPF S.A. y otro c/ La República Argentina (DAJIN 2195/2012 M°RREE y C-EEUU) s/ Exhorto*", No. 32,569/2012, Federal Court of First Instance in Contentious Administrative Matters No. 11, Clerk's Office No. 21.

(9)     Copies of the file captioned "*Repsol S.A. c/ YPF S.A. (carpe DAJIN 2896/12 Jz Mercantil I- Madrid –Espa) s/ Exhorto*", No. 56,375/2012, Federal Court of First Instance in Contentious Administrative Matters No. 2, Clerk's Office No. 4.

1

(10)    Copies of the file captioned *"Repsol YPF S.A. c/ EN-DTO 530 532 732/12 s/ Proceso de conocimiento"*, No. 21,941/2012, Federal Court of First Instance in Contentious Administrative Matters No. 7, Clerk's Office No. 13.

(11)    Copies of the file captioned *"Repsol Butano S.A. c/ EN – PEN – Ley 26.741 – Dto 530 557 732/12 s/ Proceso de Conocimiento"*, No. 27,075/2012, Federal Court of First Instance in Contentious Administrative Matters No. 4, Clerk's Office No. 7.

(12)    Copies of the file captioned *"Repsol S.A. y otros c/ YPF S.A. s/ ordinario"*, No. 103,268, First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires No. 3, Clerk's Office No. 6.

(13)    Copies of the file captioned *"Repsol YPF SA c/ Comisión Nacional de Valores s/ medida precautoria"*, No. 12,126/2012, Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel F.

(14)    Law 26,741, published in the Official Gazette on May 7, 2012.

(15)    Executive Order 530/12 published in the Official Gazette on April 16, 2012.

(16)    Executive Order 532/12 published in the Official Gazette on April 17, 2012.

(17)    Executive Order 557/12 published in the Official Gazette on April 19, 2012.

(18)    Executive Order 732/12 published in the Official Gazette on May 16, 2012.

(19)    Bylaws of YPF S.A.

(20)    Argentine Constitution.

(21)    Law 19,549.

(22)    Law 25,344.

(23)    Law 23,982.

(24)    Law 25,873.

(25)    Executive Order 1563/04.

(26)   Law 16,986

(27)   Law 24,240, as amended by Law 26,361.

(28)   Law 25,675.

(29)   Law 23,898.

(30)   Law 23,853.

(31)   Law 21,839.

(32)   Decree-Law 16,638/57.

(33)   Law 24,432.

(34)   Argentine Civil Code.

(35)   Law 26,853.

(36)   Law 26,854.

(37)   Law 26,855.

(38)   Law 24,937.

(39)   Declaration of Dr. Arecha in support of the Argentine Republic's motion to dismiss the complaint.

(40)   Law 19,550.

(41)   Law 21,499.

(42)   Executive Order 677/01.

(43)   Law 26,831.

(44)   Copy of the relevant part of the Stock Ledger of YPF.

(45)   Minutes of the YPF's Annual General Meeting of Shareholders held on June 4, 2012.

(46)    Minutes of the YPF's Annual General Meeting of Shareholders held on July 17, 2012.

(47)    Minutes of the YPF's Annual General Meeting of Shareholders held on September 13, 2012.

(48)    Argentine Federal Code of Civil and Commercial Procedure.

(49)    Argentine Supreme Court of Justice procedural rule dated December 20, 1967.

(50)    Executive Order 1,102/86.

(51)    Law 23,480.

(52)    Law 25,156.

(53)    Opinion by Alberto Marcer submitted in re *"Repsol Butano S.A. c/ YPF Gas S.A. s/ impugnación de Asamblea"*, filed before the First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires No. 3, Clerk's Office No. 6, (File No. 103,181), p. 61, third paragraph.

(54)    Law 24,441.

(55)    Executive Order 16,638/57.

(56)    Law 23,503.


Bibliography

(1)      HIGHTON, ELENA I. – AREÁN, BEATRIZ A., *"Código Procesal Civil y Comercial de la Nación concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial"*, Volumes 6 and 7 (in relevant part).

(2)      Enciclopedia Jurídica Omeba, Volume I.A, Editorial Omeba, 1979, p. 518.

(3)      HUTCHINSON, TOMÁS, *"El proceso de ejecución de sentencias contra el Estado"*, Revista Latinoamericana de Derecho, Year I, number 1, January-June 2004, pp. 289-355.

4

(4)     COLOMBO, CARLOS J. – KIPER. CLAUDIO M., Código Procesal Civil y Comercial de la Nación, anotado y comentado, Volume II, 2nd edition, La Ley, 2006 (in relevant part).

(5)     BORDA, GUILLERMO A., "*Manual de Derecho Civil. Parte General*", Perrot, Buenos Aires, 1991 (in relevant part).

(6)     RIVERA, JULIO CÉSAR (H), "*La Legitimación de las acciones colectivas*", in "Derecho Procesal Comercial", GRAZIABILE, DARÍO (director) Ed. Abeledo Perrot, Buenos Aires, 2013.

(7)     OYAHANARTE, MARTÍN, "*Reforma a la Justicia: la integración del Consejo de la Magistratura por académicos ajenos al ámbito jurídico es inconstitucional*", MJ – DOC.6229-AR, April 10, 2013.

(8)     GORDILLO, AGUSTÍN, "*La implacable tasa de justicia*", La Ley 1995-E, 503.

(9)     MAIRAL, HÉCTOR A., "*El silencio de los tribunales argentinos*", Res Pública Argentina, 2007-3 Edition.

(10)    Statement issued by the Latin American Federation of Judges dated April 18, 2013.

(11)    Statement issued by the Peace and Justice Committee of the Argentine Episcopal Conference, dated March 6, 2013, published in El Derecho on April 17, 2013.

(12)    Statement issued by the United Nations Special Rapporteur, Gabriela Knaul, on the Independence of Judges and Lawyers, dated April 30, 2013, published at: http://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=13275&LangID=S.

(13)    Draft bill submitted by representative Carlos Kunkel and others on June 26, 2013, file No. 4935-D-2013.

(14)    Newspaper article published in *iProfesional.com*, in the Legal Matters Section, on February 18, 2008.

(15) FEUILLADE, MILTON C. "*La prueba en el proceso con elementos extranjeros*", La Ley 2009-A, 1197.

(16) BIANCHI, ALBERTO B., "*Crónica de una inconstitucionalidad manifiesta*", published in La Ley on June 26, 2013.

(17) OTEIZA, EDUARDO, "*El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854*", La Ley Special Supplement, May 2013.

(18) GIL DOMÍNGUEZ, ANDRÉS, "*La inconstitucionalidad e inconvencionalidad del régimen de medidas cautelares dictadas en los procesos en los que el Estado es parte (Ley 26.854)*", La Ley, May 2013.

(19) GELLI, MARÍA ANGÉLICA, "*Las inconstitucionalidades de la ley del Consejo de la Magistratura*", La Ley, June 26, 2013.

(20) Diccionario de la Real Academia Española.

(21) Speech of the President of Argentina, Cristina Fernández de Kirchner, given on March 1, 2013, at the opening of the Congress' Ordinary Sessions, available at: http://www.presidencia.gob.ar/discursos/26370-inauguracion-del-131o-periodo-de-sesiones-ordinarias-del-congreso-diseurso-de-la-presidenta-de-la-nacion

(22) Article published in La Nación on October 21, 2005, available at http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-justicia-no-es-independiente.

(23) Newspaper article published in La Nación on July 10, 2013, available at: http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-quiere-crear-un tribunal-de-constitucionalidad-para-eludir-a-la-corte.

(24) Newspaper article published in La Nación on April 27, 2013 available at: http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte.

(25) Newspaper article published in Clarín on April 26, 2013, available at: http://www.clarin.com/politica/Zaffaroni-Corte Reforma judicial 0 908309336.html.

6

(26)    Newspaper article published in El Cronista on April 27, 2013, available at: http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html.

(27)    Newspaper article published in *iProfesional.com* on February 18, 2008.

(28)    FALCÓN, ENRIQUE M., "*Tratado de Derecho Procesal Civil, Comercial y de Familia*", Volume III, Rubinzal Culzoni, Santa Fe, 2006 (in relevant part).

(29)    PALACIO, LINO ENRIQUE, "*Derecho Procesal Civil*", Volume IV, 4th edition, Editorial Abeledo Perrot, Buenos Aires, 2011 (in relevant part).

(30)    GARCÍA PULLÉS, FERNANDO RAÚL, "*Tratado de lo contencioso administrativo*", Volume II, Hammurabi, Buenos Aires, 2004 (in relevant part).

(31)    DATES, LUIS E., "*Cooperación judicial internacional procesal en materia probatoria*", published in La Ley 2007-D, 1150.


Case law

(1)    Argentine Supreme Court of Justice, February 24, 2009, in re "*Halabi, Ernesto c. PEN Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986*".

(2)    Argentine Supreme Court of Justice, June 26, 2007, in re "*Defensor del Pueblo de la Nación inc. Dto. 1316/02 c. PEN dtos. 1570/01 y 1606/01 s/Amparo Ley 16.986*".

(3)    Federal Court of Appeals in Contentious Administrative Matters in the Autonomous City of Buenos Aires, Panel II, April 17, 2013, in re "*Lahitou, Juan Pablo c/ EN - PEN – ENRE y otros s. varios*".

(4)    Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel C, March 19, 2010, in re "*Damnificados Financieros Asociación Civil para su Defensa c. Banco Río de la Plata S.A. s. Ordinario*".

(5)    Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel D, November 5, 2009, in re "*Consumidores Financieros c. Banco Piano S.A.*".

(6)      Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, September 2, 2010, in re *"ADECUA c. Toyota Compañía Financiera S.A. y ot. s. Ordinario"*.

(7)      Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, November 16, 2010, in re *"Damnificados Financieros Asociación Civil para su Defensa c. BBVA Banco Francés SA s. Sumarísimo"*.

(8)      Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, December 28, 2012, in re *"Consumidores Financieros Asociación Civil para su Defensa c. Banco Patagonia S.A s. Ordinario"*.

(9)      Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel B, October 21, 2009, in re *"Damnificados Financieros Asociación Civil para su Defensa c. Citibank N.A. s. Sumarísimo"*.

(10)     Argentine Supreme Court of Justice, February 27, 1996, in re *"Techint Compañía Técnica Internacional c/ Corrientes, Provincia de s/ ejecución por A 10.932.954"*.

(11)     Inter-American Court of Human Rights, November 28, 2002, in re *"Cantos vs. Argentina"*, Series C, No. 97.

(12)     Argentine Supreme Court of Justice, October 20, 1996, in re *"Estructuras Tafí S.A. c. Provincia de Tucumán"*, JA 1997-I-74.

(13)     Argentine Supreme Court of Justice, July 11, 2006, in re *"Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos"*, C. 416. XXXIX. ORI.

(14)     Argentine Supreme Court of Justice, June 18, 2013, in re *"Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho) s/ acción de amparo c/ Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. N° 3034/13)"*, R. 369. XLIX.

(15)     Argentine Supreme Court of Justice, in re *"Bourdieu, Pedro Emilio c/ Municipalidad de la Capital"*.

(16)     Argentine Supreme Court of Justice, April 2, 1998, in re *"Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios"*.

8

(17)     Federal Court of Appeals in Civil and Commercial Matters, February 10, 1995, Panel II, in re *"R., J. J. c. LR3 Radio Belgrano y otros"*, JA 1997-I-211.

(18)     Federal Court of Appeals in Civil and Commercial Matters, November 12, 2002, Panel I, in re *"Domnicz, José y otro v. Camino del Atlántico S.A. "*, DJ 2003-1-944.

(19)     Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, December 23, 1998, in re *"Chiri S.A. y otros c. House of Fuller "*, LL 1998-D-240.

(20)     Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel B, March 16, 1995, in re *"Sistemas Médicos S.A. c. St. Jude Medical"*, LL 1996-B-158.

(21)     Court of Appeals in Civil Matters in the Autonomous City of Buenos Aires, Panel I, February 24, 2000, in re *"Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto"*.

# EXHIBIT C

Buenos Aires, 25 April 2013.

Messrs.

Repsol Capital, S.L.

Reconquista 336, 2nd Floor, Federal Capital

Mr. Matías Grinberg

<u>ATTENTION</u>

To whom it may concern,

In my capacity as attorney-in-fact for YPF S.A. (the "Company"), I reject all the terms of your note dated 8 February 2013 as inadmissible.

Pursuant to Law No. 26741, the exercise of all rights pertaining to the Company's shares declared to be of public use and subject to expropriation belongs to the Argentine Executive Branch.

As provided for therein, the Company paid the dividends pertaining to such shares to the Argentine State (*i.e.*, Argentine Executive Branch) in a timely fashion.

Therefore, we hereby reject your false and inadmissible assertions, and, in particular, deny that the Company owes any dividend or interest whatsoever, as YPF S.A. paid the dividends approved by a Shareholders´ Meeting as and when determined by the Board of Directors, and in accordance with applicable laws then in force and effect.

Yours faithfully,

YPF S.A.

———————————————

Leonardo Etchepare

Attorney-in-Fact

I, María Cecilia Brusa, certify under penalty of perjury under the laws of the United States of America that I am competent to translate Spanish into English, and that the foregoing translation of this Affidavit of Gustavo Naveira, is true and correct.

Executed on this 26th day of July, 2013.

María Cecilia Brusa

Sworn to before me this 26th day of July, 2013.

Bs. As. 26 / 0 7 / 13  firma certificada.
eu F 0096 13723.-

NOTARY PUBLIC

NATALIA ALEJANDRA SANTOS
ESCRIBANA
MAT. 5308



ACTA DE CERTIFICACION DE FIRMAS
LEY 404



F 009613723

Buenos Aires, **26** de **Julio** de **2013**. En mi carácter de escribano

Adscripta al Registro Notarial N° 47 de Capital Federal.-

**CERTIFICO: Que la/s** firma que obra/n en el

documento que adjunto a esta foja, cuyo requerimiento de certificación se

formaliza simultáneamente por **ACTA número** **3** del LIBRO

número **4** , es/son puesta/s en mi presencia por la/s persona/s

cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

la justificación de su identidad. María Cecilia BRUSA, DNI 25.556.898, quien

actúa por derecho propio y justifica su identidad en virtud de lo dispuesto

por el artículo 1002 inciso "c" del Código Civil y conservo fotocopias de par-

tes pertinentes del documento exhibido. Consiste en Documento Privado

redactado en idioma inglés, sin espacios en blanco. Expido la presente en

Foja F 009613723.-



NATALIA ALEJANDRA SANTOS
ESCRIBANA
MAT. 5308

CORTE DE DISTRITO DE LOS ESTADOS UNIDOS DE AMÉRICA

DISTRITO SUR DE NUEVA YORK

---

REPSOL YPF, S.A. y TEXAS YALE CAPITAL CORP.,
Por Sí y en Representación de Todos Aquellos en Similares
Circunstancias,

                    Demandantes,


               -vs.-


REPUBLICA ARGENTINA,

                    Demandada.

12 Civ. 3877 (TPG) (FM)

---

### DECLARACIÓN DE GUSTAVO NAVEIRA

### EN APOYO DE LOS ARGUMENTOS DE LOS ACTORES

De conformidad con el artículo 1746 del Capítulo 28 del *United States Code*, yo,
Gustavo Naveira, declaro lo siguiente:

1.  Soy abogado y estoy habilitado para ejercer la profesión en Argentina. Desde el
    año 1979 hasta el año 1984 me desempeñé como Juez Nacional de Primera
    Instancia en lo Comercial sito en la Ciudad Autónoma de Buenos Aires y desde
    el año 1984 hasta el año 1986 me desempeñé como Juez de la Cámara Nacional
    de Apelaciones en lo Comercial sito en la Ciudad Autónoma de Buenos Aires.
    Adjunto como *Anexo A* copia de mi *curriculum vitae* que da cuenta de mis
    antecedentes profesionales y académicos.

2.  La representación letrada de la demandante, Repsol S.A., anteriormente
    denominada Repsol YPF S.A. ("Repsol") y Texas Yale Capital Corp. ("Texas

A BRUSA
PUBLICA
GLES
114 CAP. FED.
.A. N° 6265

Yale" y en forma conjunta con Repsol, los "Demandantes"), me ha solicitado mi opinión legal en una acción de clase iniciada por los Demandantes contra la República Argentina ("Argentina" o el "Estado Nacional") en la Corte de Distrito de los Estados Unidos de América, Distrito Sur de Nueva York.

3.  Al respecto, se me ha requerido que preste declaración legal como experto sobre las siguientes cuestiones:

## I. Cuestiones de Procedimiento

**A.**  Si en la mayoría de los casos, litigar contra la Argentina ante tribunales argentinos implica mayores demoras que demandar a particulares.

**B.**  Si en los procesos identificados en el *Anexo B*, los cuales han sido iniciados contra la Argentina, YPF S.A. ("YPF") o YPF Gas S.A. ("YPF Gas"), ante los tribunales federales argentinos, en los que se impugna la toma de control sobre YPF e YPF Gas por la Argentina con base en la Ley 26.741[1], los Decretos 530/12[2], 532/12[3], 557/12[4] y 732/12[5] y actos dictados como consecuencia de esas normas, se han producido demoras significativas que, en algunos casos, constituyeron una denegación de justicia.

**C.**  Si en el derecho procesal argentino aplicable por los tribunales federales existen normas análogas a la Regla 23 de las Reglas Federales de Procedimiento Civil de los Estados Unidos de América (la "Regla 23").

**D.**  Cuál es la tasa de justicia que resultaría aplicable y cuáles son las costas que podría ocasionar una demanda ante los tribunales federales

---

[1] La Ley 26.741, publicada en el Boletín Oficial el 7 de mayo de 2012, declaró sujeta a expropiación el 51% de las acciones de YPF e YPF Gas pertenecientes a Repsol y establece la inmediata "ocupación temporánea" de dichas acciones por el Poder Ejecutivo Nacional.

[2] El Decreto 530/12 publicado en el Boletín Oficial el 16 de abril de 2012, ordenó la intervención de YPF por un período de 30 días. La "intervención" en este caso significó el reemplazo del Directorio de YPF por funcionarios gubernamentales, que a partir de entonces, ejercieron todas las funciones del Directorio.

[3] El Decreto 532/12 publicado en el Boletín Oficial el 17 de abril de 2012, designó al Secretario de Política Económica y Planificación del Desarrollo, Lic. Kicillof como sub interventor de YPF.

[4] El Decreto 557/12 publicado en el Boletín Oficial el 19 de abril de 2012, extendió los efectos del Decreto 530/12 a YPF Gas.

[5] El Decreto 732/12 publicado en el Boletín Oficial el 16 de mayo de 2012, extendió por 30 días la intervención de YPF e YPF Gas.

3RUSA
JBLICA
ES
CAP. FED.
Nº 6265

argentinos similar a la que los Demandantes han promovido ante esta Corte de Distrito de los Estados Unidos de América.

E.    Si la independencia e imparcialidad del Poder Judicial argentino se encuentran amenazadas por medidas o actos adoptados por otros poderes del Estado Nacional.

F.    Si alguna de las acciones iniciadas por los Demandantes ante tribunales federales argentinos con relación a la Ley 26.741, los Decretos 530/12, 532/12 y 732/12 y actos dictados como consecuencia de dichas normas tiene un objeto idéntico o similar al de la acción promovida ante esta Corte de Distrito de los Estados Unidos de América.

G.    Si el procedimiento ante el Tribunal de Tasaciones de la Nación ("TTN") constituye una limitación a la demanda interpuesta en el presente juicio o al lanzamiento de la oferta pública de adquisición de acciones de YPF ("OPA") según lo previsto por el Estatuto de YPF.

H.    Si en el derecho procesal argentino aplicable ante los tribunales federales, se encuentra previsto el proceso conocido como *Pre Trial Discovery* y, en su caso, con qué alcance; y cuáles son las principales reglas procesales aplicables en relación a la producción de documentos y la citación de testigos.


## II. Cuestiones Contractuales

A.    Si el término *"adquisición"* que utiliza el Estatuto de YPF requiere que el adquirente se convierta en el dueño de las acciones. Asimismo, si la ocupación temporánea dispuesta por la Ley 26.741 torna exigible la obligación de lanzar la OPA.

B.    Si según el derecho argentino el término *"adquisición"* implica generalmente que el adquirente se convierta en el dueño de la propiedad adquirida.

C.    Si de acuerdo con el Estatuto de YPF y con el derecho argentino la *"adquisición"* debe ser permanente.

3

CILIA BRUSA
ORA PUBLICA
IA INGLES
LIO 114 CAP. FED.
C.B.A. N° 6265

4.   Para la preparación de esta opinión me fueron exhibidos, en varias reuniones con los abogados de Repsol, los documentos indicados en el *Anexo B*. En base a dicha documentación y a mi conocimiento profesional acerca de las cuestiones legales consultadas, formulo la siguiente opinión:

## I.   CUESTIONES DE PROCEDIMIENTO

### A.   CONSIDERACIONES GENERALES DE LOS LITIGIOS CONTRA LA ARGENTINA ANTE TRIBUNALES ARGENTINOS

5.   Litigar contra la Argentina ante los tribunales argentinos implica demoras significativamente más prolongadas que las incurridas al litigar contra particulares.

6.   Para poder iniciar una demanda contra el Estado Nacional es necesario agotar previamente la instancia administrativa[6]. El agotamiento de la instancia administrativa insume un tiempo considerable, atento a que la Administración Pública raramente resuelve en forma expresa dentro de los plazos establecidos en la ley (lo que en un caso como este, en el que se reclaman daños originados en una violación contractual, requeriría entre 135 y 180 días hábiles para que se considere que existió una denegación tácita)[7] y, por lo tanto, el reclamante debe esperar normalmente de seis a nueve meses para poder iniciar un reclamo judicial legalmente admisible.

7.   Una vez que el juicio ha sido iniciado, el tribunal puede tardar varios meses en decidir si la demanda es admisible procesalmente. Una vez admitida la demanda, ésta debe ser notificada a la Procuración del Tesoro de la Nación, con 30 días hábiles de anticipación al traslado de la demanda[8]. Luego del traslado de la demanda, el Estado Nacional dispone de un plazo de 60 días hábiles para contestarla, conforme se establece en el Código Procesal Civil y Comercial de la Nación ("CPCCN")[9]. Todo ello implica que normalmente transcurren entre 12 y 18 meses hasta que el Estado Nacional contesta la demanda.

---

[6] Ley 19.549, artículos 23 a 32.

[7] Ley 19.549, artículos 31/32.

[8] Ley 25.344, artículo 8.

[9] CPCCN, artículo 338.

CILIA BRUSA
ORA PUBLICA
IA INGLES
)LIO 114 CAP. FED.
P.C.B.A. Nº 6265

8.   Es normal que transcurran más de diez años antes de obtener una sentencia definitiva de la Corte Suprema de Justicia de la Nación ("CSJN") en una demanda contra la Argentina.

9.   Demoras adicionales ocurren durante la etapa de ejecución de la sentencia, en la cual, en teoría el Estado Nacional cuenta con dos años para cumplir la condena que implique una obligación de pago de suma de dinero[10]. Sin embargo, en la práctica lleva mucho más tiempo[11].

## B.   LA DEMORA Y DENEGACIÓN DE JUSTICIA DE LOS TRIBUNALES ARGENTINOS EN LOS PROCESOS CONTRA LA ARGENTINA, YPF O YPF GAS

10.   En oportunidad de las reuniones llevadas a cabo con los abogados de Repsol en Argentina, pude examinar documentación que da cuenta de una notable demora incurrida por los tribunales argentinos en ciertos procesos contra la Argentina, YPF o YPF Gas iniciados por Repsol, Repsol Butano S.A., directores (o ex directores) y accionistas minoritarios de YPF (conjuntamente, los "Requirentes"), con relación a la Ley 26.741, los Decretos 530/12, 532/12, 557/12 y 732/12 (la Ley y los Decretos del Poder Ejecutivo Nacional relativos a la expropiación de YPF y de YPF Gas) y actos dictados como consecuencia de dichas normas.

11.   En trece acciones judiciales iniciadas por los Requirentes se dictaron, de oficio, un total de catorce denegatorias de competencia[12]. Peticiones análogas presentadas ante dos jueces con posible competencia (el del fuero contencioso-administrativo federal y el del fuero civil y comercial federal) fueron rechazadas por ambos jueces, que recíprocamente le atribuían competencia al otro[13].

---

[10] Este plazo de dos años resulta de la necesidad de incluir el monto de la sentencia en la ley de presupuesto sancionada anualmente, conforme lo establece la Ley 23.982, artículo 22.

[11] HUTCHINSON, TOMÁS, *"El proceso de ejecución de sentencias contra el Estado"*, Revista Latinoamericana de Derecho, Año I, número 1, enero-junio 2004, pp. 289-355 (señalando que una vez que se dicta sentencia en el juicio, debe iniciarse un nuevo procedimiento administrativo en orden a lograr el cumplimiento de la sentencia por el Estado Nacional).

[12] Es el caso de los reclamos identificados como 1), 2), 3), 4), 5), 6), 7), 8), 9), 10), 11), 12) y 13) en el *Anexo B*.

[13] Es el caso de los reclamos identificados como 10) y 11) en el *Anexo B*.

CECILIA BRUSA
TORA PUBLICA
MA INGLES
OLIO 114 CAP. FED.
.P.C.B.A. N° 6265

12.     Con fundamento en cuestiones de competencia o en argumentos inadmisibles (p.
ej., que dictar una medida cautelar ante la impugnación de una medida
inconstitucional implicaba aceptar la "presunción de inconstitucionalidad" de la
norma)[14], los tribunales argentinos evitaron pronunciarse sobre la Ley 26.741 y
los Decretos 530/12, 532/12, 557/12 y 732/12.

13.     En tres causas, sobre la base de las cuestiones de competencia suscitadas por los
propios tribunales (pese a que la normativa vigente en dicho momento no los
inhabilitaba para resolver medidas cautelares)[15], dichos tribunales evitaron
resolver planteos hasta que, en varios casos, el paso del tiempo los volvió
abstractos[16].

14.     Diversos jueces y organismos administrativos cometieron errores inexplicables,
y dictaron decisiones procesales cuestionables, todos ellos perjudiciales para los
Requirentes, a saber: a) un Juzgado de Primera Instancia, después de que su
propia Cámara de Apelaciones decidiera que la controversia correspondía a la
competencia de ese Juzgado de Primera Instancia, en lugar de acatar dicha
decisión y proceder a tramitar la demanda, erróneamente remitió el expediente a
la CSJN (un curso de acción sin ningún sustento legal), la que tardó más de un
mes en devolver la causa al Juzgado de Primera Instancia[17]; b) otro Juzgado de
Primera Instancia dispuso se informe la existencia del juicio vía oficio a la
Procuración del Tesoro de la Nación (de modo tal de permitir al Estado Nacional
conocer la existencia del proceso en forma prematura) antes de resolver la
medida cautelar solicitada, a pesar de que ésta debía ser resuelta *inaudita
parte*[18]; c) otro Juzgado de Primera Instancia obligó a justificar su personería a
quien ya estaba autorizado a tramitar el exhorto según constancias que surgían
de la misma rogatoria[19] y d) el Ministerio de Relaciones Exteriores de la

---

[14] Es el caso del reclamo identificado como 10) en el *Anexo B*.

[15] CPCCN, artículo 196. Si bien en principio los jueces deberían abstenerse de dictar medidas cautelares
cuando carecen de competencia para entender en la causa principal, la medida cautelar ordenada por un
juez incompetente es válida si existen razones de urgencia que lo justifiquen. (Ver COLOMBO, CARLOS J. –
KIPER. CLAUDIO M., Código Procesal Civil y Comercial de la Nación, anotado y comentado, Tomo II,
2da Edición, La Ley, 2006, p. 491).

[16] Es el caso de los reclamos identificados como 1), 2) y 3) en el *Anexo B*.

[17] Es el caso del reclamo identificado como 2) en el *Anexo B*.

[18] Es el caso del reclamo identificado como 11) en el *Anexo B*.

[19] Es el caso del reclamo identificado como 8) en el *Anexo B*.

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
.C.B.A. N° 6265

Argentina remitió al Juzgado el expediente respectivo incompleto, obligando así al tribunal a solicitarle la remisión de las piezas faltantes[20].

15.   En general, las circunstancias relatadas *supra* han causado demoras excesivas e inusuales: en un caso la cuestión de competencia demoró en resolverse más de nueve meses desde el inicio del reclamo[21]; en otro caso un exhorto de mera notificación demoró en cumplirse más de seis meses desde su recepción por el Ministerio de Relaciones Exteriores de la Argentina[22].

