UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REPSOL YPF, S.A. and TEXAS YALE            :
CAPITAL CORP., personally and on
behalf of similarly placed parties,         :

        Plaintiffs,                          :        12 Civ. 3877 (TPG)

      -against -                             :

THE ARGENTINE REPUBLIC,                     :

        Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## RESPONSE STATEMENT OF MARTÍN ARECHA
## IN SUPPORT OF THE ARGENTINE REPUBLIC'S
## MOTION TO DISMISS THE COMPLAINT

Pursuant to 28 U.S.C. § 1746, I, Martín Arecha, state the following:

    1.      I am an attorney authorized to practice the profession under the law in Argentina. I previously submitted an affidavit in support of the motion by the Republic of Argentina (the "Republic") to dismiss the complaint in this class action lawsuit filed by Repsol SA derived from the expropriation process that the Republic has commenced with respect to the shares of YPF SA ("YPF" or the "Company").

    2.      I have been asked to respond to the affidavit submitted by Dr. Gustavo Naveira with respect to the following questions under the parameters of Argentine law:

    (a)      whether the Argentine National State has "acquired" the shares of YPF that are subject to the temporary occupation and the expropriation process that the Argentine Republic commenced in 2012;

(b)     whether the National State is obligated to make a public tender offer for the shares of YPF that are not covered by the temporary occupation or the expropriation process.

3.     In his affidavit, Dr. Naveira states that the National Government is required to make the "public tender offer" set forth in the YPF Bylaws regarding shares not included in the expropriation declaration.   He holds that, as a consequence of such expropriation, the requirements are verified in order to generate that supposed obligation for the National Government, particularly regarding Repsol and Texas Yale, YPF shareholders, based on company bylaws.  Dr. Naveira also states that, in order to make such public tender offer, shares do not need to be registered pursuant to provisions included in Section 215 of Law 19,550.

4.     I disagree with Dr. Naveira's conclusions for several reasons.  Most important, he fails to recognize that the Argentine Republic enacted Law No. 26,741 in the exercise of its sovereign power.  An Act of State is not related to the Bylaws of a private commercial company such as YPF, and may not be restricted or conditioned by such Bylaws.

## I.  THERE HAS BEEN NO "ACQUISITION" OF YPF SHARES

5.     Law 26,741 declared to be "of public interest" and "subject to expropriation" ... *"51% of YPF S.A. equity represented by the same percentage of Class D shares of said company, whether belonging to Repsol YPF SA, its parent or controlled companies"* (Section 7).  It should be noted that under this Law, the object of the public use and expropriation is the "equity" of said company.  As YPF is a corporation pursuant to Law No. 19,550, the expropriation law refers to shares representing participation in capital stock.

6.      The declaration to subject certain stock to expropriation in the public interest only refers to the shares specified in such law – representing expropriated equity – but it does not authorize any kind of payment, nor does it grant any rights to shareholders whose shareholding is not included in this law (Section 7 of Law No. 26,741, pursuant to Section 5, *et seq*., of Law No. 21,499).

7.      If the Argentine Congress had decided that the public interest required the expropriation of a larger proportion of YPF equity represented by a greater number of shares than the number specified in Section 7 of Law No. 26,741, the Congress would have expressed that decision in the law.  The expropriation process therefore excludes any procedure, such as the public tender offer described in YPF's Bylaws, which would force the National Government to acquire a larger number of shares than necessary to achieve the purpose of the expropriation.

8.      Expropriation constitutes a sovereign decision of the National Government. It relates to an extraordinary and exceptional procedure that does not relate to property rights.  It is restrictively applied and is governed by regulatory laws included in Section 17 of the National Constitution (as per Marienhoff, M.S., in "Tratado de Derecho Administrativo" (Administrative Law Treatise) T. IV p. 129/31 ed. Lexis Nexis 1997).  It constitutes a limitation to private property based on the declaration of "public interest" law enacted by the Congress, pursuant to provisions included in Section 17 of the National Constitution.  Therefore, it is a "power" of the National Government.

9.      Under Argentine law, a sovereign act of the National Government may not be restricted in any way by the alleged "obligation" to launch the public tender offer.  Contrary to

Dr. Naveira's declaration, the power of the National Congress is not limited by the Bylaws of a private company like YPF. The scope of the legislation to satisfy the public interest cannot be conditioned on private agreements like the Bylaws. It is not true, as Dr. Naveira states (in paragraph 65) that the public tender offer requirement "has remained unaltered." No such obligation could exist in the face of an expropriation law enacted by the National Congress.

10. When the Argentine State enacted Law No. 26,741, it did not act as private shareholder of a listed corporation, but as a public law person in exercise of its sovereign power, noting that the law had been enacted for the purposes of "*self-sufficiency in hydrocarbons' supply... its exploration, exploitation, transport, and marketing*," which is crucial for the national economy of the Republic.

11. Therefore, the National Government action, pursuant to the provisions of Law No. 26,741, does not constitute a "business" or "private operation" relating to shares of the expropriated equity, but a sovereign act of government based on "public use" declaration. It begins a process that must end with expropriation, whereby shares will be incorporated into the public domain and may only be re-transferred after the process has been completed, if a law of Congress is enacted with the special majorities set by that Law 26,741 in Section 10.

12. This is not a case controlled by the private laws relating to transfer and registration of listed shares pursuant to the Corporations Law and the law governing Negotiable Instrument Public Offerings. Under Argentine law, the declaration of public use and expropriation of stock representing YPF equity does not constitute an ordinary acquisition of shares, as expropriation is an exceptional regime subjected to a specific public law regime.

