```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   REPSOL YPF, S.A.,
     REPSOL, S.A.,
 4
                    Plaintiffs,
 5                                         12 Civ. 3877 (TPG)
              v.                           12 Civ. 4018 (TPG)
 6                                         12 Civ. 8799 (TPG)
     REPUBLIC OF ARGENTINA,
 7   CHEVRON CORP.,
                                           Argument
 8                  Defendants.
     ------------------------------x
 9                                         New York, N.Y.
                                           September 6, 2013
10                                         11:00 a.m.
     Before:
11
                 HON. THOMAS P. GRIESA
12                                         District Judge

13

             APPEARANCES
14

15   LATHAM & WATKINS LLP
          Attorneys for Repsol YPF, S.A. plaintiffs
16   BY:  CHRISTOPHER HARRIS
          JASON VOLBE
17

18   QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Plaintiff Repsol, S.A.
19   BY:  STEPHEN A. BROOME

20
     DOAR, RIECK, KALEY & MACK
21        Attorneys for Defendant Republic of Argentina
     BY:  EDWARD SCARVALONE
22        JONATHAN A. WILLENS

23

     WILSON SONSINI GOODRICH & ROSATI P.C.
24        Attorneys for Defendant Chevron
     BY:  MICHAEL S. SOMMER
25        JESSICA MARGOLIS
```

```
 1                    (Case called)

 2              THE COURT:  Could we start with the lawsuit against

 3    the republic about the disclosure statement.  Who wants to

 4    speak from the plaintiffs?  I have some questions.

 5              MR. HARRIS:  Your Honor, Chris Harris of Latham &

 6    Watkins for the plaintiff, Repsol.  Just to clarify, we

 7    represent Repsol in that matter and the bylaw matter, and Mr.

 8    Broome from Quinn Emanuel represents Repsol in the Chevron

 9    matter.

10              THE COURT:  On the suit against the republic, what

11    relief are you seeking?

12              MR. HARRIS:  We are seeking that the republic be

13    ordered to issue the disclosures required by regulation 13(d).

14    Those would be disclosures that are triggered by its control of

15    more than 5 percent of the shares of YPF.

16              THE COURT:  After the expropriation?

17              MR. HARRIS:  After having received control of them.  I

18    believe as a technical matter the expropriation has not yet

19    occurred.  It has announced its intent to expropriate, and it

20    has separately seized control of the shares through what is

21    called a temporary occupation under Argentine law.  So they

22    have seized control of the shares and of the company and of all

23    the rights associated with the shares, but the actual

24    expropriation where they take legal title, that has not yet

25    been completed.
```

 1             THE COURT:  Who will speak for the republic?

 2             MR. SCARVALONE:  Your Honor, I will.  Edward

 3    Scarvalone of Doar Rieck Kaley & Mack.  Would you like me to

 4    respond?

 5             THE COURT:  Is Cleary Gottlieb not involved in this?

 6             MR. SCARVALONE:  Correct, Cleary Gottlieb is not

 7    involved in the defense of this matter, your Honor.  We

 8    represent the republic both in the 13(d) lawsuit that your

 9    Honor has inquired about as well as the other lawsuit against

10    the republic having to do with the bylaws of YPF.

11             THE COURT:  I want to ask you about the issue about

12    the disclosure statement, the 13(d) statement.  YPF is a public

13    company, right?

14             MR. SCARVALONE:  Correct.

15             THE COURT:  How long has it been a public company?

16             MR. SCARVALONE:  It's been a public company since the

17    early '90s, when the republic went public with the stock.

18    There was an IPO referenced in both sides' motion papers

19    referring to an IPO in 1993.

20             THE COURT:  OK.

21             MR. SCARVALONE:  It was public from 1993 forward.

22    Last year, in or around April, the republic announced its

23    intention to expropriate a controlling interest in the company.

24    They chose to do that not by expropriating 100 percent of the

25    shares, not by launching a tender offer for a controlling

 1    interest in the shares.

 2         Rather, they chose to get control of the company by

 3    means of the expropriation process limited to 51 percent of the

 4    shares.  They took that 51 percent from Repsol.  It is that

 5    process that has unleashed litigation both in this court, in

 6    Argentina, and also before the World Bank arbitration tribunal

 7    known as ICSID, the International Center for the Settlement of

 8    Investment Disputes.

 9         THE COURT:  YPF has been a public company.  It's been

10    registered with the SEC, right?

11         MR. SCARVALONE:  I believe there is a registration

12    statement.

13         MR. HARRIS:  That's correct, your Honor.  YPF has been

14    filing required statements with the SEC since 1993 and

15    continues to be registered and continues to have its ADSs

16    traded on the New York Stock Exchange.

17         MR. SCARVALONE:  If I could chime in, your Honor --

18         THE COURT:  Don't chime in.  What?

19         MR. SCARVALONE:  YPF has continued to make disclosures

20    under various provisions of the U.S. securities laws.

21         THE COURT:  There is a section 13(d), right?

22         MR. SCARVALONE:  Correct.

23         THE COURT:  My understanding is that someone who buys

24    5 percent or more of a public company must file a 13(d)

25    statement.  Is that correct?

 1          MR. SCARVALONE:  Yes, that is correct, someone who

 2   buys 5 percent or more.  Argentina has not bought.  Argentina

 3   has expropriated.

 4          MR. HARRIS:  Your Honor, the statute actually is

 5   triggered by acquiring beneficial ownership, which includes

 6   control of shares, which is not in dispute here.

 7          THE COURT:  I have a very simple question.  There is a

 8   lawsuit and you pose numerous defenses.  I don't understand why

 9   the republic simply doesn't file the statement.  It seems to me

10   that filing of the statement is indeed required by United

11   States law.  I don't understand why there has to be a lawsuit.

12   I don't understand why there has to be a lawsuit followed up by

13   the numerous defenses that you have posed.  Why does there have

14   to be any such lawsuit?  Why does not the republic simply file

15   a statement?  Is the republic not going to comply with United

16   States law?

17          MR. SCARVALONE:  Your Honor, the republic has decided

18   to let YPF, the company, make public announcements about the

19   business plans and operations of the company.

20          THE COURT:  You are not answering my question.  Of

21   course the republic has decided.  But it seems to me very, very

22   clear that United States law requires a statement by the

23   republic.  Why doesn't the republic comply with United States

24   law?

25          You've got a public company, an Argentine company,

1    that regularly makes filings with the SEC in compliance with

2    United States law.  Along comes an event which clearly required

3    the republic to file a statement.  Why doesn't the republic do

4    what YPF was doing, file the required statements?  Are we

5    having another instance where the republic violates the law?  I

6    don't see why it does.  Why doesn't it file a statement?

7         MR. SCARVALONE:  Your Honor, may I answer?  Your

8    Honor, the republic has made a decision that relies on two

9    well-thought-out principles.  One is it will let the issuer

10   YPF, make announcements, as YPF has continued to do since the

11   expropriation.  It makes regular announcements known as 6-Ks

12   that are filed on the SEC website, on the EDGAR system, that

13   make available to the world, current investors, prospective

14   investors, that make available to the world all the information

15   that would be required by 13(d).

16        Secondly, your Honor, and this is clear from the

17   legislative history and from the case law that interprets

18   section 13(d), the purpose of 13(d) is to alert the world, to

19   alert the marketplace, about prospective changes in corporate

20   control in order to give investors an opportunity to learn

21   about a potential tender offer that might take place.  13(d) is

22   not intended to address the situation, as we have here, where a

23   change of control has happened.  It's happened in April of

24   2012, as Mr. Harris pointed out.

25        THE COURT:  I think you are just dead wrong.  Maybe

1    I'm dead wrong.  My understanding is if someone acquires 5

2    percent or more, then the 13(d) statement is required.  Am I

3    right or wrong?

4          MR. HARRIS:  That's correct, your Honor.  There is a

5    continuing obligation then to update.  There is no exception

6    unless you avoid the requirements by seizing control and then

7    you have somehow evaded 13(d).  It is the exact opposite.

8          MR. SCARVALONE:  Our point is somewhat different, your

9    Honor.  We will agree for purposes of the motion that the

10   plaintiffs state a claim for relief under 13(d).  However, our

11   argument in our motion is that the relief they are seeking,

12   namely, a mandatory injunction requiring the republic to make

13   13(d) disclosure, that injunction cannot issue, because a 13(d)

14   injunction can only issue when it is issued in order to serve

15   the purposes of the statute, which is to alert the marketplace

16   to potential changes in control.  It has no application here.

17         THE COURT:  I think you are completely misreading the

18   statute, and your motion to dismiss is denied.

19         MR. SCARVALONE:  Your Honor, I urge you to, if your

20   Honor has a moment, look at the authorities cited in our brief,

21   including the ICN Pharmaceuticals case.

22         THE COURT:  The motion is denied.  Thank you.

23         MR. SCARVALONE:  Thank you, your Honor.

24         THE COURT:  The motion is denied.  I would hope that

25   the republic, upon reflection, would begin to do something it

 1   has not done for the last 13 years in this court and in the

 2   Court of Appeals, and that is comply with the law.  I would

 3   hope that the republic would decide to comply with this phase

 4   of United States law, which doesn't hurt it a bit.  There is no

 5   need for a lawsuit.  The motion to dismiss is denied.