16.   En síntesis, de los documentos analizados surge que en estos procesos iniciados contra la Argentina, contra YPF o contra YPF Gas: (i) los tribunales argentinos han planteado un número irrazonable de cuestiones de competencia; (ii) los tribunales argentinos evitaron mayormente considerar, aun en el limitado marco de las medidas cautelares solicitadas por los Requirentes, el mérito de las cuestiones planteadas; (iii) en algunos casos los tribunales argentinos incurrieron en un retraso considerable en la adopción de decisiones, lo que podría llegar a considerarse denegación de justicia; (iv) los tribunales y organismos administrativos argentinos cometieron una inusual cantidad de errores inexplicables en perjuicio de los Requirentes; y (v) existieron demoras excesivas en el trámite de los procesos como consecuencia de los defectos procesales indicados en (i), (ii), (iii) y (iv).


C.   **LA   AUSENCIA   DE   NORMAS   PROCESALES   ARGENTINAS ANÁLOGAS A LA REGLA 23 DE LAS REGLAS FEDERALES DE PROCEDIMIENTO CIVIL**

17.   Argentina carece de normas procesales de carácter federal análogas a la Regla 23. Por lo tanto, es poco probable que un tribunal argentino admita una acción colectiva promovida por accionistas.

18.   El segundo párrafo del artículo 43 de la Constitución Nacional de la Argentina (la "Constitución") prevé una acción de amparo para impugnar cualquier forma de discriminación, así como la violación de derechos que protegen el medio

---

[20] Es el caso del reclamo identificado como 8) en el *Anexo B*.

[21] Es el caso del reclamo identificado como 12) en el *Anexo B*.

[22] Es el caso del reclamo identificado como 8) en el *Anexo B*.

ECILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
P.C.B.A. N° 6265

ambiente, la competencia, los derechos de usuarios y consumidores, así como para la protección de los derechos de incidencia colectiva en general. La acción de amparo para la protección de los derechos mencionados (entre ellos, los derechos de incidencia colectiva) puede ser iniciada por el afectado, el Defensor del Pueblo o las asociaciones que propendan a la protección de tales derechos, registradas conforme a la ley. Sin embargo, estas nuevas reglas constitucionales sobre acciones colectivas no serían aplicables a una acción interpuesta por un grupo de accionistas como tales.

19. Argentina no tiene normas procesales de carácter federal que regulen —con alcance general— las acciones colectivas mencionadas en el segundo párrafo del artículo 43 de la Constitución. Sólo se han dictado ciertas normas procesales en algunas materias específicas[23].

20. Ante la falta de normas procesales de alcance general, los tribunales argentinos han desarrollado algunas pautas con respecto a las acciones colectivas. El principal caso que analiza esta cuestión es el fallo *"Halabi, Ernesto c. PEN-Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986"* ("Halabi")[24] dictado el 24 de febrero de 2009 por la CSJN. El caso Halabi involucró derechos extrapatrimoniales[25]. En materia de derechos patrimoniales, la CSJN ha expuesto que, tratándose de derechos individuales, la regla general en materia de legitimación es que estos derechos deben ser ejercidos por sus respectivos titulares y no mediante acciones colectivas[26]. Esta regla general excluiría una acción colectiva o de clase por parte de un grupo de accionistas, como la iniciada en este caso.

---

[23] Así, la Ley 25.675 de Política Ambiental Nacional ha incorporado algunas reglas procesales para las acciones colectivas en materia ambiental (artículos 30 y 32). La Ley 26.361, que reformó la Ley 24.240 de Defensa del Consumidor, incorporó algunas reglas procesales para las acciones colectivas en materia de protección de los derechos de los consumidores y usuarios (artículos 52, 53, 54 y 55 de la Ley 24.240).

[24] CSJN, 24 de febrero de 2009, *"Halabi, Ernesto c. PEN-Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986"*, Fallos 332:111.

[25] El actor era un abogado que planteó la inconstitucionalidad de la Ley 25.873 y de su decreto reglamentario 1563/04, en cuanto autorizaban la intervención de todas las comunicaciones telefónicas y de red, y la registración de los datos de los usuarios.

[26] CSJN, 26 de junio de 2007, *"Defensor del Pueblo de la Nación inc. Dto. 1316/02 c. PEN dtos. 1570/01 y 1606/01 s/Amparo Ley 16.986"*, Fallos 330:2800.

BRUSA
PUBLICA
LES
4 CAP. FED.
A. Nº 6265

21.   En Halabi, la CSJN sostuvo que, en materia de legitimación procesal, existen tres categorías de derechos: (i) individuales[27], (ii) de incidencia colectiva que tienen por objeto bienes colectivos[28] y (iii) de incidencia colectiva referentes a intereses individuales homogéneos[29]. La CSJN entendió que el derecho involucrado en Halabi era de incidencia colectiva referente a un interés individual homogéneo.

22.   En Halabi, la CSJN también estableció los siguientes requisitos para que un caso pueda ser admitido como acción colectiva referente a "intereses individuales homogéneos": (i) debe existir un hecho único y complejo que lesione a una pluralidad significativa de derechos individuales; (ii) la acción debe concentrarse en los efectos comunes y no en los aspectos individuales; y (iii) la naturaleza o el monto de los intereses individuales involucrados no debe justificar la promoción de demandas individuales. La Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal ha interpretado que este tercer requisito permite acciones colectivas sólo cuando los intereses individuales y separables no tuviesen una importancia suficiente como para justificar una acción individual por cada afectado[30].

23.   Si bien en Halabi la CSJN exhortó al Congreso de la Nación a legislar en materia de acciones colectivas, hasta ahora esa legislación no ha sido dictada, por lo cual la Argentina, a nivel federal, carece de normas procesales análogas a la Regla 23. Además, las pautas desarrolladas por los tribunales argentinos adolecen de dos limitaciones fundamentales. En primer lugar, el sistema judicial argentino no se rige por el principio del precedente judicial como el *Common Law* y, como consecuencia de ello, el valor de la jurisprudencia como fuente de derecho tiene un alcance más limitado que en los Estados Unidos de América[31].

---

[27] La acción está destinada a obtener la protección de derechos divisibles, no homogéneos, y se caracteriza por la búsqueda de la reparación de un daño esencialmente individual y propio de cada uno de los afectados.

[28] La acción está destinada a obtener la protección de un bien colectivo (como por ejemplo el ambiente), perteneciente a toda la comunidad, cuyo objeto debe ser indivisible y universal.

[29] La acción no está destinada a obtener la protección de un bien colectivo, ya que afecta derechos individuales enteramente divisibles. Existe un hecho único o continuado que provoca la lesión a varios intereses y, por lo tanto, es identificable una causa fáctica homogénea.

[30] CNACAF, Sala II, 17/04/13, *"Lahitou Juan Pablo c/EN-PEN-ENRE y otros s/varios"*.

[31] BORDA, GUILLERMO A., Manual de Derecho Civil. Parte General, Editorial Perrot, 1991, p. 60.

LIA BRUSA
A PUBLICA
NGLES
O 114 CAP. FED.
B.A. N° 6265

En segundo lugar, a diferencia del régimen de acciones de clase en los Estados Unidos de América, en la Argentina no existen reglas que regulen la certificación de la clase u otros aspectos claves de las acciones de clase.

24.   Las distintas salas de la Cámara Nacional de Apelaciones en lo Comercial han dictado sentencias contradictorias en materia de legitimación activa en las acciones colectivas que involucran únicamente cuestiones patrimoniales. En efecto, mientras algunas salas aceptan la legitimación activa de las asociaciones de consumidores en cuestiones vinculadas a la Ley 24.240 de Defensa del Consumidor (p. ej., seguros de vida)[32], otras salas han negado legitimación por considerar que las cuestiones patrimoniales no involucran intereses individuales homogéneos[33]. Sin embargo, no existe ningún precedente de una acción de clase con fundamento meramente patrimonial iniciada por un individuo por sí solo, y no conjuntamente con una asociación, en el que se haya reconocido legitimación al actor[34]. Tampoco hay precedentes de una acción de clase que involucre cuestiones patrimoniales de una magnitud individual similar a las sometidas ante este tribunal de los Estados Unidos de América.

25.   En función de lo expuesto, considerando que esta acción involucra exclusivamente reclamos patrimoniales y que los montos en disputa son lo suficientemente significativos para justificar acciones individuales, es altamente improbable que los tribunales argentinos puedan considerar que uno o más de los accionistas de YPF cuenten con legitimación suficiente para iniciar una acción de clase análoga a la presente acción iniciada en los Estados Unidos de América.

---

[32] CNCom, Sala C, 19.03.10 *"Damnificados Financieros Asociación Civil para su Defensa c. Banco Río de la Plata S.A. s. Ordinario"* y CNCom, Sala D, 05.11.09 *"Consumidores Financieros c. Banco Piano S.A."*.

[33] CNCom, Sala A, 02.09.10 *"ADECUA c. Toyota Compañía Financiera S.A. y ot. s. Ordinario"*; 16.11.10 *"Damnificados Financieros Asociación Civil para su Defensa c. BBVA Banco Francés SA s. Sumarísimo"*; 28.12.12 *"Consumidores Financieros Asociación Civil para su Defensa c. Banco Patagonia S.A s. Ordinario"*, entre otros y CNCom, Sala B, 21.10.09 *"Damnificados Financieros Asociación Civil para su Defensa c. Citibank N.A. s. Sumarísimo"*.

[34] RIVERA ha afirmado que el sistema de acciones colectivas argentino se encuentra todavía en su etapa inicial de desarrollo y que estas acciones no han constituido aún un mecanismo útil para proteger los derechos patrimoniales más sustantivos de los individuos. Existe jurisprudencia de la que surgen limitaciones de las acciones colectivas para tutelar derechos patrimoniales cuando los montos involucrados son significativos, agregando que resulta fundamental que el Congreso legisle en esta materia, teniendo en cuenta la experiencia de otros países. RIVERA, JULIO CÉSAR (H), *"La Legitimación de las acciones colectivas"*, en "Derecho Procesal Comercial", obra dirigida por GRAZIABILE, DARÍO, Ed. Abeledo Perrot, Buenos Aires, 2013, pag. 1502.

10

ECILIA BRUSA
TORA PUBLICA
MA INGLES
FOLIO 114 CAP. FED.
T.P.C .B.A. N° 6265

### D.   COSTAS JUDICIALES

26.   En la Argentina las actuaciones judiciales se encuentran sujetas al pago previo de una tasa, denominada "tasa de justicia", que debe ser abonada al comienzo del proceso por la parte que inicia el pleito. La tasa de justicia es establecida por el Poder Legislativo de cada jurisdicción (o sea, el Congreso federal o la Legislatura de la provincia de que se trate, respectivamente). En el ámbito federal (que a estos efectos también incluye a los principales tribunales de la Ciudad Autónoma de Buenos Aires), la tasa de justicia es del 3% (tres por ciento) del monto del reclamo[35].

27.   La CSJN ha definido esta tasa como un tributo, en el cual "*[e]l hecho imponible que origina la obligación de pagar la tasa de justicia es la prestación de un servicio por parte del órgano jurisdiccional respecto de la pretensión deducida y pesa sobre quien inicia las actuaciones la carga de afrontarla*"[36].

28.   Según la legislación que regula la organización del Poder Judicial, las sumas recaudadas en concepto de "tasa de justicia" constituyen recursos específicos y propios del Poder Judicial, que forman parte de su presupuesto anual de inversiones y gastos[37].

29.   La tasa de justicia se determina de acuerdo al valor del objeto litigioso:

(i)   En los juicios en los que el objeto litigioso no tiene valor pecuniario, el actor debe pagar $ 70 (pesos setenta) en concepto de tasa de justicia[38].

(ii)   Cuando el actor reclama el pago de una suma de dinero determinada ("monto determinado"), la tasa de justicia debe calcularse sobre el capital, la actualización monetaria y los intereses devengados que se reclamen al momento de la iniciación del proceso[39]. El actor debe pagar una tasa de justicia equivalente al 3% (tres por ciento) de ese total.

---

[35]   Ley 23.898, artículo 2.

[36]   CSJN, "*Techint Compañía Técnica Internacional c/ Corrientes, Provincia de s/ ejecución por A 10.932.954*", sentencia de fecha 27 de febrero de 1996, publicada en Fallos 319:139.

[37]   Ley 23.853, artículo 3 (a).

[38]   Ley 23.898, artículo 6.

[39]   Ley 23.898, artículo 4 (a).

11

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
P.C.B.A. N° 6265

(iii)   Cuando el monto del reclamo no pueda ser determinado al comienzo del pleito ("monto indeterminable"), el actor debe abonar $ 70 (pesos setenta) en concepto de tasa de justicia y el importe final de la misma se determinará con posterioridad, una vez terminado el proceso[40].

(iv)   Cuando el actor reclama el pago de una suma de dinero que no se encuentra determinada pero puede serlo inicialmente ("monto determinable"), el actor debe pagar una tasa de justicia equivalente al 3% (tres por ciento) del monto estimado de capital más intereses. La estimación que realiza el actor puede ser cuestionada por el Fisco y es, en última instancia, determinada por el tribunal. En caso de que la estimación del actor sea sustancialmente menor a la que en definitiva se determine, el tribunal podrá imponerle una multa de entre el 5% y el 30% de la diferencia entre ambos montos[41].

30.   Los tribunales generalmente adoptan criterios severos en cuanto a la exigencia del pago de la tasa de justicia, como así también en lo relativo a la determinación de su monto. En particular, los tribunales mantienen una postura restrictiva respecto de planteos que sostengan que un juicio no tiene un objeto litigioso susceptible de apreciación pecuniaria o de que el valor del objeto litigioso es "indeterminable". Este criterio ha sido resumido en doctrina del siguiente modo: *"La jurisprudencia está conteste en algo: No perdonar la tasa de justicia a nadie"*[42].

31.   En la situación que analizamos, si la causa iniciada por los Demandantes contra el Estado Nacional fuera iniciada en la Argentina, es altamente probable que el tribunal, ya sea por pedido del Fisco o de oficio, considere que (i) el juicio es susceptible de apreciación pecuniaria y (ii) el valor del objeto litigioso puede ser determinado al comienzo del juicio (p. ej. que tiene "monto determinable"), mediante la aplicación de los parámetros previstos en el artículo 7 del Estatuto de YPF.

---

[40]   Ley 23.898, artículo 5, segundo párrafo.

[41]   Ley 23.898, artículo 4 (d).

[42]   GORDILLO, AGUSTÍN, *"La implacable tasa de justicia"*, publicado en La Ley 1995-E, 503. Este criterio de interpretación es consistente con el destino de las sumas recaudadas en concepto de tasa de justicia, que como ya fue explicado constituyen recursos específicos y propios del Poder Judicial de la Nación.

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

32. Dado que el valor involucrado en la OPA cuyo lanzamiento reclaman los actores sería de miles de millones de dólares, la tasa de justicia ciertamente resultaría en un monto superior a los cien millones de dólares.

33. La tasa de justicia se vuelve exigible con la mera presentación de la demanda. El posterior abandono de la acción no implica la extinción de la obligación de abonar la tasa de justicia correspondiente.

34. Adicionalmente, de acuerdo al derecho procesal aplicable en el orden federal, el principio general es que la parte vencida en el juicio debe pagar todos los gastos de la contraria. Sólo excepcionalmente el tribunal puede apartarse de este principio cuando las circunstancias del caso así lo justifiquen, debiendo expresar sus razones bajo pena de nulidad[43].

35. Los gastos del juicio comprenden, además de la tasa de justicia, todos los gastos ocasionados por la tramitación del proceso, y los que se hubieren realizado para evitarlo, con exclusión de aquellos gastos considerados inútiles o superfluos[44]. En particular, los gastos incluyen (i) los honorarios de los abogados del vencedor y (ii) los honorarios de peritos.

36. En este caso, los honorarios podrían ser de cientos de millones de dólares. Los honorarios son fijados por el tribunal según las normas que regulan esta cuestión, las que establecen porcentajes sobre el monto del reclamo y no sobre una base horaria[45]. Los honorarios legales de la representación letrada del vencedor, incluyendo los honorarios correspondientes al abogado y al procurador, deben ser fijados entre el 14% y el 28% del monto del reclamo ante el Juzgado de Primera Instancia[46]. A esta suma cabe adicionar los honorarios resultantes de las actuaciones ante la Cámara de Apelaciones y la CSJN, que deben fijarse, para cada instancia entre el 25% y el 35% de la cantidad determinada para los honorarios de primera instancia[47]. Los costos se incrementarían en caso de que también tuviese intervención alguna de las

---

[43] CPCCN, artículo 68.

[44] CPCCN, artículo 77.

[45] Ley 21.839 y sus normas complementarias.

[46] Artículos 7 y 9 de la Ley 21.839. Los honorarios totales establecidos por la actuación en Primera Instancia (comprendidos los del abogado, el procurador y los peritos de oficio) no pueden en conjunto superar el 25% del monto de la sentencia (Código Civil argentino, art. 505).

[47] Ley 21.839, artículo 14.

13

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

recientemente creadas Cámaras Federales de Casación[48]. En esa posible etapa serían aplicables los mismos porcentajes fijados para la regulación de los honorarios por actuaciones ante las Cámaras de Apelaciones. Los honorarios de los peritos también se fijan según porcentajes sobre el monto del reclamo, aunque inferiores a los expuestos[49]. En consecuencia, los honorarios profesionales de los abogados y peritos, en su conjunto, podrían ascender a cientos de millones de dólares.

37.    Sólo excepcionalmente los tribunales pueden regular honorarios por debajo de los porcentajes legales[50]. De todas formas, con relación a los reclamos de los Demandantes, y considerando que los tribunales calcularían su monto de acuerdo con el artículo 7 del Estatuto de YPF, incluso si los tribunales dejaran de lado los porcentajes legales, se llegaría igualmente a varios millones de dólares en concepto de honorarios.

38.    A la luz de todo lo antes expuesto, la doctrina ha señalado que los costos de los litigios en Argentina constituyen una barrera al acceso a la justicia, dado que operan como un desincentivo para la promoción de demandas contra el Estado Nacional[51]. Sin embargo, el Estado Nacional no ha reconocido estas razones, que pueden derivar en una efectiva denegación de justicia. La Argentina ha sido condenada por la Corte Interamericana de Derechos Humanos por el enorme monto de costas judiciales reclamado a un particular cuya demanda contra el Estado Nacional había sido rechazada[52].

39.    La legislación procesal en el orden federal permite que las personas que acrediten carecer de recursos soliciten la concesión del "beneficio de litigar sin gastos". Este beneficio implica una dispensa —total o parcial— del pago de la tasa de justicia y demás costas judiciales. Sin embargo, en principio, el beneficio de litigar sin gastos no puede ser concedido a personas jurídicas. Al respecto, la

---

[48] Ver más abajo las referencias a la ley de creación de estos tribunales.

[49] Ver por ejemplo, el Decreto-Ley N° 16638/1957 que regula los honorarios de los peritos contables.

[50] Ley 24.432, artículo 13.

[51] MAIRAL, HÉCTOR A., "*El silencio de los tribunales argentinos*", Res Pública Argentina, N° 2007-3, p. 7. Una traducción al inglés de este artículo titulada "The Silence of the Argentine Courts" puede ser consultada en http://www.iiiij.org/gal/documents/HectorMairal.ThesilenceoftheArgentinecourts.pdf.

[52] Corte Interamericana de Derechos Humanos, "*Cantos c. Argentina*", sentencia del 28 de noviembre de 2002, Serie C N° 97.

ÍA BRUSA
\ PUBLICA
ÍGLES
114 CAP. FED.
3.A. Nº 6265

CSJN ha sostenido que en este tipo de casos que *"la concesión debe ser apreciada con suma prudencia y estrictez"*[53].

40. Concordantemente, la CSJN también ha sostenido que es posible asumir que las sociedades comerciales que reclaman cuantiosas sumas de dinero pueden solicitar un préstamo para pagar la tasa de justicia, por lo que no cabe otorgar en tales supuestos el beneficio de litigar sin gastos[54].

41. En la situación que analizamos, resulta manifiesto que Repsol es una compañía solvente. Además, en el juicio que podría promover contra el Estado Nacional, conforme lo recién manifestado, el tribunal podría considerar que el valor del reclamo asciende a miles de millones de dólares. En tales condiciones, el beneficio de litigar sin gastos no sería concedido.

42. Por lo expuesto, es probable que en caso de tener que litigar esta cuestión en Argentina, los Demandantes deban pagar un monto superior a cien millones de dólares en costas procesales para iniciar el caso y podrían afrontar más de cien millones de dólares en honorarios si perdieran el caso.

## E.   AFECTACIÓN DE LA INDEPENDENCIA JUDICIAL

43. Recientemente, el Congreso de la Nación sancionó una serie de leyes que introdujeron reformas sobre importantes aspectos de la organización y el funcionamiento de los tribunales federales.

44. Entre estas leyes, las más importantes son las siguientes: (i) la Ley 26.853, sobre creación de nuevas Cámaras Federales de Casación[55]; (ii) la Ley 26.854, que establece un nuevo régimen de medidas cautelares en los procesos en los que el Estado Nacional o sus entes descentralizados sean parte; y (iii) la Ley 26.855, introdujo importantes reformas relativas a la composición y al funcionamiento del Consejo de la Magistratura[56].

45. Estas leyes fueron impulsadas con mucho énfasis por el Poder Ejecutivo y aprobadas en un rápido trámite por el Congreso, y se enmarcan en el contexto de

---

[53] CSJN, *"Estructuras Tafí S.A. c. Provincia de Tucumán"*, sentencia del 20 de octubre de 1996, publicada en JA 1997-I-74.

[54] CSJN, *"Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos"*, sentencia del 11 de julio de 2006, publicada en Fallos 329:2719.

IA BRUSA
PUBLICA
GLES
114 CAP. FED.
.A. N° 6265

la denominada "Democratización de la Justicia"[57]. Los aspectos más salientes de estas reformas son los siguientes:

(i) <u>Cámaras Federales de Casación</u>. La creación de estos tribunales, como una instancia intermedia entre las Cámaras de Apelaciones y la CSJN, ha sido objeto de serias críticas[58]. Se ha sostenido que "*más allá de los pretendidos propósitos oficiales, la creación de estas nuevas Cámaras de Casación en realidad apunta a tres objetivos inocultables: (a) dilatar todo lo posible los juicios contra el Estado; (b) centralizar en tres Cámaras con asiento en la Capital Federal la revisión de todas las decisiones de todas las cámaras federales del país y (c) designar jueces afines* (se entiende, al Gobierno) *por medio de un 'procedimiento abreviado'*"[59].

(ii) <u>Medidas Cautelares</u>. El nuevo régimen de medidas cautelares ha sido también criticado, en tanto estas reformas otorgan un carácter más restrictivo a las medidas cautelares solicitadas por particulares contra el Estado Nacional, limitando las facultades del tribunal y restringiendo su margen de apreciación en esta materia[60].

(iii) <u>Consejo de la Magistratura</u>. Las reformas a este cuerpo han sido ampliamente cuestionadas, en el entendimiento de que se tiende a "*politizar*"

---

[55] La Ley 26.853 dispuso la creación de: (i) la Cámara Federal de Casación en lo Contencioso Administrativo Federal, (ii) la Cámara Federal y Nacional de Casación del Trabajo y la Seguridad Social, y (iii) la Cámara Federal y Nacional de Casación en lo Civil y Comercial.

[56] Según el artículo 114 de la Constitución Nacional, el Consejo de la Magistratura tendrá a su cargo la selección de los magistrados y la administración del Poder Judicial.

[57] En el discurso de la Presidente de la Nación del 1° de marzo de 2013 en el acto de apertura de sesiones ordinarias del Congreso se anunció el envío de estos proyectos de ley con el enunciado propósito de "*hacer una profunda democratización*" del Poder Judicial.

[58] OTEIZA, EDUARDO, "*El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854*", Suplemento Especial de La Ley, mayo de 2013 (señalando que a las dos instancias actuales se suma ahora la Casación, lo cual determina que los plazos sean mayores siendo más profunda la desprotección de los derechos fundamentales).

[59] BIANCHI, ALBERTO B., "*Crónica de una inconstitucionalidad manifiesta*", publicado en La Ley el miércoles 26 de junio de 2013.

[60] GIL DOMÍNGUEZ, ANDRÉS, "*La inconstitucionalidad e inconvencionalidad del régimen de medidas cautelares dictadas en los procesos en los que el Estado es parte (Ley 26.854)*", Suplemento Especial de La Ley, mayo de 2013 (quien sostiene que varios artículos de la ley 26.854 violan el derecho a la tutela judicial efectiva y el derecho de amparo, y que la ley genera una clara situación de desigualdad entre el Estado Nacional y los particulares); OTEIZA, EDUARDO, "*El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854*", Suplemento Especial de La Ley, mayo de 2013 (quien indica que los plazos de vigencia de las medidas cautelares fijados en seis meses para los procesos ordinarios y de tres meses para los sumarísimos y el amparo, son inconstitucionales y violan por los artículos 8 y 25 de la Convención Americana de Derechos Humanos).

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

el Consejo de la Magistratura, afectándose así la independencia de los jueces[61]. Según las modificaciones introducidas, la mayoría de los miembros del Consejo serían elegidos mediante elecciones en las que deberían presentarse como candidatos de partidos políticos. Además, se reducirían las mayorías exigibles para que el Consejo pudiese decidir el enjuiciamiento y la suspensión de los jueces federales. Según esta reforma, el Consejo podría, por simple mayoría (la que a su vez dependerá del partido mayoritario), suspender a cualquier juez federal[62].

46.   La llamada "Democratización de la Justicia" fue duramente criticada por varias de las entidades más representativas, que se pronunciaron en contra de estas medidas[63].

47.   En relación con estas reformas, la Federación Latinoamericana de Magistrados sostuvo: *"[L]os cambios propuestos importan un grave peligro para la existencia misma de la República de Argentina. Siendo los perjudicados los ciudadanos argentinos ya que los proyectos de ley presentados alteran sustancialmente el funcionamiento de la Justicia y de ninguna manera atienden a una reforma que amplíe las posibilidades de ejercer derechos, por el contrario, cercenan la independencia del Poder Judicial. [...] [S]e promueve la partidización del Consejo de la Magistratura, órgano encargado de la selección de magistrados y del control del desempeño de los jueces"*[64].

48.   En ese mismo sentido, la Comisión de Justicia y Paz de la Conferencia Episcopal Argentina reflexionó en los siguientes términos: *"La utilización del poder estatal, o la amenaza de su uso, para torcer la voluntad de los jueces a favor de los intereses del Gobierno, merecen la mayor condena y no pueden ser*

---

[61] GELLI, MARÍA ANGÉLICA, *"Las inconstitucionalidades de la ley del Consejo de la Magistratura"*, La Ley, 26 de junio de 2013 (afirmando que la reforma vulnera la independencia e imparcialidad judicial así como las garantías jurisdiccionales de los habitantes de la Nación); OYAHANARTE, MARTÍN *"Reforma a la Justicia: la integración del Consejo de la Magistratura por académicos ajenos al ámbito jurídico es inconstitucional"* MJ-DOC.6229-AR, del 10 de abril de 2013 (afirmando que la reforma viola el artículo 114 de la Constitución Nacional).

[62] Artículo 7°, inciso 15, Ley 24.937, según la reforma dispuesta por el artículo 6° de la Ley 26.855.

[63] Entre ellos: la Asociación de Magistrados y Funcionarios de la Justicia Nacional, la Federación Argentina de la Magistratura y la Función Judicial, la Asociación de Mujeres Juezas de Argentina, la Facultad de Derecho de la Universidad de Buenos Aires, la Asociación Argentina de Derecho Procesal, la Asociación Argentina de Derecho Constitucional, la Asociación Civil Justicia Democrática, la Academia Nacional de Derecho y Ciencias Sociales de Buenos Aires.

[64] Declaración de la Federación Latinoamericana de Magistrados de fecha 18 de abril de 2013.

17

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

*nunca justificadas alegando supuestas o reales presiones pretendidamente simétricas ejercidas por privados [...] La elección popular de los miembros del Consejo de la Magistratura es un mecanismo que parece reñido con la norma constitucional, y que en todo caso convertirá a un órgano que debe ser técnico y riguroso, en escenario de luchas partidarias. La politización de los jueces es inadmisible y conspira contra la neutralidad que cabe exigir de ellos [...] La anunciada creación de nuevas instancias judiciales (Cámaras de Casación) [...] implica una mayor demora en la solución de los juicios, que ya son demasiado lentos. Por lo tanto, es lícito sospechar que lo realmente buscado no es agilizar los procesos, sino crear tribunales superiores a los existentes, con jueces íntegramente designados a gusto de las actuales mayorías, que puedan modificar la jurisprudencia en un sentido favorable a la autoridad política"*[65].