13.     In contrast, in the case herein we are considering a decision based on law that declares of "public use" certain equity with specific purposes, which constitutes a sovereign decision of the National Government unrelated to private law or business decisions based on individual property rights.  The Supreme Court has affirmed that expropriation is a unilateral act of power of the expropriating authority whereby it acquires ownership of the property declared of public use **against the will of the expropriated subject** (Supreme Court, Judgments 308:2359).

14.     Thus, the expropriation process carried out by the Argentine Republic does not involve direct or indirect "acquisition" of YPF shares, but it involves the sovereign exercise of expropriation power set forth in Section 17 of the National Constitution, which is not governed -- except for regular registration issues -- by private law.

15.     Therefore, expropriation is not related to the legal concept of "acquisition" described in Section 7 of the YPF Bylaws, since that provision refers to the purchase of shares pursuant to the private property law.  Indeed, the Bylaws could not have included expropriation within the definition of "acquisition" because that would involve subjecting the exercise of the National Government's power to expropriate (Section 17 of the National Constitution) to Bylaws of a corporation applicable only to private interests.  Any such provision would be void as a matter of Argentine law.

16.     Therefore, the acquisition of shares described in Section 7 of the YPF Bylaws only refers to individual and private businesses, and does not relate to expropriation ordered by the National Government as a sovereign act.

17.     Regarding the interpretation of the term "acquisition," it may be added that when YPF intended to provide for an expropriation or any other exercise of extraordinary powers by the National Government, the term "expropriation" was specifically included to enable redemption or to agree upon special rights to shareholders.  This is clear in the provisions of YPF's 1998 bond issuance, concerning YPF bonds subject to foreign regulations.

18.     By contrast, Section 7 of the Bylaws does not mention the case of expropriation, precisely because a provision adding conditions to the exercise of the expropriation power would have been null and void as an unlawful and indirect limitation to sovereign powers of the National Government.

19.     As the Supreme Court held more than 50 years ago, there is no analogy between property transfer by expropriation and the transfer produced in a private sale (*i.e.* one in a typical acquisition where a public tender offer would be applicable).  The first case is a public law relationship in which one of the subjects is the National Government in the exercise of a public right, and the other is a private transaction between individuals (Judgments, 241:73).

20.     Law 26,741 is a "public order" law (section 31 of the National Constitution), and consequently, the law supersedes the Bylaws.  Therefore, and pursuant to our legal system, a "public order" law prevails over non-public order laws – as in the case of the YPF Bylaws – as expressly set forth in Section 21 of the Civil Code, whereby **private agreements may not override laws related to public order**.

21.     Because there is no "acquisition" or transfer of shares as contemplated by the Bylaws, the public use declaration and expropriation of certain YPF shares does not bind the National Government to launch the public tender offer referenced in the Bylaws.

22.     Based on the foregoing, we arrive at an essential conclusion: the expropriation of property and representative shares, set forth by Law 26,741 – as explained below – does not bind the National Government as a YPF shareholder to launch the public tender offer.   This conclusion applies even after the expropriation is concluded and the expropriated shares are registered under the name of the National Government (Law 19,550, Section 215).

**II.  THE NATIONAL GOVERNMENT IS NOT REQUIRED TO MAKE A PUBLIC TENDER OFFER**

23.     When the National State decided upon the expropriation of a certain percentage of equity and securities representing YPF, it acted outside the scope of private law.   This is a decision the Government is entitled to make as a public law person.   Therefore, the YPF Bylaw provisions invoked by Repsol (Section 7(f)) are not applicable under Law No. 26,741.

24.     If the National Government were required to exercise the "public tender offer" of Class D YPF shares, it would make the Expropriation Law and the National Constitution dependent upon such Bylaws provision.   This is incompatible with the purposes of the National Government and its functions, which are intended to serve the public interest.   It would mean binding the State to refrain from exercising its sovereign rights, which is unacceptable.

25.     Notwithstanding these basic considerations of the Argentine judicial system, Dr. Naveira states (in paragraph 65) that: "Throughout the Sections of Law No. 26,741, I find no evidence whatsoever of any purpose to repeal rules contained in YPF's Bylaws which regulate

specific cases of acquisition and/or change of control of the company.  This shows that the public tender offer requirement has remained unaltered. . . . [N]othing prevents the Argentine State from following the procedure provided for in Sections 7 and 8 of the YPF Bylaws."  This analysis simply ignores the impact of the public law on private legal relationships.  It makes no sense to analyze the current situation as if the Expropriation Law did not exist.

26.     If Dr. Naveira's statement were correct, we would be led to an absurd conclusion that private agreements can restrict the Legislative Branch's power to declare the public use of property.  This power belongs to the Congress and may not be limited or extended by the application of agreements among individuals.

27.     The National Government may not be bound by a private contractual agreement to acquire a higher number of shares than necessary in order to satisfy the public use as set forth in Law No. 26,741.  That law declared to be "of public interest" and "subject to expropriation" 51% of YPF equity represented by the same percentage of Class D shares, whether belonging to Repsol YPF SA, its parent or controlled companies, either directly or indirectly (Section 7).  Therefore, the National Congress decided to declare for public use 51% of YPF shares, and no more.

28.     The Expropriation Law's expropriation of a specified percentage of YPF equity indicates that the Expropriation Law excludes any other procedure, such as a contingent public tender offer, whereby the National Government would be forced to acquire a larger number of shares than the number identified by the National Congress.