 6          Now let's go to the other lawsuit.  This is against

 7   the republic and Chevron or just Chevron?

 8          MR. HARRIS:  There are two different lawsuits.  One is

 9   against the Republic of Argentina for violation of the bylaws

10   for failing to make a tender offer.  There is a separate

11   lawsuit against Chevron for its tortious acts, which Mr. Broome

12   from Quinn Emanuel is handling.  I don't know which you would

13   prefer to discuss first.

14          THE COURT:  Let's discuss the Chevron.  No, let's

15   discuss the suit against the republic.  Are you going to handle

16   that?

17          MR. HARRIS:  Yes, your Honor.

18          THE COURT:  OK.

19          MR. HARRIS:  This lawsuit is a lawsuit based on a

20   contractual requirement in YPF's bylaws that was implemented in

21   1993, when the republic decided to take YPF public.  To

22   encourage investors to purchase shares, they included a

23   provision in the bylaws that provided that if anyone, and in

24   particular if the republic, were to attempt to take control of

25   YPF again, it provided an exit mechanism for shareholders, that

1    the republic would be required to make a tender offer for all

2    the shares.  The reason for this was because people don't want

3    to invest in a government-controlled company that may not have

4    the same interests and profit motives that a private company

5    does.

6            So, to encourage people to invest, they included this

7    contractual requirement in the bylaws that is triggered, and

8    there is a whole separate section, section 28 of the bylaws,

9    specific to an acquisition of control or of possession of the

10   shares by Argentina exactly that triggers this bylaw

11   requirement to make a tender offer.  Since Argentina has

12   indisputably taken control of the shares, and is no dispute

13   about that, the bylaw requirement has been triggered and they

14   are required to make a tender offer.

15           This lawsuit is a class action on behalf of the 49

16   percent of the shares that are not subject to the

17   expropriation.  It is not dealing with the shares that

18   Argentina is expropriating.  It is dealing with the remaining

19   minority shares and is seeking to require Argentina to comply

20   with its contractual requirements or to provide damages for

21   failing to have done so.

22           THE COURT:  I don't completely understand what good

23   someone gets out of a tender offer under the circumstances

24   here.

25           MR. HARRIS:  Do you mean because Argentina may choose

 1   not to comply with yet another U.S. order?

 2           THE COURT:  No, I'm not talking about that.  What

 3   would a tender offer do?

 4           MR. HARRIS:  What is important here is in a tender

 5   offer, the bylaws have in it a formula for what is the price

 6   that the shares will be acquired at.  That price is much higher

 7   than the current now-depressed trading price of the YPF shares.

 8   It is based on a number of factors, but essentially, among

 9   other things, it looks at the pre-expropriation price.

10           What it is intended to do is to give these minority

11   shareholders a chance to exit at the price before the price was

12   driven down by the government having seized control.  It would

13   give them essentially a lot of money and would recoup some of

14   the damages that they have suffered as a result of Argentina

15   taking control of YPF.

16           THE COURT:  The tender offer doesn't allow Repsol to

17   stay in?

18           MR. HARRIS:  That's correct, and this lawsuit does not

19   challenge the expropriation in any way.  It does not challenge

20   Argentina's control of the shares.  All it does is seek to the

21   obtain contractually required compensation for Repsol and the

22   other minority shareholders who have a contractually required

23   right to an exit at a certain calculated price under the

24   bylaws.

25           THE COURT:  So it is a class action.  Is Repsol part

1    of the class?

2         MR. HARRIS:  Repsol is part of the class because

3    Repsol owned more than the 51 percent that is subject to the

4    expropriation.  Repsol owned other shares above 51 percent.  In

5    that class action, we represent Repsol and the other lead

6    plaintiff, Texas Yale as well, as representatives on behalf of

7    the class of all of the minority, the 49 percent that has not

8    been subject to expropriation.

9         THE COURT:  The tender offer would be made by?

10        MR. HARRIS:  It would be made by the Republic of

11   Argentina.  It would be made through several mechanisms, but

12   they include publication of the offer in a newspaper in New

13   York and various other mechanisms to communicate the offer to

14   all the holders of this class of shares.  All of that is laid

15   out in the bylaws.

16        THE COURT:  The bylaws of YPF?

17        MR. HARRIS:  That's correct.

18        THE COURT:  You are saying that due to the

19   expropriation, the republic has committed some act which

20   invokes the bylaws of YPF?

21        MR. HARRIS:  That's right, the expropriation and this

22   related action called the temporary occupation, which is where

23   they seize control even before they have legally acquired the

24   shares.  Having seized control and the rights associated with

25   the shares, that then triggers the bylaw requirement to make a

1    tender offer for all the shares.  The litigation does not seek

2    to stop the expropriation or seek to stop Argentina's control.

3    It is just seeking on behalf of the remaining 49 percent to

4    have this tender offer made.

5            THE COURT:  You seek injunctive relief against the

6    republic, right?

7            MR. HARRIS:  Injunctive relief to require the tender

8    offer.  Also, alternatively, damages for the failure to make

9    the tender offer.

10           THE COURT:  There is this thing called the Foreign

11   Sovereign Immunities Act.  How do you get around that?

12           MR. HARRIS:  Excellent question.  We fit under two

13   prongs of the commercial activity prong.  The first prong has

14   to do with actions in the United States.  Here what was

15   required to happen was Argentina was required to make a tender

16   offer in the United States to the U.S. holders of the ADSs that

17   are registered on the New York Stock Exchange.

18           The various mechanisms that are specified in the

19   bylaws require the tender offer to occur in the United States

20   for the U.S. shareholders.  The bylaws themselves recognize

21   that the tender offer occurs outside Argentina.  It talks about

22   when you make the tender offer, there are requirements of the

23   various jurisdictions, plural, where the tender offer occurs,

24   the requirements of those stock exchanges will apply.

25           At least for our class, the class of holders of U.S.

 1    registered ADSs, that tender offer would have occurred in the

 2    U.S.  A tender offer is inherently a commercial activity.  They

 3    failed to make that tender offer.  That is an omission, a

 4    commercial action that should have happened in the U.S.  So

 5    that satisfies the first prong of the commercial exception,

 6    which is for commercial activity in the U.S.

 7            It also satisfies the third prong, which is commercial

 8    activity abroad that has an impact in the U.S.  This whole

 9    course of conduct -- registering the shares, making the

10    original IPO both in the U.S. and Argentina, and now various

11    actions in Argentina, as well where part of the tender offer

12    would take place, that occurs, parts of it, in Argentina as

13    well -- those are also commercial activities, and some of them

14    occur in Argentina.  I don't think there is any dispute that

15    there are activities related to this lawsuit that occurred in

16    Argentina.  So the only real question is whether this has a

17    direct impact on the U.S.

18            There is a clear line of cases saying that if you fail

19    to perform a required action in the U.S., that satisfies that

20    third prong for a direct impact.  The required action that

21    should have happened is both a tender offer and also, if

22    shareholders were accept the tender, payment of money to them

23    in the U.S.  So there are a couple of impacts on the U.S. that

24    satisfy the third prong as well.

25            THE COURT:  Let's look specifically at the language of

 1    the Foreign Sovereign Immunities Act.  I should have brought

 2    the book up.  Is it quoted in the briefs?

 3              MR. HARRIS:  It is, your Honor.  I don't know if you

 4    are looking at our memorandum of law in opposition.  If you

 5    have that one in front of you, the language is on page 3 and 4.

 6    The footnote at the bottom of 4 has the full text, although it

 7    is small type.

 8              THE COURT:  Footnote at the bottom of what?

 9              MR. HARRIS:  Of page 4.

10              THE COURT:  I don't see a footnote.

11              MR. HARRIS:  Are you looking at plaintiff's memorandum

12    of law or the defendant's memorandum of law?

13              THE COURT:  I'm looking at the plaintiff's.  I have

14    the papers in order and I have a brief called memorandum of law

15    in opposition Latham & Watkins.

16              MR. HARRIS:  Yes, your Honor, that is our brief.

17              THE COURT:  I have a page 4 which has a heading at the

18    bottom "A.  Defendant's beneficial ownership," and so forth.

19    Am I in the right brief or not?  Maybe I'm not.

20              MR. KOLBE:  Your Honor, we are looking at the brief,

21    plaintiff's opposition to defendant's motion to dismiss in case

22    12-3877.  If you look at the stamp from ECF at the top of the

23    brief, it is document 16.

24              MR. HARRIS:  I think the brief that talks about

25    beneficial ownership, that brief is from the prior case we

1   talked about, the 13(d) case.

2            THE COURT:  That's right.  We are in a transition in

3   our office, and I think we don't quite have everything up here.

4            MR. HARRIS:  We have a clean copy of the plaintiff's

5   brief.

6            THE COURT:  Good.  I've got the brief.  Go ahead.  I

7   wanted to focus on the language of the Foreign Sovereign

8   Immunities Act.

9            MR. HARRIS:  If you turn to page 4 of the brief, does

10  that have the footnote at the bottom?

11           THE COURT:  Yes, it does.  What is the language you

12  are relying on?