49.    Asimismo, la Relatora Especial de las Naciones Unidas sobre la independencia de los jueces y abogados, Gabriela Knaul, sostuvo: *"[h]ago un llamado a Argentina a que establezca procedimientos claros y criterios objetivos para la destitución y sanción de los jueces, y que se asegure un recurso efectivo a los jueces para impugnar dichas decisiones, en aras de salvaguardar la independencia judicial"*[66].

50.    Hace pocas semanas, la CSJN declaró la inconstitucionalidad de diferentes artículos de la Ley 26.855 sobre el Consejo de la Magistratura, por considerarlos contrarios al artículo 114 de la Constitución[67]. Esa decisión ha dado lugar al anuncio de nuevas iniciativas relativas a reformas en el Poder Judicial, tales como las propuestas de quitar a la CSJN la administración de los fondos del Poder Judicial[68], de crear un nuevo tribunal con competencia exclusiva para

---

[65] Declaración de fecha 6 de marzo de 2013, publicada en El Derecho, ejemplar del miércoles 17 de abril de 2013, p. 22.

[66]    Declaración    de    fecha    30    de    abril    de    2013,    publicada    en
http://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=13275&LangID=S.

[67]  CSJN, *"Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho s/ acción de amparo c/ Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. N° 3034/13)"*, sentencia del 18 de junio de 2013, R. 369. XLIX.

[68]  Proyecto de ley suscripto por el diputado Carlos Kunkel y otros, el 26 de junio de 2013, Expediente N°4935-D-2013.

ECILIA BRUSA
TORA PUBLICA
MA INGLES
FOLIO 114 CAP. FED.
T.P.C.B.A. N° 6265

pronunciarse sobre la constitucionalidad de las leyes[69] e, incluso, de ampliar el número de miembros de la CSJN[70].

51.   Estos hechos recientes han venido a profundizar la crisis de independencia del Poder Judicial que ya existía desde mucho antes.

52.   En 2005, una encuesta realizada entre abogados argentinos mostró que casi el 90% de los interrogados creían que los tribunales del país carecen de independencia frente al poder político[71].

53.   En 2008, el actual Presidente de la CSJN sostuvo que "*hay prácticas que afectan la independencia judicial*" y que "*no hay magistrados en el país a cargo de causas importantes que no tengan denuncias en su contra*"[72].

54.   Es así que la independencia de los tribunales argentinos se encontraba comprometida incluso antes de la aprobación de las reformas comprendidas en la denominada "Democratización de la Justicia". Estas reformas, junto con otras que podrían aprobarse en el futuro cercano, acentúan aún más el cuadro descripto.

55.   En el caso que analizamos, dado el elevado nivel de exposición pública de la cuestión debatida y el fuerte interés del Estado Nacional en obtener una resolución favorable, es razonable suponer que, en el contexto de un juicio, los jueces que debieran resolver respecto de la obligación del Estado Nacional de lanzar la OPA, estarían expuestos a una considerable presión para fallar a favor de la Argentina. En ese escenario, la suerte de los planteos de los Demandantes bien podría estar condicionada por factores extra-jurídicos.

---

[69]   Noticia periodística publicada en La Nación del 10 de julio de 2013, disponible en: http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-quiere-crear-un-tribunal-de-constitucionalidad-para-eludir-a-la-corte

[70]   Noticia periodística por Adrián Ventura publicada en La Nación del 27 de abril de 2013, disponible en http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte; noticia periodística publicada en Clarín el 26 de abril de 2013, disponible en http://www.clarin.com/politica/Zaffaroni-Corte-Reforma_judicial_0_908309336.html; noticia periodística publicada en El Cronista del 27 de abril de 2013, disponible en http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html

[71]   Noticia periodística publicada en La Nación del 21 de octubre de 2005, disponible en http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-justicia-no-es-independiente.

[72]   Noticia periodística publicada por *iProfesional.com*, sección Legales, en fecha 18 de febrero de 2008.

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
C.B.A. N° 6265

**F.**     **EL ALCANCE DE LAS DEMANDAS PRESENTADAS POR REPSOL EN LA ARGENTINA**

56.     He tenido acceso a copia de las demandas iniciadas por Repsol en la Argentina contra el Estado Nacional e YPF.

57.     Repsol no ha iniciado ninguna acción ante tribunales argentinos persiguiendo que se ordene al Estado Nacional lanzar la OPA, o reclamando una indemnización de daños y perjuicios con motivo del incumplimiento de la obligación de lanzar la OPA.

58.     En las acciones promovidas ante tribunales argentinos, Repsol sólo ha hecho notar el incumplimiento del Estado Nacional de la obligación de lanzar la OPA, sin solicitar que se lo obligue a lanzar la OPA ni reclamar una indemnización de daños y perjuicios con motivo del incumplimiento de la obligación de lanzar la OPA. Esa referencia fue efectuada en las demandas promovidas para impugnar las decisiones adoptadas —con la participación y el voto del Estado Nacional en ejercicio de derechos emergentes de las acciones de titularidad de Repsol sujetas a expropiación— en las asambleas de accionistas de YPF de fecha (i) 4 de junio, (ii) 17 de julio y (iii) 13 de septiembre de 2012.

59.     En esas impugnaciones, Repsol solicitó que se anule lo resuelto en dichas asambleas basándose en que el Estado Nacional (i) no tenía un título legítimo para ejercer los derechos emergentes de las acciones de titularidad de Repsol que son objeto de una "ocupación temporánea" y (ii) violó el artículo 7 (h) del Estatuto de YPF que establece que en el plazo durante el cual no se lance la OPA, el Estado Nacional no podrá ejercer los derechos emergentes de las acciones de YPF sujetas a expropiación[73]. En estas demandas Repsol no requirió el lanzamiento de la OPA ni el pago de una indemnización a los accionistas de YPF que hubiesen sido receptores de la OPA en caso de que el Estado Nacional hubiese cumplido con las obligaciones que le impone el Estatuto de YPF.

---

[73] El artículo 7 (h) del Estatuto de YPF dispone que, en los casos en que una persona adquiera el control de YPF sin cumplir con el requisito de realizar la OPA, "[l]*as acciones y títulos adquiridos en violación a lo establecido [...] no darán derecho a voto o a cobrar dividendos u otras distribuciones que realice la Sociedad y no serán computadas a los fines de determinar el quórum en cualquiera de las asambleas de accionistas*". Esta disposición es específicamente aplicable al Estado Nacional, conforme lo establece expresamente el artículo 28 del Estatuto de YPF.

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
C.B.A. Nº 6265

**G.    LA IRRELEVANCIA DEL PROCEDIMIENTO ANTE EL TRIBUNAL DE TASACIONES DE LA NACIÓN PARA EL PRESENTE CASO**

60.    De acuerdo con la Ley General de Expropiación 21.499 y la Ley 26.741, el valor de las acciones de YPF sujetas a expropiación debe ser determinado inicialmente por el TTN.

61.    No obstante su nombre, el TTN es un organismo administrativo perteneciente al Poder Ejecutivo de la Argentina, que fija inicialmente, sin la intervención del expropiado, el precio del activo sujeto a expropiación que el Estado Nacional debe consignar ante el tribunal judicial competente, a los efectos de tomar posesión del activo sujeto a expropiación. Si el dueño del bien sujeto a expropiación considera que el precio es insuficiente, puede solicitar que sea fijado judicialmente.

62.    En la situación analizada, el valor que fije el TTN sólo podría resultar aplicable —en todo caso— a las acciones sujetas a expropiación, pero no a las restantes acciones de YPF, que son las que se encuentran involucradas en el presente caso.

63.    Contrariamente a lo sostenido por el Dr. Arecha, la determinación que efectúe el TTN no tiene relevancia para el presente caso. El valor de las acciones no expropiadas, que son las involucradas en el presente litigio, debe determinarse de conformidad con el artículo 7 del Estatuto de YPF. Esa determinación no resultará afectada por la valuación a la que en definitiva puedan llegar el TTN o los tribunales argentinos para las acciones sujetas a expropiación.

64.    Por lo tanto, el procedimiento ante el TTN no constituye un obstáculo a la admisibilidad de esta demanda ni para el lanzamiento de la OPA conforme lo establecido en el Estatuto de YPF.

65.    A su vez, la afirmación del Dr. Arecha de que los "fines" de las Leyes 21.499 y 26.741 son incompatibles con el régimen de OPA previsto en el Estatuto de YPF es puramente dogmática. No observo a lo largo de todo el articulado de la Ley 26.741 ninguna evidencia del propósito de derogar normas del Estatuto de YPF que regulan los supuestos de adquisición y/o cambio de control de la compañía. Ello demuestra que la obligación de lanzar la OPA se mantuvo incólume. La

21

A BRUSA
PUBLICA
GLES
114 CAP. FED.
A. N° 6265

tesis del Dr. Arecha no pondera la afectación de los derechos de los titulares de las acciones no sujetas a expropiación, los que por ser derechos de propiedad también gozan de protección constitucional[74]. En tal contexto, nada impide al Estado Nacional cumplir con el procedimiento previsto por los artículos 7 y 28 del Estatuto de YPF. Los accionistas minoritarios de YPF tienen un derecho adquirido a que se les realice una OPA de sus acciones, en los términos previstos en el Estatuto de YPF.

## H.  EL *"PRE TRIAL DISCOVERY"* ES UN PROCEDIMIENTO AJENO AL DERECHO ARGENTINO – REGLAS PROCESALES APLICABLES A LA PRODUCCIÓN DE LA PRUEBA

66.  El CPCCN, que rige en los tribunales federales de la Argentina, no contempla el procedimiento conocido como *Pre Trial Discovery*. La jurisprudencia[75] y la doctrina[76] sostienen que este procedimiento es ajeno al derecho argentino.

67.  El CPCCN prevé que la prueba debe ofrecerse, por el demandante, en su demanda, y por el demandado en su contestación[77].

68.  Entre otros medios de prueba contemplados en el CPCCN se encuentra la facultad del tribunal de intimar a una parte a acompañar al proceso documentos identificados por la parte contraria y/o de solicitar la citación de testigos[78]. Tal intimación y citación son realizadas por el juez de la causa en la etapa de prueba. Sólo excepcionalmente el juez puede ordenar la producción de prueba en una etapa anterior del proceso.

---

[74] Constitución, artículo 17. CSJN, *"Bourdieu, Pedro Emilio c/ Municipalidad de la Capital"*, Fallos: 145:307 (1925).

[75] CSJN, *"Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios"*, Fallos 321:667 (señalando que el derecho argentino no tiene un instituto análogo al *discovery period* de los Estados Unidos de América); Cámara Nacional en lo Civil y Comercial Federal, Sala II,*"R., J. J. v. LR3 Radio Belgrano y otros"* del 10/02/1995, JA 1997-I-211 (indicando que en el derecho argentino no se aplica el *discovery period* de los Estados Unidos de América).

[76] FEUILLADE, MILTON C., *"La prueba en el proceso con elementos extranjeros"*, JA 2008-IV-1516.

[77] CPCCN, artículo 333.

[78] CPCCN, artículo 388.

_IA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

1. Obtención de documentos

69.    El régimen procesal argentino de obtención de documentos es restrictivo en
comparación con la descripción que se me ha hecho del sistema norteamericano.
Los documentos cuya presentación puede ser solicitada a la contraparte deben
ser individualmente identificados por la parte requirente. La parte requirente no
puede solicitar a su contraparte la presentación de categorías o clases de
documentos[79]. Además, la presentación de los documentos no constituye una
obligación de la parte requerida, sino una simple carga. Por tal motivo, en caso
de que la parte requerida no presente los documentos, ello constituirá una mera
presunción en su contra sólo si, basándose en otros elementos de juicio, resultare
verosímil la existencia y contenido del documento[80].

70.    Un proceso judicial normalmente comienza mediante la interposición de la
demanda. Sin embargo, excepcionalmente, el proceso puede comenzar con la
solicitud del actor de producir ciertas pruebas de manera anticipada, esto es,
antes de la interposición de la demanda[81].

71.    El pedido de prueba anticipada sólo procede si existen motivos fundados para
temer que la producción de la prueba pudiera resultar imposible o muy
dificultosa durante el período de prueba. Este procedimiento es de carácter
excepcional[82] y no tiene como finalidad preparar pruebas para la demanda, sino
que intenta conservar ciertas pruebas cuya producción resultase imposible o muy

---

[79] Al respecto, la doctrina ha señalado que: "*La intimación a presentar la documentación debe ser
enunciada con precisión, tanto en lo atinente a la individualización material de la pieza cuya agregación
se exige, como a las consecuencias de su falta de presentación, expresamente previstas en la norma*"
(CARAMELO DÍAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los
códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA I. HIGHTON – BEATRIZ A. AREÁN
(Dirección), Tomo 7, Hammurabi, Buenos Aires, 2007, p. 648).

[80] Al respecto, la doctrina ha dicho que: "*Por ser una carga, el silencio o la negativa del requerido sólo
lo exponen al riesgo eventual de generar una presunción en contra de sus intereses en el proceso, pero
no autorizan a la adopción de medidas compulsivas dirigidas a la incorporación del documento al
trámite de la causa, ni a la aplicación de sanciones*" (CARAMELO DÍAZ, GUSTAVO, Código Procesal Civil
y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial,
ELENA I. HIGHTON – BEATRIZ A. AREÁN (Dirección), Tomo 7, Hammurabi, Buenos Aires, 2007, p. 648).

[81] CPCCN, artículo 326.

[82] "*El aseguramiento de pruebas en los términos del art. 326 del Cód. Proc. Civ. y Com. de la Nación
constituye una vía de excepción que sólo debe admitirse cuando se comprueba que el proponente se halla
expuesto a perder su probanza o que la misma le resultará imposible o de muy difícil realización en un
oportunidad posterior, lo que implica que debe extremar la explicación de las razones que lo hagan
viable y acreditar la existencia de los motivos que invoca a su favor*" (Cámara Nacional Federal Civil y
Comercial, Sala I, "*Domnicz, José y otro v. Camino del Atlántico S.A.*", 12 de noviembre de 2002, DJ
2003-1-944).

IA BRUSA
PUBLICA
GLES
114 CAP. FED.
A. N° 6265

dificultosa en el momento procesal oportuno[83]. La prueba documental que puede producirse de manera anticipada incluye la exhibición, resguardo o secuestro de documentos debidamente individualizados con efectos conservatorios. Sólo puede solicitarse el secuestro de documentos particulares, específicamente determinados, y no categorías o clases de documentos.

72.    Asimismo, con anterioridad a la interposición de la demanda, el actor puede solicitar la producción de diligencias preliminares[84]. Éstas también son de carácter excepcional[85] y tienen como finalidad la obtención de información o documentación, siempre que dicha información o documentación no pudiera ser obtenida a través de otro medio. Los ejemplos dados por el CPCCN y la jurisprudencia se refieren exclusivamente a documentos específicos previamente identificados[86].

2.- Interrogatorio de los testigos y absolución de posiciones

73.    De acuerdo con el CPCCN[87], el interrogatorio de los testigos está sujeto a reglas determinadas y sigue una práctica judicial. Según estas reglas y prácticas, en los procesos ante los tribunales federales, los testigos no son interrogados —ya sea directamente o mediante repreguntas de la contraparte— por los abogados de las partes. Por el contrario, la parte que propone el testigo presenta sus preguntas por escrito al tribunal antes de la audiencia testimonial[88]. Normalmente, es un funcionario del tribunal, y no el juez (quien por lo general no se encuentra presente en la audiencia), quien realiza las preguntas al testigo, literalmente o modificadas, según el funcionario lo considere pertinente. Una vez que el testigo ha contestado esta primera ronda de preguntas, el abogado de la otra parte puede

---

[83] CNCom, "*Chiri S.A. y otros c. House of Fuller*", Sala A, 23 de diciembre de 1998, LL 1998-D-240. La producción de la prueba anticipada requiere de previa citación a la contraria. De no ser posible y existiendo razones de urgencia que lo justifiquen, esta citación podrá ser suplida por la intervención del Defensor de Ausentes. ELENA I. HIGHTON – BEATRIZ A. AREÁN, (Dirección) Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, Tomo 6, Hammurabi, Buenos Aires, 2006, p. 131.

[84] CPCCN, artículo 323.

[85] CNCom, "*Sistemas Médicos S.A. c. St. Jude Medical*", Sala B, 16 de marzo de 1995, LL 1996-B-158.

[86] Por ejemplo, el requirente que invoque su condición de heredero, coheredero o legatario, puede requerir a la justicia la exhibición del testamento si no puede obtenerlo por otros medios; en caso de evicción, el enajenante o adquirente puede requerir que se exhiban los títulos u otros instrumentos referentes a la cosa vendida. Ver en este sentido, CPCCN, artículo 323.

[87] CPCCN, artículos 439-447.

[88] CPCCN, artículo 429.

24

JA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

proponer, oralmente, sus propias preguntas para que el tribunal las formule al testigo. El tribunal decide si corresponde o no realizar estas preguntas al testigo, ya sea literalmente o modificadas.[89]

74. Los funcionarios públicos, incluso aquellos de jerarquía media como subsecretarios[90], no están obligados a declarar personalmente ante el tribunal, sino que pueden presentar una declaración escrita conforme al interrogatorio que reciban por escrito.

75. La única prueba testimonial que puede producirse antes de la presentación de la demanda es la declaración de testigos de muy avanzada edad, o que estén gravemente enfermos o próximos a ausentarse del país[91].

76. Una parte en un proceso judicial no puede ser llamada a declarar como testigo en su propia causa. Una parte puede requerir que su contraparte sea convocada, como parte y no como testigo, a declarar oralmente ante el tribunal con motivo de las cuestiones discutidas en el litigio (absolución de posiciones)[92]. En el caso de las personas jurídicas —como el Estado Nacional—, es usualmente su representante legal, o alguien designado por aquel, quien declara en representación de la entidad. Este medio de prueba sólo puede ser requerido una vez que la demanda ha sido presentada.

77. Al declarar en este carácter (es decir como parte y no como testigo), las partes no cometen perjurio si no dicen la verdad, ya sea en un caso de naturaleza penal o civil[93].

78. En los procesos contra el Estado Nacional, el funcionario público competente para prestar este tipo declaraciones en representación del Estado Nacional no está obligado a comparecer ante el tribunal para declarar, sino que presenta su

---

[89] CPCCN, artículo 442.

[90] CPCCN, artículo 455. CSJN, Acordada de fecha 20 de diciembre de 1967.

[91] CPCCN, artículo 326 (1).

[92] CPCCN, artículo 404-425.

[93] FALCÓN, ENRIQUE M., Tratado de Derecho Procesal Civil, Comercial y de Familia, III, Rubinzal Culzoni, Buenos Aires, 2006, p. 125 (explica que bajo el derecho argentino, las partes pueden "mentir libremente" al declarar incluso bajo juramento, sin ningún tipo de responsabilidad penal); PALACIO, LINO ENRIQUE, Derecho Procesal Civil, IV, 4° Ed., Abeledo Perrot, Buenos Aires, 2011, p. 442 (sostiene que el derecho argentino no prevé una sanción específica contra las partes para el caso de perjurio).

IA BRUSA
, PUBLICA
IGLES
114 CAP. FED.
I.A. N° 6265

declaración por escrito[94]. El Decreto 1102/86 delegó en los abogados del Estado Nacional la facultad de presentar estas declaraciones escritas[95]. De acuerdo a un ex Subprocurador del Tesoro, generalmente esto significa que dichas declaraciones son preparadas por el mismo abogado que preparó la contestación de la demanda, con lo que, en la práctica, se le otorga así una nueva oportunidad al Estado Nacional para modificar o ampliar los argumentos presentados en la contestación de la demanda[96].

79.   Las reglas mencionadas en los puntos precedentes son obligatorias para los tribunales federales en los procesos judiciales iniciados en la Argentina.

80.   Con relación a la producción ante tribunales federales argentinos de pruebas ordenadas en procesos judiciales que tramitan en el exterior, la Argentina y los Estados Unidos de América son parte de la Convención de la Haya sobre la Obtención de Pruebas en el Extranjero en Materia Civil o Comercial[97] y de la Convención Interamericana sobre Exhortos y Cartas Rogatorias[98]. Estas Convenciones establecen que en principio, el juez que tramite un exhorto debe aplicar la legislación de su país en lo que se refiere a los métodos y procedimientos a seguir. Sin embargo, ante la solicitud del juez requirente puede seguirse un método o procedimiento especial, si éste no es incompatible con la legislación interna del Estado requerido[99]. La justicia argentina ha hecho lugar a un pedido de un tribunal de los Estados Unidos de América de producir prueba testimonial bajo los términos previstos en el exhorto[100].

---

[94] CPCCN, artículo 407.

[95] Procurador del Tesoro de la Nación, el subprocurador del Tesoro de la Nación y los directores de los servicios jurídicos de los ministerios, secretarías y demás dependencias de la administración pública nacional.

[96] GARCÍA PULLÉS, FERNANDO RAÚL, Tratado de lo contencioso administrativo, II, Hammurabi, Buenos Aires, 2004, p. 661.

[97] Ley 23.480.

[98] Ley 23.503.

[99] DATES, LUIS E., "Cooperación judicial internacional procesal en materia probatoria", publicado en La Ley 2007-D, 1150; FEUILLADE, MILTON C., "La prueba en el proceso con elementos extranjeros", publicado en La Ley 2009-A, 1197.

[100] CNCiv, Sala I, 24.02.00, "Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto".

IA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

81.   A la luz de lo antes expuesto, la producción de pruebas en la Argentina en virtud de un exhorto emitido por un tribunal de los Estados Unidos de América podría seguir las reglas sobre prueba testimonial especificadas en ese exhorto.

82.   En conclusión, en cualquier proceso judicial iniciado ante tribunales federales de la Argentina, la obtención de prueba documental en poder de la contraparte o el interrogatorio a testigos sólo se permiten con el limitado alcance previsto en el CPCCN. Por el contrario, si el juicio tramita en el exterior, de acuerdo con la Convención de la Haya y con la Convención Interamericana sobre Exhortos y Cartas Rogatorias, la producción de prueba en la Argentina podría, al menos en alguna medida, seguir las reglas del tribunal extranjero ante el cual se desarrolla el proceso.

## II.   CUESTIONES CONTRACTUALES

## A.   LA OBLIGACIÓN DE LANZAR LA OPA Y EL SIGNIFICADO DE "ADQUISICIÓN" BAJO EL ESTATUTO DE YPF

83.   El Estado Nacional adquirió el control de YPF a mediados de 2012. Desde entonces, el Estado Nacional ejerce pública y ostensiblemente los derechos políticos y los derechos económicos (p. ej., el cobro de dividendos)[101] sobre la mayoría de las acciones de YPF.

84.   Dado que Repsol ha perdido la capacidad de "formar la voluntad social" (es decir, de ejercer el voto de la mayoría de las acciones) en las asambleas ordinarias de accionistas y de elegir o revocar la designación de la mayoría de los directores o síndicos, y dado que dichos derechos están siendo ejercidos por el Estado Nacional desde la sanción de la Ley 26.741, es claro que ha existido una adquisición de control en YPF[102].

---

[101] El Estado Nacional ha cobrado los dividendos correspondientes a las "acciones sujetas a expropiación", según surge de la carta de YPF de fecha 25 de abril de 2013, que he tenido a la vista, y adjunto a la presente como *Anexo C*, según la cual "el ejercicio de todos totalidad de los derechos" que corresponden a las acciones sujetas a expropiación pertenecen al Estado Nacional. De acuerdo con este texto debe concluirse que dicho cobro ha tenido carácter definitivo, por cuenta propia del Estado Nacional y no por cuenta de Repsol.

[102] La Ley de Sociedades Comerciales, aplicable también a YPF, define la existencia de control cuando se cuente con los votos necesarios para formar la voluntad social en las asambleas ordinarias o se ejerza influencia dominante como consecuencia de acciones o por los especiales vínculos existentes. (Ley

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
.C.B.A. N° 6265

85.   Según el texto del Estatuto de YPF la obligación de lanzar una OPA se torna exigible por la mera toma de control, sin que sea necesaria la transferencia de la propiedad de las acciones.

86.   El artículo 28 del Estatuto de YPF, sobre 'Normas especiales para adquisiciones del Estado Nacional,' establece que "... *(A) Las previsiones de los incisos e) y f) del Artículo 7 (con la única excepción de lo establecido en el apartado (B) de este Artículo) se aplicarán a las adquisiciones que directa o indirectamente efectúe el Estado Nacional, por cualquier medio o título, de acciones o títulos de la Sociedad, 1) cuando como consecuencia de dicha adquisición el Estado Nacional resulte titular de, o ejerza el control sobre, acciones de la Sociedad que, sumadas a sus tenencias anteriores de cualquier clase, representen, en total, el 49% o más del capital social; o 2) cuando el Estado Nacional adquiera un 8% o más de las acciones clase D en circulación, mientras retenga acciones de la clase A que alcancen o superen el 5% del capital social establecido en el inciso (a) del artículo 6 de estos Estatutos al tiempo del registro de los mismos en el Registro Público de Comercio. En caso que las acciones clase A en poder del Estado Nacional representen un porcentaje inferior al anteriormente mencionado, no regirá lo previsto en el punto 2) de este Artículo, aplicándose en tal caso los criterios generales previstos en el inciso d) del Artículo 7"*.

87.   El artículo 7(i) define lo que constituye una adquisición "indirecta" y establece que una adquisición indirecta podría ocurrir mediante *"las tenencias accionarias que una persona posea a través de fideicomisos, certificados de depósito de acciones ("ADR") u otros mecanismos análogos"*. Ninguno de estos mecanismos requiere que se opere la transferencia formal de la propiedad de las acciones como condición para que sea exigible la obligación de realizar la OPA referida en el artículo 7. En el mismo sentido, el artículo 28 establece expresamente que una "adquisición" puede ocurrir *"directa o indirectamente, por cualquier medio o título"*, por cuya razón no requiere una transferencia de la propiedad.

---

19.550, artículo 33). El decreto 677/01, vigente al momento de los hechos, y la nueva Ley de Mercado de Capitales, que lo reemplazó, aplicables a las sociedades en el régimen de oferta pública, como YPF, definen como *"Controlante", "grupo controlante" o "grupos de control"* a las *"personas físicas o jurídicas que posean en forma directa o indirecta, individual o conjuntamente, según el caso, una participación por cualquier título en el capital social o valores con derecho a voto que, de derecho o de hecho, en este caso si es en forma estable, les otorgue los votos necesarios para formar la voluntad social en asambleas ordinarias o para elegir o revocar la mayoría de los directores o consejeros de vigilancia"* (Ley 26.831, artículo 2).

CILIA BRUSA
RA PUBLICA
. INGLES
IO 114 CAP. FED.
C.B.A. Nº 6265

88.     Asimismo, el propio texto del artículo 28(A)(1) es aún más claro en su redacción
        y contradice la interpretación propuesta por el Dr. Arecha en los párrafos 21 y
        24 de su opinión. De acuerdo al texto del artículo 28 del Estatuto de YPF, una
        "adquisición" por el Estado Nacional de acciones de YPF torna aplicables las
        disposiciones del artículo 7 párrafos (e) y (f), cuando, como consecuencia de
        dicha adquisición, el Estado Nacional "resulte titular de, *o ejerza el control
        sobre*", más del 49% del capital social de la Sociedad. Esto implica que una
        "adquisición" podrá resultar tanto de la propiedad de las acciones como de la
        toma de control sobre ellas: en ambos casos, deviene exigible la obligación de
        lanzar la OPA.

89.     Por lo tanto, en este caso la "ocupación temporánea" dispuesta por la Ley 26.741
        mediante la cual el Estado Nacional indudablemente adquirió el control del 51%
        del capital accionario de YPF, se encuentra sujeta a las previsiones del Estatuto
        de YPF. De acuerdo con el artículo 28 del Estatuto de YPF la forma en que el
        Estado Nacional ha adquirido el control —ya sea "directa o indirectamente, o
        por cualquier medio o título"— de YPF es irrelevante a los efectos de la
        obligación de lanzar la OPA. Como consecuencia de ello, dicho artículo también
        resulta aplicable a la mera "ocupación" por el Estado Nacional de los derechos
        resultantes de las acciones sujetas a expropiación.