III.    **THE COMPENSATION PRICE IS IRRELEVANT TO THE ACQUISITION PRICE UNDER THE BYLAWS, AS DR. NAVEIRA ADMITS**.

29.     In section G of his report, Dr. Naveira mentions that the price set to compensate Repsol for the expropriation is incompatible with the price of the "acquisition" pursuant to the YPF Bylaws.  He does not state that the acquisition price and compensation amounts are related.  He does indicate that the expropriation regime (Laws 21,499 and 26,741) is incompatible with that of the public tender offer.

30.     The compensation value set by the National Court of Appraisals does not relate to the value referred to in the Bylaws.  One is "compensation" and the other is "price" (see Marienhoff. M.S. ob. cit p. 244).  Thus, it is clear that the decision to expropriate has nothing to do with the public tender offer provisions included in the company Bylaws.  The rationale and grounds imply that compensation applies to "expropriation" as a sovereign decision.  This difference confirms that expropriation is unrelated to common transactions or negotiations related to shares; "instead, it is a unilateral coercive action of the National Government" (Marienhoff. M.S. p. 245) with constitutional grounds.

31.     Therefore, the future conclusion or application of the expropriation process does not trigger the National Government obligation to launch the public tender offer, because, as previously mentioned, the National Government acts as a public entity, performing a sovereign act related to shares that will fall outside the business scope.

32.     Dr. Naveira suggests that, because the compensation process under the Expropriation Law is unrelated to the public tender offer requirement in the Bylaws, the National Government must acquire the remaining YPF shares.  On the contrary, the compensation process

9

is irrelevant because *the National Government has no obligation to acquire, by public tender offer or expropriation, any more shares than the National Congress decided to acquire when it enacted Law No. 26,741.* Regulations intended to regulate relationships among individuals – or persons acting as such – are not applicable.

## IV.   THE GOVERNMENT'S EXERCISE OF "CONTROL" OVER YPF SHARES IS NOT AN ACQUISITION UNDER THE BYLAWS

33.    Dr. Naveira's opinion is based on the National Government's exercise of control over the YPF shares that are the object of the public use declaration and expropriation. As such, and based on that affirmation, he concludes that the National Government's sovereign power to expropriate is limited by or dependent on the YPF Bylaws, because this exercise of control over the company triggers contractual obligations related to other minority shareholders not affected by the decision to expropriate.

34.    I disagree with Dr. Naveira. It is contrary to Argentine law to construe the Bylaws as a limitation on the sovereign powers of the National Government. Moreover, the Expropriation Law must be interpreted restrictively, limited only to the property covered by that Law.

35.    Here, the expropriation is limited to certain shares of YPF owned by Repsol, not to the balance of the shares owned by minority shareholders. Specifically, Law No. 26,741, Section 13, states that in order to comply with the purposes of expropriation, the Executive Branch -- through persons or entities appointed -- shall exercise rights related to the shares which

are the object of the expropriation, and adds: "... **within the terms of Sections 57 and 59 of such law," *referring to Expropriation Law No. 21,499, which relates to a "temporary occupation."***

36.     According to the legislature, such "temporary occupation" was **necessary** to achieve the goals included in Law 26,741, Section 1 – which are not at issue – as it is essential to guarantee continuity of exploration, production, industrialization and refining of hydrocarbons assigned to YPF and Repsol YPF Gas SA (Section 13).  Law No. 21,499 also allows this type of occupation when necessary for the normal operation of expropriated property.

37.     Such temporary occupation is an essential element of the expropriation process provided by Law No. 21, 499, and thus is validly employed before the expropriation process is completed, as provided by Law No. 26,741. Temporary occupation is an expression of the sovereign power of the National Government and, therefore, its scope may only be decided by the National Government itself acting as sovereign.

38.     The National Government has not "acquired" rights over expropriated shares as representative of the property that is the object of Law No. 26,741, Section 7.   Instead, the government has taken "temporary occupation" of that property.  This process is not identified in the Bylaws as a triggering event for a public tender offer.

39.     To conclude, the expropriation of YPF equity and shares does not require the National Government to launch a public tender offer under the Bylaws.

40.     Once the expropriation process of the equity specified by the Expropriation Law has commenced, a public law case has arisen, justified by the National Government's essential function involving promotion of common good.  As mentioned above, this function is outside the

scope of private property rights, and therefore such sovereign decision may not be subjected to YPF Bylaw provisions.  The Bylaws may not override a Law such as Law No. 26,741 nor provide that the National Government – the expropriator in legal terms – is bound to act in a manner not set forth by the Expropriation Law.

41.    The Bylaw provisions referring to special rights aimed to regulate the relationships within a corporation are fully valid among shareholders, but may not bind the National Government acting as a public legal person and in exercise of its sovereign powers, as Repsol contends.

42.    It should be understood that the public use declaration, temporary occupation, and expropriation set forth in Law No. 26,741 are not cases requiring the launching of a public tender offer as provided in YPF Bylaws.  The Republic's decision to declare certain Repsol shares in YPF of public use and subject to expropriation, and to make a temporary occupation during the expropriation process based on a Public Order Law (Law No. 26,741), does not constitute "acquisition" under the Bylaws and does not require the public tender offer set forth in those Bylaws.

43.    Therefore, the Judge should ask: May the Legislative Branch of a Sovereign Government, whether Argentina or the United States, be limited to or conditioned by the exercise of its public power by agreements among individuals?  Clearly, the answer is no.  In this

case, we are faced with an act of State that is not restricted by the intentions of private individuals.  It is protected by the sovereign immunity of States under international law.

I state under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge and information.

In Buenos Aires, Argentina, on the _28_ day of August of 2013.