13           MR. HARRIS:  If you look at 1605(a)(2), it has three

14  clauses in it.  We are relying on the first and the third

15  clauses.  The first clause is in which the action is based upon

16  the commercial activity carried on in the United States by the

17  foreign state.  That is the first clause.  Then also the third

18  clause, which starts on the third line of that and says, "or

19  upon an act outside the territory of the United States in

20  connection with the commercial activity of the foreign state

21  elsewhere and that act causes a direct effect in the United

22  States."

23           We are relying on the first, commercial activity in

24  the United States, and the third, an act outside the territory

25  of the United States that causes a direct effect in the United

1    States.

2              THE COURT:  Again, what is the commercial activity

3    carried on in the United States?

4              MR. HARRIS:  There are two.  Under that first clause

5    it is satisfied either if there is a course of conduct that is

6    commercial or if the specific transaction at issue is

7    commercial.  Both of those are satisfied here.

8              The course of conduct here is the Republic of

9    Argentina's decision to privatize YPF through a U.S. offering

10   in which the majority of the shares were sold in the U.S. to

11   make YPF a U.S. registered company and then to take back

12   control of this U.S. registered company and, as part of that,

13   taking back control of many of the shares that are registered

14   in the U.S. as well.  That is the course of conduct.  There are

15   many cases saying that accessing the U.S. markets is a

16   commercial activity carried on in the U.S.

17             THE COURT:  Accessing the stock market?

18             MR. HARRIS:  Yes.

19             THE COURT:  Go ahead.

20             MR. HARRIS:  The second reason we satisfy it is the

21   particular action at issue in a lawsuit is also commercial.

22   This lawsuit is about an omission, and that is a failure to

23   make a tender offer, a contractually required tender offer.  A

24   tender offer is inherently commercial in nature.  It is

25   something that private and public companies, any, can do.

1   There is nothing inherently sovereign about it.  It is

2   commercial activity.  So the Omission here, the particular act

3   in question, was also a commercial action.  Both of those

4   satisfy the requirement for an action in the U.S.

5           The dispute we have with the defendant here is on the

6   second part, the particular action at issue, whether the action

7   is the failure to make a tender offer or Argentina's decision

8   not to make the tender offer.  The Republic of Argentina said

9   the relevant issue is its decision and that decision occurred

10  in Argentina.  But that is not what this lawsuit is about.  Its

11  decision-making process is simply irrelevant to our breach of

12  contract dispute.

13          The reason why the contract was breached was because

14  Argentina didn't take an action, it failed to act, and that

15  action was supposed to be in the U.S.  That was to make a

16  tender offer through making publication in the New York

17  newspapers, through making a tender offer on the New York Stock

18  Exchange to purchase securities.  That omission occurred until

19  the U.S. regardless of where its decision occurred.  Those are

20  the actions, both the course of conduct and the specific

21  action, that occurred in the U.S. and that were commercial

22  activity.

23          THE COURT:  Why don't you go ahead and finish.

24          MR. HARRIS:  The other reason why we satisfied the

25  Foreign Sovereign Immunity Act is because of the third prong,

1    which is commercial activity abroad.  Again, there was both a

2    whole course of conduct that was commercial in deciding to take

3    YPF public and that occurred in Argentina as well, and then

4    deciding not to make a tender offer in Argentina as well for

5    the Argentine shareholders.  Both of those satisfy.  Those are

6    both commercial activity that occurred abroad.  I don't think

7    there is any dispute that those activities happened, they are

8    commercial, and they occurred abroad.

9         The real question is whether this satisfies the direct

10   effect component.  The Supreme Court has held, this is in the

11   Weltover case, that where a sovereign fails to perform an act

12   required to take place in the United States, that necessarily

13   has a direct effect in the United States.  That is the Weltover

14   case.  There are Second Circuit cases, like Commercial Bank of

15   Kuwait, that also follow that.

16        Here, their failure to make a tender offer had two

17   direct effects.  The first is they failed to make the tender in

18   the U.S. by publishing the offer in New York newspapers, by

19   filing the offer with the New York Stock Exchange, by filing

20   the offer with the SEC.  All of those are explicitly required

21   in the bylaws as part of the tender offer.  So that is the

22   tender offer that was supposed to be in the U.S.

23        It also, in addition to failing to make the tender

24   offer in the U.S., had the effect that U.S. shareholders aren't

25   getting paid the money they would get if they had chosen to

1    accept the tender offer.  Both of those are a direct effect in

2    the United States under Weltover.

3         The only other thing I would add on that is the bylaws

4    themselves recognize that the tender offer occurs outside of

5    Argentina.  It occurs where the tender itself takes place.

6    That is because the bylaws themselves say that in order to

7    determine how you make a tender offer, you look at the stock

8    exchange requirements of all the jurisdictions, plural, where

9    the tender offer takes place.  That is inherently a recognition

10   in the bylaws themselves that the tender offer isn't in

11   Argentina, it is wherever the shareholders are.

12        THE COURT:  What you are essentially doing is making

13   arguments in opposition to the motion to dismiss, right?

14        MR. HARRIS:  Yes, your Honor.

15        THE COURT:  Let's have the argument in favor of the

16   motion to dismiss this case against the republic.

17        MR. SCARVALONE:  Your Honor, we argue immunity under

18   the Foreign Sovereign Immunities Act.  We argue the Act of

19   State doctrine.  We argue improper venue.  We argue forum non

20   conveniens.  We also argue under the language of the bylaws.

21   We argue that the complaint does not state a claim, because the

22   bylaws don't stand for the propositions that Repsol says they

23   stand for.

24        Shall I turn first to the immunity argument, your

25   Honor?

 1          THE COURT:  Sure.

 2          MR. SCARVALONE:  Your Honor, much of what counsel has

 3     spoken about in terms of what the case is based upon concerns

 4     actions in the early '90s in connection with the IPO that you

 5     have heard about this morning.  Plainly, the complaint is not

 6     based upon an IPO that took place in the early '90s.  It is

 7     based upon an expropriation that was announced last year and

 8     that is ongoing.

 9          Shares have not yet been acquired by Argentina,

10     although Argentina does have control of those shares.  There is

11     an ongoing process that will result eventually in the

12     acquisition of shares.  That acquisition has not happened yet.

13     And the bylaws, in particular the tender offer obligation that

14     Repsol has raised, is triggered by an acquisition.  It is not

15     triggered by control or a change of control.  It is triggered

16     by an acquisition that has not happened yet.

17          THE COURT:  Why hasn't it happened?

18          MR. SCARVALONE:  Because, your Honor, what Argentina

19     has announced is an intention to acquire shares.  That is

20     indeed how the complaint refers to it.  There has been

21     announced an intention to acquire shares.  That acquisition

22     only takes place after a valuation has been done that

23     determines what is the value of the expropriated property.

24     Then, upon determination of the value, the property owner, in

25     this case Repsol, would be compensated for the value of the

1    property that the republic is expropriating.  Until that

2    payment has been made, ownership still resides in Repsol.

3         THE COURT:  It seems to me that is a supertechnical

4    argument.  Let's pass that.

5         MR. SCARVALONE:  That is an argument arising from the

6    language of the bylaws.  I jumped the gun.  Let me back to

7    immunity, your Honor.

8         Your Honor, both our Court of Appeals and the Court of

9    Appeals in the D.C. Circuit in a case called Rong, which we

10   cite in our brief, have held that obligations that arise from

11   the exercise of sovereign power, such as expropriation, such as

12   borrowing from the World Bank, from the IMF, which is something

13   only a sovereign can do, obligations that arise in those

14   uniquely sovereign contexts are not actionable as commercial

15   activity.

16        That is not just in the Rong case that I mentioned,

17   but one of the bond cases that went up to the Second Circuit,

18   EM Ltd. v. Republic of Argentina, at 473 F.3d, which involved

19   whether the republic's repayment obligation under an IMF

20   borrowing vehicle, whether that repayment obligation was

21   commercial activity.  The circuit said no, it isn't.

22        And you know why it isn't?  It's because that

23   repayment obligation is something only a sovereign can get

24   involved in.  Only a sovereign can borrow from the World Bank.

25   Only a sovereign can expropriate property.  Obligations that

1    arise from expropriation of property are not actionable as

2    commercial activity, and for good reason, your Honor.

3         The Sovereign Immunities Act already has an

4    expropriation exception.  It is in section 1605(a)(3), where

5    Congress set out many examples of activities that are excepted

6    from sovereign immunity.  Just as there is a commercial

7    activity exception, there is also an expropriation exception.

8    Congress thought long and hard about what the scope of that

9    exception would be.  Lo and behold, it doesn't cover this.

10        THE COURT:  What does it cover?

11        MR. SCARVALONE:  It covers expropriation of property

12   not in conformance with international norms.  What that has

13   been construed to mean is expropriation that is without

14   process, expropriation that is not accompanied by a declaration

15   of public need or legislation, which is what we have here.

16        Argentina didn't just wake up one day and grab shares

17   of stock.  There was an executive decree that declared the

18   public interest in the republic controlling YPF, which the

19   nation depends on for the supply of fossil fuels.  That

20   executive degree was followed in short order by legislation,

21   law number 26,741, passed by the Argentine Congress that

22   declares this 51 percent of YPF shares subject to expropriation

23   and declares also that the valuation and all that expropriation

24   process will occur pursuant to existing Argentine law about

25   expropriation of property, much in the way the United States

1   has statutes on the books that regulate how the United States

2   can go about condemning property, acquiring property to build

3   highways, to build courthouses and the like.