90.     Esta conclusión no se vería alterada en caso de que resultara aplicable el sub
        párrafo (A)(2) en lugar del sub párrafo (A)(1) del artículo 28 del Estatuto de
        YPF. Toda vez que el Estado Nacional es titular de acciones Clase A que
        representan menos del 5% del capital social de YPF, la regla del sub párrafo
        (A)(2) remitiría al artículo 7, párrafo (d), que también torna exigible la
        obligación de lanzar la OPA cuando la parte en cuestión se convierte en "titular"
        o ejerce el "control" de acciones de YPF.


**B.     SIGINIFICADO DEL TÉRMINO "ADQUISICIÓN" EN EL DERECHO
        ARGENTINO**

91.     En el derecho argentino el término "adquisición" no exige la obtención de la
        titularidad de la propiedad. Incluso si el Estatuto de YPF no estableciese
        expresamente que un cambio de control torna exigible la obligación de lanzar la

29

BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

OPA, el término genérico "adquisición" también comprende al supuesto de cambio de control sobre los activos relevantes. En el derecho argentino, el término "adquisición" tiene un significado más amplio que el que le asigna el Dr. Arecha, quien lo restringe a la obtención de la "propiedad".

92.	De acuerdo al derecho argentino, según lo define el Código Civil y lo establecido en otras normas, el término "adquisición" incluye no sólo la adquisición de "propiedad" sino también la adquisición del "control"[103], de la "posesión"[104], y de la "tenencia"[105] de determinadas cosas.

93.	En este caso, el Estado Nacional admite abiertamente haber adquirido el control de YPF, mediante la "ocupación" de la mayoría de las acciones sujetas a la expropiación dispuesta por la Ley 26.741 y se ha otorgado a sí mismo el ejercicio pleno de todos los derechos resultantes de esas acciones.

94.	El Estado Nacional también ha adquirido la "posesión" de todos los derechos correspondientes a las acciones, lo que en esencia es equivalente a la posesión de las acciones. El Código Civil argentino define como *poseedor* a la persona que tiene la cosa bajo su poder, con intención de someterla al ejercicio de un derecho de propiedad.[106] El mismo Código define como *tenedor* a aquel que ejerce actos de dominio sobre la cosa, con intención de poseer en nombre de otro[107].

95.	El Dr. Arecha, y uno de los expertos designados por YPF Gas en los juicios sobre nulidad de asamblea que tramitan en la Argentina, reconocen que Repsol ha perdido la "posesión" de las acciones sujetas a expropiación. Así el Dr. Arecha, en el punto 6 de su opinión, describe la ocupación temporánea de la siguiente manera:

	*"La ocupación temporánea es una herramienta legal regulada por la Ley 21.499 y el Artículo 2512 del Código Civil, mediante el cual el Gobierno puede, por motivos de interés público que justifiquen la desposesión de un*

---

[103] Ley 25.156, artículo 6.

[104] Código Civil argentino, artículo 2355.

[105] Código Civil argentino, artículo 2460.

[106] Código Civil argentino, artículo 2351.

[107] Código Civil argentino, artículo 2461.

_IA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

> *bien de una entidad privada, hacer uso y goce de dicho bien en forma*
> *temporaria..."* (el subrayado es mío).

96.    En el mismo sentido, el Dr. Marcer, en su opinión presentada a pedido de YPF
       Gas (bajo el control del Estado Nacional) en procesos de nulidad de asamblea,
       sostuvo que la intervención dispuesta por los Decretos 530/12 y 557/12 en YPF
       y en YPF Gas, respectivamente, implicó la "desposesión" de Repsol[108].

97.    Por lo tanto, es claro entonces que si Repsol perdió la "posesión", esa
       "posesión" fue adquirida por el Estado Nacional.

98.    Como ejemplo adicional, según la Ley 25.156 de Defensa de la Competencia, la
       adquisición de una sociedad puede resultar de la adquisición de la *propiedad, o*
       *cualquier derecho sobre acciones*"[109]. El Estado Nacional ha admitido
       abiertamente haber adquirido los derechos sobre las acciones.

99.    Adicionalmente, el mismo diccionario citado por el Dr. Arecha reconoce que
       una "adquisición" ocurre cuando se obtienen los derechos asociados con el
       objeto: *"En su concreta acepción jurídica significa la obtención de una cosa o*
       *de un derecho con el fin de sacar el provecho pecuniario correspondiente*"[110].
       De acuerdo con el diccionario de la Real Academia Española, "obtener"
       significa *"alcanzar, conseguir y lograr algo que se merece, solicita o pretende"*.
       Esta definición no requiere que el objeto sea alcanzado, conseguido o logrado en
       calidad de propietario.

100.   El Dr. Arecha reconoce en el párrafo 12 de su opinión, que el Estado Nacional
       ha adquirido los derechos asociados con las acciones, lo que demuestra que ha
       "alcanzado" o "logrado" el control sobre las acciones.

101.   El argumento del Dr. Arecha basado en el artículo 215 de la Ley de Sociedades
       en cuanto a la necesidad de inscribir al nuevo propietario de las acciones en el
       Registro de Acciones para que opere la transferencia de la propiedad, no resulta
       aplicable al caso. En primer lugar, como se ha visto, el vocablo "adquisición"
       tiene un significado más amplio que adquisición de la propiedad. En segundo

---

[108] Opinión de Alberto Marcer presentada en: Juzgado Nacional de Primera Instancia en lo Comercial N°
3, Secretaría N° 6, Expediente N° 103.181, *"Repsol Butano S.A. c/ YPF ·Gas S.A. s/ Impugnación de
Asamblea"*, pag. 61, 3 párrafo.

[109] Ley 25.156, artículo 6.

[110] Enciclopedia Jurídica Omeba, Tomo I.A. Ed Bibliográfica Omeba, 1979, p. 518.

31

A BRUSA
PUBLICA
GLES
14 CAP. FED.
A. Nº 6265

lugar, el Libro de Depósito de Acciones y Registro de Asistencia a Asambleas, el cual debe reflejar las constancias del Libro de Registro de Acciones de YPF[111], da cuenta del ejercicio por parte del Estado Nacional de los derechos políticos y patrimoniales correspondientes a las "acciones sujetas a expropiación", siendo Repsol y el Bank of New York reconocidos como titulares meramente formales de dichas acciones, pero sin ningún derecho sobre ellas.

102.    La "ocupación" dispuesta por la Ley 26.741 satisface entonces numerosos significados ordinarios del término "adquisición" conforme el derecho argentino, mediante la obtención del control sobre las acciones, la obtención de la posesión de las acciones y la obtención de derechos sobre las acciones. En consecuencia, de acuerdo con el Estatuto de YPF y con el derecho argentino, el Estado Nacional ha adquirido las acciones de YPF.

## C.   IRRELEVANCIA DE LA TEMPORANEIDAD DE LA "ADQUISICIÓN" BAJO EL ESTATUTO DE YPF

103.    Tanto de acuerdo con las disposiciones del Estatuto de YPF como según el sentido ordinario del término "adquisición", una adquisición no necesita ser permanente.

104.    En primer término, el Estatuto de YPF no exige que la "adquisición" sea permanente. El artículo 7 (h) de dicho Estatuto expresamente reconoce que incluso las adquisiciones temporarias tornan exigible la obligación de lanzar la OPA. El Estatuto dispone que las sanciones previstas para el incumplimiento de la obligación de lanzar la OPA tendrán vigencia hasta tanto el adquirente haya perdido el control sobre YPF. En sentido coincidente, el artículo 28 del Estatuto de YPF de ninguna manera coloca a una adquisición de naturaleza temporal fuera de las reglas aplicables a la OPA.

105.    En segundo lugar, incluso si el Estatuto no hiciese referencia a si una adquisición "temporaria" torna exigible la OPA, de acuerdo con el derecho argentino, una adquisición no necesariamente implica que el adquirente haya

---

[111] El Registro de Acciones de YPF es llevado por la Caja de Valores S.A., conforme a las instrucciones de YPF.

LIA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

obtenido un derecho de manera permanente. Una adquisición puede ser temporaria.

106.    Según el Código Civil argentino las partes pueden acordar la adquisición de derechos, incluso derechos reales, por un plazo limitado. Más aún, en el derecho argentino, ciertos derechos reales sólo pueden ser adquiridos por un período determinado de tiempo. Tal es el caso, por ejemplo, del derecho de usufructo, que sólo puede ser adquirido por una persona jurídica por un máximo de veinte años,[112] o el dominio fiduciario, que sólo puede tener un término máximo de treinta años[113].


Dejo constancia, bajo pena de perjurio bajo las leyes de los Estados Unidos de América, que lo anterior es cierto y verdadero según mi leal saber y entender.

En Buenos Aires, Argentina, a los 26 días del mes de julio de 2013.


Gustavo Naveira

---

[112] Código Civil argentino, artículo 2828.

[113] Ley 24.441, artículo 4 (c).

33

IA BRUSA
PUBLICA
IGLES
114 CAP. FED.
.A. N° 6265

# ANEXO A

IA BRUSA
, PUBLICA
IGLES
114 CAP. FED.
I.A. N° 6265

## CURRICULUM VITAE

### I.  DATOS PERSONALES

1) Apellido y Nombre

   **NAVEIRA**, Gustavo Adolfo

2) Lugar y fecha de Nacimiento

   Buenos Aires, República Argentina
   9 de Septiembre de 1945

3) Domicilio Profesional

   Bouchard 680, piso 5° (CP. 1106) Ciudad Autónoma de Bs.As.
   T.E. 5272-7000 FAX. 5272-7001
   E-mail: gnaveira@ntmdall.com

### II.  ESTUDIOS UNIVERSITARIOS

Abogado: Facultad de Derecho y Ciencias Sociales de la Universidad de Buenos Aires, 1970.

### III.  CARGOS DESEMPEÑADOS EN EL PODER JUDICIAL

- Secretario del Juzgado Nacional de Primera Instancia en lo Comercial N° 20 designado el 30-04-70.

- Secretario de la Sala B de la Cámara Nacional de Apelaciones en lo Comercial de la Capital Federal.

- Juez Nacional de Primera Instancia en lo Comercial de la Capital Federal a cargo del Juzgado N° 15, designado el 7-05-79, con acuerdo del Honorable Senado de la Nación por Decreto N° 1530 del 21-05-84.

1

A BRUSA
PUBLICA
GLES
114 CAP. FED.
.A. N° 6265

- Juez de la Cámara Nacional de Apelaciones en lo Comercial de la Capital Federal, Sala B, designado por Decreto N° 3228 del 30.09.84, con acuerdo del Honorable Senado de la Nación.

## IV-   CARGOS DESEMPEÑADOS EN EL MINISTERIO DE JUSTICIA DE LA NACIÓN

- Subsecretario de Justicia de la Nación, designado el 01-07-97, Decreto N° 600.

- Secretario de Asuntos Técnicos y Legislativos del Ministerio de Justicia, designado el 29-10-97, Decreto N° 1127.
- Integrante del Consejo Rector de la Escuela de Mediación s/Resolución N° 200 de fecha 16.03.98.

- Integrante de la Comisión Asesora del Centro de Estudios Jurídicos Sociales s/Resolución N° 675 de fecha 21.09.98.

- Representante alterno y Secretario Ejecutivo de la Comisión de Infraestructura Edilicia de la Justicia Nacional y Federal, designado el 25.03.98, Resolución M.J. N° 228. En ese carácter dirigió el equipo de abogados, ingenieros y arquitectos que elaboraron el Pliego de Bases y Condiciones de la Licitación Pública Nacional e Internacional N° 4/99 y 5/99 para la construcción de la Ciudad Judicial.

- Presidente del Jurado en el Concurso Nacional de Anteproyectos de la Ciudad Judicial.

## V.   PUBLICACIONES

1. *Algunas notas sobre el art. 48 de la ley 24.522* ( ED, 28.09.95) (escrito en co-autoría con la Dra. Marta E. Acuña,  el Dr. Edgardo Daniel Truffat  y el Contador Jorge E. Basile).

2. *El arancel del art. 32 de la ley 24.522: Demasiadas dudas, escasas certezas* (ED, 28.11.95) (escrito en co-autoría con  el Dr. Jorge Basile y el Dr. Edgardo Daniel Truffat).

2

.IA BRUSA
. PUBLICA
.NGLES
114 CAP. FED.
.A. N° 6265

3. ***Proyectos de reforma a la ley 24.522. Cuadro Comparativo. Comentario a la informalmente llamada " Ley de fe de erratas "*** (
E.D.: Legislación Argentina, Boletín Nro. 18) ( escrito en co-autoría
con el Dr. Jorge Emilio Basile y el Dr. E. Daniel Truffat).

4. ***Comentarios al proyecto del senador San Millán de reforma del
art. 202 de la Ley de Sociedades Comerciales*** (E.D.L.A., N° 11)
(escrito en co-autoría con el Dr. Jorge Emilio Basile y el Dr. E. Daniel
Truffat).

5. ***"El Estudio jurídico y la pérdida de oportunidad de negocios"***
(E.D. 11.12.97) (escrito en co-autoría con el Dr. E. Daniel Truffat).

6. ***Para iniciar la polémica: El "anteproyecto de reformas a la ley
de concursos y quiebras N°. 24.522" y la oportunidad de la reforma,*** (E.D. 26.12.97) (escrito en co-autoría con el Dr. E. Daniel
Truffat).

7. ***Comentario al fallo de la Cámara Nacional Comercial "¿Deslealtad sin daño?***, publicación en E.D- to.170-22.

8. Ponencia en las "***Primeras Jornadas del Fin del Mundo de Derecho Privado" sobre "Proyecto de reglamento para el Comité de
Acreedores",*** (conjuntamente con el Dr. E. Daniel Truffat).

9. ***"El Anteproyecto de Sociedades Anónimas Deportivas"***, Revista
del Colegio Público de Abogados de la Capital Federal N° 18 (11-98).

10. ***"Monopolios actuales vs. Monopolios conjeturales"*** Sociedades
Anónimas Deportivas. (escrito en co-autoría con el Dr. E. Daniel Truffat) informe de gestión del Dr. Raúl Granillo Ocampo publicación Ministerio de Justicia, edición única 11/99.

11. ***"Concurso Nacional de Anteproyectos Ciudad Judicial"*** artículo
publicado en la Revista de Arquitectura N° 193 (6/99) de la Sociedad
Central de Arquitectos.

12. ***"Firma Digital: Tratatamiento legislativo de su regulación",*** Revista del Colegio Público de Abogados de la Capital Federal N° 27
(9/99), (escrito en co-autoría con el Ing°. Alejandro J. Román).

13. ***"El Documento Electrónico y la Firma Digital al Servicio de la
optimización del Servicio de Justicia",*** participación en carácter

3

A BRUSA
PUBLICA
GLES
114 CAP. FED.
A. N° 6265

de expositor en el Seminario organizado por el Centro de Estudios de Informática y Derecho (C.E.I.D.) dependiente del Ministerio de Justicia, realizado en la Ciudad Autónoma de Buenos Aires, durante los días 27 y 29 de septiembre de 1999.

14. *"La Mediación Previa Obligatoria.* "Vehículo de comunicación de la realidad e instrumento para la adopción de políticas públicas". (escrito en co-autoría con la Dra. Ester Riesel).

15. *"El embargo del artículo 83 inciso 3) de la ley de sociedades comerciales (¿Herramienta automática o semiautomática?)"*, (escrito en co-autoría con el Dr. E. Daniel Truffat), Revista Errepar, Tomo XIII, N° 164, julio 2001.

16. *"Algo mas sobre la suspensión de las decisiones asamblearias"*, escrito conjuntamente con el Dr. E. Daniel Truffat, Errepar, Tomo XIII; N° 169, diciembre 2001, p. 613 y ss.

17. *"Uzal y S.A. La Razón: el fin del principio"* – escrito conjuntamente con el Dr. E. Daniel Truffat, Revista del Colegio Público de Abogados de la Capital Federal, Diciembre 2001/N°52, p. 48 y ss.

18. "El presidente del directorio de una sociedad anónima no puede ni debe proclamarse "yo", el Supremo", *escrito conjuntamente con el Dr. E. Daniel Truffat,* Foro de Córdoba, Suplemento de Derecho Empresario Año I, N° 1, 2001

19. *"Una medida cautelar concursal conmocionante",* escrito conjuntamente con el Dr. E. Daniel Truffat, La Ley, Suplemento de concursos y quiebras, publicado el 5-02-02.

20. *"Breves reflexiones sobre los ilícitos societarios a la luz del art. 173, inc. 7° del Código Penal",* escrito en co-autoría con el Dr. Pablo Arguibay Molina, publicado en ED ejemplar del 7-3-2002.

21. *"La Crisis Económica y La Actividad Legislativa"* Breve referencia histórica, escrito conjuntamente con el Dr. E. Daniel Truffat, Revista de las Sociedades y Concursos N° 15, Ed. Ad Hoc, marzo/abril 2002.

22. *"El síndico societario: ¿control de legalidad o de gestión?",* escrito conjuntamente con el Dr. E. Daniel Truffat, El Derecho, ejemplar del 25.04.02.

4

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
P.C.B.A. N° 6265

23. ***"Plata perdida o tiempo perdido?",*** escrito conjuntamente con el Dr. E. Daniel Truffat, El Derecho, ejemplar del 15 de septiembre de 2003.

24. ***"¿Personas o máscaras jurídicas?,*** escrito conjuntamente con el Dr. E. Daniel Truffat, Errepar, Revista de Doctrina Societaria y Concursal, N°191, octubre de 2003.

25. ***"Prueba societaria difícil";*** escrito en coautoría con los Dres. E. Daniel Truffat y Javier A. Lorente, E.D. ejemplar del 14 de noviembre de 2003

26. *"El síndico, en el anteproyecto de reforma de la ley de sociedades"*, escrito en coautoría con el Dr. E. Daniel Truffat, E.D., ejemplar del7 de julio de 2004.

27. "¿Seguro de retiro o retiro del seguro?, E.D. ejemplar del 6 de agosto de 2004.

28. "Respuesta conjetural" a "Sobre las técnicas de "personalización" de las sociedades y "la colegialidad" de E. Daniel Truffat en coautoria con el Dr. Francisco Naveira, publicado en  Errepar, Doctrina Societaria y Concursal N° 232. pag. 190/192, marzo 2007.

## VI.  <u>PROYECTOS DE LEYES ORIGINADOS A INICIATIVA DEL SUSCRIPTO</u>

- Sociedades Anónimas Deportivas, Mensaje N° 159/99 (04-03-99).

- Modificación de la Ley  22.172, Mensaje N° 559/99 (24-05-99).

- Regulación del Arbitraje Nacional e Interno, en reemplazo del Libro VI del C.P.C.C.N., Mensaje N° 577/99 (28-05-99).

- Contrato de Colaboración Empresarial, Mensaje 856/99, (09-08-99).

- Sustitución art. 23 Ley 19550, Mensaje N° 838/99 (02-08-99)

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

- Concesión, Licencia y Permisos de Servicios Públicos Nacionales y figuras similares. Expte. 2189/99 presentado por el Diputado Vensentini el 03-05-99.
- Incorporación de derecho interno de la Ley Modelo sobre Arbitraje Comercial Internacional adoptada por la Comisión de Naciones Unidas para el Derecho Mercantil Internacional (CNUDMI) Mensaje y Ley, Provisorio N° 1363/99.

- Proyecto de Mensaje y de Ley Warrants. Provisorio N° 1362/99.

6

LIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. Nº 6265

# ANEXO B

...IA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. Nº 6265

Listado de Documentos Analizados

<u>Documentos generales</u>

1)      Copias del expediente *"Gomis Sáez, Antonio c/ Estado Nacional - PEN - Medida Cautelar"*, Nro. 26.981/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 4 – Secretaría Nro. 7.

2)      Copias del expediente *"Forwood, Walter Cristian c/ PEN – DTOS. 530 y 532/12 s/ Medida Cautelar (Autónoma)"*, Nro. 12.881/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 7, Secretaría Nro. 13.

3)      Copias del expediente *"Gallego, José Manuel c/ EN-PEN-DTO 530/12 557/12 s/ Medida Cautelar (Autónoma)"*, Nro. 13.223/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 5, Secretaría Nro. 10.

4)      Copias del expediente *"De San Martín, José y otro c/ Estado Nacional Poder Ejecutivo s/ Proceso de Conocimiento"*, Nro. 4.201/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 6, Secretaría Nro. 11.

5)      Copias del expediente *"Comisión Nacional de Valores c/ Repsol YPF S.A. s/ Queja"*, Nro. 12.815/2012, Cámara Nacional de Apelaciones en lo Comercial, Sala F.

6)      Copias del expediente *"Repsol Butano S.A. c/ YPF Gas S.A. s/ Ordinario"*, Nro. 103.181, Juzgado de Primera Instancia en lo Comercial Nro. 3 – Secretaría Nro. 6.

7)      Copias del expediente *"Repsol S.A. y otros c/ YPF S.A. s/ Ordinario"*, Nro. 103.144, Juzgado de Primera Instancia en lo Comercial Nro. 3 – Secretaría Nro 6.

8)      Copias del expediente *"Repsol YPF S.A. y otro c/ La República Argentina (DAJIN 2195/2012 M°RREE y C-EEUU) s/ Exhorto"*, Nro. 32.569/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 11 – Secretaría Nro. 21.

9)      Copias del expediente *"Repsol S.A. c/ YPF S.A. (carpe DAJIN 2896/12 Jz Mercantil I- Madrid –Espa) s/ Exhorto"*, Nro. 56.375/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 2 – Secretaría Nro. 4.

1

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

10)    Copias del expediente *"Repsol YPF S.A. c/ EN-DTO 530 532 732/12 s/ Proceso de conocimiento"*, Nro. 21.941/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 7 – Secretaría Nro. 13.

11)    Copias del expediente *"Repsol Butano S.A. c/ EN – PEN – Ley 26.741 – Dto 530 557 732/12 s/ Proceso de Conocimiento"*, Nro. 27.075/2012, Juzgado de Primera Instancia en lo Contencioso Administrativo Federal Nro. 4 – Secretaría Nro. 7.

12)    Copias del expediente *"Repsol S.A. y otros c/ YPF S.A. s/ ordinario"*, Nro. 103.268, Juzgado de Primera Instancia en lo Comercial Nro. 3 – Secretaría Nro. 6.

13)    Copias del expediente *"Repsol YPF SA c/ Comisión Nacional de Valores s/ medida precautoria"*, Nro. 12.126/2012, Cámara Nacional de Apelaciones en lo Comercial, Sala F.

14)    Ley 26.741, publicada en el Boletín Oficial el 7 de mayo de 2012.

15)    Decreto 530/12 publicado en el Boletín Oficial el 16 de abril de 2012.

16)    Decreto 532/12 publicado en el Boletín Oficial el 17 de abril de 2012.

17)    Decreto 557/12 publicado en el Boletín Oficial el 19 de abril de 2012.

18)    Decreto 732/12 publicado en el Boletín Oficial el 16 de mayo de 2012.

19)    Estatuto de YPF S.A.

20)    Constitución Argentina.

21)    Ley 19.549.

22)    Ley 25.344.

23)    Ley 23.982.

24)    Ley 25.873.

25)    Decreto 1563/04.

26)    Ley 16.986.

2

CILIA BRUSA
RA PUBLICA
A INGLES
LIO 114 CAP. FED.
C.B.A. N° 6265

27)    Ley 24.240, modificada por Ley 26.361.

28)    Ley 25.675.

29)    Ley 23.898.

30)    Ley 23.853.

31)    Ley 21.839.

32)    Decreto-ley 16.638/57.

33)    Ley 24.432.

34)    Código Civil argentino.

35)    Ley 26.853.

36)    Ley 26.854.

37)    Ley 26.855.

38)    Ley 24.937.

39)    Declaración del Dr. Arecha para apoyar la presentación de la República Argentina solicitando se declare inadmisible la demanda.

40)    Ley 19.550.

41)    Ley 21.499.

42)    Decreto 677/01.

43)    Ley 26.831.

44)    Copia de la parte correspondiente del Libro de Accionistas de YPF.

45)    Acta de Asamblea Anual de Accionistas de YPF de fecha 4 de junio de 2012.

46)    Acta de la Asamblea Anual de Accionistas de YPF de fecha 17 de julio de 2012.

3

JA BRUSA
A PUBLICA
NGLES
I 114 CAP. FED.
3.A. Nº 6265

47)   Acta de la Asamblea Anual de Accionistas de YPF de fecha 13 de septiembre de 2012.

48)   Código Procesal Civil y Comercial de la Nación.

49)   Acordada de la Corte Suprema de la Nación de fecha 20 de diciembre de 1967.

50)   Decreto 1102/86.

51)   Ley 23.480.

52)   Ley 25.156.

53)   Opinión de Alberto Marcer presentada en el expediente *"Repsol Butano S.A. c/ YPF Gas S.A. s/ impugnación de Asamblea"*, que tramita ante el Juzgado de Primera Instancia en lo Comercial Nro. 3, Secretaría Nro. 6, (Expediente Nro. 103,181), p. 61, 3er párrafo.

54)   Ley 24.441.

55)   Decreto 16.638/57.

56)   Ley 23.503.


Bibliografía

1)   HIGHTON, ELENA I. – AREÁN, BEATRIZ A., *"Código Procesal Civil y Comercial de la Nación concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial"*, Tomos 6 y 7 (en parte relevante).

2)   Enciclopedia Jurídica Omeba, Tomo I.A, Editorial Omeba, 1979, p. 518.

3)   HUTCHINSON, TOMÁS, *"El proceso de ejecución de sentencias contra el Estado"*, Revista Latinoamericana de Derecho, Año I, número 1, enero-junio 2004, pp. 289-355.

4

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

4)     COLOMBO, CARLOS J. – KIPER. CLAUDIO M., *Código Procesal Civil y Comercial de la Nación*, anotado y comentado, Tomo II, 2da Edición, La Ley, 2006 (en parte relevante).

5)     BORDA, GUILLERMO A., *"Manual de Derecho Civil. Parte General"*, Editorial Perrot, Buenos Aires, 1991 (en parte relevante).

6)     RIVERA, JULIO CÉSAR (H), *"La Legitimación de las acciones colectivas"*, en "Derecho Procesal Comercial", obra dirigida por GRAZIABILE, DARÍO, Ed. Abeledo Perrot, Buenos Aires, 2013.

7)     OYAHANARTE, MARTÍN, *"Reforma a la Justicia: la integración del Consejo de la Magistratura por académicos ajenos al ámbito jurídico es inconstitucional"*, MJ – DOC.6229-AR, 10 de abril de 2013.

8)     GORDILLO, AGUSTÍN, *"La implacable tasa de justicia"*, La Ley 1995-E, 503.

9)     MAIRAL, HÉCTOR A., *"El silencio de los tribunales argentinos"*, Editorial Res Pública Argentina, edición 2007-3.

10)   Declaración emitida por la Federación Latinoamericana de Jueces con fecha 18 de abril de 2013.

11)   Declaración emitida por el Comité de Justicia y Paz de la Conferencia Episcopal Argentina, de fecha 6 de marzo de 2013, publicada en El Derecho, ejemplar del 17 de abril de 2013.

12)   Declaración emitida por la Relatora Especial de las Naciones Unidas, Gabriela Knaul, en temas de Independencia de Jueces y Abogados, de fecha 30 de abril de 2013, publicado                                                                                               en http://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=13275&LangID=S.

13)   Proyecto de ley suscripto por el diputado Carlos Kunkel y otros con fecha 26 de junio de 2013, expediente No. 4935-D-2013.

5

A BRUSA
PUBLICA
3LES
14 CAP. FED.
A. Nº 6265

14)   Noticia periodística publicada por *iProfesional.com*, sección Legales, en fecha
18 de febrero de 2008.

15)   FEUILLADE, MILTON C., *"La prueba en el proceso con elementos extranjeros"*,
La Ley 2009-A, 1197.

16)   BIANCHI, ALBERTO B., *"Crónica de una inconstitucionalidad manifiesta"*,
publicado en La Ley, con fecha 26 de junio de 2013.

17)   OTEIZA, EDUARDO, *"El cercenamiento de la garantía a la protección cautelar en
los procesos contra el Estado por la ley 26.854"*, Editorial La Ley Suplemento Especial,
mayo 2013.

18)   GIL DOMÍNGUEZ, ANDRÉS, *"La inconstitucionalidad e inconvencionalidad del
régimen de medidas cautelares dictadas en los procesos en los que el Estado es parte
(Ley 26.854)"*, La Ley, mayo 2013.