[signature]
Martín Arecha

APPENDIX B

<u>List of documents analyzed</u>

- Marienhoff, Miguel S. "Derecho Administrativo (Administrative Law), Volumes IV and V, ed. Lexis Nexis, 1998.

- Borda, Guillermo A. "Derechos reales (Property rights)", ed. Abeledo Perrot

- Belluscio, Agusto C. "Codigo Civil Anotado y leyes complementarias, comentado, anotado y concordado (Annotated Civil Code and complementary laws, with comments, notes and compared"  Volume 1, ed. Astrea, 2005.

- Zannoni, Eduardo A. "Codigo Civil Anotado y leyes complementarias, comentado, anotado y concordado (Annotated Civil Code and complementary laws, with comments, notes and compared"  V. 10 Astrea, 2005.

- Villegas, Carlos G. "Titulos Valores y Valores Negociables (Securities and Negotiable Instruments)" ed. La Ley 2004.

- 19,550 Commercial corporations.

- 21,499 Expropriations.

- 26,741 National Oilfields

- 26,831 Capital Markets

- Decree 677/01 Transparency Policy for Public Offerings

- Bylaws of YPF Sociedad Anonima

- Judgments: 187-24 "Jose Tagliaferri vs. Prov. of San Juan" of 6.10.1940

- Judgments: 212-287: "Argentine Nation vs. Children of Luis Constantini" of 11.15.48

- Judgments 308-1282: "Osvaldo Sanabria vs. Municipality of the City of Buenos Aires" of 8/21/1986.

[signature]

MARTIN ARECHA

ATTORNEY

T$^o$5 F$^o$942

14



**Global Language Services**
Translations · Interpreting
DTP · Localization

KERN Corporation
The Helmsley Building
230 Park Avenue, Suite 1517
New York, NY 10169

State of :     New York                          ss.:     Tel. (212) 953 2070
                                                          Fax (212) 953 2073
County of:     New York                                   kern.ny@e-kern.com

                                                 **www.e-kern.com**

## CERTIFICATE OF ACCURACY

*IT IS HEREBY CERTIFIED*, *that  KERN Corporation, a corporation organized and existing under the laws of the State of New York, is professionally engaged in the rendering of foreign language translation services; that it has translated the following document(s)*

**RESPONSE STATEMENT OF MARTÍN ARECHA
IN SUPPORT OF THE ARGENTINE REPUBLIC'S
MOTION TO DISMISS THE COMPLAINT**

*from the* **SPANISH** *language into the* **ENGLISH** *language
and that the said translation is a true and correct rendering of the said document to the best of our knowledge and belief.*

Signed by: _____

(Eric Schloss)
for

Sworn to before me this

Day of _____, 2013.

**JOY WILTERMUTH**
NOTARY PUBLIC, State of New York
**No. 01WI - 6093589**
Qualified in New York County
My Commission Expires June 20, 2015

Notary Public

KERN Corporation
The Helmsley Building
230 Park Avenue, Ste.1517
New York, NY 10169
Tel: 212 953-2070
www.e-kern.com

KERN 06/2008

San Francisco: KERN Corporation · The Russ Building · 235 Montgomery Street, Suite 946 · San Francisco, CA 94104
Tel. (415) 433 5376 · Fax (415) 433 5377 · kern.sf@e-kern.com

London: Tel. 011 44 (20) 78 31 56 00 · Frankfurt: Tel. 011 49 (69) 75 60 73-0 · Berlin: Tel. 011 49 (30) 24 72 12 50 · Paris: Tel. 011 33 (1) 53 93 85 20
Zurich: Tel. 011 41 (1) 2 61 11 60 · Hong Kong: Tel. 011 (852) 28 50 44 55 · Amsterdam: Tel. 011 31 (20) 6 39 01 19 · Lyon: Tel. 011 33 (4) 783 783 73

TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
DISTRITO SUR DE NUEVA YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REPSOL YPF, S.A., y TEXAS YALE       :
CAPITAL CORP., a título personal y en
representación de otras partes en situación similar,       :

         Demandantes,       :     12 Civ. 3877 (TPG)

      contra       :

REPÚBLICA ARGENTINA       :

         Demandada.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARACIÓN DE RESPUESTA DE MARTÍN ARECHA
### PRESENTADA EN APOYO AL
### <u>PEDIDO PARA RECHAZAR LA DEMANDA</u>
### DE LA REPÚBLICA ARGENTINA

De conformidad con el Artículo 28 del U.S.C. § 1746, quien suscribe, Martín Arecha, declaro lo siguiente:

1.       Soy un abogado habilitado para ejercer la profesión bajo la ley de Argentina. Ya he presentado una declaración jurada en apoyo al pedido efectuado por la República Argentina (la "República") para rechazar la demanda en el presente reclamo de acción de clase presentada por Repsol SA derivada del proceso de expropiación que la República ha iniciado sobre las acciones de YPF SA ("YPF" o la "Sociedad").

2.       Se me ha solicitado responder a la declaración jurada presentada por el Dr. Gustavo Naveira respecto de las siguientes preguntas conforme a los parámetros de la ley de Argentina:

      (a)       si el Estado Nacional de Argentina ha "adquirido" las acciones de YPF que son objeto de la ocupación temporaria y del proceso de expropiación que la República Argentina inició en el año 2012;

(b)     si el Estado Nacional se encuentra obligado a realizar una oferta pública de las acciones de YPF que no son objeto de la ocupación temporaria ni del proceso de expropiación.