4          That is one point that I think is important for your

5   Honor to focus on, appellate authorities that say that

6   obligations that arise from the exercise of sovereign power,

7   like an expropriation, are not actionable as commercial

8   activity.

9          THE COURT:  What is excepted, in other words, if there

10  is a process and compensation, and so forth, that is not an

11  expropriation which can be sued on, right?

12         MR. SCARVALONE:  Correct.  Under the expropriation

13  exception of the statute, that can't be sued on.  That is

14  presumably why plaintiffs in the class action, putative class

15  action lawsuit, have not argued that the conduct falls within

16  the expropriation exception.  They are only arguing under the

17  commercial activities exception.

18         One of our points that we briefed is that commercial

19  obligations, such as obligations under bylaws, are not

20  actionable under the commercial activity exception, because

21  they arise from sovereign power, the exercise of sovereign

22  power.  The statute, in particular this exception, draws a

23  clear distinction between the exercise of sovereign power,

24  which is not actionable, and the exercise of commercial

25  authority, which can be actionable if it fits within one of the

1    clauses that your Honor has reviewed with counsel this morning.

2            THE COURT:  The expropriation is what really triggered

3    the whole thing.  The plaintiffs are relying very heavily on

4    the bylaw provision as, in effect, being part of a contract.

5    The bylaw requirement is there.  Why isn't the bylaw

6    requirement, the placing of the bylaw requirement -- the bylaw

7    requirement is a bylaw of YPF, right?

8            MR. SCARVALONE:  Correct.

9            THE COURT:  Let's assume for the moment that the

10   expropriation either has taken place or it is going to take

11   place and that is a fact of life.  Is it not correct that the

12   acquisition of 51 percent by the republic does under the

13   literal terms of the bylaw trigger the bylaw?

14           MR. SCARVALONE:  The bylaws only apply to purchases of

15   stock.  It does not by its terms -- we are talking about the

16   tender offer obligation here, correct?

17           THE COURT:  Yes.

18           MR. SCARVALONE:  The tender offer obligation does not

19   apply to expropriations.  If it did, it would have said so.

20   Our expert Javier Errecondo cites in his affidavit and attaches

21   as an example a financial instrument of YPF, namely, a bond

22   issuance from 1998, in which the bond issuance plainly

23   differentiates between expropriations and acquisitions.  It

24   specifically references the expropriation possibility and what

25   may happen in the event of expropriation.  These bylaws don't

1    do that, your Honor.

2         THE COURT:  Can we look at the bylaw?  Is the bylaw

3    quoted somewhere?

4         MR. SCARVALONE:  The bylaws are quoted in part

5    throughout the parties' briefs.  They are also attached as an

6    exhibit to my moving declaration as Exhibit E.  I don't know if

7    your Honor has that.

8         THE COURT:  Would it be possible to hand me a copy of

9    the relevant language?

10        MR. BROOME:  I have a copy, your Honor.  Actually, I

11   don't have a clean copy.

12        MR. HARRIS:  Here is one.

13        THE COURT:  Where is the relevant language of the

14   bylaw?

15        MR. SCARVALONE:  The provisions that the parties cite

16   are bylaw section 7 and also section 28, which should be at or

17   about the last page of the bylaws.

18        THE COURT:  Section 7, what is the relevant language?

19        MR. SCARVALONE:  In section 7, your Honor, section

20   7(d) refers to takeover and reads, "If the terms of subsections

21   (e) and (f)" of this section "are not complied with, it shall

22   be forbidden to acquire shares for securities of the

23   corporation, whether directly or indirectly, by any means,"

24   etc., and I'm skipping down, "if as a result of such

25   acquisition the purchaser becomes the holder of or exercises

1    control of the class D shares of stock of the company."

2        THE COURT:  What is the language you are relying on?

3        MR. SCARVALONE:  In part, your Honor, I am relying on

4    that language because we are not a purchaser.  There is no

5    reference to expropriation and we are not a purchaser.

6        THE COURT:  Isn't the key word "acquire"?

7        MR. SCARVALONE:  Correct, to acquire shares, which we

8    have not done yet.  The complaint concedes we have not done

9    that yet.  The complaint concedes we have announced an

10   intention to acquire.

11       THE COURT:  Let's pass that.  Let's assume this goes

12   through.  There is no use to adjourn until six weeks from now,

13   after the thing has all gone through.  Let's assume it goes

14   through.  Is it not an acquiring?  I see the word "acquire."

15       MR. SCARVALONE:  Later on, your Honor, in the passage

16   that I read, it equates acquisition with purchase.

17       THE COURT:  Where is that, please?

18       MR. SCARVALONE:  That is at the end of the fourth

19   line, the clause beginning with the word "if," "if as a result

20   of such acquisition the purchaser becomes the holder of or

21   exercises control of class D shares of stock."

22       Where the parties disagree, your Honor, is that

23   plaintiffs argue that the mere exercise of control triggers the

24   tender offer obligation.  We argue, by contrast, that the

25   bylaws' repeated references to acquisition and to purchase,

 1    which also appear in section 28, make clear that the tender

 2    offer obligation only applies in connection with your classic

 3    corporate takeover via acquisition of stock, which is not what

 4    we have here.  We have expropriation.

 5         THE COURT:  What is the relevant language in section

 6    28?

 7         MR. SCARVALONE:  Section 28(a) begins, "The provisions

 8    of subsections (e) and (f) of section 7 shall apply to all

 9    acquisitions made by the national government, whether directly

10    or indirectly, by any means or instrument, of shares or

11    securities of the corporation."  Again the word "acquisition,"

12    which section 7 previously equated to purchase.

13         THE COURT:  It seems to me if there is a narrowing in

14    7, 28 is somewhat broader.

15         MR. SCARVALONE:  We would argue that you can't read

16    section 28 in isolation from section 7.  If section 7 uses

17    "acquisition "in a particular way and equates it with purchase,

18    it would be illogical to read the word "acquisition"

19    differently in section 28.

20         THE COURT:  I don't really agree with that.

21    Acquisitions by the national government can take unique forms,

22    as they did here.  The real problem I have is that I think the

23    case law and actually the meaning of the statute, it is

24    difficult for me to see how the failure to make a tender offer

25    is commercial activity.  I think the cases go against that

```
 1    idea.  Right?

 2              MR. SCARVALONE:  Your Honor, I would also submit that

 3    in the case of a so-called failure --

 4              THE COURT:  You have cited cases against that whole

 5    proposition.

 6              MR. SCARVALONE:  Right.  And there are cases that say

 7    the failure to act or decision not to act is not something that

 8    takes place here in the U.S., it takes place in the foreign

 9    country.

10              THE COURT:  I think we had better finish argument on

11    this motion on this case.  Unless somebody else has somebody to

12    add, I will simply reserve decision.

13              MR. SCARVALONE:  Your Honor, I could briefly address

14    the other issues if you would like, and I can do it in five

15    minutes' time, too.

16              THE COURT:  Please.

17              MR. SCARVALONE:  We also argue the Act of State

18    doctrine, which Chevron argues at some length in their motion,

19    so I will summarize it very briefly.  The Act of State doctrine

20    prevents a U.S. court from ruling on the validity or invalidity

21    of a sovereign action that takes place within the sovereign

22    country.  We argue this is a straightforward application of

23    that doctrine.

24              What the plaintiffs are asking this Court to rule on

25    is the validity or invalidity of the Argentine government
```

1   deciding either not to do a tender offer or, in the 13(d) case,

2   not to make a disclosure under the securities laws.  There is

3   no question that that is something that takes place within the

4   foreign state, the Act of State doctrine applies.

5         THE COURT:  I am a little bit confused by what you are

6   arguing.  I thought the act of state that you were talking

7   about was the expropriation.  Isn't that the act of state?

8         MR. SCARVALONE:  Yes.  The expropriation --

9         THE COURT:  Please put aside anything that has to do

10  with the different stages of the acquisition.  Put it aside.

11        MR. SCARVALONE:  I can do that.

12        THE COURT:  Let's assume it is a done deal.  Now, as a

13  done deal, is that an act of state or not?

14        MR. SCARVALONE:  It falls within the Act of State

15  doctrine because what they are challenging is the decision of

16  the Argentine government to acquire control of YPF by means of

17  an expropriation without at the same time doing a tender offer

18  for the remaining shares.  The Argentine government made a

19  decision not to acquire or seek to acquire 100 percent of the

20  YPF shares.  They determined to acquire 51 percent and no more.

21  That's what the legislation says.

22        What Repsol and plaintiffs are doing, in effect, is

23  challenging the republic's decision to expropriate without at

24  the same time acquiring the remaining 49 percent by way of

25  tender offer.  That falls squarely within the Act of State

 1   doctrine.

 2          Your Honor, we also have provided your Honor arguments

 3   in cases regarding the doctrine of forum non conveniens.

 4   Plaintiffs are litigating this very same issue having to do

 5   with how to construe the bylaws in Argentina.  There are at

 6   least three different lawsuits pending right now that Repsol

 7   has brought that are pending in Argentina that raise this very

 8   claim, namely, whether the bylaws require the making of a

 9   tender offer.