19)   GELLI, MARÍA ANGÉLICA, *"Las inconstitucionalidades de la ley del Consejo de
la Magistratura"*, La Ley, 26 de junio de 2013.

20)   Diccionario de la Real Academia Española.

21)   Discurso de la Presidente de Argentina, Cristina Fernández de Kirchner, con
fecha 1 de marzo de 2013 al inicio de las Sesiones Ordinarias del Congreso, disponible
en:   http://www.presidencia.gob.ar/discursos/26370-inauguracion-del-131o-periodo-de-
sesiones-ordinarias-del-congreso-discurso-de-la-presidenta-de-la-nacion

22)   Noticia periodística publicada en La Nación del 21 de octubre de 2005,
disponible   en   http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-
justicia-no-es-independiente.

23)   Noticia periodística publicada en el diario La Nación con fecha 10 de julio de
2013, disponible en: http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-
quiere-crear-un-tribunal-de-constitucionalidad-para-eludir-a-la-corte.

6

LIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

24)     Noticia periodística publicada en el diario La Nación con fecha 27 de abril de 2013, disponible en: http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte.

25)     Noticia periodística publicada en el diario Clarín con fecha 26 de abril de 2013, disponible          en:          http://www.clarin.com/politica/Zaffaroni-Corte Reforma_judicial_0_908309336.html.

26)     Noticia periodística publicada en el diario El Cronista con fecha 27 de abril de 2013, disponible en: http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html.

27)     Noticia periodística publicada en *iProfesional.com*, con fecha 18 de febrero de 2008.

28)     FALCÓN, ENRIQUE M., *"Tratado de Derecho Procesal Civil, Comercial y de Familia"*, Tomo III, Editorial Rubinzal Culzoni, Santa Fe, 2006 (en parte relevante).

29)     PALACIO, LINO ENRIQUE, *"Derecho Procesal Civil"*, Tomo IV, 4° edición, Editorial Abeledo Perrot, Buenos Aires, 2011 (en parte relevante).

30)     GARCÍA PULLÉS, FERNANDO RAÚL, *"Tratado de lo contencioso administrativo"*, Tomo II, Editorial Hammurabi, Buenos Aires, 2004 (en parte relevante).

31)     DATES, LUIS E., *"Cooperación judicial internacional procesal en materia probatoria"*, publicado en La Ley 2007-D, 1150.


Jurisprudencia

1)     Corte Suprema de Justicia de la Nación, 24 de febrero de 2009, *"Halabi, Ernesto c. PEN Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986"*.

2)     Corte Suprema de Justicia de la Nación, 26 de junio de 2007, *"Defensor del Pueblo de la Nación inc. Dto. 1316/02 c. PEN dtos. 1570/01 y 1606/01 s/Amparo Ley 16.986"*.

7

LIA BRUSA ·
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. Nº 6265

3)      Cámara Nacional de Apelaciones en lo Contencioso Administrativo Federal, Sala II, 17 de abril de 2013, *"Lahitou, Juan Pablo c/ EN - PEN – ENRE y otros s. varios"*.

4)      Cámara Nacional de Apelaciones en lo Comercial, Sala C, 19 de marzo de 2010, *"Damnificados Financieros Asociación Civil para su Defensa c. Banco Río de la Plata S.A. s. Ordinario"*.

5)      Cámara Nacional de Apelaciones en lo Comercial, Sala D, 5 de noviembre de 2009, *"Consumidores Financieros c. Banco Piano S.A."*.

6)      Cámara Nacional de Apelaciones en lo Comercial, Sala A, 2 de septiembre de 2010, *"ADECUA c. Toyota Compañía Financiera S.A. y ot. s. Ordinario"*.

7)      Cámara Nacional de Apelaciones en lo Comercial, Sala A, 16 de noviembre de 2010, *"Damnificados Financieros Asociación Civil para su Defensa c. BBVA Banco Francés SA s. Sumarísimo"*.

8)      Cámara Nacional de Apelaciones en lo Comercial, Sala A, 28 de diciembre de 2012, *"Consumidores Financieros Asociación Civil para su Defensa c. Banco Patagonia S.A s. Ordinario"*.

9)      Cámara Nacional de Apelaciones en lo Comercial, Sala B, 21 de octubre de 2009, *"Damnificados Financieros Asociación Civil para su Defensa c. Citibank N.A. s. Sumarísimo"*.

10)     Corte Suprema de Justicia de la Nación, 27 de febrero de 1996, *"Techint Compañía Técnica Internacional c/ Corrientes, Provincia de s/ ejecución por A 10.932.954"*.

11)     Corte Interamericana de Derechos Humanos, 28 de noviembre de 2002, *"Cantos vs. Argentina"*, Series C, Nro. 97.

12)     Corte Suprema de Justicia de la Nación, 20 de octubre de 1996, *"Estructuras Tafí S.A. c. Provincia de Tucumán"*, JA 1997-I-74.

8

IA BRUSA
A PUBLICA
NGLES
114 CAP. FED.
B.A. N° 6265

13)    Corte Suprema de Justicia de la Nación, 11 de julio de 2006, *"Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos"*, C. 416. XXXIX. ORI.

14)    Corte Suprema de Justicia de la Nación, 18 de junio de 2013, *"Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho) s/ acción de amparo c/ Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. N° 3034/13)"*, R. 369. XLIX.

15)    Corte Suprema de Justicia de la Nación, *"Bourdieu, Pedro Emilio c/ Municipalidad de la Capital"*.

16)    Corte Suprema de Justicia de la Nación, 2 de abril de 1998, *"Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios"*.

17)    Cámara Federal de Apelaciones en lo Civil y Comercial, 10 de febrero de 1995, Sala II, *"R., J. J. c. LR3 Radio Belgrano y otros"*, JA 1997-I-211.

18)    Cámara Federal de Apelaciones en lo Civil y Comercial, 12 de noviembre de 2002, Sala I, *"Domnicz, José y otro v. Camino del Atlántico S.A. "*, DJ 2003-1-944.

19)    Cámara Nacional de Apelaciones en lo Comercial, Sala A, 23 de diciembre de 1998, *"Chiri S.A. y otros c. House of Fuller "*, LL 1998-D-240.

20)    Cámara Nacional de Apelaciones en lo Comercial, Sala B, 16 de marzo de 1995, *"Sistemas Médicos S.A. c. St. Jude Medical"*, LL 1996-B-158.

21)    Cámara Nacional de Apelaciones en lo Civil, Sala I, 24 de Febrero de 2000, *"Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto"*.

IA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

# ANEXO C

A BRUSA
PUBLICA
GLES
114 CAP. FED.
A. N° 6265

Buenos Aires, 25 de abril de 2013.

Sres.
Repsol Capital, S.L.
Reconquista 336 2°
Capital Federal
At. Sr. Matías Grinberg
PRESENTE

De mi consideración,

En mi carácter de apoderado de YPF S.A. (la "Compañía") rechazo en todos sus términos por improcedente su nota fechada el 8 de febrero de 2013.

De conformidad con la Ley 26.741, el ejercicio de la totalidad de los derechos que corresponden a las acciones de la Compañía declaradas de utilidad pública y sujetas a expropiación, corresponde al Poder Ejecutivo Nacional.

En virtud de lo dispuesto en la citada ley, oportunamente la compañía procedió a abonarle al Estado Nacional (Poder Ejecutivo Nacional), los dividendos correspondientes a tales acciones.

Por lo tanto, rechazamos vuestras falsas e improcedentes afirmaciones y, en particular, que la Compañía les adeude dividendo o interés alguno, por cuanto YPF S.A. ha cumplido con el pago de los dividendos aprobados por la Asamblea de Accionistas, en la oportunidad establecida por el Directorio y conforme la legislación vigente aplicable.

Sin otro particular saludo a Ud. con atenta consideración.

YPF S.A.

Leonardo Etchepare
Apoderado

ECILIA BRUSA
ORA PUBLICA
MA INGLES
OLIO 114 CAP. FED.
P.C.B.A. N° 6265

TRADUCCIÓN PÚBLICA-----------------------------------------------------------------

TRANSLATION--------------------------------------------------------------------------

AFFIDAVIT ----------------------------------------------------------------------------

UNITED STATES DISTRICT COURT----------------------------------------------------

SOUTHERN DISTRICT OF NEW YORK-----------------------------------------------

REPSOL YPF, S.A. and TEXAS YALE CAPITAL CORP., Individually and On

Behalf of All Others Similarly Situated,-------------------------------------------------

Plaintiffs,-----------------------------------------------------------------------------------

-against---------------------------------------------------------------------------------------

REPUBLIC OF ARGENTINA,---------------------------------------------------------------

Defendant.-----------------------------------------------------------------------------------

12 Civ. 3877 (TPG) (FM)-----------------------------------------------------------------

**AFFIDAVIT OF GUSTAVO NAVEIRA IN SUPPORT OF PLAINTIFFS'
ARGUMENTS** -----------------------------------------------------------------------------

Pursuant to 28 U.S.C. § 1746, I, Gustavo Naveira, state the following: --------------------

1.      I am an attorney authorized to practice law in Argentina. From 1979 to 1984, I
was a Judge in charge of a First Instance Court in Commercial Matters in the
Autonomous City of Buenos Aires, and from 1984 to 1986 I acted as Judge of the Court
of Appeals in Commercial Matters in the Autonomous City of Buenos Aires. A copy of
my *curriculum vitae* which shows my professional and academic background is
attached hereto as *Exhibit A*. ------------------------------------------------------------------

2.      I have been asked by the legal counsel for the plaintiffs in this action, Repsol S.A.
(formerly known as Repsol YPF S.A.; "Repsol") and Texas Yale Capital Corp. ("Texas
Yale," and together with Repsol, "Plaintiffs") to state my legal opinion on a class action
lawsuit filed by Plaintiffs against the Argentine Republic ("Argentina" or the
"Argentine State") before the United States District Court, Southern District of New
York. ---------------------------------------------------------------------------------------------

3.      I have been asked to state my expert legal opinion with respect to the following
questions: -----------------------------------------------------------------------------------------

**I.      Procedural Questions**-------------------------------------------------------------------

A.      Whether, generally, litigating against the Argentine State before Argentine courts
entails greater delays than suing a private party. -------------------------------------------------

B.      Whether, in the proceedings identified in *Exhibit B*—instituted against Argentina,
YPF S.A. ("YPF") or YPF Gas S.A. ("YPF Gas")—before Argentine federal courts

IA BRUSA
A PUBLICA
NGLES
114 CAP. FED.
3.A. Nº 6265

challenging the seizure of control over YPF and YPF Gas by Argentina based on Argentine Law No. 26,741,[1] Executive Orders Nos. 530/12,[2] 532/12,[3] 557/12[4] and 732/12[5] and acts issued as a consequence of such legal rules, there have been significant delays, which, in some cases, resulted in a denial of justice. -------------------------------

C.   Whether, under the Argentine procedural law applied by federal courts, there are rules similar to Rule 23 of the Federal Rules of Civil Procedure of the United States of America ("Rule 23").------------------------------------------------------------------------

D.   Which is the court tax system that would apply and which are the associated costs related to a lawsuit before Argentine Federal Courts similar to that brought by the Plaintiffs before this United States District Court.-----------------------------------------------

E.   Whether the impartiality and independence of the Argentine Judiciary is being jeopardized by measures adopted or actions taken by other Branches of Argentina's Federal Government. -----------------------------------------------------------------------------

F.   Whether any of the proceedings instituted by the Plaintiffs before Argentine federal courts in connection with Law No. 26,741, Executive Orders Nos. 530/12, 532/12 and 732/12 and acts issued as a consequence of such legal rules, has a similar or the same object as the lawsuit filed before this United States District Court.---------------

G.   Whether the proceeding before the National Appraisals Court (*Tribunal de Tasaciones de la Nación*) (the "NAC") constitute a bar to this litigation or to the launching of the tender offer ["OPA", for its Spanish acronym] as provided by the YPF Bylaws.   -----------------------------------------------------------------------------------

H.   Whether the process known as *Pre Trial Discovery* is provided for under the Argentine procedural law applied by federal courts, and, if so, to what extent, and which the main procedural rules applicable to the document production and the examination of witnesses are. ----------------------------------------------------------------------------------

---

[1] Law No. 26,741, published in the Official Gazette on May 7, 2012, declared the 51% of the shares of YPF and YPF Gas, held by Repsol, subject to expropriation and established the immediate "temporary occupation" of these shares by the Executive Branch. ---------------------------------------------------------
[2] Executive Order No. 530/12 published in the Official Gazette on April 16, 2012, ordered the intervention of YPF for a period of 30 days. "Intervention" in this case meant the replacement of the Board of Directors of YPF by government officers who thereafter exercised all the functions of the Board.
[3] Executive Order No. 532/12 published in the Official Gazette on April 17, 2012, appointed the Secretary of Economic Policy and Development Planification of the Ministry of Economy and Finance, Mr. Kicillof as under-intervenor of YPF. --------------------------------------------------------------------------------
[4] Executive Order No. 557/12 published in the Official Gazette on April 19, 2012, which extended the effects of Executive Order No. 530/12 to YPF Gas.----------------------------------------------------------
[5] Executive Order No. 732/12 published in the Official Gazette on May 16, 2012, which extended for 30 days the intervention of YPF and YPF Gas. -------------------------------------------------------------

IA BRUSA
\ PUBLICA
IGLES
114 CAP. FED.
3.A. Nº 6265

**II.    Contract Questions**------------------------------------------------------------------

A.    Whether the term "acquisition" as used in the YPF Bylaws requires the acquirer to become the legal owner of the shares. Also, whether the temporary occupation provided by Law No. 26,741 triggers the obligation to launch the tender offer.----------------------

B.    Whether under Argentine law more generally the term "acquisition" requires the acquirer to become the owner of the property. -------------------------------------------------

C.    Whether an "acquisition" must be permanent under either the YPF Bylaws or Argentine law. ---------------------------------------------------------------------------------

4.    For the preparation of this expert opinion, I have had access to the documents set forth in *Exhibit B* at several meetings with Repsol's attorneys. Based on the aforementioned documents and my professional knowledge of the legal issues in question, here follows my opinion:----------------------------------------------------------

**I.    PROCEDURAL QUESTIONS** ---------------------------------------------------------

A.    <u>**GENERAL   CONSIDERATIONS   ON   LITIGATION   AGAINST ARGENTINA BEFORE ARGENTINE COURTS**</u> ---------------------------------------

5.    Litigating against Argentina before the Argentine courts entails significantly longer delays than suing a private party. ----------------------------------------------------

6.    In order to bring a lawsuit against the Argentine State, it is necessary to previously exhaust administrative remedies.[6] Exhaustion of administrative remedies takes a significant amount of time since the administrative body seldom renders an express decision within the deadlines established by law (which, in a case such as the present one—claiming damages resulting from a breach of contract—would be from 135 to 180 business days in order to consider that a tacit denial exists)[7] and, thus, claimant must normally wait from six to nine months to be in a position to submit a legally admissible court complaint. ---------------------------------------------------------

7.    Once the lawsuit has been filed, the court may take several months to decide whether the claim is procedurally admissible. Then, once admitted, the claim must be notified to the Attorney General's Office (*Procuración del Tesoro de la Nación*) at least 30 business days before serving the complaint.[8] Once the complaint has been served, the government has 60 business days to answer in accordance with the Argentine Federal

---

[6] Law No. 19,549, Sections 23-32.----------------------------------------------------------------
[7] Law No. 19,549, Sections 31-32.  ----------------------------------------------------------------
[8] Law No. 25,344, Section 8. ----------------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

Code of Civil and Commercial Procedure (the "Code of Procedure").[9] All this means that 12 to 18 months normally elapse before the Argentine State responds to the complaint. ------------------------------------------------------------------------------------------

8.    It is common that a final court judgment by Argentina's Supreme Court of Justice ("CSJN", for its Spanish acronym) in a case instituted against the Argentine State takes more than ten years. ---------------------------------------------------------------------------------

9.    Further delays occur during the enforcement stage, where in theory the Argentine State has two years to comply with money judgments,[10] but in practice it takes much longer.[11] -----------------------------------------------------------------------------------------

**B.    THE DELAY AND DENIAL OF JUSTICE OF ARGENTINE COURTS IN PROCEEDINGS AGAINST ARGENTINA, YPF OR YPF GAS**------------------------

10.    In the course of the meetings held with Repsol's attorneys in Argentina, I had access to documents that evidence the existence of a significant delay on the part of Argentine courts in certain proceedings against Argentina, YPF, or YPF Gas instituted by Repsol, Repsol Butano S.A., directors (or former directors) and minority shareholders of YPF (jointly referred to as "Petitioners") in connection with Law No. 26,741, Executive Orders Nos. 530/12, 532/12, 557/12 and 732/12 (the Law and Executive Orders concerning the expropriation of YPF and YPF Gas) and acts issued as a consequence of such legal rules.-------------------------------------------------------------------

11.    In thirteen court proceedings instituted by Petitioners, the First Instance courts declined jurisdiction fourteen times on their own motions.[12] Similar petitions filed before two courts potentially having jurisdiction (the federal court in contentious administrative matters and the federal court in civil and commercial matters) were rejected by both courts, which attributed jurisdiction to each other.[13] ----------------------

12.    On the basis of jurisdictional issues or inadmissible arguments (*e.g.*, that granting injunctive relief in the face of the challenge to an unconstitutional measure entailed

---

[9] Code of Procedure, Section 338. ----------------------------------------------------------------------------------

[10] This results from the need to include the amount resulting from the judgment in the next budget law as provided by Law No. 23,982, Section 22. -------------------------------------------------------------------------

[11] HUTCHINSON, TOMÁS, "*El proceso de ejecución de sentencias contra el Estado*", Revista Latinoamericana de Derecho, Year I, number 1, January-June 2004, pp. 289-355 (pointing out that once the judgment is rendered a new administrative proceeding must be initiated in order to pursue compliance with the judgment by the Argentine State). --------------------------------------------------------------------

[12] This is the case of the claims identified as (1), (2), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12) and (13) in *Exhibit B*.------------------------------------------------------------------------------------------------

[13] This is the case of the claims identified as (10) and (11) in *Exhibit B*.---------------------------------------

IA BRUSA
A PUBLICA
NGLES
114 CAP. FED.
B.A. Nº 6265

accepting the "presumption of unconstitutionality" of the rule),[14] Argentine courts avoided ruling on Law No. 26,741, and Executive Orders Nos. 530/12, 532/12, 557/12 and 732/12.------------------------------------------------------------------------------------

13.   In three cases, based on the jurisdictional issues raised by the courts themselves (although those issues under the rules in effect at the time did not disqualify them from granting injunctive relief),[15] Argentine courts avoided ruling on petitions until, on several occasions, the passage of time rendered them moot.[16] ------------------------------

14.   Various courts and administrative bodies incurred inexplicable errors and questionable procedural steps, all of which exerted a negative impact on Petitioners, namely: (a) a First Instance Court—once the Court of Appeals had determined that the dispute fell within the First Instance Court's jurisdiction—instead of abiding by such decision and proceeding to hear the case, erroneously forwarded the file to the CSJN (a course of action not supported by any legal rule), which then took over a month to remand the file to the First Instance Court;[17] (b) another First Instance Court ordered that the Attorney General's Office be notified of the existence of the proceedings by means of an official letter (so that the Argentine State could learn of the existence of the proceedings in advance) before ruling on the injunctive relief requested, even though the petition of such relief should have been decided ex parte;[18] (c) another First Instance Court compelled an individual to prove his standing to deliver a letter rogatory, despite the fact that the letter itself evidenced the individual's authorization to do so;[19] and (d) the Ministry of Foreign Affairs of the Argentine Republic forwarded an incomplete file to the relevant Argentine court, which was compelled to request the Ministry to forward the missing portions thereof.[20] -----------------------------------------------------------------

15.   In general, the circumstances listed *supra* have led to undue and unusual delays: in one case, it took over nine months from the filing of the petition to decide the

---

[14] This is the case of the claim identified as (10) in *Exhibit B*.-------------------------------------------
[15] Code of Procedure, Section 196. Although, in principle, judges should abstain from granting injunctive relief when they are not competent to entertain the main action, the injunctive relief granted by an incompetent court is valid if justified under urgency grounds. (*See* COLOMBO, CARLOS J. - KIPER, CLAUDIO M., Código Procesal Civil y Comercial de la Nación, anotado y comentado, Volume II, 2nd edition, La Ley, 2006, p. 491). ------------------------------------------------------------------
[16] This is the case of the claims identified as (1), (2) and (3) in *Exhibit B*.-------------------------------
[17] This is the case of the claim identified as (2) in *Exhibit B*. ------------------------------------------
[18] This is the case of the claim identified as (11) in *Exhibit B*. -----------------------------------------
[19] This is the case of the claim identified as (8) in *Exhibit B*. ------------------------------------------
[20] This is the case of the claim identified as (8) in *Exhibit B*. ------------------------------------------

, BRUSA
'UBLICA
LES
4 CAP. FED.
. N° 6265

jurisdictional issue;[21] in another case, it took over six months from its reception by the Ministry of Foreign Affairs of the Argentine Republic to act on a letter rogatory only for notification purposes.[22]--------------------------------------------------------------------

16.    In sum, according to the documents analyzed, in these proceedings instituted against Argentina, YPF or YPF Gas: (i) Argentine courts raised an unreasonable number of jurisdictional issues; (ii) Argentine courts mostly avoided considering the merits of the questions submitted before them, even within the limited framework of the injunctive relief requested by Petitioners; (iii) in some cases, Argentine courts incurred considerable delays in rendering decisions, which may be deemed a denial of justice; (iv) Argentine courts and administrative bodies incurred an unusual number of inexplicable errors to the detriment of Petitioners; and (v) there were undue delays in the course of the proceedings as a consequence of the procedural errors listed in items (i), (ii), (iii) and (iv).--------------------------------------------------------------------

## C.    THE ABSENCE OF ARGENTINE RULES OF PROCEDURE SIMILAR TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE ----------------

17.    Argentina lacks rules of procedure at the federal level similar to Rule 23. Thus, it is very unlikely that an Argentine court would allow a collective action instituted by shareholders. --------------------------------------------------------------------

18.    The second paragraph of Section 43 of the Argentine Constitution (the "Constitution") provides for a summary action (*acción de amparo*) to challenge any form of discrimination, as well as the violation of environmental rights, antitrust rules, users' and consumers' rights, and collective rights in general. The summary proceeding for the protection of the rights mentioned *supra* (*inter alia*, collective rights) may be instituted by the affected party, the ombudsman or the associations which foster such rights, registered in compliance with the law. However, these new constitutional rules on collective actions would not apply to an action brought by a group of shareholders as such. --------------------------------------------------------------------

19.    At the federal level, Argentina has no rules of procedure —of a general nature— that regulate the collective actions incorporated into the second paragraph of Section 43

---

[21] This is the case of the claim identified as (12) in *Exhibit B*. -----------------------------------------------------
[22] This is the case of the claim identified as (8) in *Exhibit B*. -----------------------------------------------------

LIA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

of the Constitution. Certain rules of procedure have been issued on specific matters only.[23] ------------------------------------------------------------------------------------------------

20.   In the absence of general rules of procedure, Argentine courts have laid down some guidelines on collective actions. The landmark case on the matter is captioned "*Halabi, Ernesto c. PEN -Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986*" ("Halabi")[24], and was issued on February 24, 2009, by the CSJN. The Halabi case involved non-economic rights.[25] With regard to economic rights, the CSJN has stated that, being individual rights, the general rule of legal standing is that these rights are to be exercised by the titleholder and not through collective actions.[26] This general rule would preclude a class or collective action on behalf of a group of shareholders, such as the lawsuit here. ------------------------------------------------------------------------------------------

21.   In Halabi, the CSJN maintained that, with regard to legal standing, there are three categories of rights: (i) individual rights,[27] (ii) collective rights involving public goods,[28] and (iii) collective rights concerning homogeneous individual interests.[29] The CSJN understood that the right involved in Halabi was a collective right concerning a "homogeneous individual interest." --------------------------------------------------------------

22.   In Halabi, the CSJN also established the following requirements relating to "homogenous individual interest" for purposes of whether a case may be brought as a collective action: (i) there must be a single and complex event which harms a relevant plurality of individual rights; (ii) the action must focus on the common effects, and not on the individual aspects, and (iii) the nature or amount of the individual interests involved must not warrant the filing of individual lawsuits. The third requirement has

---

[23] Thus, Law No. 25,675 on Environmental Protection has incorporated certain rules of procedure for collective actions on environmental matters (Sections 30 and 32). Law No. 26,361, which amended Law No. 24,240 on Consumer Protection, incorporated some rules of procedure for collective actions for the protection of the rights of users and consumers (Sections 52, 53, 54 and 55 of Law No. 24,240).------------

[24] CSJN, February 24, 2009, "*Halabi, Ernesto c/P.E.N. -ley 25.873 dto. 1563/04- s/amparo-ley 16.986*", Fallos 332:111. ----------------------------------------------------------

[25] Plaintiff was an attorney who claimed that both Law No. 25,873 and its implementing regulation Executive Order No. 1,563/04, were unconstitutional, as they authorized the intervention of all telephone and network communications as well as the registration of information on users. ------------------------------

[26] CSJN, June 26, 2007, "*Defensor del Pueblo de la Nación inc. Dto. 1316/02 c. PEN dtos. 1570/01 y 1606/01 s/Amparo Ley 16.986*", Fallos 330:2800.--------------------------------------------------------------------

[27] The action is aimed at ensuring the protection of divisible and non-homogeneous rights and is characterized by the request for redress of an essentially individual damage pertaining to each aggrieved party.----------------------------------------------------------------------------------------------------------------

[28] The action is aimed at ensuring the protection of a collective interest (such as the environment) belonging to the community as a whole, the subject-matter of which must be indivisible and universal.

[29] The action is not aimed at ensuring the protection of a collective interest, as it concerns totally divisible individual rights. There is a single or continued event which harms several interests, and thus, homogeneous factual grounds are identifiable. -------------------------------------------------------------------

JA BRUSA
N PUBLICA
GLES
114 CAP. FED.
J.A. N° 6265

been understood by the Federal Court of Appeals in Contentious Administrative Matters as only allowing collective actions when each individual and separate interest is not of sufficient importance to merit an individual action.[30] ------------------------------------------

23.    Although in Halabi, the CSJN urged the Argentine Congress to enact laws on collective actions, no such laws have been enacted thus far, which is why Argentina lacks rules of procedure at the federal level similar to Rule 23. Moreover, the guidelines developed by Argentine courts face two fundamental limitations. First, the Argentine court system is not governed by the principle of *stare decisis* followed in the *Common Law*, and thus, the importance of case law as a source of law is more limited in scope than that in the United States of America.[31] Second, unlike the legal system governing class actions in the United States, Argentina has no rules on class certification or on other key aspects of class actions. -----------------------------------------------------------------

24.    The different panels of the Court of Appeals in Commercial Matters have issued contradictory judgments on the standing to sue in collective actions concerning only economic matters. In fact, whereas some panels acknowledge the standing to sue of consumer associations in issues related to Law No. 24,240 on Consumer Protection (*e.g.* concerning life insurance),[32] others have rejected standing on the grounds that economic matters do not entail homogeneous individual interests.[33] However, there are no precedents regarding a class action on merely economic grounds brought by a single individual instead of jointly with an association, in which the plaintiff's standing to sue has been recognized.[34] Nor are there precedents of a class action involving economic claims of an individual magnitude similar to the one filed here before this United States court. -----------------------------------------------------------------------------------------

---

[30] CNACAF, Panel II, April 17, 2013, "*Lahitou Juan Pablo c/EN-PEN-ENRE y otros s/varios*". ------------
[31] BORDA, GUILLERMO A., Manual de Derecho Civil. Parte General, Editorial Perrot, 1991, p. 60. ---------
[32] Panel C (CNCom, March 19, 2010, "*Damnificados Financieros Asociación Civil para su Defensa c. Banco Río de la Plata S.A. s. Ordinario*") and Panel D (CNCom, November 5, 2009, "*Consumidores Financieros c. Banco Piano S.A.*").-------------------------------------------------------------------------------
[33] Panel A (CNCom, September 2, 2010, "*ADECUA c. Toyota Compañía Financiera S.A. y ot. s. Ordinario*"; November 16, 2010, "*Damnificados Financieros Asociación Civil para su Defensa c. BBVA Banco Francés SA s. Sumarísimo*"; December 28, 2012, "*Consumidores Financieros Asociación Civil para su Defensa c. Banco Patagonia S.A. s. Ordinario*", *inter alia*) and Panel B (CNCom, October 21, 2009, "*Damnificados Financieros Asociación Civil para su Defensa c. Citibank N.A. s. Sumarísimo*").
[34] Rivera has pointed out that the Argentine system of collective actions is still at an initial stage of development and that these actions have not been useful yet to protect the most substantive economic rights of individuals. There is case law which shows that collective actions find limitations when the action seeks to safeguard economic rights and the amounts at stake are significant, adding that it is of utmost importance that Congress passes a law on this issue, taking into account the experience of other countries. *See* RIVERA, JULIO CÉSAR (H), "*La Legitimación de las acciones colectivas*", in "Derecho Procesal Comercial", II, directed by Graziabile, Darío, Ed. Abeledo Perrot, Buenos Aires, 2013, p. 1502.