3.     En su declaración jurada, el Dr. Naveira sostiene que el Estado Nacional está obligado a realizar la "oferta pública" prevista en el Estatuto de YPF respecto de las acciones no incluidas en la declaración de expropiación.   Sostiene que, como consecuencia de esa expropiación, se verifican los presupuestos para que se genere esa supuesta obligación a cargo del Estado Nacional, en particular respecto de Repsol y Texas Yale, los accionistas de YPF, con base en el estatuto de la sociedad. El Dr. Naveira señala también que a fin de realizar tal oferta, no es necesario que se inscriban las acciones conforme lo dispone el Artículo 215 de la Ley 19.550.

4.     No estoy de acuerdo con las conclusiones del Dr. Naveira por diferentes motivos. Lo más importante, es que no reconoce que la República Argentina sancionó la Ley 26.741 en ejercicio de su poder soberano. Un Acto de Estado no se relaciona con el Estatuto de una sociedad comercial privada como YPF, y no puede estar limitado o condicionado por dicho Estatuto.

## I.   NO HA HABIDO "ADQUISICIÓN" DE LAS ACCIONES DE YPF

5.     La Ley N° 26.741 declaró de "utilidad pública" y "sujeto a expropiación"... *el "...51% del patrimonio de YPF SA. representado por igual porcentaje de acciones clase D de dicha empresa, pertenecientes a Repsol YPF S.A., sus controlantes o controladas" (art. 7).* Debe destacarse que conforme la mencionada Ley, el objeto de la declaración de utilidad pública

2

y sujeción a expropiación es el "patrimonio" de esa sociedad.   Debido a que YPF es una sociedad del tipo anónima según la Ley N° 19.550), la norma de expropiación se refiere a las acciones representativas de esa participación en el capital social.

6.      La declaración de que ciertas acciones queden sujetas a expropiación en virtud del interés público, sólo se refiere a las que se individualizan en esa ley – que representan el patrimonio expropiado - pero no autoriza ningún tipo de pago ni otorga derecho alguno a los accionistas cuyas tenencias accionarias no estén comprendidas entre las que se identifican en esta Ley (Artículo 7° de la Ley N° 26.741, conforme al artículo 5° y siguientes de la Ley N° 21.499).

7.      Si el Congreso de la Nación Argentina hubiera requerido que para la satisfacción de la utilidad pública se expropiara una mayor proporción del patrimonio de YPF representado en una mayor cantidad de acciones a la identificada en el artículo 7° de la Ley 26.741, el Congreso así lo hubiera resuelto al sancionar dicha norma.  Por lo tanto, el proceso expropiatorio es en sí mismo excluyente de cualquier otro procedimiento, como la oferta pública de adquisición descripta en el Estatuto de YPF, que obligaría al Estado Nacional a adquirir una cantidad de acciones mayor que la necesaria para cumplir con la finalidad de la expropiación.

8.      La expropiación constituye una decisión soberana del Estado Nacional. Se trata de un procedimiento extraordinario, de excepción, que no pertenece al derecho de propiedad.  Es de aplicación restrictiva y se dispone por leyes reglamentarias del artículo 17 de la Constitución Nacional (conf. Marienhoff, M.S. en "Tratado de Derecho Administrativo" T. IV p. 129/31 ed. Lexis Nexis 1997). Constituye así, una limitación a la propiedad privada fundada en la declaración por ley de "utilidad pública" efectuada por el Congreso de la Nación, conforme lo

3

previsto por el artículo 17 de la Constitución Nacional. Por lo tanto, es una "potestad" del Estado Nacional.

9.      Conforme a la ley de Argentina, un acto soberano del Estado Nacional no podría encontrarse condicionado de ninguna manera por la supuesta "obligación" de lanzar la OPA. Contrariamente a la declaración del Dr. Naveira, la potestad del Congreso Nacional no resulta limitada por el Estatuto de una empresa privada como lo es YPF. El alcance de la voluntad legislativa en torno a la satisfacción del interés público no puede verse condicionada por acuerdos privados como son los Estatutos. Resulta errónea la manifestación del Dr. Naveira (en el párrafo 65) al sostener que el requisito de oferta pública de adquisición "se mantuvo incólumne". Nunca podría haber existido válidamente dicha obligación frente a una ley expropiatoria del Congreso de la Nación.

10.      Cuando el Estado Argentino promulgó la Ley N° 26.741, no actuó como accionista privado de una sociedad anónima cotizante, sino que lo hizo como persona de derecho público en ejercicio de su poder soberano, al punto de señalar que el objeto de la ley es lograr el "*autoabastecimiento de hidrocarburos...la exploración, explotación, transporte y comercialización de hidrocarburos...*", aspectos éstos que resultan de vital importancia para la economía nacional de la República.

11.      Así, la actuación del Estado Nacional en virtud de la Ley N° 26.741 no constituye un "negocio" ni una "operación privada" sobre las acciones representativas del patrimonio expropiado, sino un acto soberano de gobierno fundado en la declaración de "utilidad pública". Se trata del inicio de un proceso que debe culminar con la expropiación, por el cual las acciones

4

se incorporarán al dominio público del Estado y solo podrán ser transferidas nuevamente una vez culminado el proceso, si se sanciona una nueva ley del Congreso con las mayorías especiales que establece la misma Ley N° 26.741 en el artículo 10.

12. No se trata de un caso regido por la legislación privada relacionada con la transferencia y la inscripción de acciones que cotizan en bolsa conforme a la Ley de Sociedades y la Ley que regula el Régimen de Oferta Pública de Valores Negociables. Conforme a la ley de Argentina, la declaración de utilidad pública y expropiación de acciones que representan el patrimonio de YPF no constituyen una adquisición ordinaria de acciones, ya que la expropiación es un régimen excepcional sujeto a un régimen legal público especial.