10          Therefore, what we have here is a serious potential of

11   duplicative litigation, a court in New York being asked to rule

12   on the same bylaws provision that courts in Argentina are being

13   asked to rule on.  The cases have decided, and we cite in our

14   brief a case from this Court, where that precise risk of

15   duplicative litigation and inconsistent rulings is grounds that

16   tip the balance in favor of a forum non conveniens dismissal,

17   as well as the other classic forum non conveniens arguments.

18   Namely, Argentina plainly has a much more serious interest in

19   determining the application of its law relative to the

20   expropriation process and to whether or not the bylaws

21   obligation survives the expropriation process.

22          Our expert, Javier Errecondo, concludes in his

23   affidavit, which we submitted on reply, that Argentine law

24   prevents the bylaws obligation from trumping the expropriation

25   process.  In other words, the bylaws obligation has to yield to

1    the republic's exercise of sovereign power in the legislation.

2    That is an issue of Argentine law pending before the Argentine

3    courts.

4            Given the size of the public controversy, it is

5    something that is uniquely well served for the Argentine courts

6    to decide.  In much the same way that when the United States

7    makes major economic decisions within the country, such as

8    nationalizing the steel industry or rescuing the auto industry

9    a few years ago, it would strike us all as odd that that

10   decision would be litigated in Belgium or France or Germany or

11   some other country that might have some arguable interest in

12   the resolution of those issues.  Those issues were best decided

13   in Argentina.

14           There is also the classic private interest factors the

15   courts weigh in forum non conveniens dismissal, where access to

16   proof is much greater in Argentina than it is here.  The

17   documents are all in Spanish.  The witnesses are all Spanish

18   speakers.  The ability of U.S. courts to compel unwilling

19   witnesses, such as former employees either of YPF or Repsol or

20   the republic, those powers exist in Argentina but not here.

21           There is a whole confluence of factors that tip the

22   balance in favor of litigating the case in Argentina, the

23   preeminent one being the risk of inconsistent decisions between

24   a New York court and an Argentina court on how the bylaws

25   should be interpreted.

```
 1              THE COURT:  Any reply?

 2              MR. HARRIS:  Very briefly, your Honor.  On the Foreign

 3    Sovereign Immunities Act, we are not challenging the

 4    expropriation.  Your decision here will have no effect on

 5    whether the shares were expropriated.  It will have no effect

 6    on whether Argentina controls YPF.  All we are talking about is

 7    a contractual requirement.  No one disputes there is a

 8    contractual requirement that is triggered by acquiring control.

 9              And there is nothing sovereign about making a tender

10    offer or not.  In fact, the whole purpose of these bylaws, of

11    article 28 of them, was to tell people that if Argentina takes

12    control, they will have this contractual requirement.  It is

13    quite ironic for Argentina now to try and evade a bylaw

14    requirement that it put into effect in the 1993 IPO to

15    encourage U.S. investors, to now say, oh, I'm sorry, we are

16    immune, sorry, we told you that we have this right, but now we

17    are immune.

18              What we are looking at is a commercial requirement to

19    make a tender offer.  The fact that it is an omission, that

20    this is about their failure to make the tender offer rather

21    than them actually having made the tender offer, that doesn't

22    render it not commercial.  You can look at the Brocca case that

23    we cite where the court said that the failure to make a

24    required disclosure was commercial activity, or Weltover, which

25    was failure to make payments.
```

1          The mere fact that you choose not to comply with your

2     contracts doesn't mean it is not a contractual commercial

3     requirement.  They should have made a tender offer in the U.S.

4     according to explicit terms of the bylaws.  They didn't do so.

5     That is commercial activity.

6          On the Act of State doctrine, again, we are not

7     challenging the decision to expropriate.  It simply cannot be

8     the case that once you take over a company, everything

9     contractually that follows is still a sovereign decision.  That

10    is just not the case.  Otherwise, once you appropriate a

11    company, you can just decide to not make payments, you can

12    decide not to follow guarantees, you can decide to do anything.

13    That tautology is not the Act of State doctrine.

14         You look at the actual actions that are supposed to be

15    taken at this point and ask whether those actions are

16    commercial.  It is not just the expropriation that you look at.

17    You look at what happened after.  What we are challenging here

18    is not the expropriation.  It is whether they are now supposed

19    to follow the contractual requirements they imposed in 1993 to

20    make a tender offer.

21         On forum non conveniens, we are not litigating this

22    issue in Argentina.  Repsol has not filed any lawsuit on behalf

23    of anyone seeking compensation for the shares or for the 49

24    percent of shares.  What has been filed is a lawsuit against

25    YPF, not Argentina, that just seeks to void the shareholder

1    votes that were taken.  That is a different defendant, that is

2    a different remedy.  There is no lawsuit in Argentina in which

3    Repsol has sought to obtain a tender offer or other

4    compensation for these shares.  It is just not true.

5         The last thing I would say is on the tender offer

6    requirement itself, the republic says, well, it doesn't apply

7    to expropriation.  They focused you on article 7.  But if you

8    look at section 28, the portion that your Honor directed them

9    to, this is explicitly about acquisitions by the national

10   government.

11        It is written as broadly as possible.  It talks about

12   all acquisitions made by the national government "by any

13   means."  It could not have been more broad or more an attempt

14   to encompass any kind of acquisition.  It is not limited to

15   private acquisitions or expropriations.  The whole purpose of

16   this was to protect private investors in case Argentina came

17   back and took over, and that is what it did.

18        The other thing I would say on this, they are argue

19   what does the term "acquisition" mean?  I think that is what

20   this particular issue is about.  Does "acquisition" mean you

21   have acquired legal title?  That is their position.  Or does it

22   mean other things as well?  Is it satisfied if you acquire

23   ownership?  I would say two things about that.

24        One is section 28 explicitly answers that question.

25   It says "Acquisitions.  If as a consequence of such acquisition

1    the national government becomes the owner or exercises the

2    control of the shares."  If "acquisition" meant what they said

3    it means, just becoming the owner, this whole clause would be

4    irrelevant and redundant.  Instead, "acquisition" is a broad

5    term that is satisfied by either becoming the legal owner or

6    assuming control.  That is what the bylaws say.

7          Even if there was an ambiguity, if you didn't know

8    what the term "acquisition" means in Argentina law, we

9    submitted an expert declaration from a former Argentina judge

10   that explained "acquisition" is a broad term, it is not limited

11   to obtaining legal indictment, it is also satisfied by

12   obtaining control.  And they admit they have obtained control

13   of shares already.  Or obtaining the rights associated with an

14   object, and they admit they have obtained all the rights

15   associated with the shares.

16         THE COURT:  What is specified as to where and how the

17   tender offer is to be made?

18         MR. HARRIS:  The bylaws in section 7(f), I believe,

19   say a number of things showing where the tender offer was to

20   take place.

21         THE COURT:  Where is it to take place?

22         MR. HARRIS:  Among the things that they are required

23   to do is publish the tender offer in the major newspapers of

24   the City of New York.  They are also required to provide the

25   tender materials to the New York Stock Exchange and to provide

1    the tender materials to the SEC.  Under U.S. law a tender

2    occurs where the information is distributed, where people are

3    located.

4         The tender offer itself occurs in many places because

5    the shareholders are in many places.  But one of the places is

6    the U.S., and New York City in particular, where under the

7    explicit terms of the bylaws it is supposed to be published in

8    New York City newspapers and it is supposed to be provided to

9    the New York Stock Exchange.

10        The other thing I would say on this is that the bylaws

11   themselves recognize that the tender offer does not occur in

12   Argentina, where YPF is.  But the tender offer occurs in many

13   places.  How do we know that?  If you look at 7(f), it says,

14   "Each takeover bid shall be conducted in accordance with the

15   procedures herein stipulated and to the extent that applicable

16   regulations in the jurisdictions," plural, "where the takeover

17   bid takes place."

18        The bylaws themselves, by using a plural term for

19   "jurisdictions" where the takeover bid takes place, they

20   recognize, which is consistent with U.S. law, that a takeover

21   bid takes place where the people who are making the tender are.

22   That's why the tender is supposed to have occurred in the U.S.,

23   because that is where the shareholders that are our class are,

24   that's where the New York City press article was supposed to be

25   published, that is where the New York Stock Exchange was

```
 1    supposed to receive the tender materials, and that is where the

 2    SEC was supposed to receive those materials.  All that is

 3    explicitly laid out in section 7(f) of the bylaws.

 4              MR. SCARVALONE:  Your Honor, if I might?

 5              MR. HARRIS:  Just one other thing.  They are also

 6    supposed to submit the tender offer to The Bank of New York

 7    office here in New York.  The bylaws are clear the tender offer

 8    is going to occur in a number of places, but it explicitly

 9    includes New York and the United States.

10              MR. SCARVALONE:  Your Honor, I just have to correct

11    some oversights and misstatements, if I may.

12              THE COURT:  What?

13              MR. SCARVALONE:  I have to correct some I'm sure

14    inadvertent misstatements by counsel.  There is no reference to

15    the New York Stock Exchange in the bylaws, none.  There is no

16    reference to submissions to the SEC, none.  The only securities

17    regulator is the Argentine securities regulator.

18              THE COURT:  Where were you reading from?

19              MR. HARRIS:  It is from 7(f).  It talks about

20    applicable regulations in the jurisdictions where the takeover

21    bid takes place and the provisions of the stock exchanges where

22    the corporation's shares and securities are listed.  That is

23    the New York Stock Exchange.  That is 7(f), the second and

24    third lines of it, the provisions of the stock exchanges where

25    the corporation's shares and securities are listed.  There is
```

 1    no factual dispute that the majority of these shares are listed

 2    on the New York Stock Exchange.