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

25.    Based on the foregoing, given that this lawsuit involves only economic claims, and that the amounts at stake are large enough to warrant individual actions, it is highly unlikely that Argentine courts would conclude that one or more shareholders of YPF have sufficient standing to file a class action similar to this one brought in the United States. -------------------------------------------------------------------------------------------------

**D.    LITIGATION COSTS** -------------------------------------------------------------------------

26.    In Argentina, court proceedings are subject to prior payment of a fee, known as "court tax" (*tasa de justicia*), to be paid at the outset of the process by the party who institutes a lawsuit. The court tax is established by the Legislative Branch of every jurisdiction (*i.e.*, the Federal Congress or the Legislature of the relevant province, respectively). At the federal level (which, for this purpose, also includes most courts for the Autonomous City of Buenos Aires), the court tax is equal to 3% (three per cent) of the amount claimed.[35] -----------------------------------------------------------------------------------

27.    The CSJN has characterized the court tax as a tax whereby "[t]*he taxable event giving rise to the duty to pay the court tax is the provision of a service by the jurisdictional body in relation to the claim filed, and lies with the person who institutes the relevant proceedings*".[36] ----------------------------------------------------------------------------

28.    Pursuant to the laws governing the organization of the Judiciary, the amounts collected as "court tax" are specific resources owned by the Argentine Judiciary, which are part of its annual investment and expenditure budget.[37] -------------------------------------

29.    The court tax is determined according to the value of the subject-matter of litigation: ----------------------------------------------------------------------------------------------

(i)    In proceedings where the subject-matter of litigation has no monetary value, plaintiff shall pay ARS 70 (Argentine pesos seventy) as court tax.[38] -----------------------

(ii)    Where plaintiff claims payment of a certain amount of money ("determined amount"), for the purpose of calculation of the relevant court tax, the principal, currency depreciation, and the interest accrued claimed as of the institution of the proceedings shall be taken into account.[39] Plaintiff shall pay a court tax equal to 3% of the aggregate amount thereof. -------------------------------------------------------------------------------------

---

[35]   Law No. 23,898, Section 2. --------------------------------------------------------------------------------------------
[36]   CSJN, February 27, 1996, "*Techint Compañía Técnica Internacional c/ Corrientes, Provincia de s/ ejecución por A 10.932.954*", Fallos 319:139. ---------------------------------------------------------------------------
[37]   Law No. 23,853, Section 3 (a). -----------------------------------------------------------------------------------------
[38]   Law No. 23,898, Section 6. ---------------------------------------------------------------------------------------------
[39]   Law No. 23,898, Section 4 (a). ----------------------------------------------------------------------------------------

CILIA BRUSA
RA PUBLICA
A INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

(iii)   Where the amount claimed may not be determined as of the filing of the lawsuit ("indeterminable amount"), plaintiff shall pay ARS 70 (Argentine pesos seventy) as court tax, and the final amount thereof shall be determined later, upon conclusion of the proceedings.[40] --------------------------------------------------------------------------

(iv)   Where plaintiff claims payment of an amount of money which has not but may, in principle, be determined ("determinable amount"), plaintiff shall pay a court tax equal to 3% (three per cent) of the amount estimated as principal and interest. The estimate made by plaintiff may be challenged by the Tax Authority, and is ultimately determined by the court. In the event that the amount estimated by plaintiff be considerably lower than that ultimately determined, the court may impose a fine ranging from 5% to 30% of the difference between both figures.[41]--------------------------------------------------------------

30.   In general, courts follow strict criteria in relation to the payment of the court tax, as well as in the determination of the amount thereof. In particular, courts have adopted a restrictive approach towards claims that a lawsuit has no monetary value or that the value thereof is "indeterminable". This approach has been summarized by legal scholars as follows: *"Case law agrees on one thing: No one shall be exempted from payment of the court tax".*[42] -----------------------------------------------------------------------

31.   In the instant case, if Plaintiffs' action against the Argentine State were brought in Argentina, it is highly probable that the court, either at the request of the Tax Authority or on its own, would take the position that (i) the claim has a monetary value, and (ii) such value may be determined at the outset of the litigation (*i.e.*, is of a "determinable amount") by applying the parameters set forth in Section 7 of the YPF Bylaws. ----------

32.   Because the amounts relating to the tender offer, the launching of which is sought by Plaintiffs, would be for billions of dollars, the court tax would certainly be in excess of one hundred million dollars. ----------------------------------------------------------------

33.   The court tax is triggered by the mere filing of the complaint. Subsequent abandonment of the litigation does not eliminate the liability for the court tax thus triggered. --------------------------------------------------------------------------------

34.   In addition, pursuant to procedural laws applicable at the federal level, the general principle is that the losing party is to bear all the expenses incurred by the other. Only as

[40]   Law No. 23,898, Section 5, second paragraph. ------------------------------------------------
[41]   Law No. 23,898, Section 4 (d). --------------------------------------------------------------
[42]   GORDILLO, AGUSTÍN, *"La implacable tasa de justicia"*, published in La Ley 1995-E. This construction criterion is consistent with the allocation of the amounts collected as court fees, which, as it has already been explained, are specific resources owned by the Argentine Judiciary. ------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

an exception may the court depart from this principle where the circumstances of the case so warrant, stating its reasons, under penalty of annulment.[43] --------------------------

35.   Litigation costs include, in addition to the court tax, all expenses incurred in the course of the proceedings, as well as all expenses incurred in order to prevent it, other than those deemed useless or superfluous.[44] In particular, litigation costs include: (i) the fees of the legal counsel for the prevailing party, and (ii) the fees of experts. -------------

36.   Here, fees could be hundreds of millions of dollars. Fees are established by the court pursuant to the relevant regulations, which set fees as a percentage of the amount claimed, rather than on a time basis.[45] The statutory fees of the legal counsel for the prevailing party –including the fees pertaining to the lawyer and the attorney– must range from 14% to 28% of the amount of the claim for first instance.[46] This amount should be added to the fees arising from their work before the Court of Appeals and the CSJN, which may range for each instance from 25% to 35% of the fees established for the first instance.[47] Costs would increase in the event that the case were heard by one of the recently created Federal Courts of Cassation.[48] The same percentages set for the regulation of fees for work before Courts of Appeals would be applicable to this possible stage. Fees of experts are also calculated as a percentage —albeit lower than for counsel— on the amount involved. Consequently, the professional fees of counsel and experts, in the aggregate, could amount to hundreds of millions of dollars.[49] --------

37.   A court can award professional fees below statutory percentages only as an exception.[50] In any event, with respect to Plaintiffs' claims, assuming the court calculated their value according to Section 7 of the YPF Bylaws, even if the court departed from the statutory amounts, the fees would still be many millions of dollars.---

38.   Based on the foregoing, legal scholars have asserted that litigation costs in Argentina operate as a barrier to access to justice, since they work as a disincentive to

---

[43]   Code of Procedure, Section 68. -------------------------------------------------------------------------------------

[44]   Code of Procedure, Section 77. -------------------------------------------------------------------------------------

[45]   Law No. 21,839 and rules supplementary thereto. ------------------------------------------------------------

[46]   Sections 7 and 9 of Law No. 21,839. The total fees established on account of performance before the Court of First Instance (including those pertaining to the lawyer, the attorney, and court-appointed experts) may not exceed, in the aggregate, 25% of the amount of the judgment (Argentine Civil Code, Section 505).-----------------------------------------------------------------------------------------------------------

[47]   Law No. 21,839, Section 14. ----------------------------------------------------------------------------------------

[48]   For a reference to the law on creation of such courts, see *infra*.-----------------------------------------------

[49]   *See*, for example, Decree-Law No. 16,638/1957, which regulates accountant experts' fees.---------------

[50]   Law No. 24,432, Section 13. ----------------------------------------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

the filing of lawsuits against the Argentine State.[51] However, the Argentine State has not acknowledged these reasons, which may lead to an actual denial of justice. Indeed, Argentina has been held liable by the Inter-American Court of Human Rights for the extremely high litigation costs imposed on an individual, whose lawsuit against the State has been rejected.[52] --------------------------------------------------------------------

39.   Procedural legislation at the federal level provides that parties showing that they lack resources may file a "motion for leave to litigate *in forma pauperis*". This benefit entails an exemption—total or partial—from payment of the court tax and such other litigation costs as may apply. However, in principle, the motion for leave to litigate *in forma pauperis* may not be granted to corporations. In such regard, the CSJN has maintained in cases of this kind that "*the admission thereof is to be subject to a careful and thorough analysis*".[53]-----------------------------------------------------------------------

40.   Along these lines, the CSJN has also held that it may be assumed that companies claiming extremely high amounts may apply to a loan in order to pay for the court tax. Therefore, in such cases, the motion for leave to litigate *in forma pauperis* may not be granted.[54] -----------------------------------------------------------------------------------

41.   In the case under analysis, it is clear that Repsol is a solvent company. In addition, in the lawsuit it may institute against the Argentine State, as explained above, the court might consider the claim to be worth billions of dollars. Under such circumstances, the motion for leave to litigate *in forma pauperis* could not be admitted. -----------------------

42.   Thus, it is likely that Plaintiffs would have to pay an amount in excess of one hundred million dollars in court fees to bring this case in Argentina, and could face more than one hundred million dollars in attorneys' fees awards were they to lose. ------

**E.   CURTAILMENT OF THE JUDICIAL INDEPENDENCE** -----------------------

43.   The Congress has recently passed a number of laws implementing reforms on important aspects of the organization and functioning of federal courts. -------------------

---

[51] MAIRAL, HÉCTOR A., "*El silencio de los tribunales argentinos*", Res Pública Argentina, Issue 2007-3, p. 7. An English translation of this article titled "The Silence of Argentine Courts" may be found at http://www.iilj.org/gal/documents/HectorMairal.ThesilenceoftheArgentinecourts.pdf. -----------------------
[52] Inter-American Court of Human Rights, "*Cantos vs. Argentina*", Judgment of November 28, 2002, Series C No. 97. -------------------------------------------------------------------------------------------------
[53] CSJN, October 20, 1996, "*Estructuras Tafí S.A. c. Provincia de Tucumán*", JA 1997-I-74. -------------
[54] CSJN, July 11, 2006, "*Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos*", Fallos 329:2719.---------------------------------------------------------------------------------------------

CILIA BRUSA
)RA PUBLICA
A INGLES
.IO 114 CAP. FED.
C.B.A. N° 6265

44. Among these laws, the most important are the following: (i) Law No. 26,853, on the creation of new Federal Courts of Cassation;[55] (ii) Law No. 26,854, setting forth the new regime of injunctive relief in proceedings to which the Argentine State or its decentralized agencies are a party; and (iii) Law No. 26,855, introducing important amendments to the composition and functioning of the Council of Magistracy.[56] ---------

45. These laws were pushed forward with great emphasis by the Executive Branch and approved by the Congress in a swift procedure, and are framed within the context of the so-called "Democratization of Justice".[57] The most salient features of these reforms are the following: ----------------------------------------------------------------------------------

(i)     Federal Courts of Cassation. The creation of these courts, as an intermediate instance between the Courts of Appeal and the CSJN, has been subject to serious criticism.[58] It has been held that "*besides the alleged official purposes, the creation of these new Courts of Cassation is actually aimed at three undeniable targets: (a) delaying as much as possible lawsuits against the State; (b) centralizing in three Courts of Cassation sited in the Federal Capital City the review of all decisions issued by the federal chambers of the country, and (c) appointing biased++++++++++++ judges (i.e.,* in favor of the Government) *by means of an "abbreviated procedure'*.[59]-------------

(ii)    Injunctive Reliefs. The new regime on injunctive reliefs has also been criticized, since it imposes a more restrictive approach in relation to injunctive reliefs requested by private parties against the State, limiting the court's power and restricting their margin of discretion in this matter.[60] ------------------------------------------------------------------------

---

[55] Law No. 26,853 provided for the creation of: (i) the Federal Court of Cassation in Contentious Administrative Matters; (ii) the Federal and National Court of Cassation in Labor and Social Security Matters, and (iii) the Federal and National Court of Cassation in Civil and Commercial Matters.------------
[56] Pursuant to Section 114 of the Constitution, the Council of Magistracy shall be in charge of the selection of the judges and the management of the Judiciary.--------------------------------------------------------

[57] In her speech of March 1, 2013, at the opening of the Congress' ordinary sessions, the Argentine President announced the submission of these bills for the alleged purpose of *"carrying out a deep democratization"* of the Judiciary.-------------------------------------------------------------------------------

[58] OTEIZA, EDUARDO, *"El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854"*, La Ley Special Supplement, May 2013 (pointing out that the Federal Courts of Cassation imply that the judicial proceedings will take longer and enhance the vulnerability of fundamental rights). -----------------------------------------------------------------------------------------------

[59] BIANCHI, ALBERTO B., *"Crónica de una inconstitucionalidad manifiesta"*, La Ley, June 26, 2013.

[60] GIL DOMÍNGUEZ, ANDRÉS, *"La inconstitucionalidad e inconvencionalidad del régimen de medidas cautelares dictadas en los procesos en los que el Estado es parte (Ley 26.854)"*, La Ley, Special Supplement, May 2013 (pointing out that several Sections of Law No. 26,854 infringe the right to effective judicial remedy and the right to summary proceedings. Also, it is argued that the law gives rise to a situation of inequality between the State and private parties); OTEIZA, EDUARDO, *"El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854"*, La Ley, Special Supplement, May 2013 (indicating that validity periods of the injunction reliefs which is of six

13/40

IA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. N° 6265

(iii)   Council of Magistracy. The reforms to this body have been widely questioned, in the understanding that they are aimed at "*politicizing*" the Council of Magistracy, thus affecting judges' independence.[61] Pursuant to the amendments introduced, the majority of the Council's members would be elected by means of elections in which they should run as political parties' candidates. In addition, majorities required for the Council to decide the opening of the proceedings for the removal of federal judges would be reduced. Under this reform, the Council may, by simple majority (which, in turn, will depend on the majority party), suspend any federal judge.[62] ---------------------------------

46.   The so-called "Democratization of Justice" was harshly criticized by many of the most representative entities, which pronounced themselves against these measures.[63] ---

47.   Regarding these reforms the Latin American Federation of Judges held: "*[T]he changes proposed imply a serious danger for the existence of the Argentine Republic itself. The Argentine citizens being the ones harmed since the submitted bills materially alter the operation of the Judiciary and in no way do they deal with a reform that broadens the possibility of exercising rights; on the contrary, they curtail the independence of the Judicial Power [...]. The partidization of the Council of the Magistracy, the body in charge of the selection and control of the performance of judges, is fostered*".[64] --------------------------------------------------------------------------

48.   Accordingly, the Peace and Justice Committee of the Argentine Episcopal Conference reflected as follows: "*The actual or threatened use of state power to influence judges in favor of the interests of the Government should be utterly rejected and may never be justified on the basis of alleged or actual pressures, apparently symmetrical, exerted by private parties [...] The popular election of the members of the Council of Magistracy is a mechanism which seems to be inconsistent with*

months for ordinary procedures and three months for summary procedures are unconstitutional and violate Sections 8 and 25 of the American Convention on Human Rights). ------------------------------------
[61] GELLI, MARÍA ANGÉLICA, "*Las inconstitucionalidades de la ley del Consejo de la Magistratura*", La Ley, June 26, 2013 (stating that the reform affects judicial independence and impartiality as well as the judicial guarantees of the Argentine citizens); OYAHANARTE, MARTÍN, "*Reforma a la Justicia: la integración del Consejo de la Magistratura por académicos ajenos al ámbito jurídico es inconstitucional*", MJ –DOC.6229-AR, April 10, 2013 (claiming that the reform violates Section 114 of the Constitution). ------------------------------------------------------------------------------------------------------
[62] Section 7 (15) of Law No. 24,937, as amended by Section 6 of Law No. 26,855.----------------------------
[63] Among them: the National Association of Magistrates and Officials of the Federal Judiciary, the Argentine Federation of the Magistracy and Judicial Office, the Female Judges Argentine Association, the Law School of Buenos Aires University, the Argentine Procedural Law Association, the Argentine Constitutional Law Association, the Democratic Justice Civil Association, National Academy of Buenos Aires of Law and Social Sciences.------------------------------------------------------------------------------------
[64] Statement by the Latin American Federation of Judges, dated April 18, 2013. ------------------------------

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
.C.B.A. N° 6265

*constitutional rules, and which, in any case, will turn a technical and rigorous body into a scenario of struggles among political parties. The politicization of judges is inadmissible and jeopardizes the neutrality expected therefrom [...] The creation of new judicial instances (Courts of Cassation) announced [...] entails more delays in the settlement of disputes in the context of proceedings which are already too slow. Therefore, it is reasonable to suspect that the purpose is not to speed up proceedings, but to create courts higher than those existing, comprising judges customized by present majorities, which may modify case law in a sense favorable to the political authority".[65]*

49.   In addition, the United Nations Special Rapporteur on the Independence of Judges and Lawyers, Gabriela Knaul, held: *"[I] call Argentina to set clear procedures and objective criteria for the removal and sanction of judges, and that judges be granted an effective remedy to challenge such decisions, so as to safeguard judicial independence".[66]* ----------------------------------------------------------------------------

50.   A few weeks ago, the CSJN held several provisions of Law No. 26,855 on the Council of Magistracy unconstitutional by considering them in violation of Section 114 of the Constitution.[67] Such decision led to the announcement of new initiatives concerning a reform of the Judiciary, such as the proposals of depriving the CSJN of its power to manage the Judiciary,[68] creating a new court with exclusive jurisdiction to rule on the constitutionality of laws[69] and increasing the number of members of the CSJN.[70]

51.   These recent developments have worsened a crisis of independence of the Judiciary which had certainly existed long before. --------------------------------------------

---

[65] Statement dated March 6, 2013, published in El Derecho, April 17, 2013, p. 22. ----------------------------
[66]         Statement         dated         April         30,         2013,         published         at http://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=13275&LangID=S. ------------
[67] CSJN, June 18, 2013, *"Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho s/ acción de amparo c/ Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. N° 3034/13)"*, R. 369. XLIX.
[68] Draft bill submitted to Congress by Representative Carlos Kunkel and others on June 26, 2013, file No. 4935-D-2013.----------------------------------------------------------------------------------
[69] News article published in "La Nación", on July 10, 2013, available at: ---------------------------------------
http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-quiere-crear-un-tribunal-de-constitucionalidad-para-eludir-a-la-corte. -----------------------------------------------------------------
[70] News article by Adrián Ventura, published in "La Nación" on April 27, 2013, available at http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte; news article published in "Clarín" on April 26, 2013, available at http://www.clarin.com/politica/Zaffaroni-Corte-Reforma_judicial_0_908309336.html; news article published in "El Cronista" on April 27, 2013, available at http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html. ------------------------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

52.    In 2005, a survey conducted among Argentine attorneys revealed that almost 90% of the respondents believed that Argentine courts are not independent from political power.[71]-----------------------------------------------------------------------------------------

53.    In 2008, the current Chief Justice of the CSJN held that *"there are practices affecting judicial independence"* and that *"there is no judge in the country assigned to major cases who has not been the subject of a formal charge against him"*.[72] -------------

54.    Therefore, the independence of Argentine courts was jeopardized even before the enactment of the reforms included in the so-called "Democratization of the Judiciary". These reforms, along with others that may be applied in the near future, make this scenario even worse. -------------------------------------------------------------------------

55.    In this case, given the high level of exposure of the issue and the strong interest of the Argentine State in obtaining a favorable decision, it is reasonable to assume that in the context of a trial the judges who would have to rule on the Argentine State's obligation to launch the tender offer would face considerable pressure to rule in favor of Argentina. In this scenario, the fate of Plaintiffs' claims could well be conditioned by non-legal factors.----------------------------------------------------------------------------

**F.    THE SCOPE OF THE COMPLAINTS FILED BY REPSOL IN ARGENTINA** --------------------------------------------------------------------------

56.    I have had access to copies of the complaints filed by Repsol in Argentina against the Argentine State and YPF. ---------------------------------------------------------------

57.    Repsol has not filed any complaint before Argentine courts seeking that the Argentine State be ordered to launch the tender offer, or seeking compensation for failure to launch the tender offer. ----------------------------------------------------------

58.    In proceedings instituted before Argentine courts, Repsol has only noted the failure by the Argentine State to launch the tender offer, without requesting that it be compelled to do so or seeking damages for that failure. It did so in the proceedings instituted to challenge the decisions adopted—with the participation and vote of the Argentine State exercising rights arising from the stock owned by Repsol subject to expropriation—at YPF shareholder' meetings held on (i) June 4, 2012, (ii) July 17, 2012, and (iii) September 13, 2012. ---------------------------------------------------

---

[71] News article published in "La Nación" newspaper on October 21, 2005, and available at http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-justicia-no-es-independiente.---------
[72] News article published in *iProfesional.com*, Legal Section, on February 18, 2008.-------------------------

JA BRUSA
A PUBLICA
NGLES
114 CAP. FED.
A. N° 6265

59.   In those challenges, Repsol seeks the annulment of any decisions taken at said meetings on the grounds that the Argentine State (i) did not have a legitimate title to exercise rights on shares owned by Repsol which are subject to "temporary occupation," and (ii) violated Section 7 (h) of the YPF Bylaws whereby, for as long as the tender offer is not carried out, the Argentine State may not exercise the rights in connection with YPF's shares subject to expropriation.[73] In these court actions, Repsol did not request the launching of the tender offer, nor did it require the payment of any compensation to YPF's shareholders who would have received the tender offer had Argentina complied with its obligations set forth in the YPF Bylaws.------------------------

## G.   IRRELEVANCE TO THIS LITIGATION OF THE PROCEEDING BEFORE THE NATIONAL APPRAISALS COURT -------------------------------------

60.   Pursuant to the General Expropriation Law No. 21,499 and Law No. 26,741, the value of the shares of YPF subject to expropriation shall be determined initially by the NAC. -------------------------------------------------------------------------------------------

61.   Despite its name, the NAC is an administrative agency that belongs to the Argentine Executive Power that initially fixes, without the intervention of the expropriated party, the value of the asset subject to expropriation that Argentina must deposit with the competent judicial court in order to take possession of the asset subject to expropriation. If the owner of the asset subject to expropriation considers such price insufficient, it may request that the judicial court fix it. ----------------------------------------

62.   In the instant case, the value set by the NAC could apply—if at all—only to the shares subject to expropriation, but not to the remaining shares of YPF, which are the ones involved in the present litigation. -------------------------------------------------------------

63.   Contrary to Dr. Arecha's argument, the determination that the NAC could reach would have no relevance to this litigation. The value of the non-expropriated shares involved in this case is to be determined in accordance with the rules of Section 7 of the YPF Bylaws. This determination will not be affected by whichever value is ultimately set by the NAC or by the Argentine courts for the shares subject to expropriation. ------

---

[73] Section 7 (h) of the YPF Bylaws provides that, where a person acquires control over YPF absent compliance with the requirement to launch a tender offer, "*[t]he shares and securities acquired in violation of the provisions [...] shall give no right to vote or to collect dividends or to other form of distribution as may be made by the Company and shall not be computed when determining the quorum present at any each of the meetings of shareholders of the Company.*" This provision is specifically applicable to the Argentine State, as set forth by Section 28 of the YPF Bylaws.-----------------------------

IA BRUSA
PUBLICA
GLES
114 CAP. FED.
A. N° 6265

64.   Therefore, the proceeding before the NAC does not constitute a bar either to the admissibility of this complaint or to the launching of the tender offer as provided in the YPF Bylaws.------------------------------------------------------------------------------------------

65.   Similarly, Dr. Arecha's assertion whereby the "purposes" of Laws Nos. 21,499 and 26,741 are inconsistent with the tender offer regime set forth in the YPF Bylaws is merely dogmatic. Throughout the Sections of Law No. 26,741, I find no evidence whatsoever of any purpose to repeal rules contained in YPF's Bylaws which regulate specific cases of acquisition and/or change of control of the company. This shows that the tender offer requirement has remained unaltered.  Dr. Arecha's argument fails to consider the violation of the owners of the shares not subject to expropriation, which as property rights are also protected by the Constitution.[74] Within such framework, nothing prevents the Argentine State from following the procedure provided for in Sections 7 and 28 of the YPF Bylaws. YPF's minority shareholders have a vested right to have a tender offer launched for the acquisition of their shares in accordance with the YPF Bylaws. --------------------------------------------------------------------------------------------

## H.   PRE TRIAL DISCOVERY IS A LEGAL PROCEDURE ALIEN TO ARGENTINE LAW – PROCEDURAL RULES APPLICABLE TO THE PRODUCTION OF EVIDENCE--------------------------------------------------------------------

66.   The Code of Procedure, which is the procedural law applicable in the federal courts of Argentina, does not provide for the so-called *Pre Trial Discovery*. Case-law[75] and legal scholarly writings[76] assert that this process is alien to Argentine law. -----------

67.   The Code of Procedure states that evidence must be offered by plaintiff in the complaint and by defendant in the answer.[77] -----------------------------------------------------

68.   Among other means of evidence under the Code of Procedure, the court may order one party to produce documents identified by the other party and/or the examination of witnesses.[78] This order is issued by the judge at the evidence stage. Only

---

[74] Constitution, Section 17. *See also* CSJN, "*Bourdieu, Pedro Emilio c/ Municipalidad de la Capital*", Fallos: 145:307 (1925).------------------------------------------------------------------------------
[75] CSJN, "*Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios*", Fallos 321:667 (pointing that the Argentine system does not have a legal proceeding similar to the U.S. discovery period); Federal Court of Appeals in Civil and Commercial Matters, Panel II, "*R., J. J. c. LR3 Radio Belgrano y otros*", February 10, 1995, JA 1997-I-211 (indicating that Argentine law does not apply the U.S. discovery period).-------------------------------------------------------------------------
[76] FEUILLADE, MILTON C., "*La prueba en el proceso con elementos extranjeros*", JA 2008-IV-1516.
[77] Code of Procedure, Section 333. ------------------------------------------------------------------------
[78] Code of Procedure, Section 388.  ----------------------------------------------------------------------

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
.C.B.A. N° 6265

exceptionally, the court may order the production of evidence at an earlier phase of the proceedings.----------------------------------------------------------------------------------------

1. <u>Document production</u> -----------------------------------------------------------------------

69.     The Argentine procedural system for document production is restrictive compared to the U.S. system as described to me. Documents that may be required to be produced by the other party must be individually identified by the requesting party. The requesting party cannot request to the counter-party the production of categories or classes of documents.[79] Moreover, compliance with the order is not an obligation but a mere burden upon the party being required to produce. Accordingly, failure to submit the requested documentation creates a mere presumption against that party only if, based on other facts, there is a strong likelihood about the existence and contents of such documentation.[80]-----------------------------------------------------------------------------

70.     Court proceedings are normally instituted through the submission of the complaint. However, exceptionally, plaintiff may commence the court proceedings by requesting the production of some evidence in advance, *i.e.* prior to the submission of the complaint.[81] --------------------------------------------------------------------------------------

71.     The request for advance production of evidence shall only be granted if there are reasonable grounds to believe that the production of evidence would be impossible or very difficult during the evidence stage. This procedure is exceptional in nature[82] and is not intended to prepare evidence for the complaint, but rather attempts to preserve specific evidence that could be impossible or very difficult to produce at the appropriate