13. Por el contrario, en el caso en consideración estamos ante una decisión fundada en ley que declara de "utilidad pública" cierto patrimonio con fines específicos y ello constituye una decisión soberana del Estado Nacional que, por lo tanto, resulta ajena al derecho privado o a decisiones negociables fundadas en intereses patrimoniales individuales. La Corte Suprema de Justicia de la Nación ha señalado que la expropiación es un acto unilateral de poder de la autoridad expropiante por el cual ésta adquiere la propiedad del bien declarado de utilidad pública **contra la voluntad del expropiado** (CSJN, Fallos, 308:2359).

14. De esa forma, el proceso de expropiación llevado adelante por la República Argentina no consiste en una "adquisición" directa ni indirecta de acciones de YPF S.A., sino en el ejercicio soberano de la potestad expropiatoria establecida en el artículo 17 de la Constitución Nacional que, salvo temas de inscripción registral, no se rige por el derecho privado.

5

15.     La expropiación, por lo tanto, no puede ser asimilada al concepto jurídico de "adquisición" previsto en el artículo 7° del Estatuto de YPF, desde que esa disposición se refiere a la compra de acciones prevista en el derecho privado patrimonial.   De hecho, el Estatuto no pudo haber incluido a la expropiación dentro de la definición de "adquisición" ya que tal supuesto significaría una sujeción del poder del Estado Nacional de ejercer su potestad de expropiar (art. 17 de la Constitución Nacional) a una disposición estatutaria de una sociedad anónima que se rige únicamente por el derecho privado.   Dicha disposición sería nula conforme a la legislación argentina.

16.     Entonces, adquirir acciones –de acuerdo al artículo 7 del estatuto de YPF – sólo se refiere a negocios privados e individuales y no a la expropiación dispuesta por el Estado Nacional como acto soberano.

17.     Al interpretar el término "adquisición", puede agregarse que cuando YPF quiso contemplar el supuesto de expropiación o de cualquier otro ejercicio de poderes extraordinarios por parte del Estado Nacional, específicamente previó ese supuesto de "expropiación" para habilitar el rescate o acordar derechos especiales a los acreedores.   Esto se observa claramente en las disposiciones de la emisión de bonos de YPF de 1998, sujetos a la ley extranjera.

18.     Contrariamente, el artículo 7 del Estatuto no hace referencia al caso de la expropiación, precisamente porque una disposición que agregue condiciones al ejercicio de la potestad para expropiar hubiera resultado nula e inválida, configurándose una limitación ilícita e indirecta a los poderes soberanos del Estado Nacional.

19.    Como lo ha indicado la Corte Suprema de Justicia de la Nación hace más de cincuenta años, no cabe encontrar analogía entre la transferencia de la propiedad por la expropiación y la que se produce por una compraventa privada (es decir, la que se daría en una adquisición típica a la que se aplicaría el régimen de la OPA).  En el primer caso, se trata de una relación de derecho público en que uno de los sujetos es el Estado Nacional en ejercicio de la potestad pública, y en el segundo caso, se trata de una operación privada entre individuos (Fallos, 241:73).

20.    La ley 26.741 es de "orden público" (artículo 31 de la Constitución Nacional) y, por consiguiente, se encuentra por encima de lo que disponen los Estatutos. Por lo tanto, conforme nuestro sistema legal, la norma de "orden público" prevalece sobre aquellas que no lo son –caso del estatuto de YPF– tal como expresamente lo dispone el artículo 21 del Código Civil, conforme el cual **las convenciones particulares no pueden dejar sin efecto las leyes en cuya observancia esté interesado el orden público.**

21.    Debido a que no existe una "adquisición" o transferencia de acciones como lo establece el Estatuto, la declaración de utilidad pública y la expropiación de determinadas acciones de YPF no obliga al Estado Nacional a lanzar la oferta pública de adquisición prevista en el Estatuto.

22.    De todo ello se deriva una conclusión fundamental: la expropiación de los bienes y de las acciones representativas dispuestas por la Ley N° 26.741- tal como se detalla a continuación - no obliga al Estado Nacional como accionista de YPF S.A. a lanzar la OPA. Tal

conclusión es extensible incluso luego de que la expropiación quede concluida y las acciones expropiadas sean inscriptas a nombre del Estado Nacional (Ley 19.550, artículo 215).

## II.   EL ESTADO NACIONAL NO ESTÁ OBLIGADO A LANZAR UNA OFERTA PÚBLICA DE ADQUISICIÓN

23.    Cuando el Estado Nacional decidió sobre la expropiación de un determinado porcentaje del patrimonio y de los títulos que representan a YPF, actuó fuera del ámbito del derecho privado.  Se trata de una decisión del Estado que le corresponde como persona de derecho público.  Por lo tanto, las normas del estatuto de YPF que invoca Repsol (artículo 7° inciso f), no resultan operativas conforme a la Ley N° 26.741.

24.    Si el Estado Nacional debiera ejercer la OPA de las acciones clase D de YPF, significaría otorgar a la Ley de Expropiación y a la Constitución Nacional una dependencia a las disposiciones de los Estatutos.  Dicho supuesto resulta incompatible con las finalidades que debe perseguir el Estado Nacional y con sus funciones, concebidas para cumplir el interés público. Significaría obligar al Estado a no ejercer sus derechos soberanos, lo cual resulta inadmisible.