 3            MR. SCARVALONE:  Your Honor, the bottom line is there

 4    is no requirement, as one would expect to find here, that an

 5    expropriation would trigger the tender offer obligation.  There

 6    is no explicit requirement that a tender offer be made in the

 7    United States.  Just general reference, as Mr. Harris

 8    indicated, to the jurisdictions where the tender offer will

 9    take place.  That is a very different animal than a requirement

10    that the tender offer be in the United States.

11            It is that distinction that takes our case out of,

12    separate and apart from, the cases that plaintiffs have cited

13    in their brief beginning with Weltover and Hanil Bank.  Those

14    cases have explicit requirements that performance would be in

15    the U.S.  That's not what we have here.

16            THE COURT:  I'm trying to find 7(f).  You are

17    referring to 7(f), right?

18            MR. HARRIS:  7(f), yes.  Have you found that section?

19            THE COURT:  Let me try to find 7(f).  What is the

20    language that starts 7(f)?

21            MR. HARRIS:  "Takeover bid," and then a colon.

22            THE COURT:  Right.  It is not very well printed here.

23    What is the language you are relying on as far as place?

24            MR. HARRIS:  There are several things in here.  One

25    would be at the end of the first line.  "Each takeover bid

1   shall be conducted with the procedure herein stipulated and to

2   the extent that applicable regulations in the jurisdictions,"

3   plural, "where the takeover bid takes place."

4          So it is recognizing it is not just in Argentina, it

5   is in plural jurisdictions where the takeover bid takes place.

6   And the provisions of the stock exchanges where the

7   corporation's shares and securities are listed, that is the New

8   York Stock Exchange, among others, impose additional or

9   stricter requirements.

10          This recognizes a few things.  One is that the

11   takeover bid occurs in multiple jurisdictions.  It can't just

12   be where YPF is located.  And it recognizes that you have to

13   comply with the provisions of the stock exchange where the

14   shares are regulated.  That's the New York Stock Exchange.  The

15   New York Stock Exchange rules, this is New York Stock Exchange

16   Rule 311.03, requires that the offering materials be delivered

17   to the New York Stock Exchange.

18          Also, the same language we just looked at that talks

19   about the regulations and the jurisdictions, the SEC is one of

20   those jurisdictions, and the SEC also requires a filing of the

21   tender offer materials themselves.  That is SEC Rule 229.101.

22   Those are some of the things.

23          If you look further down in section (f)(iii), it says

24   they have to mail it to each shareholder.  Again there is no

25   dispute that the bulk of the shareholders here have purchased

1   shares in the New York Stock Exchange.  The bulk of the shares

2   at issue here are in the U.S.  That's (iii).  They have to mail

3   the materials to the U.S. shareholders.

4        Then, at the end of (iv), the very end of it says they

5   have to publish the materials in the business section of the

6   major newspapers of the Argentine republic, in the City of New

7   York, USA, and any other city where the shares shall be listed.

8        THE COURT:  We have to go to the other lawsuit.

9   Having lived through about eleven years of litigation about the

10  bonds and having in mind the recent Court of Appeals decision

11  which makes it clear that the republic is not complying with

12  its contractual obligations, I have to say that it seems to me

13  that under pretty plain reading, there was a bylaw or bylaws

14  plural which were a commitment and are a commitment to have a

15  tender offer.

16        Section 28 specifically talks about, sets forth,

17  provisions applicable to acquisitions by the national

18  government.  There is no way to kind of work around and get out

19  of the fact that there is going to be an acquisition or there

20  already is an acquisition.  That means that there really was a

21  bylaw provision which was, in effect, a contractual obligation

22  set up to have a tender offer.

23        What we have is, it seems to me, another instance

24  where the Republic of Argentina won't comply with its

25  contractual obligations.  It must be a habit down there.  There

 1    is an obligation here.  There may be defenses, act of state,

 2    foreign sovereign immunities, and so forth, but that really,

 3    really doesn't erase the fact that there is an obligation.

 4    There may be defenses.  The republic always has a lot of

 5    defenses.  I have heard defenses by the republic for a dozen

 6    years now.  Usually they win.

 7          But what is becoming recognized in our courts and

 8    certainly recognized in the Court of Appeals is there is a

 9    basic contractual obligation on the part of the republic, and

10    somehow that will get enforced.  That is what we have here.  We

11    have a very detailed description of what will happen if a party

12    gets to acquire a certain amount of the stock, and that thing

13    that will happen will be the tender offer.

14          Of course -- I shouldn't say of course.  I shouldn't

15    expect evil.  The republic didn't do it.  What this lawsuit is

16    about is a very simple proposition:  To get the republic to do

17    what it contracted to do.

18          I will reserve decision.  I want to go to the other

19    lawsuit about Chevron.

20          MR. BROOME:  Thank you, your Honor.  Stephen Broome

21    from Quinn Emanuel on behalf of Repsol in the Repsol against

22    Chevron matter.

23          I will start by saying that I agree with all the

24    arguments that Mr. Harris made regarding the bylaw violations

25    being separate and distinct from the expropriation.  The reason

 1    that that is important in our case is that we have asserted

 2    claims, various claims, against Chevron:  Tortious interference

 3    with the bylaws, aiding and abetting, breach of fiduciary duty

 4    for not complying with the bylaws.  We have sought declaratory

 5    and injunctive relief.  The only basis that Chevron has

 6    asserted for dismissing those claims is not that we have failed

 7    to properly or adequately allege our claims.  The sole basis

 8    that they have asserted is act of state.

 9         We really come back to the arguments that you were

10    just having or the arguments that Mr. Harris and Mr. Scarvalone

11    were just having about whether or not Argentina's breach of the

12    bylaws constitutes an act of state.  Our view, of course, is

13    that it does not.  What we are talking about here is a very

14    simple contractual matter.

15         Argentina came into this country, they launched an IPO

16    as the sole shareholder of YPF.  They said don't worry, we

17    won't expropriate your shares because we have this specific

18    tender offer requirement.  Then they changed their mind when

19    the company became incredibly profitable and said we are going

20    to expropriate it, we are taking it back, the bylaw requirement

21    doesn't apply to us anymore.

22         We have made claims against Chevron because what

23    Chevron has done, despite the fact that there has been these

24    bylaw violations and despite the fact that the bylaws make very

25    clear that shares that are expropriated --

1          THE COURT:  It seems to me the essence of your claim

2     against Chevron is tort claims for interference with business

3     relationships and contractual relationships.  Isn't that right?

4          MR. BROOME:  That's close, your Honor.  Our claim is

5     that Chevron has tortiously interfered with our rights under

6     the bylaws.  You have to remember that we are talking about an

7     energy company here.  Repsol ran this company for over a

8     decade.  When Argentina came in and forcibly removed the people

9     who were running that company, they didn't have the

10    institutional knowledge to run a company like that.  They

11    didn't have the resources or the knowledge to develop the oil

12    fields that really are the value that is at issue here, the

13    reason that Argentina made this expropriation.

14         What they did, as we allege in the complaint, is they

15    went to companies like Chevron and said we will give you a

16    better deal if you come in and you will overlook our bylaw

17    violations, we are going to expropriate the company --

18         THE COURT:  I don't understand.  What relief are you

19    seeking in this lawsuit against Chevron?  What relief are you

20    seeking?

21         MR. BROOME:  We are seeking a declaration that the

22    agreement that Chevron entered into with YPF is invalid.

23         THE COURT:  Say that again a little slower.

24         MR. BROOME:  Sorry.  We are seeking a declaration that

25    initially it was a memorandum of understanding that Chevron and

44

1   YPF had entered into is invalid because the officers and

2   directors -- sorry -- really just the officers of YPF that

3   entered into that agreement with Chevron did not have authority

4   to bind the company, because under the bylaws -- sorry. Let me

5   take a step back.

6          Those officers were appointed by Argentina, not by

7   Repsol. Argentina under the bylaws did not have authority to

8   appoint those officers, and Chevron knew that. Our allegation

9   is that that agreement should be declared invalid.

10          THE COURT:  Why didn't they have authority?

11          MR. BROOME:  The bylaw provision that we looked at

12   earlier, your Honor, in sections 7 and 28, if that bylaw

13   provision is not complied with, then it strips the holder of

14   the shares of the rights to vote or the rights to dividends.

15          In order to appoint the officers that entered into the

16   agreements with Chevron, Argentina needed the right to vote.

17   They needed the right to vote those officers into office. But

18   they didn't do that. Instead, what they did is they forcibly

19   removed the current executives that were properly appointed by

20   our client, Repsol, and they replaced them with government

21   appointees. That was a bylaw violation. That was a highly

22   publicized bylaw violation that Chevron was well aware of.