---

[79] In this regard, legal scholars have stated that: *"The petition for document production shall be accurate as regards both material identification of the document and the consequences of non-submission, expressly set forth by law"* (CARAMELO DÍAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA I. HIGHTON – BEATRIZ A. AREÁN (Directors), Volume 7, Hammurabi, Buenos Aires, 2007, p. 648). ---------------------
[80] In this regard, legal scholars have stated that: *"Since it is a burden, disregarding the demand or refusing to submit the documentation merely exposes the relevant party to the potential risk of triggering a presumption against it, but does not authorize taking action to force submission or applying penalties"* (CARAMELO DÍAZ, GUSTAVO, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, ELENA I. HIGHTON – BEATRIZ A. AREÁN (Directors), Volume 7, Hammurabi, Buenos Aires, 2007, p. 648).-------------------------------------------------
[81] Code of Procedure, Section 326. --------------------------------------------------------------------------
[82] *"Evidence assurance under Section 326 of the Argentine Code of Civil and Commercial Procedure is an exceptional procedure which should only be granted where the filing person is likely to lose evidence or find it impossible or very difficult to produce it at a later stage, which requires thoroughly explaining why such exception should be granted and evidencing the supporting grounds"* (Federal Court of Appeals in Civil and Commercial Matters, Panel I, *"Domnicz, José y otro v. Camino del Atlántico S.A."*, November 12, 2002, DJ 2003-1-944). --------------------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

procedural stage.[83] Documentary evidence that may be produced at this early stage includes the exhibition, safekeeping or seizure of duly identified documents for conservation purposes. Only particular, specifically-identified documents may be requested, not categories or classes of documents. ------------------------------------------------

72. Furthermore, before filing the complaint, the plaintiff may request the performance of preliminary procedures.[84] These procedures are also exceptional in nature[85] and are aimed at gathering information or documentation, provided that said information or documentation cannot be obtained by other means. The examples provided by the Code of Procedure and by case law also refer only to specific and previously-identified documents.[86] ------------------------------------------------

2. Examination of witnesses and parties' oral statements (*absolución de posiciones*)-----

73.    Pursuant to the Code of Procedure,[87] witness examination is subject to specific rules and follows court practice. Under these rules and practices, witnesses in Argentine federal court proceedings are not questioned (either in direct or cross examination) by the parties' counsel. Instead, the party which proposes the witness submits its questions in writing to the court before the hearing.[88]  Normally a court clerk, not the judge (who generally is not present at the hearing) then poses those questions –verbatim or amended as the clerk sees fit– to the witness. Once the witness has answered the first set of questions, opposing counsel may propose its own questions (orally) for the court to be made to the witness. The court may decide whether or not to ask those questions – verbatim or as amended.[89] -------------------------------------------------------

---

[83] CNCom, Panel A, "*Chiri S.A. y otros c. House of Fuller*", December 23, 1998, LL 1998-D-240. The early production of evidence requires previously summoning the other party. If this is not possible and there are reasonable grounds of urgency to do so, this summons could be replaced with the intervention of the Defender of Absent Parties (ELENA I. HIGHTON – BEATRIZ A. AREÁN, Código Procesal Civil y Comercial de la Nación. Concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial, Volume 6, Hammurabi, Buenos Aires, 2006, p. 131). --------------------------------------------------------
[84] Code of Procedure, Section 323. -------------------------------------------------------------------
[85] CNCom, Panel B, "*Sistemas Médicos S.A. c. St. Jude Medical*", March 16, 1995, LL 1996-B-158.
[86] For instance, a will shall be shown whenever the petitioner believes he is the heir, co-heir or legatee, if he cannot obtain it by means of a judicial measure; in case of disturbance (*evicción*) the seller or the buyer must exhibit the titles or another instrument referring to the property sold. *See* Code of Procedure, Section 323. --------------------------------------------------------------------------------------------
[87] Code of Procedure, Sections 439-447.-------------------------------------------------------------------
[88] Code of Procedure, Section 429.-----------------------------------------------------------------------
[89] Code of Procedure, Section 442. -----------------------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

74.     Government officers, even those of a middle rank such as undersecretaries,[90] do not have to appear personally before the court and testify orally, but submit a written statement based on the questions delivered in writing.------------------------------------------

75.     The only witness evidence that may be produced prior to submitting the complaint includes those witnesses who are very elderly, seriously ill or about to leave the country.[91] ------------------------------------------------------------------------------------

76.     A party to a court proceeding cannot be deposed as a witness in such proceeding. A party may call the other party as such (*i.e.*, as a party but not as a witness), to provide oral statements before the court on the matters in dispute (*absolución de posiciones*).[92] In the case of legal entities –such as the Argentine State– usually its legal representative, or someone appointed by her, declares on behalf of the entity. This means of evidence may only be requested once the complaint has been already filed. ---

77.     While being deposed in this manner (*i.e.*, as a party and not as a witness), a party does not commit perjury if he or she does not tell the truth, whether it be a criminal or a civil case.[93] ------------------------------------------------------------------------------------

78.     In litigation against the Argentine State, the officer legally empowered to provide these statements on behalf of the State is not required to appear before the court and delivers a written statement.[94] Executive Order No. 1102/86 delegated to the Government counsel the power to deliver these written statements.[95] According to a former Deputy Attorney General, this often means that these statements are delivered by the same counsel that has prepared the answer to the complaint and, in practice, grants an opportunity to the Argentine State to amend or elaborate further on the answer to the complaint.[96] ---------------------------------------------------------------------

79.     The above rules are mandatory in any federal court proceeding related to litigation instituted in Argentina. ---------------------------------------------------------------------

---

[90] Code of Procedure, Section 455; CSJN procedural rule dated December 20, 1967.--------------------------

[91] Code of Procedure, Section 326 (1). ----------------------------------------------------------------------------

[92] Code of Procedure, Sections 404-425.------------------------------------------------------------------------

[93] FALCÓN, ENRIQUE M., Tratado de Derecho Procesal Civil, Comercial y de Familia, III, Rubinzal Culzoni, Buenos Aires, 2006, p. 125 (explaining that under Argentine law, the party "may lie freely" when delivering oral statements even under oath, without any criminal liability); Palacio, Lino Enrique, Derecho Procesal Civil, IV, 4th edition, Abeledo Perrot, Buenos Aires, 2011, p. 442 (stating that Argentine law does not provide for specific sanction against perjury by the parties). ------------------------

[94] Code of Procedure, Section 407. ---------------------------------------------------------------------------

[95] The Attorney General for the Argentine Treasury, the Deputy Attorney General for the Argentine Treasury, and the Legal Directors of the Public Administration.---------------------------------------------

[96] GARCÍA PULLÉS, FERNANDO RAÚL, Tratado de lo contencioso administrativo, II, Hammurabi, Buenos Aires, 2004, p. 661. -----------------------------------------------------------------------------------------------

21/40

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
:.B.A. N° 6265

80.   In connection with the production of evidence before Argentine federal courts ordered in court proceedings conducted abroad, Argentina and the United States are parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[97] and the Inter-American Convention on Letters Rogatory.[98] These Conventions provide that, in principle, the court which executes a letter rogatory shall apply its own law as to the methods and procedures to be followed. However, upon request of the authority that has issued the letter rogatory, a special method or procedure may be followed, if this is not incompatible with the domestic law of the State of execution.[99] Argentine courts have complied with a request by a U.S. court to produce witness evidence under terms established in the letter rogatory.[100] -------------------------

81.   Based on the foregoing, the taking of evidence in Argentina pursuant to a letter rogatory issued by a United States court could follow the rules on witness examination specified in such letter rogatory. ------------------------------------------------------------------

82.   To sum up, in any domestic litigation before Argentine federal courts, the production of documents held by the other party or the examination of witnesses will only be allowed within the limited scope provided by the Code of Procedure. In contrast, pursuant to the Hague Convention and the Inter-American Convention on Letters Rogatory, the production of evidence in Argentina in connection with foreign litigation could, at least to some extent, follow the rules of the court where such litigation is being conducted. ------------------------------------------------------------------

**II. CONTRACT QUESTIONS** ------------------------------------------------------------------

**A.   THE OBLIGATION TO LAUNCH A TENDER OFFER UNDER YPF'S BYLAWS AND THE MEANING OF "ACQUISITION" AS USED IN SAID BYLAWS** ------------------------------------------------------------------

83.   The Argentine State acquired control over YPF in mid-2012. Since then, the Argentine State has been exercising voting and economic rights (*e.g.*, collection of dividends)[101] in a public and evident manner with respect to the majority of YPF shares.

---

[97] *See* Law No. 23,480. ------------------------------------------------------------------
[98] *See* Law No. 23,503. ------------------------------------------------------------------
[99] DATES, LUIS E.,"Cooperación judicial internacional procesal en materia probatoria", La Ley 2007-D, 1150; FEUILLADE, MILTON C.,"La prueba en el proceso con elementos extranjeros", La Ley 2009-A, 1197.------------------------------------------------------------------
[100] CNCiv, Panel I, February 24, 2000, *"Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto"*. ------------------------------------------------------------------
[101] The Argentine State has collected dividends pertaining to the "shares subject to expropriation" as evidenced by YPF Letter dated April 25, 2013, which I have had before me and attach hereto as *Exhibit*

CILIA BRUSA
IRA PUBLICA
I INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

84.    Since Repsol has lost the capacity to "form the corporate will" (*i.e.*, to vote the majority of the shares) at regular shareholders' meetings and to appoint or revoke the appointment of a majority of directors or members of the supervisory committee, and because such rights are currently exercised by the Argentine State since the enactment of Law No. 26,741, it is clear that there was an acquisition of control in YPF.[102] ---------

85.    Under the language of the YPF Bylaws, the obligation to launch a tender offer is triggered by obtaining control, without the transfer of property of the shares being necessary. -------------------------------------------------------------------------------------

86.    Section 28 of the YPF Bylaws, relating to "Provisions applicable to acquisitions by the National Government," provides that: "...*(A) The provisions of subsections e) and f) of Section 7 (with the sole exception of the provisions of paragraph B of the said Section) shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of the Corporation, (1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of the Corporation, which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or (2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock provided for in subsection (a) of section 6 of these By−laws upon registration thereof with the Public Registry of Commerce. Should class A shares represent a lower percentage than the one previously mentioned, the provisions set forth in point (2) of this Section shall not be applicable. Instead, the general criteria set forth in subsection (d) of Section 7 shall apply.*"-----------------------

87.    Section 7(i) then defines what an "indirect" acquisition is, and establishes that an indirect acquisition *may* occur through "*holdings of shares through trusts, depository*

_C_, according to which "exercise of all rights" pertaining to the shares subject to expropriation belong to the Argentine State. As per such text, it must be concluded that the nature of such collection has been final, on account of the Argentine State, and not on account of Repsol.-------------------------------------------
[102] Companies Law, also applicable to YPF, establishes that the existence of control depends on gathering enough votes to form the corporate will at regular shareholders' meetings or exerting dominant influence as a result of the shares or existing special relations. *See* Law No. 19,550, Section 33. Executive Order No. 677/01, in force at the relevant time, and the new Capital Markets Law, which replaced it, applicable to corporations under the public offering system, like YPF, provide the following definition of "Controlling Entity," "controlling group," or "group of control": "*A natural person or legal entity holding, whether directly or indirectly, individually or collectively, as the case may be, a participation under any title in the capital stock or securities with voting rights conferring such holder, legally or de facto, and if de facto on a stable basis, the right to cast the number of votes required to form corporate will at regular shareholders' meetings or to appoint or revoke the appointment of a majority of directors or members of the supervisory committee*" (Law No. 26,831, Section 2).-------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

*receipts ("ADR") or through other similar mechanisms"*. None of these mechanisms require a formal transfer of title to the shares as a condition to trigger the obligation to launch the tender offer for the stock acquisition referred to in Section 7. Likewise, Section 28 expressly provides that an "acquisition" may occur *"directly or indirectly, by any means or instrument"* and thus does not require transfer of title.------------------------

88.    Moreover, the text of Section 28(A)(1) has even clearer language that defeats, *per se*, the construction proposed by Dr. Arecha in paragraphs 21 and 24 of his opinion. According to the text of Section 28 of the YPF Bylaws, an "acquisition" by Argentina of YPF shares triggers the rules of Section 7, paragraphs (e) and (f), when, as a result thereof, Argentina "becomes the owner, *or exercises the control of*," more than 49% of the Company's capital. This means that an "acquisition" can result either from the ownership of shares or from the control over them: in both cases the obligation to make the tender offer is triggered. -------------------------------------------------------------------

89.    Thus, in this case, the "temporary occupation" under Law No. 26,741, through which the Argentine State admittedly acquired control over YPF shares that account for 51% of the capital stock, is governed by the rules of the YPF Bylaws. Section 28 of the YPF Bylaws states that the manner in which the Argentine State has acquired control— whether "directly or indirectly, by any means or instrument"—over YPF is irrelevant for the purpose of the obligation to launch a tender offer. As a consequence, such provision also applies to the Argentine State's "occupation" of the rights resulting from the shares subject to expropriation.------------------------------------------------------------

90.    This conclusion would not change if the rule provided in sub paragraph (A)(2) of Section 28 of YPF's by-laws were to be applied instead of that of sub-paragraph (A)(1) thereof. Since Argentina at present owns Class A shares that represent less than 5% of the YPF's capital, the rule of sub-paragraph (A)(2) would refer back to Section 7, paragraph (d), which also triggers the obligation to launch the tender offer when the party becomes the owner of or exercises "control of" the shares of YPF.-------------------

**B.    GENERAL MEANING OF THE TERM ACQUISITION UNDER ARGENTINE LAW**-------------------------------------------------------------------------

91.    Under Argentine law the term acquisition does not require the acquirer to take title. Even if the YPF Bylaws were silent as to whether a tender offer was triggered by a change in control, the generic term "acquisition" would also be satisfied by a change in control over the relevant assets. Under Argentine law, the term "acquisition" is much

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. Nº 6265

broader in meaning than Dr. Arecha maintains, restricting it to obtaining title to "property". ------------------------------------------------------------------------------------

92.   Pursuant to the Argentine law, as defined in the Civil Code and applied in other legislation, the term "acquisition" is satisfied not only by the acquisition of "property", but also by the acquisition of "control",[103] "possession",[104] and "tenancy"[105] of certain things. ------------------------------------------------------------------------------------

93.   In the instant case, the Argentine State has admittedly acquired control of YPF through the "occupation" of the shares subject to expropriation as established by Law No. 26,741, and granted itself full exercise of all rights associated with those shares. ---

94.   The Argentine State has also acquired "possession" of all the rights pertaining to the shares, which in essence is equal to the possession of the shares.  The Argentine Civil Code defines as *possessor* the person who holds a thing in his power, with the intention of subjecting it to the exercise of a right of property,[106] while such Code defines a *holder* as any person who is in position to perform acts of ownership as to a thing, but only with the intention of possessing in the name of another.[107] ----------------

95.   Dr. Arecha and one of the experts appointed by YPF Gas in the court proceedings on annulment of shareholders' meetings pending in Argentina both acknowledge that Repsol has lost "possession" of the shares subject to expropriation. In paragraph 6 of his opinion, Dr. Arecha describes the temporary occupation in the following terms: ---------

"*A temporary occupation is a legal tool governed by Law 21,499 and Article 2,512 of the Civil Code, by which the Government may, for reasons of public interest that justify the dispossession of property from a private entity, use and enjoy that property temporarily (…)*"(emphasis added). -----------------------------------------------------------

96.   Likewise, Dr. Marcer, in his opinion rendered upon request of YPF Gas (under Argentina's control) in the proceedings seeking the annulment of shareholders meetings, held that the intervention of YPF and YPF Gas (provided for by Executive Orders Nos. 530/12 and 557/12, respectively) implied the "dispossession" of Repsol.[108]

---

[103] Law No. 25,156, Section 6. ------------------------------------------------------------------------
[104] Argentine Civil Code, Section 2355. -----------------------------------------------------------
[105] Argentine Civil Code, Section 2460. -----------------------------------------------------------
[106] Argentine Civil Code, Section 2351. -----------------------------------------------------------
[107] Argentine Civil Code, Section 2461. -----------------------------------------------------------
[108] *See* Opinion by Alberto Marcer submitted in re "Repsol Butano S.A. c/ YPF Gas S.A. S/ impugnación de asamblea", before the Commercial Court of First Instance in the City of Buenos Aires No. 3, Clerk's Office No. 6 (File No. 103,181), p. 61, third paragraph.-------------------------------------------

CILIA BRUSA
RA PUBLICA
. INGLES
.IO 114 CAP. FED.
C.B.A. N° 6265

97.   Hence, it is evident that, if Repsol lost "possession", such "possession" was acquired by the Argentine State. ------------------------------------------------------------------

98.   As another example, pursuant to Antitrust Law No. 25,156, an acquisition of a company may result from the acquisition of "*the property, or any right over shares . . .*".[109] The Argentine State has admittedly acquired the rights over the shares.-------------

99.   In addition, the very same dictionary cited by Dr. Arecha acknowledges that an acquisition occurs by obtaining the rights associated with the object: "*In specific legal terms, it means obtaining a thing or right in order to reap such monetary benefits as may be relevant*".[110] According to the dictionary of the *Real Academia Española* (Spanish Royal Academy) *obtener* (to obtain) means "*to reach, get and achieve something which is deserved, requested or claimed*". This definition does not require that the thing be reached, gotten and achieved in the capacity of owner. -------------------

100.   Dr. Arecha concedes that the Argentine State has acquired the rights associated with the shares in paragraph 12 of his opinion, thus demonstrating that it has "reached" or "achieved" control over the shares. ------------------------------------------------------------

101.   Dr. Arecha's argument based on Section 215 of the Companies Law whereby the new holder of shares needs to be registered in the Stock Ledger so that the transfer of ownership becomes effective is misplaced. First, as explained above, the term "acquisition" has a broader meaning than acquisition of ownership.   Second, the Registry for the Deposit of Shares and Attendance to Shareholders' Meetings (*Libro de Depósito de Acciones y Registro de Asistencia a Asambleas*), which must reflect the records in the Stock Ledger of YPF,[111] expressly indicates that the Argentine State exercises the political and economic rights pertaining to the "shares subject to expropriation", while Repsol and The Bank of New York are acknowledged as mere formal owners of such shares without any rights upon them. ---------------------------------

102.   The "occupation" ordered by Law No. 26,741 therefore satisfies numerous common meanings of "acquisition" under Argentine law, by obtaining control of the shares, obtaining possession of the shares, and obtaining rights over the shares. Therefore, both under the YPF Bylaws as well as under Argentine law, the Argentine State has acquired the YPF shares. -----------------------------------------------------------------

---

[109] Law No. 25,156, Section 6. -----------------------------------------------------------------------------------
[110] ENCICLOPEDIA JURÍDICA OMEBA, Volume I.A, Ed Bibliográfica Omeba, 1979, p. 518. ------------------
[111] The Stock Ledger is carried by Caja de Valores S.A. (Argentina's clearing agency) under the instructions of YPF.-------------------------------------------------------------------------------------------

LIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. N° 6265

## C.   IRRELEVANCE OF THE TEMPORARINESS OF THE ACQUISITION UNDER THE YPF BYLAWS -------------------------------------------------------------------

103. An acquisition does not need to be permanent, under either the terms of the YPF Bylaws or the normal meaning of the term "acquisition". ------------------------------------

104. First, the YPF Bylaws do not require that "acquisition" be permanent. Section 7 (h) of the YPF Bylaws expressly acknowledges that even temporary acquisitions trigger the obligation to launch a tender offer. Pursuant to this Section, sanctions for not complying with the tender offer requirement shall remain effective until the acquirer has lost control over YPF. Likewise, Section 28 of the YPF Bylaws does not in any way exclude acquisitions of a temporary nature from the tender offer rules. --------------------

105. Second, even if the YPF Bylaws were silent as to whether a "temporary" acquisition triggered the tender offer, in accordance with Argentine law, an acquisition does not necessarily mean that the acquirer has obtained a right on a permanent basis. Acquisition may be temporary. ---------------------------------------------------------------

106. Under the Argentine Civil Code parties may agree upon the acquisition of rights, including *in rem* rights, for a limited time. Furthermore, some *in rem* rights under Argentine law may only be acquired for a limited time. That is the case, for instance, of the right of usufruct, which may only be acquired by a corporation for a maximum of twenty years,[112] or trusts, which may be subject to a term no longer than thirty years.[113]

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. ----------------------

In Buenos Aires, Argentine Republic, on July 26, 2013. -----------------------------------

[There follows an illegible signature:] Gustavo Naveira -------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

---

[112] Argentine Civil Code, Section 2828. ------------------------------------------------------
[113] Law No. 24,441, Section 4(c). ----------------------------------------------------------------

CILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

EXHIBIT A --------------------------------------------------------------------

CURRICULUM VITAE --------------------------------------------------------

## I.-    PERSONAL INFORMATION ---------------------------------------

(1)    Last and first names                -----------------------------------------

**NAVEIRA,** Gustavo Adolfo --------------------------------------------------

(2)    Place and date of birth-----------------------------------------------

Buenos Aires, Republic of Argentina-----------------------------------------

September 9, 1945 ----------------------------------------------------------

(3)    Professional Address -------------------------------------------------

Bouchard 680, piso 5°, Buenos Aires ---------------------------------------

Tel. 54-11-5272-7000, Fax  54-11-5272-7001 ---------------------------------

E-mail: gnaveira@ntmdall.com----------------------------------------------

----------------------------------------------------------------------------

## II.- UNIVERSITY DEGREE ----------------------------------------------

Lawyer, 1970, School of Law and Social Sciences, University of Buenos Aires. ---------

----------------------------------------------------------------------------

## III.-    OFFICES HELD IN THE JUDICIARY --------------------------------

- Clerk of the First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires No. 20, appointed on April 30, 1970. --------------------------------------
- Clerk of Panel B of the Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires.-------------------------------------------------------------------
- Judge in charge of First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires No. 15, appointed on May 7, 1979, with the agreement of the Honorable Argentine Senate according to Executive Order No. 1,530 dated May 21, 1984. ------------------------------------------------------------------------------
- Judge of the Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel B, appointed by Executive Order No. 3,228 dated September 30, 1984, with the agreement of the Honorable Argentine Senate. --------------------------------
----------------------------------------------------------------------------

## IV.-    OFFICES HELD IN THE ARGENTINE MINISTRY OF JUSTICE------------

- Argentine Undersecretary of Justice, appointed on July 1st, 1997, Executive Order No. 600. --------------------------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
.B.A. N° 6265

- Secretary of Technical and Legislative Affairs of the Ministry of Justice, appointed on November 29, 1997, Executive Order No. 1,127. --------------------------------------------
- Member of the Executive Committee of the School of Mediation, Resolution No. 200 dated March 16, 1998.--------------------------------------------------------------------------------
- Member of the Advisory Committee of the Center for Social-Legal Studies, Resolution No. 675 dated September 21, 1998. ------------------------------------------------
- Alternate Representative and Executive Secretary of the Building Infrastructure Committee of the Federal Judiciary in the Autonomous City of Buenos Aires, appointed on March 25, 1998, Ministry of Justice Resolution No. 228. Leader of a team of lawyers, engineers and architects who prepared the Terms and Conditions for National and International Public Bidding Process No. 4/99 and 5/99 for an urban development for the construction of courts in the City of Buenos Aires. ------------------------------------
- Chairman of the Award Committee in the National Bidding Process for Preliminary Designs for an urban development for the construction of courts in the City of Buenos Aires.----------------------------------------------------------------------------------------------------

------------------------------------------------------------------------------------------------------

**V.- PUBLICATIONS**----------------------------------------------------------------------------------

*1. Algunas notas sobre el art. 48 de la ley 24.522* (ED, 09.28.95), written together with attorneys Marta E. Acuña and Edgardo Daniel Truffat and accountant Jorge E. Basile.--

*2. El arancel del art. 32 de la ley 24.522: Demasiadas dudas, escasas certezas* (ED, 11.28.95), written together with attorneys Jorge Basile and Edgardo Daniel Truffat.-----

*3. Proyectos de reforma a la ley 24.522. Cuadro Comparativo. Comentario a la informalmente llamada "Ley de fe de erratas"* (E.D., Legislación Argentina, Boletín No. 18), written together with attorneys Jorge Emilio Basile and Edgardo Daniel Truffat.----------------------------------------------------------------------------------------------------

*4. Comentarios al proyecto del senador San Millán de reforma del art. 202 de la Ley de Sociedades Comerciales* (E.D.L.A., No. 11), written together with attorneys Jorge Emilio Basile and Edgardo Daniel Truffat. ----------------------------------------------------

*5. El Estudio jurídico y la pérdida de oportunidad de negocios* (E.D. 12.11.97), written together with attorney Edgardo Daniel Truffat. ----------------------------------------

*6. Para iniciar la polémica: El "anteproyecto de reformas a la ley de concursos y quiebras N°. 24.522" y la oportunidad de la reforma* (E.D. 12.26.97), written together with attorney Edgardo Daniel Truffat. ----------------------------------------------------------

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
P.C.B.A. Nº 6265

*7. Comentario al fallo de la Cámara Nacional Comercial ¿Deslealtad sin daño?* (E.D., vol. 170-22). -----------------------------------------------------------------------------

*8. Proyecto de reglamento para el Comité de Acreedores*, paper for the First End-of-the-World Symposium on Private Law, written together with attorney Edgardo Daniel Truffat.--------------------------------------------------------------------------------------

*9. El Anteproyecto de Sociedades Anónimas Deportivas*, Revista del Colegio Público de Abogados de la Capital Federal No. 18 (11-98).---------------------------------------------

*10. Monopolios actuales vs. Monopolios conjeturales*, Sports Corporations, written together with attorney Edgardo Daniel Truffat, report on the administration of Raúl Granillo Ocampo, published by the Ministry of Justice, single edition 11/99. -------------

*11. Concurso Nacional de Anteproyectos Ciudad Judicial*, Revista de Arquitectura No. 193 (6/99) of Sociedad Central de Arquitectos. ---------------------------------------

*12. Firma Digital: Tratamiento legislativo de su regulación*, Revista del Colegio Público de Abogados de la Capital Federal No. 27 (9/99), written together with engineer Alejandro J. Román. --------------------------------------------------------------------------

*13. El Documento Electrónico y la Firma Digital al Servicio de la optimización del Servicio de Justicia*, speaker in the Seminar organized by Centro de Estudios de Informática y Derecho (C.E.I.D.) reporting to the Ministry of Justice, held in the Autonomous City of Buenos Aires, September 27 and 29,1999. -----------------------------

*14. La Mediación Previa Obligatoria. Vehículo de comunicación de la realidad e instrumento para la adopción de políticas públicas*, written together with attorney Ester Riesel.-----------------------------------------------------------------------------------

*15. El embargo del artículo 83 inciso 3) de la ley de sociedades comerciales (¿Herramienta automática o semiautomática?)*, written together with attorney Eduardo Daniel Truffat, Revista Errepar, Volume XIII, No. 164, July 2001. ------------------------

*16. Algo mas sobre la suspensión de las decisiones asamblearias,* written together with attorney Eduardo Daniel Truffat, Errepar, Volume XIII, No. 169, December 2001, p. 613 et seq. ---------------------------------------------------------------------------------

*17. Uzal y S.A. La Razón: el fin del principio*, written together with attorney Eduardo Daniel Truffat, Revista del Colegio Público de Abogados de la Capital Federal, December 2001/No. 52, p. 48 et seq. -----------------------------------------------------------

*18. El presidente del directorio de una sociedad anónima no puede ni debe proclamarse "yo", el Supremo*, written together with attorney Eduardo Daniel Truffat, Forum of Córdoba, supplement on corporate law, Year I, No. 1, 2001. ---------------------

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
P.C.B.A. N° 6265

*19. Una medida cautelar concursal conmocionante,* written together with attorney Eduardo Daniel Truffat, La Ley, supplement on bankruptcy proceedings, published on February 5, 2002. -------------------------------------------------------------------------------

*20. Breves reflexiones sobre los ilícitos societarios a la luz del art. 173, inc. 7° del Código Penal,* written together with attorney Pablo Arguibay Molina, ED March 7, 2002. -------------------------------------------------------------------------------------------

*21. La Crisis Económica y La Actividad Legislativa. Breve Referencia Histórica,* written together with attorney Eduardo Daniel Truffat, Revista de las Sociedades y Concursos No. 15, Ed. Ad Hoc, March/April 2002. --------------------------------------------

*22. El síndico societario: ¿control de legalidad o de gestión?,* written together with attorney Eduardo Daniel Truffat, El Derecho, issue dated 04.25.02.-------------------------

*23. ¿Plata perdida o tiempo perdido?,* written together with attorney Eduardo Daniel Truffat, El Derecho, September 15, 2003.-------------------------------------------------------

*24. ¿Personas o máscaras jurídicas?,* written together with attorney Eduardo Daniel Truffat, Errepar, Revista de Doctrina Societaria y Concursal, No.191, October 2003.----

*25. Prueba societaria difícil,* written together with attorneys Eduardo Daniel Truffat and Javier A. Lorente, E.D., published on November 14, 2003.------------------------------