25.    No obstante estas consideraciones básicas del sistema jurídico argentino, el Dr. Naveira afirma (en el párrafo 65) lo siguiente: "No observo a lo largo de todo el articulado de la Ley N° 26.741 ninguna evidencia del propósito de derogar normas del Estatuto de YPF que regulan los supuestos específicos de adquisición o cambios de control de la compañía. Ello demuestra que la obligación de lanzar la OPA se mantuvo incólumne. . . . [N]ada impide al Estado Argentino cumplir con el procedimiento previsto por los artículos 7 y 8 del Estatuto de YPF". Este análisis simplemente ignora el impacto de la ley pública sobre las relaciones jurídicas

8

privadas. No tiene sentido analizar la situación actual como si no existiera la Ley de Expropiación.

26.    Si la afirmación del Dr. Naveira fuera correcta, llevaría a la absurda conclusión de que los acuerdos privados podrían limitar la facultad del Poder Legislativo para declarar la utilidad pública de un bien.  Esta facultad pertenece al Congreso, no pudiéndose ver limitada o extendida por acuerdos regidos entre privados.

27.    El Estado Nacional no podría verse obligado por un acuerdo contractual privado a adquirir una mayor cantidad de acciones que aquella que consideró necesaria a los efectos de atender la necesidad pública según lo dispuesto por la Ley N° 26.741. Dicha ley declaró de "utilidad pública" y "sujeto a expropiación"... el ...51% del patrimonio de YPF representado por igual porcentaje de acciones clase D, pertenecientes a Repsol YPF S.A., sus controlantes o controladas, ya sea de manera directa o indirecta (Artículo 7).    Es decir, el Congreso de la Nación Argentina decidió declarar de utilidad pública el 51% de las acciones de YPF, ni más ni menos acciones.

28.    Esta cuestión de expropiación de un porcentaje específico de patrimonio de YPF sólo da cuenta de que la Ley de Expropiación es en sí misma excluyente de cualquier otro procedimiento, como una eventual OPA, por la cual el Estado Nacional se viera expuesto a adquirir una cantidad de acciones mayor a la que el Congreso de la Nación identificó.

III.    EL IMPORTE DE LA INDEMNIZACIÓN NO ES RELEVANTE AL PRECIO DE ADQUISICIÓN CONFORME AL ESTATUTO, TAL COMO ADMITE EL DR. NAVEIRA.

29.    En el párrafo G de su informe, el Dr. Naveira indica que el precio fijado para indemnizar a Repsol por la expropiación es incompatible con el precio de la "adquisición" conforme al Estatuto de YPF. No se afirmó que el precio de adquisición y el importe de la indemnización estén relacionados. Si se señaló que el régimen de la expropiación (Leyes Nros. 21.499 y 26.741) es incompatible con el de la OPA.

30.    El valor de la indemnización determinado por el Tribunal de Tasaciones de la Nación no se relaciona con el valor  referido en el Estatuto. Uno es "indemnización" y el otro es "precio" (ver Marienhoff. M.S. ob. cit p. 244).  Así se refuerza claramente que la decisión de expropiar nada tiene que ver con las disposiciones de la OPA incluidas en el Estatuto de la Sociedad. La razón y fundamento es que la indemnización corresponde a la "expropiación" como decisión soberana. Tal diferencia ratifica que la expropiación es ajena a operaciones o negociaciones ordinarias sobre acciones; "...sino que se trata de un acto unilateral coactivo del Estado Nacional" (Marienhoff. M.S. p. 245) con fundamento constitucional.

31.    Por lo tanto, la futura conclusión o perfeccionamiento del proceso expropiatorio no constituye tampoco un presupuesto que habilite la obligación del Estado Nacional de lanzar la "OPA", ya que como se ha dicho, el Estado Nacional actúa como persona pública que realiza un acto soberano que recaerá sobre acciones que quedarán fuera del comercio.

32.    El Dr. Naveira sugiere que, dado que el proceso de indemnización conforme a la Ley de Expropiación no se relaciona con el requisito de oferta pública incluido en los Estatutos,

10

existe una obligación del Estado Nacional de adquirir las restantes acciones de YPF. Por el contrario, el proceso de indemnización es irrelevante porque *el Estado Nacional no tiene ninguna obligación de adquirir, ya sea por lanzamiento de una OPA o por expropiación, más acciones que las expresamente decidió adquirir el Congreso Nacional cuando sancionó la Ley N° 26.741*. Es por ello que aquellas disposiciones que tuvieran como objetivo regular las relaciones entre particulares, o entre sujetos en dicho carácter, no son válidas.

## IV.   EL "CONTROL" DE LAS ACCIONES DE YPF POR PARTE DEL ESTADO NACIONAL NO CONSTITUYE ADQUISICIÓN CONFORME A LOS ESTATUTOS

33.   La opinión del Dr. Naveira se funda en el ejercicio de control por parte del Estado Nacional sobre las acciones de YPF  objeto de la declaración de utilidad pública y sujeción a expropiación. De tal modo y en base a esa afirmación llega a la conclusión de que el poder soberano de expropiar del Estado Nacional se encuentra  limitado o condicionado por el Estatuto de YPF, ya que dicho ejercicio de control sobre la sociedad le generaría obligaciones contractuales respecto de otros accionistas minoritarios no alcanzados por su decisión de expropiar.

34.   No estoy de acuerdo con el Dr. Naveira. La interpretación de los Estatutos como una limitación sobre los poderes soberanos del Estado Nacional contradice la legislación argentina. Además, la Ley de Expropiación se debe interpretar de manera restrictiva, limitada exclusivamente a los bienes mencionados en dicha Ley.