23          THE COURT:  What bylaw?  Are we back to the tender

24   offer?

25          MR. BROOME:  Yes, it relates to the tender offer

1   requirement, your Honor.  Absent a tender offer, if there is no

2   tender offer, the person who holds the shares has no right to

3   dividends and has no rights at all under the shares.

4          THE COURT:  I don't mean to be stubborn, but I think

5   your complaint alleges interference with business

6   relationships, tortious interference with business

7   relationships, doesn't it?  Isn't that one of the claims?

8          MR. BROOME:  Tortious interference with contracts,

9   your Honor, and the contract is the bylaws.  It is the third

10  claim for relief in the complaint.

11         THE COURT:  How did they tortiously interfere with the

12  bylaw?

13         MR. BROOME:  In a number of ways, your Honor.  What we

14  have alleged in the complaint is that Argentina needed a

15  partner.  Mr. Galluccio, who is the CEO of YPF now, who has

16  been appointed by Argentina, has made very clear that now that

17  they have kicked our client, Repsol, out and no longer have

18  access to Repsol's institutional knowledge as to how to run the

19  company and its other resources, financial, capital,

20  intellectual resources, it can't run the company without a

21  partner.  Chevron is that partner.

22         We have alleged that Chevron engaged in tortious

23  interference both before the expropriation by having secret

24  meetings with Argentina in which Argentina asked Chevron if

25  they would partner with Repsol if they made the expropriation,

 1   if they executed the expropriation, and after the expropriation

 2   Chevron has entered into multiple agreements despite knowing

 3   that the people with whom it is entering these agreements, the

 4   government-appointed managers of YPF, lack authority to bind

 5   the company because they are not appointed in accordance with

 6   the bylaws.

 7           THE COURT:  To get back to the bylaw -- and I'm not

 8   Repsol's attorney and I don't want to give Repsol legal advice,

 9   and I'm not trying to do that, but I'm the judge here and I'm

10   looking at the case and seeing what the claims are.  Aside from

11   the bylaw, it seems to me what Repsol is alleging as far as

12   Chevron is Repsol had a very valuable business relationship

13   with YPF, right?

14           MR. BROOME:  Repsol was the majority owner of YPF.

15           THE COURT:  I mean they did a lot of business for YPF.

16           MR. BROOME:  They were the majority owner.  They ran

17   an controlled YPF.  They appointed all the board of directors.

18           THE COURT:  I'm talking about looking for things like

19   oil.  They did a lot of work, didn't they?

20           MR. BROOME:  Absolutely, your Honor.  They invested

21   millions of dollars.

22           THE COURT:  Can we focus on that for a moment?

23           MR. BROOME:  Sure.

24           THE COURT:  Put aside for the moment the perennial

25   bylaw.  Over a period of years, aside from whether they owned

 1    51 percent or not, they were doing a lot of work for YPF,

 2    right?

 3              MR. BROOME:  That's correct, your Honor.

 4              THE COURT:  Exploring for oil, and so forth, natural

 5    gas, and so forth?

 6              MR. BROOME:  Yes.

 7              THE COURT:  They spent a lot of money, right?

 8              MR. BROOME:  They certainly did, your Honor.

 9              THE COURT:  Finally they found things, right?

10              MR. BROOME:  That's right.

11              THE COURT:  To anybody past the third grade, that is a

12    very valuable business relationship, right?

13              MR. BROOME:  Absolutely, your Honor.

14              THE COURT:  I don't know that Chevron did or did not

15    do this, but if Chevron begins to have communications that are

16    not exactly public and begins to make efforts to try to get

17    that business, is that something you are alleging?

18              MR. BROOME:  Yes.

19              THE COURT:  Forget the bylaw for a minute.  I think

20    you said and I think your papers say that Chevron entered into

21    discussions with either the head of YPF or somebody at YPF

22    about getting in there and doing this work.  Am I right?

23              MR. BROOME:  Yes.

24              THE COURT:  You are alleging that, right?

25              MR. BROOME:  Yes, your Honor.

 1          THE COURT:  Obviously, Chevron has a right to compete

 2     and YPF has a right to be dissatisfied with Repsol and has a

 3     right to get a new fellow to come in and do the exploration,

 4     and so forth, right?  But there can be circumstances where

 5     somebody doesn't compete in an aboveboard way and does it

 6     differently, and that constitutes the tort of interference with

 7     contract or interference with business relationships, right?

 8          MR. BROOME:  That's correct, your Honor.

 9          THE COURT:  You are alleging that in your claim

10     against Chevron, are you not?

11          MR. BROOME:  That's correct.

12          THE COURT:  Now let me hear from Chevron.  I don't

13     understand how there is any defense to that kind of a claim

14     based on the Act of State doctrine.  I don't understand how

15     there is any application whatever of the Act of State doctrine

16     to that kind of a claim.

17          MR. SOMMER:  Judge, the answer to your question may be

18     that there isn't, but the problem is there is no such

19     allegation in the complaint.

20          Let me take two minutes to put Chevron in context, and

21     then I will address the arguments by counsel.  Everything you

22     heard from counsel this morning for about an hour about some

23     very fascinating and difficult legal issues about how to deal

24     with the 49 percent that wasn't appropriated given the fact of

25     life that your Honor has acknowledged and whether the bylaws

1   require a tender offer or not has zero application to the case

2   against Chevron.  The case against Chevron has nothing to do

3   with that 49 percent.

4           THE COURT:  I know that.

5           MR. SOMMER:  OK.  So we are dealing with the 51

6   percent that was expropriated.  By the way, Judge, just to put

7   Repsol in context, Repsol was the majority owner of YPF.  They

8   weren't a company doing a deal here that Chevron is now doing.

9   It is just the opposite.  As the owner of YPF, Repsol invited

10  Chevron to come work with them on this particular deal.  Repsol

11  did, not the republic.  Repsol owned and controlled YPF.  They

12  invited Chevron to participate in this venture.

13          The only thing that has changed vis-a-vis Chevron is

14  the ownership of that 51 percent, which is no longer owned by

15  Repsol but, under your fact of life that that's what's going to

16  happen, is owned by the Republic of Argentina.

17          There are five claims asserted against Chevron, your

18  Honor.  I'll go right through them very quickly.  Every single

19  one of them requires your Honor to find that the Expropriation

20  Act is invalid.  That is what the Act of State doctrine teaches

21  us a court in the United States should not do.

22          Judge, what I find somewhat remarkable is that counsel

23  for Repsol sitting to your right stands up before you and says

24  Repsol is not challenging the Expropriation Act at all.  Then

25  Repsol counsel sitting to your left in his complaint is

1    challenging that exact same thing.

2           Let's take tortious interference, since that is the

3    one your Honor focused on.  What is the tortious interference

4    alleged in this complaint?  It is one thing and one thing

5    alone, Judge.  It is the allegation that Chevron somehow

6    induced YPF not to comply with the bylaws, with the tender

7    offer.  That is the only thing alleged.  What your Honor has

8    described is conduct that never happened and never is alleged.

9           Chevron didn't swoop in and somehow improperly take a

10   deal that Repsol was doing for YPF.  That never happened.  That

11   is not in the complaint at all.  That is just absolutely not

12   so.  Repsol was the majority owner of YPF.  They asked Chevron

13   to partner with YPF.  And that's all Chevron has done.  The

14   only thing that changed vis-a-vis Chevron is there was a

15   different boss in town.  It is now the Republic of Argentina.

16          But there is not the slightest allegation that Chevron

17   came in here and stole a deal from Repsol.  There is zero in

18   the complaint on that.  Counsel for Repsol should have told you

19   that three minutes ago when you asked that question.  That is

20   not in the complaint.

21          Every single one of the five claims requires your

22   Honor to find the Expropriation Act invalid.  Aiding and

23   abetting.  Your Honor instructs juries sitting over here all

24   the time about what aiding and abetting is.  It is a derivative

25   liability.  You have to find the principal to have violated

1    something first.  Here the only alleged violation is the

2    failure to comply with the bylaws.  But to find that that is a

3    violation, you have to find the Expropriation Act invalid.

4          Judge, this is the most plain-vanilla case I can think

5    of for the Act of State doctrine to apply.  Every one of these

6    claims, as I have said, would require your Honor to find the

7    act invalid.  They cannot articulate a single one that would

8    not require such a finding by your Honor.

9          To declare that the managers don't have authority

10   means that the Expropriation Act is invalid.  To declare that

11   the memorandum of understanding has no force is to declare that

12   the Expropriation Act is invalid, because it was that act

13   itself which put the managers in charge.

14         Tortious interference under New York law requires an

15   underlying breach.  What is the alleged breach?  The breach is

16   that we didn't comply with the bylaws.  But that's only a

17   breach if the Expropriation Act is invalid.  If it's valid,

18   then the conduct by YPF in dealing with Chevron is perfectly

19   lawful.

20         Think about it in these terms, Judge.  We have two

21   roads.  Road A is the bylaws route.  You have to do a tender

22   offer, that's what you said you would do, Republic, that's what

23   you said you would do.  Road B says we are now creating a new

24   mechanism for Argentina to acquire these shares, not following

25   road A, it's road B, and it is called the Expropriation Act.