*26. El síndico, en el anteproyecto de reforma de la ley de sociedades,* written together with attorney Eduardo Daniel Truffat, E.D., published on July 7, 2004. --------------------

*27. ¿Seguro de retiro o retiro del seguro?,* E.D., published on August 6, 2004. ---------

*28. Respuesta conjetural to Sobre las técnicas de "personalización" de las sociedades y "la colegialidad",* written by Eduardo Daniel Truffat together with attorney Francisco Naveira, Errepar, Revista de Doctrina Societaria y Concursal No. 232, pp. 190/192, March 2007. --------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------

## VI.- PARTICIPACION IN THE DRAFTING OF LEGISLATIVE BILLS-----------

- Sports Corporations, Message No. 159/99 (03.04.99). --------------------------------------
- Amendment to Law No. 22,172, Message No. 559/99 (05.24.99). -----------------------
- Regulation of Internal and National Arbitration, replacing Book VI of the Code of Civil and Commercial Procedure for the Autonomous City of Buenos Aires, Message No. 577/99 (05.28.99). -------------------------------------------------------------------
- Corporate Cooperation Agreement, Message No. 856/99 (08.09.99).--------------------
- Substitution of Article 23, Law No. 19,550, Message No. 838/99 (08.02.99).----------

.CILIA BRUSA
ORA PUBLICA
IA INGLES
)LIO 114 CAP. FED.
P.C.B.A. N° 6265

- Concession, License and Permits of National Public Services and similar forms. File No. 2189/99 submitted by Representative Vensentini (05.03.99). --------------------------
- Incorporation as domestic law of the Model Law on International Commercial Arbitration adopted by the United Nations Commission on International Trade Law (UNCITRAL), Message and Law, Interim Resolution No. 1,363/99. ----------------------
- Draft Message and Law: Warrants. Interim Resolution No. 1,362/99. -------------------

--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------

32/40

ILIA BRUSA
RA PUBLICA
INGLES
IO 114 CAP. FED.
C.B.A. N° 6265

EXHIBIT B ----------------------------------------------------------------------------

------------------------------------List of Documents Analyzed-------------------------------------

General documents --------------------------------------------------------------------

(1) Copies of the file captioned "*Gomis Sáez, Antonio c/ Estado Nacional - PEN - Medida Cautelar*", No. 26,981/2012, Federal Court of First Instance in Contentious Administrative Matters No. 4, Clerk's Office No. 7.--------------------------------------------

(2) Copies of the file captioned "*Forwood, Walter Cristian c/ PEN – DTOS. 530 y 532/12 s/ Medida Cautelar (Autónoma)*", No. 12,881/2012, Federal Court of First Instance in Contentious Administrative Matters No. 7, Clerk's Office No. 13.-------------

(3) Copies of the file captioned "*Gallego, José Manuel c/ EN-PEN-DTO 530/12 557/12 s/ Medida Cautelar (Autónoma)*", No. 13,223/2012, Federal Court of First Instance in Contentious Administrative Matters No. 5, Clerk's Office No. 10.---------------------------

(4) Copies of the file captioned "*De San Martín, José y otro c/ Estado Nacional Poder Ejecutivo s/ Proceso de Conocimiento*", No. 4,201/2012, Federal First Instance Court in Civil and Commercial Matters No. 6, Clerk's Office No. 11. ---------------------------------

(5) Copies of the file captioned "*Comisión Nacional de Valores c/ Repsol YPF S.A. s/ Queja*", No. 12,815/2012, Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel F.------------------------------------------------------------------

(6) Copies of the file captioned "*Repsol Butano S.A. c/ YPF Gas S.A. s/ Ordinario*", No. 103,181, First Instance Court in Commercial Matters No. 3, Clerk's Office No. 6. --

(7) Copies of the file captioned "*Repsol S.A. y otros c/ YPF S.A. s/ Ordinario*", No. 103,144, First Instance Court in Commercial Matters No. 3, Clerk's Office No. 6. -------

(8) Copies of the file captioned "*Repsol YPF S.A. y otro c/ La República Argentina (DAJIN 2195/2012 M°RREE y C-EEUU) s/ Exhorto*", No. 32,569/2012, Federal Court of First Instance in Contentious Administrative Matters No. 11, Clerk's Office No. 21.--

(9) Copies of the file captioned "*Repsol S.A. c/ YPF S.A. (carpe DAJIN 2896/12 Jz Mercantil I- Madrid –Espa) s/ Exhorto*", No. 56,375/2012, Federal Court of First Instance in Contentious Administrative Matters No. 2, Clerk's Office No. 4. --------------

(10) Copies of the file captioned "*Repsol YPF S.A. c/ EN-DTO 530 532 732/12 s/ Proceso de conocimiento*", No. 21,941/2012, Federal Court of First Instance in Contentious Administrative Matters No. 7, Clerk's Office No. 13.---------------------------

(11) Copies of the file captioned "*Repsol Butano S.A. c/ EN – PEN – Ley 26.741 – Dto 530 557 732/12 s/ Proceso de Conocimiento*", No. 27,075/2012, Federal Court of First Instance in Contentious Administrative Matters No. 4, Clerk's Office No. 7. --------------

:ILIA BRUSA
RA PUBLICA
, INGLES
IO 114 CAP. FED.
:.B.A. N° 6265

(12)  Copies of the file captioned "*Repsol S.A. y otros c/ YPF S.A. s/ ordinario*", No. 103,268, First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires No. 3, Clerk's Office No. 6. ------------------------------------------------

(13)  Copies of the file captioned "*Repsol YPF SA c/ Comisión Nacional de Valores s/ medida precautoria*", No. 12,126/2012, Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel F. ------------------------------------------

(14)  Law 26,741, published in the Official Gazette on May 7, 2012.-----------------------

(15)  Executive Order 530/12 published in the Official Gazette on April 16, 2012. ------

(16)  Executive Order 532/12 published in the Official Gazette on April 17, 2012. ------

(17)  Executive Order 557/12 published in the Official Gazette on April 19, 2012. ------

(18)  Executive Order 732/12 published in the Official Gazette on May 16, 2012. -------

(19)  Bylaws of YPF S.A. --------------------------------------------------------------------

(20)  Argentine Constitution. ----------------------------------------------------------------

(21)  Law 19,549.--------------------------------------------------------------------------------

(22)  Law 25,344.--------------------------------------------------------------------------------

(23)  Law 23,982.--------------------------------------------------------------------------------

(24)  Law 25,873.--------------------------------------------------------------------------------

(25)  Executive Order 1563/04. --------------------------------------------------------------

(26)  Law 16,986.--------------------------------------------------------------------------------

(27)  Law 24,240, as amended by Law 26,361.---------------------------------------------

(28)  Law 25,675.--------------------------------------------------------------------------------

(29)  Law 23,898.--------------------------------------------------------------------------------

(30)  Law 23,853.--------------------------------------------------------------------------------

(31)  Law 21,839.--------------------------------------------------------------------------------

(32)  Decree-Law 16,638/57. -----------------------------------------------------------------

(33)  Law 24,432.--------------------------------------------------------------------------------

(34)  Argentine Civil Code. -------------------------------------------------------------------

(35)  Law 26,853.--------------------------------------------------------------------------------

(36)  Law 26,854.--------------------------------------------------------------------------------

(37)  Law 26,855.--------------------------------------------------------------------------------

(38)  Law 24,937.--------------------------------------------------------------------------------

(39)  Declaration of Dr. Arecha in support of the Argentine Republic's motion to dismiss the complaint.------------------------------------------------------------------------

(40)  Law 19,550.--------------------------------------------------------------------------------

CILIA BRUSA
ORA PUBLICA
A INGLES
LIO 114 CAP. FED.
P.C.B.A. N° 6265

(41) Law 21,499. -------------------------------------------------------------------

(42) Executive Order 677/01. ----------------------------------------------------

(43) Law 26,831. -------------------------------------------------------------------

(44) Copy of the relevant part of the Stock Ledger of YPF. -----------------------

(45) Minutes of the YPF's Annual General Meeting of Shareholders held on June 4, 2012. ----------------------------------------------------------------------------

(46) Minutes of the YPF's Annual General Meeting of Shareholders held on July 17, 2012. ----------------------------------------------------------------------------

(47) Minutes of the YPF's Annual General Meeting of Shareholders held on September 13, 2012. --------------------------------------------------------------

(48) Argentine Federal Code of Civil and Commercial Procedure. ------------------------

(49) Argentine Supreme Court of Justice procedural rule dated December 20, 1967. ---

(50) Executive Order 1,102/86. --------------------------------------------------

(51) Law 23,480. -------------------------------------------------------------------

(52) Law 25,156. -------------------------------------------------------------------

(53) Opinion by Alberto Marcer submitted in re *"Repsol Butano S.A. c/ YPF Gas S.A. s/ impugnación de Asamblea"*, filed before the First Instance Court in Commercial Matters in the Autonomous City of Buenos Aires No. 3, Clerk's Office No. 6, (File No. 103,181), p. 61, third paragraph. -------------------------------------------------

(54) Law 24,441. -------------------------------------------------------------------

(55) Executive Order 16,638/57. ------------------------------------------------

(56) Law 23,503. -------------------------------------------------------------------
-------------------------------------------------------------------------------

Bibliography ------------------------------------------------------------------

(1) HIGHTON, ELENA I. – AREÁN, BEATRIZ A., *"Código Procesal Civil y Comercial de la Nación concordado con los códigos provinciales. Análisis doctrinal y jurisprudencial"*, Volumes 6 and 7 (in relevant part). ------------------------------

(2) Enciclopedia Jurídica Omeba, Volume I.A, Editorial Omeba, 1979, p. 518. ----------

(3) HUTCHINSON, TOMÁS, *"El proceso de ejecución de sentencias contra el Estado"*, Revista Latinoamericana de Derecho, Year I, number 1, January-June 2004, pp. 289-355. -------------------------------------------------------------------------------

(4) COLOMBO, CARLOS J. – KIPER. CLAUDIO M., Código Procesal Civil y Comercial de la Nación, anotado y comentado, Volume II, 2nd edition, La Ley, 2006 (in relevant part).

CILIA BRUSA
DRA PUBLICA
A INGLES
LIO 114 CAP. FED.
.C.B.A. N° 6265

(5)  BORDA, GUILLERMO A., "*Manual de Derecho Civil. Parte General*", Perrot, Buenos Aires, 1991 (in relevant part). --------------------------------------------------------------

(6)  RIVERA, JULIO CÉSAR (H), "*La Legitimación de las acciones colectivas*", in "Derecho Procesal Comercial", GRAZIABILE, DARÍO (director) Ed. Abeledo Perrot, Buenos Aires, 2013. --------------------------------------------------------------------

(7)  OYAHANARTE, MARTÍN, "*Reforma a la Justicia: la integración del Consejo de la Magistratura por académicos ajenos al ámbito jurídico es inconstitucional*", MJ – DOC.6229-AR, April 10, 2013. --------------------------------------------------------------

(8)  GORDILLO, AGUSTÍN, "*La implacable tasa de justicia*", La Ley 1995-E, 503. --------

(9)  MAIRAL, HÉCTOR A., "*El silencio de los tribunales argentinos*", Res Pública Argentina, 2007-3 Edition. ------------------------------------------------------------------

(10)  Statement issued by the Latin American Federation of Judges dated April 18, 2013. ---------------------------------------------------------------------------------

(11)  Statement issued by the Peace and Justice Committee of the Argentine Episcopal Conference, dated March 6, 2013, published in El Derecho on April 17, 2013. -----------

(12)  Statement issued by the United Nations Special Rapporteur, Gabriela Knaul, on the Independence of Judges and Lawyers, dated April 30, 2013, published at: http://www.ohchr.org/SP/NewsEvents/Pages/DisplayNews.aspx?NewsID=13275&LangID=S. --------------------------------------------------------------------------------

(13)  Draft bill submitted by representative Carlos Kunkel and others on June 26, 2013, file No. 4935-D-2013. --------------------------------------------------------------------

(14)  Newspaper article published in *iProfesional.com*, in the Legal Matters Section, on February 18, 2008. --------------------------------------------------------------------------

(15)  FEUILLADE, MILTON C. "*La prueba en el proceso con elementos extranjeros*", La Ley 2009-A, 1197. -----------------------------------------------------------------------------

(16)  BIANCHI, ALBERTO B., "*Crónica de una inconstitucionalidad manifiesta*", published in La Ley on June 26, 2013. ------------------------------------------------------

(17)  OTEIZA, EDUARDO, "*El cercenamiento de la garantía a la protección cautelar en los procesos contra el Estado por la ley 26.854*", La Ley Special Supplement, May 2013. -----------------------------------------------------------------------------------

(18)  GIL DOMÍNGUEZ, ANDRÉS, "*La inconstitucionalidad e inconvencionalidad del régimen de medidas cautelares dictadas en los procesos en los que el Estado es parte (Ley 26.854)*", La Ley, May 2013. -------------------------------------------------------

ILIA BRUSA
RA PUBLICA
INGLES
O 114 CAP. FED.
.B.A. Nº 6265

(19)  GELLI, MARÍA ANGÉLICA, *"Las inconstitucionalidades de la ley del Consejo de la Magistratura"*, La Ley, June 26, 2013. --------------------------------------------------

(20)  Diccionario de la Real Academia Española. ------------------------------------------------

(21)  Speech of the President of Argentina, Cristina Fernández de Kirchner,  given on March 1, 2013, at the opening of the Congress' Ordinary Sessions, available at: http://www.presidencia.gob.ar/discursos/26370-inauguracion-del-131o-periodo-de-sesiones-ordinarias-del-congreso-discurso-de-la-presidenta-de-la-nacion. -----------------

(22)  Article published in La Nación on October 21, 2005, available at http://www.lanacion.com.ar/749400-para-el-874-de-los-abogados-la-justicia-no-es-independiente. --------------------------------------------------------

(23)  Newspaper article published in La Nación on July 10, 2013, available at: http://www.lanacion.com.ar/1599827-un-senador-kirchnerista-quiere-crear-un  tribunal-de-constitucionalidad-para-eludir-a-la-corte. ----------------------------------------------------

(24)  Newspaper article published in La Nación on April 27, 2013 available at: http://www.lanacion.com.ar/1576835-zaffaroni-propuso-ampliar-la-corte.-----------------

(25)  Newspaper article published in Clarín on April 26, 2013, available at: http://www.clarin.com/politica/Zaffaroni-Corte_Reforma_judicial_0_908309336.html. -

(26)  Newspaper article published in El Cronista on April 27, 2013, available at: http://www.cronista.com/economiapolitica/Zaffaroni-ratifico-su-propuesta-de-ampliar-la-Corte-Suprema-20130427-0004.html. ----------------------------------------------------

(27)  Newspaper article published in *iProfesional.com* on February 18, 2008. ------------

(28)  FALCÓN, ENRIQUE M., *"Tratado de Derecho Procesal Civil, Comercial y de Familia"*, Volume III, Rubinzal Culzoni, Santa Fe, 2006 (in relevant part).----------------

(29)  PALACIO, LINO ENRIQUE, *"Derecho Procesal Civil"*, Volume IV, 4th edition, Editorial Abeledo Perrot, Buenos Aires, 2011 (in relevant part).-----------------------------

(30)  GARCÍA PULLÉS, FERNANDO RAÚL, *"Tratado de lo contencioso administrativo"*, Volume II, Hammurabi, Buenos Aires, 2004 (in relevant part). ------------------------------

(31)  DATES, LUIS E., *"Cooperación judicial internacional procesal en materia probatoria"*, published in La Ley 2007-D, 1150. -------------------------------------------------
--------------------------------------------------------------------------------------------------

Case Law ----------------------------------------------------------------------------------------------

(1)  Argentine Supreme Court of Justice, February 24, 2009, in re *"Halabi, Ernesto c. PEN Ley 25.873 y Decreto 1563/04 s/Amparo Ley 16.986"*.----------------------------------

37/40

CILIA BRUSA
ORA PUBLICA
IA INGLES
DLIO 114 CAP. FED.
P.C.B.A. N° 6265

(2) Argentine Supreme Court of Justice, June 26, 2007, in re "*Defensor del Pueblo de la Nación inc. Dto. 1316/02 c. PEN dtos. 1570/01 y 1606/01 s/Amparo Ley 16.986*".----
(3) Federal Court of Appeals in Contentious Administrative Matters in the Autonomous City of Buenos Aires, Panel II, April 17, 2013, in re "*Lahitou, Juan Pablo c/ EN - PEN – ENRE y otros s. varios*". -------------------------------------------------------------

(4) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel C, March 19, 2010, in re "*Damnificados Financieros Asociación Civil para su Defensa c. Banco Río de la Plata S.A. s. Ordinario*". ------------------------------------------

(5) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel D, November 5, 2009, in re "*Consumidores Financieros c. Banco Piano S.A.*". ---
(6) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, September 2, 2010, in re "*ADECUA c. Toyota Compañía Financiera S.A. y ot. s. Ordinario*". --------------------------------------------------------------------------------

(7) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, November 16, 2010, in re "*Damnificados Financieros Asociación Civil para su Defensa c. BBVA Banco Francés SA s. Sumarísimo*". --------------------------------------

(8) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, December 28, 2012, in re "*Consumidores Financieros Asociación Civil para su Defensa c. Banco Patagonia S.A s. Ordinario*". --------------------------------------------

(9) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel B, October 21, 2009, in re "*Damnificados Financieros Asociación Civil para su Defensa c. Citibank N.A. s. Sumarísimo*".-----------------------------------------------------

(10) Argentine Supreme Court of Justice, February 27, 1996, in re "*Techint Compañía Técnica Internacional c/ Corrientes, Provincia de s/ ejecución por A 10.932.954*". ------
(11) Inter-American Court of Human Rights, November 28, 2002, in re "*Cantos vs. Argentina*", Series C, No. 97. ---------------------------------------------------------------------

(12) Argentine Supreme Court of Justice, October 20, 1996, in re "*Estructuras Tafi S.A. c. Provincia de Tucumán*", JA 1997-I-74. --------------------------------------------------

(13) Argentine Supreme Court of Justice, July 11, 2006, in re "*Coihue S.R.L. c/ Santa Cruz, Provincia de s/ beneficio de litigar sin gastos*", C. 416. XXXIX. ORI.--------------
(14) Argentine Supreme Court of Justice, June 18, 2013, in re "*Rizzo, Jorge Gabriel (apoderado Lista 3 Gente de Derecho) s/ acción de amparo c/ Poder Ejecutivo Nacional, ley 26.855, medida cautelar (Expte. N° 3034/13)*", R. 369. XLIX.--------------

LIA BRUSA
A PUBLICA
NGLES
) 114 CAP. FED.
B.A. Nº 6265

(15) Argentine Supreme Court of Justice, in re *"Bourdieu, Pedro Emilio c/ Municipalidad de la Capital"*. ----------------------------------------------------------------------

(16) Argentine Supreme Court of Justice, April 2, 1998, in re *"Rudaz Bissón, Juan Carlos c/ Editorial Chaco S.A. s/ indemnización de daños y perjuicios"*. --------------------

(17) Federal Court of Appeals in Civil and Commercial Matters, February 10, 1995, Panel II, in re *"R., J. J. c. LR3 Radio Belgrano y otros"*, JA 1997-I-211. --------------------

(18) Federal Court of Appeals in Civil and Commercial Matters, November 12, 2002, Panel I, in re *"Domnicz, José y otro v. Camino del Atlántico S.A."*, DJ 2003-1-944. ---

(19) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel A, December 23, 1998, in re *"Chiri S.A. y otros c. House of Fuller"*, LL 1998-D-240. --------------------------------------------------------------------------------------

(20) Court of Appeals in Commercial Matters in the Autonomous City of Buenos Aires, Panel B, March 16, 1995, in re *"Sistemas Médicos S.A. c. St. Jude Medical"*, LL 1996-B-158. ---------------------------------------------------------------------------------------

(21) Court of Appeals in Civil Matters in the Autonomous City of Buenos Aires, Panel I, February 24, 2000, in re *"Garramone, Esteban L. y otro c. Solanet, Rodolfo y otro s/ exhorto"*.----------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

----------------------------------------------------------------------------------------------------

:ILIA BRUSA
IRA PUBLICA
\ INGLES
JO 114 CAP. FED.
C.B.A. N° 6265

**EXHIBIT C** ----------------------------------------------------------------

Buenos Aires, 25 April 2013. ------------------------------------------------

Messrs.-----------------------------------------------------------------------

Repsol Capital, S.L. ---------------------------------------------------------

Reconquista 336, 2nd Floor, Federal Capital ----------------------------------

Mr. Matías Grinberg------------------------------------------------------------

ATTENTION---------------------------------------------------------------------

To whom it may concern,-------------------------------------------------------

In my capacity as attorney-in-fact for YPF S.A. (the "Company"), I reject all the terms of your note dated 8 February 2013 as inadmissible. ------------------------------------------

Pursuant to Law No. 26741, the exercise of all rights pertaining to the Company's shares declared to be of public use and subject to expropriation belongs to the Argentine Executive Branch.-------------------------------------------------------------

As provided for therein, the Company paid the dividends pertaining to such shares to the Argentine State (*i.e.*, Argentine Executive Branch) in a timely fashion. ----------------

Therefore, we hereby reject your false and inadmissible assertions, and, in particular, deny that the Company owes any dividend or interest whatsoever, as YPF S.A. paid the dividends approved by a Shareholders' Meeting as and when determined by the Board of Directors, and in accordance with applicable laws then in force and effect.-------------

Yours faithfully,-------------------------------------------------------------

YPF S.A. ----------------------------------------------------------------------

[There follows an illegible signature.] Leonardo Etchepare. Attorney-in-Fact. ------------

The foregoing is a true and accurate translation into English, which consists of forty (40) pages, of the copy of the original document in Spanish, which is attached hereto. In witness whereof, I sign and seal in the Autonomous City of Buenos Aires, on this 26th day of July, 2013. ---------------------------------------------------------------

[*For certification purposes only:*] **ES TRADUCCIÓN FIEL** en idioma inglés, que consta de 40 (cuarenta) páginas, de la copia del documento original adjunto en español, que he tenido a la vista y a la que me remito en la Ciudad Autónoma de Buenos Aires, a 26 días de julio de 2013. -----------------------------------------------------------

MARIA CECILIA BRUSA
TRADUCTORA PUBLICA
IDIOMA INGLES
TOMO XVII FOLIO 114 CAP. FED.
INSC. C.T.P.C.B.A. N° 6265

40/40





170844 45892
26/07/2013





# COLEGIO DE TRADUCTORES PÚBLICOS
# DE LA CIUDAD DE BUENOS AIRES

REPÚBLICA ARGENTINA
LEY 20.305

# <u>LEGALIZACIÓN</u>

Por la presente, el *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES*, en virtud de la facultad que le confiere el artículo 10, inc.d) de la ley 20.305, certifica únicamente que la firma y el sello que aparecen en la traducción adjunta concuerdan con los correspondientes al/la Traductor/a Público/a BRUSA, MARÍA CECILIA

que obran en los registros de esta institución en el folio 114  del Tomo  17   en el idioma    INGLES

Legalización Número:    45892

Buenos Aires, 26/07/2013

GUSTAVO A. SIGALOFF
DTO. DE LEGALIZACIONES
COLEGIO DE TRADUCTORES PUBLICOS
DE LA CIUDAD DE BUENOS AIRES

<u>ESTA LEGALIZACIÓN NO SE CONSIDERARÁ VÁLIDA SIN EL CORRESPONDIENTE</u>
<u>TIMBRADO DE CONTROL EN LA ÚLTIMA HOJA DE LA TRADUCCIÓN ADJUNTA</u>

**Control Interno:** 17084445892

Av. Corrientes 1834 - C1045AAN - Ciudad Autónoma de Buenos Aires - 4373-7173 y líneas rotativas

THE *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Sworn translators association of the city of Buenos Aires) pursuant to 20305 act, section 10, subsection d, hereby certifies that the signature and the seal on the translation attached hereto match the signature and seal of the Sworn Translator (Traductor Público) in our files.

THIS CERTIFICATION IS NOT VALID WITHOUT THE PERTINENT CONTROL STAMP ON THE LAST PAGE OF THE TRANSLATION ATTACHED HERETO.

Vu par le *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Ordre de Traducteurs Officiels de la ville de Buenos Aires), en vertu des attributions que lui ont été accordées par l'article 10, alinéa d) de la Loi n° 20.305, pour la seule légalisation matérielle de la signature et du sceau du Traductor Público (Traducteur Officiel) apposés sur la traduction du document ci-joint, qui sont conformes à ceux déposés aux archives de cette Institution.

LE TIMBRE APPOSÉ SUR LA DERNIÈRE PAGE DE LA TRADUCTION FERA PREUVE DE LA VALIDITÉ DE LA LÉGALISATION.

Con la presente il *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Collegio dei Traduttori Giurati della Città di Buenos Aires) ai sensi della facoltà conferitagli dall'articolo 10, comma d), della Legge 20.305, CERTIFICA, esclusivamente, la firma ed il timbro del Traductor Público (Traduttore Giurato), apposti in calce alla qui unita traduzione, in conformità alla firma ed al timbro depositati nei propri registri.

LA PRESENTE LEGALIZZAZIONE SARÀ PRIVA DI VALIDITÀ OVE NON VENGA TIMBRATA NELL' ULTIMO FOGLIO DELLA TRADUZIONE.

Através da presente, o *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Colégio de Tradutores Públicos da Cidade de Buenos Aires), no uso de suas atribuições, de conformidade com o artigo 10, alínea "d", da Lei 20.305, certifica unicamente que a assinatura e o carimbo do Traductor Público (Tradutor Público) que subscreve a tradução anexa conferem com a assinatura e o carimbo arquivados nos registros desta instituição.

A PRESENTE LEGALIZAÇÃO SÓ SERÁ CONSIDERADA VÁLIDA COM A CORRESPONDENTE CHANCELA MECÂNICA APOSTA NA ÚLTIMA FOLHA DA TRADUÇÃO

BEGLAUBIGUNG. Der *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Kammer der Vereidigten Übersetzer der Stadt Buenos Aires), kraft der Befugnisse, die ihr nach Artikel 10, Abs.d) des Gesetzes 20.305 zustehen, bescheinigt hiermit lediglich die Übereinstimmung der Unterschrift und des Siegelabdruckes auf der beigefügten Übersetzung mit der entsprechenden Unterschrift und dem Siegelabdruck des Traductor Público (VereidigtenÜbersetzers), die in den Registern dieser Institution hinterlegt worden sind.

DIESE BEGLAUBIGUNG IST NICHT GÜLTIG OHNE DEN ENTSPRECHENDEN GEBÜHRENSTEMPEL AUF DEM LETZTEN BLATT DER BEIGEFÜGTEN ÜBERSETZUNG.

I, María Cecilia Brusa, certify under penalty of perjury under the laws of the United States of America that I am competent to translate Spanish into English, and that the foregoing translation of this Affidavit of Gustavo Naveira, is true and correct.

Executed on this 26th day of July, 2013.

_____
María Cecilia Brusa

Sworn to before me this 26th day of July, 2013.

Bs. As. 26 / 07 / 13 firma certificada
eu F 009613724.—

_____
NOTARY PUBLIC

NATALIA ALEJANDRA SANTOS
ESCRIBANA
MAT. 5308





**ACTA DE CERTIFICACION DE FIRMAS**
LEY 404

F 009613724

1  Buenos Aires, **26** de **Julio** de **2013**. En mi carácter de escribano

2  Adscripta al Registro Notarial Nº 47 de Capital Federal.-

3  CERTIFICO: Que la/s **firma** que obra/n en el

4  documento que adjunto a esta foja, cuyo requerimiento de certificación se

5  formaliza simultáneamente por ACTA número **4** del LIBRO

6  número **4** , es/son puesta/s en mi presencia por la/s persona/s

7  cuyo/s nombre/s y documento/s de identidad se menciona/n a continuación así como

8  la justificación de su identidad. **María Cecilia BRUSA, DNI 25.556.898, quien**

9  actúa por derecho propio y justifica su identidad en virtud de lo dispuesto

10  por el artículo 1002 inciso "c" del Código Civil y conservo fotocopias de par-

11  tes pertinentes del documento exhibido. Consiste en Documento Privado

12  redactado en idioma inglés, sin espacios en blanco. Expido la presente en

13  Foja F 009613724.-

14

15

16

17

18  

NATALIA ALEJANDRA SANTOS
ESCRIBANA
MAT. 5308

19

20

21

22

23

24

25