35.   En este caso, la expropiación se limita a una determinada cantidad de acciones de YPF pertenecientes a Repsol, no se refiere al resto de las acciones pertenecientes a accionistas

11

minoritarios. Concretamente, la Ley N° 26.741 en su artículo 13, dispone que a fin de cumplir las finalidades de la expropiación, el Poder Ejecutivo –a través de las personas u organismos que designe– ejercerá los derechos que corresponden sobre las acciones objeto de expropiación, y añade : "... *en los términos de los artículos 57 y 59 de dicha norma" refiriéndose a la Ley de Expropiaciones N° 21.499,  remisión que indica que se trata de una "ocupación temporánea".*

36.     Según la valoración del legislador, tal "ocupación temporánea" resulta en el caso **necesaria** para el cumplimiento de las finalidades de la Ley N° 26.741 (artículo 1°) – que no representan materia de controversia – por resultar indispensable la continuidad operativa de la explotación, producción, industrialización y refinación de hidrocarburos a cargo de YPF y Repsol YPF Gas S.A. (artículo 13). También la Ley N° 21.499 permite en el caso de necesidad ese tipo de ocupación, que resulta indispensable para el normal desenvolvimiento de los bienes expropiados.

37.     La mencionada ocupación temporánea es un elemento esencial del proceso de expropiación previsto en la ley de expropiación N° 21.499 y por tanto valida su utilización en forma previa al perfeccionamiento de la expropiación, como se establece en la Ley N° 26.741. La ocupación temporánea es una expresión del poder soberano del Estado Nacional y, por ende, su alcance sólo puede ser determinado por el propio Estado Nacional actuando como soberano.

38.     El Estado Nacional no ha "adquirido" los derechos sobre las acciones expropiadas como representativas del patrimonio objeto de la Ley N° 26.741 artículo 7°, sino que ejerce la "ocupación temporánea" de dichas acciones.  Este proceso no puede ser identificado con los supuestos estatutariamente previstos para disparar la OPA.

39.     En definitiva, la expropiación del patrimonio de YPF  y de las acciones no obligan al Estado Nacional a lanzar la OPA prevista en el Estatuto.

40.     Iniciado el proceso de expropiación del patrimonio individualizado en la Ley de Expropiación, nos encontramos ante una institución de derecho público fundada en la función esencial del Estado de promover el bien común.  Como mencionamos anteriormente, dicha función resulta ajena al derecho patrimonial privado y, por tanto, tal decisión soberana no puede quedar supeditada a las disposiciones del estatuto de YPF.  El Estatuto no puede sobreponerse a una ley como la Ley N° 26.741 ni disponer que el Estado Nacional –sujeto expropiante en los términos legales– resulte obligado de un modo no previsto en la Ley de Expropiación.

41.     Las estipulaciones del Estatuto que se refieren a derechos especiales previstos para regular las relaciones intrasocietarias tienen pleno valor entre los accionistas pero no pueden obligar al Estado Nacional actuando como persona jurídica pública y en ejercicio de sus poderes soberanos, como pretende Repsol.

42.     Debe entenderse, entonces, que la declaración de utilidad pública, ocupación temporánea y sujeción a expropiación dispuesta por la Ley N° 26.741, no constituyen presupuestos que habiliten la OPA prevista en el Estatuto de YPF. La decisión de la República de declarar de utilidad pública y sujeto a expropiación ciertas acciones de Repsol en YPF, y de ocuparlas temporáneamente mientras tramita el proceso expropiatorio en base a una Ley de Orden Público (Ley N° 26.741), no constituye una "adquisición" según las previsiones del Estatuto ni establece la oferta pública de adquisición que menciona dicho estatuto.

13

43.  La pregunta que el Juez debe hacerse, entonces, es: ¿puede el Poder Legislativo de un Estado Soberano, sea Argentina o Estados Unidos, encontrarse limitado o condicionado en el ejercicio de su poder público, por acuerdos entre privados? Claramente, la respuesta es negativa. En este caso, estamos frente un acto de Estado que, como tal, no se encuentra condicionado por la voluntad de los particulares. Goza de la inmunidad soberana de los Estados bajo el derecho internacional.

Declaro bajo pena de perjurio conforme las leyes de los Estados Unidos de América que lo que antecede es verdadero y correcto de acuerdo a mi leal saber y entender.

En Buenos Aires, Argentina, _28_ de agosto de 2013.

_____
Martín Arecha

ANEXO B

Lista de documentos analizados

- Marienhoff, Miguel S. "Derecho Administrativo", Tomos IV y V, ed. Lexis Nexis, 1998.

- Borda, Guillermo A. " Derechos reales", ed. Abeledo Perrot

- Belluscio, Agusto C. "Código Civil Anotado y leyes complementarias, comentado, anotado y concordado" Tomo 1, ed. Astrea 1988.

- Zannoni, Eduardo A. "Código Civil Anotado y leyes complementarias, comentado anotado y concordado" T. 10 Astrea, 2005.

- Villegas, Carlos G. "Títulos Valores y Valores Negociables" ed. La Ley 2004.

- 19.550 Sociedades comerciales.

- 21.499 Expropiaciones.

- 26.741 Yacimientos Petrolíferos Fiscales

- 26.831 Mercado de Capitales.

- Decreto 677/01 Régimen de Transparencia de oferta Pública.

- Estatuto de YPF Sociedad Anónima

- Fallos: 187 – 24; "José Tagliaferri c/ Prov. de San Juan" del 10.6.1940

- Fallos: 212- 287; "Nación Argentina c/ Hijos de Luis Constantini" del 15.11.48.

- Fallos: 308 – 1282 "Osvaldo Sanabria c/ Municipalidad de la Ciudad de Buenos Aires" del 21/8/1986.

MARTIN ARECHA
ABOGADO
T°5 F°942