1    If that act is valid, then there is no breach of contract,

2    because there is an alternative methodology now in place to

3    acquire the shares and compensate the shareholders.

4         Every one of these claims comes back to the Act of

5    State doctrine.  You cannot avoid it.  And in their opposition

6    brief and in their arguments to your Honor today, they have

7    failed to identify a single one of their claims that can be

8    determined in this court without a finding of invalidity of the

9    act.

10        They have not cited a single case that says this

11   conduct falls outside the scope of the Act of State doctrine,

12   not one.  In fact, they have done just the opposite.  They have

13   misrepresented cases to your Honor, Foreign Sovereign Immunity

14   Act cases, that have absolutely no application to the Act of

15   State doctrine.

16        I completely understand your Honor's premise that was

17   before me when I first stood up:  Could a cause of action be

18   articulated under the theory your Honor articulated if Chevron

19   swooped in and stole a deal from Repsol using improper means?

20   I imagine the answer to that question is probably yes.  But

21   nothing of the sort happened here.  Nothing is pled in the

22   complaint.

23        As I said before, I'm not trying to be unfair to

24   counsel here.  He should have told you that himself because

25   that is not part of the case.  Repsol is not some party out

1  there that had a contract with YPF.  Repsol was simply the

2  majority owner of YPF that invited Chevron to this deal.

3         Your Honor, for clarity -- I don't know what you are

4  flipping through, maybe I can help you find what you are

5  looking for -- if you look at their complaint at page 23, that

6  is the tortious interference claim.  It begins at paragraph 79,

7  but it is really paragraphs 80 and 83 that make this so clear.

8  It talks about the contract being the company's bylaws and that

9  the alleged tortious interference by Chevron was to somehow

10 induce a breach of the bylaws, not some other contract out

11 there, some mystery contract that is never once mentioned or

12 alluded to in the complaint and which as a matter of fact does

13 not exist.

14        One other point on the tortious interference, as I

15 know your Honor focused on that.  The complaint makes clear

16 that the tortious interference claim here is post-expropriation

17 conduct.  In other words, it is after the Republic of Argentina

18 has control of the company.

19        Conduct by Chevron after the fact can't be a tortious

20 interference of a contract.  In other words, under New York law

21 tortious interference requires that Chevron's conduct was a

22 substantial factor in causing the breach.  So any post-

23 expropriation conduct is irrelevant and any pre-expropriation

24 conduct again must assume -- first of all, if it is before the

25 Expropriation Act, there has been no breach at all.  Again, it

1    must assume that the act itself is invalid, and that is

2    precisely what the Act of State doctrine says this Court should

3    not do.

4              THE COURT:  I want to start with one thing, and that

5    is this.  If there is in this complaint an allegation of

6    tortious interference with contract, it is no defense to

7    Chevron, the act of state.  In other words, if there is an

8    allegation of a tort committed by Chevron, a tort committed by

9    Chevron, I emphasize that, the Act of State doctrine is not a

10   defense.

11             MR. SOMMER:  I disagree with the premise, your Honor,

12   and I'll address that very promptly if you would like.

13             THE COURT:  Just a minute.  I want to clear that out.

14   Now the question is, is there really a tort here alleged

15   against Chevron?  If we could focus on that and not on act of

16   state.  I don't want to hold this action open against Chevron

17   if there really isn't any substantial allegation against

18   Chevron about a tort committed by Chevron, but I don't want to

19   dismiss the case if there is a claim of any substance against

20   Chevron.  There has been so much discussion of the bylaw, and

21   so forth, and all these other things.  That remains to me the

22   issue.

23             I have to say that I do not find a lot of substance in

24   the idea that Chevron somehow procured the violation of a

25   bylaw.  I don't find that that is very much of a claim of

 1   substance.  I am going to go back to plaintiffs' counsel and I

 2   will tell you I will hold this action open only if you are

 3   making a claim, and I mean only if you are making a claim, that

 4   Chevron somehow committed a tort of interference with business

 5   relationships or interference with contracts, not about the

 6   carrying out of the bylaw but about the business that was being

 7   done by your client with the company.

 8          MR. BROOME:  Sure, your Honor.  One point let me make

 9   at the outset.  Chevron did not challenge the sufficiency of

10   our pleadings on the tortious interference claim, so that

11   argument, if they were to make it now, has been waived.  But we

12   have pled a tortious interference claim, which is why they

13   didn't challenge it.  You will see at paragraphs 51 and 52 of

14   the complaint we say that it was essential for Argentina to

15   know before implementing its scheme to expropriate --

16          THE COURT:  Wait a minute.

17          MR. BROOME:  Maybe start at paragraph 50 on page 15.

18          THE COURT:  I'm at 50.

19          MR. BROOME:  We allege that Chevron was aware that

20   without Repsol, YPF lacks the capability to implement a plan

21   for developing these energy assets.  Then at 51 we say it was

22   essential for Argentina to know that it would have a willing

23   business partner if it kicked Repsol out.

24          THE COURT:  I'm sorry.  It what?

25          MR. BROOME:  At 51 we say it was essential for

1   Argentina to know that it would have a major oil company, like

2   Repsol was or like Chevron is, to assist it in developing these

3   energy assets which are at issue in the vaca muerta formation.

4           Mr. Sommer said earlier that Repsol had invited

5   Chevron pre-expropriation to come participate in the

6   development of the vaca muerta.  That is true to some extent,

7   but it is not entirely true.  What happened is Repsol had asked

8   Chevron to enter into negotiations for a potential partnership.

9   Those negotiations stopped.

10          Little did Repsol know that meanwhile Chevron was also

11  having negotiations with Argentina at the same time that it was

12  having negotiations with us in which Argentina asked Chevron if

13  it would participate as a partner to develop these assets

14  without Repsol if Argentina expropriated the assets.

15          Chevron's response, what we allege, is that they

16  agreed to do that if they could get a better deal.  So, what

17  this was really about, your Honor, is Chevron getting a better

18  deal to develop these energy assets with YPF, because YPF

19  needed Chevron, than the deal it could get with our client,

20  Repsol, because Repsol didn't need Chevron.

21          Your Honor, a lot of oil companies around the world

22  have made the point that we are making here, that Chevron was

23  jumping at the chance to obtain these assets at Repsol's

24  expense at fire sale prices.  Total refused to jump at that

25  chance.  Chevron said they didn't have a problem with it.  So

 1    there is the pre-expropriation --

 2             THE COURT:  What did you just say?  Who did not have a

 3    problem?

 4             MR. BROOME:  Total, an oil company from France.

 5             THE COURT:  What about Total?

 6             MR. BROOME:  They had said that they were not going to

 7    enter into agreements with YPF after the expropriation because

 8    they didn't want to jump at the chance to get these assets at

 9    fire sale prices -- I'm paraphrasing here, of course; we have

10    the quote in our brief -- unlike Chevron.

11             THE COURT:  Where in your brief?  This is your main

12    brief in this motion?

13             MR. BROOME:  Yes, your Honor, our opposition.

14             THE COURT:  What page?

15             MR. BROOME:  It's page 8.  At the bottom of page 8

16    there is a paragraph that begins, "Chevron's willingness to

17    encourage Argentina and to give assurances that it would stand

18    by Argentina and thereby capitalize on Argentina's seizure of

19    Repsol's majority interest in YPF in violation of company's

20    bylaws is in stark contrast with that of other major players in

21    the industry.  Christophe de Margerie, the chairman and CEO of

22    Total, stated that, 'Unlike Chevron, Total is not going to take

23    advantage of Repsol and leap at assets that may well be cheaper

24    given the situation.  That's not our style.'"

25             Really the point, your Honor, is that this has been

1   highly publicized, and there has been a lot of criticism,

2   international criticism, of Chevron's willingness to do

3   business with Argentina really at Repsol's expense.

4          MR. SOMMER:  Judge, may I respond?

5          THE COURT:  It is 1 o'clock.

6          MR. SOMMER:  Two minutes, I promise.

7          THE COURT:  What I would like to do is this.  I'm

8   saying right now that in my view the Act of State doctrine is

9   not a defense to the claim against Chevron.  The real problem

10  about whether to dismiss or not to dismiss the case against

11  Chevron is whether there really is a pleading that is a

12  satisfactory allegation of tort committed by Chevron.

13         I really have to say I'm not talking about the tort of

14  somehow dealing with that bylaw.  I'm talking about basically

15  what I think you're talking about at page 8 of your brief.  But

16  we discussed so many things this morning and there has been all

17  this attention given to the bylaw.

18         What I would really like to do is to have another

19  session where the plaintiff's attorneys in the suit against

20  Chevron and Chevron's attorney will come in and address the

21  issues which I want to focus on and not talk about a lot of

22  other issues.

23         MR. SOMMER:  I think that makes a lot of good sense,

24  Judge.

25         THE COURT:  I think we have to really call it a day

1    right now as far as this argument this morning.

2            On the other issues, I am reserving decision.  I would

3    like to have you work out with my deputy clerk a time sometime

4    after the 30th of September, because I am trying to get motions

5    done, when you can come in and discuss what I am talking about

6    now.

7            MR. SOMMER:  We will find dates and contact Mr. Beale

8    and schedule that, your Honor.

9            THE COURT:  Thank you very much.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25